# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**State of Florida**, et al.                  )
                         *Plaintiffs,*        )
                                              )
        v.                                    )        **Civil Action No.** _____
                                              )
**U.S. Department of Health and**             )
**Human Services**, et al.,                   )
                         *Defendants.*        )

## DECLARATION OF MARIO R. DICKERSON, M.T.S.

I, Mario R. Dickerson, M.T.S., declare as follows:

1.      I am over 21 and I am fully competent to make this declaration.

2.      These facts are true, correct, and within my personal knowledge. If called to testify, I could and would testify competently to them.

**I.      Background on the Catholic Medical Association**

3.      I serve as the Executive Director of the Catholic Medical Association ("CMA"). CMA is the largest association of Catholic individuals in healthcare. CMA is a national, physician-led community that includes about 2500 physicians and health providers nationwide in all fields of practice.

4.      For our members, healthcare is not just a job but a sacred calling. Our members care for all people without discrimination on the basis of sex or any other characteristic prohibited by law. A patient with medical needs, such as a sore throat, broken arm, or cancer, should be given the best care possible, regardless of the patient's identity.

5.      But we cannot harm or lie to our patients. Gender-transition efforts are impermissible and dangerous. Based on the Hippocratic Oath, on science, on medical ethics, on conscience, and on our religious faith, we

categorically exclude providing medical interventions or referrals for "gender transitions," and we categorically exclude facilitating or speaking in ways that affirm their legitimacy.

6.     I am informed and aware of how the new Section 1557 OCR Rules challenged in this case would impact CMA's members in their medical practices and their exercise of religion.

7.     The OCR Rules ignore clear biological truths – to the harm of doctors and patients alike. This rule tries to force doctors do evil in order to continue doing good. The OCR Rules claim that doctors who heal must also hurt. But doctors should never be forced to lie to their patients.

8.     The OCR Rules infringe on our members in many ways. Providing, facilitating, referring for, or endorsing gender-transition efforts violates our core religious beliefs and our medical oath to "do no harm."

**A.     CMA's mission**

9.     CMA represents faithful Catholics in the healthcare field so that its members can grow in faith, maintain ethical integrity, and provide excellent healthcare in accordance with the teachings of the Catholic Church.

10.     CMA members seek to be a voice of truth spoken in charity, defending the dignity of human life and showing how Catholic teachings on the human person improve the practice of medicine. CMA is a leading national voice on applying the principles of the Catholic faith to medicine. It publishes guidance on healthcare ethics, creates educational resources and events, and develops strategies for members to provide healthcare consistent with Catholic values. CMA advocates and litigates for members' freedoms.

CMA's position paper attached as Exhibit A explains the importance of protections from mandates to perform gender-transitions.[1]

**B.      CMA's membership**

11.     CMA is a Virginia nonprofit organization. CMA members join CMA voluntarily, help finance CMA activities with dues and donations, help elect CMA leaders, and serve in CMA leadership.

12.     Our board of directors has twenty-nine medical doctors, a chaplain who is also a medical doctor, and a Catholic bishop who holds a doctorate of divinity.

13.     CMA's 2024 national conferences will be held in Orlando, Florida, as was CMA's 2021 national conference.

14.     CMA has local guilds (chapters) covering every region of the country and the military. CMA has a Florida statewide guild called the Florida Catholic Medical Association. CMA also has seven local Florida guilds, which are located in Gainesville, Miami, Orlando, Jacksonville, Palm Beach, Pensacola, and St. Petersburg/Tampa Bay.

15.     CMA members mainly are physicians. We track each member's years in practice as well as whether the member has retired from practice.

16.     We have separate membership categories for clergy, seminarians, medical students, dentists, nurse practitioners, nurses, physician assistants, other healthcare professionals, retirees, friends, and general supporters.

---

[1] Ex. A, CMA, *Conscience* (Oct. 20, 2021), https://www.cathmed.org/resources/conscience/.

### C.    My role as Executive Director

17.    I submit this declaration on my own behalf as CMA's Executive Director and on behalf of CMA as its corporate representative.

18.    I hold a bachelor's degree in philosophy and theology from St. John's University and a master's in theological studies from Washington Theological Union. I have led other nonprofit organizations. I served as a Chaplain's Assistant at the National Naval Medical Center (Bethesda, MD), ministering to patients and doctors who faced tough ethical choices. I have published on faith in the workplace and have taught courses, including "Ethics in Ministry," at St. Charles Borromeo Seminary.

19.    Given my frequent interactions with all aspects of the organization and its members, I have observed our organization's operations, membership, and views. As Executive Director, I participate in all activities of the CMA board of directors as a member. I ensure that our organizational leaders support CMA's mission at their local guild levels. I help ensure that CMA leaders implement CMA's mission and values, including that they ensure that local members share CMA's mission and values. I am responsible for increasing CMA membership and for advocating for healthcare ethics. I supervise member admission. At CMA events and activities, I observe CMA members' actions and statements, CMA members' motivations for their Catholic medical practices, CMA members' intent to observe CMA values in their medical practices, and CMA members' activities and plans. I ensure that members share CMA's positions. If I believe that a person does not share CMA's positions, I do not allow that person to become (or remain) a member. In my experience, CMA members share CMA's positions—that's why they joined CMA.

20.    I have observed the operations and circumstances of CMA's members related to their commitment to operating within the Catholic values of CMA and related to the effect of the OCR Rules.

## II.    CMA's categorical positions on gender-transition procedures

21.    CMA's members have deep, substantial, science-based and religious objections to gender-transition efforts.

### A.    CMA's scientific views on gender-transition procedures

22.    We hold the categorical view that gender-transition procedures harm patients—particularly children—and can result in infertility, heart attacks, strokes, and other chronic illnesses, and that medical science does not support the provision of such procedures. We hold the categorical view that sex is a biological, immutable characteristic—a scientific reality, not a social construct. We hold the categorical view that to eliminate sex-specific private spaces violates fundamental rights to privacy, dignity, safety, and security.

23.    One article illustrating our scientific concerns about gender interventions was published in a scholarly format in CMA's quarterly journal by Paul W. Hruz, M.D., Ph.D at the Washington University School of Medicine.[2] The article identifies a lack of high-quality scientific data for gender-identity interventions, such as the lack of randomized prospective trial design, a small sample size, recruitment bias, short study duration, high subject dropout rates, and reliance on opinion. It explains the serious deficits in understanding the cause of this condition or the reasons for the marked

---

[2] Paul W. Hruz, *Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria*, 87 Linacre Quarterly (Issue 1) 34, 34–42 (Sept. 20, 2019), https://doi.org/10.1177/0024363919873762.

5

increase in people presenting for medical care. The article shows the risks of gender-transition interventions, including significant intervention-associated morbidity—raising concerns that suicide prevention is not achieved.

### B.    CMA's religious views on gender-transition procedures

24.    Our concerns about gender-transition efforts reflect the best scientific expertise, but they also rest on much older foundations. The Catholic Church teaches that men and women are created in two sexes.[3] For thousands of years, Christian anthropology, with its roots in the narrative of human origins in the Book of Genesis, has taught that "God created man in his own image … male and female he created them." *Genesis* 1:27.

25.    The Catholic Church categorically opposes invasive and drastic medical interventions promoted by modern gender ideology. Pope Francis recently issued a declaration, *Dignitas Infinita*, which explains that "any sex-change intervention, as a rule, risks threatening the unique dignity the person has received from the moment of conception."[4]

### C.    CMA's categorical positions against gender-transition procedures

26.    CMA has a position paper, attached as Exhibit B, diving deeper into these scientific, theological, ethical, and technological considerations.[5]

---

[3] *See, e.g.*, Catechism of the Catholic Church § 2333, 2393; Pope Francis, Encyclical Letter *Laudato Si': On Care for Our Common Home* ¶ 155 (May 24, 2015), https://perma.cc/AWY7-M8UH.

[4] Holy See Press Office, *Declaration of the Dicastery for the Doctrine of the Faith "Dignitas Infinita" on Human Dignity* (Apr. 8, 2024), https://press.vati can.va/content/salastampa/en/bollettino/pubblico/2024/04/08/240408c.html; *see also* Catechism of the Catholic Church § 2297.

[5] Ex. B, CMA, *The Ideology of Gender Harms Children* (Sept. 8, 2023), https://www.cathmed.org/resources/the-ideology-of-gender-harms-children/.

27.    CMA officially resolved that it "does not support the use of any hormones, hormone blocking agents or surgery in all human persons for the treatment of Gender Dysphoria." CMA "members reject all policies that condition children to accept as normal a life of chemical and surgical impersonation of the opposite sex" as well as reject "the use of puberty blocking hormones and cross-sex hormones." In addition, "the Catholic Medical Association, in recognition of the dignity of the person, supports the continuation of gender-specific facilities in all public and private places.[6]

28.    Our categorical exclusion of providing, facilitating, or affirming gender transitions, and our commitment to state law, precludes us from

A.    Prescribing puberty blockers, cross-sex hormone therapies, or other similar ongoing interventions to treat gender dysphoria or for transition efforts;

B.    Performing surgeries to treat gender dysphoria or for transition efforts, including:

   i.    Removing healthy breasts, uteruses, or ovaries from females who purport to identify as males, nonbinary, or who otherwise do not identify as females (hysterectomies, mastectomies, and oophorectomies);

   ii.    Removing healthy vaginal tissue from females who purport to believe themselves to be males, nonbinary, or otherwise not to be female, and creating for them a faux or cosmetic penis (phalloplasties and metoidioplasties);

   iii.    Removing healthy testicles or scrotums from males who purport to believe themselves to be female (orchiectomies or scrotectomies);

---

[6] CMA, Health Care Policy Resolutions, Family/Sexual Education, https://www.cathmed.org/programs-resources/health-care-policy/resolutions/familysexual-education/.

     iv.   Performing a process called "de-gloving" to remove the healthy skin of a male's penis and using it to create a faux vaginal opening or vulva (vaginoplasties and vulvoplasties);

     v.   Removing healthy internal or external genitals from any person to create a "smooth gender-neutral look" (nulloplasties or nullification surgeries); and

     vi.   Performing other procedures sought to make a person resemble the opposite sex or no sex, such as facial, chest, neck, skin, hair, or vocal modification;

C.    Saying in our professional opinions or through staff that these transition efforts are the standard of care, are safe, are beneficial, are not experimental, are not cosmetic, or should otherwise be recommended;

D.    Offering to perform, provide, or prescribe the above such transition interventions, procedures, services, or drugs, including in published statements;

E.    Referring patients for any and all such interventions, procedures, services, or drugs;

F.    Refraining from expressing our views, options, and opinions to patients when those views are critical of transition efforts;

G.    Refraining from informing patients or the public that we do not provide transition procedures, including by refraining from sharing this information in patient conversations or on websites;

H.    Treating and referring to patients according to gender identity and not sex;

I.    Saying that sex or gender is nonbinary or on a spectrum;

J.    Using language affirming any self-selected gender identity inconsistent with sex or the biological binary;

K.    Asking patients to share their gender identity or pronouns beyond basic inquiries into the patient's sex;

L.    Using patients' self-selected pronouns according to gender identity, rather than using no pronouns or using pronouns based on sex;

M.    Creating medical records and coding patients and services according to gender identity not sex;

N.    Saying that males can be pregnant or give birth;

O.    Affirming or endorsing gender-transition efforts;

P.    Allowing patients to access single-sex programs and facilities,
such as well-woman and OB/GYN care, lactation training,
induction, and medical care, breastfeeding support groups,
educational sessions, maternity homes, changing areas,
restrooms, communal showers, or other single-sex programs and
spaces, by gender identity and not by sex;

Q.    Repealing or modifying our policies, procedures, and practices of
not offering to perform or prescribe the above procedures, drugs,
and interventions for transition efforts; and

R.    Providing assurances of compliance, compliance reports, express
or implied certifications of compliance, and notices of compliant
policies, or posting notices of compliant policies in prominent
physical locations as to the OCR Rules' gender-identity
requirements.

## III.    The OCR Rules' effect on CMA members

29.    Most CMA members provide medical care in health programs
and activities receiving federal financial assistance under 42 U.S.C. § 18116.

30.    CMA has in good standing as CMA members Dr. Michael S.
Parker of Mansfield, Ohio and Dr. Quentin L. Van Meter of Atlanta, Georgia,.
Each member shares CMA's positions. They are representative of and are
similarly situated to our members as a whole.

31.    CMA thus seeks relief from the OCR Rules on behalf of its
current and future members. Seeking such relief for all aspects of their
practices is part of the mission of CMA as approved by its board of directors.

32.    The OCR Rules impact our members in their practice of medicine
as individual physicians who are regulated by the OCR Rules. And the OCR
Rules impact some of these members as corporate principals and owners of
medical practices that are regulated by the OCR Rules—for example in their
duty to create, implement, and train staff on policies and to ensure
compliance with the OCR Rules in their businesses' medical practices. Not

9

every CMA member is a recipient of federal funding within the meaning of
the OCR Rules, although some are, and others are employees of recipients of
the OCR Rules.

33.    If our members were to comply with the OCR Rules, they would
lose their integrity and reputation of practicing with sound judgment and
good medical ethics, making patients less likely to trust them, and driving
patients and employees away from their practices.

34.    If our members do not comply with the OCR Rules, our members
will have to defend themselves from investigations and enforcement actions,
losing time, money, and resources that they could use for medical care.

35.    If our members do not comply with the OCR Rules, our members
will find it difficult to be employed in the field of medicine, as almost all
medical practices receive federal financial assistance from HHS.

36.    The OCR Rules threaten to drive doctors out of the medical
profession, and they will dissuade students from choosing to practice
medicine, reducing care for underserved, low-income, and rural patients.

I declare under 28 U.S.C. § 1746 and under penalty of perjury that this
declaration is true and correct based on my personal knowledge.

Executed May 6, 2024 at Fort Washington, Pennsylvania.

Mario R. Dickerson, M.T.S.

# EXHIBIT A



FIND A CATHOLIC PHYSICIAN

*October 20, 2021*

# Conscience

Conscience is a fundamental aspect of what it is to be human. Conscience is the ability to distinguish between good and bad action and strive to live in conformity with the virtue of integrity. The formation of conscience and its role in human actions is perhaps the most critical aspect of a person's character. Many religious and secular authorities agree that the protection of conscience is a fundamental human right. However, in an age of increasing moral relativism, conscience is relegated to a secondary status in the discussion of human rights. Instead, primary importance is placed on transitory cultural trends that are often disassociated from true moral goodness and the pursuit of the common good.

Conflicts between professional ethics and patient autonomy represent the height of this modern dilemma. Patients often request medical procedures that violate the sanctity of human life, the goodness of the created order, bodily integrity, and the protection of the vulnerable. Physicians, in the name of compassion, frequently are asked to facilitate acts of abortion, assisted suicide, euthanasia, sterilization, sexual promiscuity, transsexual surgery, assisted fertility procedures, etc. A robust argument against all these acts is articulated by the natural law, human experience and in the Catholic tradition—divine revelation. If a physician's conscience dictates not to participate in these requests, he or she ought to be defended by standards of practice, medical societies, and legislative action. Moreover, not only should physicians be exempt from participating in immoral practices, their rights to educate and exhort their patients and others as to the reasons for their ethical principles and positions also must be protected. Conscience protection is only the bare minimum expectation in a healthy society, and the right to convince others of the truth of one's moral insight should also be enshrined in a similar fashion. By its very nature, truth attracts. Therefore, the Catholic Medical Association supports conscience protection for all health care workers and facilities without compromise. Nothing less is acceptable.

If the patient, an employer or supervisor, or the law, insists on a referral/consultation for an immoral action or procedure, Catholic healthcare workers must not formally cooperate with such requests. They also may not participate in immediate material cooperation in which the assistance they provide is essential to the completion of the act. To avoid claims of patient abandonment, a physician may express an objection to the physician's supervisor for a change of assignment.If the patient is insistent on pursuing an immoral choice, the physician may be unable to prevent this, thus, necessitating a transfer of the patient to another health care provider chosen by the patient or the physician's supervisor. Ultimately, the patient is an independent moral agent who is free to decide where and from whom he or she will seek care. The physician is to make his or her objections known to the patient and must not indicate where the patient might go to receive the immoral procedure or otherwise direct the patient to it A general list of other providers or institutions based on geographic vicinity or even area of specialty might be provided; however, the list may not be developed based on the criterion of whether they are known or believed to offer the immoral procedure. In practice, this means that the list must include any providers or institutions that fit the chosen criterion (geography, specialty, both, or other) and also oppose the immoral practice. In the case of objections to contraception, for example, a list of local gynecologists should include those who offer only natural family planning.

The physician should release all medical records in accordance with statutory regulations. Ideally, health care institutions and the law should favor norms assuring morally questionable or objectionable consults can be arranged solely by patient request, exempting the objecting physician from any entanglement in the process of referral. The rights of the objecting physician should also apply to any health care worker with deeply held ethical or religious beliefs.

It must be stated emphatically that Catholic Medical Association stands by these principles not only to protect the rights of medical and other health care practitioners and Catholic facilities, but also because it believes immoral and unethical procedures are not in the patient's best interest and hurt patients physically, psychologically, and spiritually. This vision is holistic and fundamental to the entire tradition of Western medicine. Physicians are called to serve and love their patients by adhering to their well-formed conscience in the practice of medicine. Following their conscience is the sole guarantee of fulfilling that calling.

*Approved by the Board – October 6, 2021*

  

Categorised in:

## *Become a member*

The Catholic Medical Association (CMA) is the largest association of Catholic individuals in health care. We help our members to grow in faith, maintain ethical integrity, and provide excellent health care in accordance with the teachings of the Church.

JOIN CMA

## *Donate to CMA*



BRANDED APPAREL & ACCESSORIES
CONFERENCE CDS & DVDS
CMA PUBLICATIONS & MORE

SHOP NOW



## Catholic Medical Association

550 Pinetown Rd., Suite 205
Fort Washington, PA 19034
Tel: 484-270-8002
E-Mail: info@cathmed.org

Home

About Us

Membership

Events

Resources

Support

Media

Join CMA

Physician Search

© 2024 Catholic Medical Association.
All rights reserved | Privacy Policy | Terms of Use

# EXHIBIT B



FIND A CATHOLIC PHYSICIAN

*September 8, 2023*

# The Ideology of Gender Harms Children

## Defining Terms and Understanding the Issue

"*Gender* is a term that refers to the psychological and cultural characteristics associated with biological sex. It is a psychological concept….*Gender identity* refers to an individual's awareness of being male or female, referred to as an individual's 'experienced gender'" (American College of Pediatricians, 2018). *Sex* is a biological term that refers to distinct and complementary roles for members of a species in relation to reproductive purpose. As there are only two gonads that contribute to human reproduction (testes and ovaries), sex is inherently binary. Gender awareness is based on thoughts and feelings whereas sex is a biological fact. The ideology of gender proposes the psychological awareness of an individual's gender may not be aligned with the person's biological sex. In cases of incongruence, the claim is made that psychological awareness predominates, negating the fact of the biological sex. *Intersex* is a term applied to disorders of sexual development. These disorders are very rare congenital defects frequently of genetic origin. It is a disease state, an objective medical condition. It is not an identity nor a third sex.

*Dysphoria* is defined as a state of dissatisfaction or unease about a given situation. *Gender dysphoria* (GD) is a psychological condition in which the individual feels an incongruence between his or her experienced gender and his or her biological sex. This condition is associated with varying levels of anxiety and unhappiness.

Human beings are born with a biological sex. The awareness of being male or female develops over time. As gender awareness develops during the early years of a child's life, there may be a time when the child may show confusion about his or her gender awareness. These pre-pubertal children may be diagnosed with gender dysphoria. W*hen GD occurs in the pre-pubertal child, it*

resolves in 80-90 percent of children by late adolescence as they naturally develop through puberty and gender awareness aligns with biological sex (Cohen-Kettenis, Delemarre-van de Waal, Gooren, 2008). Some of these adolescents may manifest same-sex attraction but without the desire to undergo sex reassignment.

The American Psychiatric Association (APA) explains in the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) that GD is listed as a mental disorder not because of the person's belief that they are someone they are not –– a break from reality –– but because of the emotional distress that is felt by the person and how this affects social functioning.

Once the distress is relieved, GD is no longer considered a disorder. The APA claims that the distress will be relieved by sex reassignment. A more recent document (DSM5-TR) reiterates the claims made by the prior document and insists that GD is not a mental disorder.

There are probably many paths that could lead to GD. There is no single-family dynamic or social situation that appears to be causative. There may be an association with adverse events in childhood including sexual abuse. Social reinforcement, parental psychopathology, family dynamics, and social contagion may all contribute to the development of GD in some children (American College of Pediatricians, 2018).

The traditional understanding of childhood GD had been that it reflected confused thinking on the part of the child. The standard approach was watchful waiting by the parents with the advice of a mental health specialist. The goals of therapy were to address family pathology when present, treat any psychosocial co-morbidities in the child, and aid the child in aligning gender identity with biological sex (American College of Pediatricians, 2018).

## Medical Evidence Lacking in New Standard of Care

The traditional approach is no longer recommended. It is alleged that mental illness and suicide will be the consequences of withholding social affirmation of the child's confusion and allowing the child to grow through natural puberty. The American Academy of Pediatrics (AAP) has presented options for the suppression of normally timed puberty in affected children, and surgical interventions on a case-by-case basis for the adolescent child (Rafferty, 2018).

The American Medical Association (AMA) endorsed the Endocrine Society's position in passing a resolution to protect access to gender-affirming care for transgender and gender-diverse persons, which did not exclude youths (American Medical Association House of Delegates 2023). AMA cites the United States Department of Health and Human Services (HHS) for this decision. HHS indicates that gender-affirming care for transgender and non-binary people consists of "an array of services that may include medical, surgical, mental health, and non-medical services for transgender and non-binary people" (HHS, 2022). The so called "treatment" for GD in the US includes affirmation of the child's confusion, chemically blocking puberty, lifelong cross-sex hormones (testosterone for girls and estrogen for boys) and mutilating surgeries.

The protocol consists of affirming the child's confusion by using name and pronoun changes and facilitating the impersonation of the opposite sex as early as ages 3-4 years old. Then puberty is suppressed with GnRH (gonadotropin releasing hormone) analogues at ages 10- 11 years old. Puberty blocking hormones "arrest bone growth, decrease bone density, prevent the sex steroid dependent organization and maturation of the adolescent brain, and inhibit fertility" (American College of Pediatricians, 2018). Recently, the FDA placed a warning on the use of hormone puberty blockers because of several cases of pseudotumor cerebri (FDA, 2022). The pathological effects of puberty blockers are not easily reversed. The noxious psychological effect of not growing into adolescence together with one's peers is not reversible.

In 2018, the AAP in a statement from the Committee on Bioethics recognized that the research on the long-term effects of puberty blockers on children is limited. However, the AAP indicated it can cause harm to refrain from using puberty blockers on children with GD because of the resulting emotional distress of the children as they develop through physiologic puberty (Rafferty, 2018).

However, Great Britain, Sweden, Finland, France, and Denmark have recently restricted the use of puberty blocking drugs in children with GD (Lawless 2023; Nainggolan 2021; Smith 2021; Smith, 2022 and SEGM). Researchers in these countries posed the question that the treatment protocol could be ideology driven and not evidence based (Ludvigsson 2023). It was noted that children were given the diagnosis of GD with little clinical psychological oversight and rapidly placed on the sex reassignment protocol. This protocol is frequently set in motion by the demand and insistence of the children and their parents. Most children who undergo puberty suppression transition to cross-sex hormones and mutilating surgeries.

Cross-sex hormones are associated with dangerous health risks. Estrogen administration to boys will place them at risk of developing thromboembolism, elevated lipids, hypertension, decreased glucose tolerance, cardiovascular disease, obesity, and breast cancer. Girls provided with high-dose testosterone will be at risk of developing elevated lipids, insulin resistance, cardiovascular disease, obesity, polycythemia, and unknown effects on breast, endometrial, and ovarian tissues (American College of Pediatricians, 2018). Children who receive puberty blocking hormones followed by cross-sex hormones prior to completion of gonadal maturation risk permanent sterilization.

Mutilating surgeries for girls include bilateral mastectomy, hysterectomy, and removal of the ovaries. Girls as young as 14 have had completely healthy breasts removed (Rowe, 2016). Girls may undergo removal of skin from another part of the body for attachment to the pelvis to simulate a penis. Genital surgery for males includes removal of the testes and dissecting the penis and inverting it into a pelvic wound (American Society of Plastic Surgeons).

The claim that children with sexual confusion will commit suicide if they are not quickly affirmed and set on the path of sex reassignment is not scientifically supported. Sexually confused children frequently show significant psychiatric co-morbidities; the incidence of suicidality in this group corresponds to the psychiatric co-morbidities these children show. Scientific evidence suggests

that the transgender interventions do not reduce the risk of suicide. In fact, puberty blockers are associated with depression and other emotional disturbances related to suicide. Furthermore, data support that in the long run transitioning may even exacerbate the psychological distress that could lead to suicide (Robbins & Broyles).

Is the anxiety and suffering exhibited by persons with GD relieved by sex reassignment? Surveys show transgender adults express an initial sense of relief and satisfaction following the use of cross-sex hormones and sex reassignment surgery. Cross-sex hormone administration and surgeries to align appearance with a sex-discordant gender identity have been used in Sweden for many years. A thirty-year follow-up study of 324 sex reassigned adults found "substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts and psychiatric hospitalizations in post-surgical transsexuals as compared to a healthy control population" (Dhejne, et al., 2011).

Evidence of regret from so called de-transitioners, who have undergone sex reassignment procedures as children or adolescents is surfacing. These individuals claim they were coerced into sex reassignment when most vulnerable and immature, and when uninformed of consequences. Some are initiating lawsuits against medical practitioners and medical organizations who provided such interventions (Independent Women's Forum).

Children are the victims of this disturbing and irresponsible experiment, as misguided adults impose a confused ideology on the most innocent and vulnerable. Children cannot legally consent; they have neither the maturity nor the life experience to make decisions that will permanently affect them for the rest of their lives. A parent who convinces his or her child that he or she was born into the wrong body is committing a grievous error.

The U.S. Department of Health and Human Services Organization has stated that: "For transgender and non-binary children and adolescents, early gender affirming care is crucial to overall health and well-being as it allows the child or adolescent to focus on social transitions and can increase their confidence while navigating the health care system" (HHS, 2022). Promoting sex reassignment via public education and legal policies will further harm children and confuse parents.

## Additional Considerations

### Theological

Church doctrine is clear that human beings are created by God, male and female (Gn 1:27; CCC, nos. 355–357, 369, 373, 1604, 1701–1702, 2331). The two sexes are complementary; the union of their bodies results in a third human person; the species thrives (Gn 1:28, 2:18–24; CCC, nos. 369–372, 1604–1605, 1643, 1652, 2331–2335, 2360–2370). The body is an intrinsic dimension of our human nature (CCC, nos. 362, 364, 2289). To reject the essentiality of the body is to reject God's

gift and reflects the pretense of the confused human being through a pure act of the will. It is the ultimate form of rebellion against creation (CCC, nos. 2280, 2290).

Human beings are a body-and-soul unity with a single nature (USCCB 2023, no. 4). The body is a gift of God, created in His image, and therefore, declared to be very good (USCCB 2023, no. 7). The body is to be respected and cared for since it is intrinsic to the person. Sexual differentiation is an essential part of this embodiment (USCCB 2023, no. 5). All must respect the order and finality of this embodiment. No one, including patients, physicians, and researchers, have unlimited rights over the body. We are not owners of our bodies to use them as tools according to our will, to be manipulated just because we can (USCCB 2023, no. 7). Just because it can be done does not mean it should be done.

**Ethical**

The present "treatment" of GD is contrary to the nature of medicine. It denies the very essence of the human person who is an integrated entity of body and soul. Such a denial is perpetuated by language that negates this reality by the erroneous use of pronouns, and the fostering of dress and behaviors that are intended to affirm this denial. New developments in addressing gender dysphoria in children are concerning in terms of violating fundamental parental rights and upending long standing jurisprudence. Policies to undermine the rights and obligations of parents or guardians, particularly in the public-school systems, in no way are to be endorsed. Children lack the full decisional capacity for such serious issues and are dependent upon engaged parents/guardians to consent or refuse potentially life-altering psychological, medical, or surgical actions.

**Technological**

Furthermore, technology should never be used to mutilate the human person. Technology, whether medical or surgical, is properly used when repairing a defect caused by injury or illness or to sacrifice a part for the whole. To allow a part to be sacrificed, three conditions must be fulfilled: (1) "The retention or functioning of a particular organ causes serious damage to it or constitutes a threat" to the whole organism. (2) "This damage cannot be avoided, or at least appreciably diminished, otherwise than by the mutilation in question and the effectiveness of the mutilation is well assured." It is a last resort. (3) "It can reasonably be expected that the negative effect, i.e., the mutilation and its consequences, will be compensated for by the positive effect: removal of the danger for the whole organism, lessening of suffering, etc." (USCCB 2023, no. 12). This loss is recognized as an evil to be tolerated.

The present medical and surgical "treatments" of GD do not meet these criteria. The organs are not causing serious damage nor threatening the whole organism and so none of the conditions are fulfilled. There is no defect because the organs are physiologically healthy and functioning normally. Nor is this a reluctant sacrifice of a body part, such as orchiectomy to treat prostate cancer. It is a deliberate, intentional attempt to transform the body to mimic the characteristics of

the opposite sex by mutilating it. In effect, the functioning of the healthy organs (reproduction) is destroyed, and the mutilation effects a cosmetic function if any at all. It is the refusal to recognize that the sexual organs have essential roles within the embodiment of the human person.

## Authentic Health Care

This attempt to address surgically and with hormones what should be treated psychiatrically with counseling is not authentic health care. Health care professionals must not affirm what is not true. Cognitive Based Therapy (CBT) has been shown to be useful in treating other body dysphoria disorders associated with increased risk of death, such as anorexia nervosa. Persons with GD would benefit from such treatment of depression and anxiety along with aggressive counseling and medications directed to those conditions.

A health care professional who counsels a parent and child seeking support in the sex reassignment process needs to inform the parent of the risks and side effects of puberty blockers and cross-sex hormones, and of sex-reassignment surgeries. The plan of care should involve both physician and mental health specialist. It is inappropriate to refer the child to a "Gender Clinic." This likely will result in rapid enrollment of the child into the sex reassignment process, frequently with little mental health oversight.

Sex reassignment does not respect the fundamental order of the human person with a body-and-soul unity. Treatments that do not respect this unity ultimately harm the human person. The ideology underlying GD is harmful since it declares that people can remake themselves according to how they feel. Solutions must be found that promote human flourishing, respect one's own bodily integrity and are in concordance with the sex inscribed in one's body. This is especially true for Catholic health care which is part of the healing ministry of Jesus. That means providing treatments directed to the healing of the whole person: physical, mental, and spiritual.

A first principle of medicine is "First, do no harm." The sex reassignment movement is a vast, unregulated experiment based on studies with a high drop-out rate, non-randomized control studies, and no long-term studies past the first five years for interventions that are structurally and/or functionally mutilating and have long term and irreversible consequences.

## Responding with Unconditional Love

Parents and guardians must show unconditional love if confronted with a child who professes to be transgender and demands affirmation which denies the reality of biological sex. Parents and guardians must be free to determine how best to address lovingly this challenge through informed consent that is not obstructed by policies that deny that right. It is best to enter into dialogue and allow the child to tell his or her story. At the same time, the parent should gently inform the child of the correct scientific data.

It is essential that concurrent treatment be given by a mental health specialist who will address the mental disorder of the child according to correct understanding of the nature of the human

person. Parents should unite and work together to advocate for appropriate and effective treatments that affirm truths about the integrity of the human person as a sacred unity of body and soul.

## Call to Action

The Catholic Medical Association calls on the medical organizations that promote the practice of sex reassignment of children with GD to reverse their decision. These organizations should consider the profoundly harmful long-term physical and psychological damage that awaits these children as they grow into adulthood.

GD is a psychiatric disorder that should be treated by a mental health specialist with the cooperation of loving parents. The practice of sex reassignment as the treatment of choice for children who show confusion with their sexuality is not ethically permissible and should be discontinued.

Furthermore, physicians and other health care professionals of conscience, who wish to promote the best interest of their patients, must be free to do so without policies that threaten their ability to practice medicine (Catholic Medical Association, 2021). As with all conflicts in medical ethics, the conscience of a clinician, enlightened by Catholic teaching on the sacredness of human life and the dignity of human persons, should never be coerced to violate the clinician's medical and moral judgement in the care of a patient.

## Sources and Suggested Reading

American College of Pediatricians, acpeds.org

American College of Pediatricians. 2018. "Gender Dysphoria in Children." https://acpeds.org/position-statements/gender-dysphoria-in-children.

American Medical Association House of Delegates. 2023. "Protecting Access to Gender Affirming Care. Resolution: 223 (A-23). June 12.

American Society of Plastic Surgeons. 2023. Gender Affirmation Surgeries. Available at https://www.plasticsurgery.org/reconstructive-procedures/gender-affirmation-surgeries.

Catholic Medical Association. 2021. "Conscience," Policy Statement developed by Ethics Committee, Approved by Board of Directors. October 6.

https://www.plasticsurgery.org/reconstructive-procedures/gender-affirmation-surgeriesCatechism of the Catholic Church (CCC). 2003. trans. USCCB. Vatican City: Libreria Editrice Vaticana. https://www.vatican.va/archive/ENG0015/_INDEX.HTM.

Cohen-Kettenis P.T., H.A. Delemarre-van de Waal, L.J. Gooren. 2008. "The Treatment of Adolescent Transsexuals: Changing Insights." *J Sexual Med* 5: 1892–1897.

Cretella, M. 2016. "Gender Dysphoria in Children and Suppression of Debate." *Journal of American Physicians and Surgeons* 21, no. 2 (Summer): 50-54.

Dhejne, Cecilia, Paul Lichtenstein, Marcus Boman, Anna L. V. Johansson, Niklas Långström, and Mikael Landén. 2011. "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden." PLoS One 6, no. 2: e16885. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3043071/.

Food and Drug Administration (US) (FDA). 2022. "Risk of Pseudotumor Cerebri Added to Labeling for Gonadotropin-Releasing Hormone Agonists." https://www.fda.gov/media/159663/download.

Furton, E. J., ed. 2023. *Transgender Issues in Catholic Health Care*. Philadelphia, Penn.: National Catholic Bioethics Center.

Independent Women's Forum. ND. "Identity Crisis: Stories the transgender movement doesn't want you to hear." https://www.iwf.org/identity-crisis/. Accessed August 13, 2023.

Lawless, Jill. 2023. "England's Health Service Says It Won't Give Puberty Blockers to Children at Gender Clinics." *Associated Press*, June 11. https://apnews.com/article/uk-transgender-puberty-blockers-abd9145484006fea23de6b4656c937da.

Littman, L. 2017. "Rapid onset of gender dysphoria in adolescents and young adults: A descriptive study." Abstract, *Journal of Adolescent Health*, 60:2, Supplement 1, S95-S96, February. https://doi.org/10.1016/j.jadohealth.2016.10.369.

Ludvigsson, JF, Adolfsson, J, Hoistad, M, Rydelius, PA, Kristrom, B, Landen, M. 2023. A systematic review of hormone treatment for children with gender dysphoria and recommendations for research. *Acta Paediatr*., November 112 (11): 2279-2292. https://pubmed.ncbi.nlm.nih.gov/37069492/

Mayer, L.S., P.R., McHugh. 2016. "Sexuality and Gender: Findings from the Biological, Psychological, and Social Sciences." *The New Atlantis*, special report (Fall).

Nainggolan, Lisa. 2021. "Hormonal Tx of Youth with Gender Dysphoria Stops in Sweden." *Medscape*, May 12. https://www.medscape.com/viewarticle/950964.

Rafferty, J. 2018. "Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents." Policy Statement, American Academy of Pediatrics, *Pediatrics*, vol 142, issue 4. October.https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for?autologincheck=redirected

Robbins, J. W., Broyles, V. R. (N.D.). The Myth about Suicide and Gender Dysphoric Children, Child and Parental Rights, American College of Pediatricians. https://childparentrights.org/wp-content/uploads/2020/05/SUICIDE-MYTH-HANDOUT.pdf.

Rowe, Peer. 2016. "Surgery Unburdens Transgender Boy." *Los Angeles Times.* April 14. https://www.latimes.com/local/california/la-me-transgender-teen-20160414-story.html.

Smith, Wesley J. 2021. "Finns Turn against Puberty Blockers for Gender Dysphoria." *National Review*, July 25. https://www.nationalreview.com/corner/fins-turn-against-puberty-blockers-for-gender-dysphoria/.

Smith, Wesley J. 2022. "France's Academy of Medicine Urges 'Great Medical Caution' in Blocking Puberty." *National Review*, April 26. https://www.nationalreview.com/corner/frances-academy-of-medicine-urges-great-medical-caution-in-blocking-puberty/.

Society for Evidence Based Gender Medicine. Aug. 17, 2023. "Denmark Joins the List of Countries that have Sharply Restricted Youth Gender Transitions." https://segm.org/Denmark-sharply-restricts-youth-gender-transitions.

United States Conference of Catholic Bishops, Committee on Doctrine. 2023. "Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body." March 20. https://www.usccb.org/resources/Doctrinal%20Note%202023-03-20.pdf.

United States Department of Health and Human Services (HHS), Office of Population Affairs. 2022. "Gender Affirming Care and Young People." March. https://opa.hhs.gov/adolescent-health.

World Professional Association of Transgender Health (WPATH). 2022. "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8." *International Journal of Transgender Health*, 23, no. S1: S1-S260.

*Revised and Approved by the Executive Committee – October 16, 2023*

  

Categorised in:

## Become a member

The Catholic Medical Association (CMA) is the largest association of Catholic individuals in health care. We help our members to grow in faith, maintain ethical integrity, and provide excellent health care in accordance with the teachings of the Church.

JOIN CMA

*Donate to CMA*



BRANDED APPAREL & ACCESSORIES
CONFERENCE CDS & DVDS
CMA PUBLICATIONS & MORE

SHOP NOW

Catholic Medical Association

550 Pinetown Rd., Suite 205
Fort Washington, PA 19034
Tel: 484-270-8002
E-Mail: info@cathmed.org

Home

About Us

Membership

Events

Resources

Support

Media

Join CMA

Physician Search

© 2024 Catholic Medical Association.
All rights reserved | Privacy Policy | Terms of Use