# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| **State of Florida**, et al. ) | |
| *Plaintiffs*, ) ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| **U.S. Department of Health and** ) | |
| **Human Services**, et al., ) ) | |
| *Defendants*. | |

### DECLARATION OF QUENTIN L. VAN METER, M.D.

I, Quentin L. Van Meter, M.D., declare as follows:

1. I am over 21 and I am fully competent to make this declaration.

2. These facts are true, correct, and within my personal knowledge. If called to testify, I could and would testify competently to them.

3. I am a pediatric endocrinologist seeing Medicaid and CHIP pediatric patients at my independent practice, Van Meter Pediatric Endocrinology, P.C., in Atlanta, Georgia. If my patients need hospitalization, I provide care at two local hospitals that receive Medicaid and CHIP funding.

4. I hold a medical degree from the Medical College of Virginia. I completed a pediatric internship and a pediatric residency at the Naval Regional Medical Center in Oakland through the University of California, San Francisco. I completed a pediatric endocrinology fellowship at Johns Hopkins University School of Medicine. I am a former adjunct associate professor of pediatrics at Emory University School of Medicine and a former clinical associate professor of pediatrics at Morehouse School of Medicine.

5. I am a member of the Catholic Medical Association (CMA) and the American College of Pediatricians (ACPeds) but I am not a member of the

Christian Employers Alliance or the Christian Medical & Dental Associations. I share CMA's and ACPeds' positions. I am ACPeds' Past President, and I serve on its board. Through ACPeds and CMA, I have long been a prominent international advocate against the harms of "gender-transition" procedures.

6. I care for all patients with respect and without unlawful discrimination. No matter how a patient identifies, I am his or her advocate and friend.

7. But I will not provide or refer for gender-transition procedures. It is a scientific fact, which informs my medical judgment, that puberty blockers and cross-sex hormones combined will sterilize many youth and cause them to develop serious chronic illnesses such as diabetes, heart disease, stroke, and cancers.

8. I categorically object to providing, referring for, or affirming any procedures to "transition" a patient's gender.

9. I categorically oppose asking for or using a patient's self-selected gender identity or pronouns for any purpose, including for coding or charting.

10. I categorically oppose allowing males in female private spaces or vice versa.

11. I categorically oppose adopting, following, or providing a policy or notice that says (or is interpreted by federal rules to mean) that I do not "discriminate" based on gender identity.

12. I hold these positions as a matter of sound medical judgment as well as sincere Catholic religious exercise and conscience. If the government requires me to speak or act against these positions, it would seek to stop me from speaking and acting in the way my medical judgment and my religious faith requires of me.

13. I regularly provide puberty blockers and sex hormones for medical reasons. I prescribe puberty blockers to treat precocious puberty. I prescribe hormone replacement therapy for delayed puberty or for children who will never go through puberty on their own due to a deficiency. But as a matter of sound medical judgment and good conscience, I do not and will not provide puberty blockers or hormones for gender-transition purposes.

14. I have cared and continue to regularly care for patients who identify as transgender, non-binary, or otherwise contrary to their sex, as well as patients who struggle with gender incongruence. I reasonably expect to see more future patients who identify in this way walk in my office door. I provide the same high-quality medical care to these patients as I do to all my patients, whether it is for diabetes or any other medical condition.

15. I have received patient requests to provide puberty blockers and cross-sex hormones for gender-transition purposes. I have been asked to give puberty blockers or cross-sex hormones to at least twelve pubertal children. About half of the parents asked for puberty blockers, and about half asked for both puberty blockers and cross-sex hormones as a pair. I expect to keep receiving similar patient requests, but I could not provide such procedures with sound medical judgment or in good conscience.

16. Families at times seek my medical opinion when they wish to evaluate whether a child should start gender-transition procedures. I have freely shared my complete medical judgment on such procedures with these patients. I explain that there are no sound studies or reliable data proving that such procedures are safe or helpful. I want to remain free in my practice to follow and share my views. I will not self-censor my medical opinions in patient consultations.

17. I regularly use pronouns for patients that accord with biological and binary sex. I code and chart patients by sex. I do not and will not ask for self-selected pronouns. I do not and will not use pronouns contrary to biology.

18. I am regularly asked by patients to use self-selected pronouns contrary to a patient's sex in conversation or in medical records. Because I am the patient's advocate, when I speak with these patients, I try to use names or nicknames for such patients, and I try to avoid pronouns, but I do not always succeed at avoiding pronouns in these conversations. Outside the presence of the patient, I speak about the patient using biological pronouns.

19. I provide access to male and female restrooms for patients and their visitors. Within our medical building, I have a single unisex restroom in my office, and I provide access to male and female restrooms in the hallway outside of my office. On the doors of these restrooms, it says "men" and "women." I understand these signs to refer to a person's biological and binary sex. Because of safety, dignity, privacy, and conscience concerns, I do not and will not ensure access to these facilities by gender identity. I do not and will not facilitate male patient access to restrooms designated for females, or vice versa, based on gender identity.

20. I left a multi-specialty clinic in 2003 to found my own practice to better care for the increasing number of pediatric patients with endocrine needs. We have several staff members. I am proud to say that my youngest daughter works as a nurse practitioner in my office.

21. I direct and manage all operations within my office. No person other than me exercises oversight over medical care for patients. I am solely responsible for office policy and for deciding what notices to give patients.

22. With the administrative help of my staff, my practice bills for Medicaid. My affiliated hospitals also serve Medicaid patients. To the best of

4

my knowledge, each time when we signed up to obtain credentials to receive Medicaid funding, we provided all required paperwork, including signing any required assurances of compliance with federal regulations.

23. I have adopted an official policy statement for my office that explains that I do not offer, refer for, or endorse gender-transition efforts.[1] I have attached this policy statement to this declaration as Exhibit A.[2]

24. I currently inform patients and potential patients on my office website that I do not offer, refer for, or endorse gender-transition efforts by posting my policy statement.

25. I want to, but out of compliance with the rule on its specified dates, will no longer inform patients and potential patients about this policy on my website. If the court does not protect me from the rule, I will remove my policy statement from my office website in compliance with the rule.

26. The rule forces me to adopt a new "nondiscrimination" policy for my office. This new policy must be consistent with the redefinition of sex to include gender identity, and I must revise all my policies to ensure that they are consistent with following the rule's requirements.

27. The rule will make me force all my employees to follow such a policy. Then my staff and I will have to give patients notice of such a policy and post the policy prominently in our office. My affiliated hospitals also must adopt and make me follow such a policy. I will refuse to adopt, post, or

---

[1] Our policies for patients seeking information and guidance are available on our office policies page: Van Meter Pediatric Endocrinology, Office Policies, https://www.pediatricendo.com/policies.

[2] Ex. A, Van Meter Pediatric Endocrinology, https://www.pediatricendo.com/_files/ugd/68c6d3_1606b8fdc36e4d948bb0dd7733291ef5.pdf.

5

follow such a policy. Nor will I make my staff members, including my daughter, do so.

28.  The rule will force me to provide training on such a "nondiscrimination" policy to myself and to all employees to ensure my office's compliance with the rule's mandatory gender-identity policy. My affiliated hospitals also must make me attend training on such a policy. But for the rule, this training would not be a condition of federal funding or of my admitting privileges.

29.  I will not arrange or provide this training. I will not reeducate myself, nor will I reeducate my employees, including my daughter. Nor will I attend this training when scheduled by my hospitals on the rule's mandatory gender-identity policy.

30.  I adamantly object to attending training on such a policy. The government should respect the views of a doctor like me. But the purpose of this government-ordered training is to target my deeply held views for elimination from the medical profession. By this mandate, the government seeks to make me a captive audience, to pressure me publicly at length to change my medical practice, and to coerce me to adopt a policy at odds with my beliefs. I will not undergo this coercion. Indeed, given my uncompromising international public advocacy against gender-transition procedures, the message I would risk sending by submitting to this training is that I yield to the rule's policy. This message would compromise my integrity, including the integrity of my public advocacy. Being forced to provide or attend this training thus would substantially burden me in the free exercise of my medical judgment, my conscientious objections, and my religious beliefs.

31.  If the rule goes into effect, each time I request Medicaid payment, the federal government will deem me to be certifying that my office complies with the rule. But we will not be in compliance with the rule's gender-identity

requirements. So arguably neither I, nor any other person, can make a certification on my behalf without making a misleading statement. I will not knowingly make a false statement or claim to the government.

      32.    Because I earn income based on the number of patients I see, I will bear the financial cost of the rule's compliance requirements in terms of my lost hours and productivity (not to mention lost staff productivity). I typically receive $350 per hour in income for my time. So, for example, if the training takes me away from patients for an hour, I will lose $350 in lost income. Or, for instance, if I have to work overtime to revise policies and plan training, I will personally lose the same value for each hour of extra uncompensated work.

      33.    I have already spent time and resources to learn about the rule. It has taken me at least an hour to read the rule, to obtain compliance guidance, and to form plans (as described in this declaration) to significantly change my daily medical practice to avoid noncompliance. My preparations to avoid noncompliance with the rule already resulted in $350 in lost value for my time. (This figure does not count time preparing for CMA to litigate on my behalf.)

      34.    If the rule goes into effect, I will spend even more resources to avoid noncompliance. I estimate that it would take me at least two hours to revise my policies to comply with the rule, at least one hour to plan training and create an attendance sign-up sheet, and at least one hour to provide training to staff on new policies. I estimate that it then would take me an hour over the next year to keep training records and patient grievance records. I would not spend my time in this way but for the rule.

35. Georgia restricts gender-transition procedures. The rule forces me to choose between following the rule or following state law. I will not violate state law or harm my patients.

36. I also will not knowingly violate federal regulations or my conscience. So if a court does not protect me from the rule and I am not exempt, I will have no choice but to take steps to stop seeing Medicaid and CHIP patients.

37. I have a well-established medical practice with many ongoing patients. My patients rely on me for specialist care for endocrine conditions like diabetes, and I rely on them, on insurance, and on Medicaid for revenue. I rely on my affiliated hospitals as an avenue for me to hospitalize patients as needed. About seven percent of my patients are Medicaid patients.

38. I do not want to stop seeing Medicaid or CHIP patients or to stop being affiliated with local hospitals, but I would rather stop seeing Medicaid or CHIP patients and lose my local hospital affiliations than adopt a policy under which I would harm a patient.

39. If I cannot participate in Medicaid or CHIP, if I lose my hospital affiliations, or if I have to close my office doors due to the burdens of government regulations, investigations, and penalties, my patients would suffer the loss of their trusted doctor and I would lose my income derived from Medicaid or CHIP, which will cause me a significant financial loss. My patients will be unexpectedly without care at a time when there is already a nationwide shortage of doctors accepting Medicaid patients.

40. When I have to decide whether to follow the rule—or risk losing my Medicaid and CHIP patients, my hospital affiliations, and my livelihood— I won't know whether my hospitals and my practice will be required to follow the rule's requirements.

I declare under 28 U.S.C. § 1746 and under penalty of perjury that this declaration is true and correct based on my personal knowledge.

Executed May 5, 2024 at Atlanta, Georgia

*[signature]*

Quentin L. Van Meter, M.D.

# EXHIBIT A

**Office Policy 2024 Regarding Patients seeking information and guidance on abortion**

1. We value all human lives equally. We oppose prematurely ending the life of any child at any stage of development from conception to natural death.
2. We will not refer pregnant patients for abortion to any abortion facility. We will, instead, caringly give such patients information about prenatal care, including, if needed, information about a pregnancy care center.
3. We will not prescribe mifepristone as an abortifacient and will reserve its use to treatment of adrenal disease.

**Office Policy 2024 Regarding Patients under the age of 18 years who identify as the opposite sex**

1. We treat all patients and visitors with respect. No matter how a patient identifies, we are the patient's advocate and friend.
2. We will welcome, compassionately, all patients who are experiencing gender dysphoria.
3. We will follow the best evidence-based standards of care including appropriate physical examinations.
4. We will use our discretion in ordering any bloodwork and x-rays.
5. We will request that the patient's family give their consent to share the records of other care providers who have treated the patient.
6. We will take extensive medical and mental health histories with specific attention to documentation of all adverse childhood experiences (ACE's). We will refer patients to vetted mental health care professionals if they have had no prior mental health assessment, or if we feel the current mental health professionals are pushing for social, medical, or surgical interventions for the purpose of changing the patient's persona.
7. No long-term study demonstrates the safety or efficacy of puberty blockers, cross-sex hormones and surgeries for youth who identify as the opposite sex or as non-binary. These "gender-transition" procedures are experimental, and therefore, neither parents nor minors can provide informed consent. Moreover, the best long-term evidence we have among adults shows that medical intervention fails to reduce suicide.
8. Our focus will be on the well-being of the patient using the Hippocratic principle of Do No Harm. Therefore, we will not prescribe GnRH agonists to interrupt normally timed puberty, and we will not use wrong-sex hormones or refer to surgeons who intend to remove healthy body parts.
9. We will use correct biological and binary terminology to refer to patients in conversation and in medical records, and we will not use biologically incorrect pronouns. We welcome all patients and visitors to our facility based on the patient's sex as a biological male or female.

*[signature]*

Quentin L. Van Meter, M.D.