## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA; FLORIDA AGENCY
FOR HEALTH CARE ADMINISTRATION;
FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES; CATHOLIC
MEDICAL ASSOCIATION, on behalf of its
current and future members,

     *Plaintiffs,*                          No. 8:24-cv-1080-WFJ-TGW

DEPARTMENT OF HEALTH AND
HUMAN SERVICES; XAVIER BECERRA,
in his official capacity as Secretary of the
Department of Health and Human Services;
MELANIE FONTES RAINER, in her official
capacity as the Director of the Office for Civil
Rights; CENTERS FOR MEDICARE AND
MEDICAID SERVICES; CHIQUITA
BROOKS-LASURE, in her official capacity as
Administrator of the Centers for Medicare and
Medicaid Services,

     *Defendants.*

## MOTION FOR STAY OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................i

INTRODUCTION .................................................................................1

BACKGROUND...................................................................................2

I.     Section 1557...............................................................................2

II.    The 2024 Rules ...........................................................................2

    A.    Separate Facilities..............................................................3

    B.    Gender-Transition Interventions ..........................................4

ARGUMENT .....................................................................................8

I.     Plaintiffs Are Likely To Prevail on the Merits....................................8

    A.    "Gender Identity" Is Not Protected by Section 1557 ............................8

    B.    Rejecting Gender-Transition Interventions Is Not Sex
        Discrimination...................................................................13

    C.    The Social Security Act Does Not Authorize Rules Forbidding
        Disparate Impacts on Gender Identity..................................18

II.    Plaintiffs Will Suffer Irreparable Injury.........................................20

III.   Balance of Harms and Public Interest Favor Plaintiffs...................23

IV.    A Stay Is the Proper Remedy.......................................................24

CONCLUSION .................................................................................24

**INTRODUCTION**

In the Affordable Care Act ("ACA"), Congress incorporated by reference several anti-discrimination provisions, including Title IX's prohibition against discriminating "on the basis of sex." Title IX includes many permissible sex-based distinctions. For example, it allows covered entities to separate living spaces based on sex. The Department of Health and Human Services ("HHS") now claims to have discovered in this ordinary non-discrimination law the extraordinary power to promulgate rules (1) *forbidding* longstanding policies or practices of separating private medical spaces based on sex whenever that policy or practice comes into conflict with an individual's "gender identity," and (2) *compelling* States to allow and even pay for controversial "gender-transition" interventions, including the removal of healthy reproductive organs.

HHS's attempt to drastically expand the contours of sex discrimination runs headlong into binding Eleventh Circuit precedent. The Eleventh Circuit has held that (1) Title IX unambiguously does not protect gender identity, and (2) banning gender-transition interventions is not discriminating "on the basis of sex," the same words used in Title IX. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023). At a minimum, the ACA does not clearly authorize HHS's new rules, as required under Congress's spending power. The rules will also impose immediate and irreparable harm on Plaintiffs by forcing them to incur irrecoverable costs and by

1

unlawfully pressuring Florida to surrender its sovereign interests. The rules should be stayed, or Defendants should be enjoined.

## BACKGROUND

### I. Section 1557

Congress has "power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). Using this power, "Congress has passed a number of statutes prohibiting recipients of federal financial assistance from discriminating based on certain protected characteristics." *Id.*

Section 1557 of the ACA is such a statute. *Id.* at 218. Section 1557 prohibits discriminating in health programs or activities "on the ground prohibited under," among other laws, "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a). Title IX, in turn, prohibits discriminating "on the basis of sex." 20 U.S.C. § 1681(a).

### II. The 2024 Rules

On May 6, 2024, HHS promulgated rules purporting to implement Section 1557. Ex. A, 89 Fed. Reg. 37,522 (May 6, 2024) ("2024 Rules") (excerpts). HHS declines to "define 'sex'" in the 2024 Rules, *id.* at 37,575, but nevertheless interprets "[d]iscrimination on the basis of sex" to include discriminating based upon, among other things, "[g]ender identity," *id.* at 37,699, *to be codified at* 45 C.F.R. § 92.101(a)(2). HHS does not define "gender identity" either, *id.* at 37,577, but explains that the term can encompass a "full range of identities," *id.* at 37,592, including "transgender,"

"nonbinary," "gender nonconforming," "genderqueer," or "genderfluid," 87 Fed. Reg. 47,824, 47,867 (Aug. 4, 2022) ("NPRM").

HHS then uses this definition of sex discrimination as a launching pad to decide matters of significant public debate. Specifically, the 2024 Rules purport to prohibit separating private spaces in healthcare facilities based on sex, and threaten any covered entity that opposes "gender-transition" interventions—such as puberty blockers, hormones, and "bottom" surgeries—that may lead to infertility and other harms to public health. Anyone in the health care sector who disagrees with HHS on these contentious medical and ethical questions, including States, now risks the loss of all HHS federal financial assistance. Compl. ¶¶ 43–46, 154, 189. The 2024 Rules also add controversial prohibitions against discriminating based on gender identity in the Medicaid and Children's Health Insurance Program ("CHIP") regulations. 89 Fed. Reg. at 37,667–68. HHS claims its rules will "preempt" any conflicting state law. *Id.* at 37,535.

## A. Separate Facilities

Florida, like many other States, holds to the longstanding view that separating intimate private spaces in public buildings based on male or female sex, or providing single-occupant facilities, best protects the safety and privacy of its residents. *See* Fla. Stat. § 553.865(5), (12).[1]

---

[1] Sex means male or female as determined by biology. *See* Fla. Stat. § 553.865(3)(*l*); *Adams*, 57 F.4th at 812; Compl. ¶¶ 62–63. It should not be confused with "gender identity." Compl. ¶ 64.

HHS disagrees and attempts to stretch Section 1557 to force compliance with its policy views. The 2024 Rules interpret "on the basis of sex" to forbid "any policy or practice" that prevents an individual from being treated "consistent with the individual's gender identity," if this causes the individual more than *de minimis* harm, a malleable concept that includes emotional or dignitary harm. 89 Fed. Reg. at 37,701, *to be codified at* 45 C.F.R. § 92.206(b)(3). HHS notes that preventing a male who identifies as a woman from sharing a dual-occupancy hospital room with a female "would result in more than *de minimis* harm." *Id.* at 37,593; NPRM, 87 Fed. Reg. at 47,866–67 (same).

### B. Gender-Transition Interventions

#### 1. *The Debate*

In recent years, a growing number of individuals, especially minors, have been diagnosed with "gender dysphoria," Compl. ¶ 84, a condition previously known as a "gender identity disorder," Compl. ¶¶ 68–71. Gender dysphoria is defined as distress resulting from a discordance between a person's sex and sense of "gender identity." Compl. ¶ 69.

There is an ongoing "debate" about how best to treat gender dysphoria and related conditions, especially in minors. *See L.W. v. Skrmetti*, 83 F.4th 460, 471–72 (6th Cir. 2023). Advocacy groups such as the World Professional Association for Transgender Health ("WPATH") promote what they call "gender-affirming care," a protocol of social, hormonal, and surgical interventions aimed at altering a person's physical characteristics to better accord with the person's sense of "gender identity."

Compl. ¶¶ 72–108. But "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). Many experts, States, and countries, while supporting mental health treatment and compassion, believe the gender-transition protocol recommended by WPATH and other organizations is experimental, harmful, and unethical. Compl. ¶¶ 106–29.

WPATH claims these interventions are necessary to promote mental wellbeing and prevent self-harm, but "no one disputes that these treatments carry risks or that the evidence supporting their use is far from conclusive." *L.W.*, 83 F.4th at 489; Compl. ¶¶ 85–108 (noting risks). Indeed, HHS noted just four years ago that there is a "lack of high-quality scientific evidence supporting such treatments." 85 Fed. Reg. 37,160, 37,187 (June 19, 2020); *see also Vazzo v. City of Tampa*, 415 F. Supp. 3d 1087, 1103–04 (M.D. Fla. 2019) (Jung, J.) ("Formal epidemiologic studies on gender dysphoria in children, adolescents, and adults are lacking").

Florida's public health authorities, its legislature, and its medical boards, have concluded that the putative psychological benefits of gender-transition interventions are too speculative to justify the health risks, particularly for minors lacking the ability to consent. Compl. ¶¶ 109–29. Florida has therefore enacted laws, standards of medical care, and regulations limiting these experimental interventions, promoting informed consent, and preventing public spending on interventions that, in Florida's considered judgment, do more harm than good. *See* Fla. Stat. §§ 286.311, 456.001,

456.52; Fla. Admin. Code r. 59G-1.050(7), r. 64B8-9.019, r. 64B15-14.014; *see also* Compl. ¶¶ 109–29 (describing these laws and regulations).

### 2. *The 2024 Rules*

In the 2024 Rules, HHS seeks to end any debate by establishing gender-transition as *the* uniform, federal standard of medical care. *See* NPRM, 87 Fed. Reg. at 47,868 & n.423 (asserting covered entities "should follow clinical practice guidelines and professional standards of care" and citing WPATH). The 2024 Rules make it presumptively discriminatory for covered entities, such as hospitals, clinics, medical practices, and pharmacies, to "[d]eny or limit" puberty blockers, cross-sex hormones, or surgeries "sought for purpose of gender transition," so long as those entities provide the services for "other purposes." 89 Fed. Reg. at 37,701, *to be codified at* 45 C.F.R. § 92.206(b)(4). For example, if a surgeon performs an orchiectomy (surgical removal of the testicles) to treat testicular cancer, he is presumptively required to remove healthy testicles for a "gender transition." *Id.*; *see also* NPRM, 87 Fed. Reg. at 47,867.

A covered entity that refuses to further a gender transition may avoid sanctions only if HHS deems a refusal "clinically appropriate *for a particular individual*." 89 Fed. Reg. at 37,701, *to be codified at* 45 C.F.R. § 92.206(c) (emphasis added). Repeatedly, HHS emphasizes that covered entities must make an "*individualized* clinical judgment." *Id.* at 37,575, 37,595–97 (emphasis added). A general policy against gender-transition interventions is necessarily not "individualized," and would therefore risk enforcement proceedings and punishment.

Confirming this understanding, HHS says that speech referring to gender-transition interventions as "experimental or cosmetic" would alone "be considered evidence of pretext because this characterization is not based on current standards of medical care"—i.e., WPATH's say-so. NPRM, 87 Fed. Reg. at 47,874. And covered entities must have "demonstrated a willingness to refer or provide accurate information about gender-affirming care." 89 Fed. Reg. at 37,598. In other words, doctors must assist gender-transitions through referrals and avoid advice HHS might deem "disinformation."

Similarly, States and insurers must subsidize gender transitions. The 2024 Rules make it presumptively discriminatory for insurers and other entities—including States—to set "limitations or restrictions" on claims "for specific health services related to gender transition" if doing so *results in* discrimination on the basis of sex." 89 Fed. Reg. at 37,701, *to be codified at* 45 C.F.R. § 92.207(b)(5) (emphasis added); *see also id.* at 37,691, *to be codified at* 42 C.F.R. § 438.3(d)(4) (requiring Medicaid service contracts to prohibit policies or practices with a discriminatory "effect" on "gender identity").

An insurer or State may avoid sanctions by showing no "medical necessity" in a particular case. But the 2024 Rules prohibit a "categorical coverage exclusion … for all health services related to gender transition." 89 Fed. Reg. at 37,701, *to be codified at* 45 C.F.R. § 92.207(b)(4), (c). In other words, HHS has already determined that "gender transition" is medically necessary, and that disagreeing with HHS's view on this issue is discriminating on the basis of sex.

## ARGUMENT

A party seeking a preliminary injunction must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). To establish a "substantial likelihood of success on the merits," Plaintiffs need only show its claims are "*likely* or probable" to succeed. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005).

The Administrative Procedure Act ("APA") also provides that "to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action." 5 U.S.C. § 705. The same standard that governs preliminary injunctions governs a stay. *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

## I.   Plaintiffs Are Likely To Prevail on the Merits

### A. "Gender Identity" Is Not Protected by Section 1557

#### 1.   *Eleventh Circuit precedent on Title IX controls this case*

The 2024 Rules are premised on the notion that Title IX, and hence Section 1557 (which incorporates Title IX by reference), prohibits any discrimination based on "gender identity." 89 Fed. Reg. at 37,699, *to be codified at* 45 C.F.R. § 92.101(a)(2). That premise is inconsistent with binding precedent. *See Adams.*, 57 F.4th at 813–14.

In *Adams*, the Eleventh Circuit squarely confronted the question at issue here. The transgender plaintiff there argued that separating bathrooms based on sex, and thus denying access to a bathroom consistent with an individual's "gender identity," was discriminating based on sex under Title IX. *Id.* at 811. The plaintiff argued this followed from *Bostock v. Clayton County*, which held that an employer discriminates "because of sex" under Title VII of the Civil Rights Act of 1964 when he fires a male for no reason other than identifying as a woman, but "retains an otherwise identical employee" who is a female. 590 U.S. 644, 659–60 (2020).

The Eleventh Circuit rejected the argument. The Court began by noting that "sex" in Title IX, and hence in Section 1557, unambiguously means "biological sex" (male and female), and not "gender identity." *Adams*, 57 F.4th at 812–13. And although *Bostock* proceeded on the assumption that "sex" means biological sex, "the statutory context of Title IX" required a different result. *Id.* at 813. As the Court noted, Title IX is an equal-opportunity statute that, among other things, permits separating living facilities based on sex, which is inconsistent with protecting "gender identity." *Id.* at 814–15 & n.7. Specifically, Title IX provides that "nothing contained [in Title IX] shall be construed to prohibit any [covered entity], from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686; *Adams*, 57 F.4th at 811. If Title IX were read to protect "gender identity," then this provision "would be rendered meaningless" whenever it came "into conflict with a transgender person's gender identity." *Id.* at 813–14. "That conclusion cannot comport" with Title IX. *Id.* at 814. For the same reason, the Court rejected the transgender plaintiff's argument that

separating facilities based on sex is prohibited sex "stereotyping." *Id.* at 813. *Adams* therefore makes it "pellucid" that unlike Title VII, Title IX doesn't protect "gender identity." *D.N. by Jessica N. v. DeSantis*, No. 0:21-cv-61334, 2023 WL 7323078, at *13 (S.D. Fla. Nov. 6, 2023).

The Court also noted that Title IX, unlike Title VII, was enacted under the "Spending Clause." *Adams*, 57 F.4th at 815. "A safeguard of our federalist system is the demand that Congress provide the States with a clear statement when imposing a condition on federal funding." *Id.* That "clear-statement" rule provided an independent basis for rejecting the transgender plaintiff's argument, as Title IX certainly does not *clearly* protect gender identity.

HHS recognizes that "Section 1557 is best read to incorporate existing interpretations of what constitutes sex discrimination under title IX, including regulatory interpretations *and case law.*" 89 Fed. Reg. at 37,638 (emphasis added). That case law includes *Adams*. The 2024 Rules, however, expand the concept of sex discrimination beyond the unambiguous text of Title IX, as interpreted by the Eleventh Circuit. Plaintiffs are therefore likely to prevail on the argument that the 2024 Rules are contrary to law.

### 2.   *HHS's attempts to avoid Title IX precedent fail.*

HHS implicitly recognizes that *Adams* precludes HHS's reading of Section 1557. *See* 89 Fed. Reg. at 37,574 n.116 (citing *Adams* with a "*but cf.*"). Nevertheless, HHS attempts to circumvent that precedent by arguing that Section 1557's reference to "the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C.

1681 et seq.)," 42 U.S.C. § 18116(a), incorporates only the phrase "on the basis of sex," 20 U.S.C. § 1681(a), but "does not incorporate provisions of title IX or that statute's regulations that do not define or interpret what constitutes a ground of discrimination or an enforcement mechanism," 89 Fed. Reg. at 37,639. In other words, HHS believes Section 1557 adopts just Title IX's lone provision barring sex discrimination, shorn from Title IX's surrounding provisions explaining what sex discrimination means in context.

That approach doesn't withstand scrutiny. HHS acknowledges that Section 1557 "incorporate[s] existing interpretations of what constitutes sex discrimination under title IX, including … case law." 89 Fed. Reg. at 37,638. And as explained, that Title IX "case law" includes *Adams*, which "define[s]" what it means to discriminate on the basis of sex. *Id.* at 37,638–39. Section 1686, also at issue in *Adams,* defines how "on the basis of sex" "shall be construed" in Title IX, so it is relevant to defining the scope of the prohibited ground of discrimination. 20 U.S.C. § 1686. *Adams* is therefore relevant "case law" even under HHS's selective reading of Section 1557. 89 Fed. Reg. at 37,638. And *Adams* concludes that gender identity is not a protected ground of discrimination under Title IX. 57 F.4th at 814. "Because Title IX does not protect … 'gender identity' status, neither does Section 1557." *Neese v. Becerra*, 640 F. Supp. 3d 668, 684 (N.D. Tex. 2022).

In any event, Section 1557 is a Spending Clause statute, which means restrictions on funds must be clearly stated, and "the needed clarity under the Spending Clause 'must come *directly from the statute*.'" *West Virginia v. U.S. Dep't of Treasury*, 59

F.4th 1124, 1147 (11th Cir. 2023) (emphasis added). The Eleventh Circuit has already held that "on the basis of sex" in Title IX unambiguously does *not* include "gender identity," the exact opposite of clearly doing so. *Adams*, 57 F.4th at 814–15. Nor does Title IX *clearly* forbid separating private spaces based on sex. In fact, it expressly allows separating living facilities based on sex, and *Adams* held it allows separate bathrooms too. Therefore, even if there is some doubt about to what extent Section 1557 imports Title IX, Plaintiffs are still likely to prevail.

### 3. Even setting aside precedent, HHS's interpretation of Section 1557 is wrong.

The Court need go no further, but Plaintiffs nonetheless explain why HHS's reading of Section 1557 is wrong, even setting aside *Adams*.

It would have been quite easy for Congress to say in Section 1557 that any sex-based distinction is barred. But it didn't. Congress expressly incorporated *all* of "title IX" by reference, including not just the general prohibition against sex discrimination (20 U.S.C. § 1681(a)) but also the numerous separate provisions allowing for sex-based distinctions, insofar as they could be relevant to health programs and activities. *See* 20 U.S.C. §§ 1681(a)(2), 1681(a)(6)(B), 1681(a)(7)(A), 1681(a)(8), 1686. Congress even used "et seq.," which means "and the following," to confirm that the remaining provisions of Title IX applied. *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 690 (N.D. Tex. 2016). HHS suggests Congress thoughtlessly put "et seq." in the statute, and that it has no "substantive" content. 89 Fed. Reg. at 37,532. Courts, however, do not lightly assume that statutory text is "meaningless." *Adams*, 57 F.4th at 813. When

12

Congress transplanted "title IX" into the ACA, it brought Title IX's "soil" with it, including its exceptions (and case law such as *Adams*). *SuVicMon Dev., Inc. v. Morrison*, 991 F.3d 1213, 1224 (11th Cir. 2021). Moreover, Congress knows how to reference only a single section of a law: it did so in Section 1557 itself. 42 U.S.C. § 18116(a) (incorporating "section 794 of title 29," part of the Rehabilitation Act of 1973). This difference must be presumed intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983).

Incorporating Title IX makes good sense: Congress wanted to ensure a uniform regime with ready-made case law to promote clarity and certainty for funding recipients. There is no daylight between the scope of "on the basis of sex" in Title IX and Section 1557. Because Title IX does not protect "gender identity" status, neither does Section 1557.

### B. Rejecting Gender-Transition Interventions Is Not Sex Discrimination.

Plaintiffs are likely to prevail for the independent reason that even if Section 1557 incorporates only Title IX's general prohibition against discriminating based on sex, the Eleventh Circuit has held that a State "does not discriminate based on sex" when it forbids hormonal treatments and surgeries for a gender transition. *Eknes-Tucker*, 80 F.4th at 1228. Although *Eknes-Tucker* involved the Equal Protection Clause, the Court's reasoning is binding here.

#### 1.   *Eknes-Tucker's Reasoning Is Binding.*

*Eknes-Tucker* involved a challenge to an Alabama law prohibiting gender-transition interventions in minors, particularly puberty blockers and cross-sex

13

hormones. *Eknes-Tucker*, 80 F.4th at 1210, 1227. The plaintiffs argued the law discriminated based on sex by referencing sex in the statute and by stereotyping based on gender "nonconformity." *Id.* at 1228.

The Eleventh Circuit held that "the statute does not discriminate based on sex." *Id.* As the Court noted, the law prohibited drugs used for a specific therapeutic purpose: "treating discordance between biological sex and sense of gender identity." *Id.* Any reference to sex or difference in treatment was due to the therapeutic purpose of the drugs coupled with basic biological facts about sex, which is not a stereotype. *Id.* at 1229. Only females can take supraphysiologic levels of testosterone for a gender transition, and only males can take supraphysiologic levels of estrogen for a gender transition. *Id.* at 1213, 1228. But acknowledging this reality is not discriminating.

Nor did the law stereotype based on sex by prohibiting interventions sought only by "gender nonconforming individuals." *Id.* at 1229. As the Court held, "the regulation of a course of treatment that only gender nonconforming individuals can undergo" is not stereotyping "based on sex" "unless the regulation were a pretext for invidious discrimination against such individuals." *Id.* at 1228–30. *Eknes-Tucker* therefore holds that absent a showing of animus, a ban on gender-transition interventions doesn't discriminate "based on sex," even when a law restricts interventions that are necessarily "sex-based." *Id.* at 1228.

The Court also distinguished *Bostock* on two grounds. First, the Court emphasized that the text of the Equal Protection Clause is different than the text of

Title VII, the law at issue in *Bostock. Eknes-Tucker*, at 1228–29. But second, and more important here, the Court emphasized the "different factual context" involved in *Eknes-Tucker* and *Bostock*—*Eknes-Tucker* involved a law regulating specific medical treatments, not a rule penalizing a transgender individual for no reason other than being transgender. *Id.* at 1229.

*Eknes-Tucker*'s reasoning is binding here. Title IX, like the Equal Protection Clause, prohibits only "intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Section 1557, therefore, also requires "a discriminatory intent or motive." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) . So, when *Eknes-Tucker* says that a ban on gender-transition interventions doesn't intentionally discriminate "on the basis of sex," the very same words used in Title IX and imported into Section 1557, that reasoning also carries over to Title IX and Section 1557.[2]

### 2.   *The 2024 Rules Conflict With Eknes-Tucker.*

The 2024 Rules conflict with *Eknes-Tucker* in at least two ways. *First*, the 2024 Rules make it presumptively discriminatory for covered entities to "[d]eny or limit"

---

[2] The Eleventh Circuit recently held that an employer violates Title VII when it excludes all denies health insurance coverage for gender-transition interventions. *Lange v. Hous. Cnty.*, No. 22-13626, slip op. at 9 (11th Cir. May 13, 2024). But *Lange* (like *Bostock*) interprets Title VII, which is not a Spending Clause statute like Title IX (at issue here). *Fitzpatrick v. Bitzer*, 427 U.S. 445, 458 (1976) (Brennan, J., concurring). So unlike Section 1557, Title VII need not satisfy the Spending Clause's stringent requirement of clear and unambiguous notice. *Adams*, 57 F.4th at 815. In any event, to the extent *Lange* conflicts with *Eknes-Tucker*, *Eknes-Tucker* controls. *Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 n.2 (11th Cir. 2006).

puberty blockers, cross-sex hormones, or surgeries "sought for purpose of gender transition," so long as those entities provide the services for "other purposes." 89 Fed. Reg. at 37,701, *to be codified at* 45 C.F.R. § 92.206(b)(4); *see also id.*, *to be codified at* 45 C.F.R. § 92.207(b)(1) (requiring services "typically or exclusively" associated with one sex). Any covered entity that categorically refuses to provide interventions "sought for purpose of gender transition" is a sex discriminator. NPRM, 87 Fed. Reg. at 47,867; Compl. ¶¶ 8, 140.

The 2024 Rules therefore prohibit discriminating based on therapeutic purpose, which is inherent in the practice of medicine and is not intentional sex discrimination. *Eknes-Tucker*, 80 F.4th at 1228. To see why, consider the following otherwise identical patients:

   (a) A male seeks an orchiectomy (removal of testicles) to treat testicular cancer;

   (b) A male who identifies as a woman seeks an orchiectomy to treat testicular cancer;

   (c) A male who identifies as a woman seeks an orchiectomy to "transition."

If a surgeon provides the medical treatment to patient (a) but not (b), discrimination based on gender stereotypes may be afoot, as no other "reasonable distinction can be found between those favored and those not favored." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 286 (2011); *Discrimination*, Black's Law Dictionary 534 (9th ed. 2009) (same).

But a surgeon who treats patient (a) but not (c) is not presumably discriminating based on sex: the surgeon is instead discriminating based on the patient's medical

condition or diagnosis. *See Eknes-Tucker*, 80 F.4th at 1228; *id.* at 1233 (Brasher, J., concurring) (same); *L.W.*, 83 F.4th at 481–82 (same in equal protection case); *Kadel v. Folwell*, No. 22-1721, 2024 WL 1846802, at \*31–33, \*35 n.19 (4th Cir. Apr. 29, 2024) (Richardson, J., dissenting) (same in equal protection and Section 1557 case). To use *Bostock*'s language, removing reproductive organs with cancer is not "to [the doctor's mind], materially identical in all respects" to removing healthy reproductive organs for a gender transition. *Bostock*, 590 U.S. at 660. That's because, in medicine as in pharmacy, the "therapeutic purpose" is material to a course of treatment. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142 (2000). Because the medical diagnosis is different, not "materially identical," intentional sex discrimination cannot be presumed. *Eknes-Tucker*, 80 F.4th at 1228; *Bostock*, 590 U.S. at 660.

*Second*, the 2024 Rules prohibit a facially neutral reimbursement policy or practice limiting gender-transition interventions if the policy or practice merely "*results in* sex discrimination." 89 Fed. Reg. at 37,701, *to be codified at* 45 C.F.R. § 92.207(b)(5). HHS claims that limiting coverage for a gender transition intentionally discriminates on the basis of gender nonconformity "because transgender individuals are the only individuals who seek transition-related care." NPRM, 87 Fed. Reg. at 47,871. But *Eknes-Tucker* rejected that same argument: "the regulation of a course of treatment that only gender nonconforming individuals can undergo" is not stereotyping "based on sex" (the same words used in Title IX) "unless the regulation were a pretext for invidious discrimination against such individuals." *Eknes-Tucker*, 80 F.4th at 1228–30.

For example, only women have abortions, but refusing to perform an abortion is not presumptive proof of misogynism. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993).

Nor are gender-transition interventions "such an irrational object of disfavor" that intentional discrimination on the basis of gender nonconformity can be presumed. *Id.* According to HHS, any covered entity that believes that "gender transition" interventions are "experimental or cosmetic" is displaying animus. *See* 89 Fed. Reg. at 37,701; NPRM, 87 Fed. Reg. at 47,874. Not so. "The unsettled, developing, in truth still experimental, nature of treatments in this area surely permits more than one policy approach." *L.W.*, 83 F.4th at 488. As numerous health organizations, States, and even western European nations have now recognized, gender-transition interventions have serious health risks, and it is far from settled that the therapeutic benefits outweigh the risks. Comp. ¶¶ 85–108. Opposing gender-transition interventions as experimental and harmful is therefore "rational." *Eknes-Tucker*, 80 F.4th at 1225. Section 1557 doesn't answer this debate by preempting state ethical standards of care restricting gender-transition interventions. *See* 42 U.S.C. § 18114(5) (ACA rules must not "violate the principles of informed consent and the ethical standards of health care professionals").

### C. The Social Security Act Does Not Authorize Rules Forbidding Disparate Impacts on Gender Identity.

What cannot be done through Section 1557, HHS seeks to accomplish through the Social Security Act ("SSA"). In addition to purporting to implement Section 1557, the 2024 Rules also amend the standard contract requirements under Medicaid and

CHIP to require prohibiting any policy or practice that has the *"effect of* discriminating" based on an individual's "gender identity." 89 Fed. Reg. at 37,691, *to be codified at* 42 C.F.R. §§ 438.3(d)(4) (emphasis added), 457.1201(d). But as explained above, Section 1557 doesn't prohibit discriminating based on gender identity, nor does it forbid discriminatory effects. So, for purported additional statutory authority, HHS invokes the SSA, which was also enacted under the Spending Clause. *See* 89 Fed. Reg. at 37,668. HHS's attempt fails.

*First*, HHS invokes its authority to adopt "methods of administration" for Medicaid that are "necessary for the proper and efficient operation of the [state Medicaid] plan." 42 U.S.C. § 1396a(a)(4). But novel civil rights laws are not "methods of administration." Congress offered examples of "methods of administration," giving "more precise content" to the term. *United States v. Williams*, 553 U.S. 285, 294 (2008) (*noscitur a sociis*). It includes setting "personnel standards" and providing for "medical personnel" and transporting patients. 42 U.S.C. § 1396a(a)(4). That humdrum list of *administrative* tasks looks nothing like the power to declare new civil rights guarantees that will transform the practice of medicine. When the SSA was enacted, States had no "clear" "notice" from the face of the statute that HHS could force their contractors into the gender-transition business. *Adams*, 57 F.4th at 815. HHS's attempts to do so therefore exceed its statutory authority.

*Second*, HHS invokes a CHIP provision stating that the "purpose of" the CHIP program "is to provide funds to States to enable them to initiate and expand the provision of child health assistance … in an effective and efficient manner." 42 U.S.C.

§ 1397aa(a). But that anodyne statement of purpose provides no authority to HHS, and certainly, it doesn't clearly authorize these rules. *Adams*, 57 F.4th at 815. In any event, imposing effects-based liability on contractors does nothing to improve the "efficiency" of the CHIP program. *See* "Efficient," *Am. Heritage Dictionary* (5th ed. 2022) ("Acting or producing effectively with a minimum of waste, expense, or unnecessary effort"). If anything, disparate impact requirements increase burdens and costs on the delivery of services by putting "undue pressure" on contractors "to adopt inappropriate prophylactic pressures." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 992 (1988).

## II.   Plaintiffs Will Suffer Irreparable Injury

Absent intervention from this Court, the 2024 Rules will be effective on Friday, July 5, 2024. 89 Fed. Reg. at 37,522. If they go into effect, Florida will face an untenable choice: renounce its sovereign interest in protecting the health and safety of its citizens and suffer irrecoverable costs, or lose federal financial assistance from HHS, an untenable option. *See* Compl. ¶ 168. Without temporary relief, Florida will remain caught between the 2024 Rules and Florida law, facing "actual and imminent" injury to its sovereign interests and unrecoverable monetary loss. *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). The 2024 Rules also leaves doctors such as the members of Plaintiff Catholic Medical Association ("CMA") in legal and professional jeopardy, forcing them to incur unrecoverable costs to avoid non-compliance. Plaintiffs are irreparably harmed in multiple ways.

*First*, the 2024 Rules purport to preempt any state law that requires covered entities to separate private spaces in public buildings based on sex. Florida has such a law. *See* Fla. Stat. § 553.865(5), (12). The 2024 Rules also unlawfully attempt to preempt Florida's laws, regulations, and standards of care restricting gender-transition interventions and preventing the use of public funds for these purposes. Compl. ¶¶ 109–28, 174, 181–84.

That is irreparable harm. "A state retains a sovereign interest in enacting and enforcing state law, and the 'inability to enforce [the State's] duly enacted plans clearly inflicts irreparable harm on the State.'" *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1039 (M.D. Fla. 2021) (quoting *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)); *see also Texas v. Becerra*, 577 F. Supp. 3d 527, 557 (N.D. Tex. 2021) ("irreparable harm exists when a federal regulation prevents a state from enforcing its duly enacted laws"). The harm is also imminent and concrete. Indeed, the federal government has already argued that Florida's Medicaid rule restricting public spending on these interventions, Fla. Admin. Code r. 59G-1.050(7), is preempted by Section 1557, asserting that HHS's then-proposed (and now final) rules make this clear by prohibiting "categorical" limits on gender-transition interventions. Brief for the United States as Amicus Curiae at 26 n.10, *Dekker v. Fla. Agency for Health Care Admin.*, No. 23-12155 (11th Cir. Dec. 4, 2023), https://perma.cc/9UYG-SVPL.

*Second*, if the 2024 Rules go into effect and Florida is forced to abandon its health and safety laws and regulations while this suit is pending, the resulting harms to the "health and welfare of [Florida's] citizens" could never be "repair[ed]" by

21

"monetary damage." *Texas v. Biden*, 589 F. Supp. 3d 595, 621 (N.D. Tex. 2022). The 2024 Rules will compel health institutions, including institutions for the intellectually and developmentally disabled, to allow "nonbinary" males into disabled female residents' private spaces, increasing the risk of harm to Florida's citizens. Ex. B, Bailey Dec. ¶¶ 31–41 Some of Florida's citizens, including minors, would also suffer irreversible infertility and other health harms while the suit is pending. Compl. ¶¶ 92–97.

*Third*, if the 2024 Rules go into effect, Florida would have to amend the State Group Health Insurance Program to cover gender-transition interventions, suffering irrecoverable monetary losses to administer and fund such payments while this suit proceeds. Compl. ¶¶ 169–70 & Ex. 2. Similarly, Florida would be pressured to amend its laws and regulations limiting funding for these interventions, which would require Florida to incur irrecoverable costs under Medicaid and CHIP while this litigation is pending. Compl. ¶ 179 & Ex. 1 ¶¶ 12–22.

*Fourth*, if the 2024 Rules go into effect, it would force CMA doctors—on pain of ineligibility to participate in Medicare, Medicaid, and CHIP—to adopt, follow, and be trained on policies that harm patients, and to provide, refer for, or affirm, unethical gender-transition procedures. Ex. C, Akey Decl. ¶¶ 25–36; Ex. D, Kaiser Decl. ¶¶ 17–21; Compl. Ex. 3, Dickerson Decl. ¶¶ 32–36; Compl. Ex. 4, Parker Decl. ¶¶ 19–21; Compl. Ex. 5, Van Meter Decl. ¶¶ 23–40. CMA members likewise separate bathroom facilities by sex, regardless of gender identity. Compl. Ex. 3, Dickerson Decl. ¶ 28; Compl. Ex. 4, Parker Decl. ¶ 16; Compl. Ex. 5, Van Meter Decl. ¶ 19. The rule's

"'substantial pressure'" on doctors to upend their practices and violate their conscience "constitutes an irreparable injury." *Navy Seal 1 v. Austin*, 586 F. Supp. 3d 1180, 1204 (M.D. Fla. 2022).

### III.   Balance of Harms and Public Interest Favor Plaintiffs

The balance of harms and public interest factors merge when the government is the defendant, *Gonzales v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020); *cf. Nken v. Holder*, 556 U.S. 418, 435 (2009), and they strongly favor Plaintiffs. Absent an injunction, Plaintiffs will suffer serious imminent harm to their interests and unrecoverable monetary loss.

By contrast, HHS has no legitimate interest in an unlawful rule, because "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021); *see also BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("Any interest [the government] may claim in enforcing an unlawful [rule] is illegitimate."). Section 1557, moreover, is self-executing, so staying or enjoining enforcement of the 2024 Rules won't interfere with HHS's legitimate law-enforcement interests. If the 2024 Rules are stayed, HHS will be able to continue enforcing Section 1557 to prevent actual intentional sex discrimination, as well as prohibited intentional discrimination based on race, disability, or age. But it won't be able to enforce the misreading of Section 1557 embodied in the 2024 Rules.

## IV.   A Stay Is the Proper Remedy

The APA expressly authorizes courts to issue all "necessary and appropriate process to postpone the effective date of an agency action or to preserve statutes or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Courts may thus stay the effective date of a rule, and this relief need not be "party-specific." *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). At the same time, a stay should be no broader than needed to prevent the irreparable harm. *Id.* Plaintiffs are irreparably harmed by HHS's interpretation of Title IX as incorporated by Section 1557, and HHS's reading of the SSA. The Court should therefore stay the effective date of the provisions of the 2024 Rules that implement HHS's reading of Title IX as incorporated in Section 1557, as well as its reading of the SSA to prohibit disparate impacts. *See* 89 Fed. Reg. at 37,698–701, *to be codified at* 45 C.F.R. §§ 92.101, 92.206, 92.207; *id.* at 37,691, *to be codified at* 42 C.F.R. § 438.3(d)(4).

## CONCLUSION

Plaintiffs are likely to succeed on the merits, will suffer imminent and irreparable injury absent temporary relief, and the balance of harms favors Plaintiffs. Accordingly, this Court should enter an order postponing the effective date of the 2024 Rules for Plaintiffs while this suit proceeds, as expressly authorized by the APA. 5 U.S.C. § 705. In the alternative, this Court should preliminarily enjoin Defendants from enforcing the 2024 Rules. Because this case is complex, an oral hearing would assist the Court.

ASHLEY MOODY
ATTORNEY GENERAL

JOHN GUARD
CHIEF DEPUTY ATTORNEY GENERAL
Florida Bar No. 374600

JAMES H. PERCIVAL
CHIEF OF STAFF
Florida Bar No. 1016188

HENRY C. WHITAKER
SOLICITOR GENERAL
Florida Bar No. 1031175

/s/ NATALIE P. CHRISTMAS
NATALIE P. CHRISTMAS*
SENIOR COUNSELOR
Florida Bar No. 1019180

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Natalie.Christmas@myfloridalegal.com

*Lead Counsel*
*Counsel for the State of Florida*

/s/ R. TRENT MCCOTTER
R. TRENT MCCOTTER (*pro hac vice pending*)*
JAMES R. CONDE (*pro hac vice pending*)
Boyden Gray PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

*Lead Counsel*
*Counsel for Agency for Health Care Administration & Florida Department of Management Services*

ANDREW T. SHEERAN
GENERAL COUNSEL
Florida Bar No. 0030599
Agency for Health Care Administration
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3670
Andrew.Sheeran@ahca.myflorida.com

*Counsel for Agency for Health Care Administration*

KRISTEN LARSON
GENERAL COUNSEL
Florida Bar No. 124770
Florida Department of Management Services
4050 Esplanade Way
Tallahassee, Florida 32399
(850) 922-2137
Kristen.Larson@dms.fl.gov

*Counsel for Florida Department of Management Services*

MATTHEW S. BOWMAN (*pro hac vice forthcoming*)
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 (fax)
mbowman@ADFlegal.org

/S/ JULIE MARIE BLAKE
JULIE MARIE BLAKE (*pro hac vice forthcoming*)*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
(571) 707-4790 (fax)
jblake@ADFlegal.org

DAVID A. CORTMAN
Florida Bar No. 18433
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 (fax)
dcortman@ADFlegal.org

*\* Lead Counsel*
*Counsel for Plaintiff Catholic Medical Association*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2024, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties who have registered with CM/ECF and filed an appearance in this action. I also sent a copy by email to the following U.S. Department of Justice attorney assigned to this matter:

Liam Holland
U.S. Department of Justice
Liam.C.Holland@usdoj.gov

*/s/ R. Trent McCotter*
R. Trent McCotter