# EXHIBIT A

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Medicare & Medicaid Services

**42 CFR Parts 438, 440, 457, and 460**

## Office of the Secretary

**45 CFR Parts 80, 84, 92, 147, 155, and 156**

**RIN 0945–AA17**

**Nondiscrimination in Health Programs and Activities**

**AGENCY:** Office for Civil Rights, Office of the Secretary, Department of Health and Human Services; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rule and interpretation.

**SUMMARY:** The Department of Health and Human Services (HHS or the Department) is issuing this final rule regarding section 1557 of the Affordable Care Act (ACA) (section 1557). Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities. Section 1557(c) of the ACA authorizes the Secretary of the Department to promulgate regulations to implement the nondiscrimination requirements of section 1557. The Department is also revising its interpretation regarding whether Medicare Part B constitutes Federal financial assistance for purposes of civil rights enforcement. Additionally, the Department is revising provisions prohibiting discrimination on the basis of sex in regulations issued by the Centers for Medicare & Medicaid Services (CMS) governing Medicaid and the Children's Health Insurance Program (CHIP); Programs of All-Inclusive Care for the Elderly (PACE); health insurance issuers and their officials, employees, agents, and representatives; States and the Exchanges carrying out Exchange requirements; agents, brokers, or web-brokers that assist with or facilitate enrollment of qualified individuals, qualified employers, or qualified employees; issuers providing essential health benefits (EHB); and qualified health plan issuers.

**DATES:** *Effective date:* July 5, 2024.

*Applicability dates:* Unless otherwise specified, the provisions of this final rule apply on or after July 5, 2024. See the **SUPPLEMENTARY INFORMATION** section for additional information.

**FOR FURTHER INFORMATION CONTACT:**

**Office for Civil Rights**

Daniel Shieh, Associate Deputy Director, HHS Office for Civil Rights (202) 240–3110 or (800) 537–7697 (TDD), or via email at *1557@hhs.gov,* for matters related to section 1557.

**Centers for Medicare & Medicaid Services**

John Giles, (410) 786–5545, for matters related to Medicaid.

Meg Barry, 410–786–1536, for matters related to CHIP.

Timothy Roe, (410) 786–2006 for matters related to Programs of All-Inclusive Care for the Elderly.

Becca Bucchieri, (301) 492–4341 or Leigha Basini, (301) 492–4380, for matters related to 45 CFR 155.120, 155.220, 156.125, 156.200, and 156.1230.

Lisa Cuozzo, (410) 786–1746, for matters related to 45 CFR 147.104.

Hannah Katch, (202) 578–9581, for general questions related to CMS amendments.

*Assistance to Individuals With Disabilities in Reviewing the Rulemaking Record:* Upon request, the Department will provide an accommodation or appropriate auxiliary aid or service to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for the final rule. To schedule an appointment for this type of accommodation or auxiliary aid, please call (202) 240–3110 or (800) 537–7697 (TDD) for assistance or email *1557@ hhs.gov.*

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background
   A. Regulatory History
   B. Overview of the Final Rule
II. Provisions of the Proposed Rule and Analysis and Responses to Public Comments
   Subpart A—General Provisions
   Purpose and Effective Date (§ 92.1)
   Application (§ 92.2)
   Treatment of the Title IX Religious Exception
   Relationship to Other Laws (§ 92.3)
   Definitions (§ 92.4)
   Assurances Required (§ 92.5)
   Remedial Action and Voluntary Action (§ 92.6)
   Designation and Responsibilities of a Section 1557 Coordinator (§ 92.7)
   Policies and Procedures (§ 92.8)
   Training (§ 92.9)
   Notice of Nondiscrimination (§ 92.10)
   Notice of Availability of Language Assistance Services and Auxiliary Aids and Services (§ 92.11)
   Data Collection
   Subpart B—Nondiscrimination Provisions
   Discrimination Prohibited (§ 92.101)

Subpart C—Specific Applications to Health Programs and Activities
   Meaningful Access for Individuals With Limited English Proficiency (§ 92.201)
   Effective Communication for Individuals With Disabilities (§ 92.202)
   Accessibility for Buildings and Facilities (§ 92.203)
   Accessibility of Information and Communication Technology for Individuals With Disabilities (§ 92.204)
   Requirement To Make Reasonable Modifications (§ 92.205)
   Equal Program Access on the Basis of Sex (§ 92.206)
   Nondiscrimination in Health Insurance Coverage and Other Health-Related Coverage (§ 92.207)
   Prohibition on Sex Discrimination Related to Marital, Parental, or Family Status (§ 92.208)
   Nondiscrimination on the Basis of Association (§ 92.209)
   Nondiscrimination in the Use of Patient Care Decision Support Tools (§ 92.210)
   Nondiscrimination in the Delivery of Health Programs and Activities Through Telehealth Services (§ 92.211)
   Subpart D—Procedures
   Enforcement Mechanisms (§ 92.301)
   Notification of Views Regarding Application of Federal Religious Freedom and Conscience Laws (§ 92.302)
   Procedures for Health Programs and Activities Conducted by Recipients and State Exchanges (§ 92.303)
   Procedures for Health Programs and Activities Administered by the Department (§ 92.304)
III. Change in Interpretation—Medicare Part B Funding Meets the Definition of Federal Financial Assistance; Responses to Public Comment
IV. CMS Amendments
   A. Medicaid and Children's Health Insurance Program (CHIP)
   B. Programs of All-Inclusive Care for the Elderly (PACE)
   C. Insurance Exchanges and Group and Individual Health Insurance Markets
   1. Comments and Responses to 45 CFR 147.104(e), 155.120(c), 155.220(j), 156.125(b), 156.200(e), and 156.1230(b)
   2. Health Insurance Exchanges
   a. Non-Interference With Federal Law and Nondiscrimination Standards (45 CFR 155.120)
   b. Federally-Facilitated Exchange Standards of Conduct (45 CFR 155.220)
   c. Essential Health Benefits Package: Prohibition on Discrimination (45 CFR 156.125)
   d. QHP Issuer Participation Standards (45 CFR 156.200)
   e. Direct Enrollment With the QHP Issuer in a Manner Considered To Be Through the Exchange (45 CFR 156.1230)
   3. Prohibition of Discrimination—Group and Individual Health Insurance Guaranteed Availability of Coverage (45 CFR 147.104)
V. Executive Order 12866 and Related Executive Orders on Regulatory Review
   A. Regulatory Impact Analysis
   a. Baseline Conditions
   b. Costs of the Final Rule

c. Total Quantified Costs
3. Discussion of Benefits
4. Analysis of Regulatory Alternatives to the Final Rule
B. Regulatory Flexibility Act—Final Small Entity Analysis
1. Entities That Will Be Affected
a. Physicians
b. Pharmacies
c. Health Insurance Issuers
d. Local Government Entities
2. Whether the Rule Will Have a Significant Economic Impact on Covered Small Entities
C. Executive Order 12250 on Leadership and Coordination of Nondiscrimination Laws
D. Paperwork Reduction Act
1. ICRs Regarding Assurances (§ 92.5)
2. ICRs Regarding Section 1557 Coordinator (§ 92.7) and Training (§ 92.9)
3. ICRs Regarding Notice of Nondiscrimination (§ 92.10) and Notice of Availability of Language Assistance Services and Auxiliary Aids and Services (§ 92.11)
E. Assessment of Federal Regulation and Policies on Families

# I. Background

Section 1557 of the Affordable Care Act (ACA) (section 1557), 42 U.S.C. 18116, prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in a health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, except where otherwise provided in title I of the ACA. Section 1557 also prohibits discrimination on the basis of race, color, national origin, sex, age, or disability under any program or activity that is administered by an executive agency, or any entity established under title I of the ACA or its amendments. The statute cites title VI of the Civil Rights Act of 1964 (title VI), 42 U.S.C. 2000d *et seq.,* title IX of the Education Amendments of 1972 (title IX), 20 U.S.C. 1681 *et seq.,* the Age Discrimination Act of 1975 (Age Act), 42 U.S.C. 6101 *et seq.,* and section 504 of the Rehabilitation Act of 1973 (section 504), 29 U.S.C. 794, to identify the grounds of discrimination prohibited by section 1557. The entities to which section 1557 and this final rule apply (*i.e.,* recipients of Federal financial assistance, the Department, and title I entities) are collectively referred to as "covered entities." The statute further specifies that the enforcement mechanisms provided for and available under title VI, title IX, the Age Act, or section 504 shall apply for purposes of violations of section 1557, 42 U.S.C. 18116(a). The statute authorizes the Secretary of the U.S. Department of Health and Human Services (HHS or the Department) to promulgate implementing regulations for section 1557, 42 U.S.C. 18116(c).

## A. Regulatory History

On August 1, 2013, the HHS Office for Civil Rights (OCR) published a Request for Information in the **Federal Register**, 78 FR 46558,[1] followed by issuance of a notice of proposed rulemaking (NPRM) on September 8, 2015 (2015 NPRM), 80 FR 54171.[2] OCR finalized the first section 1557 regulation on May 18, 2016 (2016 Rule), 81 FR 31375. On June 14, 2019, the Department published a new section 1557 NPRM (2019 NPRM), 84 FR 27846, proposing to rescind and replace large portions of the 2016 Rule.[3] On June 12, 2020, OCR publicly posted its second section 1557 final rule (2020 Rule), which was published in the **Federal Register** on June 19, 2020, 85 FR 37160. The 2020 Rule remains in effect, save for the parts enjoined or set aside by courts, until the effective date of this final rule. In the meantime, entities that are subject to the 2020 Rule must continue to comply with the parts of the 2020 Rule that remain in effect.

On January 5, 2022, the Department proposed to amend CMS regulations such that Exchanges, issuers, and agents and brokers would be prohibited from discriminating against consumers based on their sexual orientation or gender identity in the HHS Notice of Benefit and Payment Parameters for 2023 NPRM, 87 FR 584 (January 5, 2022). CMS did not finalize the amendments in the Notice of Benefit and Payment Parameters for the 2023 final rule, 87 FR 27208 (May 6, 2022); instead, CMS proposed to make the amendments to its regulations in forthcoming Departmental rulemaking.

On July 25, 2022, OCR publicly posted the section 1557 NPRM associated with this rulemaking (2022 NPRM or Proposed Rule), which was published in the **Federal Register** on August 4, 2022, 87 FR 47824. OCR invited comment on the Proposed Rule by all interested parties. The comment period ended on October 3, 2022. In total we received 85,280 comments on the Proposed Rule.[4] Comments came from a wide variety of stakeholders, including but not limited to: civil rights/ advocacy groups, including language access organizations, disability rights organizations, women's advocacy organizations, and organizations serving lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) individuals; health care providers; consumer groups; religious organizations; academic and research institutions; reproductive health organizations; health plan organizations; health insurance issuers; State and local agencies; and tribal entities. Of the total comments, 79,126 were identified as being submitted by individuals. Of the 85,280 comments received, 70,337 (80 percent) were form letter copies associated with 30 distinct form letter campaigns.

## B. Overview of the Final Rule

### Section 1557

This preamble is divided into multiple sections: section II describes changes to the section 1557 regulation and contains four subparts: subpart A sets forth the rule's general provisions; subpart B contains the rule's nondiscrimination provisions; subpart C describes specific applications of the prohibition on discrimination to health programs and activities; and subpart D describes the procedures that apply to enforcement of the rule. Section III provides official notice of HHS's change in interpretation that Medicare Part B meets the definition of "Federal financial assistance." Section IV describes changes to CMS regulations.

OCR has made some changes to the Proposed Rule's provisions, based on the comments we received. Among the changes are the following:

OCR modified proposed § 92.4 (Definitions) to include new definitions for telehealth, State, relay interpretation, and patient care decision support tools.

OCR modified proposed § 92.201 (Meaningful access for individuals with limited English proficiency) to change "limited English proficient individual" to "individual with limited English proficiency" where applicable in this provision and elsewhere where the term is used. The text for proposed § 92.201(a) was updated to include "companions with limited English proficiency" for clarity and parity with the rule's effective communication

---

[1] Responses are available for public inspection at *https://www.regulations.gov/docket/HHS-OCR-2013-0007/comments.*

[2] The 2015 NPRM received roughly 2,160 comments, which are available for public inspection at *https://www.regulations.gov/docket/HHS-OCR-2015-0006/comments.*

[3] The 2019 NPRM received roughly 198,845 comments, which are available for public inspection at *https://www.regulations.gov/document/HHS-OCR-2019-0007-0001.* This count includes bundled submissions, including petitions and form letter campaigns, which were counted as individual comment submissions.

[4] This count includes bundled submissions, including petitions. The number of submission entries in the Federal Docket Management System is 75,254 submissions. Responses are available for public inspection at *https://www.regulations.gov/docket/HHS-OS-2022-0012.*

provision. OCR also modified proposed § 92.201(f) and proposed § 92.201(g) to address concerns that audio and video remote interpreting may not be appropriate to provide meaningful access in certain circumstances.

OCR modified proposed § 92.206 (Equal program access on the basis of sex) to clarify a covered entity's ability to raise legitimate and nondiscriminatory reasons for the denial of care under this provision, while stating that the basis for a denial or limitation must not be based on unlawful animus or bias, or constitute a pretext for discrimination.

OCR modified the text of proposed § 92.207 (Nondiscrimination in health insurance coverage and other health-related coverage), consistent with changes to § 92.206(c) to clarify that covered entities may raise a legitimate, nondiscriminatory reason for denials or limitations of health services in benefit design and in individual cases, while stating that the basis for a denial or limitation must not be based on unlawful animus or bias, or constitute a pretext for discrimination.

OCR revised proposed § 92.210 (Nondiscrimination in the use of clinical algorithms in decision-making) to change "clinical algorithms" and "clinical algorithms in decision-making" to "patient care decision support tools." OCR further specified the scope of the application of this provision and the requirement that covered entities take reasonable steps to mitigate discrimination once made aware of the potential for discrimination resulting from use of these tools.

OCR modified proposed § 92.302 (Notification of views regarding application of Federal religious freedom and conscience laws) to clarify the application of religious freedom and conscience laws, and aspects of the administrative process set forth in the provision, including that a recipient may request an assurance of an exemption under such laws, the availability of a temporary exemption, and the availability of an administrative appeal process.

CMS Amendments

In response to comments, CMS is finalizing the proposed amendments to the CMS regulations with a revision to scope of sex discrimination to be consistent with section 1557's regulatory text at § 92.101(a)(2).

## II. Provisions of the Proposed Rule and Analysis and Responses to Public Comments

*Subpart A—General Provisions*

Purpose and Effective Date (§ 92.1)

In the 2022 NPRM, proposed § 92.1(a) explained that the purpose of 45 CFR part 92 is to implement section 1557, which prohibits discrimination in certain health programs and activities on the "ground[s] prohibited" under title VI, the Age Act, or section 504. Section 1557 adopts the grounds of these statutes and prohibits discrimination based on race, color, national origin, sex, age, or disability.[5]

Proposed § 92.1(b) provided that the effective date of the section 1557 implementing regulation shall be 60 days after the publication of a final rule in the **Federal Register** and provided a delayed implementation date (referred to as "applicability date" in this final rule) for provisions of this part that require changes to health insurance or group health plan benefit design.

The comments and our responses regarding the purpose and effective date are set forth below.

*Comment:* Several commenters noted that the regulatory purpose described in the 2022 NPRM strengthens nondiscrimination protections in health care, and appropriately aligns with section 1557's statutory text and Congressional intent.

*Response:* As commenters noted, the 2022 NPRM's purpose is to prohibit discrimination in accordance with section 1557's statutory text. The Proposed Rule mirrors the statutory text and clarifies that the purpose of this rule is to regulate health programs and activities conducted and funded by the Department and those of title I entities. Thus, we maintain the regulatory language for § 92.1(a) as proposed in the 2022 NPRM.

*Comment:* One commenter observed that, in addition to title IX's general prohibition of discrimination on the ground of "sex," section 904 of title IX (20 U.S.C. 1684) also prohibits discrimination on the ground of blindness or severe vision impairment.

*Response:* Both HHS's and the Department of Education's title IX regulations define title IX to exclude section 906. *See* 45 CFR 86.2(a); 34 CFR 106.2(a). While 20 U.S.C. 1684 prohibits certain forms of discrimination on the

ground of blindness or severe vision impairment, such conditions are disabilities and section 1557 prohibits discrimination on the basis of disability as it is the "ground" of discrimination prohibited by the statute's reference to section 504. Accordingly, we decline to revise the regulatory text at § 92.1(a).

*Comment:* OCR received many comments about the proposed 60-day effective date for requirements other than those related to health insurance or group health plan coverage benefit design. Commenters identified several tasks covered entities would need to accomplish to comply with the final rule requirements within the proposed 60 days, including updating existing policies and procedures; developing and reviewing new content; developing written communications with members and distributing written documents, including preparing additional mailings; and familiarizing themselves with new requirements and OCR-provided tools and resources.

Most of these commenters expressed concern that covered entities would not be able to develop and implement the required policies and procedures (§ 92.8) and notices (§ 92.10, § 92.11), or complete the proposed training requirement (§ 92.9) within the allotted 60 days. A variety of commenters argued that the 60-day effective date for §§ 92.7 through 92.11 would be unreasonable for all covered entities, requesting that OCR consider allowing covered entities more time to come into compliance with the final rule.

Commenters' recommended compliance timeframes varied widely, from 180 days to three years following publication of the final rule in the **Federal Register**. One commenter asked that, for the first 18 to 24 months following publication of the final rule in the **Federal Register**, OCR's section 1557 enforcement efforts, including complaint investigations, primarily focus on providing covered entities technical assistance with respect to their section 1557 obligations.

*Response:* OCR appreciates comments regarding the effective date and commenters' identification of factors influencing feasibility of a single effective date for all section 1557 requirements. We are maintaining the overall 60-day effective date related to the general prohibition on discrimination on the basis of race, color, national origin, sex, age, and disability. This is consistent with the approach taken with respect to the effective date of our previous

---

[5] *See Schmitt* v. *Kaiser Found. Health Plan of Wash.,* 965 F.3d 945, 953 (9th Cir. 2020) ("Section 1557(a) incorporates only the prohibited 'ground[s]' and '[t]he enforcement mechanisms provided for and available under' the four civil rights statutes. A prohibited 'ground' for discrimination . . . is simply the protected classification at issue.").

distinctions exempt from the Age Act are also exempt from section 1557 enforcement.

*Response:* OCR appreciates commenters' request for clarity and directs commenters to § 92.101(b)(1) of this regulation, which adopts by reference the permissible uses of age located in the Department's Age Act regulations at 45 CFR part 91 (subpart B).

*Comment:* Some commenters argued that the Proposed Rule is inappropriate for the Indian Health Services (IHS) facilities because these are not open to members of the public but reserved for patients who are eligible beneficiaries as citizens of Tribal Nations, and as such, tribally operated IHS health facilities [21] should be exempt. These commenters stated that the 2022 NPRM failed to recognize the unique nature of the Indian Health Care System, which is the health care system for members of federally recognized Tribes in the United States. Commenters recommended that OCR acknowledge American Indian/Alaska Native (AI/AN) as a political classification, and not as a race-based classification. Commenters further opined that the 2022 NPRM failed to recognize the diplomatic, nation-to-nation relationship between Tribal Nations and the United States.

*Response:* OCR appreciates these comments. Similar concerns were raised during the 2022 NPRM Tribal Consultation held on August 31, 2022, pursuant to Executive Order 13175. The IHS, an agency within the Department, is responsible for providing health services to members of federally recognized tribes in 37 states, arising out of the special government-to-government relationship between the Federal Government and Indian tribes.[22]

Membership or eligibility in a federally recognized tribal entity is a political classification rather than a racial classification.[23] Preferences based upon the unique relationship between

the United States and federally recognized tribal entities are distinct from the forms of discrimination prohibited by Federal civil rights laws, which aim to protect all individuals on the basis of race, color, or national origin (including AI/AN individuals, regardless of political affiliation).[24] The Department's regulations implementing title VI provide that an individual shall not be deemed subjected to discrimination by reason of their exclusion from benefits limited by Federal law to individuals of a different race, color, or national origin. 45 CFR 80.3(d) (Indian Health and Cuban Refugee Services). IHS is mentioned in the Department's title VI regulation as an example of such a program. *Id.* In § 92.101(b), the final rule adopts this provision by reference, and OCR will fully apply it, as well as other applicable exemptions or defenses that may exist under Federal law.

Programs of the IHS are administered by IHS and tribes, including through self-determination contracts or self-governance compacts, and we intend to address any restrictions on application of the law to IHS programs in the context of individual complaints.

*Comment:* Some commenters requested that OCR develop an online tool that would help covered entities determine whether the final rule applies either directly or indirectly to an organization or other health program or activity.

*Response:* OCR provides various tools on our website to help covered entities determine their covered entity status and will continue to ascertain what tools would help the industry ensure widespread compliance. OCR notes that the Department's Office of Grants operates a website that tracks obligated Department grant funds, *https://taggs.hhs.gov/*, which allows the public to identify recipients of Department funding.

Summary of Regulatory Changes

For the reasons set forth in the Proposed Rule and considering the comments received, we are finalizing the provisions as proposed in § 92.2, with modification. We are revising § 92.2(a)(3) to add the modifier "health" to "program or activity administered by a title I entity." We are also revising § 92.2(b) to state that the provisions of this part shall not apply to any

employer "or other a plan sponsor of a group health plan, including but not limited to, a board of trustees (or similar body), association or other group," with regard to its employment practices, including the provision of employee health benefits.

Treatment of the Title IX Religious Exception

In the 2022 NPRM, OCR proposed to not import the title IX religious exception into the section 1557 regulation. The title IX statute states that the nondiscrimination requirements "shall not apply to an educational institution which is controlled by a religious organization" to the extent that such application "would not be consistent with the religious tenets of such organization." 20 U.S.C. 1681(a)(3), *as amended* Public Law 100–259, section 3(b), Mar. 22, 1988, 102 Stat. 29. The title IX statutory definition of "program or activity" further limits the nondiscrimination requirements, in that they do not apply to "any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization." *Id.* at 1687(4).

In the 2022 NPRM, we said that under the most natural understanding of section 1557's text, which bans discrimination "on the ground prohibited under . . . title IX," the statutory term "ground prohibited" is best understood as incorporating only the bases on which discrimination is prohibited in the referenced statutes (*i.e.,* "sex" in title IX). 87 FR 47839. Rather than import the title IX exception for "educational institution[s]" that are controlled by "religious organization[s]," OCR proposed that the best way to address religious objections to the application of this rule—and the way most consistent with section 1557's statutory text and structure—would be through the process provided in proposed § 92.302. We sought comment on this approach. We particularly invited comments from covered entities controlled by or affiliated with religious organizations, providers employed by such entities, and people who receive health care from religiously affiliated medical providers.

The comments and our responses regarding this request for comment are set forth below.

*Comment:* Commenters provided mixed responses to OCR's proposal not to import the title IX religious exception into this rule. Many commenters supported OCR's statutory interpretation that section 1557

---

[21] Titles I and V of the Indian Self-Determination and Education Assistance Act, Pub. L. 93–638, as amended, provide Tribes the option of exercising their right to self-determination by assuming control and management of programs previously administered by the Federal Government. Since 1992, the IHS has entered into agreements with tribes and tribal organizations to plan, conduct, and administer programs authorized under section 102 of the Act. Today, over sixty percent of the IHS appropriation is administered by tribes, primarily through self-determination contracts or self-governance compacts. U.S. Dep't of Health & Hum. Servs., Indian Health Servs., *IHS Profile, https://www.ihs.gov/newsroom/factsheets/ihsprofile/.*

[22] U.S. Dep't of Health & Hum. Servs., Indian Health Servs., *About IHS, https://www.ihs.gov/aboutihs/.*

[23] *See Morton* v. *Mancari,* 417 U.S. 535, 553 & n.24 (1974).

[24] *See Morton* v. *Mancari,* 417 U.S. 535, 550 (1974) ("[a] provision aimed at furthering Indian self-government by according an employment preference withing the [Bureau of Indian Affairs] for qualified members of the governed group can readily co-exist with a general rule prohibiting employment discrimination on the basis of race.").

incorporated the title IX statute only with respect to the ground of discrimination prohibited (sex) and its enforcement mechanisms (*e.g.,* termination of Federal financial assistance and other means authorized by law). Several commenters stated that this reading is most consistent with the statutory structure, because if Congress intended for the title IX religious exception to apply, the statute would also require the importation of the other title IX exceptions, many of which are by their terms plainly inapplicable in the context of health care.

Several commenters also stated that if Congress wanted to include the title IX religious exception, it could have either explicitly referenced or listed the exception in the section 1557 statutory text. Many commenters stated that any silence regarding the title IX exceptions was not an oversight by Congress, but an intentional decision. Many commenters contended that importing the title IX religious exception is contrary to the purpose of section 1557 and the goal of the ACA: to expand access to health care coverage. Additionally, many commenters said that importing the title IX religious exception is unnecessary given the numerous other Federal laws that allow religious organizations and providers to invoke a conscience or religious objection to providing certain kinds of medical services and care.

Many other commenters disagreed with OCR's interpretation, claiming that Congress intended to incorporate the entire title IX statutory scheme by including the signal "*et seq.*" Several commenters also argued that title IX's prohibition on sex discrimination cannot be read separate and apart from all the exceptions included in the title IX statute, in which Congress authorized certain conduct—*i.e.,* otherwise prohibited sex discrimination. Accordingly, several commenters maintained that it is arbitrary and capricious for OCR to rely upon title IX's implementing regulations as a guide to prohibit discrimination on the basis of sex, such as those related to pregnancy-related conditions, or when distinguishing a marital, parental, and family status, while not importing the statute's religious exception.

A few commenters maintained that the differences between educational and health care institutions provide an unconvincing argument for nonimportation of the title IX religious exception because under the Title IX Common Rule of 2000 (Common Rule),[25] title IX already applies to

recipients of Federal financial assistance that provide health care. Many commenters also asserted that the court in *Franciscan Alliance* v. *Burwell,* 227 F. Supp. 3d 660 (N.D. Tex. 2016), found that the decision not to import the title IX religious exception into the 2016 Rule, without explanation, was contrary to law. Several commenters also pointed to that court's determination that the Department had previously "provide[d] that when cross-referencing the provisions of Title IX's use of 'student,' the term 'individual' should be used in the healthcare context." *Id.* at 691. Commenters asserted that this finding by the court undermines the Department's claim that the title IX religious exception is specific to education and cannot be adopted more broadly in the health care context.

*Response:* Title IX applies to "any education program or activity" operated by recipients of Federal financial assistance, and the statute creates an exception from coverage for the education programs and activities of "an educational institution which is controlled by a religious organization if the application of [title IX's prohibition on sex discrimination in education programs and activities] would not be consistent with the religious tenets of such organization." 20 U.S.C. 1681(a)(3). In addition, the Civil Rights Restoration Act of 1987 (CRRA)[26] statutorily defined "program or activity" for title IX to exclude from coverage "any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization." 20 U.S.C. 1687(4). The preamble to the 2020 Rule stated that section 1557 "incorporates the statutory scope of Title IX, so it is appropriate for this rule to incorporate the Title IX statutory language concerning religious institutions." 85 FR 37208.

OCR notes that as an initial matter, the CRRA's exclusion of any operation of religiously controlled entities from the application of title IX to the extent such operation is inconsistent with the religious tenets of the organization is not incorporated into section 1557. As we explain further in the discussion of "health program or activity," section 1557 includes its own coverage provision that does not incorporate the CRRA's definitions of "program or

activity." Moreover, unlike title VI, section 504, and the Age Act,[27] title IX modifies "program or activity" with "education," 20 U.S.C. 1681(a), which limited title IX's prohibition on sex discrimination to the "education" context; the definitions of "program or activity" under title VI, section 504, or the Age Act do not include any comparable exclusion for the operations of religiously controlled entities.[28] Thus, the CRRA's limitation to the application of certain applications of religious entities from title IX's coverage applies only in the "education" context and is not part of the definition of "program or activity" as that term is used in civil rights statutes more generally. Further, it is inapplicable to the definition of "health program or activity" adopted in section 1557. As a result, the sole question is whether the exclusion in title IX, 20 U.S.C. 1681(a)(3), of certain applications of the statute to "educational institution[s] which [are] controlled by a religious organization" carries over into section 1557.

Although title IX's prohibition of sex discrimination applies to some health-related activities of covered education programs—such as programs training future health workers—the range of exceptions provided in section 1681(a) are plainly tied to the educational setting (*e.g.,* the membership practices of social fraternities and sororities, YMCA, Girls Scouts, Boys Scouts; voluntary youth service organizations; father-son and mother-daughter activities; and beauty pageant-based scholarships, as well as educational admissions practices). All of these exceptions have little if any application to health programs and activities. Further, exceptions listed in that subsection include limitations regarding "educational institution[s]," "institution[s] of public higher education," or "institution[s] of higher education." 20 U.S.C. 1681(a)(1)–(9).

---

[25] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal*

*Financial Assistance,* 65 FR 52857 (Aug. 30, 2000) (multiagency rulemaking adopting consistent title IX implementing regulations).

[26] Public Law 100–259, 102 Stat. 28 (Mar. 22, 1988).

[27] *See* 42 U.S.C. 2000d (title VI, prohibiting "discrimination under any program or activity receiving Federal financial assistance"); 42 U.S.C. 6101 (the Age Act, prohibiting discrimination "in programs or activities receiving Federal financial assistance"); 29 U.S.C. 794(a) (section 504 prohibiting "discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service").

[28] S. Rep. No. 100–64, 100th Cong., 1st Sess. (1987), *as reprinted in* 1988 U.S.C.C.A.N. 3, 6, 1987 WL 61447, at *18 (discussing "education limitation in Title IX"); *see also id.* at *20–*21 ("[The CRRA] leaves the religious tenet exemption in Title IX intact and clarifies that the exemption is as broad as the Title IX coverage of *education programs and activities.*" (Emphasis added)).

The language and subject matter of the exceptions suggest that Congress, in enacting title IX, did not intend those exceptions to define the statute's basis of discrimination—what section 1557 calls the "ground prohibited"—under title IX. Title IX prohibits discrimination on the basis of sex, so the "ground prohibited" under that statute is sex. Congress intended these exceptions to delineate certain contexts in which otherwise prohibited sex discrimination in the educational context would be excluded from the statute's coverage. Congress could have chosen to draft section 1557 to incorporate additional elements from title IX and the other referenced civil rights statutes (e.g., those statutes' applicability provisions), but did not do so, instead narrowly specifying that only the "ground[s] prohibited" are incorporated.

OCR further notes that the inclusion of "*et seq.*" is simply part of an ordinary citation to the title IX statute. Congress frequently appends "*et seq.*" to statutory citations as a matter of course when legislation includes a generalized reference to a previously enacted statute.[29] Including "*et seq.*" does not change the substantive meaning of section 1557, which incorporates only the grounds of prohibited discrimination and the enforcement mechanisms of each referenced statute. Further, section 1557 includes similar parenthetical citations with "*et seq.*" for the other referenced civil rights statutes in both 42 U.S.C. 18116(a) and (b). This underscores that Congress merely intended to provide the general, ordinary citation to the statutes being referenced, including title IX.

Section 1557's role as a health care statute further reinforces our reading of the statutory text and Congressional intent. Section 1557 was enacted as part of the ACA, in part, to expand access to health insurance and increase consumer protections. Title IX, as we have explained, relates specifically to education programs and activities. The title IX religious exception in that statute allows some entities to engage in certain conduct without requiring any consideration or mitigation of harm to third parties. If a similar standard were imported into this rule, it could undermine a key purpose of section 1557—ensuring access to health care.

And as discussed below, unlike educational settings such as colleges and universities where there is more choice, individuals often have far fewer choices when accessing health care. In the federally funded health care context, the array of statutory conscience provisions enacted by Congress, as well as the general requirements of the First Amendment and the Religious Freedom Restoration Act (RFRA), provide a better fitting approach to addressing the relevant interests. This final rule has been revised to include regulatory text at § 92.3(c) recognizing that, insofar as the application of any rule requirement would violate applicable Federal protections for religious freedom and conscience, such application shall not be required. Also, we have strengthened the process for raising religious freedom and conscience protections under this final rule at § 92.302.

The fact that title IX and agency implementing regulations apply to *some* health programs and activities—those that are part of educational programs and activities[30]—does not suggest that the exceptions set forth in the statute or implementing regulations apply to health programs and activities that are not a part of an educational program. Title IX's limitation to a recipient's education programs and activities has long been established.[31] For example, the Common Rule (adopted by more than 20 Federal agencies) included the statute's limitation that the prohibition on sex discrimination applied *only to the educational components of* a covered entity's program.[32] As we have explained, it is inconsistent with the text and purpose of section 1557, as well as the text and structure of title IX, to apply the title IX exceptions outside of the educational setting. Although the title IX regulations are relevant to informing what constitutes sex discrimination for purposes of this final rule—and we have looked to them for that purpose—that is because section 1557 incorporates the "ground prohibited" under title IX. But section

1557 does not incorporate any of the title IX exceptions. 87 FR 47839.

OCR disagrees with the *Franciscan Alliance* decision vacating portions of the 2016 Rule, and in any event, that decision does not prohibit OCR from not importing the title IX religious exception in this final rule. The promulgation of this final rule constitutes new rulemaking, and OCR has provided a detailed explanation for the decision to not import the title IX religious exception and has taken important steps to address religious freedom and conscience protections beyond those in the 2016 Rule. These steps include revisions at § 92.3(c) to recognizes that, "[i]nsofar as the application of any requirement under this part would violate applicable Federal protections for religious freedom and conscience, such application shall not be required," adoption of a voluntary assurance of exemption process based on these protections at § 92.302, and the Department's issuance of a final rule entitled *Safeguarding the Rights of Conscience as Protected by Federal Statutes,* 89 FR 2078 (Jan. 11, 2024).

OCR notes that this final rule does not alter or eliminate a recipient's ability to maintain, seek, claim, or assert a title IX religious exception under title IX if it meets the applicable criteria.[33] And to the extent the recipient is entitled to a religious exception under title IX, OCR's analysis will consider the entire statute, including title IX's specific limitation to the context of educational programs and activities.

*Comment:* Many commenters supported OCR's proposal not to import the title IX religious exception, highlighting what they characterized as the dangers of doing so in the context of health care and the potential consequences on people's access to health care it might have. For example, many commenters expressed concerns that providers would be able to deny essential health care services based on disapproval of a particular group, thereby putting at risk the health and well-being of already vulnerable individuals. Many commenters asserted that entities have invoked religious beliefs to deny individuals access to health care and coverage for a broad range of health care services. Commenters said that in urgent or emergency care situations, individuals may be unable to identify or use the services of an alternate provider when an institution withholds care based on religious tenets, even when the

---

[29] *See, e.g.,* 20 U.S.C. 1689(a)(1) (requesting a task force "provide pertinent information . . . with respect to campus sexual violence prevention, investigations, and responses, including the creation of consistent, public complaint processes for violations of title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*)[.]"); *accord id.* 1689(a)(8), (b)(1), (c).

[30] *See, e.g., Doe* v. *Mercy Cath. Med. Ctr.,* 850 F.3d 545, 555 (3d Cir. 2017) (holding that a hospital's residency program was an educational program or activity under title IX).

[31] *See O'Connor* v. *Davis,* 126 F.3d 112, 117 (2d Cir. 1997), *cert. denied,* 522 U.S. 1114 (1998) (under title IX a program or activity must be "such that one could reasonably consider its mission to be, at least in part, educational"); *see also Jeldness* v. *Pearce,* 30 F.3d 1220, 1224–25 (9th Cir. 1994); *Klinger* v. *Dep't of Corrs.,* 107 F.3d 609, 613–16 & n.5 (8th Cir. 1997); *Roubideaux* v. *North Dakota Dep't of Corrs. & Rehab.,* 570 F.3d 966, 976–79 (8th Cir. 2009).

[32] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,* 65 FR 52858, 52868 (Aug. 30, 2000).

[33] 20 U.S.C. 1681(a)(3); 45 CFR 86.12.

individual is aware of such objections by an institution.

Many commenters highlighted the difference between education and health care. Multiple commenters stated that unlike certain health care settings, many parents have the choice to send their children to religious schools, whereas individuals often lack meaningful choices when seeking a health care provider, particularly for time-sensitive care. For example, numerous commenters stated that choice is especially limited in rural areas, and some patients may only have local access to religiously affiliated providers. Commenters worried that importing the title IX religious exception into this rule could have dire implications for health outcomes.

*Response:* As previously noted, this rule's application to the health care context is central to OCR's interpretation of section 1557. OCR appreciates that religiously affiliated hospitals and health care facilities play an important role in the health care system and recognizes the critical patient care needs they provide, including in underserved communities and areas which otherwise lack access to quality health care. At the same time, OCR believes that Congress chose not to import the title IX religious exception into section 1557 due to concerns about the impact such an action could have on access to health care. The importation of the title IX religious exception would raise unique concerns in the health care context that are not typically present in education programs and activities. As OCR discussed in the 2022 NPRM, health care settings differ from educational settings with respect to both the ability of affected parties to choose (or avoid) certain religiously affiliated health care institutions and the urgency of the need for services provided by the covered entities. 87 FR 47840. While students and families normally make a deliberate choice to attend a religious educational institution, in many cases specifically due to its religious character, individuals seeking health care are far more likely to be driven by other considerations such as availability, urgency, geography, insurance coverage, and other factors unrelated to whether the provider is controlled by or affiliated with a religious organization. *See id.* Rather than importing the title IX religious exception into section 1557, where Congress referenced only the "ground prohibited under" and the "enforcement mechanisms provided" for in title IX, the process set forth in § 92.302 respects religious freedom and conscience protections. As this final rule makes

clear at § 92.3(c), insofar as the application of any requirement under this rule would violate applicable Federal protections for religious freedom and conscience, such application shall not be required. Under § 92.302, recipients may rely on these protections or seek assurance of these protections from OCR, if they wish. In this process, OCR will comply with the applicable legal standards of the governing statutes, which include the protections in the ACA itself, 42 U.S.C. 18023; the Church, 42 U.S.C. 300a–7, Coats-Snowe, 42 U.S.C. 238n, and Weldon Amendments, *e.g.,* Consolidated Appropriations Act, 2024, Public Law 118–47, div. H, tit. V, sec. 507(d)(1), 138 Stat. 460, 703 (Mar. 23, 2024); the generally applicable requirements of RFRA, 42 U.S.C. 2000bb–1; and other applicable Federal laws.

*Comment:* Many commenters who supported OCR's proposal not to import the title IX religious exception raised concerns that its importation could discourage individuals from seeking necessary medical care. Many commenters also discussed various State laws recently enacted to further expand religious exemptions from health care requirements and how such laws have specifically affected communities with limited access to care. These commenters argued that the effects of these laws further support OCR's goal of ensuring patients have broad access to nondiscrimination protections.

*Response:* OCR appreciates commenters' concerns regarding the potential harms to individuals with limited or restricted access to health care. OCR appreciates that many religiously affiliated hospitals and providers are providing vital services in areas where people are in the most need and are often motivated by their faith to provide this important care. However, OCR maintains that Congress did not choose to import the title IX religious exception into section 1557. Importing the title IX exception would be inconsistent with the text, structure, and purpose of both title IX and section 1557. Rather, Congress has enacted protections for conscience in the ACA itself; the Church, Coats-Snowe, and Weldon Amendments, among others; the generally applicable requirements of RFRA, and other applicable Federal laws as the means to protect religious freedom and conscience in this context. We are committed to affording full effect to Congress's protections of conscience and religion, as detailed in § 92.302 and the Department's issuance of its final rule, Safeguarding the Rights of

Conscience as Protected by Federal Statutes. 89 FR 2078.

*Comment:* Multiple commenters opposed OCR's proposal not to import the title IX religious exception, stating that doing so would harm providers and hospital systems by compelling covered entities to provide abortion or other care that is contrary to their religious beliefs or that they believe will be harmful to their patients. Various commenters said that compelling such actions would turn many individuals and institutions of faith away from the medical profession.

Several commenters expressed confusion about available religious exceptions and how certain rule requirements would apply to religiously affiliated covered entities. These commenters said that including the title IX religious exception would clarify protections for religious entities.

Some commenters expressed concern that this regulation demonstrated OCR's intent to use section 1557 to force religious hospitals to dispense medication and perform procedures that are prohibited by their faith. Several commenters objected to the inclusion of cites in the 2022 NPRM that explain the increased prevalence of religiously affiliated health care systems and opined that this demonstrated hostility toward faith-based providers. According to these commenters, including these cites prejudices OCR's review of providers' religious exemption requests. Instead, these commenters urged OCR to make clear that providers will not be compelled to perform, cover, or promote procedures or medical interventions to which they have moral or religious objections.

*Response:* OCR appreciates commenters' concerns and respects their opposition to the proposal not to import the title IX religious exception. OCR reiterates, consistent with the 2022 NPRM, that this final rule does not promote any particular medical treatment, require provision of particular procedures, mandate coverage of any particular care, or set any standard of care; rather, the final rule implements the nondiscrimination requirements of section 1557. *See* 87 FR 47867–68. The full protections of all Federal religious freedom and conscience laws continue to apply.

Additionally, OCR makes clear that the decision not to import the title IX religious exception does not compel any individual provider or covered entity with religious or conscience-based objections to provide abortion or any other care to the extent doing so would conflict with a sincerely-held belief. The ACA itself provides that "[n]othing in this Act shall be construed to have any

effect on Federal laws regarding—(i) conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion." 42 U.S.C. 18023(c)(2)(A). As discussed further below, section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in covered health programs or activities. A covered entity does not engage in discrimination prohibited by section 1557 if it declines to provide abortions based on religious or conscience objections to performing the procedure. In addition, any recipient that believes that it is exempt from certain provisions of this rule due to the application of a Federal conscience or religious freedom law may rely on those provisions, as referenced in § 92.3(c), or choose to seek assurance of the applications of those provisions pursuant to the process provided in § 92.302.

In light of § 92.302 and 42 U.S.C. 18023(c)(2)(A) (section 1303 of the ACA), OCR maintains that although some recipient providers and hospitals may decline to participate in federally funded health programs as a result of this rule, most will choose to continue to participate. To avoid confusion, we have further clarified the process for seeking assurance of an exemption based on religious freedom and conscience laws at § 92.302 and are committed to making available trainings and other resources to assist covered entities in understanding their obligations under section 1557 and the process by which they may seek assurance of an exemption under § 92.302.

Again, OCR appreciates that religiously affiliated hospitals and health care facilities play an important role in the health care system and recognizes the critical patient care needs they provide, including in underserved communities and areas which otherwise lack access to quality health care. Any discussion relating to the prevalence of religiously affiliated care is relevant for OCR to evaluate access issues that patients seeking certain procedures or care could potentially face, although OCR does not assume that all religiously affiliated entities' refusals to provide certain forms of care would result in such access issues. As previously stated, the 2022 NPRM provided factual findings with respect to health care accessibility in the United States based upon health care capacity of providers, population demands, and geographic

limitations. 87 FR 47840. A detailed discussion of these considerations can be found in the Regulatory Impact Analysis (RIA).

Summary of Regulatory Changes

For the reasons set forth in the Proposed Rule and considering the comments received, OCR is finalizing the rule as proposed, without importing the title IX religious exception.

Relationship to Other Laws (§ 92.3)

In § 92.3, we provided an explanation of the relationship of the proposed regulation to existing laws. Proposed § 92.3(a) provided that neither section 1557 nor this part shall be interpreted to apply lesser standards for the protection of individuals from discrimination than the standards under title VI, title IX, section 504, the Age Act, or the regulations issued pursuant to those laws.

In § 92.3(b), we proposed that nothing in this part shall be interpreted to invalidate or limit the existing rights, remedies, procedures, or legal standards available under the Federal civil rights laws cited in 42 U.S.C. 18116(b) (title VI, title VII, title IX, section 504, and the Age Act), consistent with 42 U.S.C. 18116(b).

In § 92.3(c), we proposed that nothing in this part shall be interpreted to invalidate or limit the existing rights, remedies, procedures, or legal standards available under Federal religious freedom and conscience laws. Though not specifically referenced in the Proposed Rule, these include the protections in the ACA itself; the Church, Coats-Snowe, and Weldon Amendments; the generally applicable requirements of RFRA; and other applicable Federal laws.

The comments and our responses to this provision are set forth below.

*Comment:* Commenters expressed a mix of viewpoints regarding the "lesser standard" language included in proposed § 92.3(a), concerning civil rights statutes referenced in section 1557. Some commenters recommended removing the "lesser standard" language because it is not included in the section 1557 statute. Commenters stated that this language ignores Congress's decision to employ a particular standard to each of the civil rights laws incorporated, such that it would allow OCR to redefine bases for discrimination and improperly preempt State law affecting such categories.

*Response:* In this final rule, OCR seeks to give all laws their fullest possible effect. OCR appreciates these comments but declines to remove the "lesser standard" language included in

§ 92.3(a). As the 2016 Rule recognized, 81 FR 31381, this interpretation is consistent with a natural reading of section 1557's statutory text that explicitly states that section 1557 shall not be construed to "invalidate or limit the rights, remedies, procedures, or legal standards" of the referenced statutes (and title VII) "or to supersede State laws that provide additional protections against discrimination," 42 U.S.C. 18116(b). OCR accordingly reaffirms that the civil rights laws referenced in section 1557 establish the grounds of prohibited discrimination, and nothing in this final rule is intended to provide lesser protections than those found under title VI, title IX, section 504, or the Age Act, or their implementing regulations.

*Comment:* Several commenters supported the inclusion of the "lesser standard" language in § 92.3(a) but suggested that § 92.3(c), concerning Federal religious freedom and conscience laws, is unnecessary and, if included without any limitations, undermines this "lesser standard" language of § 92.3(a) and could encourage discrimination.

*Response:* We decline to remove § 92.3(c), concerning Federal religious freedom and conscience laws. These laws remain applicable and removing the language runs contrary to the Department and OCR's stated commitment to protect the rights of individuals and entities under Federal conscience or religion freedom laws. Indeed, the ACA itself contains a similar provision at 42 U.S.C. 18023(c)(2)(A)(i), which provides that "[n]othing in this Act shall be construed to have any effect on Federal laws regarding—conscience protection[.]" As discussed later in this section, we have revised § 92.3(c) to provide additional specificity regarding the application of Federal religious freedom and conscience protections.

*Comment:* Some commenters suggested that OCR clarify that section 1557 does not limit the rights of individuals to any of the protections afforded under title VI, title IX, section 504, or the Age Act. These commenters suggested that section 1557 is a distinct law and, while it is intended to work in tandem with other civil rights laws, section 1557 stands on its own. Several other commenters requested that the final rule include language that clarifies that administrative exhaustion is not required to bring any claim under section 1557 in Federal court, where for example a claim may involve age as one basis of discrimination among several (*e.g.,* alleging discrimination on the bases of age, sex, and disability at the same time) but the Age Act has a

statutory requirement that claimants first exhaust their administrative remedies.

*Response:* Section 92.3(b) clearly states that this part does not limit or invalidate the rights, remedies, procedures, or legal standards under the statutes referenced (*i.e.,* title VI, title VII, title IX, section 504, and the Age Act), consistent with the statutory text of section 1557 at 42 U.S.C. 18116(b). In addition to incorporating the "ground[s] prohibited" by these other statutes, section 1557 incorporates the "enforcement mechanisms" of the statutes. 42 U.S.C. 18116(a). Though the section 1557 rule is informed by the title VI, title IX, Age Act, and section 504 implementing regulations, section 1557 provides an independent basis for regulation of discrimination in covered health programs and activities that is distinct from these statutes. Section 1557's nondiscrimination requirements do not in any way limit or impact the interpretation of those statutes. *See id.* at 18116(b). Section 1557 is a distinct civil rights authority.

Courts have long recognized that section 1557 authorizes a private right of action under any of the bases for discrimination. While we appreciate concerns raised by commenters regarding the heightened risks associated with unnecessary delays in the context of health care, we decline to revise regulatory text to adopt a stance on the appropriate standards that apply to private litigants. This is an issue appropriately addressed by the Federal judicial branch and not via agency rulemaking. Comments and responses regarding OCR procedures for conducting its own administrative enforcement are provided in §§ 92.303 (Procedures for health programs and activities conducted by recipients and State Exchanges) and 92.304 (Procedures for health programs and activities administered by the Department).

*Comment:* Many commenters raised concerns about the potential conflicts of State and Federal laws. Some commenters expressed that any conflict between State and Federal law or policy would be inconsistent with the principles of federalism. Some commenters had specific concerns regarding the final rule's application to State laws that prohibit transgender patients from receiving certain medically necessary gender-affirming care or those that protect religious freedom and conscience. Other commenters suggested that OCR should include a subsection in the final rule that addresses the interaction between section 1557 and State or local laws,

making explicit that a State may set more rigorous standards for nondiscrimination in the provision of health care but not lesser protections than those of section 1557. To the extent State or local law offers lesser protections these commenters recommended OCR make explicit that such laws are preempted by Federal law, consistent with the general preemption standard for title I of the ACA, codified at 42 U.S.C. 18041(d).

*Response:* OCR appreciates these comments regarding the rule's interaction with State and other Federal laws. We agree with commenters who observed that Federal laws, as a general matter, preempt conflicting State laws. *See* U.S. Const. art. 6, cl. 2. We also note that title I of the ACA itself contains a preemption provision, which courts have interpreted to preempt State laws that serve as an obstacle to or frustrate the purpose of the ACA.[34] *See* 42 U.S.C. 18041(d). Accordingly, we decline to alter the regulation to include any additional language under this provision addressing preemption. OCR recognizes that some States may have laws impacting health programs and activities that are contrary to the final rule's nondiscrimination protections, and as discussed later regarding § 92.206 (Equal program access on the basis of sex), section 1557 preempts those laws, though OCR will consider the specific facts of each case and any other relevant factors in determining whether the recipient has a legitimate, nondiscriminatory reason for taking actions that conflict with section 1557. OCR is adding § 92.3(d) regarding State and local laws to provide: "Nothing in this part shall be construed to supersede State or local laws that provide additional protections against discrimination on any basis described in § 92.1."

*Comment:* Commenters recommended that OCR include in the final rule clarification that the Emergency Medical Treatment and Labor Act (EMTALA) protects emergency care for pregnancy and related conditions, including termination of pregnancy.

*Response:* This rule concerns section 1557 and does not purport to interpret or enforce EMTALA—indeed, OCR does not enforce EMTALA, nor does EMTALA limit or expand the civil rights protections found in section 1557.

Summary of Regulatory Changes

For the reasons set forth in the Proposed Rule and considering the comments received, we are finalizing the provisions as proposed in § 92.3, with modifications. We are revising § 92.3(c) to provide that, insofar as the application of any requirement under the part would violate applicable Federal protections for religious freedom and conscience, such application shall not be required. For example, 42 U.S.C. 18023 provides (among other things) that, nothing in section 1557 shall be construed to have any effect on Federal laws regarding conscience protection; willingness or refusal to provide abortion; and discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion. We are also adding a new § 92.3(d) to provide that nothing in the part shall be construed to supersede State or local laws that provide additional protections against discrimination on any basis described in § 92.1.

Definitions (§ 92.4)

In § 92.4 of the Proposed Rule, we set out proposed definitions of various terms. The comments and our responses regarding § 92.4 are set forth below.

*Auxiliary aids and services.* The term auxiliary aids and services was defined in the 2016 Rule and has not been changed substantively. The proposed definition is consistent with the Americans with Disabilities Act (ADA) regulations at 28 CFR 35.104 and 36.303(b) and provides examples of auxiliary aids and services.

*Comment:* Commenters generally supported the definition of "auxiliary aids and services." Some commenters recommended that the final rule clarify that "similar services and actions" are available for all individuals with disabilities, not just for individuals who are deaf or hard of hearing and individuals who are blind or have low vision.

*Response:* OCR appreciates this comment; however, effective communication requirements are addressed in § 92.202(a). As § 92.4 is simply providing a definition for the term auxiliary aids and services, which is used in § 92.202(b), we do not believe

---

[34] *See St. Louis Effort for AIDS* v. *Huff*, 782 F.3d 1016, 1021, 1024 (8th Cir. 2015) (partially affirming lower court preliminary injunction because Missouri law "frustrates Congress' purpose" and "pose[s] an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Coons* v. *Lew,* 762 F.3d 891 (9th Cir. 2014), *as amended,* (Sept. 2, 2014) ("The Affordable Care Act presents a classic case of preemption by implication because the Arizona Act 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"), *quoting Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98 (1992).

§ 92.11(c)(5)(ix) to read: "Communications related to the cost and payment of care with respect to an individual, including medical billing and collections materials, and good faith estimates required by section 2799B–6 of the Public Health Service Act." We are also making technical revisions, including replacing "limited English proficient individual" with "individual with limited English proficiency," consistent with modifications elsewhere.

Data Collection

We solicited comments on requiring covered entities to collect additional data, beyond those required by the referenced statutes and their regulations, on race, ethnicity, language, sex, gender, gender identity, sexual orientation, disability, and age, to inform a final rule and OCR's overall civil rights work.

We also sought comment on whether covered entities are already collecting disaggregated demographic data in their health programs and activities and, if so, for which categories of data, through what systems, and at what cost. We also invited comment on how a section 1557 civil rights data collection requirement could impact current data collection efforts, either positively or negatively. We also requested comment on whether the adoption of a regulatory standard for a recurring civil rights data collection would benefit civil rights enforcement, as well as how frequently the data should be submitted to OCR. We also sought comment on whether the data collection requirements should vary by type of entity, as recipients of Federal financial assistance include a variety of entities, including State and local agencies, health insurance issuers, providers, health care facilities and clinics, hospitals, Federally Qualified Health Centers, and health-related educational and training programs. Accordingly, we invited comment on which types of recipients (if any) should be covered; if recipients under a certain size should be exempt from the data collection requirement, and if so, whether that exemption should be based on employee number, the number of beds (if relevant), or some other metric; what types of data should be collected; what definitions should be used; the potential costs associated with such a requirement; and the potential benefits of such a requirement.

The comments and our responses regarding data collection are set forth below.

*Comment:* Some commenters recommended that OCR not mandate the collection of data, with some

strongly suggesting that we minimize provider burden and utilize existing data collection systems.

*Response:* OCR is not including a data collection requirement in the final rule. OCR has the authority independent of this rulemaking to conduct data calls to ensure recipient compliance with Federal civil rights laws.[98] OCR is actively engaged with other agencies within the Department and throughout the Federal Government related to responsible data collection and recognizes the importance of data collection to meet its mission. We will continue to work with covered entities and beneficiaries to determine whether an additional data collection requirement is needed in a future rulemaking.

*Comment:* Some commenters recommended that OCR adopt data collection standards. They noted that with any demographic data collection requirement, OCR must provide appropriate training and technical assistance resources to programs and grantees and make clear that data cannot be used for negative actions such as immigration or law enforcement, redlining, or targeting of specific groups.

*Response:* OCR appreciates the comments regarding standards and safeguards to ensure that programs and grantees have the appropriate training. OCR also understands the concerns that some commenters have regarding data being used for adverse actions. While OCR is not including a data collection requirement in the final rule, OCR will continue to research the benefits of civil rights data collection and how to mitigate potential negative impacts.

*Comment:* Some commenters urged OCR to require covered entities to collect data regarding a core set of disaggregated categories to include race, ethnicity, language, sex, gender, gender identity, sexual orientation, pregnancy status, sex characteristics, disability, and age from patients and providers. Commenters stated that data are essential to identify and address unmet needs, and for many populations data remain largely uncollected. Some commenters also noted that collecting disaggregated data could allow OCR to distinguish the impact of intersectional discrimination on those seeking access to health care. Some commenters also urged that if individuals volunteer such information, it should be self-reported to ensure accuracy and privacy.

*Response:* OCR agrees that better standards and practices for collecting data can have a positive impact on reducing disparities. OCR will continue

to work to ensure that any civil rights data collection yields accurate data that adequately protects the privacy of individuals.

Summary of Regulatory Changes

For the reasons set forth above and considering the comments received, we are finalizing the rule without a data collection provision.

*Subpart B—Nondiscrimination Provisions*

In subpart B, OCR proposed provisions related to the prohibition of discrimination on the basis of race, color, national origin, sex, age, and disability in covered health programs and activities.

Discrimination Prohibited (§ 92.101)

In § 92.101(a), we proposed a general prohibition of discrimination on the basis of race, color, national origin, sex, age, or disability under any health program or activity to which section 1557 or the part applies and provided additional detail regarding what constitutes discrimination on the basis of sex.

In § 92.101(a)(1), we proposed general prohibitions on discrimination under section 1557 by restating the core objective of section 1557. In § 92.101(a)(2), we clarified that discrimination on the basis of sex includes discrimination on the basis of sex stereotypes; sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; and gender identity.

In § 92.101(b), we identified several specific forms of prohibited discrimination under section 1557. Proposed § 92.101(b)(1)(i) specifically referred to recipients of Federal financial assistance and State Exchanges; proposed § 92.101(b)(1)(ii) referred to the Department's health programs and activities, including Federally-facilitated Exchanges.

In § 92.101(b)(2), we proposed that the enumeration of specific forms of discrimination in 92.101(b) does not limit the general application of the prohibition in proposed § 92.101(a).

The comments and our responses regarding § 92.101 are set forth below.

*Comment:* Numerous commenters supported the Proposed Rule's nondiscrimination provisions, stating that these provisions would promote the health equity for communities of color and increase access to coverage and care for those who have been historically underserved because of race, ethnicity, language, age, disability, and sex. Many commenters stated that OCR should finalize the provisions without delay.

---

[98] *See, e.g.,* 45 CFR 80.6(b).

Another commenter supported the proposed discrimination prohibitions as consistent with the ACA, and another requested that more support be provided for educating the public about the nondiscrimination obligations of health programs and activities.

*Response:* OCR agrees that the nondiscrimination provisions are one important tool to address health disparities and advance health equity. OCR will continue to provide technical assistance and public education related to compliance with section 1557 and encourages covered entities to continue to visit our website for technical assistance materials.

*Comment:* Numerous commenters stated that section 1557's explicit prohibition on discrimination based on multiple grounds fills a critical gap by protecting patients who may experience multiple forms of discrimination. Commenters provided numerous examples of simultaneous discrimination on more than one protected basis, including, but not limited to, discrimination against LGBTQI+ individuals of color, with disabilities, with LEP, or who are immigrants; and Black and Hispanic/Latino older adults. Numerous commenters recommended that OCR revise § 92.101(a)(1) to include "or any combination thereof" to explicitly account for intersectional discrimination within the regulatory text.

*Response:* OCR agrees that simultaneous discrimination on multiple prohibited bases, is important to account for and is prohibited by section 1557. As we noted in the Proposed Rule, a recent study examined disability and pregnancy as intersecting traits and how this may impact risk for maternal morbidity and mortality, underscoring the importance of ensuring nondiscrimination against women with disabilities. 87 FR 47837. The Proposed Rule also provided information regarding Black maternal health and the alarming disparities in maternal mortality rates for Black women and American Indian/Alaska Native women. 87 FR 47832.

Therefore, to account for the fact that individuals can experience discrimination based on two or more protected bases (race, color, national origin, sex, age, and disability), we have amended the language of § 92.101(a)(1) to include "or any combination thereof." This language has also been amended throughout the final rule for consistency. The addition intends to clarify that an individual is protected from discrimination on more than one

protected basis that occurs at the same time.

*Comment:* A commenter provided a discussion of the harms and unaddressed discrimination faced by patients with rare diseases and requested that OCR explicitly prohibit discrimination against patients with rare diseases. Some commenters requested that specific recognition also be made for patients with liver diseases. A commenter requested that the proposed regulatory text or accompanying guidance provide examples of discrimination on the basis of disability.

*Response:* Discrimination against an individual with a rare or specific disease that meets the definition of "disability" will be addressed under section 1557's prohibition on discrimination on the basis of disability, which already appears in the rule. The commenter's request for further guidance will be taken into consideration. For additional information related to disability discrimination, please see the discussions under subpart C. OCR also provides guidance and examples, as well as answers to frequently asked questions related to disability discrimination on our website.

*Comment:* A number of commenters asked that vaccination status be added as a ground of prohibited discrimination, stating that their right to make their own health care decisions should be protected.

*Response:* Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, and disability. To the extent vaccination status is not related to these prohibited bases of discrimination specified by Congress in section 1557, we decline to include it as a ground of prohibited discrimination under this rule.

*Comment:* Some tribal organizations recommended that OCR acknowledge American Indian/Alaska Native (AI/AN) people as holding a political classification as compared to a race-based classification and to exempt Tribal health programs from the final rule. These commenters stated that recognizing the political classification of AI/AN and AI/AN providers to only serve AI/AN patients allows AI/AN providers to only serve AI/AN patients, which commenters said is necessary because of logistical capacity constraints.

*Response:* As discussed at § 92.2, OCR recognizes the unique relationship between the United States and federally recognized tribal entities. Federal Government preferences based on an individual's membership or eligibility in a federally recognized tribal entity are based on political classifications. Such classifications are not race-based. As

such, preferences on this basis do not violate the Equal Protection Clause,[99] title VI,[100] or section 1557. As discussed at § 92.2, preferences based on the unique relationship between the United States and federally recognized Tribes are distinct from the protections afforded under Federal civil rights laws, which protect all individuals from discrimination on the basis of race, color, or national origin (including AI/AN individuals, regardless of tribal enrollment or affiliation). This final rule adopts by reference the Department's title VI regulatory provision at 45 CFR 80.3(d), which provides that an individual shall not be deemed subjected to discrimination by reason of their exclusion from benefits limited by Federal law—such as the Indian Health Service—to individuals of a different race, color, or national origin. OCR will fully apply this provision as well as other applicable exemptions or defenses that may exist under Federal law. OCR intends to address any restrictions on application of section 1557 to Tribal entities in the context of individual complaints or compliance reviews.

*Comment:* A commenter suggested that nondiscrimination protections should be extended to health care workers, indicating that health care workers often experience discrimination, especially on the basis of race and that additional protections are needed.

*Response:* While OCR acknowledges that health care workers can face discrimination as they provide health care, OCR does not have jurisdiction over patients who may discriminate against health care workers, as patients are not covered entities under section 1557. Separately, and as previously noted, OCR does not intend for this rule to apply to employment discrimination. If OCR receives a complaint from a health care worker, we will determine if we have jurisdiction to investigate. Complaints received by OCR from health care workers alleging discrimination experienced in the context of employment will be referred to an appropriate agency, per §§ 92.303(b) and 92.304(a) (incorporating 45 CFR 85.61(e)), as this regulation does not apply to employment practices.

*Comment:* Many commenters expressed support for the explicit references to discrimination on the basis of sex stereotypes; sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; and gender identity as forms of

---

[99] *See Morton* v. *Mancari,* 417 U.S. 535 (1974).
[100] 45 CFR 80.3(d).

discrimination on the basis of sex in § 92.101(a)(2). Commenters pointed to evidence of health disparities and barriers to accessing health care faced by LGBTQI+ people, and how ongoing health care discrimination contributes to higher rates of substance use, mental health conditions, HIV, cancer, and cardiovascular disease for LGBTQI+ people.[101] Several commenters stated that § 92.101(a)(2)'s prohibitions should be mirrored in the CMS regulations addressed in section IV.

*Response:* It is well documented that LGBTQI+ people face significant health disparities and barriers to health care and insurance coverage,[102] and section 1557's protections are critical tools to combat those disparities. We appreciate commenters' view that CMS regulations within this rulemaking should mirror the language provided in § 92.101(a)(2), and we refer readers to section IV (CMS Amendments).

*Comment:* A number of comments addressed discrimination in the context of organ transplantation. Several commenters noted that people with disabilities are routinely denied access to organ transplants due to stereotypical assumptions about compliance with post-operative care and policies that deny transplants to otherwise eligible individuals with disabilities.[103]

Several commenters noted that existing practices in organ transplants appear to discriminate against Black, Hispanic/Latino, and Native American/ Alaska Native individuals, as those individuals are more likely to develop end stage renal disease but are less likely to receive a kidney transplant than white individuals.[104] Another commenter stated that providers may discriminate against immigrant patients during the assessment process by assuming they lack social support or the ability to care for themselves after organ transplantation, resulting in a denial of care.[105]

*Response:* Discrimination on the basis of disability and race in the provision of health care, including organ transplantation, is a continuing issue that limits opportunities for life-saving treatment. This final rule provides OCR with a powerful tool to help address this ongoing issue. While section 1557 does not prohibit discrimination on the basis of immigration status, section 1557's protections apply regardless of someone's citizenship or immigration status, and individuals who believe they have been discriminated against based on certain characteristics such as race, color, and national origin can file a complaint. We will continue to address discrimination in organ transplantation through robust enforcement of not only section 1557, but all Federal civil rights laws.[106]

*Comment:* Numerous commenters generally supported the inclusion of the prohibition of discrimination on the basis of gender identity and sexual orientation as prohibited types of sex discrimination in proposed § 92.101(a)(2). They maintained that inclusion was consistent with *Bostock* v. *Clayton County*, 590 U.S. 644 (2020), in which the Supreme Court held that title VII's prohibition of discrimination because of sex includes discrimination on the basis of sexual orientation and gender identity. Commenters supported the application of the reasoning in *Bostock* to title IX by citing several cases, DOJ resource materials, and Executive Order (E.O.) 13988.[107]

Another commenter cited several cases stating that courts have treated title VII and title IX protections as consistent with one another in support of the application of *Bostock* to title IX.[108] A few commenters cited *City of Los Angeles Department of Water and Power* v. *Manhart,* 435 U.S. 702 (1978), as indicating that, for decades, sex discrimination prohibitions have covered sex stereotypes. The commenters also cited several opinions from district courts and one appellate court as indicating that discrimination on the basis of gender identity, gender transition, sex stereotypes, or transgender status are, similarly, unlawful types of sex discrimination.[109] Other commenters provided cites to numerous other cases as including gender identity and sexual orientation as characteristics protected by sex discrimination law.[110]

Conversely, several commenters stated that *Bostock* does not support § 92.101(a)(2) as written. Some commenters stated that *Bostock* defined sex to include only "biological distinctions between male and female" and used the term "transgender status"

---

[101] *See, e.g.,* Charlotte Patterson et al., Nat'l Acads. of Sci., Eng'g, & Med., *Understanding the Well-Being of LGBTQI+ Populations* (2020), *https:// doi.org/10.17226/25877*; Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey of Discrimination Against LGBT People and People with HIV* (2010), *www.lambdalegal.org/health-care-report*; Cornell Univ., *What Does the Scholarly Research Say about the Effects of Discrimination on the Health of LGBT People?* (2019), *https:// whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-discrimination-on-the-health-of-lgbt-people/.*

[102] *See, e.g.,* Sharita Gruberg et al., Ctr. for Am. Progress, *The State of the LGBTQ Community in 2020* (2020), *https://www.americanprogress.org/ issues/lgbtq-rights/reports/2020/10/06/491052/ state-lgbtq-community-2020/*; Sandy E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey*, p. 97 (2016), *https://transequality.org/sites/default/files/docs/ usts/USTS-Full-Report-Dec17.pdf. See also* Caroline Medina et al., Ctr. For Am. Progress, *Discrimination and Barriers to Well-Being: The State of the LGBTQI+ Community in 2022* (2023), *https:// www.americanprogress.org/article/discrimination-and-barriers-to-well-being-the-state-of-the-lgbtqi-community-in-2022/.*

[103] *See* Nat'l Council on Disability, *Organ Transplant Discrimination Against People with Disabilities* (2019), *https://www.ncd.gov/assets/ uploads/reports/2019/ncd_organ_transplant_ 508.pdf.*

[104] *See* U.S. Renal Data System, *2021 Annual Report: End Stage Renal Disease* ch. 1 (2021) (Figure 1.8); Hannah Wesselman et al., *Social Determinants of Health and Race Disparities in Kidney Transplant,* 16 Clin. J. Am. Soc'y Nephrol. 262, 262 (2021).

[105] *See* Garyphallia Poulakou, Oscar Len & Murat Akova, *Immigrants as Donors and Transplant Recipients: Specific Considerations,* 45 Int. Care Med. 401 (2019), *https://pubmed.ncbi.nlm.nih.gov/ 30701293/.*

[106] *See, e.g.,* U.S. Dep't Health & Hum. Servs., Off. for Civil Rts., *OCR Resolves Disability Complaint of Individual Who Was Denied the Opportunity for Health Transplant List Placement* (Feb. 12, 2019), *https://www.hhs.gov/about/news/2019/02/12/ocr-resolves-disability-complaint-individual-who-was-denied-opportunity-heart-transplant-list.html.*

[107] E.O. 13988, 86 FR 7023 (Jan. 25, 2021). U.S. Dep't of Justice, Title IX Legal Manual, *https:// www.justice.gov/crt/title-ix. See, e.g., Grimm* v.

[continued] *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 616–17 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied,* 976 F. 3d 399 (4th Cir. 2020), cert. denied, No. 20–1163 (June 28, 2021); *B.P.J.* v. *W. Va. State Bd. of Educ.,* No. 2:21–CV–00316, 2021 WL 3081883, at *7 (S.D.W. Va. July 21, 2021); *Koenke* v. *Saint Joseph's Univ.,* No. CV 19–4731, 2021 WL 75778, at *2 (E.D. Pa. Jan. 8, 2021); *Doe* v. *Univ. of Scranton,* No. 3:19–CV–01486, 2020 WL 5993766, at *11 n.61 (M.D. Pa. Oct. 9, 2020).

[108] *See, e.g., Doe* v. *Snyder,* 28 F.4th 103, 113–14 (9th Cir. 2022); *Emeldi* v. *Univ. of Or.,* 698 F.3d 715, 725 (9th Cir. 2012); *Franklin* v. *Gwinnett Cnty. Pub. Sch.,* 503 U.S. 60, 75 (1992); *Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 616 (4th Cir. 2020).

[109] *See Kadel* v. *Folwell,* 620 F. Supp. 3d 339, 379 (M.D.N.C. 2022); *Fain* v. *Crouch,* 618 F .Supp. 3d 313, 326–27 (S.D.W. Va. 2022); *Fletcher* v. *Alaska,* 443 F. Supp. 3d 1024, 1027, 1030 (D. Alaska 2020); *Flack* v. *Wisconsin Dep't of Health Servs.,* 395 F. Supp. 3d 1001, 1019–22 (W.D. Wis. 2019); *Boyden* v. *Conlin,* 341 F. Supp. 3d 979, 1002–03 (W.D. Wis. 2018); *Cf. Brandt by & through Brandt* v. *Rutledge,* 2022 WL 3652745, at *2 (8th Cir. Aug. 25, 2022).

[110] *See,* among others cited, *Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 593, 616, 619 (4th Cir. 2020), *reh'g en banc denied,* 976 F.3d 399 (4th Cir. 2020); *Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1049–50 (7th Cir. 2017); *Fain* v. *Crouch,* No. 3:20–0740, 2022 U.S. Dist. LEXIS 137084, at *35–36 (S.D. W. Va. Aug. 2, 2022); *Scott* v. *St. Louis Univ. Hosp.,* No. 4:21–cv– 01270–AGF, 2022 U.S. Dist. LEXIS 74691, at *18 (E.D. Mo. Apr. 25, 2022); *C.P.* v. *Blue Cross Blue Shield of Ill.,* 536 F. Supp. 3d 791, 793 (W.D. Wash. 2021); *Flack* v. *Wis. Dep't of Health Servs.,* 395 F. Supp. 3d 1001, 1014–15 (W.D. Wis. 2019); *Boyden* v. *Conlin,* 341 F. Supp. 3d 979, 997, 1002–03 (W.D. Wis. 2018); *Tovar* v. *Essentia Health,* 342 F. Supp. 3d 947, 953 (D. Minn. 2018); *Prescott* v. *Rady Children's Hosp.-San Diego,* 265 F. Supp. 3d 1090, 1098–1100 (S.D. Cal. 2017); *Adams* v. *Sch. Bd. of St. Johns Cnty.,* 968 F.3d 1286, 1305 (11th Cir. 2020); *Zarda* v. *Altitude Express, Inc.,* 883 F.3d 100, 112–13 (2nd Cir. 2018); *Franchina* v. *Providence,* 881 F.3d 32, 53–54 (1st Cir. 2018); *Hively* v. *Ivy Tech,* 853 F.3d 339, 340–41 (7th Cir. 2017).

rather than "gender identity." A commenter argued that title VII should be treated as distinct from title IX because title IX uses the term "on the basis of sex"—language the commenter described as requiring more than "but for causation"—while title VII uses "because of . . . sex." Other commenters discussed title IX to support arguments that discrimination on the basis of sex does not include discrimination on the basis of sexual orientation or gender identity, and that title IX only protects people on the basis of "biological sex."

Some commenters cited to various cases in opposition to the inclusion of gender identity and sexual orientation in proposed § 92.101(a)(2), including *State of Tennessee* v. *Department of Education,* 615 F. Supp. 3d 807 (E.D. Tenn. 2022), to support the belief that agencies cannot rely on the reasoning in *Bostock* to interpret what constitutes sex discrimination under title IX. Another commenter stated that E.O. 13988 improperly expands the application of *Bostock* and cited *Franciscan Alliance* v. *Burwell,* 227 F. Supp. 3d 660 (N.D. Tex. 2016) in support. Some commenters stated that RFRA's religious protections may supersede the sex discrimination protections described in *Bostock,* and one commenter cited *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC,* 565 U.S. 171 (2012), for the proposition that First Amendment protections may supersede employment discrimination laws. Another commenter stated that OCR's interpretation of what is prohibited sex discrimination is contrary to law, citing to *Franciscan Alliance, Inc.* v. *Becerra* [111] and *Christian Employers Alliance* v. *EEOC.* [112]

*Response:* Case law offers strong support for the position that sex discrimination under section 1557 includes discrimination on the basis of gender identity and sexual orientation. As previously noted, a body of developing case law explains how to identify unlawful sex discrimination. As part of its prohibition on sex discrimination, this rule prohibits discrimination against individuals who do not conform with stereotypical notions of how an individual is expected to present as male or female, regardless of gender identity. This is consistent with longstanding case law;

more than 30 years ago, a plurality of the Supreme Court held in *Price Waterhouse* that discrimination based on sex stereotypes was a prohibited form of sex discrimination. We have included a number of examples throughout the preamble discussion to help covered entities better understand their obligations. OCR is also committed to providing technical assistance to support compliance with this final rule and may consider additional guidance that may assist covered entities with their obligations.

As noted in the Proposed Rule, the inclusion of "sexual orientation" and "gender identity" in § 92.101(a)(2) is consistent with the Supreme Court's reasoning in *Bostock.* 87 FR 47858. Title IX and section 1557 prohibit discrimination "on the basis of sex." [113] And the *Bostock* Court used the phrase "because of sex" and "on the basis of sex" interchangeably. [114] Because the statutory prohibitions against sex discrimination in title VII and title IX are similar, the Supreme Court and other Federal courts look to interpretations of title VII to inform title IX. [115] Thus, *Bostock's* discussion of the text of title VII informs the OCR's analysis of title IX and section 1557. Given the similarity in nondiscrimination language between title VII and title IX, many Federal courts that have addressed the issue have interpreted section 1557 and title IX consistent with *Bostock's* reasoning. [116] Since *Bostock,* three Federal courts of appeals have held that the plain language of title IX's prohibition on sex discrimination must be read similarly to title VII's prohibition. [117] OCR agrees with the reasoning in these cases. [118]

Additionally, there is a significant amount of case law, pre-and post-*Bostock* that affirms that sex discrimination includes discrimination based on gender identity. [119]

We disagree with commenters' assertion that the Court's use of the term "transgender status" in *Bostock,* rather than "gender identity," results in any meaningful distinction regarding protections afforded to transgender individuals or other individuals experiencing discrimination on the basis of their gender identity. The Court's choice of language reflects that it was addressing the gender identity of the plaintiff before it, who was transgender, and does not preclude the case's application to other gender identities. Indeed, even the dissent stated that "there is no apparent difference between discrimination because of transgender status and discrimination because of gender identity." 590 U.S. at 686, n.6 (Alito, J. joined by Thomas, J., dissenting).

Additional citations by those opposing the language in § 92.101(a)(2) are either not applicable, already discussed in the Proposed Rule, or outdated. To begin, this rule does not

[111] 553 F. Supp. 3d 361 (N.D. Tex. 2021), *amended,* No. 7:16–cv–00108–O, 2021 WL 6774686 (N.D. Tex. Oct. 1, 2021), *appeal docketed,* No. 21–11174 (5th Cir. Nov. 26, 2021); *see also Franciscan All., Inc.* v. *Becerra,* 47 F.4th 368 (5th Cir. 2022).

[112] *Christian Emp'rs All.* v. *EEOC,* No. 21–cv–00195, 2022 WL 1573689 (D.N.D. May 16, 2022).

[113] 20 U.S.C. 1681(a); 42 U.S.C. 18116.

[114] *See, e.g.,* 590 U.S. 653, 662, 681.

[115] *See, e.g., Franklin* v. *Gwinnett Cnty. Pub. Sch.,* 503 U.S. 60, 75 (1992); *Jennings* v. *Univ. of N.C.,* 482 F.3d 686, 695 (4th Cir. 2007); *Gossett* v. *Okla. ex rel. Bd. Of Regents for Langston Univ.,* 245 F.3d 1172, 1176 (10th Cir. 2001).

[116] *See, e.g., Doe* v. *Snyder,* 28 F.4th 103, 113–14 (9th Cir. 2022); *Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 616 (4th Cir. 2020); *but cf. Adams* v. *Sch. Bd. of St. Johns Cnty,* 57 F.4th 791, 811–15 (11th Cir. 2022) (en banc)).

[117] *See A.C. by M.C.* v. *Metro. Sch. Dist. Of Martinsville,* 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski* v. *Ariz. Bd. Of Regents,* 69 F.4th 1110, 1116–17 (9th Cir. 2023); *Doe* v. *Snyder,* 28 F.4th 103, 113–14 (9th Cir. 2022); *Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied,* 141 S. Ct. 2878 (Mem) (2020).

[118] OCR acknowledges that at least one court has held that it would be a misapplication of *Bostock* to interpret the definition of "sex discrimination" under section 1557 and title IX to include gender identity and sexual orientation. In *Neese* v. *Becerra,* 640 F. Supp. 3d 668, the U.S. District Court for the Northern District of Texas held that the Department

misapplied *Bostock* when it issued a public notice, 86 FR 27984 (May 25, 2021), stating that it would interpret section 1557 and title IX's prohibition on sex discrimination to include discrimination on the basis of sexual orientation and gender identity. The Department appealed that decision to the U.S. Court of Appeals for the Fifth Circuit and oral argument was held on January 8, 2024. The Department is not applying the challenged interpretation to members of the *Neese* class pending the appeal.

[119] *See, e.g., Whitaker By Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.,* 858 F.3d 1034 (7th Cir. 2017) (title IX); *Smith* v. *City of Salem, Ohio,* 378 F.3d 566 (6th Cir. 2004) (title VII); *Rosa* v. *Park W. Bank & Trust Co.,* 214 F.3d 213 (1st Cir. 2000) (Equal Credit Opportunity Act); *Schroer* v. *Billington,* 577 F. Supp. 2d 293 (D.D.C. 2008) (title VII); *Boyden* v. *Conlin,* 341 F. Supp. 3d 979 (W.D. Wis. 2018) (section 1557 and title VII); *Flack* v. *Wis. Dep't. of Health Servs.,* 395 F. Supp 3d 1001, 1014 (W.D. Wis. 2019) (section 1557 and Equal Protection Clause); *Prescott* v. *Rady Children's Hosp. San Diego,* 265 F. Supp. 3d 1090, 1098–100 (S.D. Cal. 2017) (section 1557); *Tovar* v. *Essential Health,* 342 F. Supp. 3d 947, 957 (D. Minn. 2018) (section 1557). *See also Doe* v. *Snyder,* 28 F.4th 103, 113–14 (9th Cir. 2022); *Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied,* 141 S. Ct. 2878 (Mem) (2020); *Kadel* v. *Folwell,* No. 1:19–cv–00272, 2022 WL 2106270, at *28-*29 (M.D.N.C. June 10, 2022); *Scott* v. *St. Louis Univ. Hosp.,* No. 4:21–cv–01270–AGF, 2022 WL 1211092, at *6 (E.D. Mo. Apr. 25, 2022); *C.P. by & through Pritchard* v. *Blue Cross Blue Shield of Ill.,* No. 3:20–cv–06145–RJB, 2021 WL 1758896, at *4 (W.D. Wash. May 4, 2021); *Koenke* v. *Saint Joseph's Univ.,* No. CV 19–4731, 2021 WL 75778, at *2 (E.D. Pa. Jan. 8, 2021); *Doe* v. *Univ. of Scranton,* No. 3:19–cv–01486, 2020 WL 5993766, at *11 n.61 (M.D. Pa. Oct. 9, 2020); *Maxon* v. *Seminary,* No. 2:19–cv–9969, 2020 WL 6305460 (C.D. Cal. Oct. 7, 2020); *B.P.J.* v. *W. Va. State Bd. Of Educ.,* No. 2:21–cv–00316, 2021 WL 3081883, at *7 (S.D.W. Va. July 21, 2021); *Clark Cnty. Sch. Dist. V. Bryan,* 478 P.3d 344, 354 (Nev. 2020).

rely on E.O. 13988 for its authority, so criticisms of that order do not undermine the final rule. *State of Tennessee* is inapposite. There, the court held that the plaintiffs had demonstrated a reasonable likelihood of success on the claim that two other Federal agencies violated the Administrative Procedure Act by foregoing notice-and-comment procedures.[120] That is not at issue here, as this is notice-and-comment rulemaking and not the issuance of informational documents. *Hosanna-Tabor* involved First Amendment limitations on the application of employment discrimination laws—specifically the "ministerial exception" that precludes application of employment discrimination laws to "claims concerning the employment relationship between a religious institution and its ministers." 565 U.S. at 188. As discussed throughout the Proposed Rule, beginning at 87 FR 47826, OCR is aware of and discusses both *Franciscan Alliance* v. *Becerra* and *Christian Employers Alliance* v. *EEOC,* and the Department is not prohibited from finalizing this rule by either decision. 87 FR 47826. Additionally, the final rule adopts new procedures for recipients wishing to invoke Federal religious freedom and conscience protections. For more on those procedures, see § 92.302.

Finally, OCR disagrees with the commenters who cited *Franciscan Alliance* v. *Burwell,* 227 F. Supp. 3d 660 (N.D. Tex. 2016), in support of the view that section 1557 and title IX's prohibition on sex discrimination does not include discrimination on the basis of sexual orientation and gender identity. The legal landscape in this area has changed since that decision issued and the publication of the Proposed Rule. The *Franciscan Alliance* v. *Burwell* court concluded that the 2016 Rule's definition of "sex" as including "gender identity" was contrary to section 1557 because "Title IX and Congress' incorporation of it in [section 1557 of] the ACA unambiguously adopted the binary definition of sex." *Id.* at 689. Four years later, the Supreme Court held that the prohibition on discrimination "because of . . . sex" under title VII covers discrimination on the basis of gender identity and sexual orientation, even assuming that "sex" refers "only to biological distinctions between male and female." *Bostock,* 590 U.S. at 655. The *Bostock* Court held that

the statute's prohibition on employment discrimination "because of sex" encompasses discrimination on the basis of sexual orientation and gender identity. *Id.* at 670–71.

*Comment:* Several commenters generally asserted that sex is an immutable, biological binary. Some commenters relayed that their religious beliefs include that sex is an immutable binary. A commenter stated that sex has a biological component that impacts medical care.

A commenter argued that if the rule does not recognize that sex is a biological binary, there will be increased confusion in the provision of medical services. Another commenter expressed concern that the rule would diminish the quality of health care received by some patients because some health conditions, such as symptoms of heart attacks, are based on "biological sex characteristics." A commenter said that a prohibition of discrimination on the basis of gender identity would validate the recognition of gender identity and increase gender dysphoria.

*Response:* OCR recognizes that sex has biological components and knowledge of an individual's biological attributes is an essential component of providing high quality health care for all patients. For example, in the Proposed Rule, we discussed the various health disparities experienced by women, which require that providers have adequate knowledge of biology and anatomy to effectively address. 87 FR 47833–34.

OCR disagrees with commenters suggesting that nondiscrimination protections on the basis of gender identity will either cause confusion in the medical profession or lead to diminished quality of care. Health care providers are highly trained in issues of biology, anatomy, and physiology. This rule requires that individuals be treated without discrimination on the basis of sex. There is no evidence that demonstrates that compliance with civil rights protections, including on the basis of sex, has caused any confusion in the medical field. On the contrary, evidence suggests that when patients are protected on the basis of sex in health care programs, quality of care improves because patients at risk of discrimination are more likely to seek and receive high quality care. For example, research shows that individuals who are experiencing gender dysphoria—defined by the American Psychiatric Association to include "clinically significant distress or impairment related to gender incongruence"—have a clinically significant decrease in distress if they

have access to medically necessary care.[121]

Moreover, section 1557 prohibits discrimination on certain prohibited bases, and does not interfere with individualized clinical judgment about the appropriate course of care for a patient. OCR has a general practice of deferring to a clinician's judgment about whether a particular service is medically appropriate for an individual, or whether the clinician has the appropriate expertise to provide care. There is no part of section 1557 that compels clinicians to provide a service that they do not believe is medically appropriate for a patient or that they are not qualified to provide.

With respect to commenters' concerns about potential conflicts between the final rule and individuals' or organizations' sincerely held religious beliefs, we refer commenters to the discussion of this topic at § 92.302.

*Comment:* Some commenters stated that because OCR relied on *Bostock,* it is bound by the definition of "sex" in *Bostock* and that definition should be included in the final rule. These commenters opined that the term "sex characteristics" as used by OCR is sometimes contrary to a binary understanding of the term "sex," and accordingly "sex characteristics" either must be avoided in the regulations or used in a manner not to contradict the term "sex" being binary.

*Response:* OCR has determined it is not necessary to define "sex" in this rule, as we have addressed a non-exhaustive list of what constitutes discrimination on the basis of sex at § 92.101(a)(2). The Supreme Court did not define the term "sex" in *Bostock,* but rather noted that nothing in their approach to the cases considered turned on the debate over whether "sex" was limited to "biological distinctions between male and female," and the Court therefore proceeded on the assumption that "sex" carried that meaning. 590 U.S. at 655.

OCR declines to remove reference to "sex characteristics" (including intersex traits) from § 92.101(a)(2). Discrimination on the basis of sex characteristics, including intersex variations, is a prohibited form of sex discrimination because discrimination based on anatomical or physiological sex characteristics is inherently sex-based. *See* 87 FR 47858.

*Comment:* Numerous commenters supported the explicit inclusion of

---

[120] *Tennessee* v. *U.S. Dep't of Educ.,* 615 F. Supp. 3d 807 (E.D. Tenn. 2022); *appeal docketed,* No. 22–5807 (6th Cir. Sept. 13, 2022) (oral argument held April 26, 2023).

[121] Jack Turban, M.D., M.H.S., *What is Gender Dysphoria?,* Am. Psychiatric Assoc., *https:// www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria* (Aug. 2022).

discrimination based on sex characteristics, including intersex traits, stating that discrimination based on intersex traits is inherently sex-based. Several commenters supported this proposal, citing barriers to appropriate care and coverage resulting from discrimination suffered by intersex patients.[122] These commenters cited a report in which more than half of intersex respondents reported that a provider refused to see them because of their sex characteristics or intersex variation and that almost two-thirds reported having concerns that if they disclosed their intersex status to a provider, they could be denied quality medical care.[123] A few commenters recommended that § 92.101(a)(2) include concrete examples of sex discrimination, specifically on the basis of intersex traits.

*Response:* Discrimination based on sex characteristics is a prohibited form of sex discrimination because discrimination based on anatomical or physiological sex characteristics is inherently sex-based. 87 FR 47858. It follows that discrimination on the basis of intersex traits is prohibited sex discrimination because the individual is being discriminated against based on their sex characteristics.

*Comment:* Numerous commenters generally supported the inclusion of pregnancy or related conditions as protected bases of sex discrimination at § 92.101(a)(2) and recommended that OCR include examples of pregnancy-related discrimination. Commenters recommended including protection for pregnancy-related conditions as a standalone provision to emphasize the importance of these protections. Commenters stated that protection against discrimination on the basis of pregnancy or related conditions would protect many patients. Commenters also pointed out that as drafted, the Proposed Rule does not consistently define sex discrimination to include pregnancy-related conditions because other sections just state "pregnancy" as opposed to "pregnancy or related conditions." The commenters urged OCR to be consistent throughout the rule.

*Response:* The inclusion of "pregnancy or related conditions" is consistent with the longstanding interpretation of the "ground" of discrimination prohibited under title IX because pregnancy-based discrimination has long been understood as a form of sex-based discrimination under title IX. For many years preceding the enactment of the ACA, the Department (along with other agencies) determined that discrimination based on pregnancy or related conditions is discrimination based on sex.[124] Discrimination on the basis of pregnancy or related conditions may include, but is not limited to, instances of individuals who experience discrimination throughout pregnancy, labor and delivery, or the postpartum period. OCR agrees that the explicit inclusion of pregnancy or related conditions in the rule text is important for protecting many patients from discrimination.

As discussed in the Proposed Rule, OCR considered inclusion of a provision to specifically address discrimination on the basis of "pregnancy or related conditions." 87 FR 47878. We received comments stating that a separate section was not appropriate. Those comments recommended that this issue be addressed under either § 92.101 (Discrimination prohibited) or § 92.206 (Equal program access on the basis of sex). Accordingly, we maintain the inclusion of "pregnancy or related conditions" here under § 92.101(a)(2). For a further discussion of "pregnancy or related conditions," please refer to the preamble discussion at § 92.208 (Prohibition on sex discrimination related to marital, parental, or family status).

*Comment:* A commenter stated that protections from pregnancy-based discrimination should include an informed consent requirement for abortion and childbirth, because the commenter asserted that consent for a Cesarean delivery is often obtained through coercion.

*Response:* As noted in the Proposed Rule, 87 FR 47868, informed consent to any medical treatment is both a legal and ethical standard, regardless of the type of care, and serves as a basis for shared decision making.[125] OCR declines to make any changes in response to this comment.

*Comment:* Numerous commenters recommended that, in light of the Supreme Court's decision in *Dobbs* v.

*Jackson Women's Health Organization,* 142 S. Ct. 2228 (2022), and increased restrictions on reproductive health, OCR should provide that "pregnancy or related conditions" includes termination of pregnancy in the final rule. A group of commenters opined that the definition of "pregnancy or related conditions" should expressly exclude an abortion.

Several commenters stated that OCR should clarify that this provision protects patients from discrimination on the basis of actual or perceived prior abortions. Several commenters stated that, as a result of abortion bans that have gone into effect post-*Dobbs,* women have been denied critical care, such as cancer treatment, because of abortion-related concerns. A commenter wrote that abortion is often necessary to save patients' lives, especially from complications like ectopic pregnancy or premature rupture of membrane.

*Response:* OCR appreciates commenters' concerns and recognizes that the Supreme Court decision in *Dobbs* changed the legal landscape as to abortion access. While we agree that protections afforded for pregnancy or related conditions include termination of pregnancy, OCR declines to revise the language at § 92.101(a)(2) to include or exclude specific examples and will interpret section 1557's protections on the basis of sex consistent with applicable case law addressing discrimination on the basis of sex, including pregnancy and related conditions.

OCR has concluded as a matter of statutory interpretation that section 1557 does not require the Department to incorporate the language of title IX's abortion neutrality provision, *see* preamble discussion at § 92.208 (Prohibition on sex discrimination related to marital, parental, or family status). At the same time, OCR emphasizes that a covered provider's decision not to provide abortions does not itself constitute discrimination in violation of section 1557. Also, a covered provider's willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion also is not discrimination under section 1557. Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in covered health programs or activities. A covered provider that generally offered abortion care could violate that prohibition if, for example, it refused to provide an abortion to a particular patient because of that patient's race or disability. But a covered provider does not engage in

---

[122] Lambda Legal & interACT Advocates, *Providing Ethical and Compassionate Health Care to Intersex Patients: Intersex-Affirming Hospital Policies* (2018), *https://legacy.lambdalegal.org/sites/default/files/publications/downloads/resource_20180731_hospital-policies-intersex.pdf.*

[123] *See* Caroline Medina & Lindsay Mahowald, Ctr. for Am. Progress, *Advancing Health Care Nondiscrimination Protections for LGBTQI+ Communities* (2022), *https://www.americanprogress.org/article/advancing-health-care-nondiscrimination-protections-for-lgbtqi-communities.*

[124] *See* 45 CFR 86.21(c)(2), (3); 86.40(b)(1), (4), and (5); 86.51(b)(6); 86.57(b)(d) (title IX regulation).

[125] Am. Med. Ass'n, *Informed Consent, https://www.ama-assn.org/delivering-care/ethics/informed-consent.*

discrimination prohibited by section 1557 if it declines to provide abortions based on religious or conscience objections to performing the procedure, based on a professional or business judgment about the scope of the services it wishes to offer, or for any other nondiscriminatory reason.

It bears emphasis that nothing in the ACA, including section 1557, has ''any effect on Federal laws regarding—(i) conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion.'' 42 U.S.C. 18023(c)(2)(A). In addition, nothing in the ACA, including section 1557, preempts or has any effect on State laws regarding ''the prohibition of (or requirement of) coverage, funding, or procedural requirements on abortions'' as provided in section 1303 of the ACA, 42 U.S.C. 18023(c)(1).

Against this legal landscape, OCR will evaluate specific claims of discrimination on prohibited bases on a case-by-case basis, and we decline to revise the language at § 92.101(a)(2). We note also that, as commenters suggested, this provision protects patients from discrimination on the basis of actual or perceived prior abortions. For example, a recipient's denial of unrelated medical care that the provider generally provides to other patients to an individual based solely on the fact they had a prior abortion would constitute prohibited discrimination within the meaning of section 1557. Moreover, both the 2016 and 2020 Rules recognized that discrimination on the basis of pregnancy termination can be a form of sex discrimination.

*Comment:* Conversely, a commenter argued that OCR should not interpret ''pregnancy or related conditions'' to include ''termination of pregnancy'' because of a concern that it will force health care providers to participate in abortions and requested that OCR provide further clarification as to what types of conduct would be prohibited discrimination under the rule. Another commenter stated the Proposed Rule wrongly treats abortion as a right protected from sex discrimination and that title IX contains an abortion neutrality provision that the rule would contravene.

*Response:* As discussed above, a covered provider's decision not to provide abortions does not itself constitute discrimination in violation of section 1557. A covered provider does not engage in discrimination prohibited by section 1557 if it declines to provide

abortions based on religious or conscience objections to performing the procedure, based on a professional or business judgment about the scope of the services it wishes to offer, or for any other nondiscriminatory reason. A covered entity that chooses to provide abortion care but refuses to provide an abortion for a particular individual on the basis of a protected ground—such as race—would violate section 1557. For discussion regarding the title IX abortion neutrality provision, please see § 92.208.

*Comment:* Several commenters requested that OCR clarify that § 92.101(a)(2) prohibits discrimination against individuals when they are seeking or accessing fertility care, maternity care, and other reproductive health care specifically. A commenter recommended that OCR clarify that pregnancy-related care applies throughout pregnancy, childbirth, and the postpartum period.

*Response:* Section 1557 protects individuals against prohibited discrimination in all covered health programs and activities regardless of the type of care they are seeking or accessing, including fertility care, maternity care, and other reproductive health care. Similarly, section 1557 protects individuals seeking or accessing health programs and activities provided for or during preconception, pregnancy, childbirth, and postpartum recovery. Ensuring that section 1557's protections apply throughout the continuum of care is especially critical for Black women and other people of color, who face worse health outcomes and experience higher rates of discrimination throughout pregnancy and the postpartum period.[126]

*Comment:* Many commenters raised concerns about barriers to reproductive health care faced by LGBTQI+ patients. A commenter strongly urged more explicit inclusion of ''fertility'' as a form of impermissible sex-based discrimination—so that § 92.101(a)(2)(ii) prohibits discrimination on the basis of ''pregnancy, fertility, or related conditions''—as infertility is a serious issue that impacts many LGBTQI+ populations. Commenters stated that LGBTQI+ people continue to face barriers to fertility treatment, such as in vitro fertilization (IVF), and that coverage of fertility treatments often limit or exclude LGBTQI+ patients.

*Response:* OCR acknowledges the unique challenges faced by LGBTQI+

individuals seeking fertility treatment. Individuals are protected from discrimination regardless of the type of health care they seek, and we have concluded it is unnecessary to provide provisions for each specific form of health care available. Whether discrimination on the basis of sexual orientation or gender identity occurred in the provision or coverage of assistive reproductive technology—such as IVF— is necessarily fact specific. However, if a covered entity elects to provide or cover fertility services but categorically denies them to same-sex couples, it may violate section 1557's prohibition on sex discrimination.

*Comment:* Numerous commenters generally supported inclusion of sexual orientation as a protected basis for sex discrimination, and said that its inclusion would improve health care for LGBTQI+ individuals. Many commenters stated that LGBTQI+ individuals face discriminatory challenges to accessing health care and that the rule would alleviate these issues. Many commenters wrote that LGBTQI+ individuals often anticipate that they will experience discrimination in health care and thus often may not seek out care.

*Response:* It is well documented that LGBTQI+ individuals face discrimination when accessing or attempting to access health care and health insurance. Section 1557 is a critical tool in combating such discrimination and addressing the resulting health disparities and other negative impacts.

*Comment:* Numerous commenters generally supported the inclusion of discrimination on the basis of gender identity as a prohibited form of sex discrimination. Other commenters recommended including ''transgender or nonbinary status,'' ''nonbinary and gender-nonconforming,'' and ''including status as transgender, nonbinary, gender nonconforming, two-spirit, or other gender.''

*Response:* OCR recognizes that individuals use various terminology to describe their gender identity. For this reason, we decline to provide a definition of ''gender identity'' or ''transgender status'' in the regulation. We reiterate here that OCR will investigate discrimination against an individual based on having a gender identity that is different from their sex assigned at birth as discrimination on the basis of gender identity, regardless of whether the individual identifies with or uses the term ''transgender'' or another identity.

OCR is aware that the *Bostock* majority uses the term ''transgender

---

[126] Saraswathi Vedam et al., *The Giving Voice to Mothers Study: Inequity and Mistreatment During Pregnancy and Childbirth in the United States,* 16 Reprod. Health 1 (2019), *https://doi.org/10.1186/s12978-019-0729-2.*

status'' exclusively. But *Bostock* reasoned that when a person discriminates ''against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today'' such that ''[a]ny way you slice it, the employer intentionally refuses to hire applicants in part because of the affected individuals' sex, even if it never learns any applicant's sex.'' *See Bostock,* 590 U.S. at 669. This therefore includes discrimination against a person because they are transgender, or because they identify in some other way that is inconsistent with their sex assigned at birth, *e.g.,* because they are gender nonconforming. Such discrimination is also based on requiring persons to conform to stereotypical norms about sex and gender, which can also serve as the basis for impermissible sex discrimination. *See, e.g., Whitaker,* 858 F.3d at 1048–49 (*citing Price Waterhouse,* 490 U.S. at 251). Therefore, the prohibition against discrimination based on gender identity, rather than just transgender status, more fully protects individuals from prohibited sex discrimination. Indeed, the *Bostock* dissent stated that, as defined by the American Psychological Association, ''there is no apparent difference between discrimination because of transgender status and discrimination because of gender identity.'' 590 U.S. at 686, n.6 (Alito, J. joined by Thomas, J., dissenting).

*Comment:* Several commenters supported OCR's general goal at § 92.101(b) of explicitly incorporating the prohibitions on discrimination found in title VI, section 504, title IX, and the Age Act and thought this approach is prudent, given that some health care entities may not be readily familiar with the specific regulatory standards and obligations that apply to them under civil rights laws. A few commenters noted that incorporating section 504 regulations pertaining to accessibility could create conflicting obligations and specifically objected to incorporating 45 CFR 84.23(c), which applies an outdated standard (the Uniform Federal Accessibility Standards) to new facility constructions. These commenters recommended including additional language in § 92.101(b)(1)(i) that expressly states ''(except for § 84.23(c)).''

*Response:* We appreciate commenters' concerns regarding inclusion of § 84.23(c). Because the rule has a separate subsection with respect to ''Accessibility for buildings and facilities,'' commenters should refer to this preamble's discussion of § 92.203.

*Comment:* Some commenters requested that OCR restore the 2016 Rule clarification that any age distinctions exempt from the Age Act are also exempt from section 1557 enforcement.

*Response:* OCR appreciates commenters' request for clarity regarding the Age Act's permitted age distinctions. This rule adopts by reference the Age Act implementing regulation provisions at 45 CFR part 91 (subpart B), which explicitly recognize that some age distinctions may be necessary to the normal operation of a program or activity or to the achievement of any statutory objective. *See* 45 CFR 91.13 (adopting statutorily permissive age distinctions found at 42 U.S.C. 6103(b)(1)).

*Comment:* A commenter stated that OCR should exercise its authority to enforce disparate impact claims in order to address systemic discrimination in health care.[127] Another commenter supported the approach taken by OCR in the Proposed Rule to not include the site location provision from the 2016 Rule, stating they believed section 1557's context, structure, and text make evident that Congress did not intend to import multiple, piecemeal legal standards and burdens of proof derived from different statutory contexts into the doctrinal patchwork; and that section 1557 provides the full range of enforcement mechanisms and remedies available to any person pursuing a discrimination claim under section 1557, regardless of their protected characteristic.

*Response:* After reviewing comments, OCR declines to include provisions similar to former 45 CFR 92.101(b)(3)(ii) and (iii), which are not included in the 2020 Rule. OCR will preserve the longstanding treatment of discrimination in the referenced statutes' implementing regulations consistent with relevant case law.

Summary of Regulatory Changes

For the reasons set forth above and considering the comments received, we are finalizing the provision as proposed

in § 92.101, with modifications. We added ''or any combination thereof'' after disability and deleted the ''or'' before disability in § 92.101(a)(1).

*Subpart C—Specific Applications to Health Programs and Activities*

Because of section 1557's specific application to health programs and activities, subpart C provides additional detail regarding nondiscrimination requirements in these settings. The provisions in this subpart are responsive to the nature and importance of health care, health insurance coverage, and other health-related coverage, and related health programs and activities as those health-related issues impact individuals and communities protected by section 1557's prohibition of discrimination. These provisions are intended to provide clear instruction to covered entities and are informed by OCR's experience in both enforcement and in providing technical assistance as well as outreach to interested parties.

Meaningful Access for Individuals With Limited English Proficiency (§ 92.201)

In proposed § 92.201, we proposed provisions to effectuate section 1557's prohibition on national origin discrimination as it is applied to individuals with LEP in covered health programs and activities. In § 92.201(a), we proposed that covered entities ''must take reasonable steps to provide meaningful access to each limited English proficient individual eligible to be served or likely to be directly affected by its health programs and activities.''

In § 92.201(b), we proposed that language assistance services required under § 92.201(a) must be provided free of charge, be accurate and timely, and protect the privacy and independent decision-making ability of an individual with LEP.

In § 92.201(c), we proposed specific requirements for interpreter and translation services. Section 92.201(c)(1) proposed that when interpreter services are required under this part, a covered entity must offer a qualified interpreter. Section 92.201(c)(2) proposed that when translation services are required under this part, a covered entity must use a qualified translator.

In § 92.201(c)(3), we proposed regulatory language requiring a covered entity that uses machine translation to have translated materials reviewed by a qualified human translator when the underlying text is critical to the rights, benefits, or meaningful access of an individual with LEP; when accuracy is essential; or when the source documents or materials contain complex, non-literal, or technical language. We sought

---

[127] Ruqaiijah Yearby et al., *Structural Racism in Historical and Modern US Health Care Policy,* 41 Health Affairs 187 (2022), *https:// www.healthaffairs.org/doi/10.1377/ hlthaff.2021.01466;* Joe Feagin & Zinobia Bennefield. *Systemic Racism and U.S. Health Care,* 103 Soc. Sci. & Med. 7 (2014), *https://doi.org/ 10.1016/j.socscimed.2013.09.006;* Cara A. Fauci, *Racism and Health Care in America: Legal Responses to Racial Disparities in the Allocation of Kidneys,* 21 Boston Coll. Third World J. 35 (2001); Amitabh Chandra et al., *Challenges to Reducing Discrimination and Health Inequity through Existing Civil Rights Laws,* 36 Health Affairs 1040 (2017), *https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC5654529/.*

cannot state every modification that could result in a fundamental alteration because determining whether a modification is a fundamental alteration is a fact-specific process.

Summary of Regulatory Changes

For the reasons set forth above and considering the comments received, we are finalizing the provisions as proposed in § 92.205, without modification.

Equal Program Access on the Basis of Sex (§ 92.206)

OCR proposed a section clarifying covered entities' obligation to ensure equal access to their health programs and activities without discrimination on the basis of sex.

In proposed § 92.206(a), we described a covered entity's general obligation to provide individuals equal access to the covered entity's health programs or activities without discrimination on the basis of sex.

In proposed § 92.206(b)(1) through (4), we clarified certain types of discriminatory actions that would be prohibited for a covered entity in its provision of access to health programs or activities.

In § 92.206(b)(1), we proposed prohibiting a covered entity from denying or limiting health services, including those that are offered exclusively to individuals of one sex, to an individual based on the individual's sex assigned at birth, gender identity, or gender otherwise recorded.

In § 92.206(b)(2), we proposed prohibiting covered entities from denying or limiting a health care professional's ability to provide health services on the basis of a patient's sex assigned at birth, gender identity, or gender otherwise recorded.

In § 92.206(b)(3), we proposed prohibiting a covered entity from applying any policy or practice of treating individuals differently or separating them on the basis of sex in a manner that subjects any individual to more than *de minimis* harm.

In § 92.206(b)(4), we proposed prohibiting a covered entity from denying or limiting health services sought for the purpose of gender-affirming care that the covered entity would provide to a person for other purposes if the denial or limitation is based on a patient's sex assigned at birth, gender identity, or gender otherwise recorded.

In § 92.206(c), we proposed that nothing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where

the covered entity reasonably determines that such health service is not clinically appropriate for that particular individual.

In § 92.206(d), we proposed that the enumeration of specific forms of discrimination in paragraph (b) does not limit the general applicability of the prohibition in paragraph (a).

The comments and our responses regarding § 92.206 are set forth below.

*Comment:* Numerous commenters supported OCR's proposal to specifically address equal access on the basis of sex in the final rule. A supporter of the provision argued that patients who trust their provider not to discriminate against them will share better information, enabling better treatment. Some commenters specifically requested this section be strengthened by including specific examples of what constitutes discrimination based on sex characteristics.

*Response:* OCR agrees that open communication between a provider and their patient is a bedrock of the provision of quality care, and that cannot happen where the patient experiences or expects that they will face discrimination by the provider. In addition, we note that the question of whether prohibited discrimination has occurred is often context specific and fact intensive, so it is difficult to provide succinct examples of scenarios that would constitute prohibited discrimination in each and every instance.

*Comment:* Commenters urged OCR to include specific language related to reproductive health care and fertility treatments in §§ 92.206 and 92.207. A few commenters urged OCR to specify the full range of reproductive health care protected from discrimination under section 1557, including protections against discrimination based on reproductive health decisions. A few commenters said the final rule should make clear that section 1557 prohibits discrimination related to maternity care, such as failing to provide accessible medical equipment or transfer assistance, leaving wheelchair users unable to access care. Another commenter opined that the final rule should make clear that section 1557 prohibits discrimination relating to treating pregnancy emergencies and complications, including termination of pregnancy, miscarriage management, and other pregnancy outcomes.

*Response:* Matters related to reproductive health care, fertility, pregnancy, family status, and maternity care are addressed in § 92.208, and OCR refers commenters to that section.

Covered entities must ensure accessibility of their health programs and activities for individuals with disabilities, which includes accessible equipment and transfer assistance.

*Comment:* Some commenters argued that it would be more appropriate to address the impacts of the *Dobbs* decision and protections against discrimination on the basis of obtaining an abortion in § 92.206 rather than in § 92.208 (Prohibition on sex discrimination related to marital, parental, or family status), because addressing abortion in the section on marital, parental, or family discrimination could convey that denying abortion care is only discriminatory in those contexts.

Conversely, many commenters expressed opposition to the inclusion of termination of pregnancy within the scope of equal program access on the basis of sex, primarily stating that the rule would force health care professionals to perform abortions or deem their refusal to do so discrimination.

*Response:* OCR appreciates commenters' feedback regarding the addition of pregnancy or related conditions in § 92.206 rather than in § 92.208. Based on a review of the totality of the comments, additional language has not been added to § 92.206, and we discuss this issue further in § 92.208. Further, the ACA itself provides that ''[n]othing in this Act shall be construed to have any effect on Federal laws regarding—(i) conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion.'' 42 U.S.C. 18023(c)(2)(A). OCR will comply with this provision. For further discussion regarding a health care professional's decision not to provide an abortion, including due to a sincerely held religious belief or conscience objection to performing the procedure, *see* §§ 92.208 and 92.302.

*Comment:* Many commenters recommended that in addition to the specific forms of discrimination based on gender identity, it is important to include specific forms of reproductive health and pregnancy-related care discrimination in § 92.206(b). Many commenters recommended incorporating a provision or provisions under § 92.206(b) to clarify that covered entities are prohibited from denying or limiting services—or denying or limiting a health professional's ability to provide services—based on a patient's

pregnancy or related conditions, including termination of pregnancy, contraceptive use, miscarriage management, assisted reproduction, fertility care, and pregnancy-related services. One of these commenters recommended that the language of this provision not be limited to reproductive or sexual "health *care* decisions," as covered entities also discriminate based on reproductive and sexual health histories such as past experiences with sexual violence, which exist beyond the realm of services and that including "care" here could limit how covered entities understand this form of discrimination. Some commenters also stated that failure to codify some of the most prevalent forms of sex discrimination will directly undermine efforts to implement proposed §§ 92.101 and 92.206.

*Response:* OCR appreciates the recommendations regarding discrimination based on pregnancy or related conditions, including the request to provide additional examples, and directs commenters to the discussion at § 92.208. The rule does not include language related to discrimination based on health *care* decisions. The rule is not so limited—it prohibits discrimination in health programs and activities generally. This includes discrimination on the basis of sex in the context of health decisions or histories related to reproductive and sexual health.

*Comment:* Many commenters supported § 92.206 as important to ensure access to necessary health services that might otherwise be denied to people due to discrimination on the basis of sexual orientation or gender identity, with many providing specific examples of discrimination faced by LGBTQI+ individuals. Some commenters recommended specifically addressing protections for LGBTQI+ people seeking fertility treatments. A commenter recommended that OCR consider adding a subsection to § 92.206 or § 92.208 to discuss the prohibition of discrimination on the basis of sexual orientation and gender identity in access to fertility services, and provided examples of the numerous barriers that LGBTQI+ individuals and same-sex couples face in accessing this type of reproductive health care.

*Response:* Section 1557 and this rule prohibit discrimination on the basis of sex, including sex characteristics, sexual orientation, and gender identity, in health care access. Depending on the specific facts at issue, barriers described may rise to the level of discrimination and would be evaluated under this rule's general prohibition of discrimination under § 92.101(a)(1), to

make a case-by-case determination as to whether prohibited discrimination has occurred. In general, OCR anticipates that if a covered entity elects to provide or cover fertility services, but categorically denies them to same-sex couples or to individuals on the basis of sexual orientation or gender identity, such a denial of care or coverage may violate section 1557's prohibition on sex discrimination. We decline to add such specific language to the regulatory text as proposed.

*Comment:* Commenters recommended that OCR should add language to § 92.206(b) affirming that section 1557 prohibits covered entities from denying, limiting access to, or otherwise placing special caps, costs, or additional procedural requirements on medications or treatments needed specifically by people with disabilities, irrespective of whether those medications or treatments can also be used to end or complicate pregnancies or fertility.

*Response:* We address special caps, costs, or additional procedural requirements related to health insurance coverage and other health-related coverage in § 92.207, and direct commenters to that section. A discussion of medications and treatments related to pregnancy and fertility care is in § 92.208.

*Comment:* Many commenters recommended including "transgender status" in § 92.206(b)(1), (2), and (4) because there have been instances in which those seeking to permit discrimination against transgender people have justified it by pressing distinctions between transgender status and gender identity.

*Response:* As noted in the discussion for § 92.101(a)(2), the term "gender identity" necessarily encompasses transgender status and the two terms are often used interchangeably.[157] We decline to enumerate the full range of identities protected under the term "gender identity."

*Comment:* Multiple commenters expressed support for the rule's prohibition on denying or limiting care on the basis of a patient's assigned sex at birth, gender identity, or gender otherwise recorded at § 92.206(b)(2). A commenter expressed support for the rule's prohibition on covered entities denying or limiting a clinician's ability to provide clinically appropriate care when the failure to do so would constitute discrimination.

---

[157] *See, e.g., Bostock* v. *Clayton Cnty., Georgia,* 590 U.S. 644, 658–59 (2020); *Doe* v. *Mass. Dep't of Correction,* No. CV 17–12255–RGS, 2018 WL 2994403 (D. Mass. June 14, 2018); *Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034 (7th Cir. 2017).

Another commenter supported this provision, arguing that it is necessary to ensure that specialists and providers who see LGBTQI+ patients every day do not experience retaliation for providing care. Pointing to State legislative efforts seeking to restrict or ban providers from offering safe and effective treatment to LGBTQI+ patients, the commenter argued that such protections are particularly important to alleviate providers' fears that they may be subject to retaliation or loss of licensure for providing gender-affirming care. Another commenter similarly argued that covered entities sometimes discriminate against transgender patients by prohibiting their providers from providing certain services.

*Response:* As noted in the Proposed Rule, 87 FR 47866, this provision recognizes that prohibited discrimination may take the form of restrictions on individual providers, such as attending physicians, that have the effect of discriminating against patients. Where a covered entity imposes such a restriction based on a patient's gender identity or sex assigned at birth, the restriction may constitute prohibited discrimination in violation of this rule, even if the form that the restriction takes is a limitation on the ability of providers to prescribe or provide care.

Regarding providers' fears that they may be subject to retaliation by their employer or loss of licensure, this rule does not apply to employment practices, as discussed in § 92.2(b), but employees of covered entities remain protected against retaliation as provided in §§ 92.303 and 92.304. Not all State licensure boards receive Federal financial assistance from the Department; upon receipt of a complaint against a licensure board, OCR would need to first determine whether we have jurisdiction before commencing an investigation.

Also, we note that a health care provider's decision not to provide any service due to a sincerely held religious belief or conscience objection is discussed further in §§ 92.208 and 92.302.

*Comment:* Many commenters suggested that § 92.206(b)(2) would be clearer if the following phrase was deleted because it is redundant: "if such denial or limitation has the effect of excluding individuals from participation in, denying them the benefits of, or otherwise subjecting them to discrimination on the basis of sex under a covered health program or activity."

*Response:* OCR appreciates the suggestion and has considered it, but we

will maintain the proposed language, as the phrase provides additional explanation of what would constitute discrimination. As we noted in the Proposed Rule, 87 FR 47866, this is modeled on the provision in the title VI regulations that notes that certain discriminatory employment practices may be prohibited to the extent that they result in discrimination against program participants, even though the primary objective of title VI is not to regulate employment practices. *See* 45 CFR 80.3(c)(3). Likewise, the phrase commenters propose deleting here clarifies that these restrictions on providers are prohibited only insofar as they result in discrimination against individuals on the basis of sex in a covered health program or activity. This phrase is necessary to establish a violation because a discriminatory act under this rule is one in which the individual is excluded from, denied the benefits of, or otherwise subjected to discrimination under a health program or activity on the basis of sex.

*Comment:* A few commenters stated that it appears that § 92.206(b)(2) is directly aimed at the United States Conference of Catholic Bishops' Ethical and Religious Directives for Catholic Health Care Services.[158] These commenters recommended that OCR disavow this provision and affirm support for the value of religiously affiliated health care and the right of faith-based hospitals to operate in accordance with their convictions.

*Response:* As stated throughout this preamble, OCR values the vital role that faith-based hospitals and other health care providers and systems play in our nation's health care system. With respect to concerns about potential conflicts between provisions of the final rule and individuals' or organizations' sincerely held religious beliefs, we refer commenters to the discussion at § 92.302. The aim of § 92.206(b)(2) is to address discrimination that has a secondary effect on the ability of individuals to participate meaningfully in and/or to receive health care from a covered health program in a nondiscriminatory manner. OCR did not, nor did it intend to, single out any religious teachings and will respect all guarantees of Federal religious freedom and conscience laws.

*Comment:* Commenters highlighted that transgender and nonbinary people face unique discrimination in inpatient settings that are separated by sex,

particularly those that have only male and female facilities available. These commenters noted that this results in nonbinary people not having access to facilities consistent with their gender identity.

A few commenters raised concerns about the application of § 92.206(b)(3) to arrangements and practices involving patients who share intimate space with, or require intimate personal assistance from, other individuals. The commenters argued that the requirement to treat individuals consistent with their gender identity may raise concerns for privacy.

*Response:* OCR appreciates the commenters' feedback. As specified in the preamble discussion for § 92.101, this final rule protects all people regardless of gender identity, including transgender and nonbinary people. Nothing in this rule prohibits a covered entity from operating sex separated programs and facilities, so long as it does not subject anyone, including transgender and nonbinary individuals, to more than *de minimis* harm on the basis of sex. When a nonbinary individual seeks participation in a single-sex health program or activity or a health program or activity that maintains sex separate facilities, the covered entity should work with that individual to determine where they will best be served and where they can benefit the most from the health program or activity without experiencing trauma, distress, or threats to their safety due to an incorrect placement. A covered entity must not deny a nonbinary individual access to a health program or facility on the basis that the program or facility separates patients based on sex or offers separate male and female programs or facilities.

Courts have held that all individuals' safety and privacy can be protected without also excluding transgender individuals from accessing sex-separate facilities and activities consistent with their gender identity.[159] Nothing in the rule prevents covered entities from implementing policies or procedures to preserve any patient's privacy—consistent with the requirements of this rule and any other applicable laws. Providers have a range of tools at their disposal to accommodate individuals' privacy concerns and patient interests

in a nondiscriminatory manner. For example, a provider generally may accommodate a patient's preferences about roommate assignments. A covered entity will be in violation of this rule if they refuse to admit a transgender person for care or refuse to place them in facilities consistent with their gender identity, because doing so would result in more than *de minimis* harm. We also note that no application of this rule shall be required insofar as it would violate Federal religious freedom and conscience laws. Recipients may rely on those protections directly, *see* § 92.3(c), or they may seek an assurance of a religious freedom or conscience exemption, *see* § 92.302(b).

*Comment:* A commenter opposed the rule on the grounds that it would violate the U.S. Constitution's Equal Protection Clause standard for sex discrimination claims, which the commenter asserted allows men and women to be treated differently based on inherent differences in biology when such differences are real and not based on stereotypes. The commenter argued that proposed § 92.206(b)(3) would inappropriately prohibit providers from using any sex-based distinction unless they can prove it does not cause more than *de minimis* harm. This commenter alleged that the true purpose of such a provision is not equal treatment for all patients but special treatment for transgender individuals, particularly with respect to the use of sex-separate facilities. This commenter also argued that the provision would contradict the Voluntary Resolution Agreement the Department entered into with Michigan State University (MSU) under section 1557, which requires the presence of a chaperone—the sex of whom should be determined by the wishes and comfort of the patient—for all sensitive examinations.[160]

*Response:* Not all differential treatment on the basis of sex constitutes unlawful discrimination under section 1557, and the final rule does not prohibit all differential treatment.[161] If a

[158] U.S. Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* (6th ed. 2018), *https://www.usccb.org/resources/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06_0.pdf.*

[159] *Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 613–15 (4th Cir. 2020); *see also Cruzan* v. *Special Sch. Dist. # 1,* 294 F.3d 981, 984 (8th Cir. 2002) (per curiam) (holding that transgender woman's mere presence in a sex-separate space did not constitute actionable sexual harassment of her female co-workers); *Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1052–53 (7th Cir. 2017).

[160] *See* Voluntary Resolution Agreement between U.S. Dep't of Health & Hum. Servs., Off. for Civil Rights & The Bd. of Trs. of Mich. State Univ., dba Mich. State Univ. & MSU HealthTeam & MSU Health Care, Inc. (2019), *https://www.hhs.gov/sites/default/files/vra-between-msu-and-ocr.pdf.*

[161] Several courts have held that discrimination against transgender people constitutes sex discrimination under the Equal Protection Clause. *See, e.g., Hecox* v. *Little,* Nos. 20–35813, 20–35815, 2023 WL 5283127, at *12 (9th Cir. Aug. 17, 2023); *Brandt* v. *Rutledge,* 551 F. Supp. 3d 882, 889 (E.D. Ark. 2021), *aff'd sub nom. Brandt ex rel. Brandt* v. *Rutledge,* 47 F.4th 661, 670 (8th Cir. 2022); *Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 608 (4th Cir. 2020); *Whitaker by Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034,
Continued

sex-based distinction has only a *de minimis* impact, it is not prohibited discrimination.[162] But treating individuals differently on the basis of sex constitutes sex discrimination where it imposes a more-than-*de minimis* level of harm. Under the rule, providers may use sex-based distinctions to administer individualized care, provided those distinctions do not cause more than *de minimis* harm.

We disagree with the proposition that purpose of § 92.206(b)(3) is special treatment for transgender individuals, particularly with respect to the use of sex-specific facilities. The purpose of this section is to prevent unlawful discrimination on the basis of sex. The prevention of discrimination on the basis of gender identity is an important government objective that is substantially achieved by this rule.

Further, the Voluntary Resolution Agreement entered into with MSU, provides that a patient may request a chaperone to be present at any time and that the patient's ''wishes and comfort should determine the sex of the chaperone.'' [163] It further specifies that MSU ''shall accommodate, to the extent practicable, the Patient's request for a same-sex chaperone.'' [164] The final rule does not prohibit patients from requesting or receiving a chaperone of the sex of their choosing.

Finally, OCR disagrees with the commenter that the rule violates the Equal Protection Clause. OCR's authority to promulgate this rule stems from a Federal non-discrimination statute, section 1557. This rule does not purport to interpret the Equal Protection Clause. Thus, even assuming the commenter is correct that the rule bans certain sex-based distinctions that would be permitted under the Equal Protection Clause, such a discrepancy would not mean the rule is unlawful. OCR may promulgate a rule that imposes different non-discrimination requirements on recipients of Federal funds than the non-discrimination

requirements the Equal Protection Clause imposes on the government.[165]

*Comment:* A health research organization expressed support regarding § 92.206(b)(3)'s discussion of the impact on health research and clinical trials. The commenter commended OCR on its guidance on sex-specific health research. This commenter stated that the standard for limiting research outlined by OCR in the 2022 NPRM was reasonable and health researchers will typically be able to demonstrate the requisite justification for a sex-specific research project or clinical trial based on research protocols. However, the commenter requested OCR provide similar guidance for the final rule on whether health research protocols that target or exclude individuals with disabilities would be considered discriminatory.

Conversely, another organizational commenter disagreed with the statement on sex-specific clinical trials because the commenter believed it would pressure clinical researchers and organizations to disregard sex-based distinctions for fear of inviting a gender identity discrimination claim. The commenter claimed that the rule would contradict National Institutes of Health (NIH)'s expectation for clinical trials, which the commenter claimed required specifying the ''biological sex'' of subjects, by laying down an ''unscientific marker'' that sex-specific clinical trials can only be justified in limited circumstances.[166] The commenter further argued that this would represent a backward step for women's health, because the evaluation of diseases and treatments improved when researchers recognized that sex must be taken into account as a biological variable in medicine.

*Response:* OCR appreciates these comments regarding the application of this provision to sex-specific health research and clinical trials and the standard proposed for evaluating claims of discrimination in such health programs and activities. We agree that researchers should not have challenges showing necessary justifications for nondiscriminatory research distinctions grounded in a participant's

reproductive, anatomical, and genetic characteristics.

We disagree with the proposition that OCR is disregarding sex-based distinctions in medicine. Health research and clinical trial protocols are not prohibited from specifying an individual's sex consistent with their reproductive, anatomical, and genetic characteristics, where those characteristics are relevant to the clinical trial. However, there are ways in which health research and protocols may result in discrimination, such as disallowing participation based on gender identity rather than on the basis of scientific requirement of the research.

Should the need arise, OCR will consider issuing guidance on the impacts of disability protections on research participation.

*Comment:* Several commenters supported the rule's prohibition on sex-specific health programs or activities that subject any individual to more than *de minimis* harm. One supportive commenter argued that this approach recognizes harm as the primary measure of discrimination and creates flexibility to identify new forms of harm, and another argued the standard of no more than *de minimis* harm is consistent with applicable case law, including *Bostock.* A commenter expressed appreciation for the Proposed Rule's detailed explanation of *de minimis* harm and the difference between clinical care for a patient.

Conversely, another commenter stated the Proposed Rule ''cherry picks'' a title IX court decision to justify a standard of ''more than *de minimis* harm'' as the basis for ''adjudicating gender identity,'' arguing that title IX has never required sex to be recognized as anything but ''objectively, biologically based.'' Similarly, another commenter argued the rule applies beyond denial or limitations on health services. The commenter argued that the rule would prohibit health care professionals, medical facilities, and insurance companies from using any sex-based distinction unless they can prove it does not cause more than *de minimis* harm, and that if a provider asks the wrong question or asks an appropriate question in the wrong manner then the provider will likely face a claim of discrimination on the basis of gender identity.

*Response:* OCR appreciates the range of comments provided on the proposed language regarding *de minimis* harm, and after careful review, OCR is finalizing the language as proposed. The rule does not prohibit all sex-based distinctions in health programs or activities, nor does it broadly prohibit any policy or practice of treating

---

1048 (7th Cir. 2017), *abrogated on other grounds as recognized by Ill. Republican Party* v. *Pritzker,* 973 F.3d 760, 762 (7th Cir. 2020); *Glenn* v. *Brumby,* 663 F.3d 1312, 1316 (11th Cir. 2011); *Smith* v. *City of Salem,* 378 F.3d 566, 572, 577 (6th Cir. 2004); *but see L. W. by & through Williams* v. *Skrmetti,* 83 F.4th 460 (6th Cir. 2023).

[162] *See, e.g., Oncale* v. *Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998) (title VII does not reach non-harmful ''differences in the ways men and women routinely interact with'' each other); *see also Burlington N. & Santa Fe Ry. Co.* v. *White,* 548 U.S. 53, 59–60 (2006) (''No one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals.'').

[163] MSU Agreement at IV.D.1.v.

[164] MSU Agreement at IV.D.1.vi.

[165] *Cf. Fitzgerald* v. *Barnstable Sch. Comm.,* 555 U.S. 246, 257 (2009) (recognizing that the liability standards under title IX and the Equal Protection Clause ''may not be wholly congruent'').

[166] The commenter does not provide a citation when making this statement; however earlier in their comment, the commenter cites a Notice from the National Institutes of Health (NIH): U.S. Dep't of Health & Hum. Servs., Nat'l Inst. of Health, *Consideration of Sex as a Biological Variable in NIH-funded Research,* NOT–OD–15–102 (June 9, 2015), *https://grants.nih.gov/grants/guide/notice-files/not-od-15-102.html.*

A-21

individuals differently based on sex. As noted in the Proposed Rule, although intentional differential treatment on the basis of sex would generally be considered prohibited discrimination, separation by sex or differential treatment on the basis of sex is permissible under section 1557 where it does not cause more than *de minimis* harm. 87 FR 47866. This distinction generally allows for sex-specific clinical trials when sex is relevant to the trial, for example, while still prohibiting differential treatment that causes harm.

Providers often need to make inquiries about a patient's sex-related medical history, health status, or physical traits related to sex in the course of providing care and this rule does not prohibit or inhibit that. 87 FR 47867–68. Such inquiries are not per se discriminatory, even where they touch on intimate or sensitive matters. For example, it is not discriminatory for a provider treating a patient presenting with symptoms consistent with an ectopic pregnancy to inquire about the possibility that the patient could be pregnant, regardless of that patient's gender identity. Similarly, when providing appropriate care to a patient, asking medically relevant questions about a patient's anatomy or medical history in a way that causes inadvertent distress—on its own—would not violate section 1557. However, it is important to note that if such questions are not relevant to assessing the patient's condition, or the patient has answered the questions and makes clear that further questions are unwelcome, the inquiries may rise to the level of harassment on the basis of sex. For example, if the conduct is so severe or pervasive that it denies a patient access to medical care, it would no longer be permissible. OCR will evaluate these types of harassment claims on a case-by-case basis to determine whether the alleged harassment was "sufficiently severe, pervasive, and objectively offensive," to meet the standards for discriminatory harassment.[167]

In response to commenters that questioned the legal basis for our *de minimis* standard, we discussed in the 2022 NPRM, 87 FR 47866, n. 412, that sex-based distinctions that have only *de minimis* impact are not the type of discrimination that Congress envisioned.[168]

*Comment:* A commenter recommended that, based on existing racial disparities in maternal health and overall poor maternal health outcomes in the United States, § 92.206(b)(3) be amended to specify that harm exceeding the threshold of *de minimis* harm with respect to pregnancy and maternal health can include policies or practices that subject people to rough handling, harsh language, undertreatment of pain or pregnancy-related conditions, or other discriminatory mistreatment during childbirth or the prenatal or postpartum periods.

*Response:* OCR recognizes that there is ample research demonstrating the significant racial disparities in maternal health outcomes.[169] Section 92.206(b)(3) specifically addresses different treatment on the basis of sex, such as through sex-separate health programs and activities. Depending on the specific facts at issue, the treatment described by the commenter may rise to the level of discrimination and would be evaluated under this rule's general prohibition of discrimination under § 92.101.

*Comment:* An organizational commenter strongly supported the additional guidance provided by proposed §§ 92.206 and 92.207 and noted that the forms of discrimination highlighted in proposed §§ 92.206(b)(3) and (4) and 92.207(b)(3) through (5), in particular, affect many intersex people.

*Response:* OCR appreciates the commenter's feedback regarding the discrimination addressed in §§ 92.206(b)(3) and (4) and 92.207(b)(3) through (5) affecting intersex people as well. This final rule makes explicit in regulatory text that sex discrimination includes discrimination based on sex characteristics, including intersex traits, as reflected in § 92.101(a)(2).

*Comment:* Many commenters expressed support for the proposed provisions related to gender-affirming care at § 92.206(b)(4). These commenters stated that such care can be critical to the well-being of transgender and nonbinary people, and that accessing such care can reduce the risk of negative physical and mental health outcomes

associated with gender dysphoria. Commenters discussed the negative impact of widespread health care discrimination against transgender people, stating that transgender people of color and transgender people with disabilities are at particularly high risk of discrimination and associated harms.

*Response:* OCR appreciates these comments and agrees that the nondiscrimination protections are important to transgender and nonbinary people's ability to access clinically appropriate care, especially those who may face elevated risk of harm due to discrimination on multiple protected bases.

In determining whether a covered entity violated section 1557 by denying or limiting a health service sought for the purpose of gender-affirming care, OCR will continue to consider evidence that the covered entity would provide that same service for other purposes. Evidence that OCR may consider to establish that the type of care is ordinarily provided could include, among other things, statements by the provider, information showing that the provider has provided similar care in the past, or documentation regarding the provider's scope of practice.

Where there is other evidence that the covered entity has subjected the individual to differential treatment on the basis of sex apart from the denial of care itself, OCR may investigate and make a case-by-case determination as to whether prohibited discrimination has occurred.

*Comment:* A few commenters stated that OCR is explicitly asserting that it has authority under section 1557 to regulate the practice of medicine according to its own determination of what is appropriate and non-discriminatory care, along with authority to definitively determine what is the current standard of medical care. Some commenters requested OCR amend the provision to specify that care standards cannot facially discriminate or otherwise result in discrimination based on a protected characteristic, such that covered entities cannot mask discrimination behind clinical policies or criteria.

*Response:* Section 1557 prohibits discrimination on certain prohibited bases, and does not (and cannot) require a specific standard of care or course of treatment for any individual or otherwise interfere with individualized clinical judgment about the appropriate course of care for a patient. OCR has a general practice of deferring to a clinician's judgment about whether a particular service is medically appropriate for an individual, or

---

[167] *Cf. Davis by Next Friend LaShonda D.* v. *Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 650 (1999) (Under title IX, discriminatory harassment must be "severe, pervasive, and objectively offensive").

[168] *See also Elborough* v. *Evansville Cmty. Sch. Dist.,* 636 F. Supp. 2d 812, 820–21 (W.D. Wis. 2009) (noting that Title IX does not "authorize[ ]lawsuits for damages in all cases of differential treatment, no

matter how isolated or minimal. The maxim that 'the law doesn't concern itself with trifles' applies to civil rights cases as it does to any other case.").

[169] Donna L. Hoyert, U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, *Maternal Mortality Rates in the United States* (Feb. 2022), *https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2020/E-stat-Maternal-Mortality-Rates-2022.pdf*; Marian F. MacDorman et al., *Racial and Ethnic Disparities in Maternal Mortality in the United States Using Enhanced Vital Records, 2016–2017,* 111 a.m. J. Pub. Health 1673, 1671 (2021), *https://ajph.aphapublications.org/doi/10.2105/AJPH.2021.306375.*

whether the clinician has the appropriate expertise to provide care. There is no part of section 1557 that compels clinicians to provide a service that they do not believe is medically appropriate for a patient or that they are not qualified to provide.

Section 92.206(c) is consistent with the general principle in nondiscrimination law that entities facing allegations of discrimination have the opportunity to articulate a legitimate, nondiscriminatory basis for their challenged action or practice but that such a basis may not be a pretext for discrimination.

*Comment:* Some commenters expressed concern that OCR is setting standards of care for gender-affirming care in this rule, and that is outside the scope of OCR's authority. Many commenters weighed in with their views on the state of medical evidence relating to gender-affirming care and submitted citations to research studies and other data. Some comments characterized the evidence as lacking or mixed, and highlighted their concerns relating to gender-affirming care for minors. Others stated that there is robust evidence, including from major medical associations, supporting the provision of gender-affirming care, including that such medically necessary care benefits the health and well-being of transgender patients.

*Response:* This final rule prohibits discrimination on the basis of sex, consistent with Federal law. As such, nothing in this rule impedes covered entities from taking nondiscriminatory actions based on current medical standards and evidence, such as making decisions about the timing or type of protocols appropriate for care. The rule does not (and cannot) require a specific standard of care or course of treatment for any individual, minor or adult. Section 1557 prohibits discrimination on certain prohibited bases, and does not interfere with individualized clinical judgment about the appropriate course of care for a patient. OCR has a general practice of deferring to a clinician's judgment about whether a particular service is medically appropriate for an individual, or whether the clinician has the appropriate expertise to provide care.

*Comment:* A number of commenters had concerns or questions about the scope of how OCR would define gender-affirming care. Some commenters requested a definition or an enumeration of what types of procedures would fall within this term. Others raised concerns about the impact of such care and the benefits of such care.

*Response:* As with the 2016 Rule, 81 FR 31435, OCR declines to provide a regulatory definition for gender-affirming care. However, when we used the term "gender-affirming care" in both §§ 92.206 and 92.207, we are generally referring to care designed to treat gender dysphoria that may include, but is not necessarily limited to, counseling, hormone therapy, surgery, and other related services. 87 FR 47834 n.139. As noted elsewhere, the rule does not impose a categorical requirement that covered entities must provide gender-affirming care. Further, while we acknowledge comments in support of and opposed to gender affirming care and its subsequent impacts on individuals, we are not making any additional edits to the rule in response.

*Comment:* Some commenters opposing the rule raised First Amendment concerns and questioned the scope of what would be required of providers in terms of expressing support of transgender people who wish to access gender-affirming care, using the name and pronouns requested by patients, and speaking about gender-affirming care.

*Response:* OCR takes seriously concerns about, and is fully committed to upholding, the First Amendment, and nothing in these regulations restricts conduct protected by the First Amendment.[170] Whether discrimination is unlawful or considered harassment is necessarily fact-specific. This final rule does not purport to identify all of the circumstances that could constitute unlawful harassment. It is unlikely that an isolated incident with no other indications of animus or ill treatment would meet the standards for discriminatory harassment. Conversely, OCR notes that conduct, including verbal harassment, that is so severe or pervasive that it creates a hostile environment on the basis of sex is a form of sex discrimination.

*Comment:* A few commenters argued that providing gender-affirming care poses high malpractice lawsuit risks to providers, and therefore OCR should not categorically require providers to provide such services.

*Response:* As discussed elsewhere in this preamble, this final rule prohibits discrimination in the provision of health programs and activities and does not require provision of any specific

---

[170] *See, e.g., W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943) ("We think the action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.").

services, including gender-affirming care. Section 1557 prohibits discrimination on certain prohibited bases, and does not interfere with individualized clinical judgment about the appropriate course of care for a patient. OCR has a general practice of deferring to a clinician's judgment about whether a particular service is medically appropriate for an individual, or whether the clinician has the appropriate expertise to provide care.

*Comment:* One commenter expressed concern that the rule would result in decreased access to health care, as providers may choose to leave Federal health care programs based on a belief that they will be required to provide gender-affirming care, especially if there is no avenue for providers with religious or conscience objections to certain types of care to request exemptions.

*Response:* Section 1557 requires that health care providers who receive Federal financial assistance must provide nondiscriminatory care. However, providers do not have an affirmative obligation to offer any health care, including gender-affirming care, that they do not think is clinically appropriate or if religious freedom and conscience protections apply. OCR believes that the majority of providers already provide nondiscriminatory care to their patients and will continue to do so. This commenter presented no evidence that a significant exodus of providers is likely, and we are not aware of any data to support a significant concern on this front. Providers with religious freedom or conscience concerns, however, may rely upon §§ 92.3 and 92.302.

*Comment:* A few commenters expressed support for nondiscrimination protections that prohibited discriminating against an individual because of their gender identity but opposed interpreting such protections to protect access to gender-affirming care.

*Response:* OCR appreciates these commenters' support for the rule's nondiscrimination protections on the basis of gender identity. We respectfully disagree, however, that such protections have no implications for the provision of gender-affirming care. A fact-specific analysis is necessary to determine whether prohibited discrimination has occurred, but the rejection of a practice closely linked with a protected status may, in conjunction with other evidence, lead to a finding of discrimination. This rule does not require or mandate the provision of any particular medical service. Section 1557 prohibits discrimination on certain prohibited bases, and does not interfere

with individualized clinical judgment about the appropriate course of care for a patient. OCR has a general practice of deferring to a clinician's judgment about whether a particular service is medically appropriate for an individual, or whether the clinician has the appropriate expertise to provide care.

*Comment:* An organizational commenter supported reference to the multi-factor test found in *Arlington Heights* v. *Metro. Housing Dev. Corp.,* 429 U.S. 252 (1977), and the burden-shifting framework of *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973), among a non-exhaustive list of tools that OCR may utilize for investigating discrimination claims. The commenter asserted that sex discrimination claims are hard to prove, and that together these approaches are appropriate for their adjudication by allowing people to rely on different types of circumstantial evidence to collectively demonstrate a discriminatory act by a covered entity and by placing the onus on the covered entity to provide a legitimate, nondiscriminatory reason for its actions. Similarly, another commenter encouraged OCR to clearly state in the final rule that the familiar but-for causation test applies to establishing a violation of section 1557; that the use of the phrase "legitimate, nondiscriminatory reason" in these sections should not be construed in any way to limit the method of proof for any section 1557 claim to the *McDonnell Douglas* burden-shifting framework; and that this method cannot be used to defend an express sex-based classification that causes injury. Another commenter recommended that OCR clarify in the preamble to the final rule that the *McDonnell Douglas* burden-shifting framework and legitimate non-discriminatory reason framework apply to circumstantial evidence cases but not where there is direct evidence of discrimination.

*Response:* OCR agrees that different methods of proof drawn from civil rights case law should be used in analyzing claims of discrimination under this section including, but not limited to, the *Arlington Heights* multi-factor test and the *McDonnell Douglas* burden-shifting framework. For cases where the alleged discrimination is not based on a facially discriminatory policy, we are clarifying that the phrase "legitimate, nondiscriminatory reason" in these sections is taken from, but should not be construed to limit, the method of proof to the *McDonnell Douglas* burden-shifting framework. As we noted in the Proposed Rule, *Arlington Heights* provides a method of

proof that uses a number of different types of evidence—*e.g.,* direct, circumstantial, statistical, and anecdotal—that, taken collectively, can demonstrate that the covered entity acted because of a protected basis; the *McDonnell Douglas* burden-shifting framework is an inferential method of proof most commonly applied in cases alleging discrimination in individual instances where a plaintiff alleges that a defendant treated similarly situated individuals differently because of a protected basis. 87 FR 47865. Under the *Arlington Heights* framework, *McDonnell Douglas* evidence identifying similarly situated comparators can also be considered but is not required.[171]

*Comment:* Many commenters supported the rule's clarification that while providers may exercise clinical judgment when determining if a particular service is appropriate for an individual patient, they may not refuse gender-affirming care based on a belief that such care is never clinically appropriate. A great number of individuals and organizations provided comment on the types of rationales that might constitute a legitimate, nondiscriminatory basis for a provider declining to provide gender-affirming care. Some commenters opined that it should not be considered discriminatory to deny care when a provider categorically objects to gender-affirming care. Other commenters appreciated the clarification that a provider's personal belief that gender-affirming care is never appropriate is not a legitimate, nondiscriminatory basis for denying such care. The majority of commenters opined that the rule provides adequate protection for providers exercising nondiscriminatory clinical judgment about the appropriateness of particular care for a specific patient, though some commenters disagreed.

*Response:* OCR appreciates commenters' views on proposed § 92.206(c). In light of comments received, we are modifying the language in this provision to provide additional specificity regarding how OCR will evaluate a covered entity's proffered legitimate, nondiscriminatory reason for denying care. We also add a reference to § 92.302 to make clear that this provision does not limit a recipient's

ability to seek assurance of an exemption based on religious freedom or conscience laws. Also, we note that while many commenters specifically discuss providers' personal beliefs, these changes clarify that the rule applies to covered entities rather than specific individuals.

To provide additional specificity, we are striking the second sentence of § 92.206(c), which previously read, "[h]owever, a provider's belief that gender transition or other gender-affirming care can never be beneficial for such individuals (or its compliance with a State or local law that reflects a similar judgment) is not a sufficient basis for a judgment that a health service is not clinically appropriate," in its entirety and replacing it with: "A covered entity's determination must not be based on unlawful animus or bias, or constitute a pretext for discrimination. Nothing in this section is intended to preclude a covered entity from availing itself of protections described in §§ 92.3 and 92.302." Our reasons for this change are as follows:

First, many commenters strongly urged OCR to consider that providers may have a nondiscriminatory reason to not provide some aspects of or all gender-affirming care. OCR understands that a provider may have a legitimate nondiscriminatory reason not to provide a health service, which the newly revised § 92.206(c) makes clear. While this section has application in the gender-affirming care context, the revised language is also intended to make clear that it is not limited to that context. When OCR investigates claims of discrimination based on the denial of care, OCR will consider the covered entity's rationale for such denial, any supporting information the covered entity offers for its position, and any evidence of unlawful animus, bias, or other discriminatory factors in the case.

Second, and as discussed, section 1557 prohibits discrimination on certain prohibited bases, and does not interfere with individualized clinical judgment about the appropriate course of care for a patient. OCR has a general practice of deferring to a clinician's judgment about whether a particular service is medically appropriate for an individual, or whether the clinician has the appropriate expertise to provide care. There is no part of section 1557 that compels clinicians to provide a service that they do not believe is medically appropriate for a particular patient or that they are not qualified to provide.

Since the rule does not (and cannot) set a standard of care for gender-affirming care, the focus of any investigation will not be to generally

---

[171] *Pac. Shores Props., LLC* v. *Newport Beach,* 730 F.3d 1142, 1158–59 (9th Cir. 2013) (noting that a plaintiff need not rely on the *McDonnell-Douglas* approach to intentional discrimination but may instead produce other circumstantial evidence of intentional discrimination using *Arlington Heights,* as *McDonnell Douglas* "is not a straitjacket requiring the plaintiff to demonstrate that such similarly situated entities exist").

review a covered entity's clinical judgment but rather to determine whether the assertion of that judgment reflects unlawful animus or bias, or is a pretext for discrimination. Similarly, outside of the gender-affirming care context, OCR may find an invocation of clinical appropriateness to be pretextual if, for example, the evidence demonstrates that the covered entity asserted that pain medication was not clinically appropriate for a patient because of the belief that women exaggerate pain symptoms and inaccurately relay information about their symptoms.

Third, because many commenters expressed concern about the relationship between § 92.206(c) and religious or moral beliefs concerning gender-affirming care, we added an explicit reference in § 92.206(c) to § 92.302. The new language clarifies that § 92.206(c) does not preclude the process set forth in § 92.302 where a recipient's objection to gender-affirming care may be protected under religious freedom and conscience laws.

*Comment:* Many commenters also cited religious or moral objections to gender-affirming care, urging that these should be considered a legitimate, nondiscriminatory reason to decline to provide such care.

*Response:* OCR understands that recipients may have religious or conscience objections to the provision of certain types of care. Such an objection can serve as a legitimate, nondiscriminatory reason where it is neither pretextual nor discriminatory. If a provider typically declines to provide a particular health service to any individual based on a religious belief, regardless of individual's sex assigned at birth or gender identity, the provider likely meets § 92.206(c)'s standard for a "legitimate, nondiscriminatory reason." And where a provider's religious belief causes the provider to treat individuals differently based on sex assigned at birth or gender identity, the provider may rely on the protections afforded by religious freedom and conscience laws or choose to seek assurance of those protections by making use of § 92.302(b)'s assurance of religious freedom and conscience exemption process, a feature that both the 2016 and 2020 Rules lacked. As discussed in more detail below, OCR is making several modifications to § 92.302 to strengthen and clarify this process.

*Comment:* Many commenters supported the inclusion of § 92.206(c) but recommended that OCR strengthen the language pertaining to providers complying with a State or local law as a justification for denying gender-

affirming care, abortions, or other reproductive health care to clarify that as a Federal civil rights law, the rule preempts any such State or local law restricting access to such care. Some commenters suggested including language in the preamble to make clear that the majority of States' policies that restrict transgender and nonbinary people's access to health care would be barred. Another commenter expressed support for explicit preemption language, because otherwise providers would be forced to attempt to comply with State and local laws, while also trying not to run afoul of OCR's case-by-case judgment concerning what conduct may be considered discriminatory. Some commenters expressed concern that the rule could deem physicians' conduct discriminatory when declining to provide services because of State or local laws restricting those services, leaving them in an untenable position. Other commenters criticized the rule because they believe it preempts State laws restricting abortion and gender-affirming care and seeks to preempt State laws on religious freedom and conscience. A commenter expressed confusion as to how the rule would preempt State law as opposed to simply disallowing Federal funds from entities that do not comply.

*Response:* OCR understands providers' concerns that the provision's reference regarding compliance with State or local law would place them in a difficult position with regard to the conflicting demands of this rule's nondiscrimination requirements and various State and local laws restricting access to abortion or gender-affirming care. While we have removed the language from § 92.206(c) that many commenters supported, section 1557's nondiscrimination requirements nevertheless generally preempt conflicting State law for the reasons stated earlier in this preamble. That said, in exercising and determining its enforcement priorities, OCR will consider the specific factual record of each complaint on a case-by-case basis. This may include, among other things, consideration of whether any covered entity that is taking discriminatory actions under the rule is doing so because it believes in good faith it is obligated to do so by State or local law, whether that covered entity demonstrated a willingness to refer or provide accurate information about gender-affirming care, or is otherwise engaging in good faith efforts to ensure patients are receiving medically necessary care.

*Comment:* Several commenters expressed support for § 92.206(d)'s

clarification that the enumeration of specific forms of prohibited discrimination in § 92.206(b) does not limit the general prohibition against discrimination in § 92.206(a), while recommending that additional preamble language be added to the final rule citing additional examples of discrimination and to provide confirmation that OCR's investigations will not be limited by the enumerated examples in § 92.206(b).

*Response:* We emphasize that § 92.206(b) is not an exhaustive list of all scenarios that would constitute of sex discrimination under the rule. We have provided additional examples of sex discrimination in this preamble, and OCR's investigations will not be limited by the enumerated forms of discrimination addressed in § 92.206(b) or elsewhere.

*Comment:* One commenter stated that OCR ignored *Burwell* v. *Hobby Lobby*, 573 U.S. 682 (2014), in the Proposed Rule and that the Proposed Rule is comparable to the Department's actions in that case, in which the Court found that the government's compelling interest in protecting women's health could be accomplished in a less restrictive manner.

*Response:* OCR has considered *Hobby Lobby* and will be mindful of it when carrying out enforcement of the final rule. For a further discussion of views regarding application of Federal conscience or religious freedom laws, refer to § 92.302.

Summary of Regulatory Changes

For the reasons set forth above and considering the comments received, we are finalizing the provision as proposed in § 92.206, with modifications. We have revised § 92.206(b)(1) to state: "Deny or limit health services, including those that have been typically or exclusively provided to, or associated with, individuals of one sex . . . ." We are revising § 92.206(c) to remove the sentence that reads: "However, a provider's belief that gender transition or other gender-affirming care can never be beneficial for such individuals (or its compliance with a State or local law that reflects a similar judgment) is not a sufficient basis for a judgment that a health service is not clinically appropriate." To the end of § 92.206(c) we are adding sentences that read: "A covered entity's determination must not be based on unlawful animus or bias, or constitute a pretext for discrimination. Nothing in this section is intended to preclude a covered entity from availing itself of protections described in §§ 92.3 and 92.302.''

Nondiscrimination in Health Insurance Coverage and Other Health-Related Coverage (§ 92.207)

In § 92.207, OCR proposed to prohibit discrimination on the basis of race, color, national origin, sex, age, or disability in the provision or administration of health insurance coverage and other health-related coverage. This proposed section would apply to all covered entities that provide or administer health insurance coverage or other health-related coverage that receive Federal financial assistance, and the Department in the administration of its health-related coverage programs.

In § 92.207(a), OCR proposed a general nondiscrimination requirement, and § 92.207(b) proposed specific examples of prohibited actions.

In § 92.207(b)(1), OCR specified that covered entities are prohibited from denying, cancelling, limiting, or refusing to issue or renew health insurance coverage or other health-related coverage, or denying or limiting coverage of a claim, or imposing additional cost sharing or other limitations or restrictions on coverage, on the basis of race, color, national origin, sex, age, or disability.

In § 92.207(b)(2), OCR proposed prohibiting marketing practices or benefit designs that discriminate on the basis of race, color, national origin, sex, age, or disability.

In § 92.207(b)(3), OCR proposed that it is prohibited discrimination to deny or limit coverage, deny or limit coverage of a claim, or impose additional cost sharing or other limitations or restrictions on coverage to an individual based upon the individual's sex at birth, gender identity, or gender otherwise recorded. We invited comment on this provision, including whether it sufficiently addresses the challenges transgender and gender nonconforming individuals are experiencing when seeking access to medically necessary care due to a discordance between their sex assigned at birth and their sex as recorded by their issuer.

In § 92.207(b)(4), OCR proposed to prohibit a covered entity from having or implementing a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care.[172]

In § 92.207(b)(5), OCR proposed to ensure that a covered entity does not impose discriminatory limits on coverage for specific health services related to gender transition or other gender-affirming care, which would generally be the case if such limits are not applied when those same health services are not related to gender transition or other gender-affirming care.

In § 92.207(b)(6), OCR proposed an integration provision that prohibits covered entities from having or implementing a benefit design that does not provide or administer health insurance coverage or other health-related coverage in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

OCR sought comment on the scope and nature of the benefit design features that result in unjustified segregation or institutionalization of qualified individuals with disabilities or place such individuals at serious risk of institutionalization or segregation. We were interested in feedback on the application of the integration requirement to a wide variety of health services and were particularly interested in comments on the application of the integration requirement to coverage of post-acute services, mental health services, and other services commonly provided by non-State payers (*i.e.*, health insurance issuers, self-insured group health plans, and other payers). OCR was also interested in feedback on the application of the integration requirement to the Medicaid program and its statutory framework at title XIX of the Social Security Act. Specifically, we requested input on how State Medicaid agencies are able to achieve compliance with the integration requirement through benefit design, such as through reimbursement, service scope, and service authorization that do not incentivize institutional services over community services. In addition, OCR requested input on the amount of time needed to reach compliance with needed benefit design modifications.

In § 92.207(c), OCR stated that nothing in this section requires the coverage of any health service where the covered entity has a legitimate, nondiscriminatory reason for determining that such health service fails to meet applicable coverage

requirements, such as medical necessity requirements, in an individual case.

Finally, in § 92.207(d), OCR made clear that the enumeration of specific forms of discrimination in § 92.207(b) does not limit the general applicability of the prohibition in § 92.207(a).

OCR generally invited comment on how section 1557 might apply to: provider networks; how provider networks are developed, including factors that are considered in the creation of the network and steps taken to ensure that an adequate number of providers and facilities that treat a variety of health conditions are included in the network; the ways in which provider networks limit or deny access to care for individuals on the basis of race, color, national origin, sex, age, or disability; and the extent to which the lack of availability of accessible medical diagnostic equipment in a provider network limits or denies access to care for individuals with disabilities. We also sought comment on the extent, scope and nature of value assessment methods that discriminate on the basis of race, color, national origin, sex, age, or disability. We were interested in feedback on the civil rights implications of value assessment across a wide variety of contexts, including utilization management, formulary design, price negotiations, alternative payment models and other relevant applications. Finally, OCR invited comment on all aspects of this section. In particular, we sought comment on the anticipated impact of the proposed application to excepted benefits and short-term, limited duration insurance (STLDI) when such products are offered by a covered entity; how the Proposed Rule's nondiscrimination requirements would impact the industry that offers excepted benefits and STLDI and the consumers who rely upon those products; the prevalence of excepted benefits and STLDI offered by covered entities and the standard industry practices under which such plans are designed and administered; and excepted benefits and STLDI plans' scope of coverage, types of exclusions and limitations, underwriting practices, premium setting, and actuarial or business justifications for industry practices (as applicable), that may raise concerns about discrimination under section 1557.

The comments and our responses regarding § 92.207 are set forth below.

For ease of reference, OCR may simply refer to "health insurance issuers" or "issuers" throughout the preamble, but other covered entities may also be subject to the section under

---

[172] As noted in the discussion of § 92.206 above, this preamble uses the terms "gender transition" and "gender affirmation" interchangeably in discussing the range of care that transgender individuals (including those who identify using other terms, for example, nonbinary or gender nonconforming) may seek to treat gender dysphoria and support gender transition or affirmation. Because insurance coverage provisions and medical-necessity determinations more often use

the term gender transition, within these provisions, the term gender affirmation encompasses gender transition, that is the terminology used in the text of the regulation. The use of the term "gender transition" in the regulation, however, is not intended to convey a narrower meaning than the term "gender affirmation."

discussion. In addition, for purposes of this preamble only, OCR uses the term "health plan" or "plan" interchangeably to refer generally to health insurance coverage and other health-related coverage that is subject to this rule. As used in this preamble, "health plan" or "plan" may include health insurance coverage or other health-related coverage offered in the group and individual markets, group health plan coverage, Medicare Advantage plans, Medicare Part D plans, and Medicaid programs that are subject to this rule. OCR does not intend "health plan" or "plan" to be regulatory terms in this regulation or to replace any existing or proposed term in Federal law.

OCR notes that a variety of entities may be considered covered entities subject to § 92.207, including but not limited to health insurance issuers, group health plans, Medicare Advantage Organizations, Medicare Part D plan sponsors, Medicaid managed care plans, pharmacy benefit managers, third party administrators (as part of a covered entity's operations when it meets the criteria in paragraph (2) of the definition of "health program or activity" under § 92.4), and the Department.

*Comment:* Commenters strongly supported the inclusion of an explicit provision related to prohibited discrimination in health insurance coverage and other health-related coverage, noting that it will help provide clarity for covered entities. Many commenters stated that it is clear from the statutory text of the ACA that Congress intended for section 1557 to apply to health insurance coverage. Commenters stated that the 2020 Rule's rescission of similar protections created confusion, was contrary to the intent and purpose of the ACA, and increased the burden on States to monitor and enforce nondiscrimination laws. Commenters noted that ensuring covered entities provide health insurance coverage and other health-related coverage in a nondiscriminatory manner will reduce adverse health outcomes and address some of the barriers vulnerable communities face in accessing health insurance coverage and other health-related coverage. Commenters from the health insurance industry were generally supportive of reinstating the section with some suggested modifications. This includes one commenter noting that, as an employer, they appreciated the Proposed Rule's clarification prohibiting categorical exclusions, noting that the 2016 Rule's similar prohibition had allowed them to negotiate a nondiscriminatory plan to cover their employees.

One organizational commenter opposed to the inclusion of § 92.207 argued that health insurance issuers could face substantial costs, including compliance costs and claims costs, as a result of having to alter their coverages and business practices, which would result in higher premiums. This commenter also argued OCR is engaging in expansive and detailed regulation of numerous issuer business decisions in an arbitrary and capricious manner that could result in issuers facing heightened business risks and increased liability exposure.

*Response:* OCR agrees that section 1557 applies broadly, including to prohibit discrimination by covered entities that provide or administer health insurance coverage and other health-related coverage. As discussed throughout this preamble, particularly under the discussion of the definition of "health program or activity" under § 92.4, the ACA is clearly intended to apply to health insurance coverage and other health-related coverage and prohibit the discriminatory practices therein.

OCR disagrees that § 92.207 imposes expansive regulation of health insurance issuers and their business decisions in an arbitrary and capricious manner. The plain text of section 1557 applies to health insurance coverage and other health-related coverage; OCR is implementing Congressional intent to prohibit discrimination in health insurance coverage and other health-related coverage in § 92.207. In addition to section 1557, health insurance issuers are required to comply with myriad State and Federal laws regulating the practice of health insurance coverage and other health-related coverage. These laws include other Federal laws that regulate health insurance coverage and other health-related coverage practices, including nondiscrimination requirements.[173] Compliance with legal requirements, such as section 1557, is a standard business practice as a health insurance issuer. Further, health insurance issuers were subject to former § 92.207's requirements[174] from either July 18, 2016, or January 1, 2017 (if plan design changes were required as a result

of the 2016 Rule), through August 18, 2020, the effective date of the 2020 Rule.

*Comment:* Some commenters supported § 92.207(b)(1), related to coverage denials and limitations. Some commenters asked OCR to state that cost sharing must not be used by covered entities in a discriminatory manner. Commenters acknowledged that cost sharing can be an effective tool, but they also expressed concern that insurance companies and pharmacy benefit managers are increasingly employing high cost sharing that disproportionately affects people with disabilities, chronic conditions, and other significant health needs. Commenters cited several studies that show patients who are uncertain about their ability to afford their out-of-pocket-care expenses delay or forgo care or fall out of compliance with recommended follow-up steps.[175] Commenters noted that such gaps in care can have deadly consequences for individuals with certain conditions, such as people living with HIV/AIDS.

Commenters also provided examples of concerns related to cost sharing and patient financial assistance. A few commenters raised concerns about treatment of patient financial assistance, accumulator adjustment programs, copay maximizers, and alternative funding programs. Other commenters raised concerns about issuers designating drugs as "non-essential-health-benefits" to avoid certain

---

[173] *See, e.g.,* 42 CFR 422.100(f)(2) and (3), 422.110 (Medicare Advantage), 423.104(d)(2)(iii), 423.2262(a)(1)(iv) (Part D), 438.3(d) and (f) (Medicaid managed care), and 600.405(d) (Basic Health Program); 45 CFR 147.104(e) (group and individual health insurance markets), 156.125(a) and (b) (EHB), 156.200(e), and 156.225(b) (qualified health plans).

[174] Issuers were subject to those requirements except for provisions either enjoined or vacated through lawsuits. *See, e.g., Franciscan Alliance* v. *Burwell,* 227 F. Supp. 3d 660 (N.D. Tex. 2016).

[175] *See, e.g.,* Joel F. Farley, *Medicaid Prescription Cost Containment and Schizophrenia,* 48 Med. Care 5, 440–47 (2010), *https://pubmed.ncbi.nlm.nih.gov/20351586/*; Teresa B. Gibson & Ronald J. Ozminkowski, *The Effects of Prescription Drug Cost Sharing: A Review of the Evidence,* 11 a.m., J. Managed Care 11, 730–40 (2005), *https://pubmed.ncbi.nlm.nih.gov/16268755/*; Daniel M. Hartung et al., *Impact of a Medicaid Copayment Policy on Prescription Drug and Health Services Utilization in a Fee-for-Service Medicaid Population,* 46 Med. Care 6, 565–72 (2008), *https://pubmed.ncbi.nlm.nih.gov/18520167/*; Nantana Kaisaeng et al., *Out-of-Pocket Costs and Oral Cancer Medication Discontinuation in the Elderly,* 20 J. Managed Care Pharmacy 7, 669–75 (2014), *https://pubmed.ncbi.nlm.nih.gov/24967520/*; Deliana Kostova & Jared Fox, *Chronic Health Outcomes and Prescription Drug Copayments in Medicaid,* 55 Med. Care 5, 520–27 (2017), *https://pubmed.ncbi.nlm.nih.gov/28234755/*; Sujha Subramanian, *Impact of Medicaid Copayments on Patients With Cancer,* 49 Med. Care 9, 842–47 (2011), *https://pubmed.ncbi.nlm.nih.gov/21577164/*; Samantha Artiga et al., *The Effects of Premium and Cost-Sharing on Low-Income Populations: Updated Review of Research Findings,* Kaiser Family Found., pp.1–5 (2017), *https://www.kff.org/medicaid/issue-brief/the-effects-of-premiums-and-cost-sharing-on-low-income-populations-updated-review-of-research-findings/*; David B. Ridley & Kirsten J. Axelsen, *Impact of Medicaid Preferred Drug Lists on Therapeutic Adherence,* 24 Pharmacoeconomics Suppl. 3, 65–78 (2006), *http://www.ncbi.nlm.nih.gov/pubmed/17266389.*

essential health benefits (EHB) requirements.[176]

One organizational commenter expressed concerns about § 92.207(b)(1) and argued that this provision would impose new nondiscrimination tests on issuer business decisions that result in the denial or limitation of payment for a claim, on variations in cost sharing under the terms of a health plan, or on the imposition of other limitations or restrictions on coverage. The commenter argued this would result in expansive and detailed regulation of numerous issuer business decisions in an arbitrary and capricious manner.

*Response:* OCR appreciates commenters' concerns regarding cost sharing, which is explicitly addressed in § 92.207(b)(1). Covered entities are prohibited from ''impos[ing] additional cost sharing or other limitations or restrictions on coverage, on the basis of race, color, national origin, sex, age, or disability.'' We disagree with the commenter's concerns that this provision arbitrarily or capriciously imposes new nondiscrimination tests on issuer business decisions. Covered entities subject to this rule are prohibited from engaging in unlawful discrimination in their health programs or activities, including in health insurance coverage or other health-related coverage. Cost sharing is standard industry practice that is a feature of an issuer's health insurance coverage or other health-related coverage. Nothing in this rule dictates the business decisions an issuer should make in establishing its coverage limitations, including with regard to cost sharing. To the extent an issuer imposes cost sharing in its coverage, it cannot do so in a discriminatory manner. Comments related to violations of EHB requirements are outside the scope of this regulation.[177]

*Comment:* Commenters generally supported the prohibition on discriminatory marketing practices in § 92.207(b)(2). Commenters discussed that covered entities might use marketing practices to dissuade enrollment by individuals with high-cost conditions. For example, commenters noted that plans present inaccurate or confusing information about formularies and hide or fail to provide information about certain drugs. Several commenters referenced a 2022 study by the AIDS Institute that found 57.9 percent of the 299 Exchange plan documents reviewed did not list PrEP

(pre-exposure prophylaxis to prevent HIV infection) as a free preventive service, though health insurance issuers were required to include such coverage for all plans offered through the Exchanges in 2022.[178] Commenters asked OCR to provide an example of discriminatory marketing practices in regulatory text. They further requested that OCR coordinate the study of marketing practices with other regulatory agencies.

*Response:* OCR concurs with the importance of ensuring that an issuer's marketing practices are not designed or implemented in a way that discriminates against individuals with a specific disability or on any other basis prohibited under section 1557. Inaccuracies or omissions in plan marketing materials may impede an individual's ability to determine what treatments and services are covered. While certain inaccuracies or omissions in marketing materials may not be prohibited discrimination under this section, inaccuracies or omissions that were intended to or resulted in discouraging individuals from enrolling in health insurance coverage and other health-related coverage or steering individuals away from enrolling in health insurance coverage and other health-related coverage on the basis of disability or other prohibited basis would raise concerns of prohibited discrimination. The determination of whether a particular marketing practice is prohibited under this section requires a case-by-case analysis dependent on the facts of the challenged marketing practice. Accordingly, OCR declines to specify particular examples in the regulation, though we included an example in the Proposed Rule, stating that covered entities that avoid advertising in areas populated by a majority of people of color to reduce the enrollment of people of color in their health insurance coverage could violate § 92.207. 87 FR 47869–70. We note that covered entities may be subject to other Departmental and Federal regulations governing marketing practices.[179] While

OCR declines to coordinate a study of marketing practices, we continue to coordinate with other regulatory agencies on health insurance-related matters.

We note that individuals with LEP or disabilities may face challenges in accessing a covered entity's marketing materials. This final rule addresses such concerns in multiple ways, including by requiring covered entities to provide a Notice of Nondiscrimination under § 92.10; a Notice of Availability under § 92.11 (including in member handbooks at § 92.11(c)(5)(x)); taking reasonable steps to provide meaningful access to individuals with LEP under § 92.201; and taking appropriate steps to ensure effective communication for individuals with disabilities under § 92.202.

*Comment:* Numerous commenters supported the prohibition on discriminatory health plan benefit designs in § 92.207(b)(2). Commenters stated that covered entities employ many features of benefit design and delivery to deny coverage or discourage people with significant or high-cost health needs from enrolling in their plans. These include exclusions, cost sharing, formularies, visit limits, provider networks, service areas, benefit substitutions, prior authorization, and other utilization management that the commenters allege are arbitrary and not clinically based or appropriate.

Some commenters requested that OCR define the term ''benefit design'' or include specific examples of benefit design features in the regulatory text of § 92.207(b)(2). While some commenters expressed concern that failing to define benefit design in the regulation would result in a lack of clarity as to what the rule prohibits, other commenters supported OCR's proposed approach to avoid defining the term in a prescriptive manner.

One organizational commenter opposed § 92.207(b)(2) as imposing nondiscrimination tests on insurance benefit design, which the commenter argued would result in expansive and detailed regulation of a number of issuer business decisions in an arbitrary and capricious manner.

*Response:* Benefit design features may result in a discriminatory denial of access to medically necessary care, particularly for individuals with disabilities who have significant health needs. To address this concern, covered entities are explicitly prohibited from having or implementing benefit designs

---

[176] *See* section 1302 of the ACA, codified at 42 U.S.C. 18022.

[177] *See* 42 U.S.C. 18022, 300gg–6(a); 45 CFR 156.100 through 165.155.

[178] Letter from The AIDS Institute to Dr. Ellen Montz, Deputy Admin'r & Dir. (June 9, 2022), *https://www.theaidsinstitute.org/letters/ marketplace-insurance-plan-prep-compliance.* In general, under section 2713 of the PHS Act and its implementing regulations, plans and issuers must provide coverage, without cost sharing, for recommended preventive services for plan years (in the individual market, policy years) that begin on or after the date that is 1 year after the date the recommendation or guideline is issued. 26 CFR 54.9815–2713(b); 29 CFR 2590.715–2713(b); 45 CFR 147.130(b).

[179] *See, e.g.,* 45 CFR 147.104(e) (health insurance issuers offering coverage in the individual and group markets) and 156.225(b) (qualified health

plans); 42 CFR 423.2263 (Medicare Part D marketing requirements).

that discriminate on any protected basis as set forth under § 92.207(b)(2).

We decline to define "benefit design" or specify types of benefit design features in the regulatory text. Section 92.207(b)(2) sufficiently notifies covered entities that discriminatory benefit designs are prohibited under this rule. In addition, we seek to avoid being overly prescriptive or unintentionally inconsistent with other Departmental regulations that may define benefit design.[180] While OCR declines to provide examples of specific benefit design features in the regulatory text, for purposes of applying section 1557 and this final rule, examples of benefit design features include, but are not limited to, coverage, exclusions, and limitations of benefits; prescription drug formularies; cost sharing (including copays, coinsurance, and deductibles); utilization management techniques (such as step therapy and prior authorization); medical management standards (including medical necessity standards); provider network design; and reimbursement rates to providers and standards for provider admission to participate in a network.

OCR disagrees with the organizational commenter's concern that this provision arbitrarily or capriciously imposes new nondiscrimination tests on issuer business decisions. This section does not dictate what business decisions an issuer must make in establishing its benefit design and does not specify any particular design feature must be included. OCR acknowledges that issuers have discretion in designing their plans; however, they must do so in a nondiscriminatory manner as discussed throughout this section.

*Comment:* Commenters requested that OCR provide a non-exhaustive list of presumptively discriminatory benefit design examples. Some commenters also suggested that OCR incorporate the presumptively discriminatory benefit design examples provided in CMS' EHB regulations [181] or otherwise rely on other nondiscrimination provisions in

CMS regulations implementing the ACA. Commenters stated that allowing plan discretion on every benefit other than gender dysphoria undercuts the regulation. Many commenters stated that OCR should recognize that most benefit design elements are inherently discriminatory as they apply disproportionately to individuals with disabilities and chronic conditions. Commenters expressed concerns that without presumptively discriminatory benefit design examples, issuers will adopt designs that exclude or make lifesaving treatments unaffordable for individuals in protected categories. Commenters noted that such designs include cost-sharing requirements, restrictive medical necessity standards, narrow networks, drug formularies, adverse tiering, benefit substitution, utilization managements, exclusions, visit limits, quantity limits, waiting periods, service areas, and coercive wellness programs.

*Response:* OCR declines to provide specific examples of presumptively discriminatory benefit designs in the rule due to the fact-intensive analysis needed to determine whether a particular benefit design feature is discriminatory under this section. We also decline to give examples of presumptively discriminatory benefit designs similar to those in EHB regulations applicable to non-grandfathered health insurance coverage in the individual and small group markets that CMS finalized in the preamble of its Notice of Benefit and Payment Parameters for 2023 final rule.[182] Essential health benefits are governed by CMS regulations and not by this final rule. While many of the practices cited by CMS would raise concerns of prohibited discrimination under this rule, OCR's determinations that a particular benefit design is discriminatory will be a fact-specific inquiry that OCR will conduct on a case-by-case basis. OCR's process for analyzing claims of discrimination in

benefit design is discussed in more detail under the *Benefit Design Analysis* discussion later in this section. OCR will consider issuing guidance on discriminatory practices prohibited under this section in future guidance.

OCR disagrees that the prohibition against categorical exclusions or limitations of coverage for all health services related to gender transition or other gender-affirming care under § 92.207(b)(4) undercuts the regulation. Such explicit, categorical exclusions or limitations impermissibly single out an entire category of services based on an individual's transgender status and are presumptively discriminatory on the basis of sex as prohibited under this section. As discussed in detail under § 92.206, this rule includes specific provisions related to gender-affirming care given the widespread discriminatory denial of care for such services and its direct connection to an individual's transgender status.[183] As discussed in more detail below, covered entities may raise a defense under § 92.207(c) where they contend that they have a legitimate, nondiscriminatory basis for a coverage limitation that may otherwise appear to constitute discrimination. Recipients may also rely upon §§ 92.3 and 92.302(a) or request an assurance of exemption under § 92.302(b) based on their view that religious freedom or conscience protections apply.

We also decline to incorporate examples of presumptively discriminatory benefit designs similar to those in EHB regulations applicable to non-grandfathered health insurance coverage [184] in the individual and small group markets that CMS finalized in the preamble of its Notice of Benefit and Payment Parameters for 2023 final rule. Essential health benefits are governed by CMS regulations and are not addressed by this final rule. While many of the practices cited by CMS would raise concerns of prohibited

---

[180] Other Departmental and Federal regulations governing private health insurance and public health coverage refer to "benefit design" and "marketing practices." *See, e.g.,* 45 CFR 147.104(e), 156.20, 156.125(a) (health insurance issuers offering coverage in the individual and group markets), 156.200(b)(3), 156.225(b) (qualified health plans), 156.110(d), and 156.111(b)(2)(v) (EHB benchmark plans); 42 CFR 422.100(f)(3) (Medicare Advantage), 423.2263 (Medicare Part D marketing requirements), 423.882, 423.894(d) (Medicare retiree prescription drug plans), 440.347(e) (Medicaid benchmark plans), and 600.405(d) (Basic Health Program); 29 CFR 2510.3–40(c)(1)(iv)(A) (multiple employer welfare arrangements under ERISA).

[181] *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit & Payment Parameters for 2023, 87 FR 27208, 27301–02 (May 6, 2022).

[182] Patient Protection and Affordable Care Act; HHS Notice of Benefit & Payment Parameters for 2023, 87 FR 27208, 27301–05 (May 6, 2022) (providing the following examples of presumptively discriminatory benefit designs under CMS' EHB nondiscrimination regulations applicable to non-grandfathered health insurance coverage in the individual and small group markets: (1) limitation on hearing aid coverage based on age; (2) autism spectrum disorder coverage limitations based on age; (3) age limits for infertility treatment coverage when treatment is clinically effective for the age group; (4) limitation on foot care coverage based on diagnosis (whether diabetes or another underlying medical condition); and (5) access to prescription drugs for chronic health conditions (adverse tiering)). We note these regulations are enforced by CMS and are distinct from section 1557 and other civil rights laws enforced by OCR.

[183] *See, e.g., Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.,* 557 F. Supp. 224, 239 (D. Mass. 2021) ("[p]laintiffs have shown a substantial risk that insurers will deny reimbursement for treatment they previously covered based on the elimination of the prohibition on categorical coverage exclusions. Out2Enroll's analysis indicates that "the number of insurers using transgender-specific exclusions . . . more than doubled" after HHS promulgated the 2020 Rule.").

[184] In general, health coverage is considered grandfathered if it was in existence and has continuously provided coverage for someone (not necessarily the same person, but at all times at least one person) since March 23, 2010, provided the plan (or its sponsor) or the issuer has not taken certain actions resulting in the plan relinquishing grandfathered status, as more fully described at 26 CFR 54.9815–1251, 29 CFR 2590.715–1251, and 45 CFR 147.140.

discrimination under this rule, OCR's determinations that a particular benefit design is discriminatory will be a fact-specific inquiry that OCR will conduct on a case-by-case basis. OCR's process for analyzing claims of discrimination in benefit design is discussed in more detail under the *Benefit Design Analysis* discussion later in this section. OCR will consider issuing guidance on discriminatory practices prohibited under this section in future guidance.

*Comment:* Commenters asked OCR to include examples of discriminatory benefit design specifically related to prescription drug formularies. These commenters provided examples of practices they considered to be discriminatory, such as issuers placing most or all drugs used in the treatment of certain conditions into the highest cost sharing tier; excluding single tablet regimens even when they are the standard of care for a condition; requiring the use of specialty pharmacy programs that require mail delivery even when that adds unnecessary and burdensome administrative barriers and delays to obtaining drugs; and using quantity limits for an entire class of medications without scientific or clinical explanation. Commenters expressed concerns that discriminatory prescription drug formularies discourage enrollment among certain populations, including individuals with HIV, mental health needs, or other chronic conditions. Commenters noted that enrollees who need high-cost medications often must choose between plans that will provide adequate coverage of their medication or plans that cover their preferred providers. A commenter cited a study that showed that Black and Hispanic/Latino people are more likely to abandon medications at the pharmacy because of high cost.[185] Finally, some commenters recommended that OCR develop specific mechanisms to monitor prescription drug formulary practices and coverage of physician-administered "medical benefit" drugs to ensure that formularies are not used to discriminate against patients with specific disabilities.

*Response:* Benefit design practices related to prescription drugs have an enormous impact on individuals' access

to medically necessary medication. Coverage of prescription drugs could pose concerns of prohibited discrimination and OCR would investigate such practices under the rule on a case-by-case basis. OCR declines to state that specific practices are per se discriminatory under the rule because each investigation is a fact-specific inquiry, based on nondiscrimination principles and relevant case law,[186] including consideration of the covered entity's reason for the design feature in question.

As discussed in the Proposed Rule, several benefit design practices related to drug formularies could be discriminatory under this section, including prescription drug formularies that place utilization management controls on most or all drugs that treat a particular condition regardless of their costs without placing similar utilization management controls on most or all drugs used to treat other conditions, and benefit designs that place utilization management controls on most or all services that treat a particular disease or condition but not others. 87 FR 47874. OCR notes that coverage of physician-administered "medical benefit" drugs would be considered part of a plan's benefit design and therefore subject to this rule.

While we identify some prescription drug practices above that may raise concerns under section 1557, this rule does not prohibit covered entities from engaging in nondiscriminatory practices related to prescription drug benefit design. For example, covered entities may utilize preferred drug lists, such as preferred drug lists under the Medicaid program under title XIX of the Social Security Act, as long as the coverage criteria does not constitute prohibited discrimination. In addition, as discussed in more detail below, covered entities are not prohibited from applying nondiscriminatory utilization management techniques in their drug formularies.

*Comment:* Many commenters expressed concerns about benefit designs that impose coverage limitations or exclusions related to health services that could result in discrimination on the basis of disability. For example, some commenters argued that plans should not be permitted to have blanket exclusions for services related to ASD or applied behavioral analysis (ABA) therapy, a therapeutic intervention

sometimes recommended for autistic children.

Several commenters raised concerns about how frequently insurance benefit design practices inappropriately limit coverage of durable medical equipment. Commenters noted that issuers place unique annual coverage caps on items such as wheelchairs, ventilators, and hearing aids. A commenter noted an example of an individual with hearing loss that requires treatment other than cochlear implants being denied coverage of hearing aids and outpatient visits to an audiologist due to their issuer's blanket exclusion of programs or treatments for hearing loss other than cochlear implants. Another commenter noted that issuers limit coverage of multiple-use speech-generating devices, which are most useful and effective for autistic individuals, even when those devices are less expensive than single-use speech generating devices.

Other commenters expressed concerns that covered entities include clinically inappropriate limits on the coverage of habilitative and rehabilitative services and devices. Commenters noted that such limitations, including on the number of covered visits, discriminate against people with more significant disabilities who need extensive habilitation or rehabilitation in order to gain, regain, or maintain functioning. Commenters requested that OCR clarify that blanket limitations or exclusions of habilitative services for individuals with specific disabilities are prohibited discrimination under section 1557 when those same services are allowed for rehabilitation of nondisabled persons. Commenters noted that people with developmental disabilities are routinely denied coverage for habilitative services needed to gain skills or improve functioning while an identical service is covered for individuals who require it for rehabilitative care to restore functioning. For example, a commenter noted that coverage of "speech therapy to restore speech" results in excluding all children with developmental delays who need the therapy to *attain* speech. Commenters noted that habilitative services are important for children who are delayed in walking or talking or need to learn other muscular skills for the first time and for individuals with disabilities to be able to live as independently as possible.

*Response:* OCR appreciates the variety of concerns raised by commenters. A coverage limitation or exclusion that is based on a specific disability or condition (or other basis prohibited by section 1557, such as age, discussed below), would be investigated as

[185] PhRMA, *Patient Experience Survey: Barriers to Health Care Access in the Patient Experience,* pp. 10–11 (2021), *https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/P-R/PES-Report_100621_Final.pdf* (stating that utilization management disproportionately impacts people of color (Black Americans (56 percent) and Hispanic Americans (60 percent) versus white Americans (36 percent)) and that barriers imposed by utilization management can contribute to poor medication adherence or prescription abandonment).

[186] *See, e.g., Doe* v. *CVS Pharmacy, Inc.,* 982 F.3d 1204, 1212 (9th Cir. 2020); *Doe* v. *BlueCross BlueShield of Tenn.,* 926 F.3d 235, 241 (6th Cir. 2019).

potentially discriminatory under this rule. Blanket exclusions of all treatments related to a particular condition, such as ASD or hearing loss, would raise significant concerns of prohibited discrimination on the basis of disability such that OCR would expect the covered entity to provide a legitimate, nondiscriminatory reason for the exclusion. Non-categorical exclusions or limitations for certain treatments related to a specific disability or condition may also raise concerns under the rule. This rule, however, does not require covered entities to cover all services related to a specific disability or condition. Application of standard disability discrimination principles requires a specific analysis of each claimed exclusion. We therefore decline to expressly state that a particular coverage exclusion or limitation is per se discriminatory on the basis of disability under this rule. Determinations of whether a particular coverage exclusion or limitation is discriminatory will be evaluated on a case-by-case basis, in accordance with longstanding civil rights principles and relevant case law, as discussed throughout this section. When investigating a potentially discriminatory exclusion or limitation, OCR will consider whether the covered entity has a legitimate, nondiscriminatory reason for the challenged design feature. If OCR determines that the covered entity's reason is a legitimate, nondiscriminatory reason that is not a pretext for discrimination, OCR will conclude that the challenged exclusion or limitation is not prohibited under the rule.

Regarding durable medical treatment, the commenters' example of exclusions of coverage for programs or treatments for hearing loss other than cochlear implants has been the subject of at least two court cases where the courts have held that such exclusions do not state a claim for proxy disability discrimination under section 1557.[187]

We also note that health insurance issuers may be subject to other Departmental authorities that are relevant to issues raised by commenters.[188] For example, to the extent durable medical equipment is an EHB, like hearing aids are in some states, covered entities may also be subject to CMS' EHB nondiscrimination

regulations at 45 CFR 156.125 applicable to non-grandfathered health insurance coverage in the individual and small group markets.[189] Further, CMS' EHB regulations require coverage of habilitative services and devices, and specify that plans may not impose limits on coverage of habilitative services and devices that are less favorable than limits imposed on coverage of rehabilitative services and devices.[190]

*Comment:* Many commenters raised concerns related to mental health services. Commenters asked OCR to require both public and private payers to remedy the current inadequacies and inequities in mental health service reimbursement rates and policies, explaining that reimbursement rates have been historically lower for mental health services than physical health services. Commenters also identified a range of specific mental health benefit design inequities, including the need for intermediate-facility coverage for high-use patients with non-urgent care needs to mobile crisis response that is on par to that of physical emergency response. Commenters also requested that the rule align with the mental health parity protections in the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA).

*Response:* OCR acknowledges commenters' concerns regarding coverage for mental health services. Mental health services may be needed by people who may or may not be individuals with disabilities under this rule. OCR will examine complaints alleging less favorable treatment for mental health coverage as compared to physical health coverage on a case-by-case basis to determine if the coverage discriminates against people with disabilities. Reimbursement rates and policies are subject to § 92.207 as part of a plan's benefit design, and thus must be provided in a nondiscriminatory manner. We also discuss reimbursement rates in the context of the integration provision under § 92.207(b)(6).

We decline to incorporate or align this rule with MHPAEA, as section 1557 is a distinct Federal civil rights law. We note that coverage limitations found to

violate section 1557 may also be prohibited under MHPAEA.[191]

*Comment:* Commenters expressed concerns about issuers discriminating against enrollees based on age through certain benefit designs. Commenters provided examples of practices they believed to be discriminatory, such as issuers requiring an ASD diagnosis by a certain age to access coverage for ASD-related health care; not covering hearing aids for adults when otherwise covered for children; and imposing limitations on wheelchair and mobility device replacement for children that fail to align with how quickly children outgrow such devices. One commenter asked that OCR require issuers to attest that their pediatric benefit packages are comprehensive and age-appropriate by demonstrating that physical and mental health benefits do not have age, visit, or coverage limits that are not based on medical necessity or that are based on adult metrics. Commenters noted that plans that limit coverage to specific conditions or a child's capacity to attain a certain functional status will unfairly prevent many children with special health care needs from accessing critically important services.

*Response:* Section 1557 prohibits discrimination on the basis of age, consistent with the Age Act and its implementing regulations. The Age Act allows age distinctions under certain circumstances, including distinctions

---

[187] *Schmitt* v. *Kaiser Found. Health Plan of Wash.,* 965 F.3d 945, 960 (9th Cir. 2020); *E.S.* v. *Regence BlueShield,* No. 2:17–cv–01609–RAJ, 2022 WL 279028, at *8–9 (W.D. Wash., Jan. 31, 2022).

[188] *See, e.g.,* Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA).

[189] *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2023, 87 FR 27208, 27301–02 (May 6, 2022) (concluding that age limitations on hearing aid coverage are presumptively discriminatory under 45 CFR 156.125 when applied to EHB and there is no clinical basis for the age distinction). We note these regulations are enforced by CMS and are distinct from section 1557 and other civil rights laws enforced by OCR.

[190] 45 CFR 156.110(a)(7) and 156.115(a)(5)(ii).

[191] The Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA), Public Law 110–343; 42 U.S.C. 300gg–26 (HHS); 29 U.S.C. 1185a (Department of Labor); 26 U.S.C. 9812 (Department of Treasury), and implementing regulations at 45 CFR 146.136 and 45 CFR 147.160, 29 CFR 2590.712, and 26 CFR 54.9812–1, respectively; The Departments of the Treasury, Labor, and HHS also published proposed rules on August 3, 2023 (88 FR 51552), to amend existing regulations and establish new regulations for the nonquantitative treatment limitation comparative analyses required under MHPAEA, as amended by the Consolidated Appropriations Act, 2021. The proposed rules would amend the existing rules to prevent group health plans and health insurance issuers offering group or individual health insurance coverage that provides both medical and surgical benefits and mental health or substance use disorder benefits from using nonquantitative treatment limits to place greater limits on access to mental health and substance use disorder benefits as compared to medical/surgical benefits; *see also* U.S. Dep't of Labor, U.S. Dep't of Health & Hum. Servs., U.S. Dep't of the Treasury, *2022 MHPAEA Report To Congress: Realizing Parity, Reducing Stigma, and Raising Awareness: Increasing Access to Mental Health and Substance Use Disorder Coverage* (2022), *https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/report-to-congress-2022-realizing-parity-reducing-stigma-and-raising-awareness.pdf*; U.S. Dep't of Labor, *Self-Compliance Tool for the Mental Health Parity and Addiction Equity Act (MHPAEA),* p. 38 (2020), *https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/self-compliance-tool.pdf*.

that reasonably take into account age as a factor necessary to the normal operation or the achievement of any statutory objective [192] of a program or activity; are based on age-related factors that bear a direct and substantial relationship to the normal operation of the program or activity or to the achievement of a statutory objective; provide special benefits to the elderly or children; or are contained in a rule or regulation issued by the Department.[193] As a result, not all age-related distinctions in State or Federal law, including Department regulations, are prohibited by section 1557.[194] As noted above, these permissible age distinctions form part of the ''ground'' of discrimination prohibited under the Age Act, because they identify distinctions that either are not forbidden age discrimination, 42 U.S.C. 6103(b)(1)(A) (''reasonably takes into account age as a factor necessary to the normal operation or the achievement of any statutory objective of such program or activity''), or are not age discrimination at all, *id.* section 6103(b)(1)(B) (''based upon reasonable factors other than age'').

When investigating a benefit design with an age distinction, OCR will first determine whether the distinction is permitted under the Age Act (and therefore section 1557). If it is not, OCR will then investigate the age distinction to determine whether it violates section 1557. As with other benefit design investigations, OCR's analysis will involve a fact-specific inquiry and will consider a covered entity's reason for the age distinction in its benefit design. The covered entity's justification must be a legitimate, nondiscriminatory reason, as discussed under § 92.207(c). For example, if an issuer is not able to provide a legitimate, nondiscriminatory reason to substantiate an age distinction in ASD coverage, such an age distinction would likely violate section 1557. We reiterate that this rule does not require a covered entity to provide coverage for all health services related to a particular disability or condition; rather, it requires covered entities to design their plan benefits in a nondiscriminatory manner. We note

that covered entities may also be subject to relevant CMS EHB nondiscrimination regulations regarding presumptively discriminatory age distinctions.[195]

OCR does not agree that it is necessary to require a separate attestation related to pediatric benefit packages. As recipients of Federal financial assistance, issuers are required to submit an Assurance of Compliance with section 1557 under § 92.5, which attests that they will not discriminate on the basis of age, among other prohibited bases.

*Comment:* A commenter requested that OCR clarify the obligation of issuers and plan administrators to ensure that their staff, as well as the staff of any subsidiary entities with which they do business, receive explicit training on the relationship between benefit design choices and practices and activities that can amount to discrimination based on race, color, national origin, sex, age or disability.

*Response:* Covered entities are responsible for ensuring their staff, subrecipients, and subcontractors are compliant with section 1557. Section 92.9 requires covered entities to provide training to relevant employees on their section 1557 Policies and Procedures, and while we note that it is in a covered entity's best interest to ensure that relevant staff are adequately trained, we decline to specify additional training requirements at this time.

*Comment:* Commenters requested that the final rule expressly state that section 1557 prohibits proxy discrimination in benefit design, either in the preamble or regulation. Commenters expressed concern that absent express incorporation of proxy principles, covered actors may attempt to evade section 1557's nondiscrimination provisions. A commenter requested that the final rule incorporate established discrimination principles and noted that issuers continue to justify discriminatory plan designs by taking the position that health plans that target a particular medical service rather than a disability are neutral or uniform with respect to all enrollees. As an example, the commenter noted that plans

restricting coverage of dialysis justify it as not being discriminatory against enrollees with end-stage renal disease. The commenter requested that the final rule declare that discriminatory plan designs that limit dialysis treatment are a form of prohibited disability discrimination under section 1557 due to the fact that dialysis services are a near perfect proxy for end-stage renal disease, according to the commenter.

*Response:* Proxy discrimination occurs when a policy or practice treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group.[196] Proxy discrimination is one of many basic civil rights theories available to OCR when investigating complaints under section 1557 and which courts have applied in cases alleging discrimination under section 1557.[197] Due to the fact-intensive nature of the analysis necessary, including determinations of whether a particular benefit design is discriminatory,[198] we decline to expressly include this theory of discrimination in the rule text. As we have noted above, all claims under this section will be evaluated on a case-by-case basis.

*Comment:* Some commenters noted that health insurance coverage and other health-related coverage may employ coverage limitations that are facially neutral and apply to all enrollees but have a disparate impact on a basis protected under section 1557. Specifically, commenters observed that these limitations and exclusions can have a particular discriminatory effect on individuals with disabilities who have chronic conditions and significant health needs.

*Response:* OCR utilizes all applicable causes of action when investigating potential discrimination under section 1557 consistent with relevant case law. For further discussion related to OCR's enforcement procedures, see § 92.301.

---

[192] 45 CFR 91.12(b) (Defining ''Statutory objective'' to mean ''any purpose of a program or activity expressly stated in any Federal statute, State statute, or local statute or ordinance adopted by an elected, general purpose legislative body.'').

[193] *See* 42 U.S.C. 6103(b); 45 CFR 91.12 through 91.14 and 91.17.

[194] *See, e.g.,* 42 U.S.C. 300gg; 45 CFR 147.102 (permitting premium rates charged by a health insurance issuer for health coverage offered in the individual or small group market to vary with respect to the particular plan of coverage by age, among other factors).

[195] *See, e.g.,* Patient Protection and Affordable Care Act; HHS Notice of Benefit & Payment Parameters for 2023, 87 FR 27208, 27301–02 (May 6, 2022) (providing examples of presumptively discriminatory benefit designs under CMS' EHB nondiscrimination regulations applicable to non-grandfathered health insurance coverage in the individual and small group markets that include limitations on hearing aid coverage based on age, autism spectrum disorder coverage limitations based on age, and age limits for infertility treatment coverage when treatment is clinically effective for the age group). These regulations are enforced by CMS and are distinct from section 1557 and other civil rights laws enforced by OCR.

[196] *Schmitt* v. *Kaiser Found. Health Plan of Wash.,* 965 F.3d 945, 958 (9th Cir. 2020) (citing *Davis* v. *Guam,* 932 F.3rd 822, 837 (9th Cir. 2019)).

[197] *See, e.g., Schmitt* v. *Kaiser Found. Health Plan of Wash.* No. 2:17–cv–01611–RSL, 2018 WL 4385858 (W.D. Wash. Sept. 14, 2018), *aff'd in part, rev'd in part and remanded,* 965 F.3d 945 (9th Cir. 2020); *E.S.* v. *Regence BlueShield,* No. 2:17–CV–01609–RAJ, 2022 WL 279028, at *1 (W.D. Wash. Jan. 31, 2022).

[198] *See, e.g., Schmitt* v. *Kaiser Found. Health Plan of Wash.,* No. 2:17–cv–01611–RSL, 2018 WL 4385858 (W.D. Wash. Sept. 14, 2018), *aff'd in part, rev'd in part and remanded,* 965 F.3d 945 (9th Cir. 2020); *E.S.* v. *Regence BlueShield,* No. 2:17–CV–01609–RAJ, 2022 WL 279028, at *1 (W.D. Wash. Jan. 31, 2022).

*Comment:* Commenters requested that the final rule make clear the language in § 92.207(b), which addresses sex-related health services, includes the full spectrum of reproductive health services and treatments and medications for people with disabilities that may prevent, complicate, or end fertility or pregnancies.

*Response:* OCR appreciates the unique challenges faced by people with disabilities seeking reproductive health care. Section 1557 prohibits discrimination on prohibited bases regardless of the type of care an individual is seeking or receive. Therefore, we do not believe it is necessary to provide specific provisions related to each form of care an individual may seek.

*Comment:* Commenters requested that the final rule expressly state that infertility diagnoses, treatment, and services, including assisted reproductive technology, if offered, must be covered without regard to sexual orientation, gender identity, sex characteristics (including intersex traits), or any other protected basis. Commenters raised several examples of benefit design or coverage related to assisted reproductive technology that they stated should be prohibited as discriminatory against individuals based on their relationship status and sexual orientation. As examples, commenters cited requiring enrollees to use their spouse's sperm to fertilize their eggs for in vitro fertilization and requiring that single enrollees or those in non-heterosexual relationships pay out of pocket for a predetermined number of failed intrauterine insemination cycles before providing coverage when heterosexual couples do not have to meet the same standard. Commenters stated that issuers justify these types of benefit design features on outdated definitions of infertility. A commenter argued that in vitro fertilization coverage should include screening for genetic abnormalities that are unique to enrollees' lineage as a matter of reproductive justice and religious freedom.

*Response:* OCR agrees that to the extent plans cover infertility diagnosis, treatment, and services, including assisted reproductive technology, they must do so on a nondiscriminatory basis, including for same-sex couples. Due to the fact-intensive nature of the analysis necessary, determinations of whether a particular benefit design is discriminatory under this section will be evaluated on a case-by-case basis.

*Comment:* Commenters recommended that OCR add a new paragraph to § 92.207(b) affirming that denying or limiting coverage of, or coverage of a claim for, health services because they may prevent, cause complications to, or end fertility or pregnancies is prohibited. Commenters asserted this language would address discrimination by a State program that otherwise provides coverage of contraceptives but excludes a specific contraceptive because of a medically inaccurate assertion that the contraception causes an abortion, or a provider network that only includes facilities that refuse to provide certain types of contraception. Commenters emphasized that individuals are currently being improperly denied access to medications or treatments for care unrelated to abortion because the medicine is also used for abortion care.

*Response:* Denying access to specific medication or health services that may potentially be used for medication abortion purposes but are prescribed for reasons unrelated to abortion care may constitute discrimination under section 1557.[199] OCR finds it unnecessary to add any additional regulatory language to prohibit such discrimination on the basis of disability and sex. As noted above, simultaneous discrimination on multiple prohibited bases is important to account for and is prohibited by section 1557.

*Comment:* A commenter asked OCR to provide confirmation that while nothing in the regulation would require a covered entity to cover abortions, to the extent plans do cover abortions, they must do so on a nondiscriminatory basis.

*Response:* As the commenter stated, nothing in this rule requires the provision of any particular medical care, including abortion. To the extent plans offer coverage for termination of pregnancies and related services, they must do so on a nondiscriminatory basis.

*Comment:* Commenters recommended that OCR revise the regulatory text of proposed § 92.207(b)(4) and (5) to address sex discrimination related to pregnancy or related conditions by adding discrimination related to abortion, fertility care, and contraception. Some commenters requested that OCR specifically add "termination of pregnancy, contraception, fertility care, miscarriage management, pregnancy loss, maternity

---

[199] *See* U.S. Dep't of Health & Hum. Servs., *Guidance to the Nation's Retail Pharmacies: Obligations Under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Health Care at Pharmacies* (Sept. 29, 2023), *https://www.hhs.gov/ civil-rights/for-individuals/special-topics/ reproductive-healthcare/pharmacies-guidance/ index.html.*

care, other reproductive and sexual health services, or any health services'' to the prohibitions on exclusions, limitations, and cost sharing related to gender transition or other gender-affirming care in § 92.207(b)(4) and (5).

*Response:* OCR declines this suggestion. Section 92.207(b)(4) and (5) are not intended to list all types of potentially prohibited exclusions. The general prohibition on discriminatory limitations under § 92.207(b)(1) would apply to any exclusion or limitation related to all types of care that resulted in discrimination on the basis of sex.

*Comment:* Some commenters stated that they oppose § 92.207 to the extent it violates religious freedom and conscience protections. Other commenters stated that they opposed § 92.207 because it prevents plans from excluding coverage of all gender affirming care.

*Response:* Section 92.207 does not violate such protections because providers may rely on the protections of Federal religious freedom and conscience laws or choose to seek assurance of those protections from OCR under this final rule. With respect to concerns about potential conflicts between provisions of the final rule and individuals' or organizations' conscience or religious freedom, please refer to the preamble discussion of § 92.302. Additionally, we are revising § 92.207(c) to specify that nothing in this section precludes a covered entity from availing itself of protections described in § 92.3 and § 92.302. This modification is consistent with the revised language in § 92.206(c). As noted elsewhere in this preamble, and in § 92.3(c), insofar as the application of any rule requirement would violate applicable Federal protections for religious freedom and conscience, such application shall not be required.

*Comment:* Many commenters expressed strong support for the provisions in § 92.207(b)(3) through (5), citing the extensive discrimination faced by transgender people in the health insurance coverage and other health-related coverage context. Several legal service providers described their experiences assisting clients facing various types of discrimination in their health plans, even where State law or the plan terms provided some protection for gender-affirming care. Some commenters noted these provisions also addressed forms of discrimination commonly faced by intersex people. Commenters noted that the physical, mental health, and financial costs of such discrimination could be high, with individuals forgoing necessary care, facing extreme financial

burdens, and experiencing distress when denied access to necessary medical care.

Both supporters and opponents of the Proposed Rule raised many of the same issues discussed in § 92.206(b)(4) (prohibiting categorical coverage exclusions on gender transition or other gender-affirming care) and (c) (discussing legitimate, nondiscriminatory reasons for denying or limiting care) above. As with § 92.206, some commenters asked OCR to define gender-affirming care or provide more detail about what types of care must be covered.

*Response:* OCR agrees that transgender and intersex people have long faced discrimination in the health insurance coverage and other health-related coverage context. Many of OCR's responses to the comments in § 92.206(b)(4) (prohibiting categorical coverage exclusions on gender transition or other gender-affirming care) and (c) (discussing legitimate, nondiscriminatory reasons for denying or limiting care) above are applicable to the comments in this section as well. For example, for the reasons we discussed above, we will not provide a definition of "gender-affirming care" in the regulation text.

*Comment:* Commenters noted that even plans without categorical exclusions will exclude certain types of gender-affirming care as "cosmetic." Commenters noted that categorizing procedures as cosmetic when needed for gender-affirming care is contrary to established standards of care for the treatment of gender dysphoria and urged OCR to explicitly prohibit such procedure-specific exclusions. Some commenters further noted that plans will often consider these procedures on a case-by-case basis when not related to gender transition but will not do so when the care is related to gender transition.

Many commenters recommended deleting the word "all" from § 92.207(b)(4) to make clear that the exclusion of *any* gender-affirming care from coverage is prohibited. Some commenters stated that this change would be more consistent with § 92.207(b)(5), which more generally prohibits discriminatory limits on gender-affirming care coverage.

*Response:* OCR appreciates commenters' feedback and concern about forms of discrimination beyond broad categorical coverage exclusions. While we understand that some gender-affirming care exclusions are limited to the specific type of care at issue, we decline to revise the language of § 92.207(b)(4). Section 92.207(b)(5)'s

general prohibition on limitations or restrictions on coverage for gender transition or other gender-affirming care reaches the narrower exclusions or restrictions on gender-affirming care.

We also decline to state that any denial of gender-affirming care will necessarily be discriminatory regardless of context or rationale. We will instead consider claims of discrimination raising non-categorical denials on a case-by-case basis. Where OCR receives complaints about such exclusions or restrictions, we will investigate on a case-by-case basis whether they constitute prohibited discrimination under § 92.207(b)(5) or any other applicable provision of the rule. Since section 1557 only prohibits discrimination and does not prescribe any specific standard of care, such denials will violate the final rule only where they entail discrimination on the basis of sex. As stated throughout this section, covered entities will have the opportunity to provide a legitimate, nondiscriminatory reason for such exclusions or restrictions.

*Comment:* Some commenters proposed striking the phrase "if such denial, limitation, or restriction results in discrimination on the basis of sex" from § 92.207(b)(5), stating that the elimination would make this provision clearer. Commenters viewed this phrase as confusing and redundant, as they stated that limiting or restricting coverage for services related to gender-affirming care is necessarily discriminatory. Another commenter noted the intersectionality of discrimination and stated that this language may be limiting.

*Response:* For the reasons discussed above, we disagree that any restriction impacting gender-affirming care will necessarily constitute prohibited discrimination. For example, if an insurance plan places restrictions on coverage for gender-affirming surgeries that are no more stringent than the restrictions placed on any other type of surgical care, those restrictions will not violate the rule. As such, we decline to make the deletion proposed by these commenters.

OCR agrees that the rule prohibits discrimination in the provision or coverage of gender-affirming care whether it is on the basis of sex or on the basis of race, color, national origin, age, or disability. That said, allegations about such discrimination are best brought under § 92.207(b)(1), as § 92.207(b)(5) is aimed at the types of denials or limitations on coverage that are based on a person's gender identity and are thus a form of sex discrimination.

*Comment:* Commenters noted that even plans without categorical exclusions of gender-affirming care may adopt barriers to accessing such care, such as more stringent pre-approval processes. The commenters noted that these requirements could result in transgender people ultimately not receiving necessary care or having to invest significant time and resources to navigate the barriers. Some commenters additionally noted the high mental health toll on individuals facing discriminatory limitations on medically necessary care.

*Response:* OCR appreciates the commenter's feedback and concern about the forms of discrimination transgender people encounter in seeking coverage for gender-affirming care but declines to revise § 92.207(b)(3) as suggested. Section 92.207(b)(5) prohibits limitations or restrictions on coverage for gender transition or other gender-affirming care.

*Comment:* Many commenters supported the provisions limiting issuers' ability to deny care based on a person's sex assigned at birth, gender identity, or gender otherwise recorded, noting that transgender, nonbinary, and intersex people can all face such discriminatory denials. Other commenters objected to these provisions, expressing concern that this would compel issuers to pay for care that was not medically necessary or appropriate for a given individual.

*Response:* Section 92.207(c) makes clear that a nondiscriminatory determination that care is not medically necessary based on a patient's anatomy or medical need is permissible. For example, this final rule would not prohibit a covered entity from denying coverage for preventive health services for a transgender patient where such care is not medically necessary, such as a prostate exam for a transgender man who does not anatomically have a prostate. In contrast, the rule may prohibit a covered entity from denying coverage for medically necessary preventive care for a transgender patient.

*Comment:* One provider group urged OCR to work with the Office of the National Coordinator for Health Information Technology (ONC) and electronic health record vendors to ensure that there are options for separately identifying a patient's gender identity and anatomy to reduce the risk of improper denials.

*Response:* OCR appreciates the suggestion that discriminatory denials could be reduced if the records systems used by providers, issuers, and other covered entities provide better options

**37608**  **Federal Register** / Vol. 89, No. 88 / Monday, May 6, 2024 / Rules and Regulations

for recording gender identity and sex characteristics. While minimum standards for record systems are not within the scope of the rule, we are committed to working with ONC and other relevant stakeholders to explore solutions to this issue.

*Comment:* Commenters noted that transgender people often have difficulty getting their health coverage to update their records to reflect their correct name and gender. Commenters noted that gender marker mismatches in health insurance records can result in denial of coverage for clinically appropriate care, and one commenter urged OCR to make clear that claims processing procedures that automatically deny coverage for care based on a perceived mismatch of sex or gender is a form of impermissible sex discrimination.

*Response:* OCR appreciates commenters' concerns about coverage denials due to a sex mismatch in claims processing procedures, which can result in transgender patients being denied coverage for a medically necessary and clinically appropriate services. However, we decline to categorically state that sex mismatch denials are always discriminatory. Instead, OCR will consider and investigate complaints raising this issue on a case-by-case basis under § 92.207(b)(3). While we refrain from categorically stating that initial sex mismatch or coding denials are prohibited under this rule, we caution that denials resulting in an undue delay or denial of services, such as repeated denials, could result in a finding of prohibited discrimination. For more information on OCR's view of this issue, please see the 2016 Rule preamble's discussion on computer systems with gender coding resulting in gender mismatches at 81 FR 31436.

*Comment:* With respect to cases where coverage for comparable treatments is relevant to the discrimination analysis, some commenters urged OCR to clarify that the question of what is comparable can be construed broadly, rather than parsing minor differences in broadly similar types of care.

*Response:* OCR declines to identify a bright line of how similar care must be to be considered comparable when such considerations are relevant to a discrimination claim, as there are many factors that may be relevant to this analysis, and our approach is case by case.

*Comment:* Commenters who addressed the integration requirement in § 92.207(b)(6) overwhelmingly supported the newly proposed provision, which clarifies the prohibition on having or implementing benefit designs that do not provide or administer health insurance coverage or other health-related coverage in the most integrated setting appropriate to the needs of qualified individuals with disabilities. Several noted the particular importance of this provision and access to community integration in light of the COVID–19 pandemic and the higher infection risks associated with congregate settings. A few commenters noted the role that discrimination on multiple bases may play with regard to community integration, highlighting the overrepresentation of people of color in institutional settings, and the relationship between access to effective communication and community integration. Numerous comments included examples of current practices that may violate the integration provision.

Commenters agreed that this provision should apply to both benefit design and implementation of a benefit design, including: coverage, exclusions, and limitations of benefits; prescription drug formularies; cost sharing (including copays, coinsurance, and deductibles); utilization management practices; medical management standards (including medical necessity standards); provider network design; provider reimbursement; standards for provider admission to participate in a network; benefits and service administration contracted to third parties, such as pharmacy benefit managers; and quality measurement and incentive systems. Many commenters requested that OCR clarify that the convenience or potential cost-saving of administering treatments in institutional settings are not legitimate, nondiscriminatory reasons for not providing comparable benefits in less restrictive settings.

Commenters suggested that providing coverage to qualified individuals with disabilities in the most integrated setting appropriate should not be done in a way that unnecessarily increases costs for all enrollees or compromises individual health benefits.

*Response:* We appreciate support for the inclusion of this provision. OCR recognizes the importance of providing and administering health coverage in the most integrated setting appropriate to the needs of qualified individuals with disabilities; we also recognize that discrimination on multiple bases heightens barriers and are committed to addressing allegations of discrimination on all bases protected under section 1557. As discussed in the Proposed Rule, 87 FR 47873, this provision encompasses both the benefit design of the benefit being offered by a covered entity as well as the indirect mechanisms that affect the implementation of the benefit design within a covered entity's control, such as utilization management practices, provider reimbursement, contracting out to third-party contractors such as pharmacy benefit managers, and quality measurement and incentive systems. OCR is not prescriptive in the list of potential mechanisms that could result in prohibited discrimination through implementation of a benefit design because it is a case-by-case analysis depending on the facts of each situation.

With respect to concerns about unnecessarily increasing costs to comply with this provision, OCR notes that institutional care is generally more expensive than community-based care and that increased cost alone is not necessarily a fundamental alteration.[200] However, concerns related to cost can be raised through a fundamental alterations defense.[201]

*Comment:* Nearly all commenters who addressed this provision agreed with the 2022 NPRM preamble language stating that requiring prior authorization, step therapy, or other utilization management when individuals access treatment in the community but not in an institution, would constitute discrimination if the discrepancy results in unnecessary segregation or a serious risk of unnecessary segregation. Commenters noted that these practices place additional terms and conditions on the receipt of certain benefits in integrated settings that are not in place within segregated or institutional settings, and that they can often delay care and cause unnecessary institutionalization. For example, commenters asserted that people with physical and sensory disabilities, complex medical needs, and people with psychiatric and mental disabilities are often required to try less expensive and often unsuccessful medication (*i.e.,* step therapy) before being able to access effective treatments in the community. If utilization management techniques are only required for community-based treatment and not for institutional care, commenters argued this may push individuals urgently in need of care into institutional setting so they can access treatment more quickly. In contrast, one commenter suggested that it may be clinically appropriate to distinguish between institutional settings and home and community-based settings (HCBS) through the use of medical management

---

[200] *Fisher v. Okla. Health Care Auth.,* 335 F.3d 1175, 1183 (10th Cir. 2003).

[201] *Id.* at 1182.

tools like prior authorization and step therapy due to closer monitoring by medical professionals in institutional settings.

*Response:* OCR shares commenters' concerns about the potential discrimination associated with the serious risk of institutionalization. The integration mandates of the ADA and section 504 apply to people with disabilities who are at serious risk of segregation or institutionalization, not only to people with disabilities who are currently in institutions.[202] For example, an individual could show sufficient risk of institutionalization such that it would constitute a violation of this provision if a covered entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety, or welfare that result in the serious risk of institutionalization or segregation.

As articulated in the Proposed Rule, 87 FR 47873, step therapy and other utilization management practices that impose different standards on members or beneficiaries in the community than in institutional settings are discriminatory if the discrepancy results in unnecessary segregation or a serious risk of unnecessary segregation. Section 1557's incorporation of section 504's integration provision through § 92.101(b)(1) makes clear that serious risk of institutionalization is covered under section 1557 as well, given that the vast majority of courts have found section 504 and title II of the ADA prohibits actions, omissions, policies, and practices that place individuals at serious risk of unjustified isolation. Indeed, nearly every court of appeals to address the issue has held that the integration mandate of the ADA and section 504 apply not only to people

with disabilities who are currently in institutions, but also to people with disabilities who are at serious risk of segregation or institutionalization.[203] As noted in *Fisher* v. *Oklahoma,* the integration mandate's "protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force into segregated isolation." [204] Likewise, section 1557's integration mandate would ring hollow if individuals were required to show that they have already had to submit to institutionalization in order to assert their right to receive services in the most integrated setting appropriate to their needs.

Further, even if a serious risk of unnecessary institutionalization was not an actionable claim in and of itself, it would still be appropriate for courts to grant relief to those at serious risk in order to prevent the unnecessary institutionalization prohibited by law.[205] For these reasons, the rule's integration provision explicitly prohibits benefit design that results in a serious risk of institutionalization.

Plans continue to be able to limit services, use utilization review standards, and employ other limitations to manage costs as long as they are not discriminatory in doing so.

OCR has revised the regulation text to clarify that the integration requirement under section 1557 extends to practices that result in the serious risk of institutionalization or segregation. We recognize that the question of what constitutes "serious risk" is a fact-based inquiry, which is why the Federal courts to have considered the question have provided only general guidance on determining risk rather than an exhaustive test.[206]

*Comment:* Several commenters strongly disagreed with the 2022 NPRM

preamble language that stated that a State Medicaid program would generally not be required to provide a new benefit because that would fundamentally alter the nature of the program. Commenters noted that a State Medicaid program or other covered entity may have to expand its HCBS waiver programs or modify eligibility for particular services where necessary to satisfy the integration provision, and that there are many situations in which a State program has been required to create a "new" community-based benefit, where that benefit was previously only available in institutional settings. For example, commenters stated that a covered entity that provides for residential treatment for certain substance use disorder conditions and does not provide coverage of such services in appropriate community-based settings may need to create a "new benefit" by offering an existing institutional benefit in the community.

*Response:* After considering these comments, we clarify here that while a State Medicaid program is not required to create "new" programs to assist people with disabilities, nor are states required to provide a particular standard of care or level of benefits, covered entities must nevertheless adhere to section 1557's disability nondiscrimination requirements—including the integration requirement—with regard to the services they in fact provide. When a covered entity chooses to provide a service, it must do so in a nondiscriminatory fashion by ensuring access to that service in the most integrated setting appropriate to the needs of the qualified individual.[207] States may be required to offer services in an integrated setting that they have only been offering in segregated settings; that is not offering a "new service," but instead is ensuring the service is offered in integrated settings and not just in segregated settings.[208]

---

[202] *See, e.g., Waskul* v. *Washtenaw Cnty. Cmty. Mental Health,* 979 F.3d 426, 460–62, (6th Cir. 2020) ("Plaintiffs may thus state a claim by sufficiently alleging that they are at serious risk of institutionalization"); *Steimel* v. *Wernert,* 823 F.3d 902, 911–12 (7th Cir. 2016) (agreeing that the mandate applies to "persons at serious risk of institutionalization or segregation"); *Davis* v. *Shah,* 821 F.3d 231, 262–64 (2d Cir. 2016) ("We thus hold that a plaintiff may state a valid claim . . . by demonstrating that the defendant's actions pose a serious risk of institutionalization for disabled persons."); *Pashby* v. *Delia,* 709 F.3d 307, 322 (4th Cir. 2013) (individuals state claims under the ADA and the Rehabilitation Act when "they face a risk of institutionalization"); *M.R.* v. *Dreyfus,* 663 F.3d 1100, 1117–18 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir. 2012) (plaintiff must "show that the challenged state action creates a serious risk of institutionalization"); *Fisher* v. *Okla. Health Care Auth.,* 335 F.3d 1175, 1181–82 (10th Cir. 2003) (plaintiffs who "stand imperiled with segregation" because of state action may state a claim under the ADA's integration mandate); *but see U.S.* v. *Miss.,* No. 21–60722, 2023 WL 6138536, at *5–*9 (5th Cir. Sep. 20, 2023) (rejecting the United States' at-risk *Olmstead* claim).

[203] *See supra* footnote 202 (citing cases).

[204] 335 F.3d 1175, 1181 (10th Cir. 2003).

[205] *See, e.g., U.S.* v. *W.T. Grant Co.,* 345 U.S. 629, 633 (1953) (explaining that "[t]he purpose of an injunction is to prevent future violations" and that such relief is appropriate where there is a "cognizable danger of recurrent violation.").

[206] For example, in *Davis* v. *Shah,* 821 F.3d 231, 262–63 (2d Cir. 2016), the court quoted DOJ, noting that "a plaintiff 'need not wait until the harm of institutionalization or segregation occurs or is imminent' " to bring a claim under the ADA. A plaintiff establishes a "sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *See also Waskul* v. *Washtenaw Cnty. Cmty. Mental Health,* 979 F.3d 426, 462 (6th Cir. 2020) (finding "declines in health, safety, or welfare" as to sufficient to show plaintiffs were at serious risk of institutionalization).

[207] *See Olmstead,* 527 U.S. 581, 603 (1999); *see also Radaszewski* v. *Maram,* 383 F.3d 599, 609 (7th Cir. 2004) (citing *Olmstead,* 527 U.S. at 603 n. 14, for the principle "that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide") ("While 'a State is not obligated to create new services,' it 'may violate Title II when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting.' ").

[208] *See* U.S. Dep't of Justice, Civil Rts. Div., *Statement of the Dep't of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.,* Question 8 (February 28, 2020), *https://www.ada.gov/olmstead/q&a_olmstead.htm* (stating that "(p)ublic entities cannot avoid their obligations under the ADA and Olmstead by characterizing as a "new
Continued

OCR clarifies that a program providing community-based services that are already available in institutional settings is not a new program for purposes of evaluating a fundamental alteration defense.[209] In addition, states may be required to offer services in an integrated setting that have only been offered in a segregated setting. Providing services beyond what a State currently covers under its Medicaid program may not be a fundamental alteration under § 92.205 (Requirement to make reasonable modifications), and existing nondiscrimination law, including section 504 and the ADA,[210] may require states to provide those services, under certain circumstances. In addition, to the extent that a benefit, including an optional benefit, is already provided in institutions as part of the State's program, the same or a substantially similar benefit must be offered in the community in a manner that does not incentivize institutional services over community services.

*Comment:* OCR received many comments in response to our request for comment on the application of the integration provision to State Medicaid programs. A number of comments related to Medicaid program designs required by title XIX of the Social Security Act. One commenter recommended that any action by a State Medicaid authority to reduce the existing scope of Medicaid-funded home and community-based long term services and supports, or to more strictly limit eligibility for them, that would have the effect of forcing people with disabilities who currently do, or could, live in their own homes and participate in unrestricted community activities into segregated, congregate, and/or institutional residential or day settings, or to cease their current level of community participation, on the basis of any general categorization of disability would be discriminatory under this provision.

*Response:* We appreciate the many comments highlighting potential issues related to community integration and State Medicaid programs. This rule does not impact the ability of states to target benefits under section 1915(c), section 1915(i), or section 1937 of the Social Security Act, consistent with Medicaid law. At the same time, the fact that a State chooses to use a Medicaid authority to target a particular disability population does not relieve a State of its obligations towards other populations. We will continue to work with our partners in CMS to ensure the robust provision of services in a nondiscriminatory manner to the maximum extent possible. We remind covered entities that obligations under the Medicaid statute are distinct from obligations under section 1557, and compliance with Medicaid requirements does not per se constitute compliance with section 1557.

*Comment:* A significant number of commenters raised concerns with "use-in-the-home" policies, where an insurance issuer will cover the provision of a service solely for use "in the home." For example, commenters discussed that a covered entity might offer supplemental oxygen equipment for use in the home but decline to provide sufficient oxygen or equipment for an individual to access the broader community. Similarly, commenters noted that issuers might decline to cover medically necessary wheelchairs with functions that an individual needs to access the broader community outside their home. Commenters also provided examples of other kinds of medical diagnostic equipment, durable medical equipment, and home-use devices that are often not covered, but which would replace services provided in an institution and enable individuals to receive care in their home and community.

Commenters expressed concern that many State Medicaid programs, delegated managed care companies, and employer-sponsored private health plans have adopted the Medicare Mobility Assistive Equipment Coverage Policy [211] (a policy designed specifically to apply in the context of Medicare Part B) as their policy, despite what commenters see as the statutory differences between Medicare Part B and other authorities. Commenters contended that the unnecessary and unmandated adoption of such a policy in all programs unnecessarily restricts benefits to a low bar, denying people the ability to live in the most integrated setting possible.

*Response:* We appreciate the concerns raised by commenters. Each covered entity should review any legal authority governing the coverage they may provide to ensure that they are not interpreting it in a manner that results in discrimination. For example, Medicaid programs that impose homebound or "in-the-home" criteria that are not statutorily required under Federal law may be unnecessarily restricting services in the community in violation of civil rights laws. Where an in-the-home restriction is included in a statute, covered entities may not automatically deny coverage for any good or service that may also have use outside of the home, but must assess each claim to determine whether the denial will violate the most integrated setting requirement.

*Comment:* Many commenters expressed the need for § 92.207(b)(6), due to states increasingly turning to managed care plans to deliver Medicaid benefits. These commenters expressed concern that large issuers that administer a range of private employer plans and individual plans, as well as public Medicare and Medicaid plans, could employ uniform coverage policies across their plans that do not adequately support community integration. Commenters additionally noted that that Medicaid agencies should monitor whether Medicaid Managed Care Organizations (MCOs) are appropriately authorizing services in the community and that under current law states contracting with MCOs cannot escape liability when MCOs discriminate against people with disabilities.

*Response:* We appreciate the concerns raised by commenters. We recognize the increasing reliance on alternative payment models for the delivery or management of services to individuals with disabilities. The shift towards managed care in State Medicaid programs and other changes, such as quality incentives, quality assurance activities, and risk-sharing arrangements, requires addressing unnecessary segregation in these emerging models in this rule.

As we noted in the Proposed Rule, 87 FR 47873, covered entities designing contracts with MCOs, pharmacy benefit managers, or other third-party entities taking on financial risk for the delivery of health services should carefully scrutinize their capitation,

---

service" services that they currently offer only in institutional settings."); *see also Townsend* v. *Quasim,* 328 F.3d 511, 517 (9th Cir. 2003) ("Here, the precise issue is not whether the state must provide the long term care services sought by Mr. Townsend and the class members—the state is already providing these services—but in what location these services will be provided.").

[209] *See Townsend,* 328 F.3d at 517 ("[c]haracterizing community-based provision of services as a new program of services not currently provided by the state fails to account for the fact that the state is already providing those very same services. If services were to constitute distinct programs based solely on the location in which they were provided, *Olmstead* and the integration regulation would be effectively gutted.").

[210] While this final rule generally references the ADA and section 504, the requirements under this rule are under section 1557, a separate legal authority. Accordingly, the integration requirements, like other requirements under this section 1557 rule, do not limit or impact the interpretation of integration requirements under the ADA and section 504.

[211] U.S. Dep't of Health & Hum. Servs., Ctrs. for Medicare & Medicaid Servs., *National Coverage Determination, Mobility Assistive Equipment (MAE)* (2005), *https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?NCDId=219.*

reimbursement, quality measurement, and incentive structures to ensure that they do not result in the unjustified segregation of individuals with disabilities or place individuals with disabilities at serious risk of institutionalization or segregation. When responsibility for services is shared across multiple entities, for example, under a managed care contract, both the State Medicaid agency and the contracted entity have obligations under this provision if they are both recipients of Federal financial assistance.

*Comment:* Many commenters discussed challenges related to mental health services, noting that the lack of available and funded community alternatives to institutional mental health care will continue to result in the institutionalization of individuals with serious mental illness, whether in hospitals, inpatient psychiatric facilities, prisons, or other secure facilities.

Many commenters voiced concern related to discharge planning, as people requiring intensive mental health services are often referred only to institutional or otherwise congregate care options, rather than comparably intensive services in community-based settings. Commenters recommended that OCR clarify that this can constitute a violation of the integration provision if it forces people with psychiatric disabilities to enter segregated settings in order to receive access to adequate services.

Other commenters discussed the disparity in access to community-based care for children who need mental health care.

*Response:* OCR appreciates the significant concerns related to the availability of community-based behavioral health services, particularly services to address youth mental health. With respect to discharge planning, a hospital or acute care provider that routinely discharges individuals with disabilities, including those with serious mental illness, to nursing homes, psychiatric residential treatment facilities, or other segregated care settings due to discharge planning procedures that do not assess for home-based support services or refer individuals to community-based providers may violate this provision. Covered entities are prohibited from implementing planning, service system design, and service implementation practices that result in the serious risk of institutionalization or segregation.

*Comment:* Several commenters provided insight into the relationship between community integration and

reimbursement rates necessary to sustain a direct care workforce. Commenters explained that individuals receiving care in the community often fail to receive all of the hours of care for which they are approved due to a lack of provider capacity to fully staff the approved hours. Commenters noted that nurse's aides and other individuals who provide assistance in institutional settings are often paid at a higher rate than home health aides and other direct care professionals, resulting in an imbalanced direct care workforce. Commenters emphasized the importance of rate setting to incentivize HCBS.

*Response:* Reimbursement rates and network adequacy both constitute methods of program administration. As such, these are factors that OCR would consider as reimbursement practices or methods of administration related to this provision.

*Comment:* Commenters suggested additional guidance clarifying implementation of this provision, including incorporating DOJ's guidance on enforcement of the integration requirement under title II of the ADA describing how to provide the most integrated setting appropriate for an individual or group of individuals;[212] addressing the remedies available for violations of the integration provision; and explaining how OCR will undertake a fundamental alteration analysis. One commenter recommended incorporating the fundamental alteration defense into regulatory text. Commenters underscored the importance of setting a high bar for a fundamental alteration, noting that programs must alter an essential aspect of the health program or activity. Other commenters urged OCR to clarify how the fundamental alteration analysis applies to the integration provision, including whether and how OCR will incorporate DOJ guidance and case law related to the ADA's fundamental alteration defense for ADA title II entities. Commenters also requested clarification on whether covered entities will be required to establish an *Olmstead* integration plan[213] to raise the

fundamental alteration defense, and if so, guidance related to that requirement.

Commenters also asked OCR to explain in future guidance how covered entities, including Medicaid programs, must coordinate community-based primary care and specialty mental health care and offer case management to avoid discrimination on the basis of disability and to avoid placing individuals with mental disabilities at serious risk of institutionalization.

Commenters further suggested guidance to covered entities explaining the specific HCBS that are essential to achieving compliance with the integration requirement, including as part of EHB. Commenters suggested that it would be discriminatory if EHB plans set higher reimbursement rates for a service or item for individuals in segregated settings rather than community-based settings; if rehabilitation services for physical conditions are covered, but not psychiatric rehabilitation services; and if a particular benefit (such as personal care services) is offered in greater amounts to individuals in segregated settings by virtue of the plan benefit design.

Finally, commenters encouraged OCR to develop joint guidance with DOJ on section 1557, section 504, and titles II, III, and IV of the ADA to ensure the rights of people with disabilities to access community integration in health care settings.

*Response:* We appreciate the comments requesting clarification through sub-regulatory guidance. We will consider future guidance after this rule has been finalized and are committed to our continued partnership with DOJ in developing shared guidance on civil rights requirements. The availability of the fundamental alteration defense is clear as drafted and so we decline to specifically incorporate this recommendation into regulation text. In this final rule, we clarify that a program is not required to provide coverage for a service in the most integrated setting appropriate to an individual's needs if it would fundamentally alter the program to do so.

*Comment:* Commenters, primarily representatives of the insurance industry, supported proposed § 92.207(c) that specified nothing in this section requires coverage of any health service where the covered entity has a legitimate, nondiscriminatory reason for determining that such health service fails to meet applicable coverage

---

[212] U.S. Dep't of Justice, Civil Rts. Div., *Statement of the Dep't of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.* (June 22, 2011), *https://www.ada.gov/olmstead/q&a_olmstead.htm.*

[213] Under the ADA, an *Olmstead* plan is a public entity's plan for implementing its obligation to provide individuals with disabilities opportunities to live, work, and be served in integrated settings. U.S. Dep't of Justice, Civil Rts. Div., *Statement of the Dep't of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.* (June 22,

2011), *https://www.ada.gov/olmstead/q&a_olmstead.htm.*

37612    **Federal Register** / Vol. 89, No. 88 / Monday, May 6, 2024 / Rules and Regulations

requirements, such as medical necessity requirements, in an individual case. Commenters appreciated that OCR acknowledged that a covered entity's legitimate, nondiscriminatory reason for its actions may serve as a defense under this section.

Some commenters requested clarification that use of the phrase "legitimate, nondiscriminatory reason" not be construed in any way to limit the method of proof for any section 1557 claim to the *McDonnell Douglas* burden-shifting framework; that this method cannot be used to defend an express sex classification that causes injury; that the familiar but-for causation test applies to establishing a violation of section 1557; and that the *McDonnell Douglas* burden-shifting framework and legitimate nondiscriminatory reason framework apply to circumstantial evidence cases but not where there is direct evidence of discrimination.

*Response:* OCR appreciates commenters' support of this provision. As discussed throughout this section and in the Proposed Rule, in instances where there is not a facially discriminatory policy and OCR is investigating whether a particular action or practice is discriminatory under this rule, covered entities have the opportunity to defend the challenged action or practice by providing a legitimate, nondiscriminatory reason for its actions that is not pretext for discrimination. OCR will then evaluate whether the reason given by the covered entity is a pretext for prohibited discrimination. When considering whether a proffered reason is pretextual, OCR will consider, among other things, whether a denial of a health service is based on medical necessity standards or other reasonable medical management techniques that are not discriminatory, as discussed in more detail below.

To provide additional clarity about OCR's analysis when evaluating whether a covered entity's legitimate, nondiscriminatory reason is pretextual, OCR is revising § 92.207(c) to state that a covered entity's denial or limitation of a health service must not be based on unlawful animus or bias, or constitute a pretext for discrimination. This modification is consistent with the revised language in § 92.206(c). Under either section, in instances where there is no evidence of a facially discriminatory policy, covered entities may assert a legitimate, nondiscriminatory basis for actions that could otherwise give rise to the inference of discrimination. Consistent with general principles of civil rights law, OCR will consider such asserted bases but may also investigate to

determine whether such asserted bases are pretextual and whether there is evidence that the challenged action was taken because of unlawful animus, bias, or other discriminatory factors.

In evaluating claims of discrimination, OCR relies on general nondiscrimination principles and longstanding civil rights case law. Such principles include, but are not limited to, the multi-factor test articulated in *Arlington Heights* and the *McDonnell Douglas* burden-shifting framework, which were discussed in detail in the Proposed Rule at 87 FR 47865. *Arlington Heights* sets forth a method of proof that utilizes different types of evidence that collectively may demonstrate that a covered entity acted, at least in part, because of a protected basis. The *McDonnell Douglas* burden-shifting framework is an inferential method of proof used to show that a covered entity treated similarly situated individuals differently because of a protected basis. Under *McDonnell Douglas*, where non-facial evidence of discrimination exists, a covered entity must articulate a legitimate, nondiscriminatory reason for its actions. The entity's legitimate, nondiscriminatory reason may refute the evidence of discrimination, unless it can be established that this reason is a mere pretext for prohibited discrimination. In response to the commenters' concerns about how § 92.207(c) may be interpreted inconsistently with the principles set forth in *McDonnell Douglas* and other civil rights principles, please see our response to the same comments under § 92.206 in which we affirm commenters' interpretations are correct—*McDonnell Douglas'* burden-shifting framework and legitimate nondiscriminatory reason framework apply to circumstantial evidence cases but not in cases where there is direct evidence of discrimination based on a facially discriminatory policy.

*Comment:* Some commenters appreciated OCR clarifying that medical management techniques based on clinical evidence are permitted, including the use of reasonable medical necessity and utilization management techniques based on clinical standards and evidence-based guidelines, when applied in a neutral manner. Commenters noted that medical management tools provide an important role in promoting quality care and reducing health care costs.

Other commenters raised concerns about medical necessity criteria and other medical management tools, noting that such tools may limit access to needed services and treatment.

Commenters noted that discriminatory decisions often occur under the guise of medical necessity determinations. Some commenters argued that medical management practices such as prior authorization, step therapy, and durational or quantity limits are inherently discriminatory and inconsistent with patient health and safety. Many commenters strongly supported OCR clarifying that excessive use or administration of benefit utilization management tools that target particular disabilities could violate section 1557. Commenters asked OCR to expressly note the limitation on the use of utilization management tools in the text of the regulation.

Commenters asked OCR for examples of excessive medical management and suggested the following examples: requiring step therapy for new enrollees who are already on a working course of treatment; transferring management of particular medicines to niche vendors that apply more extensive medical management through specialty carve-out programs; requiring the use of off-label medications within step therapy; and imposing categorical prior authorization and step therapy requirements on most or all drugs required to treat a particular disease. Commenters noted that issuers apply such medical management techniques to discourage individuals with high-cost needs from enrolling in their plans. A commenter cited evidence that plans have restricted access to lower-cost brand drugs and generics when demand for those drugs attracts patients who have overall high health costs.[214] Other commenters noted that information about treatment limitations can be difficult to find for enrollees and cited evidence of issuers building arbitrary coverage denials into their business plans.[215] Commenters cited a study that found that more than half of step therapy policies developed by commercial health plans were more

---

[214] Michael Geruso et al., *Screening in Contract Design: Evidence from the ACA Health Insurance Exchanges,* 11 a.m. Econ. J.: Econ. Pol. 2, 64–107 (2019), *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8130799/.*

[215] Karen Pollitz et al., *Claims Denials and Appeals in ACA Marketplace Plans in 2021,* Kaiser Family Found. (2022), *https://www.kff.org/private-insurance/issue-brief/claims-denials-and-appeals-in-aca-marketplace-plans/* (finding nearly 17 percent of in-network claims in non-group qualified health plans were denied in 2021; insurer denial rates varied widely around this average, ranging from 2 to 49 percent; about 14 percent were denied because the claim was for an excluded service, 8 percent were due to lack of preauthorization or referral, 2 percent were based on medical necessity, and 77 percent were classified as "all other reasons").

restrictive than recommended clinical guidelines.[216]

Some commenters requested that OCR revise the text of § 92.207(c) to state that, in addition to medical necessity requirements, covered entities may employ reasonable medical management techniques.

*Response:* OCR appreciates the variety of comments and recommendations put forth by commenters related to the rule's coverage of medical management techniques, including medical necessity standards and utilization management techniques.

OCR agrees that revising the regulatory text to reference reasonable medical management techniques would provide clarity and would be consistent with other provisions in the ACA and the Proposed Rule. Therefore, OCR is revising § 92.207(c) to state that applicable coverage requirements include reasonable medical management techniques, including medical necessity.

Further, as stated in the Proposed Rule, covered entities are not prohibited from employing reasonable medical management techniques as long as they are not discriminatory and are not otherwise prohibited under other applicable Federal and State law. 87 FR 47873–74. As just one example, covered entities participating in the Medicaid program under title XIX of the Social Security Act are not prohibited from implementing nondiscriminatory utilization management techniques, such as prior authorization.[217]

Under § 92.207(c), an issuer may assert a legitimate, nondiscriminatory reason for its denial or limitation of coverage of a health service that asserts the denial was based on medical necessity standards—or any other medical management technique. When assessing whether the challenged action was based on prohibited discrimination rather than on nondiscriminatory medical necessity standards, OCR will review a medical necessity determination only to make sure that it is a bona fide medical judgment, not conduct a review of the medical judgment underlying the medical necessity determination, but rather will

assess whether the rationale for the denial was based on impermissible discriminatory considerations. In its review, OCR may require a covered entity to provide the following information: its medical necessity standards or guidelines; the clinical, evidence-based criteria or guidelines[218] relied upon to make the medical necessity determination; and the medical substantiation for the medical necessity determination. As discussed previously, OCR will evaluate a covered entity's assertion that its actions were based on legitimate, nondiscriminatory reasons to determine if it is pretextual. Medical necessity determinations that are not based upon general medical judgments or based on clinical, evidence-based criteria or guidelines may be considered evidence of pretext for discrimination.

Similarly, as noted in the Proposed Rule, 87 FR 47872, we affirm that covered entities are not prohibited from using other reasonable medical management techniques, such as utilization management tools, when applied in neutral, nondiscriminatory manner and not otherwise prohibited under other applicable Federal and State law. Utilization management techniques include prior authorization,[219] step therapy (or "fail-first"),[220] and durational or quantity limits.[221]

OCR shares commenters' concerns about potentially discriminatory practices related to medical management techniques and the negative impacts of excessive utilization management. As such, when relying on

medical necessity requirements and other medical management techniques to deny coverage for a health service, covered entities must ensure that such tools are developed and applied in a neutral, nondiscriminatory manner. OCR would have concerns about guidelines that establish more restrictive requirements for certain diseases or conditions without a nondiscriminatory justification. In addition, OCR expects that limitations within such guidelines should be applied consistently with clinical standards within each patient population disease state, condition level, and diagnostic category to ensure equal clinical treatment across protected bases. That is, all patients diagnosed with a particular disease state must receive the same treatment that is deemed clinically appropriate, regardless of their race, color, national origin, sex, age, or disability.

We affirm that excessive use or administration of utilization management practices that target a particular condition that could be considered a disability or other prohibited basis under section 1557 could be discriminatory under this rule. OCR declines to state in preamble or regulatory text that specific practices are per se discriminatory under section 1557. As discussed throughout this section, OCR must conduct a fact-specific inquiry into allegations of discriminatory actions and consider a covered entity's proffered reason for the challenged action.

*Comment:* OCR received a number of comments discussing costs as a legitimate, nondiscriminatory reason for benefit designs under § 92.207(c). Commenters supported the rule allowing clinical evidence to support a benefit design and requested that OCR allow covered entities to use extraordinary costs as justification for certain benefit designs. Commenters stated that covered entities use utilization management controls, such as drug tiering, as part of their benefit design to keep coverage affordable. Commenters noted concerns that high-cost drugs or other services could lead to health plans becoming insolvent if they are unable to apply utilization management controls where all treatments for a particular condition are high cost, particularly when they are expensive new drugs or gene therapies. Commenters argued that issuers and plans must retain some flexibility in their approach to covering and paying for high-cost drugs and services. Commenters expressed concern that § 92.207 would prohibit covered entities from having utilization management controls on all or most drugs or services

---

[216] Kelly L. Lenahan et al., *Variation in Use and Content of Prescription Drug Step Therapy Protocols, Within and Across Health Plans,* 40 Health Affairs 11, 1749–57 (2021), *https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2021.00822?journalCode=hlthaff* (finding that plans applied step therapy in 38.9 percent of drug coverage policies, with varying frequency across plans (20.6–57.5 percent); 34.0 percent were consistent with corresponding clinical guidelines, 55.6 percent were more stringent, and 6.1 percent were less stringent).

[217] *See, e.g.,* 42 U.S.C. 1396r–8(d).

[218] *See also* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2023, 87 FR 27208, 27296–300 (May 6, 2022) (discussing newly promulgated 45 CFR 156.125(a), which states "[a] non-discriminatory benefit design that provides [EHB] is one that is clinically-based").

[219] Medicare defines "prior authorization" as "the process through which a request for provisional affirmation of coverage is submitted to CMS or its contractors for review before the service is provided to the beneficiary and before the claim is submitted for processing." 42 CFR 419.81 (Medicare definition of "prior authorization" for hospital outpatient department services). *See also* Ctrs. for Medicare & Medicaid Servs., *Prior Authorization Process for Certain Hospital Outpatient Department (OPD) Services Frequently Asked Questions (FAQs),* Q1 (Dec. 27, 2021), *https://www.cms.gov/files/document/opd-frequently-asked-questions.pdf.*

[220] Medicare defines "step therapy" for the Medicare Advantage Program as a "utilization management policy for coverage of drugs that begins medication for a medical condition with the most preferred or cost effective drug therapy and progresses to other drug therapies if medically necessary." 42 CFR 422.2.

[221] Durational or quantity limits place limits on the frequency or number of benefits to be provided, such as limiting therapy visits to once per week or limiting prescription drug coverage to a 30-day supply of a medication.

**37614** **Federal Register** / Vol. 89, No. 88 / Monday, May 6, 2024 / Rules and Regulations

that treat a particular condition or disease, regardless of their cost, and asked OCR to affirm that placing all treatments for a certain disease or condition in one tier may not in fact be discriminatory by default, but rather an appropriate benefit design due to the high cost of those particular items or services.

Conversely, other commenters asked OCR to clarify that covered entities cannot justify benefit designs that disfavor coverage for medically necessary services based on cost savings. Commenters noted that as costs of medications and therapies have increased, covered entities have significantly increased the use of utilization management, including adding arbitrary prior authorization processes not based in clinical evidence for new cancer therapies. They added that rare disease patients face the additional challenge of having no or few treatment alternatives if a preferred medication or therapy is not covered.

*Response:* OCR reiterates that § 92.207 does not prohibit a covered entity from engaging in reasonable utilization management techniques applied in a neutral, nondiscriminatory manner and that are not otherwise prohibited under other applicable Federal and State law. As noted above, excessive use or administration of utilization management tools that target a particular condition that could be considered a disability or other prohibited basis could violate section 1557. Where there is an alleged discriminatory practice or action that is not based on a facially discriminatory policy, § 92.207(c) provides that the covered entity has the opportunity to provide a legitimate, nondiscriminatory reason for the practice. Covered entities are not restricted in what information they elect to provide to OCR as part of their justification for the challenged practice or action. OCR will carefully review a covered entity's proffered reason to ensure it is not pretext for discrimination.

OCR discussed previously that determinations on whether a particular benefit design feature is discriminatory, such as utilization management or drug tiering, will be made on a case-by-case basis. Accordingly, OCR declines to specify whether certain benefit design practices are per se discriminatory.

*Comment:* One organization raised concerns that OCR is asserting *de facto* authority over the relationship between health insurance and medical care, and that OCR is asserting that it has authority under section 1557 to regulate the practice of medicine and the structure of health insurance coverage

according to its own determination of what is "appropriate" and "nondiscriminatory," along with the authority to definitively determine what is, or is not, the current standard of medical care. The commenter further states that OCR may in the future assert and exercise similar claims of authority with respect to other medical practices, standards of care, or health insurance coverages.

*Response:* As previously discussed throughout this preamble, section 1557 was intended to prohibit discrimination in health insurance coverage and other health-related coverage, as the statute's plaint text makes apparent. Congress expressly granted the Secretary the authority to promulgate regulations to implement section 1557. 42 U.S.C. 18116(c). Therefore, OCR is acting within its statutory authority in promulgating this final rule to regulate health insurance coverage or other health-related coverage provided or administered by a recipient health insurance issuer or other covered entity. OCR disagrees with the commenter that this rule establishes a standard of medical care, or requires certain health insurance coverages. As specified in the preceding discussion, when assessing whether a challenged action was based on prohibited discrimination rather than on nondiscriminatory medical necessity standards, OCR will not conduct a general review of the medical judgment underlying the medical necessity determination, but rather will assess whether there is facial or other direct evidence of discriminatory intent or if a proffered rationale for the denial was pretext for discrimination. Further, this final rule does not require coverage of a particular health service; rather, it requires that the coverage being offered must be provided in a neutral and nondiscriminatory manner.

*Comment:* Commenters stated that issuers should provide transparent information on coverage details, utilization management practices, denial rates, and reasons for denials. Specifically, a commenter requested that this section be strengthened by implementing a requirement for health plans to disclose medical necessity determinations when care or coverage is denied based on medical necessity to individual enrollees. The commenter further suggested that OCR adopt the approach in the MHPAEA final rule, requiring disclosure of medical necessity criteria to potential beneficiaries or enrollees and the reasons behind denials of coverage or reimbursement. Commenters emphasized that disclosure would help providers and consumers to identify and

challenge discriminatory denials of medically necessary care, which can be difficult to do when data regarding the coverage they need either does not exist or the issuer holds the data on details of coverage, denial rates, and reasons for denial.

*Response:* OCR agrees with commenters that transparency about medical management policies and coverage determinations and denials is useful information for the public, and we encourage issuers to disclose such information to all enrollees. OCR considered requiring issuers to affirmatively disclose certain plan information to the public, but we decline to do so at this time. We have determined that placing a transparency requirement on health insurance issuers covered under section 1557 would not be helpful to issuers if required in every situation, and because the scope and application of section 1557 is broader than, and imposes different requirements from, MHPAEA. We stress that OCR has the authority to request and receive information from a covered entity on the details of coverage, medical management policies, denial rates, and reasons for denials, among other things, when necessary to determine compliance with section 1557.[222] In addition, we note that appeals processes that subject individuals protected by section 1557 to excessive administrative burdens in accessing coverage benefits that other enrollees are not required to navigate when accessing coverage may be discriminatory under section 1557.

*Comment:* OCR received many comments on the use of value assessment methods in benefit design and pricing and coverage decisions, and their impacts on treatments for people with disabilities and older adults, particularly in access to prescription drugs and benefit design. Commenters suggested that some payers use these assessment methods to steer patients away from newer or more innovative treatments to less effective options. Commenters on this issue appreciated OCR's recognition in the Proposed Rule that these methods can have discriminatory impacts, though commenters did not provide uniform input about how to address these impacts.

Several commenters called for increased oversight of value assessment methods by OCR, and some called on OCR to ban the use of the quality-

---

[222] 45 CFR 92.303 (section 1557); 80.6 (title VI); 84.61 (section 504, incorporating title VI's § 80.6); 86.71 (title IX, incorporating title VI's § 80.6); 91.34 (Age Act).

adjusted life year (QALY) framework and similar methods. Commenters supporting a ban on the use of QALYs stated that these methods are inherently discriminatory because they assign a lesser numerical value to extending the lives of people with disabilities and older adults compared to people without disabilities or younger persons, especially when applied to benefit design or access to prescription drugs.[223]

*Response:* OCR recognizes that value assessment methods can be helpful tools in making decisions in various contexts within health care and are used widely. The use of value assessment methods that result in discrimination on the basis of race, color, national origin, age, disability and sex are prohibited under section 1557's general mandate of nondiscrimination. That is, where a value assessment uses methods that penalize patients or groups of patients on a ground protected by section 1557 and where such methods then result in limiting access to an aid, benefit, or service, they may violate section 1557. In response to commenters, we note that value assessment tools cannot be used to, to deny or afford an unequal opportunity to qualified individuals with disabilities or on the basis of age with respect to the eligibility or referral for, or provision or withdrawal of any aid, benefit, or service, including the terms or conditions under which they are made available. We further note that methods of value assessment are permissible so long as they do not discriminate in discounting the per-year value of life extension on the basis of age or disability under section 1557.

In addition, OCR has proposed a prohibition against the discriminatory use of value assessment methods in pending rulemaking under section 504. 88 FR 63409. Proposed § 84.57, which applies to recipients of Federal financial assistance from HHS, prohibits, directly or through contractual, licensing, or other arrangements, using any measure, assessment, or tool that discounts the value of life extension on the basis of

disability to deny or afford an unequal opportunity to qualified individuals with disabilities with respect to the eligibility or referral for, or provision or withdrawal of any aid, benefit, or service, including the terms or conditions under which they are made available.

Given that many different measures exist for use in value assessment and may be applied in different ways, this discussion applies to evaluating any value assessment methodology rather than commenting on specific measures at this time. However, we appreciate the concerns raised by the commenters and will take them into account as OCR proceeds with future work on value assessment.

*Comment:* Many comments on value assessment also requested further development of new value assessment measures and the incorporation of input from patients with disabilities (and, per some commenters, their family members and providers) into value assessment schema. Commenters urged the Department to support the development and dissemination of these methodologies. Another commenter noted that cultural barriers existed in institutions that prevented the adoption of new metrics.

*Response:* OCR appreciates commenters' input and encourages and supports the development of such metrics and the incorporation of input from people with disabilities and other interested groups protected under section 1557, as reflected in research priorities elsewhere in the Department. Numerous research and grantmaking initiatives from the National Institutes of Health (NIH) and the National Institute on Disability, Independent Living, and Rehabilitation Research (NIDILRR) support this and similar efforts.[224] In addition, OCR notes that the National Council on Disability issued an updated policy brief released in November 2022.[225]

Benefit Design Analysis

The comments and our responses regarding benefit design are set forth below.

In the Proposed Rule, we discussed that OCR will apply basic nondiscrimination principles to the facts of the particular plan or coverage when analyzing allegations of discrimination under this section to determine if the challenged action is unlawful. We discussed that, consistent with general principles in civil rights law, covered entities will have the opportunity to articulate a legitimate, nondiscriminatory justification for an alleged discriminatory action or practice, and that OCR will scrutinize the justification to ensure it is not a pretext for discrimination.

*Comment:* Some commenters requested that OCR provide additional guidance explaining how it intends to investigate potential violations by health programs or activities engaged in providing or administering health insurance coverage or other health-related coverage and to ensure ongoing compliance with Federal law. Commenters urged OCR to establish clear, predictable standards that covered entities can rely upon when designing their plans and that will ensure OCR's "case-by-case" analysis does not result in only retroactive reviews of existing plans or lead to arbitrary results.

Another commenter noted that if OCR will not provide presumptively discriminatory benefit design examples, OCR should provide more information to educate covered entities about what OCR interprets to be best practices other than the information, corrective plans, and resolution agreements it stated it would publish on its website in the 2016 Rule. The commenter urged OCR to publicly publish deidentified information on each and every investigation that it pursues, including the specific actions purported to be discriminatory by a covered entity, the alleged basis of discrimination, and OCR's resolution of the complaint so that covered entities can educate themselves on best practices and actions that OCR may deem to be discriminatory.

*Response:* We appreciate the comments requesting further specificity regarding OCR's analysis when investigating potential violations under this section. We agree that providing clarity to covered entities promotes compliance and reduces prohibited discrimination. Each potentially discriminatory action involves unique

---

[223] These concerns were also highlighted in testimony at a recent Congressional hearing on proposed legislation to ban the use of QALYs in all Federal health programs. *See Lives Worth Living: Addressing the Fentanyl Crisis, Protecting Critical Lifelines, and Combatting Discrimination Against Those with Disabilities: Hearing on H.R. 467, H.R. 498, H.R. 501, and H.R. 485 Before the Subcomm. on Health of the H. Comm. on Energy & Com.*, 118th Cong. (2023) (statement of Kandi Pickard, President & CEO, Nat'l Down Syndrome Society), *https:// d1dth6e84htgma.cloudfront.net/Witness_ Testimony_Pickard_HE_02_01_2023_ 065c903370.pdf?updated_at=2023-01- 30T21:38:38.787Z* (speaking on her support of Protecting Health Care for All Patients Act, H.R. 485, 118th Cong. (2023)).

[224] Funding Opportunity Announcement, U.S. Dep't of Health & Hum. Servs., Nat'l Insts. of Health, *NIH Faculty Institutional Recruitment for Sustainable Transformation (FIRST) Program: FIRST Cohort (U54 Clinical Trial Optional)* (December 8, 2020), *https://grants.nih.gov/grants/ guide/rfa-files/RFA-RM-20-022.html*; U.S. Dep't of Health & Hum. Servs., Adm. for Cmty. Living, *Disability and Rehabilitation Research Projects (DRRP) Program, https://acl.gov/programs/research- and-development/disability-and-rehabilitation- research*; U.S. Dep't of Health & Hum. Servs., Nat'l Insts. of Health, *All of Us Research Program, https://allofus.nih.gov/*.

[225] Nat'l Council on Disability, *Alternatives to QALY-Based Cost-Effectiveness Analysis for Determining the Value of Prescription Drugs and Other Health Interventions* (2022), *https:// www.ncd.gov/report/alternatives-to-qaly-based- cost-effectiveness-analysis-for-determining-the-*

*value-of-prescription-drugs-and-other-health- interventions/.*

abortion coverage and services.[313] Each of these laws continues to apply and is not affected by this rule. Accordingly, it is not necessary to incorporate title IX's abortion neutrality provision.

OCR emphasizes that a covered provider's decision not to provide abortions or abortion coverage does not itself constitute discrimination in violation section 1557. As described above, section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in covered health programs or activities. As such there may be nondiscriminatory reasons for a provider not to offer abortion care or coverage. A covered entity does not engage in discrimination prohibited by section 1557 if it declines to provide abortions based on religious or conscience objections to performing the procedure, based on a professional or business judgment about the scope of the services it wishes to offer, or for any other nondiscriminatory reason.

*Comment:* Many commenters who supported OCR's proposal noted that section 1557 does not require incorporation of title IX's abortion neutrality provision because if Congress wanted to include such a provision, it would have done so either by explicitly referencing title IX's abortion neutrality provision or by including text matching 20 U.S.C. 1688. Commenters suggested that silence on the incorporation or importation of title IX's abortion neutrality provision is not an oversight on the part of Congress, but instead an intentional decision, as Congress legislates with knowledge of the basic rules of statutory construction.

Many commenters stated that the Congressional drafters of section 1557 did not pick and choose among the multiple title IX exceptions, including those specific to military training, admissions decisions, and membership practices of certain tax-exempt organizations, and that there is no justification for OCR to do so either. They maintained that the statute only references title IX for the prohibition of sex discrimination. Commenters also said there was no need to import title IX's abortion neutrality provision given the availability of existing Federal statutory protections for covered entities and individuals who object to the provision, payment, or referral of abortion services. Many commenters noted that OCR proposed a process in which a covered entity could seek an exemption based on conscience or religious conflicts. These commenters argued that, where permitted by

relevant Federal laws, such analysis by OCR would also account for any potential harm to third parties.

*Response:* For the reasons we set forth above, OCR maintains that importing title IX's abortion neutrality provision in this rule is not legally required by the statute.

*Comment:* Other commenters who supported not importing the title IX abortion neutrality provision suggested that the final rule should include the Proposed Rule's discussion that EMTALA protects emergency care for pregnancy-related conditions, including termination of pregnancy. Some commenters expressed that the final rule should make clear that section 1557 incorporates section 1303(d) of the ACA, 42 U.S.C. 18023(d), which states that nothing in title I of the ACA relieves any health care provider from providing emergency services as required by EMTALA.

*Response:* OCR does not enforce EMTALA and directs commenters to the discussion of EMTALA under § 92.3. OCR notes that the 2022 NPRM's discussion of EMTALA does not alter any requirements under section 1557, EMTALA's existing obligations, or the Department's previous guidance regarding EMTALA. Nothing in this rule changes or otherwise affects any health care provider's obligations with respect to EMTALA, including with respect to the rights, remedies, procedures, or legal standards available to individuals and entities under section 1303(c) of the ACA.

*Comment:* Many commenters objected to OCR's proposal that it was not required to import title IX's abortion neutrality provision in this rule. These commenters argued that the provision must be included to explicitly address that section 1557 and its implementing regulations are abortion neutral. Some commenters maintained that the 2022 NPRM's request for comment on whether "it could be beneficial to include a provision specifically prohibiting discrimination on the basis of pregnancy-related conditions as a form of sex-based discrimination," 87 FR 47879, constituted an "abortion mandate" that would discriminate against providers and covered entities who object to abortion. Some commenters stated that the inclusion of "pregnancy or related conditions" as a form of sex discrimination without importing title IX's abortion neutrality provision would strip providers of their ability to object to pregnancy terminations. Some commenters acknowledged that other Federal laws exist to protect religious freedom and conscience, but nevertheless expressed

concerns that absent the provision's adoption of title IX's abortion neutrality provision, health care providers and entities with religious objections would be left without protections and would be forced to provide, cover, pay, or refer for abortion services.

*Response:* OCR appreciates commenters' concerns, but for the reasons stated above, we disagree. A covered entity does not engage in discrimination prohibited by section 1557 if it declines to provide, pay for, cover, or refer for abortions based on religious or conscience objections to performing the procedure. OCR also intends to enforce and comply with all applicable religious freedom and conscience protections, including section 1303 of the ACA, the Weldon, Church, and Coats-Snowe amendments, RFRA, and other applicable religious freedom and conscience laws. We have added a procedure for recipients whereby they may rely on such protections or seek assurance of those protections, if they wish. See § 92.302.

*Comment:* Other commenters who objected to the Department's position contended that, on the one hand, OCR was relying on title IX's regulations to prohibit discrimination on pregnancy-related conditions, while, on the other hand, ignoring title IX's statutory abortion neutrality provision and religious exception. These commenters argued that OCR is arbitrarily and capriciously picking and choosing which provisions of title IX to implement. They stated that, under title IX, declining to provide or pay for any service related to abortion is not treated as prohibited sex discrimination and therefore it cannot be that the same action, under section 1557, could constitute prohibited sex discrimination. Several commenters argued that the abortion neutrality provision, unlike title IX's exceptions, is a rule of construction that applies to all of title IX, including the statute's prohibition on sex discrimination, and thus OCR must incorporate the provision into any section 1557 implementing regulations.

*Response:* OCR appreciates commenters' concerns. As we explained above, however, section 1557 incorporates some, but not all, parts of title VI, title IX, the Age Act, and section 504. Specifically, section 1557 incorporates the "ground" of discrimination and the "enforcement mechanisms" under the referenced statutes, including title IX. Section 1557 is best read to incorporate existing interpretations of what constitutes sex discrimination under title IX, including regulatory interpretations and case law.

---

[313] *See* 42 U.S.C. 18023(b).

But section 1557 does not incorporate provisions of title IX or that statute's regulations that do not define or interpret what constitutes a ground of discrimination or an enforcement mechanism. Those provisions include the religious exception and the abortion neutrality provision. This reading gives meaning to every term in section 1557, while recognizing that although the statute incorporates parts of other civil rights statutes, each statute addresses distinct issues and contexts. Title IX's abortion neutrality provision is a rule of construction as to what action can be required of recipients under title IX, but nothing in the provision states that it construes what constitutes a ground of prohibited discrimination. In section 1557, Congress was explicit in the limited incorporation of title IX when it listed only the ground to be prohibited by itle IX and the enforcement mechanisms that apply, and the title IX abortion neutrality provision is not an enforcement mechanism.

*Comment:* Many commenters stated that OCR's proposal to not import the title IX abortion neutrality provision is contrary to Congress's intent when it drafted section 1557 and explicitly adopted by reference the entire title IX scheme under 20 U.S.C. 1681 *et seq.* Commenters stated that enactment of title IX did not simply prohibit sex discrimination, because at least two categories of conduct are not, in Congress's view, what constitutes sex discrimination for purposes of title IX—religious decisions by an entity that conflict with the terms of title IX and the refusal to provide or pay for abortion. In their view, this means that OCR cannot prohibit discrimination based on termination of pregnancy or abortion as a form of sex discrimination.

*Response:* OCR appreciates commenters's concerns but disagrees that the manner in which Congress chose to cite title IX in section 1557 indicates an intent to limit what constitutes discrimination of the basis of sex for the reasons stated above. OCR specifically disagrees that the inclusion of ''*et seq.*'' indicates Congress's intent to incorporate the entire statute, thereby negating Congress's use of the terms ''ground prohibited'' and ''enforcement mechanisms'' when describing which portions of title IX shall be incorporated in section 1557. Moreover, as discussed in detail above (*see* Treatment of the Title IX Religious Exception), OCR's analysis considers the entire statute, including title IX's specific limitation to the context of educational programs and activities.

*Comment:* Commenters argued that title IX's adoption by reference supports Congress's longstanding position to legislate in a manner that remains neutral with respect to abortion. In support of this view, some commenters pointed to the Pregnancy Discrimination Act of 1978, where Congress prohibits discrimination on the basis of pregnancy, childbirth, or related medical conditions, but also explicitly included an exemption for health insurance benefits for abortion which, in their view, demonstrates Congress's intent to remain neutral on abortion.

*Response:* OCR will adhere to the specific terms Congress enacted in section 1557 as well as other applicable Federal laws, including section 1303 of the ACA, the Weldon, Church, and Coats-Snowe amendments, RFRA, and other applicable religious freedom and conscience laws.

*Comment:* Other commenters who objected to OCR's proposal not to import title IX's abortion neutrality provision in the rule expressed concern that OCR ignored section 1303 of the ACA, 42 U.S.C. 18023, which they opine requires abortion neutrality throughout the ACA. For example, commenters discuss that section 1303(a), which gives States the option to prohibit abortion coverage in health plans, would be rendered meaningless if the final rule requires such coverage by either prohibiting discrimination on the basis of pregnancy-related conditions or by failing to include a provision establishing section 1557's abortion neutrality. Commenters stated that section 1303 forecloses any construction of section 1557 that would require the provision or coverage of abortion.

*Response:* OCR appreciates commenters's concerns regarding section 1303's applicability to section 1557. Section 1303(a) provides that States and qualified health plans may, to the extent allowed by State law, opt to offer or prohibit abortion coverage; it does not require that section 1557 to import the language of title IX's abortion neutrality provision. Section 1303 primarily grants States flexibility to decide whether qualified health plans sold through their respective Exchanges can include coverage benefits for abortion services. *See* 42 U.S.C. 18023(a) (''State opt-out of abortion coverage''). And, unless otherwise prohibited by State law, participating issuers may elect to cover abortion services in qualified health plans. For qualified health plans that elect to offer as a coverage benefit abortion services for which Federal funding is prohibited, section 1303 establishes separate accounting requirements to ensure Federal funds are segregated and maintained separate from a policy holder's out-of-pocket

funds, which may pay for abortion coverage. 42 U.S.C. 18023(b)(2)(B)–(C). OCR acknowledges that section 1303 allows qualified health plans the independence to choose whether to provide abortion coverage where consistent with State law, but it does not command that the final rule import title IX's abortion neutrality provision.

OCR reiterates, moreover, that a covered provider's decision not to provide abortions or abortion coverage does not itself constitute discrimination in violation of section 1557. A covered entity that generally offered abortion care could violate section 1557 if, for example, it refused to provide an abortion to a particular patient because of their race or disability. But a covered provider does not engage in discrimination prohibited by section 1557 if it declines to provide abortions based on religious or conscience objections to performing the procedure, based on a professional or business judgment about the scope of the services it wishes to offer, or for any other nondiscriminatory reason. Further, OCR maintains that importing title IX's abortion neutrality provision is not required given the recognition of the ACA provisions on abortion and the inclusion of those provisions in regulatory text.

*Comment:* Several commenters pointed to the Weldon and Church Amendments to assert that OCR does not have the authority to prohibit discrimination on the basis of pregnancy termination and requested that OCR include title IX's abortion neutrality provision to avoid any uncertainty on the issue. Other commenters urged OCR to include affirmative language in the final rule that section 1557 does not require the provision of, referral for, or coverage of abortion to eliminate any uncertainty maintained by many religious providers.

*Response:* OCR remains committed to upholding the Federal laws, including the abortion and conscience provisions of the ACA itself, the Church, Coats-Snowe, and Weldon Amendments; the generally applicable requirements of RFRA; and other applicable Federal laws that provide protection to covered entities. It is not necessary to include title IX's abortion neutrality provision in the final rule to provide certainty as to the safeguards in place to protect religious freedom and conscience. As discussed, a covered entity does not engage in discrimination prohibited by section 1557 if it declines to provide abortions based on religious or conscience objections to performing the procedure. Also, we refer again to the process described at § 92.302, whereby

*Comment:* Many other commenters expressed the view that this change in position by the Department reflects the evolution of how the Part B program operates today. Commenters explained that while Part B once served as contracts of insurance for those who qualified, today, individual providers directly bill and receive payment from the Federal Government itself.

*Response:* The Department acknowledges commenters' point that the current manner in which the Part B program is administered is a factor in our changed view on whether Part B funds meet the definition of "Federal financial assistance". As the commenters noted, a majority (²⁄₃) of providers enrolled in Part B bill and are paid directly by the Medicare program. 87 FR 47889. However, this is not solely determinative regarding the change in interpretation. As noted in the 2022 NPRM, under *Grove City College* v. *Bell,* 465 U.S. 555, 569 (1984), Federal funds are Federal financial assistance regardless of whether they are provided directly by the Federal Government to an entity or are provided initially to beneficiaries (*i.e.,* program participants) for the specified purpose of assisting with payment for services.

*Comment:* Several commenters stated that this change in position will increase equity in access to quality health care for individuals with LEP, immigrants, and communities of color, as these groups are more likely to participate in Part B. Other commenters expressed the view that this interpretation allows the Department to align Part B providers' nondiscrimination obligations to Medicare Part A, which will result in better care for individuals with disabilities and will eliminate confusion for older adults who cannot determine whether their Part B provider receives any other type of Federal financial assistance. Other commenters stated that this will offer significant relief for older patients, individuals with disabilities, and LGBTQI+ adults by providing the same protections and rights regardless of the nature of the Medicare provider or the service they are receiving. These patients will no longer have to determine whether they are eligible for both Medicare and Medicaid, or whether they have Medicare or Medicaid, in order to assess what nondiscrimination protections they are afforded. A few commenters expressed the view that this will be particularly helpful for enrollees who rely on small specialty providers for care, such as medical equipment suppliers, that receive only Part B and no other form of Federal financial

assistance. Several other commenters also explained that because many Medicare providers also serve people with other forms of health coverage, including private insurance, this change will increase access to quality health care for underserved communities who face disproportionate discrimination and barriers.

*Response:* The Department appreciates these comments and generally agrees that bringing all Medicare programs in line with other Federal financial assistance programs will bring about better health outcomes and increase equity in access to care. This position is also supported by the similarities across the Medicare programs and eliminates an inconsistency in the application of the definition of "Federal financial assistance" that the Department has determined is no longer justifiable.

*Comment:* A few commenters suggested that the Department should have a delayed date for when the revised interpretation regarding Part B payments as Federal financial assistance becomes effective. Some suggested at least 180 days and up to 365 days for newly covered providers to reach compliance for those practices that have not been subject to these requirements in the past. Several commenters stated that newly covered entities will need sufficient time to implement appropriate procedures, such as having a one-year applicability date or a safe-harbor compliance window of at least 6 months. However, one commenter expressed that the Department should impose the same implementation timeline for all covered entities, given that, in their view, very few entities will be providers who are not already Federal financial assistance recipients. This commenter explained that additional time is not necessary because OCR is also providing entities with technical assistance to reach compliance.

*Response:* The Department appreciates commenters' concerns and has amended the applicability date to give newly covered recipients sufficient time to come into compliance with civil rights obligations, as described below in the "Summary of Changes." As this new designation of Part B applies to all Federal financial assistance-based civil rights statutes enforced by the Department, to the extent covered entities require assistance, OCR will provide adequate support.

Notice of Interpretation and Dates

A. *Notice of interpretation.*
The Department is finalizing its interpretation that Medicare Part B

("Part B") funding meets the definition of "Federal financial assistance" for the purpose of title VI, title IX, section 504, the Age Act, and section 1557.

B. *Effective date.*
This interpretation is effective upon its publication in the **Federal Register**.

C. *Applicability date.*
The Department recognizes that that there are some recipients that do not receive any Federal financial assistance other than Part B funds and that these recipients are newly required to comply with section 1557 and other Federal civil rights laws enforced by OCR. The Department acknowledges that these recipients will require time to come into compliance as a result of this change in position. Therefore, while this revised interpretation is effective upon publication in the **Federal Register**, it will have a one-year delayed applicability date. Thus, compliance by entities whose Federal program participation has been limited to Part B must be in compliance with title VI, title IX, section 504, the Age Act, and section 1557 no later than May 6, 2025. An Assurance of Compliance, as required by 45 CFR 92.5, must be filed with the Department by entities whose Federal program participation has been limited to Medicare Part B no later than May 6, 2025. This can be completed via OCR's Assurance of Compliance portal at *https://ocrportal.hhs.gov/ocr/aoc/ instruction.jsf.* Similarly, if such a recipient accepts a form of Federal financial assistance other than Part B prior to May 6, 2025, they will be required to complete an Assurance of Compliance at that time, consistent with section 1557 and the other Federal civil rights laws enforced by OCR.

## IV. CMS Amendments

In the 2022 NPRM, the Department proposed clarifying CMS provisions that govern Medicaid and CHIP; PACE; health insurance issuers, including issuers providing EHB and issuers of qualified health plans (QHPs), and their officials, employees, agents, and representatives; States and the Exchanges carrying out Exchange requirements; and agents, brokers, or web-brokers that assist with or facilitate enrollment of qualified individuals, qualified employers, or qualified employees into Exchange coverage so that they again identify and recognize discrimination on the basis of sexual orientation and gender identity as prohibited forms of discrimination based on sex. The Department sought comments on CMS' proposal to explicitly mention only gender identity and sexual orientation in its amendments, while understanding that

discrimination on the basis of sex stereotypes, sex characteristics, and pregnancy or related conditions is also prohibited sex discrimination.

We are clarifying and emphasizing our intent that if any provision of this final rule is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further action, it shall be severable from this final rule, and from rules and regulations currently in effect, and not affect the remainder thereof or the application of the provision to other persons not similarly situated or to other, dissimilar circumstances. Through this rule, we adopt provisions that are intended to and will operate independently of each other, even if each serves the same general purpose or policy goal. Where a provision is necessarily dependent on another, the context generally makes that clear.

*Comment:* The majority of commenters on the proposed CMS amendments in the 2022 NPRM supported the proposal to explicitly identify and recognize discrimination on the basis of sexual orientation and gender identity as prohibited types of sex discrimination. However, many of the commenters noted that the language in the CMS amendments did not match the language explaining what constitutes sex discrimination in the proposed section 1557 implementing regulation (proposed 45 CFR 92.101(a)(2)). Commenters encouraged the agency to adopt the language in proposed § 92.101(a)(2). Specifically, those commenters suggested that the CMS amendments should revise the term "sex" to "sex (including discrimination on the basis of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; transgender status; and sex stereotypes)" rather than "sex (including sexual orientation and gender identity)" as proposed for the various CMS regulations. Commenters argued that adopting the language from § 92.101(a)(2) in the CMS amendments would avoid confusion and ensure consistency of implementation and enforcement among the nondiscrimination protections in the CMS amendments and section 1557. In many contexts, CMS program regulations are more visible to some providers, patients, patient advocates, and other stakeholders than section 1557 requirements and are more readily translated into institutional policy, training, and patient awareness. Commenters asserted that the Department having a consistent description of sex discrimination would improve consistency across Department

regulations, further the health and safety of program beneficiaries, and protect them from discrimination in health care. One commenter emphasized that a statement in the 2022 NPRM that CMS understands that discrimination on the basis of sex stereotypes, sex characteristics, and pregnancy or related conditions is prohibited sex discrimination, without the inclusion of such language in the regulatory text, provides inadequate notice to entities required to comply with the CMS amendments.

*Response:* The Department is finalizing the proposed amendments to the CMS regulations, with a revision to the description of sex discrimination to conform to the language in 45 CFR 92.101(a)(2). We appreciate that so many commenters made this suggestion and raised important issues concerning avoiding confusion, ensuring consistent implementation, and providing greater clarity for compliance and enforcement. In the Proposed Rule, CMS noted in the preamble that it understands that sex discrimination includes discrimination based on sex stereotypes, sex characteristics, including intersex traits, and pregnancy or related conditions, but limited the explicit mention in the regulatory text to gender identity and sexual orientation, sought comments. 87 FR 47891. The Department agrees with commenters that the amendments in the regulation should reflect CMS' intended interpretation of sex discrimination to avoid confusion for regulated entities and to better address the barriers to obtaining health care, including those faced by LGBTQI+ people, that CMS noted in the Proposed Rule. As there are entities that must comply with both CMS nondiscrimination provisions and section 1557, adopting identical language will ensure consistency across the policies and requirements applicable to entities subject to all of the provisions. As finalized, these CMS regulations provide that discrimination based on "sex" includes discrimination based on sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes. The list in the regulation text is not an exhaustive one that outlines all the ways (or the only ways) that discrimination can be based on sex but, rather, it only identifies examples; CMS interprets these regulations accordingly. However, nothing in this rule impedes regulated entities from taking nondiscriminatory actions based on current medical standards and evidence, such as individualized and nondiscriminatory decisions based on current medical

standards and evidence about the timing or type of protocols appropriate for care. The rule does not (and cannot) require a specific standard of care or course of treatment for any individual, minor or adult.

Summaries of regulatory changes are outlined below, along with responses to comments. In the following sections, for brevity, all references to "sex discrimination" or "discrimination on the basis of sex" mean "discrimination based on sex (including discrimination on the basis of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity, including transgender status; and sex stereotypes)."

*A. Medicaid and Children's Health Insurance Program (CHIP)*

In 42 CFR 438.3(d)(4) and 438.206(c)(2) (which apply to CHIP managed care through existing cross-references in §§ 457.1201(d) and 457.1230(a)), we proposed to restore regulatory text to prohibit Medicaid and CHIP managed care plans, which include managed care organizations, prepaid inpatient health plans, prepaid ambulatory health plans, primary care case managers, and primary care case management entities in managed care programs, from discriminating on the basis of sexual orientation and gender identity, and to require managed care plans to promote access and delivery of services in a culturally competent manner to all beneficiaries regardless of sexual orientation or gender identity. Such text was finalized as part of §§ 438.3(d) and 438.206(c)(2) in the Medicaid and CHIP managed care final rule published in the **Federal Register** on May 6, 2016 (2016 Medicaid and CHIP Rule), 81 FR 27498, but was removed as part of the Department's second section 1557 rulemaking (2020 Rule), 85 FR 37160, 37219–37220.

Similarly, in 42 CFR 440.262, for fee-for-service Medicaid programs, we proposed to restore regulatory text to require States to promote access and delivery of services in a culturally competent manner to all beneficiaries regardless of sex, including sexual orientation or gender identity. Again, the text was finalized as part of § 440.262 in the 2016 Medicaid and CHIP Rule but the references to sexual orientation and gender identity were removed by the 2020 Rule. We also proposed to change "unique" in 42 CFR 440.262 to "individualized" to more accurately reflect Medicaid's goal of providing person-centered care. Finally, we proposed to incorporate 42 CFR 440.262 into CHIP regulations through a cross-reference at 42 CFR 457.495(e),

ensuring alignment across fee-for-service Medicaid and CHIP programs.

The comments received on these proposals and our responses are set forth below.

*Comment:* We received many comments in support of the reinstatement of prohibitions against discrimination based on sexual orientation and gender identity in Medicaid and CHIP. Commenters stated that restoring the regulation text at 42 CFR 438.3(d)(4), 438.206(c)(2), and 440.262 (and therefore in §§ 457.1201(d) and 457.1230(a)) would promote access to care and the delivery of services in a culturally competent manner, strengthen the Department's commitment to increasing equity, and address discrimination in health programs and activities that can lead to disparate health outcomes.

*Response:* We appreciate the support for our proposals and believe finalizing revisions to these provisions will be an essential step in promoting culturally competent care that improves access, quality of care, and ultimately health outcomes.

*Comment:* One commenter that asked CMS to adopt the more detailed description of "sex discrimination" in proposed § 92.101(a)(2) pointed out that CMS program rules provide different compliance mechanisms—including prospective as well as complaint-based mechanisms—that complement section 1557's fundamental but essentially retrospective, complaint-based enforcement scheme.

*Response:* We appreciate the commenter raising this important perspective. There are prospective and retrospective compliance mechanisms reflected as State and managed care plan responsibilities in the Medicaid managed care regulations at 42 CFR part 438. Some provisions explicitly address requirements that must be included in managed care plan contracts and others stipulate State responsibilities. A provision that particularly reflects State responsibilities for proactively monitoring their managed care programs to ensure compliance with Federal regulations is 42 CFR 438.66, which requires States to have a monitoring system for all Medicaid managed care programs that addresses all aspects of the program including the performance of each managed care plan. This provision also requires States to use the data collected from their monitoring activities to improve their program's performance. This example of a prospective and retrospective activity requirement demonstrates how the Medicaid managed care regulations may help states and their managed care

programs complement OCR's enforcement actions related to the prohibition of discrimination by providing for more timely monitoring and enforcement of discrimination prohibitions. Consistent regulation text about what sex discrimination means in this context—specifically, it includes discrimination on the basis of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes—will maximize the effect of these benefits.

In addition, we believe it is critical to ensure consistency in the application of nondiscrimination requirements between Medicaid managed care and fee-for-service programs. Under section 1902(a)(19) of the Social Security Act, states must provide for such safeguards as may be necessary to assure access to care and services in a manner consistent with simplicity of administration and the best interest of beneficiaries. A Medicaid fee-for-service regulation (at 42 CFR 440.262) clarifying the meaning of the term "sex" in this context, particularly when that regulation is consistent with 42 CFR 438.3(d)(4) and 438.206(c)(2) facilitates simplicity in administration of nondiscrimination requirements and ensures the best interests of the beneficiaries are met across Medicaid delivery systems for all Medicaid beneficiaries. As we noted in the NPRM, the best interest of beneficiaries is appropriately met when access to care and services are provided in a non-discriminatory manner. A consistent approach on this issue will help protect beneficiaries from discrimination, avoid confusion, and provide for simplicity in administration of State Medicaid programs. To this end, we believe the reference to "sex" at 42 CFR 440.262 should be consistent with 42 CFR 438.3(d)(4) and 438.206(c)(2).

For this reason and those stated above, we are finalizing the proposed amendments to 42 CFR 438.3(d)(4), 438.206(c)(2), and 440.262 with revisions to make the discussions of "sex" in them consistent with 45 CFR 92.101(a)(2). In 42 CFR 438.3(d)(4) (and therefore § 457.1201(d)), we also are finalizing revisions to improve the readability of the provision by replacing some of the commas with semicolons and moving "disability" after "national origin." We have also removed unnecessary parentheses in 42 CFR 438.3(d)(4), 438.206(c)(2), and 440.262.

*Comment:* One commenter asserted that the Department based the Proposed Rule on general provisions of the Social Security Act requiring that health assistance be provided in the "best interest of beneficiaries" (for Medicaid

programs) and that the statute cited by the Department does not indicate Congressional intent related to prohibiting discrimination.

*Response:* The Department undertook this rulemaking to better align the section 1557 regulation with the statutory text of 42 U.S.C. 18116, to reflect recent developments in civil rights case law, and to better address issues of discrimination that contribute to negative health interactions and outcomes. We believe aligning the Medicaid and CHIP regulations in 42 CFR parts 438, 440, and 457, subpart L, with the section 1557 regulations is critical to fulfilling the Department's mission of pursuing health equity and protecting public health. Access to health care that is free from discrimination benefits all communities and people, and is also vital to addressing public health emergencies, such as the COVID–19 pandemic.

CMS possesses statutory authority under section 1902(a)(4) of the SSA (codified at 42 U.S.C. 1396a(a)(4)), which authorizes the Secretary to adopt methods of administration necessary for the proper and efficient operation of the Medicaid State plan; section 1902(a)(19) of the SSA (codified at 42 U.S.C. 1396a(a)(19)), which requires the Medicaid State plan to provide safeguards as necessary to assure that covered services are provided in a manner consistent with the best interests of the recipients; and section 2101(a) of the SSA (codified at 42 U.S.C. 1397aa(a)), which permits provision of funds to States to enable them to initiate and expand the provision of child health assistance to uninsured, low income children in an effective and efficient manner. CMS interprets section 1902(a)(19) of the SSA as prohibiting discrimination in the delivery of services because such discrimination is inconsistent with the best interests of the Medicaid beneficiaries who are eligible for and receive services. CMS interprets sections 1902(a)(4) and 2101(a) of the SSA as authorizing CMS to adopt regulations prohibiting discrimination on the basis of sex because such prohibitions on discrimination are necessary for the proper and efficient operation of a State plan, are in the best interest of beneficiaries, and enable states to provide child health assistance in an effective and efficient manner. For these reasons, we disagree with the commenter and continue to assert that adopting protection against discrimination to address disparities and, ultimately, health outcomes is within the authority granted to CMS by the Act.

*Comment:* One commenter stated that the proposed regulation text would prohibit physicians or other health professionals from categorically declining to provide gender-affirming treatments due to their religious or moral beliefs guaranteed them under the First Amendment to the U.S. Constitution and could require them to provide services and treatment procedures related to gender-affirming care that they object to performing.

*Response:* These regulations do not require the provision of any specific services. These regulations are neutral, generally applicable, and do not violate the Free Exercise Clause of the First Amendment. These regulations do not target religiously motivated conduct, but rather, are intended to prohibit sex discrimination generally in order to improve health outcomes for the LGBTQI+ community and fulfill the statutory command of the ACA to prohibit discrimination and remove unreasonable barriers to care. As noted previously in this rule, conduct does not constitute a violation of this rule's prohibition on sex discrimination if there is a legitimate, nondiscriminatory reason for the action. Also, HHS will respect religious freedom and conscience protections in Federal law, particularly with regard to the provision of certain health-related services. For example, when enforcing its nondiscrimination regulations, HHS will comply with laws protecting the exercise of conscience and religion, including RFRA (42 U.S.C. 2000bb through 2000bb–4) and all other applicable legal requirements. Nothing in the nondiscrimination protections at 42 CFR 438.3(d)(4), 438.206(c)(2), and 440.262 (which apply to CHIP managed care through existing cross-references in §§ 457.1201(d) and 457.1230(a) and CHIP fee-for-service through a new cross-reference at § 457.495(e)), displaces those protections. In enforcing the nondiscrimination provisions in the corresponding CMS regulations, the Department will comply with laws protecting the exercise of conscience and religion, including the Religious Freedom Restoration Act (42 U.S.C. 2000bb through 2000bb–4) and all other applicable legal requirements. Finally, we note that physician licensing and discipline are outside the scope of this rulemaking.

Summary of Regulatory Changes

After consideration of the public comments, we are finalizing 42 CFR 438.3(d)(4), 438.206(c)(2), and 440.262 (which apply to CHIP managed care through existing cross-references in §§ 457.1201(d) and 457.1230(a)) with revisions to specify that discrimination based on "sex" includes discrimination on the basis of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes. Similarly, where these regulations require actions to be taken regardless of sex, that includes actions regardless of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes. We are also finalizing the change of "unique" to "individualized" in 42 CFR 440.262 as proposed.

*B. Programs of All-Inclusive Care for the Elderly (PACE)*

In 42 CFR 460.98(b)(3), CMS proposed to add sexual orientation and gender identity to the list of characteristics that may not serve as a basis for discrimination against a PACE participant. Additionally, in 42 CFR 460.112, we proposed to add gender identity to the list of characteristics that may not serve as a basis for discrimination against a PACE participant. This PACE provision is applicable one year after the effective date of this final rule.

*Comment:* CMS received numerous comments supporting our changes to both provisions.

*Response:* CMS thanks the commenters for supporting these important changes that will serve to protect CMS' beneficiaries.

*Comment:* Several commenters did not support CMS' proposal to add sexual orientation and gender identity to the list of characteristics that may not serve as a basis for discrimination against a PACE participant. Some commenters objected to the protections against discrimination on the basis of gender identity, in particular. Some commenters, believing that the proposal requires coverage of gender-affirming care, stated that the Department can adequately protect people from discrimination without mandating this coverage.

*Response:* This rule does not require entities to cover any particular procedure or treatment. We clarify that, in finalizing the prohibition against discrimination on the basis of sex, the Department is not mandating that PACE organizations include coverage for any particular item or service not already covered. Rather, amending these sections to clarify discrimination on the basis of sex as including sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes will better ensure that all individuals are treated fairly in their access to health care. Without protection from such sex discrimination, transgender individuals may face barriers or be denied medically necessary services that are classified as covered under PACE and made available to other enrolled individuals. These amendments will better clarify nondiscrimination protections for all individuals, while also addressing existing disparities for LGBTQI+ individuals seeking health care. For the reasons discussed here and in the preamble to the Proposed Rule, CMS believes it is important to ensure all PACE participants are protected against unlawful discrimination of any kind, including discrimination based on sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes. Therefore, we are finalizing these revisions.

Summary of Regulatory Changes

We are finalizing the regulatory language with modifications based on comments received. Specifically, we are revising the reference to sex to include additional detail explaining that the reference to "sex" includes sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity, including transgender status; and sex stereotypes.

*C. Insurance Exchanges and Group and Individual Health Insurance Markets*

In the HHS Notice of Benefit and Payment Parameters for 2023 Proposed Rule (2023 Payment Notice NPRM),[397] the Department proposed amendments to the regulations applicable to Exchanges, QHPs, and certain issuers to prohibit discrimination based on sexual orientation and gender identity. The amendments were similar to those proposed in the 2022 NPRM. Those proposed amendments were not finalized in the Notice of Benefit and Payment Parameters for 2023 final rule published on May 6, 2022,[398] because the Department determined that it would be most prudent to address the nondiscrimination proposals related to sexual orientation and gender identity in the 2022 NPRM to ensure consistency across the policies and requirements applicable to entities subject to both

---

[397] U.S. Dep't of Health & Hum. Servs. Ctrs. for Medicare & Medicaid Servs., Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2023, 87 FR 584 (January 5, 2022).

[398] U.S. Dep't of Health & Hum. Servs. Ctrs. for Medicare & Medicaid Servs., Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2023, 87 FR 27208 (May 6, 2022).

variety of reasons. Some of the commenters stated that the final rule would lead to health care professionals leaving the industry from the lack of conscience or religious exemptions. A couple of commenters stated that future health care professionals would not enter the industry in the future as the final rule would require them to violate the Hippocratic Oath or their religious beliefs.

*Response:* As discussed in section 2 of the RIA and preamble of the rule, the final rule includes a variety of protections for religious freedom and conscience rights, including a process whereby entities may rely on these protections and seek assurance of them from HHS. See § 92.302.

*Comment:* Several commenters noted that portions of the data that were used in the RIA, such as the number of covered entities and number of small entities, are outdated and need to be updated for an accurate cost estimate to be made.

*Response:* OCR agrees with commenters that data sources could be updated from the Proposed Rule. In this final rule RIA, the data for the number of covered entities, number of entities with more than 15 employees, the number of small entities, and hourly wages have been updated to the most recent data available.

*Comment:* A few commenters expressed concern that the final rule would cause irreparable harm to individuals who regret transitions.

*Response:* Commenters do not provide supporting evidence or data on the frequency or cost of potential irreparable harm. OCR disagrees with the commenters and did not find studies providing evidence or data on the frequency or cost of what the commenters characterize as irreparable

harm, and therefore makes no changes to the final rule.

*Comment:* One commenter expressed concern that long-term costs associated with gender-affirming care are not accounted for within the RIA and that the studies used may not be accurate. Due to this, the commenter stated that the supplementary information provided is at best speculative.

*Response:* The main source for costs related to gender-affirming care come from a peer reviewed article in the New England Journal of Medicine, a well-respected medical journal. The cost associated with gender-affirming care is based on actual cost data from the Defense Manpower Data Center, which is part of the Department of Defense (DOD). As noted, the final rule does not mandate the provision of or coverage of gender-affirming care, or any particular health service. However, to the extent a covered entity provides coverage for a particular health service, the covered entity must provide the health service to all individuals in a neutral, nondiscriminatory manner consistent with this rule.

*Comment:* One commenter stated that the costs of algorithmic discrimination have been quantified and asked OCR to include examples of the costs of such discrimination.

*Response:* OCR includes a specific provision on algorithmic discrimination in the final rule and qualitatively discusses the potential costs to individuals from discriminatory application of algorithms and other decision support tools in the benefits section.

### 2. Summary of Costs and Benefits

This analysis quantifies several categories of costs to covered entities and to the Department under the final rule. Specifically, we quantify costs

associated with covered entities training employees, revising policies and procedures, and costs associated with notices, including the Notice of Nondiscrimination and Notice of Availability. We quantify costs associated with provisions of the final rule related to documenting training activities performed under the final rule. We also quantify incremental costs associated with coverage for gender-affirming care (which, as noted above, is not mandated by the rule). Our analysis also addresses uncertainty in costs associated with notices and gender-affirming care, which is discussed in greater detail in the notices section of subsection B of section 2 of the RIA. We separately report a full range of cost estimates of about $523 million to $1,302.3 million using a 7 percent discount rate, and a full range of cost estimates of about $511.4 million to $1,290.7 million using a 3 percent discount rate. All cost estimates are in 2022 dollars. We conclude that the final rule would result in annualized costs over a 5-year time horizon of $646.5 million or $637.1 million, corresponding to a 7 percent or a 3 percent discount rate respectively.

In addition to these quantified cost estimates, the main analysis includes a discussion of costs that we do not quantify, and a discussion of the potential benefits under the rule that we similarly do not quantify. In addition to the impacts that we quantify, this final rule could also result in increases in premiums, which would result in increases in Exchange user fees and Federal expenditures for advance payments of the premium tax credit. These increases would be minimal due to the low utilization of gender affirming care and the availability of the services.

### TABLE 1—ANNUALIZED COSTS OF THE FINAL RULE

[$ millions/year (percent)]

| Primary estimate | Low estimate | High estimate | Year dollars | Discount rate (percent) | Period covered |
|---|---|---|---|---|---|
| $646.5 | $523 | $1,302.3 | 2022 | 7 | 2024–2028 |
| $637.1 | 511.1 | 1,290.7 | 2022 | 3 | 2024–2028 |

### a. Baseline Conditions

Section 1557 prohibits an individual from being excluded from participation in, denied the benefits of, or otherwise subjected to discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities. It applies to any health program or activity, any part of which is receiving Federal financial assistance,

and to any program or activity that is administered by an executive agency or any entity established under title I of the ACA.[421] On May 18, 2016, the Department published a final rule to implement section 1557 under the statute 5 U.S.C. 301. 81 FR 31375. On June 19, 2020, the Department

---

[421] 42 U.S.C. 18116.

published a final rule that revised the Department's approach to implementing section 1557. 85 FR 37160. As described in greater detail in the Background section of this preamble, neither final rule was fully implemented as published, and certain provisions of the 2020 Rule remain the subject of ongoing litigation.

The baseline scenario of no further regulatory action is substantially informed by the RIAs published with the 2016 and 2020 Rules. The 2016 RIA identified five sources of monetized costs: training and familiarization, enforcement, notice publication, sex discrimination policy and procedure changes, and language access plans. The bulk of the monetary impacts identified in the 2016 RIA occur in the first two years under the 2016 rule, with costs continuing in future years only for enforcement and language access plans.

The 2020 RIA adopted many of the assumptions contained in the 2016 RIA. For example, it assumed that many of the initial activities anticipated under the 2016 Rule were performed, and that the first two years of costs attributable to the 2016 Rule were incurred.[422] The 2020 RIA identifies cost savings only "from the repeal of (1) the provision on the incentive for covered entities to develop language access plans and (2) the provisions on notice and taglines."

85 FR 37224. The 2020 RIA also identifies costs in the first year "on covered entities' voluntary actions to re-train their employees on, and adopt policies and procedures to implement, the legal requirements of this final rule." 85 FR 37224.

In establishing a baseline scenario, this analysis similarly maintains a number of assumptions and estimates contained in prior analyses. For example, the baseline scenario includes some ongoing costs that are attributable to the 2016 Rule, such as the costs of enforcement. The 2016 RIA estimated that the costs of enforcement would be $108.8 million (reported in 2022 dollars), which we adopt as the costs under both the baseline and final rule scenarios. Similarly, we adopt the assumption in the 2020 RIA that covered entities continue to provide ongoing training attributable to the 2016 Rule, which was not impacted by the 2020 Rule. We include these ongoing training activities, including annual

refresher training for returning employees and training for new employees, in the baseline scenario of no regulatory action.

The final rule analysis updates baseline conditions on the number of covered entities. The 2016 Rule, 2020 Rule, and 2022 NPRM all used 275,002 covered entities, and 41,250 covered entities that have 15 or more employees. This final rule updates the covered entities to 266,297 and the number of covered entities with 15 or more employees to 63,950. Table 2 presents the updated data on covered entities. To update this data, we identified the source of the original data being the 2012 Statistics of U.S. Businesses (SUSB) Annual Data Tables by Establishment Industry and found the 2020 version of the same dataset. Using the same NAICS codes from the Proposed Rule we identify the number of entities under these NAICS codes in addition to the number of firms with 15 or more employees.

TABLE 2—COVERED ENTITIES

| NAICS code | Business type | Firm count 2020 | Firms with 15 or more employees |
|---|---|---|---|
| 62142 | Outpatient mental health and substance abuse centers. | 7,649 | 2,911 |
| 621491 | HMO medical centers | 84 | 21 |
| 621492 | Kidney dialysis centers | 449 | 216 |
| 621493 | Freestanding ambulatory surgical and emergency centers. | 4,554 | 2,204 |
| 621498 | All other outpatient care centers | 6,307 | 2,766 |
| 6215 | Medical and diagnostic laboratories | 7,200 | 1,892 |
| 6216 | Home health care services | 25,718 | 10,901 |
| 6219 | All other ambulatory health care services | 7,091 | 2,589 |
| 62321 | Residential intellectual and developmental disability facilities. | 6,674 | 3,628 |
| 6221 | General medical and surgical hospitals | 2,445 | 2,344 |
| 6222 | Psychiatric and substance abuse hospitals | 434 | 414 |
| 6223 | Specialty (except psychiatric and substance abuse) hospitals. | 301 | 280 |
| 6231 | Nursing care facilities (skilled nursing facilities). | 9,824 | 7,513 |
| 45611 | Pharmacies and drug stores | 19,346 | 3,436 |
| 6211 | Offices of physicians | 167,294 | 22,494 |
| 524114 | Insurance Issuers | 869 | 341 |
| | Navigator grantees | 58 | |
| | Total Entities | 266,297 | 63,950 |

In the next section, we discuss the incremental costs of the final rule, which exclude ongoing costs attributable to prior rulemaking.

b. Costs of the Final Rule

This analysis anticipates that the final rule would result in one-time costs to covered entities to process assurance of exemption requests and revise policies

and procedures. The final rule would result in costs associated with a revised approach to notices, including the Notice of Nondiscrimination and Notice of Availability, costs to review new decision support tool requirements, and costs to training employees. The final rule would also result in costs associated with provisions related to

documenting training activities performed under the final rule.

The final rule might result in additional costs associated with coverage for gender-affirming care. We discuss the potential costs associated with gender-affirming care coverage and the potential that some or all of these costs would be offset by reductions in spending on other types of care. We

---

[422] E.g., 85 FR 37235 ("The Department assumes sunk costs cannot be recovered by this rule, and

therefore that initial language access plan

development costs attributable to the 2016 Rule cannot be recovered.").

reiterate that the final rule does not mandate the provision of or coverage of gender-affirming care, or any particular health service. However, to the extent a covered entity provides coverage for a particular health service, the covered entity must provide the health service to all individuals in a neutral, nondiscriminatory manner consistent with this rule.

The analysis also discusses other potential costs of the final rule that we do not quantify.

Training

The Department anticipates that some covered entities would incur costs to train or retrain employees under the final rule. To calculate the costs related to training, we followed an approach common to both the 2016 and 2020 RIAs. Both analyses estimate that covered entities would train their employees on the requirements. This final rule uses the updated estimate of covered entities (266,297) as the basis for calculating the total costs. The 2020 RIA adjusted the number of covered entities downward by 50 percent, anticipating that some covered entities would not modify their procedures in response to the 2020 final rule, and would therefore not need to offer new training. Both RIAs anticipated that employers would most likely train employees who interact with the public and recognized that the percentage of employees that interact with patients and the public vary by covered entity. To account for this, the analyses adopted a central estimate of 50 percent of staff at covered entities that received one-time training on the requirements of the regulation.

Both RIAs reported the number of employees at covered entities by occupation category. To monetize the total costs of training, the RIAs adopted a value of time based on the average fully loaded wage rate for each occupation, combined with an assumption about the duration of the training. The 2016 RIA assumed that 50 percent of total employees at covered entities would receive training, while the 2020 RIA assumed that 25 percent of employees would receive training. Both RIAs assumed the typical training would last one (1) hour. For this analysis, we assume that 75 percent of total employees at covered entities would receive training, and that this training would last one (1) hour. This estimate is consistent with an assumption that all covered entities would revise their policies and procedures under the final rule and that most employees at covered entities would receive training.

As a necessary first step in calculating the incremental total costs of training attributable to the final rule, we have collected the most recent available data on the number of employees that would likely undergo training under the final rule, and data on the average wage rate by occupation for these employees.

The first category of health care staff that may receive training comprises health diagnosing and treating practitioners. This category includes physicians, dentists, optometrists, physician assistants, occupational, physical, speech and other therapists, audiologists, pharmacists, registered nurses, and nurse practitioners. The U.S. Bureau of Labor Statistics (BLS) Occupational code for this grouping is 29–1000, and the 2022 reported employment count for this occupational group is approximately 5.96 million, with average loaded wages of $114.42 per hour at the national level.[423]

The second category of health care staff that the Department assumes will receive training comprises degreed technical staff (Occupation code 29–2000) and accounts for 2.95 million employed individuals with average loaded wages of $51.18 per hour at the national level.[424] Technicians work in almost every area of health care: x-ray, physical, speech, psychiatric, dietetic, laboratory, nursing, and records technicians, to name but a few areas.

The third category of health care staff that the Department assumes will receive training comprises non-degreed medical assistants (Occupation code 31–0000), which includes psychiatric and home health aides, orderlies, dental assistants, and phlebotomists. Health care support staff (non-degreed, medical assistants) operate in the same medical disciplines as technicians, but often lack professional degrees or certificates often required for degreed technical staff. There are approximately 6.79 million employed individuals in these occupations in the health care and social assistance sector, with average loaded wages of $34.20 per hour at the national level.[425]

The fourth category of health care staff that the Department assumes will receive training is health care managers (Occupation code 11–9111) and accounts for approximately 0.48 million employed individuals with average loaded wages of $123.06 per hour at the national level.[426]

The fifth category of health care staff that the Department assumes will receive training is office and administrative assistants (Occupation code 43–0000) and accounts for approximately 2.719 million employed individuals with average loaded wages of $41.16 per hour within the Health Care and Social Assistance sector.[427] These workers are often the first staff patients encounter in a health facility and, because of this, covered entities might find it important that staff, such as receptionists and assistants, receive training on the regulatory requirements. The Department assumes that outreach workers are included in the five categories listed above.

The Department estimates that there are a total 18.9 million employees at covered entities, of which we assume 14.2 million, 75 percent, would receive training attributable to the final rule. Across the five occupation categories, we estimate a weighted hourly wage rate of $32.70, or a weighted fully loaded hourly wage rate of $65.41. Assuming that the average training takes one (1) hour and adopting a value of time based on fully loaded wage rates, we estimate total first-year training costs for all covered entities to be approximately $927.3 million[428] As a sensitivity analysis, we considered the scenario of covered entities providing training to all employees, 18.9 million, not just employees who interact with the public, 14.2 million. Under this scenario, the total cost of training would increase to about $1.2 billion. These costs are likely overstated since this training may supplement or replace expected annual or other ongoing training activities at covered entities. To the extent that covered entities reduce time spent on other training activities, these costs would offset some of the total costs attributable to the final rule.

Lastly, the Department assumes that 91 investigators at OCR, who are equivalent to GS–12 Step 1 employees

---

[423] U.S. Bureau of Labor Statistics, *May 2022 National Occupational Employment and Wage Estimates, https://www.bls.gov/oes/current/oes_ nat.htm.* The average loaded wage for Healthcare Diagnosing or Treating Practitioners is derived by multiplying the mean hourly rate by 200 percent to include the mean hourly wage, the cost of fringe benefits and overhead costs ($57.21 * 200% = $114.42).

[424] U.S. Bureau of Labor Statistics, *May 2022 National Occupational Employment and Wage Estimates, https://www.bls.gov/oes/current/oes_ nat.htm.*

[425] U.S. Bureau of Labor Statistics, *May 2022 National Occupational Employment and Wage Estimates, https://www.bls.gov/oes/current/oes_ nat.htm.*

[426] U.S. Bureau of Labor Statistics, *May 2022 National Occupational Employment and Wage Estimates, https://www.bls.gov/oes/current/oes_ nat.htm.*

[427] U.S. Bureau of Labor Statistics, *National Industry-Specific Occupational Employment and Wage Estimates, Sector 62- Health Care and Social Assistance, https://www.bls.gov/oes/current/ naics2_62.htm#43-0000.*

[428] Numbers may not multiply due to rounding.

and whose average hourly loaded wage is $65.46, will receive a one-time training during the first year of the promulgation of this rule.[429] Each individual would receive 8 hours of training for a total of $47,655 (91 x 1 x $65.46) in training costs. This training would not occur in any subsequent years.

In addition to the first-year training costs, we anticipate that the final rule would result in additional costs associated with ongoing training, including annual refresher training for returning employees and training for new employees. As discussed in the Baseline Conditions section, we assume that many covered entities are routinely carrying out these activities, absent further regulatory action. However, we anticipate that the final rule would result in a larger share of employees at covered entities receiving such training. To quantify the change in training activities between the baseline scenario and the final rule scenario, we take the difference between the share of employees receiving training under the baseline scenario and the final rule scenario. We carry through an assumption from the 2016 RIA, which assumed that 50 percent of total employees at covered entities receive training and compare this to an assumption in this final RIA that 75 percent of total employees at covered entities would receive training. This yields an estimate of 25 percent of total employees at covered entities that would receive training in subsequent years under the final rule. We adopt the same weighted hourly wage estimate, number of employees, and estimate the total ongoing annual training costs as $309.1 million. This was calculated by multiplying the total number of employees at covered entities by .25 and multiplying by $65.41.

Finally, the Department assumes covered entities may require employees to undergo one (1) hour of training in response to an OCR investigation. As it is difficult to determine the type of employee that would be required go through additional training, we use the average loaded hourly wage of $65.41 to evaluate the opportunity cost of training time. To estimate the frequency with which covered entities may assume this cost, we reviewed OCR complaints from the 2023 calendar year and identified 60 cases investigated under section 1557 that were closed with a covered entity either engaging in voluntary corrective

action in response to the investigation or entering into a Voluntary Resolution Agreement with the agency.[430] Using this as a baseline, the Department assumes that for every year of the observation period there would be 60 potential instances of this additional training, and that it would be conducted in each case. As a result, we estimate that covered entities would incur $3,924 in additional training costs for every year of the observation period.[431]

Revising Policies and Procedures

As discussed above in the previous section, the Department anticipates that all covered entities, or approximately 266,297 entities, would revise their policies and procedures under the final rule, with approximately half of these entities requiring less extensive revisions. For covered entities with more extensive revisions, we adopt the estimates contained in the 2020 RIA, with four (4) total hours spent on revisions per entity. Of these, three (3) would be spent by a mid-level manager equivalent to a first-line supervisor (Occupation code 43–1011), at a cost of $62.98 ($31.49 × 2) per hour after adjusting for the cost of fringe benefits and other indirect costs, while an average of one (1) hour would be spent by executive staff equivalent to a general and operations manager (Occupation code 11–1021), at a cost of $118.14 ($59.07 × 2) per hour at the national level, including the cost of fringe benefits and other indirect costs.[432] For covered entities with less extensive revisions, we assume two (2) total hours spent on revisions per entity. Of these, one (1) would be spent by a mid-level manager, and one (1) would be spent by executive staff.

We monetize the time spent on revising policies and procedures by estimating a total cost per entity of $307.08 or $181.12, depending on the extent of the revisions. For the 133,149 covered entities with more extensive revisions, we estimate a total cost of about $40.8 million. For the 133,149 covered entities with less extensive revisions, we estimate a total cost of about $24.1 million. We estimate the total cost associated with revisions to policies and procedures under the final rule of $65.0 million.

The above estimates of time and number of entities that would choose to revise their policies under the regulation are approximate estimates based on general BLS data. We are unable to precisely estimate the total number of covered entities that would choose to revise their policies and procedures under the new regulation or to what extent they would make these changes due to the wide range of types and sizes of covered entities, from complex multi-divisional hospitals to small neighborhood clinics and physician offices.

In addition to the initial revisions of policies and procedures, the Department assumes some covered entities may elect or be required to revise their policies and procedures following an investigation. We assume that such revisions would cost the same as the original revision that occurs in the first year of the observation period. As discussed above, the Department estimates that during every year of the observation period, there would be an average of 60 instances in which corrective actions may be taken due to a 1557 investigation. As revising policies and procedures is a more significant corrective action compared to corrective training, the Department assumes that it will occur in response to only half of the investigations. The Department continues to use the assumption that half of the entities revising their policies and procedures would be major firms while the other half would be minor firms. The estimated total annual cost for revisions of policies and procedures in response to an OCR investigation is $7,323 (307.08 × 15 + 181.12 × 15) in each year of the observation period.

Notices

The final rule requires the 266,297 covered entities to provide a Notice of Nondiscrimination to participants, enrollees, and beneficiaries, hereafter referred to as beneficiaries of its health program or activity, and members of the public. It also requires covered entities to provide a Notice of Availability. These provisions resemble elements of the 2016 Rule that were repealed in the 2020 Rule; however, the approach under the final rule provides a narrower set of situations where covered entities would be required to provide these notices. Both types of notices are required (1) on an annual basis; (2) upon request; (3) at a conspicuous location on the covered entity's health program or activity website; and (4) in clear and prominent physical locations where the health program or activity interacts with the public.

---

[429] U.S. Off. of Personnel Mgmt., *Salary Table 2022–GS. GS–12 Step 1 Employee*, *https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2022/GS_h.pdf/*.

[430] U.S. Dep't of Health & Hum. Servs., Off. for Civil Rts., *Complaints Closed During Calendar Year 2023 within the Section 1557 Program Area*.

[431] $3,924 = ($65.41 × 1 × 60).

[432] U.S. Bureau of Labor Statistics, *Occupational Employment and Wages, May 2022, 43–1011 First-Line Supervisors of Office and Administrative Support Workers*, *https://www.bls.gov/oes/current/oes431011.htm*.

The Notice of Availability is also required in the following electronic and written communications related to the covered entity's health programs and activities: (1) notice of nondiscrimination required by final § 92.10; (2) notice of privacy practices required by 45 CFR 164.520; (3) application and intake forms; (4) notices of denial or termination of benefits or services, including Explanations of Benefits (EOBs) and notices of appeal and grievance rights; (5) communications related to an individual's rights, eligibility benefits, or services that require or request a response from a beneficiary; (6) communications related to a public health emergency; (7) consent forms and instructions related to medical procedures or operations, medical power of attorney, or living will (with an option of providing only one notice for all documents bundled together); (8) discharge papers; (9) communications related to the cost and payment of care with respect to an individual, including good faith estimates and medical billing and collections materials; (10) complaint forms; and (11) patient and member handbooks.

For the purposes of the Notice of Availability analysis, we base our estimates of the number of communications containing these notices on a subset of the communications identified in the 2020 RIA. We include communications that are EOBs. The Department received feedback regarding the financial burden imposed by applying the Notice of Availability requirements to EOBs.

EOBs are typically an individual's first, and often only, notice of a denial or termination of benefits or services, and as such, the Notice of Availability requirement is essential in this context to ensure timely and equitable access to appeals processes. The final rule at § 92.11(d) permits covered entities to provide individuals with the option to opt out of receiving the Notice of Availability on an annual basis, which will reduce the cost and burden associated with these requirements. In addition, as beneficiaries increasingly elect to receive EOBs and other types of communications electronically, we expect the cost of these requirements to decrease over time. We adopt the other estimates as a reasonable proxy for the number of communications that would be anticipated under the final rule. These estimates are intended to encompass all categories of Notices of Availability required under the final rule. We have increased the total number of communications containing notices by 10 percent to account for the additional communications related to the cost and payment of care with respect to an individual, including good faith estimates and medical billing and collections materials, which were not included in the Proposed Rule.[433]

Table 3 below reports the number of communications containing notices anticipated under the final rule and presents the costs of these communications. Our cost estimates reflect a wide range of uncertainty in the cost per communication. For our primary scenario, we adopt a central estimate of the average costs to print

and fold paper forms containing prescribing information of $0.05 (calculated as the midpoint estimate of a range from $0.03 to $0.07), reported in 2010 dollars.[434] We explore the sensitivity of the overall cost estimates under a low-cost ($0.035 per unit) and high-cost ($0.32 per unit) scenario, reported in 2018 dollars, which matches the range contained in the 2020 RIA. We adjust these per-unit cost inputs for inflation to 2022 price levels using the Implicit Price Deflator, resulting in a primary per-unit cost estimate of about $0.067 and a full range of about $0.045 to $0.37.[435] Combining these per-unit cost estimates with the count of each notice results in a primary estimate of $93.2 million, with a range of estimates between $57.2 million and $522.8 million. Following the approach in the 2020 RIA, we adjust this figure downward by 50 percent to account for the lower cost of electronic communications. For this adjustment, we adopt a measure of the share of respondents reporting that they used a "Digital (mobile app or website)" method to contact or interact with their health insurance issuer or plan in the last year when viewing an online statement.[436] We anticipate that the share of communications occurring online will increase over time but have not accounted for a trend for the 5-year time horizon of this analysis. This adjustment results in a primary estimate of the adjusted annual total of $46.6 million, with a range of costs between $28.6 million and $261.4 million. These costs would occur in each year of the time horizon of the analysis.

TABLE 3—COST OF NOTICE PROVISIONS

[2022 Dollars]

| Cost element | Count (millions) | Cost scenario ($ millions) | | |
| --- | --- | --- | --- | --- |
| | | Low | Primary | High |
| Eligibility and enrollment communications | 19.5 | $0.8 | $1.3 | $7.2 |
| Annual notice of benefits | 135.3 | 5.5 | 8.9 | 49.9 |
| Explanations of benefits—hospital admissions | 105.6 | 4.3 | 6.9 | 39.0 |
| Explanations of benefits—physician visits | 1035.1 | 41.8 | 68.1 | 382.0 |
| Medical bills—hospital admissions | 12.1 | 0.5 | 0.8 | 4.5 |
| Medical bills—physician visits | 108.9 | 4.4 | 7.2 | 40.2 |
| Total, Unadjusted | 1416.5 | 57.2 | 93.2 | 522.8 |
| Total, Adjusted for Electronic Delivery | 1133.2 | 28.6 | 46.6 | 261.4 |

[433] This reflects the increase from 10 categories accounted for by communications and notices in the Proposed Rule RIA to 11 categories, or an increase of 10 percent.

[434] U.S. Dep't of Health & Hum. Servs., Food & Drug Admin., *Electronic Distribution of Prescribing*

*Information for Human Prescriptions Drugs, Including Biological Products*, Proposed Rule, 79 FR 75506 (Dec. 18, 2014).

[435] Fed. Reserve Bank of St. Louis, *Gross Domestic Product: Implicit Price Deflator* (GFPDEF), *https://fred.stlouisfed.org/series/GDPDEF*.

[436] Saurabh Gupta et al., *HFS Rsch. & Cognizant, Health Consumers Want Digital: It's Time for Health Plans to Deliver*, p. 4 (2021), *https://www.cognizant.com/en_us/general/documents/cognizant-hfs-health-consumers-want-digital-its-time-for-health-plans-to-deliver.pdf*.

Documentation Requirements

The final rule requires covered entities to contemporaneously document certain other activities performed under the final rule. This includes activities such as employees' completion of the training required by this section in written or electronic form. The final rule also requires covered entities to retain certain records. These and other requirements, and the associated cost estimates, are discussed in greater detail in the PRA section.

The costs associated with retaining records related to grievances filed with a covered entity is the time spent by the staff of covered entities to store the complaints for no less than three (3) years. We calculate the costs of labor as one (1) employee per covered entity with more than 15 employees (63,950) spending 10 hours to store complaints and the associated records required under final § 92.8(c)(2) each year.[437] We assume that administrative or clerical support personnel would perform these functions. The mean hourly wage for this occupation is $19.02 per hour, which we double to account for overhead and other indirect costs. We estimate the costs of retaining records related to grievances filed at all covered entities would be $24.3 million annually ($19.02 × 2 × 10 × 63,950). This estimation approach will overstate the costs if many covered entities already retain complaint information.

The costs associated with documenting employee training is the time spent by the staff of covered entities to (a) create training attendance forms, and (b) store the training sign-up sheet. We calculate the costs of labor as one (1) employee spending 15 minutes (0.25 hours) to create the sign-up sheet during the first year and one (1) employee spending one (1) hour collecting and storing the attendance forms the first year and subsequent years. We assume that administrative or clerical support personnel would perform these functions. The mean hourly wage for this occupation is $19.02 per hour, which we double to account for overhead and other indirect costs. We estimate the costs of documenting employee training would be $12.6 million in the first year ($19.02 × 2 × 1.25 × 266,297) and $10.1 million

in subsequent years ($19.02 × 2 × 1 × 266,297).

Coverage for Gender-Affirming Care

In addition to the cost some covered health insurance issuers and plans may incur for revising policies and procedures to comply with the rule, there is a possibility that such issuers and plans may incur a de minimis cost related to the cost of coverage for gender-affirming care. Various studies, however, suggest that any such increased costs will likely be negligible, and that any increases may be offset by savings from decreased utilization of other services. The likelihood of significant costs is low both because transgender individuals make up a very small percentage of the population and because many transgender individuals do not seek gender-affirming surgeries or other types of care.[438]

In April 2012, the California Department of Insurance conducted an Economic Impact Assessment on Gender Nondiscrimination in Health Insurance that found that prohibiting discrimination on the basis of gender identity in health insurance plans would have an "insignificant and immaterial" impact on costs.[439] This conclusion was based on evidence of low utilization and the estimated number of transgender individuals in California. The transgender population of California was estimated to range between 0.0022 percent and 0.0173 percent.[440] The study revealed that, contrary to common assumptions, not all transgender individuals seek surgical intervention, and that gender-affirming health care differs according to the needs and pre-existing conditions of each individual.[441] Despite expecting a

possible spike in demand for benefits due to former or current unmet demand, the California Insurance Department concluded that any increased utilization that might occur over time is likely to be so low that any resulting costs remain actuarially immaterial.[442] The Assessment notes the experience of one employer that initially established premium surcharges to cover the anticipated cost of gender-affirming care, reporting that the employer subsequently eliminated the surcharges because they found that the funds collected were nearly 15 times the amount expended on care.[443] While it did not analyze any original data, a 2018 analysis by the State of Wisconsin's Department of Employee Trust Funds cited numerous studies finding that the cost of coverage was minimal, and noted that "[w]hile it is challenging to predict the costs of care averted for any condition, there is some evidence that the costs associated with providing transgender-inclusive plans is met with reduced costs related to comorbidities."[444] Other studies looking at both public and private sector plans have reached similar conclusions. One study published in the New England Journal of Medicine projected that the cost for providing gender-affirming care benefits to members of the military would result in an annual increase of 0.012 percent of health care costs, "little more than a rounding error in the military's $47.8 billion annual health care budget."[445] A 2013 study of 34 public and private sector employers that provided nondiscriminatory health care coverage found that providing coverage of gender-affirming care had "zero to very low costs."[446] An

---

[437] This estimate is consistent with the 2016 Rule's Regulatory Impact Analysis: "Of the 275,002 covered entities, approximately 15 percent employ more than 15 employees, resulting in approximately only slightly more than 41,250 covered entities being required to have grievance procedures and designate a responsible official." 81 FR 31375, 31452 (May 18, 2016).

[438] *See, e.g.,* U.S. Health & Hum. Servs., Ctrs. for Medicare & Medicaid Servs., *Colorado 2023 EHB-Benchmark Plan Actuarial Report, https:// www.cms.gov/CCIIO/Resources/Data-Resources/ ehb.* Suite of Gender-affirming care benefits to treat gender dysphoria resulted cost estimate was 0.04 percent of the total allowed claims assuming utilization would be for adults.

[439] State of Cal., Dep't of Ins., *Economic Impact Assessment Gender Nondiscrimination in Health Insurance,* p. 1 (Apr. 13, 2012), *http:// translaw.wpengine.com/wp-content/uploads/2013/ 04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.*

[440] *Id.* at p. 3. More recent estimates indicate that a higher share of the population in the United States identifies as transgender (0.6 percent of the U.S. adult population). Andrew R. Flores et al., The Williams Inst., UCLA Sch. of Law, *Race and Ethnicity of Adults Who Identify as Transgender in the United States,* p. 2 (2016), *https:// williamsinstitute.law.ucla.edu/wp-content/uploads/ Race-Ethnicity-Trans-Adults-US-Oct-2016.pdf.*

[441] State of Cal., Dep't of Ins., *Economic Impact Assessment Gender Nondiscrimination in Health Insurance,* p. 8 (Apr. 13, 2012), *http://translaw.wpengine.com/wp-content/uploads/2013/04/Economic-Impact-*

*Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.*

[442] State of Cal., Dep't of Ins., *Economic Impact Assessment Gender Nondiscrimination in Health Insurance,* p. 9 (Apr. 13, 2012), *http:// translaw.wpengine.com/wp-content/uploads/2013/ 04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.*

[443] State of Cal., Dep't of Ins., *Economic Impact Assessment Gender Nondiscrimination in Health Insurance,* pp. 6–7 (Apr. 13, 2012), *http:// translaw.wpengine.com/wp-content/uploads/2013/ 04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.*

[444] Wis., Dep't of Employee Trust Funds, *Correspondence Memorandum Re: Transgender Services Coverage,* pp. 6–8 (Aug. 14, 2018), *https:// etf.wi.gov/boards/groupinsurance/2018/08/22/ item6a1/download?inline=.*

[445] Aaron Belkin, *Caring for Our Transgender Troops—The Negligible Cost of Transition-Related Care,* 373 New Eng. J. Med. 1089 (2015), *https:// www.nejm.org/doi/pdf/10.1056/NEJMp 1509230?articleTools=true.*

[446] Jody Herman, The Williams Inst., UCLA Sch. of Law, *Cost and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans: Findings from a Survey of Employers,* p. 2 (Sept. 2013), *http://*

additional study comparing costs and potential savings associated with covering gender-transition-related care concluded that "additional expenses hold good value for reducing the risk of negative endpoints—HIV, depression, suicidality, and drug abuse" and noted that "provider coverage was cost-effective in 85 percent of simulations." [447] More recently, a 2021 survey of employers conducted by the Human Rights Campaign noted that most employers who covered gender-affirming care reported only "marginal increases" in cost, on the order of "a fraction of a decimal point of cost calculations." [448]

In recent years, some legal challenges to coverage exclusions have also considered issues of cost and concluded that covering gender-affirming care does not significantly increase costs for plans. In discussing the parties' experts on the issue of the cost, one court noted that, "[f]rom an actuarial perspective, there appears to be no dispute that the cost of coverage is immaterial." [449] Another court reviewing expert testimony called any cost savings from excluding coverage for gender-affirming care "both practically and actuarially immaterial." [450]

Based on the studies discussed above, we estimate that providing transgender individuals nondiscriminatory insurance coverage and treatment would have a small impact on the overall cost of care and on health insurance premiums in terms of the percentage of overall spending. We reiterate that the final rule does not mandate the provision or coverage of gender-affirming care, or any particular health service. However, to the extent a covered entity provides coverage for a particular health service, the covered entity must provide the health service to all individuals in a neutral, nondiscriminatory manner consistent with this rule. The utilization rate of covered services, whatever those services may be, is likely to be extremely low because transgender individuals represent a small minority in the general population and because not all transgender individuals will seek medical care in the course of their transition. [451]

As described in this section, the costs associated with gender-affirming care are likely to be small on a percentage basis of total health care costs; however, when these estimates are combined with measures of overall health care spending, they would likely result in incremental costs that could be substantial. As an initial estimate, we pair the Belkin (2015) estimate of 0.012 percent of incremental health care costs with \$4,255.1 billion in total health expenditures in calendar year 2021. [452] When this is grown to 2022 dollars, total health care costs are \$4,550.0 billion. Combining these yields our upper-bound estimate of \$546 million in annual costs associated with additional coverage. As a lower-bound estimate, we adopt an assumption that these costs will be fully offset by reductions in spending on other medical care. This lower bound of \$0 is broadly consistent with a cost-effectiveness analysis that includes the probability of negative incremental costs associated with coverage. [453] For our primary estimate, we start with the midpoint of the lower-bound and upper-bound cost estimate of about \$273.24 million annually. We reduce this figure by half to account for several factors, such as some covered entities already covering gender-affirming care under the baseline scenario. The coverage from § 92.207(b)(1) through (5) and (6) have delayed applicability dates of the first day of the first plan year beginning on or after January 1, 2025. Therefore, there is no cost from coverage in year 1 (2024). This results in a primary estimate of about \$138 million per year starting in year 2 in incremental annual costs associated with additional coverage under the final rule, with a full range of cost estimates including \$0 million and \$546 million.

In addition, health plans and issuers could incur overall costs if total health care utilization increases as a result of this final rule. Any potential increase in costs as a result of increased health care utilization as a result of decreased discrimination could be passed on to beneficiaries in the form of increased premiums. However, this cost would be minimal due to the low utilization of gender affirming care along with the availability of the services.

Assessing Decision Support Tools for Discrimination

Section 92.210 sets a minimum requirement for each covered entity to make reasonable efforts to mitigate the risk of discrimination resulting from the covered entity's use of a decision support tool. This will impose a cost on covered entities to review for potential discrimination in their decision support tools and to then make reasonable steps to mitigate the risk of discrimination. To estimate the cost of review, the Department assumes that all covered entities, or 266,297 entities, would on average take 1 hour to review decision support tools in year 1 and 0.5 hours in each year 2–5. The Department assumes the time burden is halved after year 1 because entities would only be reviewing new decision support tools or changes made to preexisting ones in the past year. Evidence suggests that larger entities, such as insurers, health systems and national labs, are more likely to use decision support tools while some types of entities may not use them at all. [454] It is therefore likely that entities will have a large variance in time burden in practice as some entities will need to spend more time reviewing and others much less. OCR assumes that the hour of review consists of a 1557 coordinator (SOC code 43–4071) spending 0.5 hours coordinating a request for information on the potential for discrimination in decision support tools used by the covered entity and a Management Analyst (13–1111) or equivalent employee with knowledge of the decision support tools spending 0.5 hours responding to that request. After adjusting for fringe benefits and other indirect costs, the hourly wages for the Management Analyst and Section 1557 Coordinator come to \$100.64 and \$38.04 respectively. We monetize the time spent on reviewing decision support tools by estimating a total cost per entity

*williamsinstitute.law.ucla.edu/wp-content/uploads/Herman-Cost-Benefit-of-Trans-Health-Benefits-Sept-2013.pdf.*

[447] William V. Padula et al., *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis,* 31 J. of Gen. Internal Med. 394 (2015), *https://pubmed.ncbi.nlm.nih.gov/26481647/.*

[448] Hum. Rts. Campaign, *Corporate Equality Index 2021* (2021), *https://reports.hrc.org/corporate-equality-index-2021?_ga=2.206988627.1166715317.1639876655-819100514.1639876655.*

[449] *Boyden v. Conlin,* 341 F. Supp. 3d 979, 1000 (W.D. Wis. 2018).

[450] *Flack v. Wis. Dep't of Health Servs.,* 395 F. Supp. 3d 1001, 1021 (W.D. Wis. 2019); *see also Kadel v. Folwell,* No. 1:19–cv–00272, 2022 WL 2106270, at *22 (finding that the cost of covering gender-affirming care "pales in comparison" to the Defendant state health plan's overall cash balance and that excluding such coverage would only save each plan member "about one dollar each").

[451] State of Cal., Dep't of Ins., *Economic Impact Assessment Gender Nondiscrimination in Health Insurance,* pp. 2, 5 (Apr. 13, 2012), *http://translaw.wpengine.com/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.*

[452] U.S. Dep't of Health & Hum. Servs., Ctrs. for Medicare & Medicaid Servs., *Table 19. National Health Expenditure Accounts: Methodology Paper,* 2022, *https://www.cms.gov/files/document/definitions-sources-and-methods.pdf.*

[453] William V. Padula et al., *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis,* 31 J. of Gen. Internal Med. 394 (2015), *https://pubmed.ncbi.nlm.nih.gov/26481647/.*

[454] Xia Jing et al., *Availability and Usage of Clinical Decision Support Systems (CDSSs) in Office-Based Primary Care Settings in the USA,* BMJ Health Care Inform. (2019), *https://pubmed.ncbi.nlm.nih.gov/31818828.*

of $69.34 ($100.64 × 0.5 + $38.04 × 0.5). The estimated total cost to review decision support tools for all covered entities is $18,465,034 ($69.34 × 266,297) in year 1. In years 2–5, OCR estimates that the time burden will be half of what it was in year 1. This will lead to a total cost per entity of $34.67 ($100.64 × 0.25 + $38.04 × 0.25) in years 2–5. The estimated total cost to review decision support tools for all covered entities is $9,232,517 ($34.67 × 266,297) in each year 2–5.

If an entity reviews their decision support tools and determines that there is no evidence that use of the tools may result in discriminatory outputs, then it is likely that no further action will be taken, and no additional cost will be incurred. If the entity determines that there is evidence that the decision support tools used by the covered entity could result in discriminatory outputs, then the entity will have to make reasonable mitigation steps to be in compliance with the final rule. OCR has determined that there are a large variety of actions that a covered entity can take to satisfy the requirements of the final rule and that these steps likely depend on the specific scenario. One aspect that will affect what a covered entity would do is if the decision support tool that is being used is a third-party product that the covered entity pays for or was developed and is owned by the covered entity itself. In the first scenario, the covered entity could notify the third party that the decision support tool may result in outputs that could be in violation of the rule, take mitigation steps in the use of the tool to ensure decisions made using that tool account for the potential for bias, or switch to a different product if the cost to do so is not prohibitive. If the covered entity maintains their own decision support tool, then they might take time to update the decision support tool, change policies and procedures about its use, or take other reasonable mitigation measures to ensure that it is not used in a discriminatory manner. The cost of all these actions may vary greatly, and OCR does not have data to assess what the costs may be. Generally, OCR assumes that larger entities, such as multihospital health systems and insurers will have a higher cost to resolve these issues since they are more likely to use decision support tools.[455] In addition, OCR does not have data on how likely any given decision support tool is to be discriminatory and therefore necessitate taking reasonable mitigation steps. Due to these data limitations, OCR does not quantify the cost of taking reasonable mitigation steps.

Exemption Requests

We also identify a cost related to covered entities submitting a request for assurance of an exemption based on Federal conscience or religious freedom laws. We model this potential cost associated with exemption assurance requests as the time spent by covered entities to (a) assess the need for an exemption; (b) write the exemption assurance request; and (c) submit such a request to OCR. As an initial calculation, we assume that this would involve two (2) employees spending two (2) hours each assessing the need for an exemption and one employee spending three (3) hours writing and submitting the exemption assurance request to OCR. We further assume that legal personnel, including lawyers and legal assistants, would perform these functions. The mean hourly wage for these occupations is $70.55 per hour for each employee, which we double to account for overhead and other indirect costs. We multiply these factors together and estimate the cost per exemption request of $987.70 ($141.10 × 7 = $70.55 × 2 × 7).

OCR has revised the estimate of the number of religious exemptions from the Proposed Rule RIA, which assumed 27 religious exemptions. OCR has increased this estimate to provide a more conservative estimate of the cost of religious exemptions, given significant uncertainty in the number of requests that will be submitted. OCR revises its assumptions to assume that 707 religious hospitals and 2 percent of all other covered entities will request assurance of religious exemptions. This results in a total of 6,019 of such requests (707 + ((266,297 − 707) × 0.02)) in the first year. OCR estimates the cost to covered entities for the 6,019 of such requests as $5,944,792 (6,019 × $987.73).

We estimate the cost to OCR comprising the time it would take to review the request and determine if the exemption assurance should be given. We estimate that it would take a single lawyer equivalent employee (Occupation code 23–1011), with a wage of $70.55 per hour, 3 hours to complete this review. We double the mean hourly wage to account for overhead and fringe benefits. OCR estimates the cost to review 6,019 assurance of exemption requests as $2,547,768 ($141.10 × 3 × 6,019). The total estimated cost of this process is $8,492,559.

c. Total Quantified Costs

Table 4 below presents the total annual costs anticipated under the final rule for which estimates have been developed. For the purposes of this analysis, we assume that the regulatory requirements begin to take effect in the middle of 2024. In the first year under the final rule, these estimated costs include $927.4 million in training, $8.5 million to process religious assurance of exemption requests, $18.5 million to review decision support tools, and $65.0 million to revise policies and procedures. For all years in the analysis, we estimate recurring costs of $46.6 million related to notices. We estimate a first-year cost of $37 million related to documentation, with ongoing costs in future years of $10.1 million. We also report a primary recurring cost estimate of $136.6 million associated with coverage of gender-affirming care starting in year 2 and $9.2 million in reviewing decision support tools starting in year 2. The total costs in year 1 amount to $1,102.9 million, with ongoing annual costs of $511.7 million in subsequent years.

TABLE 4—PRIMARY ESTIMATE OF TOTAL ANNUAL COSTS

[$ Millions, 2022 dollars]

| Cost element | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| Training | $927.4 | $309.1 | $309.1 | $309.1 | $309.1 |
| Policies and Procedures | 65.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Notices | 46.6 | 46.6 | 46.6 | 46.6 | 46.6 |
| Documentation | 37.0 | 10.1 | 10.1 | 10.1 | 10.1 |
| Gender-affirming Care Coverage | 0 | 136.6 | 136.6 | 136.6 | 136.6 |

[455] Robert. S. Rudin & Shira H. Fischer, *Trends in the Use of Clinical Decision Support by Health System-Affiliated Ambulatory Clinics in the United States 2014–2016*, Am. J. of Accountable Care (2019), https://www.ajmc.com/view/trends-in-the-use-of-clinical-decision-support-by-health-system-affiliated-ambulatory-clinics-in-the-united-states-20142016.

TABLE 4—PRIMARY ESTIMATE OF TOTAL ANNUAL COSTS—Continued

[$ Millions, 2022 dollars]

| Cost element | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| Assurance of Exemption Requests ......................................................... | 8.5 | 0.0 | 0.0 | 0.0 | 0.0 |
| Decision Support Tool Review ................................................................ | 18.5 | 9.2 | 9.2 | 9.2 | 9.2 |
| Total Costs * ...................................................................................... | 1,102.9 | 511.7 | 511.7 | 511.7 | 511.7 |

This rulemaking also revises the Department's interpretation of whether Medicare Part B payments constitute Federal financial assistance by answering that question in the affirmative. Thus, the requirements of section 1557 and other civil rights statutes apply to entities that receive payments through Medicare Part B. We are currently unable to quantify the number of covered entities that are enrolled in Medicare Part B but that receive no other forms of Federal financial assistance. The 2016 Rule discussed several of the challenges associated with estimating the number of these entities. For example, the 2016 Rule notes that, "although we have data, by program, for the number of physicians receiving payment from each program, there is no single, unduplicated count of physicians across multiple programs." We adopt the finding of the 2016 Rule that almost all practicing physicians were likely covered by the rule because they accept Federal financial assistance from sources other than Medicare Part B.[456]

3. Discussion of Benefits

Quantifying benefits for this final rule presents significant challenges. One notable challenge relates to attribution: several sources of benefits discussed in the preambles of the 2016 and 2020 Rules overlap with and may be attributable to prior existing civil rights regulation, to the ACA rather than the 2016 and 2020 rulemakings that implement section 1557, or to nondiscrimination policies based on State law or institutional policies prohibiting discrimination generally.

A second challenge relates to identifying a quantitative relationship between nondiscrimination policies and important outcomes such as improvements in public health outcomes. For example, we anticipate that this regulation would reduce the incidence of providers refusing to treat patients based on the patient's gender identity. This would result in fewer instances of delayed or denied care, which in turn would lead to reductions in mortality and morbidity risks.

However, we are not able to estimate the changes in the magnitude of these discriminatory events that would be attributable to the final rule, and thus are unable to quantify or monetize these health improvements. Similarly, we anticipate that the final rule will result in other sources of benefits that we are unable to quantify. These include a reduction in suicidal ideation and attempts, improvements to mental health, reductions in substance use, and generally align with a discussion of the economic impacts of a California regulation relating to gender nondiscrimination in health insurance.[457]

In addition to these health improvements, we anticipate benefits to covered entities from additional regulatory clarity on how OCR will enforce the ACA's nondiscrimination protections, particularly in light of ongoing litigation related to the 2020 Rule, interpretation of the Supreme Court's *Bostock* decision, and the Department's Bostock Notification. The training provisions represent one mechanism by which the final rule would reduce discriminatory events. This would, in turn, reduce the number of enforcement actions, representing a potential cost-saving benefit for covered entities. We also anticipate benefits to covered entities from the establishment of a grievance process, which would reduce the number of complaints filed with OCR, though this may be offset somewhat from covered entities with fewer than 15 employees referring complaints to OCR in lieu of adopting their own grievance procedure.

We also anticipate that beneficiaries could benefit from reduced obstacles to accessing health care, including fewer language barriers and a reduction in discriminatory behavior related to sexual orientation and gender identity, resulting in a potential increase in overall health care utilization. These benefits relate to individuals' ability to access care and the quality of care they

receive. For example, the provisions related to language access for individuals with LEP and accessibility for individuals with disabilities could reduce instances of negative outcomes, including death, due to a lack of understanding between patient and doctor or between patient and pharmacist, as well as lack of access to services. We also anticipate that the process by which individuals and recipients may seek assurance of an exemption based on Federal conscience or religious freedom laws will result in benefits from reduced litigation, which we do not capture in the benefit analysis. In addition, the prohibition on discrimination through the use of decision support tools is also likely to have a direct benefit on the health of individuals who are suffering from delayed or denied medical care due to discriminatory application of decision support tools. An example of this would be an incorrect diagnosis for skin cancer for a Black patient, which could lead to greater medical costs in the future and negative health outcomes for the patient.[458] Furthermore, the positive effects of using decision support tools, such as identifying those at risk for cardiovascular disease at an earlier date, will be a benefit across populations experiencing discrimination.[459]

4. Analysis of Regulatory Alternatives to the Final Rule

The Department considered various alternatives while developing this regulation, including adopting the compliance timeline of the Proposed Rule. As discussed in the preamble, the final rule will allow additional time for covered entities to comply with certain procedural requirements, as compared to the timeline of the Proposed Rule. For example, covered entities must comply with the § 92.9 Training requirements by no later than 300 days of effective

---

[456] 81 FR 31375, 31445–46 (May 18, 2016).

[457] State of Cal., Dep't of Ins., *Economic Impact Assessment Gender Nondiscrimination in Health Insurance,* pp. 9–11 (Apr. 13, 2012), *http://translaw.wpengine.com/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.*

[458] Thomas Grote & Geoff Keeling, *On Algorithmic Fairness in Medical Practice,* Cambridge Quarterly of Healthcare Ethics, January 2022. *https://pubmed.ncbi.nlm.nih.gov/35049447/.*

[459] Rachel Gold et al., *Effect of Clinical Decision Support at Community Health Centers on the Risk of Cardiovascular Disease: A Cluster Randomized Clinical Trial,* JAMA Network Open (2022), *https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2788645.*

date. This revised timeline will postpone certain costs incurred by covered entities; however, since this analysis reports annual impacts, the revised timeline does not affect the quantified cost estimates. This section discusses several other alternatives OCR considered.

The Department analyzed several regulatory alternatives to the final rule related to the notice requirements. The first alternative considered retaining the 2020 Rule's repeal of the notices and taglines provisions. The Department considered concerns raised in response to the 2016 Rule notice and tagline requirements, as well as concerns raised in response to the removal of those requirements in the 2020 Rule. Though the Department acknowledges the burden placed on covered entities through the 2016 Rule notice requirements, the Department believes the 2020 Rule did not adequately consider the confusion and uncertainty placed on individuals or the unnecessary ambiguity that covered entities face by the 2020 Rule's repeal of the notices and taglines provisions in their entirety. As described earlier, we estimate that these provisions under the final rule would cost covered entities, as an aggregate, $46.6 million for each year. While excluding the provisions relating to the notices would reduce the cost of the final rule by $46.6 million, the Department rejected this option because it believes that the final provisions strike an appropriate balance between providing greater access for beneficiaries, while maximizing efficiency and economies of scale for covered entities.

The second alternative considered by the Department would require covered entities to provide notices only at their first encounter with a beneficiary. For this alternative, we adopt the quantity and cost estimates associated with eligibility and enrollment communication included in Table 5 above. Under our primary cost scenario, this policy alternative would result in annual costs of notices of $0.7 million, which is about $45.9 million lower than the final rule. The Department rejected this option however, because this policy alternative, while posing a significantly reduced cost and burden on covered entities, would be too narrow and substantially reduce the information available to beneficiaries, likely resulting in beneficiaries not being aware of their civil rights, including whether they have experienced a prohibited discriminatory practice by a covered entity.

The third alternative considered by the Department would require a more expansive notice provision, extending the requirements to include pharmacy-related notices. For this alternative, we adopt the 2020 RIA estimate of 3.2 billion annual pharmacy-related notices. This would result in $169.7 million in costs per year, or an increase of $123.1 million compared to the final rule. While this alternative related to notices would increase the number of notices available to beneficiaries, and therefore increase beneficiaries' opportunity to receive information regarding nondiscrimination and civil rights protections, the Department believes this alternative would neither address nor remedy the burden placed on covered entities through the 2016 Rule notice requirements. For this reason, the Department rejected this alternative.

Finally, the Department also considered not including a process for covered entities to submit a request for assurance of a religious or conscience exemption. As described in the cost section, we estimate that this policy alternative would reduce the quantified costs by $8.5 million. The Department did not choose this alternative because of its obligations to enforce a range of statutory protections, including Federal religious freedom and conscience laws. OCR remains committed to educating patients, providers, and other covered entities about their rights and obligations under these statutes, to protecting patients' health and dignity, and to providing a clear administrative process that respects the right to raise objections to the provision of certain kinds of care.

We have not quantified the benefits associated with this information for the final rule or for these policy alternatives.

Table 5 reports the total costs of these policy alternatives in present value and annualized terms, adopting a 3 percent and 7 percent discount rate. Table 6 reports the difference between the total cost of the alternatives compared to the provisions of the final rule, using the same accounting methods and discount rates. All estimates are presented in millions of year-2022 dollars, using 2024 as the base year for discounting.

### TABLE 5—TOTAL COST OF POLICY ALTERNATIVES CONSIDERED

[$ Millions, 2022 dollars]

| Accounting method discount rate | Present value | | Annualized | |
| --- | --- | --- | --- | --- |
| | 3% | 7% | 3% | 7% |
| Final Rule | $2,917.6 | $2,650.8 | $637.1 | $646.5 |
| Alternative 1: No Notice Provision | 2,704.1 | 2,459.7 | 590.5 | 599.9 |
| Alternative 2: Single Notice Provision | 2,707.4 | 2,462.6 | 591.2 | 600.6 |
| Alternative 3: Pharmacy-Related Notices | 3,481.3 | 3,155.4 | 760.1 | 769.6 |
| Alternative 4: No Exemption Provision | 2,909.4 | 2,642.8 | 635.3 | 644.6 |

### TABLE 6—COMPARISON OF ALTERNATIVES TO FINAL RULE

[$ Millions, 2022 dollars]

| Accounting method discount rate | Present value | | Annualized | |
| --- | --- | --- | --- | --- |
| | 3% | 7% | 3% | 7% |
| Alternative 1: No Notice Provision | −$213.5 | −$191.1 | −$46.6 | −$46.6 |
| Alternative 2: Single Notice Provision | −210.2 | −188.2 | −45.9 | −45.9 |
| Alternative 3: Pharmacy-related Notices | 563.7 | 504.6 | 123.1 | 123.1 |
| Alternative 4: No Exemption Provision | −8.2 | −7.9 | −1.8 | −1.9 |

The Department also considered whether to require covered entities to collect the self-identified race, ethnicity, primary language (spoken and written), sex (consistent with the categories of sex discrimination described at § 92.101(a)(2)), age, and disability status data for beneficiaries in any health program or activity. The Department believes, however, that our current authorities under section 1557, title VI, section 504, title IX, and the Age Act already provide us the ability to collect these data to ensure compliance.[460]

*B. Regulatory Flexibility Act—Final Small Entity Analysis*

The RFA requires agencies issuing a regulation to analyze options for regulatory relief of small businesses if a rule will have a significant impact on a substantial number of small entities. The RFA generally defines a "small entity" as:

(1) A proprietary firm meeting the size standards of the Small Business Administration (SBA);

(2) A nonprofit organization that is not dominant in its field; or

(3) A small government jurisdiction with a population of less than 50,000 (States and individuals are not included in the definition of "small entity").

OCR uses as its measure of significant economic impact on a substantial number of small entities a change in revenues of more than 3 percent for 5 percent or more of affected small entities. In instances where OCR judged that the final rule would have a significant impact on a substantial number of small entities, we considered alternatives to reduce the burden. To accomplish our task, we first identified all the small entities that may be impacted, and then evaluated whether the economic burden we determined in the RIA represents a significant economic impact.

1. Entities That Will Be Affected

OCR has traditionally classified most providers as small entities even though some nonprofit providers would not meet the definition of "small entity" were they proprietary firms. Nonprofit entities are small if they are independently owned and operated and are not dominant in their fields. The CMS Provider of Service file has indicators for profit and nonprofit entities, but these have proven to be unreliable. The Census data identifies firms' tax status by profit and non-profit status but only reports revenues and does not report them by the profit and non-profit status of the entity.

a. Physicians

One class of providers we do not automatically classify as small businesses is physician practices. Physician practices are businesses and therefore are "small" if they meet the SBA's definition. The current size standard for physicians (excluding mental health specialists) (North American Industry Classification System code 62111) is annual receipts of less than $16 million.[461] Using the Census data showing the number of firms, employees and payroll, we selected physicians that reported fewer than 20 employees as the top end for small physician offices. This equaled 16,361 entities or 9.8 percent of all physician offices defined as "large." This left 150,933 offices or 90.2 percent as "small."[462]

b. Pharmacies

Pharmacies also are businesses, and the size standard for them is annual receipts of less than $37.5 million. According to Statistics of U.S. Businesses, there are 19,346 pharmacy and drug store firms (North American Industry Classification System code 456110). Because of the lack of revenue or receipt data for pharmacies, we are unable to estimate the number of small pharmacies based on the SBA size standard. However, using the number of employees taken from the Statistics of U.S. Businesses as a proxy for revenues, the data is divided by number of employees per firm and shows the number of employers with fewer than 20 employees and those with more than 20 employees.[463] There are 17,160 pharmacy firms with fewer than 20 employees, representing 88.7 percent of the total number of pharmacy firms. It seemed reasonable to assume that firms with fewer than 20 employees satisfy the SBA size standard and thus we accepted that the number of small pharmacy firms equaled 17,160. As with the number of small physician offices, our method can only identify the minimum number of "small" pharmacies that meet the SBA size

standard. We cannot determine the actual number of "small" pharmacies.

c. Health Insurance Issuers

Another class of covered entities that are business enterprises is health insurance issuers. The SBA size standard for health insurance issuers is annual receipts of $47 million. Based on the analysis below, we conclude that there are few small health insurance issuers.

In 2021, there were 483 issuers in the U.S. health insurance market.[464] Health insurance issuers are generally classified under the North American Industry Classification System (NAICS) code 524114 (Direct Health and Medical Insurance Carriers). According to SBA size standards,[465] entities with average annual receipts of $47 million or less are considered small entities for this NAICS code. The Departments expect that few, if any, insurance companies underwriting health insurance policies fall below these size thresholds. Due to the lack of recent Census data based on enterprise receipt size, HHS used the Census 2017 SUSB data as a proxy since it was the last year in which this data is available. Based on data from SUSB annual report submissions for the 2017 SUSB reporting year, approximately 443 out of 745 issuers of health insurance coverage nationwide, approximately 59.46%, had total premium revenue of $40.0 million or less.[466] OCR decided to use a value slightly higher than the 2017 SBA standard to account for slight changes in the industry in addition to inflation. We then apply this percentage to the current number of insurance Issuers to estimate the number of small entities for the business type, which is approximately 517 of 869 entities. However, this estimate may overstate the actual number of small health insurance issuers that may be affected due to changes in the health care industry since 2017. To produce a conservative estimate, for the purposes of this analysis, the Departments assumes 59.5 percent, or 517 issuers are considered small entities.

d. Local Government Entities

We also excluded local governmental entities from our count of small entities

---

[460] *See, e.g.,* 45 CFR 80.6, 86.71, 91.34, and 84.61.

[461] U.S. Small Business Admin., *Table of Small Business Size Standards Matched to North American Industry Classification System Codes, Small Business Administration* (March 2023), *https://www.sba.gov/document/support-table-size-standards.*

[462] Physician practices may earn more than $16 million per year and that would increase the number of "large" practices in the analysis. But as we will later show, large practices will have proportionally larger workforce staff that must be excluded from the analysis.

[463] U.S. Census Bureau, *Statistics of U.S. Businesses, https://www.census.gov/programs-surveys/susb.html.*

[464] U.S. Health & Hum. Servs., Ctrs. for Medicare & Medicaid Servs. (2022), *Medical Loss Ratio Data and System Resources, https://www.cms.gov/CCIIO/Resources/Data-Resources/mlr.*

[465] U.S. Small Business Admin., *Table of Size Standards* (March 17, 2023), *https://www.sba.gov/document/support--table-size-standards.*

[466] U.S. Health & Hum. Servs., Ctrs. for Medicare & Medicaid Servs., *Medical Loss Ratio Data and System Resources* (2017), *https://www.sba.gov/marketplace/resources/data/medical-loss-ratio-data-systems-resources.*

because we lack the data to classify them by populations of fewer than 50,000. The following table shows the number of small, covered entities we estimated could be affected by the final rule.

TABLE 8—SMALL ENTITIES

| NAICS code | Business type | Small entities |
|---|---|---|
| 62142 | Outpatient mental health and substance abuse centers | 7,649 |
| 621491 | HMO medical centers | 84 |
| 621492 | Kidney dialysis centers | 449 |
| 621493 | Freestanding ambulatory surgical and emergency centers | 4,554 |
| 621498 | All other outpatient care centers | 6,307 |
| 6215 | Medical and diagnostic laboratories | 7,200 |
| 6216 | Home health care services | 25,718 |
| 6219 | All other ambulatory health care services | 7,091 |
| 62321 | Residential intellectual and developmental disability facilities | 6,674 |
| 6221 | General medical and surgical hospitals | 2,445 |
| 6222 | Psychiatric and substance abuse hospitals | 434 |
| 6223 | Specialty (except psychiatric and substance abuse) hospitals | 301 |
| 6231 | Nursing care facilities (skilled nursing facilities) | 9,824 |
| 45611 | Pharmacies and drug stores | 17,160 |
| 6211 | Offices of physicians | 150,933 |
| 524114 | Insurance Issuers | 517 |
| | Navigator grantees | 58 |
| | Total Entities | 247,398 |

## 2. Whether the Rule Will Have a Significant Economic Impact on Covered Small Entities

The Department generally considers a rule to have a significant impact on a substantial number of small entities if it has at least a 3 percent impact on revenue on at least 5 percent of small entities. We performed a threshold analysis to determine whether the quantified impacts of the final rule will exceed these thresholds. As described earlier in this analysis, we estimate the total annualized costs of the final rule would be about $637.1 million. Dividing these total costs by the 247,398 small entities gives a cost per entity of $2,575. This cost estimate would only exceed the 3 percent "significant impact" threshold on revenue for any covered small businesses with revenue below $85,836. We conclude that very few small businesses covered by the final rule will have revenues below $85,836, and that this number is very likely to be smaller than the 5 percent "substantial number" threshold.

As an additional consideration, we note that the costs of the final rule are mostly proportional to the size of the covered entity. For example, the costs associated with training, which account for more than 70 percent of the total costs of the final rule, are mostly proportional to the number of employees receiving training. In the main analysis, we estimate an incremental impact of one (1) hour per employee trained. The opportunity cost of training each employee represents 0.05 percent of a full-time employee's

annual labor productivity, assuming a full-time employee works 2,080 hours per year.[467] This finding, that the cost of training represents 0.05 percent of the share of employees receiving training, is constant across firm size.

Because the costs of the final rule are small relative to the revenue of covered entities, including covered small entities, and because even the smallest affected entities would be unlikely to face a significant impact, we certify that the final rule will not have a significant economic impact on a substantial number of small entities.

## C. Executive Order 12250 on Leadership and Coordination of Nondiscrimination Laws

Pursuant to E.O. 12250, the Department of Justice has the responsibility to "review . . . proposed rules . . . of the Executive agencies" implementing nondiscrimination statutes such as section 1557 "in order to identify those which are inadequate, unclear or unnecessarily inconsistent." The Department of Justice has reviewed and approved this final rule.

## D. Paperwork Reduction Act

### Information Collection Requirements

This final rule contains information collection requirements (ICRs) that are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA) of

1995.[468] In order to evaluate whether an information collection should be approved by OMB, the PRA requires that the Department solicits comment on the following issues:

1. Whether the information collection is necessary and useful to carry out the proper functions of the agency;

2. The accuracy of the agency's estimate of the information collection burden;

3. The quality, utility, and clarity of the information to be collected; and

4. Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.[469]

The PRA requires consideration of the time, effort, and financial resources necessary to meet the information collection requirements referenced in this section. The Department previously published a notice of a proposed data collection on August 4, 2022, at 87 FR 47907–08, as part of an NPRM entitled "Nondiscrimination in Health Programs and Activities" (RIN 0945–AA17), to invite public comment. OCR solicited comment on the issues listed above for the sections that contain ICRs. The following paragraphs describe these provisions, with an estimate of the annual burden, summarized in Table 1. OCR did not receive comments related to the previous notice but has adjusted the estimated respondent burden in this request to reflect revised assumptions based on updated information available at the time of the final rule's

---

[467] 40 hours per week × 52 weeks = 2,080 hours. 0.05% = 0.0005 = 1 hour ÷ 2080 hours.

[468] 44 U.S.C. 3501–3520.

[469] 44 U.S.C. 3506(c)(2)(A).

E. Assessment of Federal Regulation and Policies on Families

Section 654 of the Treasury and General Government Appropriations Act of 1999 requires Federal departments and agencies to determine whether a proposed policy or regulation could affect family well-being. If the determination is affirmative, then the Department or agency must prepare an impact assessment to address criteria specified in the law.

The final rule would not negatively affect family wellbeing and would strengthen the stability of the family by promoting the ability of all individuals and families to receive health care free from discrimination. As research demonstrates that experiencing discrimination can have a negative impact on health and wellbeing, this rule addresses the immediate and long-term effects of discriminatory actions and establishes a set of practices to remove barriers to accessing care among entities that receive Federal funds. Addressing and preventing discrimination in health care can also improve the financial stability of the family unit by increasing access to nondiscriminatory health insurance coverage and other health-related coverage, aiding parents in their ability to provide for and nurture their children. The rule may be carried out only by the Federal Government because it would implement Federal nondiscrimination law, ensuring that American families have access to health care information and services, regardless of the State where they are located.

List of Subjects

*42 CFR Part 438*

Citizenship and naturalization, Civil rights, Grant programs-health, Individuals with disabilities Medicaid, Reporting and recordkeeping requirements, Sex discrimination.

*42 CFR Part 440*

Citizenship and naturalization, Civil rights, Grant programs-health, Individuals with disabilities, Medicaid, Sex discrimination.

*42 CFR Part 457*

Administrative practice and procedure, Grant programs-health, Health insurance, Reporting and recordkeeping requirements.

*42 CFR Part 460*

Aged, Citizenship and naturalization, Civil rights, Health, Health care, Health records, Individuals with disabilities, Medicaid, Medicare, Religious discrimination, Reporting and recordkeeping requirements, Sex discrimination.

*45 CFR Part 80*

Civil rights, Individuals with disabilities, Sex discrimination, Vocational education.

*45 CFR Part 84*

Civil rights, Equal educational opportunity, Equal employment opportunity, Health care, Individuals with disabilities, Infants and children, Reporting and recordkeeping requirements.

*45 CFR Part 92*

Administrative practice and procedure, Aged, Citizenship and naturalization, Civil rights, Communications equipment, Health facilities, Health insurance, Health programs or activities, Healthcare, Individuals with disabilities, Reporting and recordkeeping requirements, Sex discrimination.

*45 CFR Part 147*

Aged, Citizenship and naturalization, Civil rights, Health care, Health insurance, Individuals with disabilities, Intergovernmental relations, Reporting and recordkeeping requirements, Sex discrimination.

*45 CFR Part 155*

Administrative practice and procedure, Advertising, Aged, Brokers, Citizenship and naturalization, Civil rights, Conflict of interests, Consumer protection, Grant programs-health, Grants administration, Health care, Health insurance, Health maintenance organizations (HMO), Health records, Hospitals, Indians, Individuals with disabilities, Intergovernmental relations, Loan programs-health, Medicaid, Organization and functions (Government agencies), Public assistance programs, Reporting and recordkeeping requirements, Sex discrimination, State and local governments, Taxes, Technical assistance, Women, Youth.

*45 CFR Part 156*

Administrative practice and procedure, Advertising, Advisory committees, Brokers, Conflict of interests, Consumer protection, Grant programs-health, Grants administration, Health care, Health insurance, Health maintenance organization (HMO), Health records, Hospitals, Indians, Individuals with disabilities, Loan programs-health, Medicaid, Organization and functions (Government agencies), Public assistance programs, Reporting and recordkeeping requirements, State and local governments, Sunshine Act, Technical assistance, Women, Youth.

Dated: April 18, 2024.

**Xavier Becerra,**
*Secretary, Department of Health and Human Services.*

For the reasons set forth in the preamble, the Department of Health and Human Services amends 42 CFR parts 438, 440, 457, and 460 and 45 CFR parts 80, 84, 92, 147, 155, and 156 as follows:

**Title 42—Public Health**

**PART 438—MANAGED CARE**

■ 1. The authority citation for part 438 continues to read as follows:

**Authority:** 42 U.S.C. 1302.

■ 2. Amend § 438.3 by revising paragraph (d)(4) to read as follows:

**§ 438.3 Standard contract requirements.**

\* \* \* \* \*

(d) \* \* \*

(4) The MCO, PIHP, PAHP, PCCM or PCCM entity will not discriminate against individuals eligible to enroll on the basis of race; color; national origin; disability; or sex which includes sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes; and will not use any policy or practice that has the effect of discriminating on the basis of race; color; national origin; disability; or sex which includes discrimination on the basis of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes.

\* \* \* \* \*

■ 3. Amend § 438.206 by revising paragraph (c)(2) to read as follows:

**§ 438.206 Availability of services.**

\* \* \* \* \*

(c) \* \* \*

(2) *Access and cultural considerations.* Each MCO, PIHP, and PAHP participates in the State's efforts to promote the delivery of services in a culturally competent manner to all enrollees, including those with limited English proficiency and diverse cultural and ethnic backgrounds, disabilities, and regardless of sex which includes sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity and sex stereotypes.

\* \* \* \* \*

## PART 440—SERVICES: GENERAL PROVISIONS

■ 4. The authority citation for part 440 continues to read as follows:

**Authority:** 42 U.S.C. 1302.

■ 5. Revise § 440.262 to read as follows:

### § 440.262   Access and cultural conditions.

The State must have methods to promote access and delivery of services in a culturally competent manner to all beneficiaries, including those with limited English proficiency, diverse cultural and ethnic backgrounds, disabilities, and regardless of sex which includes sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes. These methods must ensure that beneficiaries have access to covered services that are delivered in a manner that meets their individualized needs.

## PART 457—ALLOTMENTS AND GRANTS TO STATES

■ 6. The authority citation for part 457 continues to read as follows:

**Authority:** 42 U.S.C. 1302.

■ 7. Amend § 457.495 by adding paragraph (e) to read as follows:

### § 457.495   State assurance of access to care and procedures to assure quality and appropriateness of care.

\*     \*     \*     \*     \*

(e) Access to and delivery of services in a culturally competent manner to all beneficiaries, as described in 42 CFR 440.262.

## PART 460—PROGRAMS OF ALL-INCLUSIVE CARE FOR THE ELDERLY (PACE)

■ 8. The authority citation for part 460 continues to read as follows:

**Authority:** 42 U.S.C. 1302, 1395, 1395eee(f), and 1396u–4(f).

■ 9. Amend § 460.98 by revising paragraph (b)(3) to read as follows:

### § 460.98   Service delivery.

\*     \*     \*     \*     \*

(b) \*  \*  \*

(3) The PACE organization shall not discriminate against any participant in the delivery of required PACE services based on race, ethnicity, national origin, religion, sex (including sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes), age, mental or physical disability, or source of payment.

\*     \*     \*     \*     \*

■ 10. Amend § 460.112 by revising paragraph (a) introductory text to read as follows:

### § 460.112   Specific rights to which a participant is entitled.

(a) *Respect and nondiscrimination.* Each participant has the right to considerate, respectful care from all PACE employees and contractors at all times and under all circumstances. Each participant has the right not to be discriminated against in the delivery of required PACE services based on race, ethnicity, national origin, religion, sex (including sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes), age, mental or physical disability, or source of payment. Specifically, each participant has the right to the following:

\*     \*     \*     \*     \*

### Title 45—Public Welfare

## PART 80—NONDISCRIMINATION UNDER PROGRAMS RECEIVING FEDERAL ASSISTANCE THROUGH THE DEPARTMENT OF HEALTH AND HUMAN SERVICES EFFECTUATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

■ 11. The authority citation for part 80 continues to read as follows:

**Authority:** Sec. 602, 78 Stat. 252; 42 U.S.C. 2000d–1.

■ 12. Amend appendix A to part 80 under part 1 by adding entry 155 in numerical order to read as follows:

### Appendix A to Part 80—Federal Financial Assistance To Which These Regulations Apply Part 1. Assistance Other Than Continuing Assistance to States

\*     \*     \*     \*     \*

155. Supplementary medical insurance benefits for the aged (Title XVIII, Part B, Social Security Act, 42 U.S.C. 1395j–1395w–6).

\*     \*     \*     \*     \*

## PART 84—NONDISCRIMINATION ON THE BASIS OF HANDICAP IN PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE

■ 13. The authority citation for part 84 continues to read as follows:

**Authority:** 20 U.S.C. 1405; 29 U.S.C. 794; 42 U.S.C. 290dd–2; 21 U.S.C. 1174.

■ 14. Amend appendix A to part 84 in subpart a, under Definitions, by revising section 2 to read as follows:

### Appendix A to Part 84—Analysis of Final Regulation

### Subpart A—General Provisions

*Definitions* \* \* \*

2. "Federal financial assistance". In § 84.3(h), defining Federal financial assistance, a clarifying change has been made: procurement contracts are specifically excluded. They are covered, however, by the Department of Labor's regulation under section 503. The Department has never considered such contracts to be contracts of assistance; the explicit exemption has been added only to avoid possible confusion.

The proposed regulation's exemption of contracts of insurance or guaranty has been retained. A number of comments argued for its deletion on the ground that section 504, unlike title VI and title IX, contains no statutory exemption for such contracts. There is no indication, however, in the legislative history of the Rehabilitation Act of 1973 or of the amendments to that Act in 1974, that Congress intended section 504 to have a broader application, in terms of Federal financial assistance, than other civil rights statutes. Indeed, Congress directed that section 504 be implemented in the same manner as titles VI and IX. In view of the long established exemption of contracts of insurance or guaranty under title VI, we think it unlikely that Congress intended section 504 to apply to such contracts.

\*     \*     \*     \*     \*

■ 15. Revise part 92 to read as follows:

## PART 92—NONDISCRIMINATION IN HEALTH PROGRAMS OR ACTIVITIES

### Subpart A—General Provisions

Sec.
92.1   Purpose and effective date.
92.2   Application.
92.3   Relationship to other laws.
92.4   Definitions.
92.5   Assurances required.
92.6   Remedial action and voluntary action.
92.7   Designation and responsibilities of a Section 1557 Coordinator.
92.8   Policies and procedures.
92.9   Training.
92.10   Notice of nondiscrimination.
92.11   Notice of availability of language assistance services and auxiliary aids and services.

### Subpart B—Nondiscrimination Provisions

92.101   Discrimination prohibited.

### Subpart C—Specific Applications to Health Programs and Activities

92.201   Meaningful access for individuals with limited English proficiency.
92.202   Effective communication for individuals with disabilities.
92.203   Accessibility for buildings and facilities.
92.204   Accessibility of information and communication technology for individuals with disabilities.
92.205   Requirement to make reasonable modifications.

92.206   Equal program access on the basis of sex.
92.207   Nondiscrimination in health insurance coverage and other health-related coverage.
92.208   Prohibition on sex discrimination related to marital, parental, or family status.
92.209   Nondiscrimination on the basis of association.
92.210   Nondiscrimination in the use of patient care decision support tools.
92.211   Nondiscrimination in the delivery of health programs and activities through telehealth services.

**Subpart D—Procedures**

92.301   Enforcement mechanisms.
92.302   Notification of views regarding application of Federal religious freedom and conscience laws.
92.303   Procedures for health programs and activities conducted by recipients and State Exchanges.
92.304   Procedures for health programs and activities administered by the Department.

**Authority:** 42 U.S.C. 18116.

## PART 92—NONDISCRIMINATION IN HEALTH PROGRAMS OR ACTIVITIES

### Subpart A—General Provisions

**§ 92.1   Purpose and effective date.**

(a) *Purpose.* The purpose of this part is to implement section 1557 of the Patient Protection and Affordable Care Act (ACA) (42 U.S.C. 18116), which prohibits discrimination on the basis of race, color, national origin, sex, age, and disability in certain health programs and activities. Section 1557 provides that, except as otherwise provided in title I of the ACA, an individual shall not, on the grounds prohibited under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, or section 504 of the Rehabilitation Act of 1973, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an executive agency or any entity established under title I of the ACA. This part applies to health programs or activities administered by recipients of Federal financial assistance from the Department, Department-administered health programs or activities, and title I entities that administer health programs or activities.

(b) *Effective date.* The regulations in this part are effective beginning July 5, 2024, unless otherwise provided in the following schedule:

TABLE 1 TO PARAGRAPH (b)

| Section 1557 requirement and provision | Date by which covered entities must comply |
|---|---|
| § 92.7 ...................... | Within 120 days of July 5, 2024. |
| § 92.8 ...................... | Within one year of July 5, 2024. |
| § 92.9 ...................... | Following a covered entity's implementation of the policies and procedures required by § 92.8, and no later than one year of July 5, 2024. |
| § 92.10 ..................... | Within 120 days of July 5, 2024. |
| § 92.11 ..................... | Within one year of July 5, 2024. |
| § 92.207(b)(1) through (5). | For health insurance coverage or other health-related coverage that was not subject to this part as of July 5, 2024, by the first day of the first plan year (in the individual market, policy year) beginning on or after January 1, 2025. |
| § 92.207(b)(6) ........... | By the first day of the first plan year (in the individual market, policy year) beginning on or after January 1, 2025. |
| § 92.210(b) and (c) ... | Within 300 days of July 5, 2024. |

**§ 92.2   Application.**

(a) Except as otherwise provided in this part, this part shall apply to:

(1) Every health program or activity, any part of which receives Federal financial assistance, directly or indirectly, from the Department;

(2) Every health program or activity administered by the Department; and

(3) Every health program or activity administered by a title I entity.

(b) The provisions of this part shall not apply to any employer or other plan sponsor of a group health plan, including but not limited to, a board of trustees (or similar body), association or other group, with regard to its employment practices, including the provision of employee health benefits.

(c) Any provision of this part held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be severable from this part and shall not affect the remainder thereof or the application of the provision to other persons not

similarly situated or to other, dissimilar circumstances.

**§ 92.3   Relationship to other laws.**

(a) Neither section 1557 nor this part shall be construed to apply a lesser standard for the protection of individuals from discrimination than the standards applied under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, or the regulations issued pursuant to those laws.

(b) Nothing in this part shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available under title VI of the Civil Rights Act of 1964, title VII of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, or the Age Discrimination Act of 1975.

(c) Insofar as the application of any requirement under this part would violate applicable Federal protections

for religious freedom and conscience, such application shall not be required. For example, 42 U.S.C. 18023 provides (among other things) that nothing in section 1557 shall be construed to have any effect on Federal laws regarding conscience protection; willingness or refusal to provide abortion; and discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion.

(d) Nothing in this part shall be construed to supersede State or local laws that provide additional protections against discrimination on any basis described in § 92.1.

**§ 92.4   Definitions.**

As used in this part, the term—

*1991 Standards* means the 1991 ADA Standards for Accessible Design, published at appendix A to 28 CFR part 36 on July 26, 1991, and republished as appendix D to 28 CFR part 36 on September 15, 2010.

*2010 Standards* means 36 CFR part 1191, appendices B and D (2009), in conjunction with 28 CFR 35.151.

*ACA* means the Patient Protection and Affordable Care Act (Pub. L. 111–148, 124 Stat. 119 (2010) as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152, 124 Stat. 1029) (codified in scattered sections of U.S.C.)).

*ADA* means the Americans with Disabilities Act of 1990 (42 U.S.C. 12101 *et seq.*), as amended.

*Age* means how old a person is, or the number of elapsed years from the date of a person's birth.

*Age Act* means the Age Discrimination Act of 1975 (42 U.S.C. 6101 *et seq.*), as amended.

*Applicant* means a person who applies to participate in a health program or activity.

*Auxiliary aids and services* include, for example:

(1) Qualified interpreters on-site or through video remote interpreting (VRI) services, as defined in 28 CFR 35.104 and 36.104; note takers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible information and communication technology (ICT); or other effective methods of making aurally delivered information available to persons who are deaf or hard of hearing;

(2) Qualified readers; taped texts; audio recordings; Braille materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible information and communication technology; or other effective methods of making visually delivered materials available to persons who are blind or have low vision;

(3) Acquisition or modification of equipment and devices; and

(4) Other similar services and actions.

*Companion* means a family member, friend, or associate of an individual seeking access to a service, program, or activity of a covered entity, who along with such individual, is an appropriate person with whom a covered entity should communicate.

*Covered entity* means:

(1) A recipient of Federal financial assistance;

(2) The Department; and

(3) An entity established under title I of the ACA.

*Department* means the U.S. Department of Health and Human Services.

*Director* means the Director of the Office for Civil Rights (OCR) of the Department, or their designee(s).

*Disability* means, with respect to an individual, a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment, as defined and construed in the Rehabilitation Act, 29 U.S.C. 705(9)(B), which incorporates the definition of ''disability'' in the ADA, 42 U.S.C. 12102, as amended and adopted at 28 CFR 35.108.

*Exchange* means the same as ''Exchange'' defined in 45 CFR 155.20.

*Federal financial assistance,* as used in this part:

(1) Federal financial assistance means any grant, loan, credit, subsidy, contract (other than a procurement contract but including a contract of insurance), or any other arrangement by which the Federal Government, directly or indirectly, provides assistance or otherwise makes assistance available in the form of:

(i) Funds;

(ii) Services of Federal personnel; or

(iii) Real or personal property or any interest in or use of such property, including:

(A) Transfers or leases of such property for less than fair market value or for reduced consideration; and

(B) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government.

(2) Federal financial assistance the Department provides or otherwise makes available includes Federal financial assistance that the Department plays a role in providing or administering, including advance payments of the premium tax credit and cost-sharing reduction payments under title I of the ACA, as well as payments, subsidies, or other funds extended by the Department to any entity providing health insurance coverage for payment to or on behalf of a person obtaining health insurance coverage from that entity or extended by the Department directly to such person for payment to any entity providing health insurance coverage.

*Federally-facilitated Exchange* means the same as ''Federally-facilitated Exchange'' defined in 45 CFR 155.20.

*Health program or activity* means:

(1) Any project, enterprise, venture, or undertaking to:

(i) Provide or administer health-related services, health insurance coverage, or other health-related coverage;

(ii) Provide assistance to persons in obtaining health-related services, health insurance coverage, or other health-related coverage;

(iii) Provide clinical, pharmaceutical, or medical care;

(iv) Engage in health or clinical research; or

(v) Provide health education for health care professionals or others.

(2) All of the operations of any entity principally engaged in the provision or administration of any health projects, enterprises, ventures, or undertakings described in paragraph (1) of this definition, including, but not limited to, a State or local health agency, hospital, health clinic, health insurance issuer, physician's practice, pharmacy, community-based health care provider, nursing facility, residential or community-based treatment facility, or other similar entity or combination thereof. A health program or activity also includes all of the operations of a State Medicaid program, Children's Health Insurance Program, and Basic Health Program.

*Individual with limited English proficiency* means an individual whose primary language for communication is not English and who has a limited ability to read, write, speak, or understand English. An individual with limited English proficiency may be competent in English for certain types of communication (*e.g.,* speaking or understanding), but still be limited English proficient for other purposes (*e.g.,* reading or writing).

*Information and communication technology (ICT)* means information technology and other equipment, systems, technologies, or processes, for which the principal function is the creation, manipulation, storage, display, receipt, or transmission of electronic data and information, as well as any associated content. Examples of ICT include, but are not limited to: computers and peripheral equipment; information kiosks and transaction machines; telecommunications equipment; telehealth interfaces or applications; customer premises equipment; multifunction office machines; software; mobile applications; websites; videos; and electronic documents.

*Language assistance services* may include, but are not limited to:

A-64

(1) Oral language assistance, including interpretation in non-English languages provided in-person or remotely by a qualified interpreter for an individual with limited English proficiency, and the use of qualified bilingual or multilingual staff to communicate directly with individuals with limited English proficiency;

(2) Written translation, performed by a qualified translator, of written content in paper or electronic form into or from languages other than English; and

(3) Written notice of availability of language assistance services.

*Machine translation* means automated translation, without the assistance of or review by a qualified human translator, that is text-based and provides instant translations between various languages, sometimes with an option for audio input or output.

*National origin* includes, but is not limited to, a person's, or their ancestors', place of origin (such as country or world region) or a person's manifestation of the physical, cultural, or linguistic characteristics of a national origin group.

*OCR* means the Office for Civil Rights of the Department.

*Patient care decision support tool* means any automated or non-automated tool, mechanism, method, technology, or combination thereof used by a covered entity to support clinical decision-making in its health programs or activities.

*Qualified bilingual/multilingual staff* means a member of a covered entity's workforce who is designated by the covered entity to provide in-language oral language assistance as part of the person's current, assigned job responsibilities and who has demonstrated to the covered entity that they are:

(1) Proficient in speaking and understanding both spoken English and at least one other spoken language, including any necessary specialized vocabulary, terminology and phraseology; and

(2) Able to effectively, accurately, and impartially communicate directly with individuals with limited English proficiency in their primary languages.

*Qualified individual with a disability* means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the covered entity.

*Qualified interpreter for an individual with a disability* means an interpreter who, via a video remote interpreting service (VRI) or an on-site appearance:

(1) Has demonstrated proficiency in communicating in, and understanding:

(i) Both English and a non-English language (including American Sign Language, other sign languages); or

(ii) Another communication modality (such as cued-language transliterators or oral transliteration);

(2) Is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary or terms without changes, omissions, or additions and while preserving the tone, sentiment, and emotional level of the original statement; and

(3) Adheres to generally accepted interpreter ethics principles including client confidentiality.

(4) Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued-language transliterators.

*Qualified interpreter for an individual with limited English proficiency* means an interpreter who via a remote interpreting service or an on-site appearance:

(1) Has demonstrated proficiency in speaking and understanding both spoken English and at least one other spoken language (qualified interpreters for relay interpretation must demonstrate proficiency in two non-English spoken languages);

(2) Is able to interpret effectively, accurately, and impartially to and from such language(s) and English (or between two non-English languages for relay interpretation), using any necessary specialized vocabulary or terms without changes, omissions, or additions and while preserving the tone, sentiment, and emotional level of the original oral statement; and

(3) Adheres to generally accepted interpreter ethics principles, including client confidentiality.

*Qualified reader* means a person who is able to read effectively, accurately, and impartially using any necessary specialized vocabulary.

*Qualified translator* means a translator who:

(1) Has demonstrated proficiency in writing and understanding both written English and at least one other written non-English language;

(2) Is able to translate effectively, accurately, and impartially to and from such language(s) and English, using any necessary specialized vocabulary or terms without changes, omissions, or additions and while preserving the tone,

sentiment, and emotional level of the original written statement; and

(3) Adheres to generally accepted translator ethics principles, including client confidentiality.

*Recipient* means any State or its political subdivision thereof; or any instrumentality of a State or political subdivision thereof; any public or private agency, institution, or organization; other entity; or any person, to whom Federal financial assistance is extended directly or indirectly, including any subunit, successor, assignee, or transferee of a recipient. Such term does not include any ultimate beneficiary.

*Relay interpretation* means interpreting from one language to another through an intermediate language. This mode of interpretation is often used for monolingual speakers of languages of limited diffusion, including select indigenous languages. In relay interpreting, the first interpreter listens to the speaker and renders the message into the intermediate language. The second interpreter receives the message in the intermediate language and interprets it into a third language for the speaker who speaks neither the first nor the second language.

*Section 504* means section 504 of the Rehabilitation Act of 1973 (Pub. L. 93–112; 29 U.S.C. 794), as amended.

*Section 1557* means section 1557 of the ACA (42 U.S.C. 18116).

*State* includes each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, and the Commonwealth of the Northern Mariana Islands.

*State Exchange* means an Exchange established by a State and approved by the Department pursuant to 45 CFR part 155, subpart B.

*Telehealth* means the use of electronic information and telecommunications technologies to support long-distance clinical health care, patient and professional health-related education, public health, and health administration. Technologies include videoconferencing, the internet, store-and-forward imaging, streaming media, and terrestrial and wireless communications.

*Title I entity* means any entity established under title I of the ACA, as amended, including State Exchanges and Federally-facilitated Exchanges.

*Title VI* means title VI of the Civil Rights Act of 1964 (Pub. L. 88–352; 42 U.S.C. 2000d *et seq.*), as amended.

*Title VII* means title VII of the Civil Rights Act of 1964 (Pub. L. 88–352; 42 U.S.C. 2000e *et seq.*), as amended.

*Title IX* means title IX of the Education Amendments of 1972 (Pub. L. 92–318; 20 U.S.C. 1681 *et seq.*), as amended.

*UFAS* means the Uniform Federal Accessibility Standards (Pub. L. 90–480; 42 U.S.C. 4151 *et seq.*), as amended.

### § 92.5   Assurances required.

(a) *Assurances.* An entity applying for Federal financial assistance to which this part applies must, as a condition of any application for Federal financial assistance, submit an assurance, on a form specified by the Director, that the entity's health programs and activities will be operated in compliance with section 1557 and this part. A health insurance issuer seeking certification to participate in an Exchange or a State seeking approval to operate a State Exchange to which section 1557 or this part applies must, as a condition of certification or approval, submit an assurance, on a form specified by the Director, that the health insurance issuer's or State's health program or activity will be operated in compliance with section 1557 and this part. An applicant or entity may incorporate this assurance by reference in subsequent applications to the Department for Federal financial assistance or requests for certification to participate in an Exchange or approval to operate a State Exchange.

(b) *Duration of obligation.* The duration of the assurances required by this section is the same as the duration of the assurances required in the Department's regulations implementing section 504, 45 CFR 84.5(b).

(c) *Covenants.* When Federal financial assistance is provided in the form of real property or interest, the same conditions apply as those contained in the Department's regulations implementing section 504, at 45 CFR 84.5(c), except that the nondiscrimination obligation applies to discrimination on all bases covered under section 1557 and this part.

### § 92.6   Remedial action and voluntary action.

(a) *Remedial action.* (1) If the Director finds that a recipient or State Exchange has discriminated against an individual on the basis of race, color, national origin, sex, age, or disability, in violation of section 1557 or this part, such recipient or State Exchange must take such remedial action as the Director may require to overcome the effects of the discrimination.

(2) Where a recipient is found to have discriminated against an individual on the basis of race, color, national origin, sex, age, or disability, in violation of

section 1557 or this part, and where another recipient exercises control over the recipient that has discriminated, the Director, where appropriate, may require either or both entities to take remedial action.

(3) The Director may, where necessary to overcome the effects of discrimination in violation of section 1557 or this part, require a recipient, in its health programs and activities, or State Exchange to take remedial action with respect to:

(i) Persons who are no longer participants in the recipient's or State Exchange's health program or activity but who were participants in the health program or activity when such discrimination occurred; or

(ii) Persons who would have been participants in the health program or activity had the discrimination not occurred.

(b) *Voluntary action.* A covered entity may take nondiscriminatory steps, in addition to any action that is required by section 1557 or this part, to overcome the effects of conditions that result or resulted in limited participation in the covered entity's health programs or activities by persons on the basis of race, color, national origin, sex, age, or disability.

### § 92.7   Designation and responsibilities of a Section 1557 Coordinator.

(a) *Section 1557 Coordinator and designees.* A covered entity that employs fifteen or more persons must designate and authorize at least one employee, a ''Section 1557 Coordinator,'' to coordinate the covered entity's compliance with its responsibilities under section 1557 and this part in its health programs and activities, including the investigation of any grievance communicated to it alleging noncompliance with section 1557 or this part or alleging any action that would be prohibited by section 1557 or this part. As appropriate, a covered entity may assign one or more designees to carry out some of these responsibilities, but the Section 1557 Coordinator must retain ultimate oversight for ensuring coordination with the covered entity's compliance with this part.

(b) *Responsibilities of a Section 1557 Coordinator.* A covered entity must ensure that, at minimum, the Section 1557 Coordinator:

(1) Receives, reviews, and processes grievances, filed under the grievance procedure as set forth in § 92.8(c);

(2) Coordinates the covered entity's recordkeeping requirements as set forth in § 92.8(c);

(3) Coordinates effective implementation of the covered entity's language access procedures as set forth in § 92.8(d);

(4) Coordinates effective implementation of the covered entity's effective communication procedures as set forth in § 92.8(e);

(5) Coordinates effective implementation of the covered entity's reasonable modification procedures as set forth in § 92.8(f); and

(6) Coordinates training of relevant employees as set forth in § 92.9, including maintaining documentation required by such section.

### § 92.8   Policies and procedures.

(a) *General requirement.* A covered entity must implement written policies and procedures in its health programs and activities that are designed to comply with the requirements of this part. The policies and procedures must include an effective date and be reasonably designed, taking into account the size, complexity, and the type of health programs or activities undertaken by a covered entity, to ensure compliance with this part.

(b) *Nondiscrimination policy.* (1) A covered entity must implement a written policy in its health programs and activities that, at minimum, states the covered entity does not discriminate on the basis of race, color, national origin (including limited English proficiency and primary language), sex (consistent with the scope of sex discrimination described at § 92.101(a)(2)), age, or disability; that the covered entity provides language assistance services and appropriate auxiliary aids and services free of charge, when necessary for compliance with section 1557 or this part; that the covered entity will provide reasonable modifications for individuals with disabilities; and that provides the current contact information for the Section 1557 Coordinator required by § 92.7 (if applicable).

(2) OCR considers it a best practice toward achieving compliance for a covered entity to provide information that it has been granted a temporary exemption or granted an assurance of exemption under § 92.302(b) in the nondiscrimination policy required by paragraph (b)(1) of this section.

(c) *Grievance procedures.* (1) A covered entity that employs fifteen or more persons must implement written grievance procedures in its health programs and activities that provide for the prompt and equitable resolution of grievances alleging any action that would be prohibited by section 1557 or this part.

(2) A covered entity to which this paragraph applies must retain records related to grievances filed pursuant to the covered entity's grievance procedures required under paragraph (c)(1) of this section that allege discrimination on the basis of race, color, national origin, sex, age, or disability for no less than three (3) calendar years from the date the covered entity resolves the grievance. The records must include the grievance; the name and contact information of the complainant (if provided by complainant); the alleged discriminatory action and alleged basis (or bases) of discrimination; the date the grievance was filed; the date the grievance was resolved; grievance resolution; and any other pertinent information.

(3) A covered entity to which this paragraph (c) applies must keep confidential the identity of an individual who has filed a grievance under this part except as required by law or to the extent necessary to carry out the purposes of this part, including the conduct of any investigation.

(d) *Language access procedures.* A covered entity must implement written language access procedures in its health programs and activities describing the covered entity's process for providing language assistance services to individuals with limited English proficiency when required under § 92.201. At a minimum, the language access procedures must include current contact information for the section 1557 Coordinator (if applicable); how an employee identifies whether an individual has limited English proficiency; how an employee obtains the services of qualified interpreters and translators the covered entity uses to communicate with an individual with limited English proficiency; the names of any qualified bilingual staff members; and a list of any electronic and written translated materials the covered entity has, the languages they are translated into, date of issuance, and how to access electronic translations.

(e) *Effective communication procedures.* A covered entity must implement written effective communication procedures in its health programs and activities describing the covered entity's process for ensuring effective communication for individuals with disabilities when required under § 92.202. At a minimum, a covered entity's effective communication procedures must include current contact information for the Section 1557 Coordinator (if applicable); how an employee obtains the services of qualified interpreters the covered entity

uses to communicate with individuals with disabilities, including the names of any qualified interpreter staff members; and how to access appropriate auxiliary aids and services.

(f) *Reasonable modification procedures.* A covered entity must implement written procedures in its health programs and activities describing the covered entity's process for making reasonable modifications to its policies, practices, or procedures when necessary to avoid discrimination on the basis of disability as required under § 92.205. At a minimum, the reasonable modification procedures must include current contact information for the covered entity's Section 1557 Coordinator (if applicable); a description of the covered entity's process for responding to requests from individuals with disabilities for changes, exceptions, or adjustments to a rule, policy, practice, or service of the covered entity; and a process for determining whether making the modification would fundamentally alter the nature of the health program or activity, including identifying an alternative modification that does not result in a fundamental alteration to ensure the individual with a disability receives the benefits or services in question.

(g) *Combined policies and procedures.* A covered entity may combine the content of the policies and procedures required by paragraphs (b) through (f) of this section with any policies and procedures pursuant to title VI, title 504, title IX, and the Age Act if section 1557 and the provisions in this part are clearly addressed therein.

(h) *Changes to policies and procedures.* (1) Covered entities must review and revise the policies and procedures required by paragraphs (b) through (g) of this section, as necessary, to ensure they are current and in compliance with section 1557 and this part; and

(2) A covered entity may change a policy or procedure required by paragraphs (b) through (g) of this section at any time, provided that such changes comply with section 1557 and this part.

### § 92.9  Training.

(a) A covered entity must train relevant employees of its health programs and activities on the civil rights policies and procedures required by § 92.8, as necessary and appropriate for the employees to carry out their functions within the covered entity consistent with the requirements of this part.

(b) A covered entity must provide training that meets the requirements of paragraph (a) of this section, as follows:

(1) To each relevant employee of the health program or activity as soon as possible, but no later than 30 days following a covered entity's implementation of the policies and procedures required by § 92.8, and no later than 300 days following July 5, 2024;

(2) Thereafter, to each new relevant employee of the health program or activity within a reasonable period of time after the employee joins the covered entity's workforce; and

(3) To each relevant employee of the health program or activity whose functions are affected by a material change in the policies or procedures required by § 92.8 and any other civil rights policies or procedures the covered entity has implemented within a reasonable period of time after the material change has been made.

(4) For purposes of this section, "relevant employees" includes permanent and temporary employees whose roles and responsibilities entail interacting with patients and members of the public; making decisions that directly or indirectly affect patients' health care, including the covered entity's executive leadership team and legal counsel; and performing tasks and making decisions that directly or indirectly affect patients' financial obligations, including billing and collections.

(c) A covered entity must contemporaneously document its employees' completion of the training required by paragraphs (a) and (b) of this section in written or electronic form and retain said documentation for no less than three (3) calendar years.

### § 92.10  Notice of nondiscrimination.

(a) A covered entity must provide a notice of nondiscrimination to participants, beneficiaries, enrollees, and applicants of its health programs and activities, and members of the public.

(1) The notice required under this paragraph (a) must include the following information relating to the covered entity's health programs and activities:

(i) The covered entity does not discriminate on the basis of race, color, national origin (including limited English proficiency and primary language), sex (consistent with the scope of sex discrimination described at § 92.101(a)(2)), age, or disability;

(ii) The covered entity provides reasonable modifications for individuals with disabilities, and appropriate

auxiliary aids and services, including qualified interpreters for individuals with disabilities and information in alternate formats, such as braille or large print, free of charge and in a timely manner, when such modifications, aids, and services are necessary to ensure accessibility and an equal opportunity to participate to individuals with disabilities;

(iii) The covered entity provides language assistance services, including electronic and written translated documents and oral interpretation, free of charge and in a timely manner, when such services are a reasonable step to provide meaningful access to an individual with limited English proficiency;

(iv) How to obtain from the covered entity the reasonable modifications, appropriate auxiliary aids and services, and language assistance services in paragraphs (a)(1)(ii) and (iii) of this section;

(v) The contact information for the covered entity's Section 1557 Coordinator designated pursuant to § 92.7 (if applicable);

(vi) The availability of the covered entity's grievance procedure pursuant to § 92.8(c) and how to file a grievance (if applicable);

(vii) Details on how to file a discrimination complaint with OCR in the Department; and

(viii) How to access the covered entity's website, if it has one, that provides the information required under this paragraph (a)(1).

(2) The notice required under this paragraph (a) must be provided in a covered entity's health program or activity, as follows:

(i) On an annual basis to participants, beneficiaries, enrollees (including late and special enrollees), and applicants of its health program or activity;

(ii) Upon request;

(iii) At a conspicuous location on the covered entity's health program or activity website, if it has one; and

(iv) In clear and prominent physical locations, in no smaller than 20-point sans serif font, where it is reasonable to expect individuals seeking service from the health program or activity to be able to read or hear the notice.

(b) A covered entity may combine the content of the notice required by paragraph (a) of this section with the notices required by 45 CFR 80.6(d), 84.8, 86.9, and 91.32 if the combined notice clearly informs individuals of their civil rights under section 1557 and this part, so long as it includes each of the elements required by paragraph (a)(1) of this section.

## § 92.11   Notice of availability of language assistance services and auxiliary aids and services.

(a) A covered entity must provide a notice of availability of language assistance services and auxiliary aids and services that, at minimum, states that the covered entity, in its health programs or activities, provides language assistance services and appropriate auxiliary aids and services free of charge, when necessary for compliance with section 1557 or this part, to participants, beneficiaries, enrollees, and applicants of its health program or activities, and members of the public.

(b) The notice required under paragraph (a) of this section must be provided in English and at least the 15 languages most commonly spoken by individuals with limited English proficiency of the relevant State or States in which a covered entity operates and must be provided in alternate formats for individuals with disabilities who require auxiliary aids and services to ensure effective communication.

(c) The notice required under paragraph (a) of this section must be provided in a covered entity's health program or activity, as follows:

(1) On an annual basis to participants, beneficiaries, enrollees (including late and special enrollees), and applicants of its health program or activity;

(2) Upon request;

(3) At a conspicuous location on the covered entity's health program or activity website, if it has one;

(4) In clear and prominent physical locations, in no smaller than 20-point sans serif font, where it is reasonable to expect individuals seeking service from the health program or activity to be able to read or hear the notice; and

(5) In the following electronic and written communications when these forms are provided by a covered entity:

(i) Notice of nondiscrimination required by § 92.10;

(ii) Notice of privacy practices required by 45 CFR 164.520;

(iii) Application and intake forms;

(iv) Notices of denial or termination of eligibility, benefits or services, including Explanations of Benefits, and notices of appeal and grievance rights;

(v) Communications related to an individual's rights, eligibility, benefits, or services that require or request a response from a participant, beneficiary, enrollee, or applicant;

(vi) Communications related to a public health emergency;

(vii) Consent forms and instructions related to medical procedures or operations, medical power of attorney,

or living will (with an option of providing only one notice for all documents bundled together);

(viii) Discharge papers;

(ix) Communications related to the cost and payment of care with respect to an individual, including medical billing and collections materials, and good faith estimates required by section 2799B–6 of the Public Health Service Act;

(x) Complaint forms; and

(xi) Patient and member handbooks.

(d) A covered entity shall be deemed in compliance with this section with respect to an individual if it exercises the option to:

(1) On an annual basis, provide the individual with the option to opt out of receipt of the notice required by this section in their primary language and through any appropriate auxiliary aids and services, and:

(i) Does not condition the receipt of any aid or benefit on the individual's decision to opt out;

(ii) Informs the individual that they have a right to receive the notice upon request in their primary language and through the appropriate auxiliary aids and services;

(iii) Informs the individual that opting out of receiving the notice is not a waiver of their right to receive language assistance services and any appropriate auxiliary aids and services as required by this part;

(iv) Documents, on an annual basis, that the individual has opted out of receiving the notice required by this section for that year; and

(v) Does not treat a non-response from an individual as a decision to opt out; or

(2) Document the individual's primary language and any appropriate auxiliary aids and services and:

(i) Provides all materials and communications in that individual's primary language and through any appropriate auxiliary aids and services; or

(ii) Provides the notice required by paragraph (a) of this section in that individual's primary language and through any appropriate auxiliary aids and services in all communications that are identified in paragraph (c)(5) of this section.

## Subpart B—Nondiscrimination Provisions

### § 92.101   Discrimination prohibited.

(a) *General.* (1) Except as provided in title I of the ACA, an individual must not, on the basis of race, color, national origin, sex, age, disability, or any combination thereof, be excluded from

participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity operated by a covered entity.

(2) Discrimination on the basis of sex includes, but is not limited to, discrimination on the basis of:

(i) Sex characteristics, including intersex traits;

(ii) Pregnancy or related conditions;

(iii) Sexual orientation;

(iv) Gender identity; and

(v) Sex stereotypes.

(b) *Specific prohibitions on discrimination.* (1) In any health program or activity to which this part applies:

(i) A recipient and State Exchange must comply with the specific prohibitions on discrimination in the Department's implementing regulations for title VI, section 504, title IX, and the Age Act, found at 45 CFR parts 80, 84, 86 (subparts C and D), and 91 (subpart B), respectively. Where this paragraph (b) cross-references regulatory provisions that use the term ''recipient,'' the term ''recipient or State Exchange'' shall apply in its place. Where this paragraph (b) cross-references regulatory provisions that use the term ''student,'' ''employee,'' or ''applicant,'' these terms shall be replaced with ''individual.''

(ii) The Department, including Federally-facilitated Exchanges, must comply with specific prohibitions on discrimination in the Department's implementing regulations for title VI, section 504, title IX, and the Age Act, found at 45 CFR parts 80, 85, 86 (subparts C and D), and 91 (subpart B), respectively. Where this paragraph (b) cross-references regulatory provisions that use the term ''a recipient,'' the term ''the Department or a Federally-facilitated Exchange'' shall apply in its place. Where this paragraph (b) cross-references regulatory provisions that use the term ''student,'' ''employee,'' or ''applicant,'' these terms shall be replaced with ''individual.''

(2) The enumeration of specific prohibitions on discrimination in paragraph (b)(1) of this section does not limit the general applicability of the prohibition in paragraph (a) of this section.

## Subpart C—Specific Applications to Health Programs and Activities

### § 92.201   Meaningful access for individuals with limited English proficiency.

(a) *General requirement.* A covered entity must take reasonable steps to provide meaningful access to each individual with limited English proficiency (including companions with

limited English proficiency) eligible to be served or likely to be directly affected by its health programs and activities.

(b) *Language assistance services requirements.* Language assistance services required under paragraph (a) of this section must be provided free of charge, be accurate and timely, and protect the privacy and the independent decision-making ability of the individual with limited English proficiency.

(c) *Specific requirements for interpreter and translation services.* (1) When interpretation services are required under this part, a covered entity must offer a qualified interpreter in its health programs and activities.

(2) When translation services are required under this part, a covered entity must utilize the services of a qualified translator in its health programs and activities.

(3) If a covered entity uses machine translation when the underlying text is critical to the rights, benefits, or meaningful access of an individual with limited English proficiency, when accuracy is essential, or when the source documents or materials contain complex, non-literal or technical language, the translation must be reviewed by a qualified human translator.

(d) *Evaluation of compliance.* In evaluating whether a covered entity has met its obligation under paragraph (a) of this section, the Director shall:

(1) Evaluate, and give substantial weight to, the nature and importance of the health program or activity and the particular communication at issue, to the individual with limited English proficiency; and

(2) Take into account other relevant factors, including the effectiveness of the covered entity's written language access procedures for its health programs and activities, that the covered entity has implemented pursuant to § 92.8(d).

(e) *Restricted use of certain persons to interpret or facilitate communication.* A covered entity must not, in its health programs and activities:

(1) Require an individual with limited English proficiency to provide their own interpreter, or to pay the cost of their own interpreter;

(2) Rely on an adult, not qualified as an interpreter, to interpret or facilitate communication, except:

(i) As a temporary measure, while finding a qualified interpreter in an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no qualified interpreter for the individual with limited English

proficiency immediately available and the qualified interpreter that arrives confirms or supplements the initial communications with an initial adult interpreter; or

(ii) Where the individual with limited English proficiency specifically requests, in private with a qualified interpreter present and without an accompanying adult present, that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, the request and agreement by the accompanying adult is documented, and reliance on that adult for such assistance is appropriate under the circumstances;

(3) Rely on a minor child to interpret or facilitate communication, except as a temporary measure while finding a qualified interpreter in an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no qualified interpreter for the individual with limited English proficiency immediately available and the qualified interpreter that arrives confirms or supplements the initial communications with the minor child; or

(4) Rely on staff other than qualified interpreters, qualified translators, or qualified bilingual/multilingual staff to communicate with individuals with limited English proficiency.

(f) *Video remote interpreting services.* A covered entity that provides a qualified interpreter for an individual with limited English proficiency through video remote interpreting services in the covered entity's health programs and activities must ensure the modality allows for meaningful access and must provide:

(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;

(2) A sharply delineated image that is large enough to display the interpreter's face and the participating person's face regardless of the person's body position;

(3) A clear, audible transmission of voices; and

(4) Adequate training to users of the technology and other involved persons so that they may quickly and efficiently set up and operate the video remote interpreting.

(g) *Audio remote interpreting services.* A covered entity that provides a qualified interpreter for an individual with limited English proficiency through audio remote interpreting

services in the covered entity's health programs and activities must ensure the modality allows for meaningful access and must provide:

(1) Real-time audio over a dedicated high-speed, wide-bandwidth connection or wireless connection that delivers high-quality audio without lags or irregular pauses in communication;

(2) A clear, audible transmission of voices; and

(3) Adequate training to users of the technology and other involved persons so that they may quickly and efficiently set up and operate the remote interpreting services.

(h) *Acceptance of language assistance services is not required.* Nothing in this section shall be construed to require an individual with limited English proficiency to accept language assistance services.

### § 92.202   Effective communication for individuals with disabilities.

(a) A covered entity must take appropriate steps to ensure that communications with individuals with disabilities (including companions with disabilities), are as effective as communications with non-disabled individuals in its health programs and activities, in accordance with the standards found at 28 CFR 35.130 and 35.160 through 35.164. Where the regulatory provisions referenced in this section use the term "public entity," the term "covered entity" shall apply in its place.

(b) A covered entity must provide appropriate auxiliary aids and services where necessary to afford individuals with disabilities an equal opportunity to participate in, and enjoy the benefits of, the health program or activity in question. Such auxiliary aids and services must be provided free of charge, in accessible formats, in a timely manner, and in such a way to protect the privacy and the independence of the individual with a disability.

### § 92.203   Accessibility for buildings and facilities.

(a) No qualified individual with a disability shall, because a covered entity's facilities are inaccessible to or unusable by individuals with disabilities, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any health program or activity to which this part applies.

(b) Each facility or part of a facility in which health programs or activities are conducted that is constructed or altered by or on behalf of, or for the use of, a recipient or State Exchange must comply with the 2010 Standards if the

construction or alteration was commenced on or after July 18, 2016, except that if a facility or part of a facility in which health programs or activities are conducted that is constructed or altered by or on behalf of, or for the use of, a recipient or State Exchange, was not covered by the 2010 Standards prior to July 18, 2016, such facility or part of a facility must comply with the 2010 Standards if the construction or alteration was commenced after January 18, 2018. If construction or alteration was begun on or after July 18, 2016, and on or before January 18, 2018, in conformance with UFAS, and the facility or part of the facility was not covered by the 2010 Standards prior to July 18, 2016, then it shall be deemed to comply with the requirements of this section and with 45 CFR 84.23(a) and (b). Departures from particular technical and scoping requirements by the use of other methods are permitted where substantially equivalent or greater access to and usability of the facility is provided. All newly constructed or altered buildings or facilities subject to this section must comply with the requirements for a "public building or facility" as defined in section 106.5 of the 2010 Standards.

(c) Each facility or part of a facility in which health programs or activities under this part are conducted that is constructed or altered by or on behalf of, or for the use of, a recipient or State Exchange in conformance with the 1991 Standards at appendix D to 28 CFR part 36 or the 2010 Standards shall be deemed to comply with the requirements of this section and with 45 CFR 84.23(a) and (b) with respect to those facilities, if the construction or alteration was commenced before July 18, 2016. Each facility or part of a facility in which health programs or activities are conducted that is constructed or altered by or on behalf of, or for the use of, a recipient or State Exchange in conformance with UFAS shall be deemed to comply with the requirements of this section and with 45 CFR 84.23(a) and (b), if the construction or alteration was commenced before July 18, 2016, and such facility would not have been required to conform with a different accessibility standard under 28 CFR 35.151.

### § 92.204   Accessibility of information and communication technology for individuals with disabilities.

(a) A covered entity must ensure that its health programs and activities provided through information and communication technology are accessible to individuals with

disabilities, unless doing so would result in undue financial and administrative burdens or a fundamental alteration in the nature of the health programs or activities. If an action required to comply with this section would result in such an alteration or such burdens, a covered entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services of the health program or activity provided by the covered entity.

(b) A recipient or State Exchange shall ensure that its health programs and activities provided through websites and mobile applications comply with the requirements of section 504 of the Rehabilitation Act, as interpreted consistent with title II of the ADA (42 U.S.C. 12131 through 12165).

### § 92.205   Requirement to make reasonable modifications.

A covered entity must make reasonable modifications to policies, practices, or procedures in its health programs and activities when such modifications are necessary to avoid discrimination on the basis of disability, unless the covered entity can demonstrate that making the modifications would fundamentally alter the nature of the health program or activity. For the purposes of this section, the term "reasonable modifications" shall be interpreted in a manner consistent with the term as set forth in the ADA title II regulation at 28 CFR 35.130(b)(7).

### § 92.206   Equal program access on the basis of sex.

(a) A covered entity must provide individuals equal access to its health programs and activities without discriminating on the basis of sex.

(b) In providing access to health programs and activities, a covered entity must not:

(1) Deny or limit health services, including those that have been typically or exclusively provided to, or associated with, individuals of one sex, to an individual based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded;

(2) Deny or limit, on the basis of an individual's sex assigned at birth, gender identity, or gender otherwise recorded, a health care professional's ability to provide health services if such denial or limitation has the effect of excluding individuals from participation in, denying them the benefits of, or otherwise subjecting them

to discrimination on the basis of sex under a covered health program or activity;

(3) Adopt or apply any policy or practice of treating individuals differently or separating them on the basis of sex in a manner that subjects any individual to more than de minimis harm, including by adopting a policy or engaging in a practice that prevents an individual from participating in a health program or activity consistent with the individual's gender identity; or

(4) Deny or limit health services sought for purpose of gender transition or other gender-affirming care that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded.

(c) Nothing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to any individual or where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual. A covered entity's determination must not be based on unlawful animus or bias, or constitute a pretext for discrimination. Nothing in this section is intended to preclude a covered entity from availing itself of protections described in §§ 92.3 and 92.302.

(d) The enumeration of specific forms of discrimination in paragraph (b) of this section does not limit the general applicability of the prohibition in paragraph (a) of this section.

### § 92.207  Nondiscrimination in health insurance coverage and other health-related coverage.

(a) A covered entity must not, in providing or administering health insurance coverage or other health-related coverage, discriminate on the basis of race, color, national origin, sex, age, disability, or any combination thereof.

(b) A covered entity must not, in providing or administering health insurance coverage or other health-related coverage:

(1) Deny, cancel, limit, or refuse to issue or renew health insurance coverage or other health-related coverage, or deny or limit coverage of a claim, or impose additional cost sharing or other limitations or restrictions on coverage, on the basis of race, color, national origin, sex, age, disability, or any combination thereof;

(2) Have or implement marketing practices or benefit designs that discriminate on the basis of race, color, national origin, sex, age, disability, or any combination thereof, in health insurance coverage or other health-related coverage;

(3) Deny or limit coverage, deny or limit coverage of a claim, or impose additional cost sharing or other limitations or restrictions on coverage, to an individual based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded;

(4) Have or implement a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care;

(5) Otherwise deny or limit coverage, deny or limit coverage of a claim, or impose additional cost sharing or other limitations or restrictions on coverage, for specific health services related to gender transition or other gender-affirming care if such denial, limitation, or restriction results in discrimination on the basis of sex; or

(6) Have or implement benefit designs that do not provide or administer health insurance coverage or other health-related coverage in the most integrated setting appropriate to the needs of qualified individuals with disabilities, including practices that result in the serious risk of institutionalization or segregation.

(c) Nothing in this section requires coverage of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting coverage of the health service or determining that such health service fails to meet applicable coverage requirements, including reasonable medical management techniques such as medical necessity requirements. Such coverage denial or limitation must not be based on unlawful animus or bias, or constitute a pretext for discrimination. Nothing in this section is intended to preclude a covered entity from availing itself of protections described in §§ 92.3 and 92.302.

(d) The enumeration of specific forms of discrimination in paragraph (b) of this section does not limit the general applicability of the prohibition in paragraph (a) of this section.

### § 92.208  Prohibition on sex discrimination related to marital, parental, or family status.

In determining whether an individual satisfies any policy or criterion regarding access to its health programs or activities, a covered entity must not take an individual's sex, as defined in § 92.101(a)(2), into account in applying

any rule concerning an individual's current, perceived, potential, or past marital, parental, or family status.

### § 92.209  Nondiscrimination on the basis of association.

A covered entity must not exclude from participation in, deny the benefits of, or otherwise discriminate against an individual or entity in its health programs and activities on the basis of the respective race, color, national origin, sex, age, or disability of the individual and another person with whom the individual or entity has a relationship or association.

### § 92.210  Nondiscrimination in the use of patient care decision support tools.

(a) *General prohibition.* A covered entity must not discriminate on the basis of race, color, national origin, sex, age, or disability in its health programs or activities through the use of patient care decision support tools.

(b) *Identification of risk.* A covered entity has an ongoing duty to make reasonable efforts to identify uses of patient care decision support tools in its health programs or activities that employ input variables or factors that measure race, color, national origin, sex, age, or disability.

(c) *Mitigation of risk.* For each patient care decision support tool identified in paragraph (b) of this section, a covered entity must make reasonable efforts to mitigate the risk of discrimination resulting from the tool's use in its health programs or activities.

### § 92.211  Nondiscrimination in the delivery of health programs and activities through telehealth services.

A covered entity must not, in delivery of its health programs and activities through telehealth services, discriminate on the basis of race, color, national origin, sex, age, or disability.

## Subpart D—Procedures

### § 92.301  Enforcement mechanisms.

The enforcement mechanisms available for and provided under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975 shall apply for purposes of section 1557 as implemented by this part.

### § 92.302  Notification of views regarding application of Federal religious freedom and conscience laws.

(a) *General application.* A recipient may rely on applicable Federal protections for religious freedom and conscience, and consistent with § 92.3(c), application of a particular