# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STATE OF FLORIDA; FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION; FLORIDA DEPARTMENT OF MANAGEMENT SERVICES, CATHOLIC MEDICAL ASSOCIATION, on behalf of its current and future members,

    *Plaintiffs*,

DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the Department of Health and Human Services; MELANIE FONTES RAINER, in her official capacity as the Director of the Office for Civil Rights; THE CENTERS FOR MEDICARE AND MEDICAID; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services,

    *Defendants*.

No. 8:24-cv-01080-WFJ-TGW

## DECLARATION OF J. KEVIN BAILEY

I, J. Kevin Bailey, declare as follows:

1.    My name is J. Kevin Bailey and I have personal knowledge of the following statements. I am employed by the Florida Agency for Persons with Disabilities ("APD") as the Agency Operated Facilities Manager.

2.    As part of my duties, I oversee the management of two state-operated Intermediate Care Facilities for the Developmentally Disabled ("ICF/DD"), also known as Developmental Disabilities Centers ("DDC"), which are responsible for the

active treatment care, room and board, residential habilitation, medical assistance, and assistance with activities of daily living of its residents.

3. APD is the state agency responsible for providing all services provided to persons with developmental disabilities under Florida Statutes, Chapter 393, including the operation and programmatic management of Home and Community Based Medicaid waivers established to provide services to persons with developmental disabilities in Florida, and the operation of all state institutional programs. Fla. Stat. § 20.197(3).

### Intermediate Care Facilities for the Developmentally Disabled

4. An ICF/DD is a residential facility licensed and certified in accordance with state law, and certified by the federal government pursuant to the Social Security Act, as a provider of Medicaid services to persons who have developmental disabilities. Fla. Stat. § 400.960(6).

5. In Florida, ICF/DDs are licensed by the Agency for Health Care Administration ("AHCA"). Fla. Stat. § 400.962(1).

6. ICF/DDs must comply with all rules adopted by AHCA for facility licensing and operation. Fla. Stat. § 400.967.

7. AHCA promulgated Florida Administrative Code, Chapter 59A-26 for ICF/DD facility operation.

8. For coverage of services and reimbursement by Medicaid, AHCA promulgated Florida Administrative Code, Rule 59G-4.170, which incorporates by

reference the Intermediate Care Facility for Individuals with Intellectual Disabilities Services Coverage Policy ("ICF/DD Handbook").

9. In order to reside in an ICF/DD, and receive covered services reimbursable by Medicaid, a Resident must first be a Medicaid recipient. ICF/DD Handbook § 2.2.

10. An ICF/DD must provide the following services to its Residents: activity services, dental services, dietary services (including therapeutic diets), nursing services, pharmacy services, physician services, rehabilitative services (including physical, speech, occupational, mental health therapies, and intensive behavioral therapy, as applicable), room/bed and maintenance services, routine personal hygiene items, and social services. ICF/DD Handbook § 4.2.

11. An ICF/DD Resident's Level of Care must be assessed to evaluate the Resident's required medical and related needs to see which services are necessary to meet those needs. This is done through an Active Treatment Plan.

12. "Active treatment" means the provision of services by an interdisciplinary team which are necessary to maximize a client's individual independence or prevent regression or loss of functional status. Fla. Stat. § 400.960(1).

13. As part of the Active Treatment Plan required to reside in an ICF/DD, Residents must be assessed for medically necessary physical, psychological, and behavioral needs. An Interdisciplinary Team ("IDT") conducts this assessment. Fla. Admin. Code R. 59A-26.001(10).

14. An IDT must be composed of a Resident or Resident's representative, Qualified Intellectual Disability Professional, social worker, a licensed nurse, the Resident's physician and other staff in disciplines determined by the individual Resident's needs to develop a care plan to include prevention and management interventions with measurable goals. The team will determine that it is safe for the Resident to self-administer drugs before the Resident may exercise that right. *Id.*

15. Among other things, the Active Treatment Plan is for the benefit of both the Resident being assessed and the other Residents who share the same living space. This is evidenced by the sophistication and variety of professionals required to be a part of the IDT.

16. The Active Treatment Plan assessment will sometimes indicate special behavioral or physical considerations, such as psychological distress or condition, violence, sexual aggression, or a lack of rational understanding of foreseeable consequences of behavior.

17. This may necessitate enhanced services for behavior or supervision, or special considerations for living space.

18. Residents with developmental disabilities must be placed in an environment and given a living space which considers their own needs, and keeps them free from harm. Fla. Stat. § 393.13.

19. Due to the institutional nature of the setting, APD is required to approve any admission into an ICF/DD and to counsel an individual on other Home and Community Based options.

### Developmental Disabilities Centers

20. A DDC is a state-owned and state-operated ICF/DD, and was formerly known as a "Sunland Center." Fla. Stat. § 393.063(10).

21. One of the DDCs the Agency operates is located in Marianna, Florida. It is known as Sunland Center Marianna.

22. Sunland Center Marianna is a 535-acre campus with 5 licensed ICF/DD homes, holding AHCA license numbers 4078096, 4079096, 4080096, 4107096, and 4081096. It serves approximately 152 Residents.

23. The other facility the Agency operates is located in Gainesville, Florida. It is known as Sunland Center Tacachale ("Tacachale").

24. Tacachale has an approximately 500-acre campus with 6 licensed ICF/DD homes with AHCA license numbers, 028004600, 028006200, 028015100, 028024100, 028026700, 028055100. It serves approximately 224 Residents.

25. Where appropriate, and in accordance with Resident needs, both facilities utilize dual-occupancy rooms.

### The 2024 Rules

26. APD's DDCs receive federal financial assistance through HHS and are therefore covered entities under Section 1557.

27. The 2024 Rules prohibit discriminating based on gender identity. 89 Fed. Reg. at 37,699, *to be codified at* 45 C.F.R. § 92.101(a)(2). Section 206 of Part 92, would require covered entities to ensure "equal access" without discriminating based on sex. 89 Fed. Reg. at 37,700, *to be codified at* 45 C.F.R. § 92.206(a).

5

28. Among other things, Section 206 prohibits any policy or practice that separates or treats persons based on sex, including any policy or practice that prevents an individual from being treated "consistent with the individual's gender identity," if this causes the person harm—including emotional or dignitary harm—that is more than *de minimis*. *Id.* at 37,701, *to be codified at* 45 C.F.R. § 92.206(b)(3). For example, HHS explains, a hospital that assigns patients to dual-occupancy rooms based on their sex would be *required* to allow a male who identifies as a woman to share a room with a female. *Id.* at 37,593; NPRM, 87 Fed. Reg. at 47,866–67.

29. Other aspects of the 2024 Rules would prohibit any categorical limits on gender-transition treatments and would require APD to justify every denial of transition treatments on an individualized basis, following medical guidelines for gender transitions. *See* 89 Fed. Reg. at 37,701, *to be codified at* 45 C.F.R. § 92.206(b)(1), (4), (5).

30. The 2024 Rules will affect APD's operation of its DDCs in two ways. First, APD will need to redesign its campus to accommodate the 2024 Rules and hire more personnel for supervision of Residents. Second, APD will be forced to cover procedures that are otherwise prohibited under Florida law.

Dual Occupancy Rooms and Health and Safety

31. The 2024 Rules would impose significant fiscal costs on Florida by requiring the entire redesign of both of its DDC Campuses as well as additional staffing to supervise Residents and ensure health and safety.

6

32. The Agency currently utilizes dual-occupancy rooms which are separated by sex. A female Resident cannot share a room with a male, and a male cannot share a room with a female.

33. The Agency, in its judgment as operator of the DDCs, does so primarily to promote the health and safety of its Residents by providing a safe and appropriate abode as recommended by the IDT in the Active Treatment plan.

34. APD also employs this policy in order to facilitate treatment of its Residents most efficiently, as well as to create as much of a home-like and community environment as possible for all Residents.

35. Most of the homes at the DDCs are separated by sex themselves. However, Sunland Center Marianna currently has two homes for medically fragile Residents who are either wheelchair or bed bound. Sunland Center Tacachale has one home with medically fragile Residents who are wheelchair or bedbound. Because of the mobility considerations of the Residents in these homes, these homes are the only ones which have males and females living in the same home. In one of these medically fragile homes, all Residents have a private, single-occupancy room. At the two other homes, some residents have single occupancy rooms, and other residents share dual occupancy rooms. In both of the homes where residents share a dual occupancy room, no rooms are shared by members of the opposite sex. In both of those same homes the wings are separated by sex, with administrative rooms and offices between the two wings.

36. The reasons for separating rooms based on sex are obvious and are directly related to the health and safety of all Residents. Many Residents at the DDCs are seriously disabled and lack the cognitive ability to consent to activities, let alone activities with potentially serious consequences, such as medical procedures, or sexual activity. This is often one of the reasons why an ICF/DD is the least restrictive setting to meet a Resident's needs. As the administrator and operator of these facilities, APD has a duty to ensure it is anticipating and accounting for such needs and scenarios.

37. The DDCs care for several Residents who have sexually aggressive or inappropriate behaviors, histories of violence, and histories of felony criminal charges.

38. Indeed, this is compounded by the fact that the needs of one Resident are not a facsimile of another's. Residents often show a great variety in the levels of their sophistication and their understanding of consent.

39. Separating by sex allows for the physical safety of all Residents, particularly those who may be physically stronger and have more behavioral needs than other Residents.

40. APD will be irreparably injured by having to accommodate requests to have a Resident share a room with the opposite sex. To avoid loss of funds, and to preserve Resident safety and continued separating rooms based on sex, APD would have to overhaul its existing facilities to single-occupant rooms, incurring irrecoverable costs.

41. In the alternative, APD will undoubtedly have to employ additional personnel to maintain the health and safety of all Residents.

Medicaid Services

42. AHCA's state Medicaid program currently does not cover gender-transition interventions for the public at large. In August 2022, AHCA promulgated Florida Administrative Code, Rule 59G-1.050(7). That Rule provides that Florida Medicaid does not cover the following interventions for the treatment of gender dysphoria: (1) puberty blockers; (2) hormones and hormone antagonists; (3) gender-reassignment surgeries; and (4) any other procedures that are intended to alter primary or secondary sexual characteristics.

43. In May 2023, Governor Ron DeSantis signed into law Senate Bill 254, which prohibits the use of state funds for "sex-reassignment prescriptions or procedures"—including puberty blockers, hormones, hormone antagonists, or any medical procedure, including a surgical procedure, used "in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex." Fla. Stat. §§ 286.311, 456.001(9)(a).

44. AHCA's programs currently do not cover the cost of puberty blockers, hormones, hormone antagonists, or any medical procedure, including a surgical procedure, used as part of a sex-reassignment protocol.

45. Under state law, APD therefore cannot provide these services. But the 2024 Rules may require APD to do so, forcing APD to choose between following state law and HHS's regulations. Should APD refuse to comply with HHS's regulations, APD will be subject to penalties.

9

46. Combined with the forced redesign and need to hire additional personnel, APD will be similarly irreparably harmed by being forced to cover services that conflict with Florida law in order to avoid penalties by CMS.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 15th day of May 2024.

*J. Kevin Bailey*
J. Kevin Bailey