# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| **State of Florida**, et al. | ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No. 8:24-cv-01080 |
| **U.S. Department of Health and Human Services**, et al., | ) ) ) ) | |
| *Defendants*. | ) | |

## DECLARATION OF ANGELI MAUN AKEY, M.D.

I, Angeli Maun Akey, M.D., declare as follows:

1. I am over 21 and I am fully competent to make this declaration.

2. These facts are true, correct, and within my personal knowledge. If called to testify, I could and would testify competently to them.

3. I am a Florida medical doctor seeing Medicare patients at my independent practice in Gainesville, Florida. If my patients need hospitalization, I provide care at a local hospital that receives Medicare, Medicaid, and CHIP funding.

4. I am board-certified in Internal Medicine, Integrative and Holistic Medicine, Anti-aging and Regenerative Medicine, and certified in Functional Medicine. I hold a Bachelor of Science, a Bachelor of Arts and Doctor of Medicine degree from the University of Florida, where I graduated from the Jr. Honors Medical Program with Alpha Omega Alpha honors. I completed my internship, residency and chief residency at the Yale School of Medicine. I am the founding medical director of the Palm Beach Institute of Preventative Medicine and I teach doctors at conferences nationally and

internationally. I have written a book for patients on understanding hormones called *Fine-Tune Your Hormone Symphony*.

5. I have been in active medical practice in Gainesville for 25 years and I specialize in prevention, early detection, treatment and management of diseases associated with aging. My practice is organized as North FL Internal Medicine PA, doing business as North Florida Integrative Medicine. North Florida Integrative Medicine is a primary care practice that serves around 3,500 patients, many of whom suffer from chronic diseases. I opened North Florida Integrative Medicine in 2000 and I manage a staff of nearly 20 people serving this practice. We serve an area designated by the federal government to be a primary care shortage area.

6. If my patients need hospitalization, I provide my services in conjunction with other providers at HCA Florida North Florida Hospital, which is located 3.5 miles from the University of Florida campus in my hometown of Gainesville. HCA Florida North Florida Hospital is a 510-bed, full-service medical and surgical acute care center serving North Central Florida. HCA Florida North Florida Hospital accepts all forms of government insurance including Medicare, Medicaid, and CHIP.

7. I am a member of the Catholic Medical Association (CMA) but I am not a member of the Christian Employers Alliance or the Christian Medical & Dental Associations. I share CMA's positions.

8. I care for all patients with respect and without unlawful discrimination. No matter how a patient identifies, I provide the best medical care possible.

9. But, as a matter of sound medical judgment, good conscience, and religious belief, I categorically object to providing, referring for, or affirming any procedures to "transition" a patient's gender. It is a scientific fact, which

informs my medical judgment, that cross-sex hormones have not been proven safe by any reliable studies or data. It is a scientific fact that removing healthy body parts, such as by performing a mastectomy or hysterectomy, can lead to serious permanent damage. Providing gender-transition procedures of any kind is not the standard of care, and doing so would violate our medical oath to do no harm.

10. Doctors seeking to perform these procedures to address gender identity incongruence deny the realities of the body, and I cannot be a part of this as a medical doctor. As we remember to "first do no harm," we cannot change how we practice medicine based on weak scientific evidence.

11. I categorically oppose asking for or using a patient's self-selected gender identity or pronouns for any purpose, including for coding or charting.

12. I categorically oppose allowing males in female private spaces or vice versa.

13. I categorically oppose adopting, following, or providing a policy or notice that says (or is interpreted by federal rules to mean) that I do not "discriminate" based on gender identity.

14. I hold these positions as a matter of sound medical judgment as well as sincere Catholic religious exercise and conscience. If the government requires me to speak or act against my convictions, it would seek to stop me from speaking and acting in the way that my medical judgment and my religious faith requires of me.

15. I have regularly cared and expect to continue to care for patients who identify as transgender, non-binary, or otherwise contrary to their sex. I provide the same excellent medical care for these patients as I do for all my patients.

16. I regularly provide sex hormones for medical reasons. I prescribe hormone replacement therapy for postmenopausal women and some older men. But as a matter of sound medical judgment and good conscience, I do not and will not provide or refer for hormones for gender-transition purposes.

17. I have received new patient inquiries for management of hormones for gender-transition purposes. I expect to keep receiving similar patient inquiries. Were I to offer hormonal management for gender-transition purposes, I expect that many patients would request hormonal management for gender-transition purposes from me as I have reason to believe that there is demand in my community for doctors like me to provide hormonal management for gender-transition purposes.

18. I regularly provide referrals to oncologists for breast cancer treatment, including for mastectomies as appropriate. But as a matter of sound medical judgment and good conscience, I do not and will not refer for mastectomies for gender-transition purposes.

19. I regularly provide referrals to gynecologists for consideration for aberrant bleeding, which sometimes leads to medically indicated hysterectomies. But as a matter of sound medical judgment and good conscience, I do not and will not refer for hysterectomies for gender-transition purposes. Although there are some diagnoses that require a hysterectomy, it is always preferable to preserve the organ if possible. A gender-dysphoria diagnosis is not a medical diagnosis indicating a hysterectomy because a gender-dysphoria diagnosis does not indicate that the uterus is not healthy.

20. I expect patients will continue to attempt to consult me about gender-transition procedures and I expect that they may seek my medical opinion about gender-transition procedures. I expect that I will receive future requests for referrals for gender-transition purposes. I declined to provide

these procedures in the past, and I wish to be free to share my complete medical judgment on such procedures with these patients in the future. I want to be able explain that such procedures are unsafe, harmful, experimental, and cosmetic. In particular, I want to warn patients that these procedures do not reduce the risk of suicide—in fact, they increase it. Because I want to provide patients with complete information, I will not self-censor my medical opinions in patient consultations.

21. I regularly use pronouns for patients that accord with biological and binary sex. I code and chart patients by sex. I do not and will not ask for self-selected pronouns. I do not and will not use pronouns contrary to biology.

22. I have provided ongoing care to multiple patients who identify as transgender. These patients may very well expect me to use self-selected pronouns contrary to the patients' sex in conversation or in medical records but I do not ask for or use their self-selected pronouns. Because I seek to build a strong relationship with my patients, when I speak with these patients, I simply try to use first names. I try to avoid any pronouns in these conversations, but I may not always succeed. Outside the presence of the patient, I speak and write about the patient using biological pronouns.

23. I direct and manage operations within my office. No person other than me exercises oversight over my medical care for patients. I am solely responsible for office policy and for deciding what notices to give patients.

24. With the administrative help of my staff, my practice bills for Medicare. My affiliated hospital also serves Medicare, Medicaid, and CHIP patients. To the best of my knowledge, each time when we signed up to obtain credentials to receive federal funding, we provided all required paperwork, including signing any required assurances of compliance with federal regulations.

5

25. I have adopted an official written policy statement for my office that explains that I do not offer, refer for, or endorse gender-transition efforts. This policy says,

> In medicine, we bring our best knowledge about the body and healing to patient care in an integrative approach. Sound medicine teaches that each patient has a sex as a biological male or female.
>
> Doctors should always prioritize the health and well-being of their patients and doctors should always recognize biological reality. For this reason, we categorically do not provide medical interventions or referrals for "gender transition." Cross-sex hormones have not been proven safe by any reliable studies or data. These hormone treatments and related surgeries can permanently sterilize and there are no long term studies of outcomes for individuals who had gender-transition procedures. The best evidence shows that gender-transitions procedures do not reduce the risk of suicide—these procedures increase it. We cannot speak in favor of these experimental and cosmetic procedures, such as by offering medical opinions in favor of these procedures or by using pronouns that are contrary to a patient's sex. Our mission is to heal and not to harm.

26. I wish to retain this policy for my practice and to keep this policy in my book that employees may consult for information about office policies.

27. The rule forces me to abandon this policy and adopt a new gender-identity "nondiscrimination" policy for my office. This new policy must be consistent with the federal government's redefinition of sex to include gender identity, and I must revise my existing policy to ensure that it is consistent with following the rule's gender-identity requirements. Under the new policy, I must provide access based on a person's gender identity, treat each person according to gender identity, and be open to providing and referring for gender-transition procedures.

28. The rule will make me force all my employees to follow such a gender-identity policy. Then my staff and I will have to give patients notice of such a gender-identity policy and post the gender-identity policy prominently in our office. My affiliated hospital also must adopt and make me follow this kind of a gender-identity policy. I will refuse to adopt, post, or follow such a gender-identity policy.

29. The rule will force me to provide training on such a gender-identity policy to myself and to all employees to ensure my office's compliance with the rule's gender-identity requirements. My affiliated hospital also must make me attend training on such a policy. But for the rule, this training would not be a condition of federal funding or of my hospital affiliations.

30. I will not arrange or provide this training. I will not reeducate myself, nor will I reeducate my employees. Nor will I attend this training when scheduled by my hospital.

31. I object to attending training on such a policy. The government should respect my views and respect my position as a leader in my community. It should not coerce me to say things I do not believe or pressure me in a reeducation session to adopt a policy at odds with my beliefs. Being forced to provide or attend this training thus would substantially burden me in the free exercise of my medical judgment, my conscientious objections, and my religious beliefs.

32. Because I earn income based on the number of patients I see, I will bear the financial cost of the rule's compliance requirements in terms of my lost hours and productivity (not to mention lost staff productivity).

33. I have already spent time and resources to learn about the rule. If the rule goes into effect, I will spend even more resources to avoid noncompliance. I estimate that it would take me at least one hour to revise

7

my policies to comply with the rule, at least two hours to plan training and create an attendance sign-up sheet, and at least one hour to provide training to staff on new policies. I would not spend my time in this way but for the rule.

34. Florida restricts gender-transition procedures. The rule potentially forces me to choose between following the rule or following state law. I will not violate state law or harm my patients.

35. I also will not knowingly violate federal regulations or my conscience. So if this rule is enforced against me, I would rather stop seeing Medicare patients and lose my local hospital affiliation than adopt a policy under which I would harm a patient.

36. If I cannot participate in Medicare, if I lose my hospital affiliation, or if I have to close my office doors due to the burdens of government regulations, investigations, and penalties, my patients would suffer the loss of their trusted doctor and I would lose my income derived from Medicare, which will cause me a substantial financial loss this year.

37. The nationwide Change Healthcare cyberattack of February 21, 2024 has thrown my practice into serious financial chaos, and so any disruption in Medicare reimbursements in the next several months in particular would have an unusually disruptive impact on my practice. The outages from the cyberattack reduced my practice's cash flow by more than 80% for six weeks. As of early April, I had amassed more than $130,000 worth of insurance claims that I had not been able to get reimbursed for. In order to make payroll, I liquidated my retirement investments as an extra precaution. Payments have begun flowing back into my practice, though levels are still down between 30% and 40% from where they normally are. The adverse financial impact from this cyberattack is still in effect, making

any short-term disruption in Medicare reimbursements particularly difficult. Indeed, this serious difficulty with reliable reimbursement mechanisms is part of why I have made the hard decision to transition away from accepting Medicare payments next year (outside of the hospital setting) and will start asking Medicare patients to provide payment by alternative means. I intend to opt out of Medicare for my private office beginning on January 1, 2025.

38. I intend to continue my hospital affiliations for as long as my hospital will allow me to do so. I am currently in the process of renewing my longstanding hospital privileges, a process that I expect to be completed very soon.

39. When I have to decide whether to follow the rule—or risk losing my Medicare patients this year, my hospital affiliations, and my livelihood—I won't know whether my hospital and my practice will be required to follow the rule's requirements.

I declare under 28 U.S.C. § 1746 and under penalty of perjury that this declaration is true and correct based on my personal knowledge.

Executed May 8, 2024 at New York, NY

_____
Angeli Maun Akey, M.D.,
MAY 9TH, 2024

9