# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

| | | |
|---|---|---|
| **McComb Children's Clinic, LTD.**, a Mississippi Corporation, | ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | **Case No.** <u>5:24-cv-48-KS</u>-LGI |
| **Xavier Becerra**, in his official capacity as Secretary of the United States Department of Health and Human Services; **United States Department of Health and Human Services**; **Melanie Fontes Rainer**, in her official capacity as Director of the Office for Civil Rights of the United States Department of Health and Human Services; and **Office for Civil Rights of the United States Department of Health and Human Services**, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

## COMPLAINT
## <u>JURY TRIAL DEMANDED</u>

### INTRODUCTION

1.     A new final regulation from the U.S. Department of Health and Human Services (HHS) under Section 1557 of the Affordable Care Act forces medical clinics to perform or facilitate body-altering "gender-transition" procedures. The rule also forces clinics to speak in support of gender-transition efforts and to assure the government of their compliance with this mandate. These radical changes will completely upend the practice of medicine. The Biden administration is

working to force doctors to do harm by performing harmful, sterilizing procedures to make people appear as the opposite sex.

2.      The rule violates the Administrative Procedure Act, the freedom of speech, and other constitutional doctrines.

3.      Congress did not authorize the rule. The rule purports to implement the sex-discrimination prohibition in Section 1557 of the Affordable Care Act, but there is no gender-transition mandate in that statute, nor in Title IX of the Education Amendments of 1972 from which it is derived.

4.      If medical clinics such as Plaintiff McComb Children's Clinic, LTD. (MCC) do not change their policies and comply with the rule, HHS can punish them with huge financial penalties and exclude them from treating patients paid through federally funded programs like Medicaid or the Children's Health Insurance Program (CHIP). This would effectively prevent them from treating the most vulnerable children in Mississippi unless they ascribe to the radical gender ideology imposed by the president and his bureaucrats in Washington, D.C.

5.      Thus MCC seeks judicial relief to shield its medical practice—and its patients—from HHS's illegal and harmful rule.

6.      The Court should enjoin Defendants' enforcement of the rule preliminarily and permanently, declare and hold it to be unlawful, and set it aside, under the Administrative Procedure Act (APA), the Declaratory Judgment Act, and the First Amendment.

## JURISDICTION AND VENUE

7.      This case seeks declaratory, injunctive, and other appropriate relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the APA, 5 U.S.C. § 701–06; and Federal Rule of Civil Procedure 57.

8.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.

9.     This Court has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

10.    This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

11.    This Court has inherent jurisdiction to review and enjoin ultra vires or unconstitutional agency action under an equitable cause of action. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

12.    The APA provides jurisdiction and a cause of action to review Defendants' actions and enter appropriate relief. 5 U.S.C. §§ 553, 701–06.

13.    This Court may award costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

14.    Venue is proper in this Court and this division under 28 U.S.C. § 1391, including paragraph (e).

15.    Defendants are agencies of the United States, and officers and employees of the United States or of any agency thereof acting in their official capacity or under color of legal authority.

16.    The Plaintiff McComb Children's Clinic, LTD. (MCC) resides at 309 Llewellyn Avenue, McComb, Mississippi, in the Western Division of the Southern District of Mississippi, and no real property interest is involved in the action.

17.    A substantial part of the events or omissions giving rise to the claims occurred in this district, because the case concerns the impact of Defendants' regulation on MCC and its operations in this division of this district.

## PARTIES

### *Plaintiff*

18.     Plaintiff McComb Children's Clinic, LTD. (MCC) is a Mississippi corporation located at 309 Llewellyn Avenue, McComb, Mississippi 39649.

19.     MCC is a for-profit corporation founded in 1973 and incorporated in the State of Mississippi. Its registered agent is in McComb, Mississippi.

20.     MCC's primary purpose is to provide healthcare.

21.     MCC provides medical care in health programs and activities receiving federal financial assistance from HHS under Section 1557 of the Affordable Care Act (ACA), 42 U.S.C. § 18116.

22.     Additional facts about MCC are set forth in the declaration of its president attached as Exhibit 1.

### *Defendants*

23.     Defendant Xavier Becerra is sued in his official capacity as Secretary of the United States Department of Health and Human Services. His address is 200 Independence Avenue SW, Washington, DC 20201.

24.     Secretary Becerra is responsible for the overall operations of HHS, including the Department's administration of Section 1557 and the rule.

25.     Defendant United States Department of Health and Human Services (HHS) is a federal cabinet agency within the executive branch of the United States government and is an agency under 5 U.S.C. §§ 551 and 701(b)(1). HHS's address is 200 Independence Avenue SW, Washington, DC 20201.

26.     HHS is responsible for implementing and enforcing Section 1557 and the rule.

27.     Defendant Melanie Fontes Rainer is sued in her official capacity as the Director of the Office for Civil Rights (OCR) at HHS. Her address is 200 Independence Avenue SW, Washington, DC 20201.

28.     Defendant Rainer is responsible for enforcing Section 1557 and the rule.

29.     Defendant the Office for Civil Rights is a division of the United States Department of Health and Human Services and is an agency under 5 U.S.C. § 551 and 701(b)(1). OCR's address is 200 Independence Avenue SW, Washington, DC 20201.

30.     OCR is responsible for implementing and enforcing Section 1557 and the rule.

## BACKGROUND

**I.   Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972**

31.     On May 6, 2024, HHS issued a new regulation implementing Section 1557 of the Affordable Care Act. "Nondiscrimination in Health Programs and Activities," 89 Fed. Reg. 37,522 ("the 1557 rule" or "the rule").

32.     Section 1557 of the ACA states:

> Except as otherwise provided for in this title (or an amendment made by this title), *an individual shall not, on the ground prohibited under* title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), *title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.),* the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29 [commonly known as Section 504 of the Rehabilitation Act], *be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity*, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a) (emphasis added).

5

33.     Section 1557 prohibits discrimination on the basis of sex to the extent such discrimination is prohibited by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (Title IX).

34.     Under Title IX's sex discrimination provision, "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

35.     Sex is a term that refers to whether a person is male or female according to biology.

36.     Sex discrimination is forbidden under Title IX, its regulations, and longstanding guidance.

37.     Title IX, its regulations, and longstanding guidance require education programs to provide females, as such, with equal opportunities.

38.     In many cases, such as in sports with physical contact, these opportunities must be specific to sex.

39.     Title IX, its regulations, and longstanding guidance do not mention or forbid discrimination based on "gender identity."

40.     The ACA does not mention gender identity.

41.     The ACA refers to sex and the sexes with biologically binary language.

42.     The ACA acknowledges that medical practice is biological and is tailored to advance health according to biological distinctions between the male and female sexes.

43.     The ACA cannot be construed legitimately to require clinics to practice medicine as if males are females or vice versa.

44.     The ACA cannot be construed legitimately to require entities covered by Section 1557 to provide, facilitate, or speak in favor of "gender transitions."

45.     42 U.S.C. § 18116 does not authorize HHS to issue a rule implementing Section 1557 to require performing or promoting "gender transitions."

## II.     Section 1557's breadth and scope

46.     Section 1557 applies to what HHS calls "covered entities," which are recipients of federal financial assistance from HHS or through the ACA.

47.     These recipients of federal financial assistance include clinics, hospitals, and doctors that accept patients paying through Medicare, Medicaid, and CHIP.

48.     Section 1557 applies to virtually every healthcare entity in America.

49.     Through Medicare, Medicaid, and CHIP, the federal government is the single largest source of spending on healthcare—providing 33% of all U.S. health spending in 2022.[1]

50.     Medicare is a federal health insurance program for people over 65 or who have certain disabilities or conditions. Medicare accounts for 21% of total health spending in the United States—over $1 out of every $5 spent.[2]

51.     This year, in 2024, 98% of providers participate in Medicare.[3]

52.     Medicaid is a joint federal and state health insurance program for people with limited incomes. Medicaid provides $1 out of every $6 spent nationally

---

[1] Ctrs. for Medicare & Medicaid Servs., U.S. Dep't of Health & Human Servs., *National Health Expenditures 2022 Highlights* 3, https://www.cms.gov/files/document/highlights.pdf (last modified Dec. 13, 2023).

[2] CMS, HHS, *National Health Expenditures*, *supra* note 1.

[3] Ctrs. for Medicare & Medicaid Servs., U.S. Dep't of Health & Human Servs., *Annual Medicare Participation Announcement* 1–2, https://www.cms.gov/files/document/medicare-participation-announcement.pdf (last modified Nov. 17, 2023).

on healthcare. Seventy-four percent of all healthcare providers accept new Medicaid patients, including 81.7 percent of OB/GYNS and 84.7 percent of pediatricians.[4]

53.     Medicaid is the largest source of federal revenues for state budgets, accounting for about 45% of all state expenditures from federal funds in SFY 2021 and accounting for about 27% of total state spending for all items in state budgets.[5]

54.     CHIP is a joint federal and state health insurance program for certain children who do not qualify for Medicaid. In some states, CHIP covers pregnant women. More than 88 million people, including nearly 40 million children, are enrolled in Medicaid and CHIP coverage.[6]

55.     In 2023, federal spending on Medicare made up 13% of net federal outlays, and federal spending on Medicaid and CHIP made up 10% of net federal outlays.[7]

56.     An entity that "any part of which" participates in HHS financial assistance programs is subject *in all aspects* to Section 1557. All of the operations of the covered entity are covered—not merely that part of the covered entity that receives the funding. That means that any hospital or doctors' office that accepts a single Medicare, Medicaid, or CHIP patient must follow Section 1557's policies for *all* its patients, no matter how other patients pay for care.

---

[4] Medicaid & CHIP Payment & Access Comm'n, *Physician Acceptance of New Medicaid Patients* 3–4 (June 2021), https://www.macpac.gov/wp-content/uploads/2021/06/Physician-Acceptance-of-New-Medicaid-Patients-Findings-from-the-National-Electronic-Health-Records-Survey.pdf.

[5] Elizabeth Williams et al., *Medicaid Financing: The Basics*, KFF, (Apr. 13, 2023), https://www.kff.org/medicaid/issue-brief/medicaid-financing-the-basics/.

[6] Press Release, HHS, New State by State Analysis on Impact of CMS Strategies for States to Protect Children and Youth Medicaid and CHIP Enrollment (Dec. 18, 2023), https://www.hhs.gov/about/news/2023/12/18/new-state-by-state-analysis-on-impact-cms-strategies-for-states-protect-children-youth-medicaid-chip-enrollment.html (providing state-by-state figures).

[7] Williams et al., *Medicaid Financing: The Basics*, *supra* note 5.

### III.   Section 1557's enforcement mechanisms

57.    The ACA incorporates Title IX's public and private enforcement mechanisms for Section 1557 and HHS's implementing regulations. 42 U.S.C. § 18116(a).

58.    If OCR finds a covered entity in noncompliance, HHS may require it to take remedial action or else lose federal funding.

59.    Under this authority, OCR or the Attorney General may investigate the entity and demand the production of the entity's internal information. 18 U.S.C. § 3486; 45 C.F.R. §§ 80.6–80.11; 45 C.F.R. Pt. 81; 45 C.F.R. § 92.5.

60.    Entities must provide this information or they arguably face criminal liability. 18 U.S.C. §§ 1516, 1518.

61.    Criminal penalties also arguably apply to covered entities that receive federal funding but do not comply with Section 1557 or HHS's implementing regulations, including under federal criminal healthcare-fraud or false-claim statutes. 18 U.S.C. §§ 287, 1001, 1035, 1347; 42 U.S.C. §§ 1320a-7b(a), 1320a-7b(c).

62.    Violators arguably may, and after certain criminal convictions must, be excluded by HHS from future eligibility for federal healthcare funding. 42 U.S.C. §§ 1320a-7, 1320c-5.

63.    Violators of Section 1557 or HHS's implementing regulations may arguably be subject to federal civil false-claims liability, including civil penalties, treble damages, and the possibility of "up to five years' imprisonment," 18 U.S.C. § 1001, and civil penalties up to $10,000 per false claim, adjusted for inflation, plus treble damages, 31 U.S.C. § 3729(a)(1).

64.     The public may file with OCR complaints about healthcare entities that they believe are not complying with Section 1557, Title IX, or HHS's implementing regulations.[8]

65.     OCR will accept and investigate complaints filed under the 1557 rule.

66.     Multiple courts have interpreted Section 1557 to allow members of the public to sue covered entities to require compliance.

## IV.   President Biden's direction to add gender identity to Section 1557 and Title IX

67.     The 1557 rule was issued at the President's direction.

68.     Upon taking office, President Biden signed an executive order directing federal agencies to interpret Section 1557 and Title IX to prohibit gender-identity discrimination.[9]

69.     Since then, federal agencies have been implementing a whole-of-government agenda to redefine "sex" discrimination to prohibit gender-identity discrimination.

70.     Secretary Becerra described disagreements with his gender-identity position as "the hateful and harmful beliefs of a narrow-minded few."[10]

71.     The 1557 rule, in prohibiting discrimination on the basis of "gender identity" is part of government-wide efforts by the White House.

---

[8] *See, e.g.*, *How to File a Civil Rights Complaint*, U.S. Dep't of Health & Human Servs., Office for Civil Rights, https://www.hhs.gov/civil-rights/filing-a-complaint/complaint-process/index.html (last visited May 6, 2024).

[9] Exec. Order No. 13,988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021); Exec. Order No. 14021, Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, 86 Fed. Reg. 13,803 (Mar. 8, 2021).

[10] Press Release, HHS, Statements by HHS Secretary Xavier Becerra and HHS Principals on Pride Month (June 1, 2023), https://www.hhs.gov/about/news/2023/06/01/statements-by-hhs-secretary-xavier-becerra-hhs-principals-pride-month.html.

## V.     The rule's gender-identity mandate

72.     Under the rule, "[d]iscrimination on the basis of sex includes, but is not limited to, discrimination on the basis of sex stereotypes; sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; and gender identity," as well as "marital, parental, or family status," and it also includes discrimination against an individual on the basis of the sex "of the individual and another person with whom the individual has a relationship or association." 89 Fed. Reg. at 37,698–99, 37,701 (codified at 45 C.F.R. §§ 92.101(a)(2), 92.208, 92.209)).

73.     The rule treats these bases of liability as overlapping ways in which Section 1557 and Title IX address gender identity.

74.     For example, the rule directly defines "gender-identity" discrimination to be sex discrimination, but the rule separately defines "sex stereotypes" discrimination to be sex discrimination, and the rule considers "sex stereotypes" discrimination to encompass gender-identity discrimination.

75.     The rule provides for discriminatory-intent liability, disparate-impact liability, hostile-environment liability, harassment liability, and other theories of liability on all of these bases.

76.     Likewise, Section 1557 addresses disability discrimination under Section 504 of the Rehabilitation Act, but the rule references regulations that deem gender dysphoria a "disability" that can trigger the same gender-identity mandate.

77.     One way or another, OCR insists using the rule to consider covered healthcare entities not to have complied with Section 1557 and not to have provided "equal access" to health programs "without discriminating on the basis of sex" or disability unless the providers do not exclude, deny benefits, or "discriminate" against individuals on the basis of gender identity. 89 Fed. Reg. at 37,698–701 (codified at 45 C.F.R. §§ 92.101(a), 92.206(a), 92.208–98.211).

78.     Consequently, to the extent this Complaint refers to, or asks the Court to issue relief concerning, the rule and Defendants' actions thereunder prohibiting discrimination on the basis of gender identity, MCC intends to encompass any language or alternative theory in the rule that Defendants may use to achieve those same ends.

79.     The rule considers it discriminatory to deny or limit health services, including those that are offered exclusively to individuals of one sex, to an individual based on the individual's sex assigned at birth, gender identity, or gender otherwise recorded.

80.     The rule considers it discriminatory to deny or limit a healthcare entity's ability to provide health services on the basis of an individual's sex assigned at birth, gender identity, or gender otherwise recorded if such denial or limitation has the effect of excluding individuals from participation in, denying them the benefits of, or otherwise subjecting them to discrimination on the basis of sex under a covered health program or activity.

81.     The rule considers it discriminatory to adopt a policy or engage in a practice that prevents an individual from participating in a health program or activity consistent with the individual's gender identity.

82.     The rule considers it discriminatory to deny or limit health services sought for the purpose of "gender transition" or other "gender-affirming care" that the covered entity would provide to an individual for other purposes if the denial or limitation is based on a patient's sex assigned at birth, gender identity, or gender otherwise recorded.

**A.      Forcing healthcare entities to perform "gender-transition" procedures**

83.     The rule forces healthcare entities to perform "gender-transition" procedures.

84.    "Gender-transition" procedures are drugs or interventions that block a person's natural development as a person of one sex, such as puberty-blocking drugs, cross-sex hormones, and body-altering surgeries.

85.    The rule considers it discrimination if a covered entity provides a particular health service but will not provide that health service for gender transitions or to affirm gender transitions.

86.    If a healthcare entity is willing to prescribe puberty blockers for therapeutic reasons related to early onset of puberty, the rule requires such an entity to also prescribe those hormones when requested by a patient to help achieve or continue a "gender transition."

87.    If a healthcare entity is willing to perform a mastectomy for therapeutic reasons, such as those related to cancer, the rule requires such an entity to also perform mastectomies on women and girls to help achieve or continue a "gender transition."

88.    If a healthcare entity is willing to perform a hysterectomy on a woman with a cancerous uterus, the rule requires it to perform a hysterectomy on a woman with a healthy uterus if she identifies as a man and seeks the procedure for "gender-transition" purposes.

89.    By requiring healthcare entities to provide health services that have the purpose or effect of causing, assisting, or affirming "gender transition," the rule creates a new government-mandated standard of care.

90.    Where the rule requires healthcare entities to provide health services with the purpose or effect of causing, assisting, or affirming "gender transition," those entities must comply with the rule even if doing so violates state law, medical ethics, or the entity's own policies.

91.    By "gender-affirming care" HHS means care for "transgender" individuals (including those who identify using other terms, for example,

"nonbinary" or "gender nonconforming") that may include, but is not necessarily limited to, counseling, hormone therapy, surgery, and other services designed to support gender-transition efforts.

92.     Under the rule, healthcare providers must provide or refer for "gender-affirming care" unless they have a reason that the rule considers legitimate and nondiscriminatory for denying or limiting the requested service, including where the covered entity typically declines to provide the health service to any individual, or where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual.

93.     Under the rule, a healthcare entity's position that procedures for "gender transition" are categorically never beneficial for individuals is *not* a sufficient basis for declining to provide that service, if it is a service they will provide when it does not have the purpose or effect of causing, assisting, or affirming "gender transition."

94.     Under the rule, if MCC declines to provide a procedure for "gender transition" to a minor because doing so is prohibited by Mississippi's "Regulate Experimental Adolescent Procedures (REAP) Act," House Bill 1125 (2023), that reason will not protect MCC from liability for violating the rule.

95.     It is no defense to liability under the rule that in a healthcare entity's medical judgment, removing a healthy organ for "gender-transition" purposes is never clinically indicated or beneficial.

96.     It is no defense to liability under the rule that a healthcare entity considers "gender-transition" efforts categorically experimental or cosmetic.

**B.      Forcing healthcare entities to change their speech to conform to HHS's gender ideology**

97.     The rules forces healthcare entities to lie to their patients.

98.     The rule considers it discrimination for a covered entity to speak to patients in a way that categorically excludes the legitimacy of "gender transition."

99.     The rule considers it discrimination for a covered entity to speak using a patient's pronouns that align with his or her sex according to the patient's biology if the patient prefers different pronouns that correspond to his or her gender identity.

100.    The rule considers it to create a hostile environment for patients in violation of the rule if a healthcare entity and its staff speak in ways that categorically deny the medical legitimacy of gender transitions.

101.    Under the rule, covered entities cannot tell their patients that in their best medical opinions, transition efforts or procedures are categorically experimental and dangerous.

102.    Under the rule, covered entities cannot speak or act toward their patients on the view that transition efforts or procedures are categorically harmful.

103.    Under the rule, covered entities may not raise categorical objections about transition efforts or procedures based on detransitioners' regret over these efforts.

104.    Under the rule, covered entities may not raise categorical objections about "gender-transition" efforts based on their view of the harms of puberty-blocking drugs, cross-sex hormones, surgeries, and other procedures.

105.    The rule forces covered entities to give patients the impression that "gender-transition" efforts can in some cases be clinically indicated or beneficial.

106.    Under the rule, if a patient identifies with a gender different from his or her sex, covered entities must refer to that patient by pronouns the patient prefers corresponding to that patient's perceived gender and not by pronouns corresponding to that patient's sex.

107.    Under the rule, if a patient identifies with a gender different from his or her sex, covered entities may not use biologically correct pronouns to refer to the patient.

108.    Under the rule, if a patient identifies with a gender different from his or her sex, covered entities may not omit the use of pronouns concerning that patient based on the doctor's disagreement with using biologically inaccurate pronouns.

109.    Under the rule, covered entities must tell patients that males can get pregnant, give birth, and breastfeed.

110.    Under the rule, covered entities must not tell patients that males categorically cannot get pregnant, give birth, and breastfeed.

111.    Under the rule, if covered entities provide patients with written materials stating any of the things the rule considers discriminatory, that would violate the rule and could also constitute discrimination.

### C.    Putting males into female private spaces

112.    The rule forces females to share private spaces with males when the male identifies as female or non-binary.

113.    When a male identifies as female or non-binary, covered entities must designate males to female private spaces or programs, such as sex-specific hospital rooms, lactation rooms, lactation training, exam rooms, restrooms, shared showers, and pregnancy-related educational sessions.

114.    Under the rule, a hospital that assigns patients to dual-occupancy rooms based on sex would be forced to allow a man who identifies as a woman to share a room with a woman who identifies as a woman.

115.    The hospital would not be allowed to assign rooms on the basis of sex according to biology.

116.    Under the rule, healthcare providers will not be able to honor patient requests for a healthcare provider or chaperone of a particular sex in cases where a provider, chaperone, or patient identifies contrary to his or her sex.

117.    Because the rule requires covered entities to allow access to sex-specific programs or facilities according to a person's asserted gender identity, the rule forbids sex-specific programs or facilities based on biology.

### D.    Requiring policies, certifications, and assurances

118.    The rule requires healthcare entities to agree to comply with the rule, submit assurances or certifications of compliance, adopt policies ensuring compliance by and within the entity, notify patients of compliance, and train staff to comply.

119.    Under the rule, as a condition of MCC continuing to treat patients covered by programs such as CHIP and Medicaid, MCC must begin now to repeal existing policy, adopt new policy, make assurances to the government, give notices to patients, and train staff in order to comply with the rule's requirements to provide "gender-transition" procedures and to not speak in categorical criticism or exclusion of such procedures.

## VI.    The rule's immediate compliance requirements

120.    The rule's prohibition on discrimination on the basis of gender identity goes into effect on July 5, 2024.

### A.    New policies, notices, assurances of compliance, and certifications

121.    The rule prohibits covered entities from having or applying policies contrary to the rule.

122.    The rule requires covered entities to adopt and publish policies that comply with the rule.

123.    The rule requires covered entities to have policies consistent with the rule and to state in their policies that they will not discriminate on the basis of sex or disability, which the rule defines to mean gender identity.

124.    The rule requires covered entities to provide an updated notice of nondiscrimination to patients consistent with stating that they will not discriminate on the basis of gender identity.

125.    The notice to patients must be provided annually and on request.

126.    The notice must be posted at a conspicuous location on the covered entity's health program or activity website and in clear and prominent physical locations where it is reasonable to expect individuals seeking service from the health program or activity to be able to read or hear the notice.

127.    The rule prohibits covered entities from stating to patients that they will engage in actions or omissions inconsistent with the rule's prohibitions on discrimination on the basis of gender identity.

128.    The rule requires covered entities to train or reeducate themselves and their employees to comply.

129.    Under the rule, covered entities must contemporaneously document their employees' completion of the training and maintain that documentation for at least three calendar years.

130.    Under the rule, covered entities must submit an assurance of compliance to HHS that they have adopted the rule's new policies as a contractual condition of receipt of federal funding, or else they will be unable to apply or maintain eligibility for federal funding.

131.    Under the assurance, covered entities must agree to comply with the rule, including the prohibition on discrimination on the basis of gender identity.

132.    This assurance must be submitted by clinics seeking to receive any federal health funding from HHS, including to receive Medicaid or CHIP certification.

133.    Assurance of compliance submitted by clinics prior to issuance of the rule, including assurances made by clinics for Medicaid or CHIP certification, will now be read by HHS to encompass a contractual assurance that MCC will comply with the rule.

134.    Every time a covered entity requests a federal health funding payment from HHS it impliedly certifies to the federal government that it follows governing regulations, and the rule imports the prohibition on gender-identity discrimination into those implied certifications.

135.    Covered entities unwilling to agree to make such an assurance or certification of compliance cannot apply for or maintain eligibility for federal health funding from HHS.

136.    Each required assurance or certification that an entity makes to receive federal health funding from HHS will create or extend contractual obligations requiring the covered entity to comply with the rule.

137.    Under the rule, a covered entity that employs 15 or more people must appoint a "Section 1557 Coordinator" in charge of compliance with the rule, must implement written grievance procedures for receiving and resolving allegations of any action that the rule would prohibit, must keep all grievances for three years, and must not disclose the identity of any person who files a grievance against the entity.

**B.      The rule's creation of new liability risks**

138.    The rule creates new risks that covered entities could lose federal funding or face criminal and civil liability.

139.    Failure to follow the rule and its interpretation of Section 1557, Title IX, and HHS regulations risks the burdens and costs of federal investigations and enforcement proceedings.

140.    Failure to follow the rule and its interpretation of Section 1557, Title IX, and HHS regulations risks disallowance, exclusion, suspension, and debarment from receipt of federal funding.

141.    Failure to follow the rule and its interpretation of Section 1557, Title IX, and HHS regulations arguably risks liability under a cause of action in civil litigation, including in suits brought by the public.

142.    Litigants may arguably cite the rule as a binding interpretation of Section 1557 under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

143.    Failure to follow the rule and its interpretation of Section 1557, Title IX, and HHS regulations arguably risks civil and criminal liability under federal healthcare-fraud and false-claims statutes and regulations.

144.    The rule creates these arguable healthcare-fraud and false-claims liability risks because the rule requires covered entities to operate their practices in accord with the rule and to sign assurances of compliance as a contractual condition of receiving funds.

145.    The False Claims Act, for example, makes a person liable for "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

146.    A "claim" means "any request or demand, whether under a contract or otherwise, for money or property" presented to an officer of the United States or a recipient of federal funding (like a state administering its state Medicaid program). 31 U.S.C. § 3729(b)(2)(A).

20

147.   Under these laws, covered entities must ensure that they are presenting accurate and appropriate claims, such as when covered entities seek payment for providing healthcare to Medicaid patients.

148.   As HHS warns physicians, "When you submit a claim for services performed for a Medicare or Medicaid beneficiary, you are filing a bill with the Federal Government and certifying that you have earned the payment requested and complied with the billing requirements."[11]

149.   A covered entity is arguably liable for express or implied false certifications when a provider submits a claim for payment but does not or intends not to comply with the rule's gender-identity nondiscrimination requirement, or fails to disclose such noncompliance.

150.   Such a covered entity arguably incurs this liability each time it submits a claim for federal payment or accepts federal financial assistance.

151.   HHS considers compliance with the rule and its interpretation of Section 1557, Title IX, and HHS regulations material in its payment decisions.

152.   HHS is substantially likely to deem a provider's request for payment misleading if the provider is not in compliance with the rule and its interpretation of Section 1557 and its implementing regulations.

## VII.   McComb Children's Clinic's injuries from the rule

153.   MCC has an urgent need for judicial relief to shield its medical practice and its patients from HHS's harmful rule.

154.   MCC is a pediatrics practice, and provides high-quality medical services to children without discrimination on the basis of sex or any other characteristic prohibited by statute.

---

[11] *Physician Relationships With Payers*, Office of Inspector General, HHS, https://oig.hhs.gov/compliance/physician-education/i-physician-relationships-with-payers/ (last visited May 6, 2024) (emphasis omitted).

155.    MCC's position is that a child with medical needs, such as a broken bone, an infection, or cancer, should be given the best medical care possible, regardless of his or her identity. But medical professionals cannot harm patients, nor can they lie to them.

156.    Based on MCC's view of medical science and ethical medical practice, it categorically does not provide medical interventions or referrals for, and does not facilitate or speak in ways that affirm the legitimacy of, the practice of "gender transition."

157.    MCC is committed to following state law, which restricts gender-transition interventions for minors.

158.    MCC also cares for and welcomes each patient in its health programs and facilities based on the patient's sex as a biological male or female.

159.    MCC communicates these policies and positions to its patients, including on its website.

160.    The scope of MCC's pediatrics practice triggers the rule's gender-identity mandate.

161.    MCC offers a full array of services to help children maintain good health.

162.    These services include, but are not limited to, well-child care exams, sports physicals, newborn care, vision and hearing screenings, immunizations, sick child diagnosis and treatment, dietary and nutrition guidance, lab testing, and prescription of medication.

163.    MCC treats or refers some patients for puberty blockers or sex hormones for sound medical and therapeutic reasons, such as labial adhesions, cases of precocious puberty, or pituitary failure that prevented naturally occurring puberty.

22

164.    MCC opposes providing, referring for, facilitating, or speaking in favor of similar services for "gender-transition" interventions.

165.    A doctor at MCC has encountered a patient identifying as transgender and engaging in "social transition" and has had to interact with the patient in ways that the rule would regulate.

166.    MCC uses pronouns for patients that accord with the patients' sex according to biology (male or female). MCC codes and charts patients by sex.

167.    MCC categorically opposes asking for its patients' gender identity, or charting or coding them according to their gender identity instead of their sex according to biology.

168.    MCC categorically opposes providing advice, referrals, or care that "affirms" gender transition, or participates in "social transition" by, for example, the use of "preferred pronouns."

169.    MCC has designated lactation rooms, and specifies by signage that those rooms are for use by "Breastfeeding Moms Only." MCC also provides referrals to moms of its infant patients to receive lactation consultations and treatment.

170.    MCC categorically opposes allowing males in female private spaces as if the males are females, and vice versa, opposes allowing males to use its lactation rooms for so-called "chestfeeding" or for any purpose inconsistent with the rooms' proper use, opposes changing its signage to refer not to "Moms" but to "Pregnant Persons" or any other such euphemism derived from gender ideology, and opposes providing referrals for males to "chestfeed" a child.

171.    Through its health professionals, MCC has freely shared its medical judgment on "gender transition" with patients.

172.    MCC sees patients who may unknowingly be pregnant. MCC will administer appropriate pregnancy testing. Where a patient is pregnant, MCC refers the patient for prenatal care from an Obstetrician/Gynecologist.

173.   MCC's scope of practice would include referring patients for methotrexate for an immunosuppressive condition like juvenile rheumatoid arthritis.

174.   Doctors and staff also engage in discussions and counseling with a patient and/or their parent or guardian concerning pregnancy and sexual activity. For example, clinic doctors or staff will counsel that patients will maximize their sexual health by not having sex outside of marriage, and by having babies after being in marriage.

175.   MCC wants to remain free to follow and share its medical views on these issues.

176.   A doctor at MCC has encountered a female pediatric patient that identified as transgender and was engaged in "social transition" activities. The doctor declined to address or treat the female patient as male, including by using a male name, and the doctor shared the general position, held by the clinic, that sex is biological and "gender transition" is not a sound practice.

177.   In such cases, the clinic provides the same high-quality medical care to those patients as it does to all patients, whether it is for a wellness exam, acute illness, or any other medical condition. The clinic also supports its doctors and staff in sharing the clinic's views with those patients, appropriate to the situation, about the inherent biological error of gender ideology and the dangers of gender transition.

178.   MCC's views and practices are described in more detail in the attached signed declaration of MCC's president Dr. Michael Artigues. Ex. 1.

179.   MCC's categorical exclusion of providing, facilitating, or affirming "gender-transition" interventions, and its commitment to complying with state law, precludes it from:

A.     Prescribing puberty blockers, cross-sex hormone therapies, or other similar ongoing interventions to treat gender dysphoria or for transition efforts;

B.     Performing surgeries to treat gender dysphoria or for transition efforts, including:

      i.     Removing healthy breasts, uteruses, or ovaries from females who purport to identify as males, as nonbinary, or who otherwise do not identify as females (hysterectomies, mastectomies, and oophorectomies);

      ii.     Removing healthy vaginal tissue from females who purport to believe themselves to be male, to be nonbinary, or otherwise not to be female, and creating for them a faux or cosmetic penis (phalloplasties and metoidioplasties);

      iii.     Removing healthy testicles or scrotums from males who purport to believe themselves to be female (orchiectomies or scrotectomies);

      iv.     Performing a process called "de-gloving" to remove the healthy skin of a male's penis and using it to create a faux vaginal opening or vulva (vaginoplasties and vulvoplasties);

      v.     Removing healthy internal or external genitals from any person to create a "smooth gender-neutral look" (nulloplasties or nullification surgeries); and

      vi.     Performing other procedures sought to make a person resemble the opposite sex or no sex, such as facial, chest, neck, skin, hair, or vocal modification;

C.     Saying through its staff that these transition efforts are the standard of care, are safe, are beneficial, are not experimental, are not cosmetic, or should otherwise be recommended;

D.     Offering to perform, provide, or prescribe the above such transition interventions, procedures, services, or drugs, including in published statements;

E.     Referring patients for any and all such interventions, procedures, services, or drugs;

F.     Refraining from expressing its views, options, and opinions to patients when those views are critical of transition efforts;

G.     Refraining from informing patients or the public that they do not provide transition procedures, including by refraining from sharing this information in patient conversations or on websites;

H.    Treating and referring to patients according to gender identity and not sex;

I.    Saying that sex or gender is nonbinary or on a spectrum;

J.    Using language affirming any self-selected gender identity inconsistent with sex or the biological binary;

K.    Asking patients to share their gender identity or pronouns beyond basic inquiries into the patient's sex;

L.    Using patients' self-selected pronouns according to gender identity, rather than using no pronouns or using pronouns based on sex;

M.    Creating medical records and coding patients and services according to gender identity not to sex;

N.    Saying that a boy is a girl, or vice versa, or say that males can be pregnant, give birth, or breastfeed;

O.    Affirming or endorsing transition efforts;

P.    Allowing patients to access single-sex programs and facilities, such as lactation rooms, lactation training, hospital rooms, restrooms, or other single-sex programs and spaces, by gender identity and not by sex;

Q.    Repealing or modifying its policies, procedures, and practices of not offering to perform or prescribe the above procedures, drugs, and interventions for transition efforts; and

R.    Providing assurances of compliance, compliance reports, express or implied certifications of compliance, and notices of compliant policies, or posting notices of compliant policies in prominent physical locations as to the rule's gender-identity requirements.

180.    The rule, however, requires MCC to do or say all these things.

## VIII.  The rule's substantive injuries to McComb Children's Clinic

181.    MCC is a covered entity under the 1557 rule.

182.    MCC participates in health programs and activities receiving federal financial assistance.

183.    MCC treats patients who provide payment through federally subsidized healthcare programs such as Medicaid, Medicare, and CHIP.

184.    MCC bills Medicaid and CHIP for patient care, and complies with paperwork, certification, and assurances to do so.

185.    The rule forces MCC to abandon its policies categorically excluding the provision of "gender transitions."

186.    The rule forces MCC to violate state laws prohibiting gender transitions for minors.

187.    The rule seeks to preempt state law that protects MCC from facilitating gender-transition procedures—both state laws that restrict these procedures themselves and state laws that protect healthcare institutions' rights to decline to participate in these procedures..

188.    The rule threatens MCC with expulsion from participation in Medicaid, Medicare, and CHIP, and other federal financial assistance programs.

189.    It would cause MCC significant financial harm to lose eligibility to participate in federal healthcare programs such as Medicare, Medicaid, and CHIP.

190.    The rule threatens MCC's income and ability to pay its employees.

191.    The rule arguably exposes MCC to civil penalties, criminal penalties, damages, investigative burdens, and document demands.

192.    The burdens of being investigated for alleged or suspected violations— or reviews over such non-compliance—are severe, imposing significant costs of time, money, attorney's fees, and diversion of resources that these healthcare providers could use to continue providing quality medical care and to continue receiving compensation for the same.

193.    The rule imposes the following no-win choice on MCC: (1) abandon or violate its policies and incur the costs of compliance with the rule; (2) maintain its positions and practices but falsify its policies, notices, and assurances of compliance to HHS and then risk continuing liability and investigative demands from OCR with no promise it will be deemed exempt from the loss of eligibility for participation in federal financial assistance programs; or (3) exit the medical field and abandon its patients.

194.    Put to the same choice, the rule will drive thousands of doctors and clinics out of the medical profession, and it will dissuade students from choosing to practice medicine.

195.    These effects will exacerbate shortages of medical professionals nationwide and in Mississippi specifically, reducing the availability of healthcare providers to care for underserved, low-income, and rural patients.

196.    The rule will place intense strain on the healthcare system and cause immense human suffering and higher medical costs.

197.    Imposing the rule will deprive patients who want to receive care from MCC.

198.    If the number of physicians who take federal funding is reduced, they cannot easily be replaced, and it will reduce access to care for federally funded patients. Medicaid patients already have less access to primary and specialty care than privately insured patients.[12] Physicians historically have been significantly less likely to accept new patients covered by Medicaid (74.3 percent) than those with Medicare (87.8 percent) or private insurance (96.1 percent).[13]

199.    If MCC were to comply with the rule, it would lose its integrity and reputation of practicing consistent with the health of children and medical ethics, and this would make patients less likely to trust MCC, driving patients away from its practice.

200.    If MCC complies with the rule by performing, referring for, or legitimizing "gender-transition" procedures, it takes on increased malpractice liability because of the risks and harms of those efforts and of patients later

---

[12] Walter R. Hsiang et al., *Medicaid Patients Have Greater Difficulty Scheduling Health Care Appointments Compared With Private Insurance Patients: A Meta-Analysis*, 56 Inquiry 1 (2019), https://journals.sagepub.com/doi/pdf/10.1177/0046958019838118.

[13] MACPAC, *Physician Acceptance of New Medicaid Patients*, *supra* note 4, at 2 (collecting data on the percentage of doctors accepting new patients in each category).

regretting the decision to undergo those efforts, and it takes on increased legal liability based on state laws restricting these procedures.

201.   At the same time, the rule constricts MCC's ability to warn patients about the risks and harms of transition procedures.

202.   Compliance with the rule also presents risks to MCC's patients—including life-threatening risks—by creating a risk of confusion as to a patient's sex that can lead to medical errors.

203.   Compliance with the rule would present risks to MCC's patients—including life-threatening risks—by requiring that necessary procedures and inquiries be omitted by MCC because those are associated with the patient's sex and not the patient's gender identity.

204.   Compliance with the rule would lead to medically unnecessary procedures, harming patients, wasting the time and money of providers, patients, and insurers, and draining resources that could be better spent elsewhere.

205.   Compliance with the rule would cause MCC to incur increased costs from defending against Defendants' investigation and enforcement actions.

206.   Compliance with the rule would force MCC to force its employees against their will to perform, refer for, facilitate, speak in favor of, or not speak against, "gender transitions."

207.   Compliance with the rule would drive employees away from MCC and make it difficult for MCC to hire employees.

208.   The rule requires MCC to adopt, give notice of, and post a policy that it does not discriminate on the basis of gender identity or termination of pregnancy as understood by the rule.

209.   MCC opposes complying with the rule's requirement that it adopt a "nondiscrimination" policy on "gender identity," or that it provide notice that it does not discriminate on the basis of "gender identity" or "termination of pregnancy."

210.    The rule will also require MCC to reverse and pull down its existing policy communication on "gender transitions."

211.    MCC wants to keep its existing policy of categorically rejecting providing, referring for, or affirming "gender transitions."

212.    Out of fear of punishment under the rule, MCC will remove its notice of this policy from its website on the effective date of the rule, unless it first receives a court order protecting its ability to maintain its current policy despite this rule.

213.    The rule will require MCC to remove or revise its signage on its lactation rooms to eliminate reference to "Breastfeeding Moms Only," and to allow men to use the rooms for "chestfeeding."

214.    MCC has provided past assurances of compliance or certifications as required by HHS to be eligible to receive federal financial assistance.

215.    The rule will deem MCC's past assurances of compliance or certifications as if they encompass compliance with the rule's new gender-identity mandate.

216.    The rule will likely require MCC to submit new assurances of compliance or certifications that it complies with the rule.

217.    The rule will force MCC and its directors and staff to make false statements if it maintains its current policies and also continue seeing patients that pay through Medicaid or CHIP.

218.    The rule will subject MCC to significant financial and legal liability if it continues its current practices instead of engaging in compliance measures under the rule.

219.    The rule will require MCC to provide training to its employees to ensure their compliance with the rule.

## IX.   The rule inflicts compliance costs on McComb Children's Clinic

220.   The rule estimates that covered entities such as MCC will incur financial costs for compliance.

221.   The rule estimates that each covered entity will incur up-front costs from revising policies, training staff, and keeping records of employee training.

222.   The rule estimates that each covered entity will incur annual or ongoing costs to train or refresh the training of new or returning employees, to maintain records of training and grievances, and to provide notices.

223.   Defendants admit in the rule that covered entities will incur financial compliance costs, some of which are likely to occur even before the rule's effective date.

224.   Defendants admit in the rule that entities with more than 15 employees will incur compliance costs even higher than smaller employers.

225.   MCC is a covered entity with more than 15 employees that falls within those entities that Defendants estimate are subject to compliance costs caused by the rule.

226.   The rule imposes compliance costs that MCC must start incurring now unless the rule is enjoined.

227.   MCC has already incurred some compliance costs from the rule.

228.   These include reviewing the rule and obtaining legal advice about compliance and legal options.

229.   The rule requires MCC to spend time and money to comply with the rule that it would not expend but for the rule.

230.   The rule will, at minimum, impose these costs on MCC through requiring it to: familiarize itself with the rule, draft, adopt, and publish a "nondiscrimination" policy on "gender identity"; designate a 1557 coordinator and draft grievance policies; revise clinic policies to comply with the rule; plan and

create training documents and train employees to comply with the rule; keep records of training; and keep records of patient grievances.

231.    The rule states that to comply with its training requirements, covered entities will train each employee that has interactions with the public or with patients, and that the training would last an hour.

232.    Including its doctors and nurse practitioners, MCC currently has 30 staff members, 29 of whom interact with patients.

233.    For MCC, its cost to review and comply with the rule will amount to at least $2,715 in the first year and $376 each subsequent year.

234.    The rule has caused and continues to cause MCC to divert its organizational resources and staff time from its medical practice to review the rule, consult legal counsel, and engage in statements and educational efforts towards staff and patients to mitigate confusion that the rule has caused about its application to MCC and its inconsistency with other federal and state laws.

235.    MCC must continue incurring further compliance costs under the rule, both prior to and after its effective date, unless this Court issues it an injunction.

236.    MCC will avoid most compliance costs from the rule if this Court preliminarily enjoins it and ultimately issues permanent relief to MCC.

## X.    Urgent need for judicial relief

237.    Defendants HHS and OCR are federal agencies subject to the APA.

238.    The APA allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. § 702.

239.    MCC suffers legal wrong and adverse effects from the rule.

240.    MCC is a regulated party under the rule.

241.    The day a rule is adopted and you're a regulated party, even if nothing has happened to you by the agency, you have standing to go in to sue. That happens all the time.

242.    The rule is final agency action.

243.    The rule is a legislative or substantive rule.

244.    The rule is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

245.    No statute precludes judicial review of the rule, and the rule is not committed to agency discretion by law, under 5 U.S.C. § 701(a).

246.    MCC has no adequate or available administrative remedy.

247.    In the alternative, any effort to obtain an administrative remedy would be futile.

248.    The rule is definitive and determines the rights and obligations of persons, including MCC.

249.    HHS declares the rule to be treated as if it has the full force of law.

250.    MCC faces imminent irreparable harm and is susceptible to risk of enforcement under the rule beginning on its effective date.

251.    MCC's compliance costs constitute irreparable harm.

252.    Absent injunctive and declaratory relief granted before the rule's effective date, MCC has been and will continue to be harmed by continued exposure to legal penalties for practicing medicine in line with its best judgment and for speaking those views to its patients.

253.    Unless the Court provides protection from Defendants' enforcement of the rule, MCC will continue to suffer from this ongoing violation of law.

254.    MCC has no adequate remedy at law.

255.   All the acts of the Defendants described above, and their officers, agents, employees, and servants, were executed and are continuing to be executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the United States.

## FIRST CLAIM
## ADMINISTRATIVE PROCEDURE ACT
## (5 U.S.C. § 706)

256.   Plaintiff McComb Children's Clinic realleges and incorporates herein, as though fully set forth, paragraphs 1–255 of this Complaint.

257.   MCC brings this claim as to the rule's gender-identity nondiscrimination requirement and the implications thereof under the rule.

### A.   Not in Accordance with Law, In Excess of Statutory Jurisdiction, Authority, and Limitations, and Contrary to Right, Power, Privilege, and Immunity

258.   Under the APA, a court must "hold unlawful and set aside agency action" if the agency action is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706.

259.   The rule is not in accordance with law, is in excess of statutory jurisdiction, authority, and limitations, and is contrary to constitutional rights and power.

260.   Congress has not delegated to the Defendants the authority to prohibit gender-identity discrimination under Section 1557.

261.   The rule exceeds the authority of Section 1557, the Affordable Care Act, and Title IX of the Education Amendments of 1972, as amended, as it constrains the sex-discrimination prohibition in the ACA.

262. The text of Section 1557, the ACA, and Title IX as applicable to Section 1557, speak of sex as a biological binary that preclude imposing Section 1557 as if it prohibits gender-identity discrimination.

263. Prohibiting discrimination on the basis of gender identity throughout the nation's health system, as a condition on receipt of federal health funding from HHS, is an issue of vast economic and political significance for which Congress did not give HHS clear authority.

264. The rule violates the major questions doctrine and the clear-statement federalism and spending clause canons.

265. The rule is contrary to Section 1554 of the ACA, 42 U.S.C. § 18114; specifically: parts (1)–(2) and (6) because it pressures healthcare providers like MCC out of federally funded health programs and the practice of healthcare; parts (3)–(4) because it requires healthcare providers like Plaintiff to speak in affirmance of gender transition and refrain from speaking in accordance with a patient's sex and related medical needs; and part (5) because it requires healthcare providers like MCC to deprive patients of informed consent by preventing them from warning patients of the dangers of transition procedures.

266. HHS has no authority to create and impose requirements that involve compliance costs for covered entities beyond the requirement not to discriminate on grounds prohibited by Section 1557, such as by requiring policy changes, training, duties for compliance coordinators, grievance procedures, notices of nondiscrimination, and record-keeping.

267. For the reasons discussed below in Claims Two and Three, the rule violates constitutional protections for free speech, association, and assembly, as well as structural constitutional principles related to federalism and Congress' enumerated powers.

## B.      Arbitrary, Capricious, and an Abuse of Discretion

268.    Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

269.    In drafting and promulgating the rule, HHS failed to undergo reasoned decision-making.

270.    HHS failed to adequately consider important aspects of these issues.

271.    HHS failed to adequately consider and find that, in medical practice as in education, sex is a biological reality.

272.    HHS failed to adequately consider the harm that comes to patients when covered entities ignore or misconstrue the biological differences between the sexes as demanded by the rule.

273.    HHS failed to adequately consider that there is an evolving state of medical knowledge about "gender-transition" efforts and that the rule short-circuits this debate.

274.    HHS improperly relied on unreliable facts and studies only from one side of the issue and improperly ignored or disregarded experts who point out that there is not enough evidence to require the provision of "gender transitions."

275.    HHS failed to adequately consider the disproportionately negative impact of the "gender-transition" mandate on women and girls.

276.    HHS improperly ignored the effect of the rule on clinics that have medical and ethical objections to "gender-transition" procedures.

277.    HHS improperly ignored the reliance interests of doctors on the absence of a "gender-transition" mandate under Section 1557.

278.    HHS improperly ignored the reliance interests of patients who want to keep receiving care from clinics object to "gender transitions."

279.    HHS failed to adequately consider how the rule will drive thousands of healthcare providers out of medicine and harm underserved populations treated by those doctors.

280.    HHS failed to adequately consider alternative policies.

## SECOND CLAIM
## FREEDOM OF SPEECH AND ASSOCIATION
## (FIRST AND FIFTH AMENDMENTS)

281.    Plaintiff McComb Children's Clinic realleges and incorporates herein, as though fully set forth, paragraphs 1–255 of this Complaint.

282.    MCC brings this claim as to the rule's gender-identity nondiscrimination requirements and the implications thereof on the First Amendment's protections of the freedoms of speech and association.

283.    MCC also brings this claim as to the rule's notice of nondiscrimination requirements with respect to the rule's category of "termination of pregnancy" discrimination.

284.    The Constitution and federal rules authorize claims seeking to enjoin and declare unlawful federal agency actions that are *ultra vires* for violating constitutional authority, and the APA authorizes the Court to enjoin, hold unlawful, and set aside agency actions that are contrary to constitutional power or privilege or otherwise not in accordance with constitutional law.

285.    Under the First Amendment to the U.S. Constitution, "Congress shall make no law … abridging the freedom of speech … or the right of the people peaceably to assemble …." U.S. Const. amend. I.

286.    Under the Fifth Amendment to the U.S. Constitution, "No person shall be … deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

287.    MCC's speech and practice in the context of healthcare is protected under the First Amendment.

288.    The rule restricts and compels MCC's speech in violation of the First Amendment.

289.    The rule regulates speech based on content and viewpoint by requiring messages, information, referrals, and pronouns affirming transition efforts, and by prohibiting and restricting speech taking a contrary view.

290.    MCC seeks to keep following its best medical and ethical judgments in communicating to patients, but the rule does not allow this.

291.    But for the rule, MCC would continue to speak freely on these matters in each clinical situation as its doctors and family nurse practitioners deem appropriate, as it has done until this mandate.

292.    The rule violates MCC's right of expressive association (or freedom of assembly) by coercing MCC to participate in facilities, programs, groups, and other healthcare-related endeavors that are contrary to its views and that express messages with which MCC disagrees.

293.    The rule's regulations impacting speech and association are not justified by a compelling interest and are not narrowly tailored to achieve the government's purported interests.

294.    No relevant statute provides any governmental interest to sustain the speech regulations of the gender-identity mandate.

295.    The rule is an overbroad restriction on speech, and it sweeps within its ambit a substantial amount of First Amendment-protected speech and expression.

296.    This overbreadth chills the speech of healthcare entities that engage in private speech through statements, notices, and other means in healthcare on the basis of sex.

297.    The rule imposes an unconstitutional condition on MCC's receipt of federal funding.

298.    Defendants' implementation of the rule through instruments such as HHS's Form 690 requirement to assure compliance with Section 1557, or statements required to be made in award applications, notices of awards, or applications to qualify as providers in Medicaid, Medicare, or CHIP, function in a way that compels speech and requires self-censorship on condition of losing federal funds in violation of the First Amendment.

299.    The nondiscrimination mandate is void for vagueness and give officials' unbridled discretion in violation of due process rights.

300.    The rule coerces MCC's speech by forcing it to provide notices to patients that it does not discriminate on the basis of "gender identity" or "termination of pregnancy."

301.    MCC holds views against providing, referring for, or affirming the legitimacy of "gender transition" or abortion, and communicates those views to patients and the public.

302.    By forcing MCC to tell its patients directly, on its walls, and on its website that it does not discriminate on the basis of gender identity or termination of pregnancy, the rule forces MCC to speak falsely, and it forces MCC to fatally undermine its communication of its own medical ethical standards. This undermines MCC's reputation and brand as a trustworthy pediatrics clinic that follows Mississippi laws on "gender transitions" and abortion.

303.    The rule's coerced notices of nondiscrimination on gender identity and abortion fail any applicable level of scrutiny under the Free Speech Clause.

304.    In the alternative, if Section 1557 or Title IX is found to prohibit discrimination on the basis of gender identity, and to the extent Defendants enforce

it as doing so, these statutes violate the First and Fifth Amendments of the U.S. Constitution as applied to MCC and all similarly situated healthcare professionals.

## THIRD CLAIM
## STRUCTURAL PRINCIPLES OF FEDERALISM AND
## LACK OF ENUMERATED POWERS

305.   Plaintiff McComb Children's Clinic realleges and incorporates herein, as though fully set forth, paragraphs 1–255 of this Complaint.

306.   MCC brings this claim as to the rule's gender-identity nondiscrimination requirements and the implications thereof under the rule.

307.   The Constitution and federal rules authorize claims seeking to enjoin and declare unlawful federal agency actions that are *ultra vires* for violating constitutional authority, and the APA authorizes the Court to enjoin, hold unlawful, and set aside agency actions that are contrary to constitutional power or privilege or otherwise not in accordance with constitutional law.

308.   Even if the rule's reinterpretation of Section 1557 and Title IX were a permissible interpretation of the statutes, it would be constitutionally impermissible.

309.   The rule exceeds Congress's Article I enumerated powers and transgresses on the reserved powers of the States under the federal constitution's structural principles of federalism and the Tenth Amendment. U.S. Const. art. I, § 8, cl. 1; *id.* amend. X.

### A.   Lack of constitutionally required notice.

310.   For a statute to preempt the historic police powers of the States, to abrogate state sovereign immunity, or to regulate a matter in areas of traditional state responsibility, the Constitution limits the States and the public's obligations

to those requirements unambiguously set out on the face of the statute. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

311.   No funding recipient could unmistakably know or clearly understand that Section 1557, Title IX, or Section 504 would impose the mandate created by the rule as a condition of accepting federal funds from HHS.

312.   The public lacked the constitutionally required clear notice that the statutes would apply in this way when Section 1557 or Title IX was passed or when funding grants were made. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

**B.     Exceeding the authority of spending power**

313.   The rule improperly goes beyond the authority Congress gave to HHS, or that Congress possesses and exercised in Section 1557.

314.   Defendants expressly and impliedly, but improperly, seek to use a Spending Clause statute to preempt traditional state authority over healthcare, the healing professions, and standards of care.

315.   The rule purports to override state conscience-protection laws as well as state laws restricting "gender-transition" procedures.

316.   The rule requires the States and MCC to violate state laws and their core convictions as a condition of federal funding.

317.   These state laws protect MCC's ability to operate without needing to provide, promote, facilitate, or speak in favor of such procedures.

318.   Congress does not have the authority under the Spending Clause to preempt state law. An agency may not pay anyone to violate state law. Instead, if state law prevents the spending of federal funds in a certain way, the only thing an agency may do is disallow funds.

### C.   Unconstitutional coercion and lack of enumerated power

319.   The rule requires the States and covered entities to follow the rule's gender-identity mandate as a condition of receiving federal healthcare funding. Federal Medicaid funding alone is about 27% of the average state budget, and any ineligibility for Medicare, Medicaid, or CHIP funding threatens to drive healthcare providers out of the practice of medicine entirely.

320.   Such a requirement is unconstitutionally coercive. The rule requires the States and covered entities to adopt a controversial gender-identity mandate or give up more than 27% of state budgets and disregard the healthcare systems put in place over several decades. That leaves the States and covered entities with no meaningful choice. It is an improper use of the Spending Clause.

321.   The States and Plaintiffs cannot accept the rule's gender-identity mandate because that would conflict with state restrictions on gender-transition procedures and state conscience-protection law. The federal government cannot commandeer state governments in that way or require the States to repeal their laws. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–75 (2018).

322.   Coercing the States and healthcare providers to abandon their laws or to give up federal healthcare funding that their federal tax dollars underwrite — which is what they must do to comply with the rule—is beyond the federal government's spending clause power. It amounts to a "gun to the head" for the States and covered entities. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (plurality). It is "economic dragooning that leaves the States with no real option but to acquiesce." *Id*. at 582 (plurality).

323.   Defendants lack any authority to preempt state laws in these fields or to impose these conditions through any federal spending power.

## PRAYER FOR RELIEF

Plaintiff McComb Children's Clinic respectfully prays for judgment as follows and requests the following relief:

A.     That this Court declare unlawful, set aside, and vacate the rule to the extent it prohibits discrimination on the basis of gender identity;

B.     That this Court issue a preliminary and permanent injunction against Defendants implementing, enforcing, or applying a gender-identity nondiscrimination mandate under any aspect of the rule, including that Defendants may not require covered entities to:

1.     Perform, provide, offer, refer for, facilitate, make arrangements for, endorse, or refrain from criticizing or from categorically rejecting "gender transition";

2.     Allow members of one sex into the private spaces or sex-specific programs of the other sex in their facilities, such as by allowing males into female restrooms, lactation rooms, or lactation training program referrals;

3.     Speak in ways that the entities contend inaccurately refers to a patient's sex, such as in pronoun usage, coding, charting, or conversation, or be forced to say that a boy is a girl or vice versa, or say that men can get pregnant, give birth, or breastfeed;

4.     Stay silent on the negative impacts of "gender-transition" efforts, including by being unable to say that they do not provide, offer, refer for, or endorse those procedures, or by being pressured to withhold criticism or their complete opinions on these subjects, or by being unable to use accurate sex-specific language in speech or writing;

5.     Affirm "gender-transition" efforts, or refrain from providing criticism or their full opinions to patients on these subjects; or

6.     Make statements in their policies, notices, or website statements, or train staff, or speak to patients or visitors, or submit assurances or certifications of compliance, to the effect that the entity will not discriminate on the basis of gender identity, or of any nondiscrimination category in the rule or Section 1557 to the extent that Defendants contend it encompasses gender-identity nondiscrimination.

C.     That under the First and Fifth Amendments, this Court preliminarily and permanently enjoin Defendants from implementing, enforcing, or applying the rule, or Section 1557 of the ACA, in any aspect of a covered entity's expression, including as described in *supra* Prayer for Relief B.3–6, including but not limited to the requirement that MCC provide notices to its patients that it does not discriminate on the basis of gender identity or termination of pregnancy.

D.     That under 5 U.S.C. § 705 this Court enjoin and declare the rule unenforceable on a preliminary basis and delay its effective date to preserve status and rights pending review of this Court;

E.     That this Court render declaratory judgment that Section 1557 of the ACA, Title IX of the Education Amendments of 1972, and Section 504 of the Rehabilitation Act as incorporated therein do not prohibit discrimination on the basis of gender identity under the ACA;

F.     That this Court render declaratory judgment that the rule and Defendants' enforcement or defenses thereof violates the Administrative Procedure Act; 42 U.S.C. § 238n; 42 U.S.C. § 18023; 42 U.S.C. § 18114; the Free Speech and Assembly Clauses of the First

Amendment; the Fifth Amendment; the Tenth Amendment; the constitutional principles of federalism; the Spending Clause; and Congress's enumerated powers;

G. That this Court extend such relief to run against Defendants, their officials, agents, employees, and all persons in active concert or participation with them, including their successors in office; including any actions to deny federal financial assistance or qualification for participation in federally funded programs or activities because of the failure to perform, offer, endorse, proscribe, or refer for either gender transition efforts, or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions;

H. That this Court expressly extend all such relief to protect and benefit any of McComb Children's Clinic's current or future operations, employees, or persons acting in concert or participation with MCC as necessary to protect MCC's functions;

I. That this Court define such relief to encompass any language or alternative theory in the rule that Defendants may use to achieve those same ends as to gender identity;

J. That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that such declarations will have the force and effect of final judgment;

K. That this Court retain jurisdiction of this matter to enforce this Court's orders;

L. That this Court grant to McComb Children's Clinic reasonable costs and expenses of this action, including attorneys' fees in accordance with any applicable federal statute, including 28 U.S.C. § 2412.

M.   That this Court grant the requested injunctive relief without a condition of bond or other security being required of McComb Children's Clinic; and

N.   That this Court grant all other just and proper relief.

Respectfully submitted this the 13th day of May, 2024.

/s/ *D. Michael Hurst, Jr.*

**D. Michael Hurst, Jr., MB 99990**
**Nash E. Gilmore MB 105554**
**Phelps Dunbar LLP**
4270 I-55 North
Jackson, Mississippi 39211-6391
Telephone: (601) 352-2300
Facsimile: (601) 360-9777
mike.hurst@phelps.com
nash.gilmore@phelps.com

*Counsel for Plaintiff McComb Children's Clinic, LTD.*