Exhibit 9

UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

THE CATHOLIC BENEFITS ASSOCIA-
TION, on behalf of its members; SISTERS
OF ST. FRANCIS OF THE IMMACU-
LATE HEART OF MARY; ST. ANNE'S
GUEST HOME; and ST. GERARD'S
COMMUNITY OF CARE,

*Plaintiffs,*

v.

XAVIER BECERRA, Secretary of the
United States Department of Health and
Human Services; UNITED STATES DE-
PARTMENT OF HEALTH AND HU-
MAN SERVICES; CHARLOTTE BUR-
ROWS, Chair of the United States Equal
Employment Opportunity Commission; and
UNITED STATES EQUAL EMPLOY-
MENT OPPORTUNITY COMMISSION,

*Defendants.*

No. 3:23-cv-203-PDW-ARS

**CBA PLAINTIFFS' VERIFIED AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

**Table of Contents**

I.     INTRODUCTION AND SUMMARY OF THE ACTION ................................................. 3

II.    JURISDICTION AND VENUE ........................................................................................... 8

III.   PARTIES ................................................................................................................................ 8

   A.   Plaintiffs .......................................................................................................................... 8

      1.   The Sisters of St. Francis ........................................................................................ 8

      2.   St. Anne's Guest House ......................................................................................... 10

      3.   St. Gerard's Community of Care ........................................................................... 12

      4.   The Catholic Benefits Association ........................................................................ 14

      5.   The CBA's associational standing ........................................................................ 17

B. Defendants .................................................................................................19

IV. PLAINTIFFS' BELIEFS AND PRACTICES RELATED TO THE MANDATE......... 20

A. Catholic teaching on the duty to treat all persons with dignity ..................... 20

B. Catholic teaching on gender identity............................................................. 22

C. Catholic teaching on abortion....................................................................... 24

D. Catholic teaching on artificial reproductive technology.................................25

E. Catholic teaching on scandal ........................................................................ 26

F. The Ethical and Religious Directives ............................................................ 26

G. The Catholic Benefits Association's Ethics Committee..................................27

H. The Mandate is bad medicine ....................................................................... 28

V. THE MANDATE ................................................................................................ 30

A. Statutory and regulatory overview ................................................................ 30

1. Section 1557 of the Affordable Care Act, and its incorporation of Title IX of the Education Amendments of 1972 and section 794 of title 29 ....................... 30

2. Title VII of the Civil Rights Act of 1964 ...............................................32

B. The 2016 Rule ...............................................................................................33

C. HHS'S unsuccessful effort to repeal the mandate ........................................35

1. Litigation against the 2016 Rule .............................................................35

2. The 2020 Rule ........................................................................................36

D. *Bostock v. Clayton County* ............................................................................41

E. Legal challenges to, and preliminary injunctions against, the 2020 Rule...................... 42

F. This Court's injunction of the Mandate and the Eighth Circuit's affirmance ..............43

G. The 2021 and 2022 Notices ..........................................................................45

H. The 2024 Rule............................................................................................... 46

1. Healthcare professionals are required to perform or refer for gender transition procedures, abortion, and immoral infertility treatments............................51

2. Catholic healthcare organizations cannot adopt the Ethical and Religious Directives or the Doctrinal Note. ...........................................................................56

3. Healthcare providers are required to alter their speech and medical advice. ..............56

4. Covered employers and insurance providers are required to offer employee benefits covering gender transition procedures and immoral infertility treatments. ...............58

5. Sex-specific healthcare facilities or programs, including shower facilities or hospital wards, must be opened to individuals based on gender identity. ................................ 60

6. Other requirements of the 2024 Rule .....................................................61

      7.     HHS rejects calls to accommodate religious exercise consistent with the Eighth Circuit's ruling in *Religious Sisters of Mercy*. ...............................................61

  I.     EEOC, invoking Title VII, has imposed on non-covered entities the Mandate's requirement of gender-transition coverage. ...................................................... 64

  J.     Enforcement Mechanisms ......................................................................... 69

VI.    THE MANDATE AND THE EEOC'S INTERPRETATION CONTINUE TO BURDEN THE RELIGIOUS EXERCISE OF CBA'S MEMBERS ...........................................71

  A.    The Mandate's effects on CBA members that are covered entities – medical services .72

  B.    The Mandate's effects on CBA members that are covered entities – insurance coverage ...............................................................................................................73

  C.    The Mandate's effects on insured CBA members ...............................................74

  D.    The Mandate's effects on self-insured CBA members ...................................75

VII.   NEED FOR RELIEF ...........................................................................................76

VIII.  CAUSES OF ACTION .......................................................................................77

IX.    PRAYER FOR RELIEF ......................................................................................97

Plaintiffs, the Catholic Benefits Association, on behalf of its members, The Sisters of St. Francis of the Immaculate Heart of Mary, St. Anne's Guest Home, and St. Gerard's Community of Care (collectively, either "Plaintiffs" or "CBA Plaintiffs"), through their attorneys, First & Fourteenth PLLC, and pursuant to the Court's order, Doc. 43, allege:

## I.    INTRODUCTION AND SUMMARY OF THE ACTION

    1.    Since its promulgation of its May 2016 rule ("2016 Rule"), the U.S. Department of Health and Human Services ("HHS"), in coordination with the Equal Employment Opportunity Commission ("EEOC"), has interpreted the prohibitions on "sex" discrimination in Section 1557 of the Affordable Care Act ("ACA") and Title VII of the Civil Rights Act to require  Catholic healthcare providers and employers, as well as their respective insurers, third-party administrators ("TPAs"), pharmacy benefit managers ("PBMs"), and other service providers to cover gender-transition services or "gender affirming care," in violation of CBA members' Catholic faith. By defining "sex" as including "termination of pregnancy," HHS also has imposed an abortion-

coverage-and-performance mandate, requiring healthcare providers to actually perform all of these services themselves in total disregard of their Catholic values.  HHS recently doubled down on its mandate, issuing a 2024 Rule interpreting Section 1557 (the "2024 Rule") that restates and amplifies the 2016 Rule. Plaintiffs refer to these continuous and coordinated interpretations of Section 1557 and Title VII challenged by this suit as the "Mandate."

2.      In 2019, a federal district court found that HHS's 2016 Rule violated the Religious Freedom Restoration Act and the Administrative Procedure Act, vacated portions of the rule, and ordered HHS to reconsider. In June 2020, HHS published a new final rule, the "2020 Rule," that would have repealed much of the 2016 Rule, including its (i) rejection of Title IX's abortion-neutrality provision and (ii) its categorical exemption for religious organizations. But the new rule never became operative. Two district courts enjoined it and ordered that the 2016 Rule remain in effect.

3.      In 2021, this Court permanently enjoined the Government's enforcement of the Mandate as it applied to the Catholic Benefits Association ("CBA"), its unnamed members, and three of its members who were named plaintiffs, the Roman Catholic Diocese of Fargo North Dakota, Catholic Charities of North Dakota, and the Catholic Medical Association because the Mandate violated of the Religious Freedom Restoration Act. *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1153 (D.N.D. 2021). This Court found that the CBA and its members faced a credible threat of enforcement of the Mandate. *Id.* at 1143, 1147-49. This Court also concluded that the CBA had associational standing to sue on behalf of its members and granted them a permanent injunction. *Id.* at 1141. The Court's injunction extended not only to the plaintiffs and CBA's members, but also to "their respective health plans and any insurers or TPAs in connection with such

4

health plans." *Id.* at 1153-54. The Eighth Circuit affirmed this Court's determination that the CBA and its member-plaintiffs faced a credible threat of enforcement of the Mandate. *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 607, 609 (8th Cir. 2022). The Eighth Circuit reversed on the narrow ground that the CBA lacked associational standing because it had not identified a member other than a named plaintiff who had suffered the requisite harm under Title VII and Section 1557. *Id.* at 602. On remand, this Court dismissed CBA's claims to the extent they sought associational relief and ruled that the CBA could refile suit to properly establish associational standing: "Importantly, the dismissal is without prejudice, and nothing prevents the CBA from filing a new action, where associational standing is properly established." *Religious Sisters of Mercy v. Becerra*, 16-cv-00386, slip op. at 3 (D.N.D. Sept. 15, 2023). This Court accordingly entered an amended judgment in *Religious Sisters of Mercy v. Becerra*, 16-cv-00386, on October 11, 2023.

4.      Plaintiffs, the CBA, the Sisters of St. Francis, St. Anne's Guest Home, and St. Gerard's Community of Care refiled this follow-on action to *Religious Sisters of Mercy* on October 13, 2023, which "properly establishe[s]" associational standing, and seeks a declaration for the named plaintiffs and for the CBA's unnamed members that the Mandate cannot lawfully be applied to them, as well as an injunction barring enforcement of the Mandate against them, their members, and any third parties contracting or acting in concert with them for the delivery of health coverage and services, including the unnamed members' and Plaintiffs' respective insurers, TPAs, and other service providers.

5.      Almost eight years to the day after HHS issued the 2016 Rule, HHS, on May 6, 2024, HHS issued the 2024 Rule. The 2024 Rule is identical to the 2016 Rule in all material respects for purposes of this challenge: it expands Section 1557's prohibition on sex discrimination

in healthcare to require Catholic healthcare organizations and employers to cover and provide "gender-affirming care," sterilization, abortion, and infertility treatments such as IVF, surrogacy, and gamete donation contrary to their faith and medical judgment; it refuses to incorporate a categorical religious exemption as required by the rulings of this Court in *Religious Sisters of Mercy* and *Christian Employer's Alliance*, the Eighth Circuit in *Religious Sisters of Mercy*, and the North District of Texas and the Fifth Circuit in *Franciscan Alliance*; it strains the definition of "covered entity" beyond any faithful reading of Section 1557; and it targets the Ethical and Religious Directives ("ERD") and Doctrinal Note on care for those with gender dysphoria guiding Catholic healthcare organizations by forbidding such organizations from adopting policies consistent with that guidance.

6.      The 2024 Rule, like the 2016 Rule, applies directly to a "covered entity," *i.e.*, an entity that operates a federally funded health program or activity. This encompasses virtually all healthcare providers and health insurers in the United States. And because the Mandate affects nearly every insurer including those that contract with CBA members, it also affects Catholic employers that are not "covered entities." As a result of the Mandate, some members of the CBA have received notices from their insurers that their health plans had begun covering gender-transition services, including "[m]ale to female surgeries," "female to male surgeries," and "cross-sex hormone therapy." And at least one CBA member has been subject to an enforcement action by EEOC pursuant to the Mandate during the *Religious Sisters of Mercy* case.

7.      Catholic employers cannot avoid the Mandate by adopting a self-insured health plan and contracting with a TPA to administer benefits because the 2024 Rule, like the 2016 Rule, subjects TPAs to its requirements and because many TPAs providing services are themselves

health insurers or affiliates of health insurers. And the 2024 Rule, like the 2016 Rule, says that HHS may refer any violations of the Mandate over which HHS lacks jurisdiction to EEOC. As a result of the 2016 Rule, Catholic employers that excluded gender-transition services from their self-insured health plans have been required to indemnify their TPAs, or otherwise accept their TPAs' liability, for violating the Mandate.

8.      HHS could have included a *per se* religious exemption in its new 2024 Rule. There was ample reason to do so. Section 1557 prohibits sex discrimination by incorporating Title IX, and Title IX expressly provides that it "shall not apply" to religious organizations, 20 U.S.C. § 1681(a)(3). Numerous other federal laws, including the ACA itself, the Religious Freedom Restoration Act, and the First Amendment, likewise protect rights of conscience and religious exercise. And this Court, the Eighth Circuit, the Northern District of Texas, and the Fifth Circuit have all ruled that a religious exemption is required.

9.      Failure to comply with the Mandate exposes Catholic entities to severe penalties. Covered entities can be fined, barred from millions of dollars of Medicaid and Medicare funding, subjected to treble damages under the False Claims Act, and incur civil and criminal liability. Responsible persons may face prison time. Because the EEOC similarly interprets Title VII to require employer health plans to cover gender-transition services, employers ("EEOC Statement")— even for employers that are not covered entities under the 2016 Rule—may face civil lawsuits and agency enforcement actions that expose them to compensatory damages, punitive damages, and attorneys' fees.

10.      The Court ordered CBA to amend its Complaint to address the effect of the 2024 Rule on the CBA's claims. Doc. 43. In this amended complaint, CBA seeks declaratory relief on

behalf of the named plaintiffs and CBA's members that the Mandate, including the 2024 Rule, is contrary to law. CBA seeks injunctive relief on behalf of the named plaintiffs and CBA's members prohibiting any interpretation of Section 1557 or Title VII to require CBA members to cover or provide gender-affirming care, abortion, and immoral infertility treatments.

## II.  JURISDICTION AND VENUE

11.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361 because this action arises under the Constitution and laws of the United States. The Court has jurisdiction to render declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

12.  Venue lies in this district under 28 U.S.C. § 1391(e)(1). Plaintiffs, the Sisters of St. Francis, St. Anne's, and St. Gerard's reside in this district and this division because their principal places of business are either in Hankinson or Grand Forks, North Dakota.

## III.  PARTIES

### A.  Plaintiffs

#### 1. The Sisters of St. Francis

13.  The Sisters of St. Francis of the Immaculate Heart of Mary dba Franciscan Sisters of Dillingen ("Sisters of St. Francis"), located in Hankinson, North Dakota, is a congregation of religious women of the Third Order Regular of St. Francis. Its ecclesiastical lineage begins generally with St. Francis of Assisi and institutionally with the Congregation of Franciscan Sisters in Dillingen founded in Bavaria in 1241.

14.  The Sisters of St. Francis began in the United States in 1913 when twenty-four sisters relocated from the motherhouse in Germany to Collegeville, Minnesota.

8

15.    The Sisters of St. Francis are, to this day, governed by The Rule and Constitutions of the Congregation of the Franciscan Sisters of Dillingen as supplemented by Provincial Directives specific to their Immaculate Heart of Mary Province. Under this Rule, the Sisters of St. Francis seek "to observe the Holy Gospel of Our Lord Jesus Christ in Obedience, in Poverty, and in Chastity." They also "promise obedience and reverence to the Pope and the Holy Catholic Church." They "seek[] to witness to God's love by [their] Franciscan way of life."

16.    The calling of the Sisters of St. Francis is to serve where the Catholic Church needs them and to do so consistently with Catholic values. Over the years, the Sisters of St. Francis have staffed Catholic schools, and founded and/or administered five rural Catholic hospitals, and two long term care facilities: St. Anne's Guest Home, and St. Gerard's Community of Care. Their work today, in addition to their common life of prayer and study, includes spiritual direction, operating a retreat center, and supporting St. Anne's and St. Gerard's.

17.    The Sisters of St. Francis relocated to Hankinson in 1928. They civilly incorporated in August 1950.

18.    Under Roman Catholic canon law, the Sisters of St. Francis are a type of public juridic person called a religious institute. Under civil law, they are a North Dakota nonprofit corporation.  They are listed in *The Official Catholic Directory* and, therefore, enjoy § 501(c)(3) status under the group ruling held by the United States Conference of Catholic Bishops ("USCCB").

19.    Sister Donna Marie Welder OSF is the superior or provincial of the Sisters of St. Francis. She is president and chair of the board of directors for their corporation, and also for Plaintiffs St. Anne's Guest Home ("St. Anne's) and St. Gerard's Community of Care ("St.

Gerard's"). Sister Welder has verified the allegations in this complaint related to these three entities.

20.     In addition to the twelve sisters who are members of the Sisters of St. Francis, the Sisters of St. Francis have around 30 lay employees. They, therefore, are an "employer" within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(b).

21.     The Sisters of St. Francis sponsor a group health insurance plan for their employees. St. Anne's and St. Gerard's are participating employers on that plan and provide health insurance for their employees through that plan. Consistent with Catholic values, the Sisters of St. Francis' health plan categorically excludes gender transition procedures and abortion services.

22.     If the Sisters of St. Francis or its health plan insurer were required to provide coverage for gender transition services, abortion, or infertility treatments such as IVF, surrogacy, or gamete donation, it would violate its Catholic values, give scandal to its employees and supporters, and otherwise compromise its religious mission.

23.     The Sisters of St. Francis are a member of The Catholic Benefits Association.

**2. St. Anne's Guest House**

24.     St. Anne's Guest Home is a Catholic health care facility and senior residence located in Grand Forks, North Dakota. It began its work in the 1940s when the Most Rev. Aloisius Muench, Bishop of Fargo, asked the Sisters of St. Francis to help homeless and other indigent people living on the streets.

25.     St. Anne's provides senior residences for low-income individuals and for couples. It also provides senior residences for people capable of living independently if supported with basic care. St. Anne's nurses assist residents with management of medications and other basic care.

26.     St. Anne's website describes its purpose and values:

> Our mission at St. Anne's is to provide a safe, caring, and family-like home for our residents. Inspired by St. Francis, we strive to serve each person who comes to us as we would Christ. We welcome those who come to us from various backgrounds, treating them with love and dignity while providing for their physical, emotional, and spiritual needs.
>
> St. Anne's strives to embody the gospel message in accord with the "Ethical and Religious Directives for Catholic Health Care Services" given by the U.S. Co[nference] of Catholic Bishops.

Our Story, St. Anne's Living Center, https://www.stannesguesthome.org/about-us/ (last visited May 28, 2024).

27.     St. Anne's bylaws describe its purpose is to serve as a "a Catholic health care facility in an environment of living and sharing the Gospel for the healing of the spiritual and physical, as well as the psychological, social, and emotional needs of the people . . . the Corporation serves, in accordance with the Ethical, Moral, and Religious Directives" of the United States Conference of Catholic Bishops and with the USCCB's 2023 Doctrinal Note.[1]

28.     St. Anne's is careful to try to inculcate its Catholic and Franciscan values in its employees to ensure that St. Anne's is a loving home for seniors. Its residents include a Catholic priest who offers Mass and is available for confessions daily at St. Anne's. A weekly ecumenical Bible study is offered. Protestant services are provided on Sunday. The Sisters live in their convent next door to St. Anne's; they work with the staff and residents of St. Anne's every day and are available around the clock.

---

[1] *See infra* ¶ 88.

29.     St. Anne's is a Catholic ministry. It is listed in *The Official Catholic Directory* and, therefore, enjoys § 501(c)(3) status under the USCCB group ruling.  It seeks to align all of its work with Catholic values including those in opposition to abortion and transgender services.

30.     St. Anne's is also a North Dakota nonprofit corporation.

31.     St. Anne's receives over 85% of its funding from Medicaid.

32.     St. Anne's has around 30 employees and, therefore, is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(b).

33.     If St. Anne's or its health plan insurer were required to provide coverage for gender transition services, abortion, or infertility treatments contrary to Catholic teaching such as IVF, gamete donation, and surrogacy; if St. Anne's were required to help perform or otherwise accommodate gender transition services, abortion, or infertility treatments contrary to Catholic teaching such as IVF, gamete donation, and surrogacy; or if St. Anne's became ineligible for Medicare or Medicaid, it would violate its Catholic values, threaten its survival, give scandal to its employees and supporters, and otherwise compromise its religious mission.

34.     St. Anne's is a member of the Catholic Benefits Association.

### 3. St. Gerard's Community of Care

35.     St. Gerard's Community of Care aka St. Gerard's Community Nursing Home is a Catholic ministry in Hankinson, North Dakota that provides independent living and skilled nursing care for seniors. At the same location, it also provides childcare for infants and toddlers, a preschool, and before and after school supervision for older grade school children.

36.      St. Gerard's vision, as stated on its website is "to provide those we serve with loving and caring service based on Christ's mission of love and compassion." Its mission, as stated in its bylaws, is "to provide the residents with loving and caring service based on Christ's mission

of love and compassion in accordance Gospel values and" with the Ethical and Religious Directives promulgated by the USCCB and with the USCCB's Doctrinal Note.

37.     St. Gerard's also supports the spiritual needs of its residents and patients. It provides a daily communion service and a weekly Mass for Catholics.  A weekend worship service for Protestants is offered on Sundays.

38.     St. Gerard's has thirty-three beds for residents in need of skilled nursing. Its nursing services include rehabilitation services, IV therapy, physical therapy, speech therapy, occupational therapy, dementia and memory care, restorative care, tracheostomy care, feeding tubes, wound care, and end of life care.

39.     St. Gerard's is a Catholic ministry. It is listed in *The Official Catholic Directory* and, therefore, enjoys § 501(c)(3) status under the USCCB group ruling.  It seeks to align all of its work with Catholic values including those values in opposition to abortion and transgender services.

40.     St. Gerard's is a North Dakota nonprofit corporation.

41.     It receives 14% to 17% of its funding from Medicare and 43% to 56% of its funding from Medicaid.

42.     St. Gerard's has around 60 employees and, therefore, is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(b).

43.     If St. Gerard's or its health plan insurer were required to provide coverage for gender transition services abortion, or infertility treatments contrary to Catholic teaching such as IVF, gamete donation, and surrogacy; if St. Gerard's were required to help perform or otherwise accommodate gender transition services abortion, or infertility treatments contrary to Catholic teaching such as IVF, gamete donation, and surrogacy; or if St. Gerard's became ineligible for

13

Medicare or Medicaid, it would violate its Catholic values, threaten its survival, give scandal to its employees and supporters, and otherwise compromise its religious mission.

44.     St. Gerard's is a member of The Catholic Benefits Association.

**4.  The Catholic Benefits Association**

45.     The CBA is a § 501(c)(3) nonprofit, non-stock corporation and Catholic ministry. Its certificate of incorporation states that it is "organized for charitable purposes" that are "consistent with Catholic values, doctrine, and canon law." Specifically, it states that the CBA is organized "[t]o support Catholic employers . . . that, as part of their religious witness and exercise, provide health or other benefits to their respective employees in a manner that is consistent with Catholic values"; and "[t]o work and advocate for religious freedom of Catholic and other employers seeking to conduct their ministries and businesses according to their religious values". *See* Ex. A, Amended and Restated Certificate of Incorporation of the Catholic Benefits Association ("CBA Articles"), art. IV.

46.     Archbishop William E. Lori of Baltimore is chairman of the CBA's board of directors.

47.      Nine of the CBA's directors are Catholic archbishops or bishops. They are Archbishop Gregory M. Aymond of New Orleans, Archbishop Paul S. Coakley of Oklahoma City, Archbishop Salvatore Cordileone of San Francisco, Bishop John T. Folda of Fargo, Archbishop Bernard A. Hebda of Saint Paul and Minneapolis, Archbishop Jerome E. Listecki of Milwaukee, Archbishop William E. Lori of Baltimore, Archbishop Joseph F. Naumann of Kansas City in Kansas, and Archbishop Thomas G. Wenski of Miami. Three of its directors are religious women, Mother Agnes Mary Donovan, S.V., Superior General of the Sisters of Life; Sister Diane Marie McGrew, President of OSF Healthcare; and Sister Mary Peter Muehlenkamp, O.P., J.D., In House Counsel for

the St. Cecilia Congregation of the Dominican Sisters of Nashville. Five of its directors are Catholic lay persons, including: Professor Helen Alvaré, J.D.; Thomas M. Buckley, General Counsel for the Archdiocese of St. Louis; Beth Elfrey, Deputy General Counsel for the Knights of Columbus; Nancy Matthews, J.D., Carla K. Mills, Chief Financial Officer of the Archdiocese of Kansas City in Kansas; and Doug Wilson, Chief Executive Officer, of the CBA.

48.     All of the CBA's officers are Catholic.

49.     All of its employees are Catholic.

50.     The CBA has a standing Ethics Committee, comprised exclusively of the archbishops and bishops on its board. The CBA's bylaws state:

> The Ethics Committee shall have exclusive authority to review all benefits, products, and services provided by the Ministry, its affiliates or subsidiaries, or their respective contractors to ensure such conform with Catholic values and doctrine. If they do not, the committee shall determine the necessary corrections to bring such benefits, products, and services into conformity with Catholic values and doctrine. The decision of the committee shall be final and binding on the Ministry, its board, and its officers . . . .

Ex. B, CBA Bylaws, art. 5.14.2.

51.     To be a member of the CBA, an organization must meet these criteria, among others: (1) it shall be a Catholic employer, and (2) with regard to the benefits it provides to its employees, independent contractors, or students, or with regard to the health care services it provides to its patients, the employer shall, as part of its religious witness and exercise, be committed to providing no benefits or services inconsistent with Catholic values. Ex. B, CBA Bylaws art. 3.1.2; *see also* Ex. A, CBA Articles, art. VI, Members; Ex. C, CBA Nonprofit Employer Application for Membership; Ex. D, CBA For-Profit Employer Application for Membership.

52.     The Bylaws of the CBA provide that an employer "shall satisfy the requirement of being Catholic if either the employer is listed in the current edition of *The Official Catholic Directory*

15

or the secretary or his or her designee makes such a determination." Ex. B, CBA Bylaws, art. § 3.1.1.1.

53.    The Bylaws further provide that a for-profit employer seeking membership in the CBA "shall be deemed Catholic only if (i) Catholics (or trusts or other entities wholly controlled by such Catholic individuals) own 51% or more of employer, (ii) 51% or more of the members of the employer's governing body, if any, is comprised of Catholics, and (iii) either the employer's own-ers or governing body has adopted a written policy stating that the employer is committed to providing no benefits to the employer's employees or independent contractors inconsistent with Catholic values." Ex. B, CBA Bylaws, art. § 3.1.1.2.

54.    All members of the CBA meet its criteria for being Catholic.

55.    CBA members include 85 Catholic dioceses and archdioceses. Its members total over 1,471 Catholic employers, plus 7,100 Catholic parishes, and 1900 parochial schools. Together, they provide health care benefits to approximately 161,500 employees and their families.

56.    CBA members also include schools, colleges, religious orders, and other Catholic ministries and Catholic-owned businesses.

57.    CBA members include hospitals, medical clinics, physician medical practice groups, skilled nursing facilities, and other healthcare entities.  Most of these receive Medicaid and Medicare payments and thus are covered entities under the 2016 and 2024 rules.

58.    CBA members include Catholic Charities and other social service organizations that offer counseling and other mental health services, in individual and group settings.  Many of these also receive Medicaid and Medicare payments and participate in HHS-funded programs and thus are covered entities under the 2016 and 2024 rules.

59.     CBA members provide employee health benefits by contracting with health insurers and TPAs. These insurers and TPAs participate in federally funded marketplaces and thus are covered entities under the 2024 Rule.

60.     A substantial portion of its members have fifteen or employees and, thus, are "employers" within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(b).

61.     The Mandate thus constrains CBA members' ability to arrange for and secure health plans that reflect their Catholic values.

**5. The CBA's associational standing**

62.     The CBA has associational standing to represent its present and future members.

63.     To have associational standing, the Eighth Circuit clarified that the CBA must, through testimony other than "the organizations' self-description of their membership," identify at least one member who would have standing to sue in its own right. *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022); *see also id.* at 601-02 ("[P]laintiff-organizations [must] make specific allegations establishing that **at least one** identified member had suffered or would suffer harm." (Emphasis added) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

64.     This complaint is verified not only by the CBA's Chief Executive Officer and the Chairman of its board, but by the Sisters of St. Francis, St. Anne's, and St. Gerard's. These three members are specifically named and have suffered the requisite harm from the Mandate.

65.     In addition, CBA Plaintiffs attaches to this complaint, four declarations from nine non-plaintiff members of the CBA that specifically identify the following CBA members and that would have standing in their own right and have suffered the requisite harm. These include:

a. Exhibit E: Declaration of Chris Baechle for Cardinal Ritter Senior Services, Mary Queen and Mother Center, Our Lady of Life Apartments, Mother of Perpetual Help Residences, St. Elizabeth Hall, and Affordable Senior Living;

b. Exhibit F: Declaration of Dr. Michael Sherman for Holy Family Catholic Clinic;

c. Exhibit G: Declaration of Dr. Michelle Stanford for Centennial Pediatrics;. And

d. Exhibit H: Declaration of Deacon Anthony Ternes for Catholic Charities North Dakota.

66.     Each of these CBA members receives HHS funding (standing for purposes of Section 1557), employs more than 15 individuals (standing for purposes of Title VII), and oppose providing or covering gender-transitions services, abortion, and certain infertility treatments because of their adherence to Catholic social teaching. Exh. E at ¶¶ 7, 9-14, 17-18, 20; Exh. F at ¶¶ 4, 6, 9, 12, 14-15; Exh. G at ¶¶ 4-5, 10, 12-14; Exh. H at ¶¶ 3-4, 9-10, 12-13.

67.     Many of these members also contract with private insurers and/or TPAs who are themselves bound by the Mandate. Exh. E at ¶ 14; Exh. F at ¶ 5; Exh. H at ¶ 4.

68.     Thus, between the three plaintiff verifications of this complaint, plus the four declarations of nine non-plaintiff CBA members, the CBA Plaintiffs have, through sworn testimony, identified to this Court twelve CBA members by name each of whom has over fifteen employees, each of whom receive Medicare or Medicaid, and each of whom are, because of their Catholic values morally opposed to covering transgender services in its health plan each of whom is morally opposed to performing such services. Accordingly, they have suffered suffer the requisite harm and satisfied other requirements for standing.

69.     The Mandate harms the CBA's members.

70.     The CBA seeks to protect its members' ability to operate in accordance with Catholic values and to access morally compliant health coverage for their respective employees or agents. It additionally seeks, for members that are covered entities, protection from being required to provide medical services and drugs, and to perform surgeries contrary to Catholic values.

71.     The CBA can adequately represent its members' interests. CBA members are similarly situated in that the Defendants' Mandate coerces CBA members to cover, provide, pay for, or otherwise directly or indirectly facilitate access to gender transition services, abortions, and infertility treatments for their patients or for their employees in violation of members' sincerely held Catholic beliefs. The Mandate also deprives or will deprive certain CBA members of the option to purchase group insurance or to arrange self-funded plans without gender transition, abortion, and/or infertility coverage.

72.     The CBA brings this action on behalf of its members who themselves have suffered and will suffer concrete harm as a result of Defendants' actions.

**B.     Defendants**

73.     Defendants are appointed officials of the federal government and federal government agencies responsible for promulgating, administering, and enforcing the Mandate.

74.     Defendant United States Department of Health and Human Services is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the 2016, 2020, and 2024 Rules.

75.     Defendant Xavier Becerra is the Secretary of HHS. He is sued only in his official capacity.

76.     Defendant Equal Employment Opportunity Commission is a federal agency that administers, interprets, and enforces certain laws, including Title VII. The EEOC is responsible for, among other things, investigating complaints and bringing enforcement actions against employers for discrimination "because of . . . sex" in violation of Title VII.

77.     Defendant Charlotte Burrows is the EEOC Chair. She is, in this capacity, responsible for the administration and implementation of policy within the EEOC, including investigation and enforcement pursuant to Title VII. She is sued only in her official capacity.

## IV.     PLAINTIFFS' BELIEFS AND PRACTICES RELATED TO THE MANDATE

78.     All Plaintiffs and all CBA members are Catholic ministries or Catholic-owned businesses that believe and practice the teachings of the Catholic Church on the nature of the human person, the dignity of humankind, the right to life, the right of conscience and religious freedom, and related ethical issues. *See generally* Exhs. E, F, G, H; and *supra* at ¶¶ 13-44.

### A.  Catholic teaching on the duty to treat all persons with dignity

79.     The Catholic Church teaches that all people are created in the image and likeness of God and are thus imbued with human dignity. Catechism of the Catholic Church ("CCC") 1701. All persons are therefore to be loved and respected in their human freedom, CCC 1738, even if they reject the Church's teaching on matters of sexual identity and sexual morality, CCC 2358.

80.     The United States Conference of Catholic Bishops ("USCCB") has applied this teaching to transgender persons and those afflicted with gender dysphoria. In response to the U.S. Department of Education's guidance letter asserting that Title IX bars discrimination based on "gender identity," the USCCB stressed that the Catholic Church "consistently affirms the inherent dignity of each and every human person and advocates for the wellbeing of all people,

particularly the most vulnerable." The USCCB statement affirms that people who struggle with their gender identity "deserve compassion, sensitivity, and respect."[2]

81.    The comments the USCCB filed along with other Christian bodies in response to HHS's 2016 rule under Section 1557 likewise affirmed that "[e]veryone should have access to health care and health coverage,"[3] as did their comments on HHS's 2024 rule.[4]

82.    HHS has previously acknowledged that every religious group that submitted comments in response to 2016 proposed rule shared similar sentiments. The 2016 Rule notes, "None of the commenters supporting a religious exemption asserted that there would be a religious basis for generally refusing to treat LGBT individuals for a medical condition." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,379 (May 18, 2016).

---

[2] *USCCB Chairmen Respond to Administration's New Guidance Letter on Title IX Application*, USCCB (May 16, 2016), https://www.usccb.org/news/2016/usccb-chairmen-respond-administrations-new-guidance-letter-title-ix-application (last visited Sept. 26, 2023).

[3] Comments from USCCB et al. to U.S. Dept. of Health and Human Services Re: Nondiscrimination in Health Programs and Activities RIN 0945-AA-2, at 2 (Nov. 6, 2015), http://www.usccb.org/about/general-counsel/rulemaking/upload/Comments-Proposal-HHS-Reg-Nondiscrimination-Federally-Funded-Health.pdf (last visited Sept. 26, 2023).

[4] Comments from USCCB et al. to U.S. Dept. of Health and Human Services Re: Nondiscrimination in Health Programs and Activities RIN 0945-AA17, at 2 (Sept. 7, 2022), https://www.usccb.org/sites/default/files/about/general-counsel/rulemaking/upload/2022.comments.1557.regulations.final_.pdf (last visited May 21, 2024) ("Ensuring access to health coverage and health care, and removing barriers to these, is without question a laudable goal. Concern for the health of its citizens requires that society help in the attainment of living conditions that allow them to grow and reach maturity which . . . [includes] health care." (Cleaned up).).

## B. Catholic teaching on gender identity

83.    Catholic teaching on the nature of the human person begins with the Book of Genesis, which teaches that "God created man in his own image . . . male and female he created them." CCC 2331 (quoting Genesis 1:27).

84.    The Catechism further teaches that "[e]veryone, man and woman, should acknowledge and accept his sexual identity." CCC 2333 (emphasis omitted). "By creating the human being man and woman, God gives personal dignity equally to the one and the other. Each of them, man and woman, should acknowledge and accept his sexual identity." CCC 2393.

85.    Pope Francis has reiterated this Catholic teaching in recent years, affirming that "'man too has a nature that he must respect and that he cannot manipulate at will.' . . . The acceptance of our bodies as God's gift is vital for welcoming and accepting the entire world as a gift from the Father. . . . Learning to accept our body, to care for it and to respect its fullest meaning, is an essential element of any genuine human ecology." *Laudato Si*, No. 155 (2015) (quoting Pope Benedict XVI, Address from His Visit to the Bundestag (Sept. 22, 2011)).

86.    This bedrock Church teaching on the dignity of all human persons is intertwined with all Catholic Social Teaching—not only on sex and sexuality, but also poverty, genocide, euthanasia, unjust war, the travail of migrants, human trafficking, the marginalization of people with disabilities, and other matters. *See* Declaration of the Dicastery for the Doctrine of the Faith, *Dignitas Infinita*, *on Human Dignity* (April 4, 2024), *available at* https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2024/04/08/240408c.html (last visited May 28, 2024).

87.     As for youth who are struggling with their gender identity, Pope Francis has taught that "the young need to be helped to accept their own body as it was created." *Amoris Laetitia*, No. 285 (2016).

88.     On March 20, 2023, the USCCB's Committee on Doctrine issued a "Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body" (the "Doctrinal Note").  Paragraphs 14 and 15 of the Doctrinal Note explain that "the use of surgical or chemical techniques that aim to exchange the sex characteristics of a patient's body for those of the opposite sex or for simulations thereof" and, "[i]n the case of children, the exchange of sex characteristics . . . prepared by the administration of chemical puberty blockers, which arrest the natural course of puberty and prevent the development of some sex characteristics in the first place" to treat "gender dysphoria" and "gender incongruence" are not "morally justified either as attempts to repair a defect in the body or as attempts to sacrifice a part of the body for the sake of the whole." "First, they do not repair a defect in the body: there is no disorder in the body that needs to be addressed; the bodily organs are normal and healthy." "Second, the interventions do not sacrifice one part of the body for the good of the whole." The Doctrinal Note continues at Paragraph 18:

> Such interventions, thus, do not respect the fundamental order of the human person as an intrinsic unity of body and soul, with a body that is sexually differentiated. Bodliness is a fundamental aspect of human existence, and so is the sexual differentiation of the body.  Catholic health care services must not perform interventions, whether surgical or chemical, that aim to transform the sexual characteristics of a human body into those of the opposite sex or take part in the development of such procedures. They must employ all appropriate resources to mitigate the suffering of those who struggle with gender incongruence, but the means used must respect the fundamental order of the human body.  Only by using morally appropriate means do healthcare providers show full respect for the dignity of each human person.

89.     "Sexual reassignment surgery requires the destruction of healthy sexual and reproductive organs."[5]

90.     The Catholic Church teaches that intentionally removing healthy organs that identify as a person as male or female is a type of amputation or mutilation that is not morally licit.

91.     Some gender transition surgeries also involve sterilization. The Catholic Church teaches that all forms of sterilization are contrary to the moral law. CCC 2370.

92.      The Catholic Church teaches that "[e]xcept when performed for strictly therapeutic medical reasons, directly intended amputations, mutilations, and sterilizations performed on innocent persons are against the moral law." CCC 2297.

**C. Catholic teaching on abortion**

93.     The Catechism of the Catholic Church teaches that life begins at conception and that "[h]uman life must be respected and protected absolutely from the moment of conception." CCC 2270. Thus, "[d]irect abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law." CCC 2271.

94.     While "[a]bortion . . . (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted" for Catholic individuals and organizations, "[o]perations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable," are,  "even if they

---

[5] Richard P. Fitzgibbons, M.D., et al., *The Psychopathology of "Sex Reassignment" Surgery: Assessing its Medical, Psychological and Ethical Appropriateness*, 9 Nat'l Catholic Bioethics Q. 97, 100 (2009), https://repository.library.georgetown.edu/handle/10822/1029434.

will result in the death of the unborn child." *See* United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services*, p. 18-19, ¶¶ 45, 47 (6th ed. 2018).

### D.    Catholic teaching on artificial reproductive technology

95.    The Catechism of the Catholic Church, which is the universal teaching of the Catholic Church, expresses that the sexual relationship between spouses is more than mere biology (*Familiaris Consortio*, Pope John Paul II, Paragraph 11 (1981)),  and the conception of a child is the most serious role of spouses, involving co-creation with God, and holding that each child is to be received as a gift from the Creator (CCC 2367, 2378). The Catechism acknowledges the sorrow caused by infertility and supports the use reproductive technologies that restore normal fertility to marital intercourse (CCC 2375), preserving its unitive and procreative purposes (United States Conference of Catholic Bishops, Ethical and Religious Directives for Catholic Health Care Services, pg. 17, ¶ 38 (6th ed. 2018)). However, methods that involve third parties (medical technicians, donor gametes, or surrogate wombs) or separate fertilization from the conjugal act, are a violation of the dignity of the persons involved and are gravely immoral. Thus, Catholics commit grave sin if they participate in these technologies, either financially or through performance, (CCC 2376-77) Catholic teaching permits infertility treatment "that does not separate the unitive and procreative ends of" a "marital act of sexual intercourse." United States Conference of Catholic Bishops, Ethical and Religious Directives for Catholic Health Care Services, p. 17, ¶ 38 (6th ed. 2018). Accordingly, infertility treatments that support the procreative and unitive nature of marriage, for example hormonal support, are permissible. By contrast, Catholic healthcare providers and health plans may not provide or cover procedures such as IVF, surrogacy, or gamete donation that separate the procreative and unitive ends of the marital union, *id.* at p. 17, ¶¶ 39-43, or provide

any fertility treatments to individuals and couples in relationships not recognized as marriage by the Catholic church. *Id.* at p. 17, ¶ 38.

### E.      Catholic teaching on scandal

96.     Catholic moral also theology prohibits acts that may give rise to "scandal." The Catechism defines scandal as "an attitude or behavior which leads another to do evil." CCC 2284. The Catechism teaches that "[a]nyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged." CCC 2287. Avoiding scandal is particularly important for Catholic entities that seek to inculcate Catholic faith and values.

### F.  The USCCB's Ethical and Religious Directives governing Catholic healthcare

97.     These teachings are reflected in the Ethical and Religious Directives for Catholic Health Care Services ("Ethical and Religious Directives" or "ERDs"), a document issued by the United States Conference of Catholic Bishops in order "to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person" and "to provide authoritative guidance on certain moral issues that face Catholic health care today." United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* 4 (6th ed. 2018), https://www.usccb.org/resources/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06_0.pdf (last visited May 28, 2024).

98.     The ERDs teach that "[d]irect sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." *Id.* at p. 19, ¶ 53.

26

99.    The ERDs teach that "Catholic health care organizations are not permitted to en-

gage in immediate material cooperation in actions that are intrinsically immoral, such as abortion,

euthanasia, assisted suicide, and direct sterilization." *Id*. at p. 25, ¶ 70.

**G. The Catholic Benefits Association's Ethics Committee**

100.    As noted above, the CBA's Ethics Committee, comprised exclusively of Catholic

archbishops, has the duty and responsibility to define Catholic values and doctrine on relevant is-

sues for CBA members.

101.    In November 2016, the CBA's Ethics Committee convened to address doctrinal

and ethical issues related to the Mandate. After consultation, it unanimously adopted the following

resolutions:

> **RESOLVED**: that treatments and services designed to alter a person's biological
> sex are contrary to Catholic values. A Catholic employer, therefore, cannot, con-
> sistent with Catholic values, comply with the government's mandate to include
> coverage in its employee health plan for treatments services designed to alter a per-
> son's biological sex.

> **RESOLVED**: that treatments and services designed to alter a person's biological
> sex are contrary to Catholic values. A Catholic hospital, clinic, physicians practice
> group, or other medical provider, therefore, cannot, consistent with Catholic val-
> ues, comply with the government's mandate to provide or deliver treatments or
> services designed to alter a person's biological sex.

> **RESOLVED**: that abortion is contrary to Catholic values. A Catholic employer,
> therefore, cannot, consistent with Catholic values, comply with any government
> mandate to include coverage in its employee health plan for abortion.

> **RESOLVED**: that abortion is contrary to Catholic values. A Catholic health care
> insurer or third party administrator, therefore, cannot, consistent with Catholic val-
> ues, comply with any government abortion mandate by operating or administering
> a plan that provides coverage for abortion.

> **RESOLVED**: that abortion is contrary to Catholic values. A Catholic hospital,
> clinic, physicians practice group, or other medical provider, therefore, cannot, con-
> sistent with Catholic values, comply with any government abortion mandate that
> requires the provision and delivery of abortion services.

102.    Consistent with the Ethics Committee's guidance, all CBA members believe they must adhere to the above teachings as matters of religious faith and doctrine. Consequently, CBA members believe that gender-transition procedures, sterilization, abortion, immoral infertility treatments, and related drugs or counseling are categorically contrary to the Catholic faith. CBA members further believe, as part of their faith, that they must not provide, pay for, or directly or indirectly facilitate access to such services and, therefore, that they must not perform gender transition services, sterilization, abortion, certain infertility treatments, and/or related counseling and must not include coverage for such procedures in their group health plans.

**H. The Mandate is bad medicine[6]**

103.    In addition to the religious and ethical convictions described above, Plaintiffs and all CBA members also believe that the Mandate constitutes bad medicine. As the Supreme Court has observed, "sex . . . is an immutable characteristic." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion)); *see also* Expert Report of Stephen B. Levine 8 (Feb. 23, 2022), *in* Attachments to Comments  of Alliance Defending Freedom, *Factual Evidence*, HHS-OS-2022-0012-68192.

104.    Because Defendants' Mandate has no age limit, it requires covered entities to provide gender transition services for adolescents diagnosed with gender dysphoria.

105.    Placing adolescents on puberty blockers or cross-sex hormones may cause permanent infertility and increased health risks.

---

[6] With regard to the facts stated in this section, *see* Ex. F, Declaration of Dr. Michael Sherman, ¶¶ 16-17; Ex. G, Declaration of Dr. Michelle Stanford, ¶¶ 11-13.

106.    For example, male adolescents on cross-sex hormones are at a higher risk for thrombosis, cardiovascular disease, weight gain, elevated blood pressure, decreased glucose tolerance, gallbladder disease, and breast cancer.

107.    Similarly, female adolescents on cross-sex hormones are at a higher risk for hepatotoxicity, polycythemia, increased risk of sleep apnea, insulin resistance, and unknown effects on breast, endometrial, and ovarian tissues.

108.    These consequences are even more serious given that the overwhelming majority of adolescents who are formally diagnosed with gender dysphoria naturally come to accept their sex and enjoy emotional health by late adolescence.

109.    Even where gender transition surgeries are effective in helping patients' physical bodies match their gender identity, post-surgical individuals have substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts, and hospitalizations compared to a healthy control population, especially as the years progress.

110.    Plaintiffs believe that Defendants' Mandate also declares as "medically necessary" a radical course of treatment that the medical profession properly rejects when it comes to other psychological conditions where people experience emotional distress because of a discrepancy between their self-image and the physical reality. According to Defendants' logic, it would be "medically necessary" to perform liposuction on someone with anorexia nervosa (belief that one is obese), cosmetic surgery on someone with body dysmorphic disorder (belief that one is disfigured), or amputations for someone with body integrity identity disorder (belief that one is meant to be disabled).

111.    Plaintiffs also believe that optimal patient care—including patient education, diagnosis, and treatment—requires taking account of the biological differences between men and women. To cite but one example, optimal prevention of and treatment for heart disease in women requires monitoring for different warning signs, accounting for different risk factors, and providing different counseling than it would for men.

112.    For all these reasons, the CBA and its members believe that providing gender transition services constitutes bad medicine and, therefore, is contrary to their religious and professional obligations.

## V.    THE MANDATE

### A.    Statutory and regulatory overview

#### 1.    Section 1557 of the Affordable Care Act, and its incorporation of Title IX of the Education Amendments of 1972 and section 794 of title 29

113.    Together, the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (Mar. 23, 2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, 124 Stat. 1029 (Mar. 30, 2010), make up and are known as the Affordable Care Act ("ACA").

114.    Section 1557(a) of the ACA prohibits discrimination in federally funded healthcare programs and activities on the basis of (1) race, color, and national origin, (2) sex, (3) age, and (4) disability. *See* 42 U.S.C. § 18116(a). The statute does not do this directly. Instead, it incorporates by reference, and bars discrimination "on the ground prohibited" by four other federal laws: (1) Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), (2) Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.); (3) the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.); and (4) section 794 of Title 29 (the Rehabilitation Act).

115.    Section 1557(b) of the ACA provides that nothing in the statute "shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of Title 29, or the Age Discrimination Act of 1975." 42 U.S.C. § 18116(b).

116.    Section 1554 of the ACA provides that "notwithstanding any other provision of [the ACA, HHS] shall not promulgate any regulation that— . . . violates the principles of informed consent and the ethical standards of health care professionals." 42 U.S.C. § 18114(5).

117.    Title IX was enacted in 1972. Public Law No. 92-318, 86 Stat. 235 (June 23, 1972). It states that no person "shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

118.    Title IX's prohibition, however, "shall not apply" to an institution "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

119.    Nor does Title IX's prohibition on sex discrimination require a "public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

120.     The Rehabilitation Act prohibits certain forms of disability discrimination.

121.    The Rehabilitation Act's prohibition, however, specifically excludes "transsexualism" and "gender identity disorder" "not resulting from physical impairments." 42 U.S.C.

§ 18116(a)(pointing to section 794 of title 29 as providing substantive content of protection). 29 U.S.C. § 705(20)(F)(i) (providing that "transsexualism" and "gender identity disorders not resulting from physical impairments" are not a "disability" under section 794). Those terms at the time were synonymous with having a transgender identity, so transgender persons that do not have a disorder of sex development—a physical impairment—do not have a "disability" and are excluded from "section 792 of title 29." 42 U.S.C. § 18116(a). The specific exclusion of transgender identity governs the general prohibitions of Section 1557, so the general term "based on sex" cannot be read to include discriminating based on transgender identity in Section 1557.

### 2. Title VII of the Civil Rights Act of 1964

122.    Congress enacted Title VII in 1964. Public Law 88-352, 78 Stat. 241 (July 2, 1964).

123.    Title VII makes it unlawful for an employer to discriminate against an employee or prospective employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

124.    Title VII defines an "employer" subject to its provisions as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).

125.    The U.S. Census Bureau estimates that there are over 875,000 employers in the United States with 15 or more employees.[7]

---

[7] *See 2017 SUSB Annual Data Tables by Establishment Industry*, U.S. Census Bureau (Mar. 2020), https://web.archive.org/web/20200307131234/https://www.census.gov/data/tables/2017/econ/susb/2017-susb-annual.html (select "U.S. and states, NAICS sectors, small employment sizes less than 500" for statistics on firm size measured by number of employees).

126.    Title VII has a broad religious exemption. It states that Title VII "shall not apply" to a religious organization's "employment of individuals of a particular religion." *See* 42 U.S.C. § 2000e-1(a). The statute defines "religion" broadly to include "all aspects of *religious observance and practice*, as well as belief." 42 U.S.C. § 2000e(j) (emphasis added).

127.    Congress enacted the Pregnancy Discrimination Act in 1978 to further define what constitutes "sex" discrimination under Title VII. It specified that the terms "because of sex" or "on the basis of sex" include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

**B.    The 2016 Rule**

128.    The regulatory background to this dispute begins with the 2016 Rule that HHS issued interpreting Section 1557. On May 18, 2016, HHS finalized a rule pursuant to Section 1557 stating that impermissible discrimination "on the basis of sex" "includes . . . discrimination on the basis of . . . termination of pregnancy, . . . sex stereotyping, and gender identity." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,467 (May 18, 2016). Plaintiffs refer to this as the "2016 Rule."

129.    The 2016 Rule defined "gender identity" to include a person's "internal sense of gender, which may be male, female, neither, or a combination of male and female." *Id.*; *see also id.* at 31,392 (stating that the "gender identity spectrum includes an array of possible gender identities beyond male and female"); *id.* at 31,384 (stating that individuals with "non-binary gender identities are protected under the rule").

130.    The 2016 Rule defined "sex stereotypes" to mean "stereotypical notions of masculinity or femininity, including expectations of how individuals represent or communicate their

gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics." *Id.* at 31,468.

131.     The 2016 Rule applied to a "covered entity," defined to mean "any entity that has a health program or activity, any part of which receives Federal financial assistance from [HHS]." *Id.* at 31,445. HHS estimated that the 2016 Rule covered "almost all licensed physicians because they accept Federal financial assistance," including payments from Medicare and Medicaid. *Id.* Other observers estimate that 2016 Rule applies "to over 133,000 (virtually all) hospitals, nursing homes, home health agencies, and similar provider facilities, about 445,000 clinical laboratories, 1,200 community health centers, 171 health-related schools, state Medicaid and CHIP programs, state public health agencies, federally facilitated and state-based marketplaces, at least 180 health insurers that market policies through the [federally facilitated marketplace] and state-based marketplaces, and up to 900,000 physicians." Timothy Jost, Implementing Health Reform: HHS Proposes Rule Implementing Anti-Discrimination ACA Provisions (Contraceptive Coverage Litigation Update), *Health Affairs Blog* (Sept. 4, 2015), http://healthaffairs.org/blog/2015/09/04/implementing-health-reform-hhs-proposes-rule-implementing-anti-discrimination-aca-provisions/.

132.     The 2016 Rule's extension of Section 1557 to "gender identity" and "termination of pregnancy," coupled with its expansive definition of a "covered entity," meant that (1) healthcare providers were required to perform or refer for gender transition procedures and abortions, (2) healthcare providers were required to alter their speech and medical advice, (3) covered employers, insurance providers and TPAs were required to offer employee benefits covering gender transition procedures, and (4) sex-specific healthcare facilities and programs, including

shower facilities and hospital wards, must be opened to individuals based on gender identity, among other requirements.

133.     As explained below, the gender-identity portions of the 2016 Rule have been in continuous effect since its issuance. The recently promulgated 2024 Rule merely restates and amplifies the 2016 Rule's provisions objected to by the CBA and its members.

### C.     HHS'S unsuccessful effort to repeal the mandate

#### 1.     Litigation against the 2016 Rule

134.     On December 31, 2016, the U.S. District Court for the Northern District of Texas issued a nationwide preliminary injunction prohibiting HHS from "enforcing the [2016] Rule's prohibition against discrimination on the basis of gender identity or termination of pregnancy." *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016) (order granting nationwide preliminary injunction). The court concluded that the 2016 Rule's "expanded definition of sex discrimination" exceeded HHS's statutory authority under Section 1557, and that the 2016 Rule's failure to incorporate the religious and abortion exemptions in Title IX "renders the Rule contrary to law" in violation of the APA. *Id.* at 689, 691. The court also found that that the rule violated RFRA because it placed "substantial pressure on Plaintiffs to perform and cover [gender] transition and abortion procedures" in violation of their religious beliefs, and HHS could not show that the rule satisfied RFRA's requirement of strict scrutiny. *Id.* at 692-93.

135.     On October 15, 2019, as clarified in the order of November 21, 2019, the same court entered summary judgment vacating the 2016 Rule "insofar as the Rule defines 'On the basis of sex' to include gender identity and termination of pregnancy," and remanded to HHS for further consideration. *See Franciscan All. v. Azar*, 414 F.3d 928, 946–47 (N.D. Tex. 2019); *Franciscan All., Inc. v. Azar*, No. 16-00108-O, slip op. at 2 (N.D. Tex. Nov. 21, 2019) (emphasis omitted).

136.     On December 30, 2016, this Court in the *Religious Sisters of Mercy* case issued an order temporarily staying enforcement of the 2016 Rule against Plaintiffs. On January 23, 2017, the Court amended its December 30, 2016 order "to make clear that it temporarily stays enforcement, as to the named Plaintiffs, of Section 1557's prohibitions against discrimination on the bases of gender identity and termination of pregnancy."

### 2.  The 2020 Rule

137.     In May 2019, HHS issued a Notice of Proposed Rulemaking, and in June 2019 it published a proposed rule, to amend the 2016 Rule. *See* Nondiscrimination in Health and Health Education Programs or Activities, 84 Fed. Reg. 27,846 (June 14, 2019). Citing the *Franciscan Alliance* court's preliminary-injunction decision, the proposed rule stated that the Rule's definition of "sex" "exceeded [HHS's] authority under Section 1557." *Id.* at 27,849. The proposed rule sought to address this issue by repealing the 2016 Rule's definition of "sex" in its entirety, which, HHS said, would "allow the Federal courts, in particular, the U.S. Supreme Court . . . to resolve any dispute about the proper legal interpretation of" the term "sex" in Section 1557. *Id.* at 27,873. As the proposed rule noted, *see id.* at 27,855, the Supreme Court had recently granted certiorari to decide whether sex discrimination under Title VII included discrimination on the basis of sexual orientation and gender identity, in three cases that would later be decided together as *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

138.     On June 12, 2020, HHS finalized its new rule, the "2020 Rule." *See* Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020).

139.     The 2020 Rule would have taken effect on August 18, 2020. *Id.* at 37,160.

140.     The 2020 Rule sought to repeal certain portions of the 2016 Rule, and in particular, "omit[] the vacated language concerning gender identity and termination of pregnancy." *Id.* at

37,162; *see also id.* at 32,236 ("[T]his final rule removes . . . the expansive inclusion of gender iden-tity and sex stereotyping in the definition of sex discrimination."). But HHS declined to replace the 2016 Rule's definition of "sex" with a new definition, reasoning instead that the Supreme Court's then-forthcoming decision in *Bostock* would "likely have ramifications for the definition of 'on the basis of sex' under Title IX." *Id.* at 37,168. Thus, simply repealing the prior definition would permit "application of the [*Bostock*] Court's construction." *Id.*

141.    Responding to the *Franciscan Alliance* court's vacatur order, HHS said that, under the 2020 Rule, it "will interpret Section 1557's prohibition on sex-based discrimination consistent with Title IX and its implementing regulations," *id.* at 37,192, and that it was amending its Title IX regulations "to explicitly incorporate relevant statutory exemptions from Title IX, including abortion neutrality and the religious exemption," *id.* at 37,162.

### Gender identity

142.    The 2020 Rule sought to clarify that Section 1557 does not require healthcare pro-fessionals to perform gender transition procedures. *Id.* at 37,188. HHS "believes providers should be generally free to use their best medical judgment, consistent with their understanding of medical ethics, in providing healthcare to Americans." *Id.* at 37,187. "[T]he 2016 Rule inappropriately in-terfered with the ethical and medical judgment of health professionals." *Id.* The 2020 Rule "does not presume to dictate to medical providers the degree to which sex matters in medical decision making, nor does it impose the 2016 Rule's vague and overbroad mandate that they 'treat individ-uals consistent with their gender identity.'" *Id.* at 37,188.

143.    The 2020 Rule sought to "clarif[y] that sex, according to the Title IX's plain mean-ing, may be taken into account in the provision of healthcare, insurance (including insurance cov-erage), and health research, as was the practice before the 2016 Rule." *Id.* at 37,189. At the same

time, the 2020 Rule did not "prohibi[t] a healthcare provider from offering or performing sex-reassignment treatments and surgeries, or an insurer from covering such treatments and procedures, either as a general matter or on a case-by-case basis." *Id.* at 37,188.

144.    While the 2016 Rule prohibited health insurers from "hav[ing] or implement[ing] a categorical coverage exclusion or limitation for all health services related to gender transition," *id.* at 37,196 (quotation omitted), the 2020 Rule sought to repeal this prohibition, noting that there is a lack of "medical consensus to support one or another form of treatment for gender dysphoria," *id.* at 37,198. In HHS's view, "the 2016 Rule did not give sufficient evidence to justify, as a matter of policy, its prohibition on blanket exclusions of coverage for sex-reassignment procedures." *Id.* Even if it were appropriate policy to mandate the provision and coverage of gender transition procedures, HHS could not do so "through application of Section 1557 and Title IX" because "[t]here is no statutory authority to require the provision or coverage of such procedures under Title IX protections from discrimination on the basis of sex." *Id.*

### Protections for religious freedom and conscience

145.    The 2020 Rule "d[id] not craft a religious exemption to Section 1557." *Id.* at 37,207. Rather, it "simply state[d] that the Section 1557 regulation will be implemented consistent with" various religious and conscience protections already present in federal law, "including RFRA, healthcare conscience statutes, and the religious organization exception in Title IX." *Id.*

146.    Accordingly, the 2020 Rule stated that "[i]nsofar as the application of any requirement under this part would violate, depart from, or contradict definitions, exemptions, affirmative rights, or protections provided by" Title IX, RFRA, and numerous other federal laws protecting conscience, "such application shall not be imposed or required." 45 C.F.R. § 92.6(b).

147.   HHS stated that it "agrees with the court in *Franciscan Alliance* that particular provisions in the 2016 Rule violated RFRA as applied to private plaintiffs." 85 Fed. Reg. at 32,707. Regarding the 2016 Rule's gender identity provisions, HHS conceded that it "sees no compelling interest in forcing the provision, or coverage, of . . . medically controversial [gender transition] services by covered entities, much less in doing so without a statutory basis." *Id.* at 37,188.

148.   Like the 2016 Rule, the 2020 Rule sought to make Section 1557 applicable to "any entity that has a health program or activity, any part of which receives Federal financial assistance from [HHS]." *Id.* at 37,226. If an entity receives HHS funds and is "principally engaged in the business of providing healthcare," then Section 1557 applies to the entity as a whole. *Id.* at 37,244. Otherwise, Section 1557 applies only to the "health program or activity" of the entity that receives HHS funds. *See id.*

149.   But the 2020 Rule sought to narrow the application of Section 1557 to health insurance issuers. While the 2016 Rule declares that health insurance issuers are entities "principally engaged in the business of providing healthcare," the 2020 Rule seeks to repeal this aspect of the 2016 Rule and clarify that the provision of health insurance coverage is not *per se* the provision of "healthcare." Under the new rule, "an entity principally or otherwise engaged in the business of providing health insurance shall not, by virtue of such provision, be considered to be principally engaged in the business of providing healthcare." *Id.* at 37,244-45 (45 C.F.R. § 92.3(c)). Thus, a health insurance issuer not principally engaged in the business of healthcare would be subject to Section 1557 only to the extent of any federally funded health program or activity of the issuer.

150.     The 2020 Rule stated that employer-sponsored (i.e., self-insured) health plans are not covered entities "[t]o the extent that [they] do not receive Federal financial assistance and are not principally engaged in the business of providing healthcare." *Id.* at 37,173.

### Enforcement mechanisms

151.     The 2020 Rule sought to repeal the "patchwork" of enforcement mechanisms contained in the 2016 Rule, and to adopt the enforcement mechanisms of the four statutes which Section 1557 incorporates along with "their implementing regulations respectively, each for its own statute." *Id.* at 37,202; *see also Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 240 (6th Cir. 2019) (stating that the 2016 Rule's blending of different enforcement mechanisms under Section 1557 "failed to respect" the plain language of Section 1557); *Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 738 (N.D. Ill. 2017) (language of Section 1557 "unambiguously demonstrate[s] Congress's intent to import the various different standards and burdens of proof into a Section 1557 claim, depending upon the protected class at issue" (quotation omitted)).

152.     Because the incorporated statutes and their implementing regulations contain their own enforcement mechanisms, the enforcement mechanisms described above for the 2016 Rule continued to apply, in substantial part, under the 2020 Rule.

153.     In the 2020 Rule, HHS declined to "to take a position in its regulations on the issue of whether Section 1557 provides a private right of action." *Id.* at 37,203. HHS stated that, "[t]o the extent that Section 1557 permits private rights of action, plaintiffs can assert claims under Section 1557 itself rather than under the Department's Section 1557 regulation." *Id.*

154.     Courts have held that Section 1557 authorizes a private right of action to the extent that the incorporated statutes do. *See Doe*, 926 F.3d at 239; *Briscoe*, 281 F. Supp. 3d at 737.

D. *Bostock v. Clayton County*

155.    On June 15, 2020, the Supreme Court decided *Bostock*. The Court held that when "an employer . . . fires someone simply for being homosexual or transgender," the employer has "discriminated against that individual 'because of such individual's sex'" within the meaning of Title VII. 140 S. Ct. at 1753.

156.    *Bostock* did not hold that the term "sex" in Title VII equates to gender identity. Rather, the *Bostock* Court "assum[ed]" that "sex" means biological sex. *Id.* at 1739. But the Court reasoned that if an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," while "retain[ing] an otherwise identical employee who was identified as female at birth," then "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* at 1741-42.

157.    The Court cautioned, however, that its opinion did not "prejudge" the proper interpretation of "other federal . . . laws that prohibit sex discrimination," *id.* at 1753, including Section 1557 and Title IX, *see id.* at 1779-82 & n.57 (Alito, J., dissenting).

158.    The Court further said it was "deeply concerned with preserving the promise of the free exercise of religion," and emphasized that the First Amendment and RFRA, among other laws, protect religious employers against being forced to "violate their religious convictions." *Id.* at 1754. Religious liberty protections, the Court explained, may "supersede Title VII's commands in appropriate cases." *Id.*

159.    *Bostock* also instructs courts to read statutes "in accord with the[ir] ordinary public meaning." *Id.* at 1738.

41

### E.  Legal challenges to, and preliminary injunctions against, the 2020 Rule

160.     Before the 2020 Rule could take effect, on August 17, 2020, the U.S. District Court for the Eastern District of New York entered "a stay and preliminary injunction to preclude the [2020 Rule] from becoming operative." *Walker v. Azar*, 2020 WL 4749859, at *1 (E.D.N.Y. 2020). The court concluded that the 2020 Rule is "contrary to *Bostock*," that HHS's attempt to repeal the 2016 Rule was "contrary to law," and that the plaintiffs were likely to succeed on the merits of their APA claim. *Id.* at *1, *9. The court acknowledged that the *Franciscan Alliance* court had vacated the 2016 Rule in part and "agree[d] that it has no power to revive a rule vacated by another district court." *Id.* at *7. The court nonetheless thought that "*Franciscan Alliance* did not address the concept of 'sex stereotyping' embodied in the 2016 Rule." *Id.* The court entered the following order:

> [T]he Court stays the repeal of the 2016 definition of discrimination on the basis of sex. As a result, the definitions of "on the basis of sex," "gender identity," and "sex stereotyping" currently set forth in 45 C.F.R. § 92.4 [sic] will remain in effect. In addition, the Court preliminarily enjoins the defendants from enforcing the repeal.

161.     The *Walker* court's preliminary injunction reinstated the 2016 Rule and the Mandate.

162.     On September 2, 2020, the U.S. District Court for the District of Columbia entered a nationwide preliminary injunction against aspects of the 2020 Rule. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 2020 WL 5232076, at *45 (D.D.C. 2020).

163.     Citing the *Franciscan Alliance* vacatur, the court acknowledged that it had "no authority . . . to disregard the final order of a district court vacating part of a regulation." *Id.* at *13. But the court distinguished between what it called the "'gender identity' portion" of the 2016 Rule and that rule's "prohibition on discrimination based on sex stereotyping." *Id.* at *14.

Believing that *Franciscan Alliance* vacated only the former "portion," the court enjoined the 2020 Rule to the extent that it "eliminated 'sex stereotyping' from the [2016] Rule's definition of 'discrimination on the basis of sex." *Id.* at *1, *45.

164.    The court also held that HHS erroneously incorporated Title IX's religious exemption into its new rule without considering "the potential negative consequences that importing a blanket religious exemption into Section 1557 might have for access to health care." *Id.* at *28. The court stated, however, that "nothing in this decision renders religiously affiliated providers devoid of protection" and identified two "statutory safeguards": the ACA's explicit conscience and abortion protections, 42 U.S.C. § 18023(c)(2), and RFRA, *Id.* at *29.

165.    The court refused to invalidate the provision of the 2020 Rule that repealed the 2016 Rule's prohibition on categorical coverage exclusions for gender-transition services. The court was satisfied that HHS had "thoroughly considered the evidence" on this issue and that it was "not this Court's place to resolve this scientific debate." *Id.* at *31.

166.    The court concluded that HHS is "preliminarily enjoined from enforcing the repeal of the 2016 Rule's definition of discrimination '[o]n the basis of sex' insofar as it includes 'discrimination on the basis of . . . sex stereotyping'" and "from enforcing its incorporation of the religious exemption contained in Title IX." *Id.* at *45.

167.    The effect of these two overlapping injunctions is that the 2016 Rule remained in place and that the 2020 rule never took effect. *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1138 (D.N.D. 2021).

**F.    This Court's injunction of the Mandate and the Eighth Circuit's affirmance**

168.    On January 19, 2021, this Court granted the Religious Sisters of Mercy Plaintiffs' and the CBA's and its member plaintiffs' motions for summary judgment. *Religious Sisters of Mercy*,

43

513 F. Supp. 3d at 1137 (subsequent history omitted). The Court first held that the Plaintiffs had standing to challenge the Mandate to the extent it requires Plaintiffs to "perform or cover gender-transition procedures" under Section 1557. *Id.* at 1138. The Court ruled that Plaintiffs' claims implicate constitutional interests; Section 1557 arguably requires such coverage; and Plaintiffs are under a credible threat of enforcement. *Id.* The Court next held that the CBA Plaintiffs has standing to "pursue RFRA claims against the EEOC's interpretation of Title VII" that Title VII requires CBA members to "cover gender-transition procedures in their health plans." *Id.* at 1141. Finally, the Court concluded that the Mandate substantially burdens the Plaintiffs' sincerely held religious beliefs without satisfying strict scrutiny. *Id.* at 1147-49.

169.    For both Section 1557 and Title VII, the Court also ruled that the CBA had associational standing to sue on behalf of its members. *Id.* at 1137. The Court explained that "[a]n organizational plaintiff 'need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing.'" *Id.* at 1137 (quoting *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013)). The CBA satisfied this test because its "verified second amended complaint confirms that its membership includes Catholic hospitals and other healthcare entities 'that receive Medicaid and Medicare payments and participate in HHS-funded programs'" and the named-CBA-member Plaintiffs had standing to challenge the Defendants' interpretation "in their own right." *Id.* at 1137, 1141. The Court entered a permanent injunction on February 19, 2021. *Religious Sisters of Mercy*, 2021 WL 1574628, at *1 (D.N.D. Feb. 19, 2021).

170.    The Government appealed only the Court's rulings as to justiciability. The Eighth Circuit affirmed this Court's injunction in full, with one exception. *Religious Sisters of Mercy v.*

*Becerra*, 55 F.4th 583, 609 (8th Cir. 2022). The Eighth Circuit held that the CBA itself and the individual CBA members had standing to challenge the Defendants' interpretations of Section 1557 and Title VII. *Id.* at 602-07. Yet the Circuit reversed this Court's holding that the CBA had associational standing to sue on behalf of its unnamed members. The Eighth Circuit held that the CBA had to identify, through testimony from someone other than the "organization's self-descriptions of their membership", an additional, non-named-plaintiff member who had standing to sue in its own right in order to have associational standing. *Id.* at 601-02.

171.    On remand, this Court dismissed without prejudice the CBA's claims to the extent they sought relief for the CBA's unnamed members, but invited the CBA to refile a suit in "properly establish[ed]" associational standing. *Religious Sisters of Mercy v. Becerra*, 16-cv-00386, slip op. at 3, (D.N.D. Sept. 15, 2023) ("Importantly, the dismissal is without prejudice, and nothing prevents the CBA from filing a new action, where associational standing us properly established."). This Court entered a corresponding amended judgment on October 11, 2023.

172.    This suit was filed the next day, and docketed by the clerk on October 13.

**G.    The 2021 and 2022 Notices**

173.    The day he was sworn into office, President Biden issued an executive order asserting that "laws that prohibit sex discrimination . . . prohibit discrimination on the basis of gender identity or sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021).

174.    On May 25, 2021, pursuant to this executive order, HHS published a document titled "Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972." 86 Fed. Reg. 27,984 (May 25, 2021). The May 2021 notice announced that "consistent with the Supreme Court's decision in *Bostock* and

Title IX," HHS would "interpret and enforce section 1557 of the Affordable Care Act prohibition on discrimination on the basis of sex to include: Discrimination on the basis of sexual orientation; and discrimination on the basis of gender identity." *Id.* at 27,984.

175.    Shortly thereafter a group of physicians challenged the notification on the grounds that it would force them to treat youth suffering from gender dysphoria in a manner that violated their clinical judgment and conscience. *Neese v. Becerra*, 640 F. Supp. 3d 668, 668–70 (N.D. Tex. 2022). The U.S. District Court for the Northern District of Texas found the Notification to be "not in accordance with the law." *Id.* at 3. The Court entered a declaratory judgment declaring that "Section 1557 of the ACA does not prohibit discrimination on account of sexual orientation and gender identity, and the interpretation of 'sex' discrimination that the Supreme Court of the United States  adopted in [*Bostock*] is inapplicable to the prohibitions on 'sex' discrimination in Title IX of the Education Amendments of 1972 and in Section 1557 of the ACA." Final Judgment, *Neese*, 2:21-cv-163-Z (N.D. Tex. Nov. 22, 2022), ECF No. 71.

## H.    The 2024 Rule

176.    On May 6, 2024, HHS published a rule interpreting Section 1557, Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 (May 6, 2024). Plaintiffs refer this rule as the "2024 Rule."

177.    The 2024 Rule repeals the never-in-effect 2020 Rule and reiterates the commands of the 2016 Rule, including the Mandate.

178.    With some exceptions, the 2024 Rules will be effective on Friday, July 5, 2024. 89 Fed. Reg. at 37,522.

179.    The 2024 Rule applies to a "health program or activity operated by a covered en-
tity." 89 Fed. Reg. at 37,699, to be codified at 45 C.F.R. § 92.101(a)(1). The 2024 Rule defines
"covered entity" as, *inter alia*, a "recipient of Federal financial assistance." 89 Fed. Reg. at 37,694,
to be codified at 45 C.F.R. § 92.4. The 2024 Rule defines "health program or activity" to cover
virtually all healthcare providers and facilities, as well as health insurers, third-party administra-
tors, pharmacy benefits managers, and other health service providers in the United States: Health
program or activity means: "(1) Any project, enterprise, venture, or undertaking to: (i) Provide or
administer health-related services, health insurance coverage, or other health-related coverage; (ii)
Provide assistance to persons in obtaining health-related services, health insurance coverage, or
other health-related coverage; (iii) Provide clinical, pharmaceutical, or medical care; (iv) Engage
in health or clinical research; or (v) Provide health education for health care professionals or oth-
ers." 89 Fed. Reg. at 37,694, to be codified at 45 C.F.R. § 92.4; *see also* 89 Fed. Reg. at 37,538
("OCR agrees with commenters' assessment that the Proposed Rule's approach to the inclusion
of health insurance coverage and other health-related coverage in the definition of 'health program
or activity' is most consistent with section 1557's statutory text and Congressional intent."); *id.*
(noting that the 2024 Rule applies to all the operations of a health program or activity if any part
receives federal financial assistance).

180.    The 2024 Rule provides: "Discrimination on the basis of sex includes, but is not
limited to, discrimination on the basis of: (i) Sex characteristics, including intersex traits; (ii) Preg-
nancy or related conditions; (iii) Sexual orientation; (iv) Gender identity; and (v) Sex stereotypes."
89 Fed. Reg. at 37,699, to be codified at 45 C.F.R. § 92.101(a)(2). The 2024 Rule does not provide
definitions of these terms.

181.    HHS previously defined "gender identity" in the 2022 Notice of Proposed Rule-making to include the terms "transgender," "nonbinary," "gender nonconforming," "gender-queer," or "genderfluid." Notice of Proposed Rulemaking, Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824, 47,867 (Aug. 4, 2022) ("2022 NPRM").

182.    The 2022 NPRM defines the Rule's prohibition on "gender identity" discrimination to require coverage and performance of "gender affirming care." "'[G]ender-affirming care' refers to care for transgender individuals (including those who identify using other terms, for example, nonbinary or gender nonconforming) that may include, but is not necessarily limited to, counseling, hormone therapy, surgery, and other services designed to treat gender dysphoria or support gender affirmation or transition." 87 Fed. Reg. at 47,834 n. 139. HHS has apparently adopted the standards of the World Professional Association for Transgender Health ("WPATH") as governing its interpretation of Section 1557. *See id.*; *see also id.* at 47,867 n. 416, 47,868 n. 423, 47,870 n. 448.

183.    Guidance from HHS's Office of Population Affairs defines "gender affirming care" to include:

| Affirming Care | What is it? | When is it used? | Reversible or not |
|---|---|---|---|
| Social Affirmation | Adopting gender-affirming hair-styles, clothing, name, gender pronouns, and restrooms and other facilities. | At any age or stage. | Reversible. |
| Puberty Blockers | Using certain types of hormones to pause pubertal development. | During puberty. | Reversible. |
| Hormone Therapy | Testosterone hormones for those who were assigned female at birth Estrogen hormones for those who were assigned male at birth. | Early adolescence onward. | Partially reversible. |

| Gender-Affirming Surgeries | "Top" surgery – to create male-typical chest shape or enhance breasts.<br>"Bottom" surgery – surgery on genitals or reproductive organs<br>Facial feminization or other procedures. | Typically used in adulthood or case by-case in adolescence. | Not reversible. |
|---|---|---|---|

HHS Office of Population Affairs, Gender-Affirming Care and Young People, available at https://opa.hhs.gov/sites/default/files/2023-08/gender-affirming-care-young-people.pdf   (last visited May 22, 2024).

184.    The 2024 Rule defines "[p]regnancy or related conditions" to include "termination of pregnancy," *i.e.* abortion. 89 Fed. Reg. at 37,576; *see also id.* ("A covered entity that chooses to provide abortion care but refuses to provide an abortion for a particular individual on the basis of a protected ground—such as race—would violate section 1557."); *id.* at 37,556 ("We clarify that a Nondiscrimination Policy's prohibition of sex discrimination encompasses protections afforded for various types of sex discrimination such as pregnancy, including termination of pregnancy or related conditions."); *id.* at 37,556 ("OCR has concluded as a matter of statutory interpretation that section 1557 does not require the Department to incorporate the language of title IX's abortion neutrality provision."); *id.* at 37,557 ("We note also that, as commenters suggested, this provision protects patients from discrimination on the basis of actual or perceived prior abortions."); *id.* at 37,606 ("To the extent plans offer coverage for termination of pregnancies and related services, they must do so on a nondiscriminatory basis."). The Fifth Circuit has previously explained that defining sex discrimination to include "termination of pregnancy" "require[s] that hospitals perform . . . abortions." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374 (5th Cir. 2022). This

interpretation of Section 1557 follows, *inter alia*, HHS's recent guidance to pharmacies, requiring pharmacies to stock abortion-inducing drugs pursuant to Section 1557.[8]

185.    The 2024 Rule also defines sex discrimination and sexual-orientation discrimination to include "fertility care," including procedures like IVF, surrogacy, and gamete donation. 89 Fed. Reg. at 37,577 (defining "fertility care" to include "IVF"). The Rule also requires covered entities to provide infertility treatments to non-married couples. *Id.* (stating that "if a covered entity elects to provide or cover fertility services but categorically denies them to same-sex couples, it may violate section 1557's prohibition on sex discrimination."). In other words, a Catholic covered entity or employer must provide or cover IVF, surrogacy for all individuals, and must provide fertility treatments that are otherwise in line with Catholic belief for a non-married individual or a couple in a non-traditional relationship.

186.    The 2024 Rule's extension of Section 1557 to "gender identity," abortion, and fertility, coupled with its expansive definition of a "covered entity," means that (1) healthcare providers are required to perform or refer for gender transition procedures, abortion, and infertility procedures; (2) healthcare providers are required to alter their speech and medical advice; (3) covered employers,  insurance providers and TPAs are required to offer employee benefits covering

---

[8] *See* Dep't of Health and Hum. Servs., Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Health Care at Pharmacies (Sept. 29, 2023) ("An individual experiences an early pregnancy loss (first-trimester miscarriage) and their health care provider prescribes medication to assist with the passing of the miscarriage. If a pharmacy refuses to fill the individual's prescription—which is prescribed to manage a miscarriage or complications from pregnancy loss, because this medication can also be used to terminate a pregnancy—the pharmacy may be discriminating on the basis of sex."), *available at* https://www.hhs.gov/civil-rights/for-individuals/special-topics/reproductive-healthcare/pharmacies-guidance/index.html (last visited May 22, 2024).

gender transition procedures and abortions; and (4) sex-specific healthcare facilities and programs, including shower facilities and hospital wards, must be opened to individuals based on gender identity, among other requirements.

1. **Healthcare professionals are required to perform or refer for gender transition procedures, abortion, and immoral infertility treatments.**

187.    The 2024 Rule, like the 2016 Rule, requires healthcare providers to cover, perform, or refer for; and insurers, PBMs, and TPAs to cover, gender transition procedures if they offer analogous services in other contexts. *See* 89 Fed. Reg. at 37,700-01, to be codified at 45 C.F.R. § 92.206. Section 206 of the 2024 Rule specifically prohibits denying or limiting "health services sought for  purpose of gender transition or other" so-called "gender-affirming care that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." 89 Fed. Reg. at 37,701, to be codified at 45 C.F.R. § 92.206(b)(4). That includes, according to HHS, "counseling, hormone therapy surgery, and other services designed to treat gender dysphoria or support gender affirmation or transition." NPRM, 87 Fed. Reg. at 47,834 n.139; *see* 89 Fed. Reg. at 37,596 ("gender-affirming care" includes "hormone  therapy, surgery, and other related services").

188.    For example, if a provider specializing in reconstructive surgery would perform a mastectomy for a woman suffering from breast cancer, the 2024 Rule requires that provider to perform a mastectomy for a minor who for a transgender man. *See* 87 Fed. Reg. at 47,867 ("By contrast, a gynecological surgeon may be in violation of the rule if they accept a referral for a hysterectomy but later refuse to perform the surgery upon learning the patient is a transgender man."). It would similarly be discriminatory  under the 2024 Rule for a clinic to prescribe and administer puberty blockers to treat precocious puberty—an FDA-approved use—but not a

"gender transition"—a non- FDA-approved use. It would also be presumptively discriminatory for a hospital to provide an orchidectomy to treat testicular cancer but refuse to remove healthy testicles for a "gender transition."

189.    Although HHS disclaims an attempt to mandate standards of care for gender-transition services in the final rule, the proposed rule mentioned the clinical "guidelines" it expects covered entities will follow: the guidelines of the WPATH and Endocrine Society. 2022 NPRM, 87 Fed. Reg. at 47,868 (asserting that covered entities "should follow clinical practice guidelines and professional standards of care," and citing WPATH Standards of Care ("SOC") 7 & Endocrine Society Guideline). HHS does not disavow that endorsement in the final rule or provide any examples of competing guidelines that would not require covered entities to support a "gender-transition."

190.    According to WPATH SOC 8, the purportedly medically necessary drug interventions for a gender transition include:

a.   Prescribing and administering puberty blockers off-label, and.

b.   Prescribing supraphysiological levels of cross-sex hormones off-label and related visits and tests.

191.    According to WPATH SOC 8, the purportedly "medically necessary" so- called "gender-affirming surgical procedures," WPATH SOC 8, *supra*, at S18, S128, include the following:

a.   "Hysterectomy" (removal of healthy uterus);

b.   "Mastectomy" (removal of healthy breasts);

c.   "Salpingo-oophorectomy" (removal of healthy ovaries and fallopian tubes);

d.  "Orchiectomy" (removal of healthy testicles);

e.  "Phalloplasty" (constructing penis-like structure using tissue from skin), including "urethral lengthening," "prosthesis," "colpectomy" (closure of healthy vagina), "colpoclesis" (shortening of healthy vagina), and "scrotoplasty" (creating new scrotums);

f.  "Metoidioplasty" (constructing penis-like structure using tissue from a hormone-enlarged clitoris), including "urethral lengthening," "prosthesis," "colpectomy" (closure of healthy vagina), "colpoclesis" (shortening of healthy vagina), and "scrotoplasty" (creating new scrotums);

g.  "Vaginoplasty" (constructing vagina-like structure), including methods of "[penile] inversion" (using combination of skin surrounding penis and scrotal skin), "peritoneal [flaps pull-through]" (pulling down peritoneum (inner lining of abdominal wall) into space between rectum and urethra/prostate), and "intestinal" technique (using section of terminal large intestine);

h.  "Vulvoplasty" (constructing vulva-like structures)

i.  "Hair line advancement and/or hair transplant;"

j.  Facelift/mid-face lift (following alteration of the underlying skeletal structures);

k.  "Platysmaplasty" (neck lift);

l.  "Blepharoplasty" (eye and lid modification);

m.  "Rhinoplasty" (nose reshaping);

n.  "Cheek" surgery, including "implant[s]" and "lipofilling;"

o.  "Lip" surgery, including "augmentation" and "upper lip shortening;"

p.   "Lower jaw" surgery, including "augmentation" and "reduction of the mandibu-

lar angle" (cutting or shaving the corner of the lower jaw);

q.   "Chin reshaping" surgery.

r.   "Chondrolaryngoplasty" (shaving down Adam's apple);

s.   "Vocal cord surgery;"

t.   "Breast reconstruction" and "augmentation" (mammoplasty);

u.   "Body contouring" surgeries, including "liposuction," "lipofilling," and "im-

plants" (such as "pectoral, hip, gluteal, [and] calf");

v.   "Monsplasty" (reduction of mons pubis tissue around the public bone, which is

more pronounced in biological females);

w.   "Nipple-areola tattoo;"

x.   "Uterine transplantation" (uterus from donor);

y.   "Penile transplantation" (penis from donor);

z.   "Hair removal," including "laser epilation" (laser removal) or "electrolysis"

(permanent removal by destroying hair follicles).

WPATH 8, supra, at S128.

192.   The 2024 Rule, like the 2016 Rule, requires healthcare providers to perform (or

refer for), and insurers and TPAs to cover abortions if they offer analogous services in other con-

texts. For example, the 2024 Rule states: "A covered provider that generally offered abortion care

could violate that prohibition if, for example, it refused to provide an abortion to a particular patient

because of that patient's race or disability." 89 Fed. Reg. at 37,576. Thus, if a Catholic healthcare

provider would perform a surgery to save the life of the mother, the unintended effect of which is

an abortion (*e.g.*, in the case of ectopic pregnancies[9]), or would provide procedures to treat miscarriage that could also be used for abortion, *see Religious Sisters of Mercy,* 513 F. Supp. 3d at 1124 ("The same concept theoretically applied for abortions. So if an obstetrician performed dilation and curettage procedures for miscarriages, then the 2016 Rule barred a later refusal to perform those procedures for abortions."), the 2024 Rule would require that healthcare provider to offer abortion in violation of the providers' faith.

193.    The 2024 Rule also requires healthcare providers to perform (or refer for), and insurers, PBMs, other service providers, and TPAs to cover artificial reproductive technologies such as IVF, surrogacy, and gamete donation for any individual, regardless of marital status. 89 Fed. Reg. at 37,577 ("OCR acknowledges the unique challenges faced by LGBTQI+ individuals seeking fertility treatment. Individuals are protected from discrimination regardless of the type of health care they seek.").

194.    In crafting the 2024 Rule, HHS and EEOC disregarded the commenters that asked HHS to make clear that health services need only be covered if they are deemed to be "medically necessary" or "medically appropriate" in the professional opinion of those charged with the care of the patient. For example, the 2024 Rule prohibits any categorical exclusion of "gender affirming care." 89 Fed. Reg. at 37,701, to be codified at 45 C.F.R. § 92.207(b)(4). "When medically necessary treatments are categorically excluded when sought by transgender enrollees for purposes of

---

[9] *See* United States Conference of Catholic Bishops, Ethical and Religious Directives for Catholic Health Care Services, p. 18, ¶ 47 (6th ed. 2009) ("Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.").

gender-affirming care, but the same such treatments are covered for cisgender enrollees, such ex-clusions may deny transgender individuals access to coverage based on their sex." 89 Fed. Reg. at 37,671.

### 2. Catholic healthcare organizations cannot adopt the Ethical and Religious Directives or the Doctrinal Note.

195.    The 2024 Rule prohibits Catholic healthcare organizations from adopting policies, such as the Ethical and Religious Directives or Doctrinal Note, that would prohibit the organiza-tions' constituents or agents from providing abortions, gender-affirming care, or immoral artificial reproductive procedures. The 2024 Rule "prohibits covered entities from . . . limiting a health care professional's ability to provide health services on the basis of a patient's . . . gender identity." 89 Fed. Reg. at 37,591; *see also id.* at 37,700 (same), to be codified at 45 C.F.R. § 92.206(b)(1). Indeed, this appears to be HHS's intent in adopting this provision. Although it was aware of commenters concerned that §§ 92.206(b)(1) 92.207(b)(4) would eliminate the ability of Catholic healthcare or-ganizations to adopt the Ethical and Religious Directives, the Department declared that it harbored no anti-Catholic animus, 89 Fed. Reg. at 37,593, *and promulgated this provision regardless*, *id.*

### 3. Healthcare providers are required to alter their speech and medical ad-vice.

196.    The 2024 Rule, like the 2016 Rule, continues to compel the speech of healthcare institutions and professionals in several ways. For example, the Rule mandates revisions to healthcare program and activity's written policies, requiring express affirmations that gender tran-sition-related procedures would be provided, 89 Fed. Reg. at 37,697, to be codified at 45 C.F.R. § 92.10(a)(1)(i), even if such revisions do not reflect the entity's medical judgment, values, or be-liefs. The 2024 Rule also prohibits healthcare programs and activities from stating their view that "gender-affirming care" is not medically necessary. Thus, to avoid liability, healthcare providers

are compelled to speak by revising their policy to endorse gender transition-related services, to express language that is "affirming" of gender transition, and to express a non-binary view of gender. Further, by treating as discriminatory a medical view of transition-related treatment as experimental, the 2024 Rule coerces healthcare providers to speak about these procedures the way the government wants them to, even though they disagree and even though they believe they would disserve patients in so doing.

197.    Like the 2016 Rule, 81 Fed. Reg. at 31,452, 31,458-59, the 2024 Rule requires covered entities to train their employees regarding the non-discrimination requirements in the Rule related to gender-affirming care, abortion, and artificial reproductive technology. 89 Fed. Reg. at 37,697, to be codified at 45 C.F.R. § 92.9.

198.    In response to First Amendment concerns about "what would be required of providers in terms of expressing support of transgender people who wish to access gender-affirming care, using the name and pronouns requested by patients, and speaking about gender-affirming care," HHS simply noted that whether "discrimination is unlawful or considered harassment is necessarily fact-specific" and that "conduct, including verbal harassment, that is so severe or pervasive that it creates a hostile environment on the basis of sex is a form of sex discrimination." 89 Fed. Reg. at 37,596.

199.    Under the 2024 Rule, covered entities must tell patients that males can get pregnant, give birth, and breastfeed. As HHS explains in the 2022 NPRM, healthcare providers are responsible for "'discrimination, stigma, and erasure'" if they speak or act in way that treats "pregnancy and childbirth . . . as something exclusively experienced by . . . women." 87 Fed. Reg. at 47,865.

**4. Covered employers and insurance providers are required to offer employee benefits covering gender transition procedures and immoral infertility treatments.**

200.    The 2024 Rule, like the 2016 Rule, prohibits certain employers, health programs, and insurance plans from exercising judgment as to what they cover. HHS stated, "When medically necessary treatments are categorically excluded when sought by transgender enrollees for purposes of gender-affirming care, but the same such treatments are covered for cisgender enrollees, such exclusions may deny transgender individuals access to coverage based on their sex." *Id.* at 37,671. And so Section 92.207(b)(4) and (5) of the 2024 Rule prohibits a covered entity from "[h]av[ing] or implement[ing] a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care" or "[o]therwise deny[ing] or limit[ing] coverage, deny[ing] or limit[ing] coverage of a claim, or impos[ing] additional cost sharing or other limitations or restrictions on coverage, for specific health services related to gender transition or other gender-affirming care if such denial, limitation, or restriction results in discrimination on the basis of sex." 89 Fed. at 37,701.

201.    This conflict with religious employers extends beyond treatment related to gender dysphoria because some required procedures (such as elective hysterectomies) result in sterilization, and the 2024 Rule also extends to "termination of pregnancy." 89 Fed. Reg. at 37,576.

202.    As a result of the 2016 Rule's materially identical requirement, some CBA members received notices from their insurance companies that their health plans were changing. These changes were not requested by these members. They were imposed involuntarily by the insurers on the ground that the changes were mandated by the 2016 Rule. Exhibits K and L hereto are, respectively, the gender dysphoria policies that United Healthcare and Blue Cross Blue Shield of

Kansas City delivered to CBA member dioceses – even those these dioceses are not themselves "covered entities" under the 2016 Rule.

203.    The United Healthcare "Gender Dysphoria Rider" informed the diocese that its plan would now cover "[b]enefits for the treatment of Gender Dysphoria" and that any "exclusion for sex transformation operations and related services . . . is deleted." Ex. K at 1, 3. "Benefits for the treatment of Gender Dysphoria" include psychotherapy, "[c]ross-sex hormone therapy," and "[s]urgery for the treatment of Gender Dysphoria." *Id.* The latter category of surgery includes "Male to female surgeries" such as orchiectomy and penectomy (removal of testicles and penis) and clitoroplasty, labiaplasty, and vaginoplasty (creation of a clitoris, labia, and vagina). It also includes "Female to male surgeries" such as mastectomy, hysterectomy, vulvectomy and vaginectomy (removal of vulva and vagina), and metoidioplasty and phalloplasty (creation of penis).

204.    After receiving notice of the United Healthcare rider in the mail, the CBA member diocese called the insurance company to demand the rider be removed from its plan. The insurer refused, informing the diocese that its plan must include the rider a result of the 2016 Rule.

205.    The Blue Cross Blue Shield of Kansas City "Treatment of Gender Dysphoria" Policy informed the covered diocese that "[i]f coverage for gender reassignment surgery is available per the member's benefit, Blue Cross and Blue Shield of Kansas City (Blue KC) will provide coverage for treatment of gender dysphoria including gender reassignment surgery when it is determined to be medically necessary." Ex. L at 1. Under the policy, the diocesan plan covers "[p]sychotherapy for gender dysphoria"; "Continuous Hormone Replacement Therapy" with "[h]ormones of the desired gender," and surgeries for a "medically necessary initial gender reassignment," such as those identified above.

206.    After receiving notice of the Blue Cross Blue Shield policy, the CBA member dio-

cese called the insurer and was informed that the policy applied to the diocese's plan as a result of

HHS's interpretation of Section 1557.

### 5. Sex-specific healthcare facilities or programs, including shower facilities or hospital wards, must be opened to individuals based on gender identity.

207.    With regard to facilities, the 2024 Rule, like the 2016 Rule, prohibits sex-specific

facilities. The 2024 Rule states, "A covered entity must not deny a nonbinary individual access to

a health program or facility on the basis that the program or facility separates patients based on sex

or offers separate male and female programs or facilities." 89 Fed. Reg. at 37,593. "For example,

a hospital that assigns patients to dual-occupancy rooms based on sex would be prohibited from

requiring a transgender woman to share a room with a cisgender man, regardless of how [that per-

son's] sex is recorded in [their] insurance or medical records." 87 Fed. Reg. at 47,866-67.

208.    When Title IX—the foundation for the 2016 and 2024 rules—was enacted, Con-

gress ensured that it protected and preserved the privacy rights of individuals in intimate areas. *See*

20 U.S.C. § 1686; 117 Cong. Rec. 30407 (1971); 117 Cong. Rec. 39260 (1971); 117 Cong. Rec. 39263

(1971); 118 Cong. Rec. 5807 (1972). HHS's predecessor, the Department of Health, Education,

and Welfare, promulgated regulations guaranteeing the privacy of individuals in intimate areas. *See*

34 C.F.R. § 106.32(b); 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room,

and shower facilities on the basis of sex . . . ."). But in the 2016 and 2024 rules, HHS disregarded

any  right to "privacy" that could be violated "simply by permitting another person access to a

sex-specific program or facility which corresponds to their gender identity." 81 Fed. Reg. at 31,389,

31,409; *see also* 89 Fed. Reg. at 37,593 (explaining that any policy protecting patient privacy must

be implement "consistent with the requirements of this rule" that non-binary individuals cannot be excluded from sex-specific facilities).

209.    With regard to other health programs, HHS stated that sex-specific health programs or activities are permissible only when they do not cause more than *de minimis* harm. 89 Fed. Reg. at 37,594-95; *see also id.* at 37,701, to be codified at 45 C.F.R. 92.206(b)(3) ("In providing access to health programs and activities, a covered entity must not adopt or apply any policy or practice of treating individuals differently or separating them on the basis of sex in a manner that subjects any individual to more than de minimis harm, including by adopting a policy or engaging in a practice that prevents an individual from participating in a health program or activity consistent with the individual's gender identity.").

### 6.   Other requirements of the 2024 Rule

210.    Like the 2016 Rule, 81 Fed. Reg. at 31,468, the 2024 Rule requires that covered entities applying for federal financial assistance affirm up front that they will comply with the rule, 89 Fed. Reg. at 37,596, to be codified at 45 C.F.R. 92.5(a).

211.    Like the 2016 rule, 81 Fed. Reg. at 31,472, the 2024 Rule requires covered entities to post notices regarding compliance with the 2024 Rule in conspicuous locations, 89 Fed. Reg. at 37,597-98, to be codified at 45 C.F.R. 92.10.

### 7.   HHS rejects calls to accommodate religious exercise consistent with the Eighth Circuit's ruling in *Religious Sisters of Mercy*.

212.    Like the 2016 Rule, 81 Fed. Reg. at 31,378, HHS was aware that the 2024 Rule would substantially burden the religious exercise of religious hospitals, churches, ministries, and other employers, 89 Fed. Reg. at 37,674.

213.     During the comment period, many religious organizations voiced their alarm at the scope of the earlier proposed rule and explained why it was essential for HHS to include categorical protections for religious employers and healthcare organizations. For example, the United States Conference of Catholic Bishops joined with the National Association of Evangelicals, the Christian Medical Association, the National Catholic Bioethics Center, and other religious organizations to submit comments explaining how HHS's proposed rules would affect religious employers and urging HHS to protect religious exercise. Comments from USCCB et al. to U.S. Dept. of Health and Human Services Re: Nondiscrimination in Health Programs and Activities RIN 0945-AA17, at 2 (Sept. 7, 2022), https://www.usccb.org/sites/default/files/about/general-counsel/rulemaking/upload/2022.comments.1557.regulations.final_.pdf (last visited May 21, 2024).

214.     HHS and EEOC ignored the calls to accommodate religious exercise as required by law in at least two ways.

215.     *First*, like the 2016 Rule, 81 Fed. Reg. at 31,380, the 2024 Rule refuses to incorporate Title IX's categorical religious exception, 89 Fed. Reg. at 37,530-32. In doing so, HHS expressly rejected commenters' calls to follow the decision in *Franciscan Alliance v. Burwell*, 227 F. Supp. 3d 660, 691 (N.D. Tex. 2016) that failure to incorporate Title IX's religious exemption is "contrary to law." 89 Fed. Reg. at 37,532.

216.     The 2024 Rule also refuses to incorporate Title IX's abortion-neutrality provision. 89 Fed. Reg. at 37,532 ("OCR has concluded as a matter of statutory interpretation that section 1557 does not require the Department to incorporate the language of title IX's abortion neutrality provision."). And although HHS gestures toward other federal laws that prohibit the Department from imposing an abortion mandate, *id.*, it refuses to provide a categorical exemption for religious

covered entity from the 2024 Rule's inclusion of "termination of pregnancy" in the definition of "sex" for purposes of Section 1557.

217.    The 2024 Rule, like the 2016 Rule, is, in this regard, even more extreme and unyielding than the contraceptive/abortifacient mandate that HHS created based on another section of the Affordable Care Act. *See Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 933-35 (8th Cir. 2015) (describing HHS's contraceptive and abortifacient mandate). While HHS reluctantly decided to exempt a narrowly defined group of "religious employers" from its abortifacient and contraception mandate, *id*. at 933, it refused to categorically exempt *any* religious employers from the 2024 Rule. And while many non-exempt religious employers could avoid the contraceptive/abortifacient mandate (though at substantial cost) by maintaining a grandfathered group health plan, there is no grandfather exemption from the requirements of Section 1557 or the 2024 Rule.

218.    Even while refusing to exempt religious organizations from its Mandate, the government has exempted its own insurance programs. TRICARE, the military's insurance program, generally does not cover "surgery for the treatment of gender dysphoria." Covered Services, Gender Dysphoria Services, TRICARE.  A TRICARE guidance memo states that in the context of gender dysphoria treatment, "[i]n no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs."  Yet no similar protections for providers' medical judgment or religious beliefs are offered under the 2024 Rule.

219.    Further, Medicare and Medicaid do not require coverage for gender-reassignment surgery but allow states and local administrators to make coverage determinations on a case-by-

case basis. Ctrs. for Medicare & Medicaid Servs., Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (Aug. 30, 2016).[10] The Centers for Medicare & Medicaid Services, which is part of HHS, concluded that "there is not enough evidence to determine whether gender reassignment surgery improves health outcomes" because while some studies "reported benefits," "others reported harms." Ctrs. for Medicare & Medicaid Servs., Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (June 2, 2016).[11]

220.    *Second*, the 2024 Rule fails to follow this Court's and the Eighth Circuit's decisions in *Religious Sisters of Mercy*, holding that the Religious Freedom Restoration Act requires an exemption for Catholic employers and healthcare providers who object to performing and providing the immoral procedures mandated by the 2024 Rule. *See Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1149 (D.N.D. 2021) ("As applied, the challenged interpretations of Section 1557 and Title VII violate the RFRA."); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022) (affirming judgment that requiring Catholic employers and healthcare providers to cover and provide gender-affirming care violates RFRA). Notably, HHS refused to even acknowledge the existence of these rulings in the 2024 Rule or its preamble.

## I.    EEOC, invoking Title VII, has imposed on non-covered entities the Mandate's requirement of gender-transition coverage.

221.    Although the 2024 Rule directly applies only to "covered entities," it announces, like the 2016 Rule did, 81 Fed. Reg. at 31,432, that the EEOC will enforce a similar rule against

---

[10]    Available    at    https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282.

[11]    Available    at    https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=Y&NCAId=282.

employers under Title VII. The 2024 Rule declares that although HHS lacks jurisdiction over "employment practices," 89 Fed. Reg. at 37,552, it will "transfer matters to the EEOC or DOJ where OCR lacks jurisdiction over an employer," *id.* at 37,624, 37,627; *see also* 87 Fed. Reg. at 47,877 ("For example, OCR will transfer matters to the EEOC where OCR lacks jurisdiction over an employer responsible for the benefit design of an employer-sponsored group health plan."). HHS has decided that, for non-healthcare entities, Title VII is better suited to "address claims that an employer has discriminated in the provision of benefits, including health benefits, to its employees." *Id.* at 31,437.

222.    In the context of Title VII, the EEOC has adopted similar substantive standards as HHS. For eight years, the EEOC has interpreted Title VII as prohibiting discrimination against employees on the basis of "transgender status." EEOC, What You Should Know About EEOC and the Enforcement Protections for LGBT Workers.[12] The EEOC maintains this interpretation today. *See* EEOC, What You Should Know: The EEOC and Protections for LGBT Workers ("EEOC Statement").[13]

223.    The EEOC has specifically enforced this interpretation by requiring employer health plans to cover "medically necessary care based on transgender status." EEOC, Deluxe Financial to Settle Sex Discrimination Suit on Behalf of Transgender Employee, 2016 WL 246967 (Jan. 21, 2016) (noting that three-year consent decree with employer "provides that, as of January

---

[12] This EEOC Statement was previously available at https://www.eeoc.gov/eeoc/newsroom/ wysk/enforcement_protections_lgbt_workers.cfm. The version of this page, as accessed and preserved on December 15, 2016 by the Internet Archive, is attached hereto as Exhibit J.

[13] Available at https://www.eeoc.gov/laws/guidance/what-you-should-know-eeoc-and-protections-lgbt-workers.

1, 2016, [employer's] national health benefits plan will not include any partial or categorical exclusion for otherwise medically necessary care based on transgender status"); *see also Darin B. v. U.S. Office of Personnel Mgmt.*, EEOC Appeal No. 0120161068, 2017 WL 1103712 (Mar. 6, 2017) (a transgender male complainant stated a cognizable claim of sex discrimination when he alleged that his Federal Employee Health Benefits insurance plan denied pre-authorization for nipple-areola reconstruction; the failure to use or exhaust the process for Agency review of an insurance carrier's decision does not preclude an employee from asserting a viable claim in the EEO process).

224.    Dignity Health is one of the largest healthcare systems in the United States and includes many Catholic hospitals.  It has now merged with Catholic Health Initiatives to form Common Spirit Health, the largest Catholic Hospital network in the world.  In June 2016, Josef Robinson, a transgender male, sued Dignity Health for maintaining an employee health plan that categorically excluded coverage for gender transition services. Robinson's complaint asserted a violation of Title VII, claiming that "[d]iscrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of 'sex' under Title VII," and that the hospital's exclusion of transgender surgery constituted a violation of Section 1557 of the Affordable Care Act. EEOC filed an amicus brief in the case in support of Robinson, arguing that the employer's transgender exclusion violated Title VII by denying Robinson "access to medically necessary treatment for his gender dysphoria, a serious health condition directly related to the fact that he is transgender." Amicus Brief of EEOC in Support of Plaintiff, *Robinson v. Dignity Health*, 16-cv-03035 YGR (N.D. Cal.) (filed Aug. 22, 2016).[14]

---

[14]    Available    at    https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/litigation/briefs/robinson.html.

225.     The EEOC has taken enforcement action against other employers for the "categorical exclusion" from their health plans of "services related to transgender treatment/sex therapy." Soc'y for Human Res. Mgmt., Wal-Mart Loses Perfect LGBTQ Rating Because of Transgender Harassment, Nov. 30, 2017.[15]

226.     The EEOC has attempted to enforce the Mandate against at least one CBA member. While the appeal in *Religious Sisters of Mercy* was pending before the Eighth Circuit, in October 2022, the CBA was notified by one of its members, a Catholic ministry with "Catholic" in its name, that the EEOC had begun an enforcement action for its refusal to provide gender-transition coverage. The EEOC demanded reams of information from this CBA member (hereafter "Catholic Ministry"), including "all contracts" with insurers and third party administrators, "all benefits and/or health plans," "all hard copy and/or electronic communications and/or notes" regarding health plans, "all medically necessary reason(s) for which [Catholic Ministry] has covered hysterectomy procedures," and "the software and/or additional data systems" used by Catholic Ministry to manage health benefits. The injunction previously entered by this Court was the only thing protecting this CBA member. However, when the Court vacated its injunction to the extent it protected CBA on an associational basis, the CBA's members are currently under threat of similar enforcement actions. *See* Ex. I, incorporated by reference herein.

227.     Since promulgating the guidance and taking the positions and enforcement actions described above, the EEOC has never changed its interpretation or application of Title VII.

---

[15]  Available at https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/wal-mart-lgbtq-rating.aspx.

228.    Courts have recently interpreted Title VII consistent with the EEOC position that health insurance coverage cannot exclude care for transgender services, such as vaginoplasty could not be excluded from coverage. See *Lange v. Houston Cnty., Georgia*, No. 22-13626, 2024 WL 2126748, at *1 (11th Cir. May 13, 2024) ("a health insurance provider can be held liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for denying coverage for gender-affirming care to a transgender employee *because* the employee is transgender. We hold that it can.").

229.    Indeed, in *Lange*, the United States filed an *amicus* brief in support of the plaintiff in that case, who alleged discrimination under Title VII by her employer for its categorical exclusion of "gender-affirming care" from the employer's health plan. Brief for the United States as Amicus Curiae Supporting Plaintiff-Appellee and Urging Affirmance on the Issues Addressed Herein, *Lange v. Houston Cnty., Georgia*, No. 22-13626, (Mar. 17, 2023), attached here as Exhibit N. In that brief, the United States argued that an employer-sponsored health insurance plan violates Title VII if it excludes coverage for medical treatments only when they are needed to provide gender-affirming care." *Id.* at 10. The United States filed this brief because of its "substantial interest . . . [in] the proper application of the prohibition on sex discrimination in Title VII . . . to an employer's denial of health insurance benefits to a transgender worker" in light of EEOC's and DOJ's "enforcement authority under Title VII." *Id.* at 1-2.

230.    Accordingly, it is the policy and official position of the EEOC, based on the EEOC's statements and the agency's actual enforcement actions, that exclusion of gender-transition coverage in employer health plans constitutes a violation of Title VII's ban on "sex" discrimination.

**J.  Enforcement Mechanisms**

231.    CBA members that do not comply with the Mandate may face enforcement actions initiated by federal agencies or by individuals who allege they have been discriminated against.

232.    The 2024 Rule, like the 2016 Rule, Fed. Reg. at 31,467-68, 31,472, 31,439, subjects "covered entities" to enforcement actions brought by HHS's Office of Civil Rights ("OCR"). If the Director of OCR concludes that a covered entity had discriminated on the basis of "gender identity," "sexual orientation," or "termination of pregnancy," the entity would have to take "remedial action . . . to overcome the effects of the discrimination." 89 Fed. Reg. at 37,696, to be codified at 45 C.F.R. § 92.6(a)(1). If it refuses, OCR could initiate an administrative procedure to terminate the entity's HHS funding. 89 Fed. Reg. at 37,664.

233.    The 2024 Rule, like the 2016 Rule, *see* 81 Fed. Reg. at 31,439, 31,472, also empowers OCR to compel covered entities to record and submit compliance reports under Section 1557, 89 Fed. Reg. at 37,664.

234.    Under the 2024 Rule, like the 2016 Rule, where HHS does not have jurisdiction over an alleged discriminatory act, it said it would refer the matter to the EEOC for enforcement under Title VII. 89 Fed. Reg. at 37,626. Similar to HHS's authority under Section 1557, the EEOC has authority to investigate alleged Title VII violations and will ask violators to voluntarily take corrective action for the discriminatory behavior. 42 U.S.C. § 2000e-5(a).

235.    If HHS or the EEOC are dissatisfied with an entity's corrective remedial actions, the 2024 Rule permits referral of the matter to the Department of Justice to bring a federal lawsuit to enforce federal civil rights laws. *See, e.g.*, 89 Fed. Reg. at 37,664.

236.     Title VII creates a private right of action. In the 2016 and 2024 rules, HHS interpreted Section 1557 as authorizing a private right of action. *See* 81 Fed. Reg. at 31,440; 89 Fed. Reg. at 37,654. This means that individuals who believe they have been discriminated against on the basis of gender identity may bring their own federal lawsuits. These laws can also be enforced by class action suits.

237.     Sanctions for failing to comply with the 2024 Rule are severe. They include compensatory damages, punitive damages, treble damages, civil penalties, attorney fees, injunctive relief, and even loss of federal funding.

238.     *Loss of federal funding*: Catholic healthcare entities subject to the 2024 Rule risk the denial or discontinuance of federal funding if they do not comply. 89 Fed. Reg. at 37,664. HHS Form 690 makes compliance "a condition of continued receipt of Federal financial assistance" and authorizes the government "to seek judicial enforcement of this assurance." *Assurance of Compliance*, U.S. Dep't of Health and Hum. Servs., https://www.hhs.gov/sites/default/files/form-hhs690.pdf. (last visited May 22, 2024).

239.     *Civil and criminal penalties and treble damages*: Covered entities that submit HHS Form 690 but do not comply with the 2024 Rule could be liable under the False Claims Act, which authorizes a civil penalty of up to $11,000 for each false claim, "plus 3 times the amount of damages which the Government sustains because of" the false claim. 31 U.S.C. § 3729(a)(1). False claims related to a health program may also subject responsible persons to fines and up to five years imprisonment under 18 U.S.C. § 1035(a).

240.     *Compensatory damages*: Catholic employers that violate the 2024 Rule may be subject to compensatory damages under Section 1557 or under Title VII. 89 Fed. Reg. at 37,654 ("The

enforcement mechanisms available for and provided under . . . Title IX . . . shall apply for purposes of Section 1557."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992) (compensatory damages available under Title IX); 42 U.S.C. § 1981a(b)(3) (compensatory damages available under Title VII). Compensatory damages may include pecuniary losses and even nonpecuniary losses such as "emotional pain" and "mental anguish." 42 U.S.C. § 1981a(b)(3); *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998).

241.    *Punitive damages*: Punitive damages are available under Title VII if the employer acted "with malice or with reckless indifference to the federally protected rights" of an employee. 42 U.S.C. § 1981a(b)(1). Punitive damages are subject to the same statutory caps that are imposed for nonpecuniary losses. *See id.* § 1981a(b)(3).

242.    *Injunctive relief*: Courts may order broad forms of injunctive relief under Title VII, *see* 42 U.S.C. §2000e-5(g)(1); *United States v. Criminal Sheriff, Parish of Orleans*, 19 F.3d 238, 239 (5th Cir. 1994), and may even mandate that employers adopt certain policies, *see, e.g.*, *Morris v. Am. Nat'l Can Corp.*, 730 F. Supp. 1489, 1498 (E.D. Mo. 1989), *aff'd in part, rev'd in part on other grounds*, 952 F.2d 710 (8th Cir. 1991); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1541 (M.D. Fla. 1991). Title IX, and hence Section 1557, also permit broad injunctive relief. *See Roberts v. Colo. State Bd. of Agriculture*, 998 F.2d 824, 833 (10th Cir. 1993).

243.    *Attorney's fees*: Under Title VII and Section 1557, a prevailing party is entitled to costs and attorney's fees. *See* 42 U.S.C. § 2000e-5(k); *id.* § 1988(b).

## VI.    THE MANDATE AND THE EEOC'S INTERPRETATION CONTINUE TO BURDEN THE RELIGIOUS EXERCISE OF CBA'S MEMBERS

244.    The Mandate continues to burden the religious exercise of the CBA's members.

245. The EEOC's interpretation of Title VII applies to all employers with 15 or more employees.

246. The decisions of CBA members to refuse to cooperate in their patients', employees', or plan beneficiaries' efforts to undergo gender transition procedures qualify as the exercise of religion.

## A. The Mandate's effects on CBA members that are covered entities – medical services

247. The Mandate's regulatory scheme makes it virtually impossible for CBA members that qualify as a "covered entity" to continue their healthcare and ministries. Their options are: (1) provide gender transition services, abortion, and/or immoral infertility treatments; (2) cease providing any services that HHS may correlate with gender transition, abortion, and/or immoral infertility treatments; (3) continue to meet patients' needs but refuse to provide gender transition, abortion, and/or immoral infertility treatments; (4) stop participating in all HHS-related programs, including Medicaid and Medicare; and (5) cease providing health services and activities.

248. Option 1, directly providing gender transition, abortion, and/or immoral infertility treatments, is contrary to Catholic values and would give rise to scandal. Directly providing gender transition, abortion, and/or immoral infertility treatments is contrary to Catholic teaching and belief. This situation gives rise to scandal and the loss of members' reputation because patients, employees, and the larger community would perceive that CBA-member healthcare providers profess one thing but do another. Such scandal devastates ministry.

249. Option 2, ceasing providing any services that HHS may correlate with gender transition, abortion, and/or immoral infertility treatments, would be ruinous for covered-entity CBA members and their patients. To avoid the Mandate, CBA members could refuse to perform any

procedure that might be used as part of a gender transition, such as hysterectomies, mastectomies, hormone treatments, and plastic surgery; abortion, such as treatment for miscarriage or surgeries to save a mother's life; or fertility treatments such as hormonal therapy or surgeries. Doing so would prevent these CBA members from being able to use such procedures to address medical illnesses or conditions—such as uterine cancer, breast cancer, menopause, miscarriage, and poly-cystic ovarian syndrome—thus injuring their healing ministries. Artificially restricting their medical services in this manner would cause these CBA members to incur financial losses, lose valuable employees, and suffer other injuries.

250.    Absent injunctive relief from this Court, option 2 is ruinous because it would expose covered entity CBA members to HHS and EEOC enforcement actions and other penalties as described above.

251.    Option 3, stopping participation in HHS-related programs, including Medicaid and Medicare, would severely penalize CBA members for maintaining their religious convictions. This would also require them to severely curtail their services to the poor, disabled, and the elderly, thus injuring their healing ministries.

252.    Option 4, ceasing their health services and activities, would burden CBA members' religious exercise, because they are called by their Catholic values to engage in the healing ministry of Christ.

**B.  The Mandate's effects on CBA members that are covered entities – insurance coverage**

253.    The Mandate also affects CBA members' ability to offer their employees health benefits that reflect their Catholic values. Their options are: (1) provide a group health plan that includes coverage for gender transition, abortion, and/or immoral infertility treatments; (2)

provide a group health plan that excludes coverage for gender transition, abortion, and/or immoral infertility treatments; or (3) cease providing health coverage.

254.    Option 1, providing a group health plan that covers gender transition, abortion, and/or immoral infertility treatments, is contrary to Catholic values and would give rise to scandal.

255.    Absent injunctive relief from this Court, option 2 is ruinous because it would expose covered entity CBA members to HHS and EEOC enforcement actions and other penalties as described above.

256.    Option 3, dropping health benefits, would burden CBA members' exercise of religion because: (a) Catholic values commend providing just compensation and benefits supportive of family values, including, whenever possible, health care; (b) eliminating health insurance for employees subjects CBA members to annual excise taxes of $2,000 per employee after the first 30 employees, 26 U.S.C. § 4980H(a), (c)(1); and (c) eliminating health insurance would put CBA members at a significant disadvantage in the market for recruiting the best workers and thereby harm the operation of their ministries.

## C.  The Mandate's effects on insured CBA members

257.    The Mandate also injures CBA members who are not covered entities, and are thus not directly regulated by the 2024 Rule. Regardless of whether a CBA member is a covered entity, the Mandate restricts its ability to acquire a group health plan that reflects Catholic values. This is because group insurers are covered entities that are required, under the 2024 Rule, to cover gender transition, abortion, and/or immoral infertility treatments.

258.    For CBA members that sponsor an insured group plan, their options are: (1) provide a group health plan that includes coverage for gender transition, abortion, and/or immoral

74

infertility treatments; (2) provide a group health plan that excludes coverage for gender transition, abortion, and/or immoral infertility treatments; or (3) cease providing health coverage.

259.    Option 1, providing a group health plan that covers gender transition, abortion, and/or immoral infertility treatments is contrary to Catholic values and would give rise to scandal.

260.    The Mandate has made option 2, providing a group health plan that excludes gender transition, abortion, and/or immoral infertility treatments, either impossible or unduly burdensome. Insured CBA members have been told by their insurers that, as a direct result of the Mandate, their plans must include gender-transition coverage. Absent injunctive relief from this Court, even if a non-covered entity CBA member were able to secure a morally compliant insured plan, option 2 is ruinous because it would expose CBA members to EEOC enforcement actions and other penalties as described above.

261.    Option 3, dropping health benefits, would burden CBA members' exercise of religion as described above.

## D.    The Mandate's effects on self-insured CBA members

262.    The Mandate also injures CBA members who have a self-insured group health plan. For CBA members that sponsor a self-insured group health plan, their options are: (1) provide a group health plan that includes coverage for gender transition, abortion, and/or immoral infertility treatments; (2) provide a group health plan that excludes coverage for gender transition, abortion, and/or immoral infertility treatments; or (3) cease providing health coverage.

263.    Option 1, providing a group health plan that covers gender transition, abortion, and/or immoral infertility treatments is contrary to Catholic values and would give rise to scandal.

264.    The Mandate has made option 2, providing a group health plan that excludes gender transition, abortion, and/or immoral infertility treatment coverage, either impossible or unduly burdensome. Absent injunctive relief from this Court, even if a non-covered entity CBA member were able to secure a morally compliant self-insured plan, option 2 is ruinous because it would expose members to EEOC enforcement actions and other penalties as described above.

265.    Option 3, dropping healthcare benefits, would burden CBA members' exercise of religion as described above.

**VII.    NEED FOR RELIEF**

266.    The 2024 Rule continues and amplifies the Mandate. As a result, absent relief from this Court, CBA members are presently subject to the Mandate and are required to perform, or include in their health plans, gender-transition services or else risk enforcement actions, civil lawsuits, and other penalties.

267.    As a direct result of the Mandate, self-insured CBA members have been notified by their TPAs that they must indemnify their TPA or accept their TPA's liability in order to maintain their exclusion of all gender transition coverage.

268.    Absent relief from this Court, CBA members that are covered entities are currently threatened by the Mandate with administrative investigations, civil lawsuits, and various penalties if they continue to offer health services in a manner that reflect their Catholic convictions.

269.    Absent relief from this Court, all CBA members are currently threatened by the Mandate with administrative investigations, civil lawsuits, and various penalties if they continue to offer employee health benefits in a manner that reflects their Catholic convictions.

## VIII.   CAUSES OF ACTION

### COUNT I

**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law**

270.    Plaintiffs incorporate by reference all preceding paragraphs.

271.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the 2016 Rule, along with the EEOC Statement complained of herein, constitute "rules" under the APA, *id.* § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

272.     The 2024 Rules are a "rule" under the APA. 5 U.S.C. § 551.

273.    The 2024 Rules are a "final agency action" subject to judicial review. 5 U.S.C. § 704.

274.    The APA prohibits agency actions that are "not in accordance with law, in excess of statutory authority, or limitation, or short of statutory right." *Id.* § 706(2)(A), (C). The 2024 Rule and the EEOC Statement are not in accordance with law for a number of independent reasons.

275.    The 2024 Rule will require physicians to perform gender transition procedures, abortion, and/or fertility treatments regardless of whether those procedures are "medically necessary" or "medically appropriate." It is not in accordance with law for HHS to require medical professionals to perform procedures that may not be necessary or appropriate and may in fact be harmful to the patients.

276.    The 2024 Rule is not in accordance with Section 1557 of the Affordable Care Act (42 U.S.C. § 18116), Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., or the Rehabilitation Act, 29 U.S.C. § 705(20)(F)(i). The 2024 Rule define discriminating "on the

basis sex" in a manner that is contrary to Section 1557, Title IX, and the Rehabilitation Act. *See* 89 Fed. Reg. at 37,699. Neither Section 1557, the Rehabilitation Act, nor Title IX requires performance of abortion or fertility treatments, nor prohibit consideration of the real biological differences between the sexes in the context of healthcare and health coverage. HHS's attempt to expand the definition is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

277.    The Mandate is not in accordance with Title VII. Title VII does not require coverage of fertility treatments or sterilization, or prohibit consideration of the real biological differences between the sexes in the context of healthcare and health coverage. EEOC's attempt to expand the definition is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

278.    HHS's failure to include in the 2024 Rule a religious exemption and abortion neutrality provisions that parallels the religious exemption and abortion neutrality provisions in Title IX is also not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

279.    HHS's failure to include an exclusion for gender identity and/or transgender status from the 2024 Rule as required by 42 U.S.C. § 18116(a) and 29 U.S.C. § 705(20)(F)(i) is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

280.    HHS's failure to include an exclusion for sterilization and sterilization-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b), which protect the right of healthcare entities who receive federal funding to refuse to participate in or assist with sterilizations.

281.    The 2024 Rule violates the Church Amendments, 42 U.S.C. § 300a-7, which protect the right of healthcare entities that receive federal funding to refuse to participate, perform, or

78

assist with gender-transition procedures, including when it would be contrary to his religious beliefs or moral convictions.

282.    The 2024 Rule also forces physicians to provide medical services related to gender transition, abortion, and infertility treatments. This is not in accordance with substantive due process rights protecting a medical professional's right to not perform a procedure he or she believes to be experimental, ethically questionable, and potentially harmful.

283.    The 2024 Rule is not in accordance with law because it violates the First Amendment, Fifth Amendment, and the Religious Freedom Restoration Act, as hereafter described.

284.    Further, Congress must "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2022) (cleaned up). Section 1557 doesn't clearly authorize the 2024 Rule.

285.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

286.    Plaintiffs have no adequate remedy at law.

287.    Absent injunctive and declaratory relief against the Mandate, the CBA Plaintiffs have been and will continue to be harmed.

**COUNT II**

**Violation of the Administrative Procedure Act**
**Agency Action In Excess of Statutory Authority and Limitations**

288.    Plaintiffs incorporate by reference all preceding paragraphs.

289.    The APA prohibits agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The 2024 Rule and the EEOC Statement are in excess of statutory jurisdiction, authority, and limitations for a number of reasons.

79

290.    For the reasons described above, there is no statutory authority or jurisdiction for HHS to require medical professionals and facilities to perform procedures (or refer for the same) that may not be necessary or appropriate, and may in fact be harmful to the patients.

291.    For the reasons described above, HHS's decision to interpret Section 1557 to ban "gender identity" and "termination of pregnancy" discrimination in the context of healthcare and health coverage is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

292.    For the reasons described above, EEOC's decision to interpret Title VII to ban "gender identity" discrimination in the context of healthcare and health coverage is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

293.    For the reasons described above, HHS's failure to include a religious exemption or an abortion-neutrality provision in the 2024 Rule that parallels the religious exemption in Title IX is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

294.    For the reasons discussed above, HHS's failure to include an exclusion for sterilization and sterilization-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

295.    For the reasons described above, EEOC's decision to require CBA members to act in violation of Title VII by not accommodating their employees' religious and conscientious objections to participating in (or referring for) gender transition services and/or infertility treatments is

in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

296.     For the reasons discussed above, the 2024 Rule is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates the First Amendment, Fifth Amendment, and the Religious Freedom Restoration Act, as hereafter described.

297.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

298.     Plaintiffs have no adequate remedy at law.

299.     Absent injunctive and declaratory relief against the Mandate, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT III

### Violation of the Administrative Procedure Act
### Agency Action that is Arbitrary, Capricious and an Abuse of Discretion

300.     Plaintiffs incorporate by reference all preceding paragraphs.

301.     The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The 2016 Rule is arbitrary and capricious agency action for a number of reasons.

302.     For the reasons discussed above, HHS's prohibition on "gender identity" discrimination in the context of healthcare and health coverage is an arbitrary and capricious interpretation of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

303.    For the reasons discussed above, HHS's prohibition on "termination of preg-

nancy" discrimination in the context of healthcare and health coverage is an arbitrary and capri-

cious interpretation of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) and Title IX of

the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

304.    For the reasons discussed above, EEOC's prohibition on "gender identity" dis-

crimination in the context of healthcare and health coverage is an arbitrary and capricious inter-

pretation of Title VII.

305.    For the reasons discussed above, HHS's failure to include a religious exemption in

the 2024 Rule that parallels the religious exemption and abortion neutrality provision in Title IX is

arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

306.    For the reasons discussed above, HHS's failure to include an exclusion for sterili-

zation and sterilization-related services is arbitrary and capricious within the meaning of 5 U.S.C.

§ 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b), the

Religious Freedom Restoration Act, the prior decisions of this Court, and the Weldon Amend-

ment.

307.    For the reasons described above, HHS's decision to require Plaintiffs to act in vio-

lation of Title VII by not accommodating their employees' religious objections to participating in

gender transition procedures, abortion, and/or infertility treatments is arbitrary and capricious

within the meaning of 5 U.S.C. § 706(2)(A).

308.    For the reasons discussed above, the 2024 Rule is arbitrary and capricious within

the meaning of 5 U.S.C. § 706(2)(A) as it violates the First Amendment, Fifth Amendment, and

Religious Freedom Restoration Act as hereafter described.

309.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

310.    Plaintiffs have no adequate remedy at law.

311.    Absent injunctive and declaratory relief against the 2024 Rule, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT IV

### Violation of the First Amendment of the United States Constitution
### Freedom of Speech
### Compelled Speech and Compelled Silence

312.    Plaintiffs incorporate by reference all preceding paragraphs.

313.    CBA members plan to continue using their best medical and ethical judgment in treating and advising patients. Performing (or referring for) gender transition procedures is contrary to their best medical and/or ethical judgment.

314.    The 2024 Rule prohibits CBA members from expressing their professional opinions that gender transition procedures, abortion, and certain infertility treatments are not the best standard of care, immoral, and/or are experimental.

315.    The 2024 Rule also requires CBA members to amend their written policies to expressly endorse gender transition procedures, abortion, and certain infertility treatments, even if such revisions do not reflect the medical judgment, values, or beliefs of CBA members. The 2024 Rule also requires CBA members to use gender-transition affirming language in all situations, regardless of circumstance.

316.    Performing (or referring for) gender transition procedures, abortion, and certain infertility treatments is also contrary to the religious and conscientious beliefs of CBA members, and their beliefs prohibit them from conducting, participating in, or referring for such procedures.

317.    The 2024 Rule compels CBA members to conduct, participate in, refer for, or otherwise facilitate gender transition procedures abortion, and certain infertility treatments.

318.    The 2024 Rule prohibits CBA members from expressing their religious views that gender transition procedures, abortion, and certain infertility treatments are not the best standard of care or are experimental.

319.    The 2024 Rule compels CBA members to speak in ways that they would not otherwise speak.

320.    The 2024 Rule thus violates CBA members' right to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

321.    The 2024 Rule's compelled speech requirement is not justified by a compelling governmental interest.

322.    Even if HHS has a compelling government interest, the 2024 Rule is not narrowly tailored to achieve that interest.

323.    Absent injunctive and declaratory relief against the 2024 Rule, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT V

**Violation of the First Amendment of the United States Constitution**
**Freedom of Speech and Free Exercise Clause**
**Viewpoint Discrimination**

324.    Plaintiffs incorporate by reference all preceding paragraphs.

325.    CBA members' sincere religious and conscientious beliefs prohibit them from covering, facilitating, or participating in gender transition procedures, abortion, and/or certain infertility treatments.

326.    CBA members' medical judgment is that it is harmful and unethical to encourage a patient to undergo gender transition procedures, gender transition procedures, abortion, and/or certain infertility treatment.

327.    The 2024 Rule would prohibit CBA members from expressing their religious or conscientious viewpoint that gender transition procedures, abortion, and/or certain infertility treatments are not the best standard of care. The 2024 Rule also requires CBA members to affirm their provision of such services and to train their staff members regarding their willingness to cover and provide such services.

328.    The 2024 Rule withholds funding based on an intent to restrict CBA members' speech.

329.    The 2024 Rule's viewpoint discrimination is not justified by a compelling governmental interest.

330.    Even if HHS has a compelling government interest, the 2024 Rule is not narrowly tailored to achieve that interest.

331.    Defendants' actions thus violate CBA members' rights as secured to them by the First Amendment of the United States Constitution.

332.    Absent injunctive and declaratory relief against the 2024 Rule, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT VI

**Violation of the First and Fifth Amendments of the United States
Constitution
Freedom of Speech and Due Process
Overbreadth**

333.    Plaintiffs incorporate by reference all preceding paragraphs.

334.    The 2024 Rule regulates protected speech. The 2024 Rule states, in the context of covered entities offering health services, that a "categorical" belief that gender-affirming care is never warranted "impermissibly single[s] out an entire category of services based on an individual's transgender status and [is] presumptively discriminatory." 89 Fed. Reg. at 37,602.

335.    This exposes CBA members to penalties for expressing their medical and moral views of gender transition procedures. It also prohibits CBA members from using their medical judgment to determine the appropriate standard of care for interactions with their patients.

336.    CBA members believe that the 2024 Rule restricts their speech regarding the best standard of care for patients.

337.    The 2024 Rule states, the "determination of whether a challenged action is discriminatory is necessarily a fact-specific, case-by-case analysis dependent on the facts of the particular situation." *Id*. at 37,616.

338.    The 2024 Rule chills CBA members' speech.

339.    The 2024 Rule's overbreadth is not justified by a compelling governmental interest.

340.    Even if HHS has a compelling government interest, the 2024 Rule is not narrowly tailored to achieve that interest.

341.     Defendants have therefore violated CBA members' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment by prohibiting speech that would otherwise be protected.

342.     Absent injunctive and declaratory relief against the 2024 Rule, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT VII

### Violation of the First Amendment of the United States Constitution
### Free Exercise Clause and Freedom of Speech
### Unbridled Discretion

343.     Plaintiffs incorporate by reference all preceding paragraphs.

344.     The 2024 Rule "appl[ies] to every health program or activity, any part of which receives Federal financial assistance, directly or indirectly from the Department; every health program or activity administered by the Department; and every health program or activity administered by a Title I entity." 89 Fed. Reg. at 37,693, to be codified at 45 C.F.R. § 92.2(a).

345.     The 2024 Rule also states, "A fact-specific analysis is necessary to determine whether prohibited discrimination has occurred." 89 Fed. Reg. at 37,597.

346.     The 2024 Rule also says: "Insofar as the application of any requirement under this part would violate applicable Federal statutory protections for religious freedom and conscience, such application shall not be required." 89 Fed. Reg. at 37,893, to be codified at 45 C.F.R. 92.3(c).

347.     Because the Defendants have sole discretion over financial assistance provided or made available, and because Defendants have sole discretion over the application of the 2024 Rule and any religious freedom protection that applies, the 2024 Rule vests unbridled discretion over which organizations will have their First Amendment interests accommodated.

348.    In Title IX of the Education Amendments of 1972, Congress precluded discrimination on the basis of "sex" in federally funded education programs, "except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)-(a)(3). Defendants have exercised unbridled discretion by declining to apply the clear religious freedom protections of Title IX.

349.    Defendants' actions therefore violate CBA members' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

350.    Absent injunctive and declaratory relief against the 2016 Rule, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT VIII

**Violation of the First Amendment to the United States Constitution**
**Free Speech Clause**
**Unconstitutional Conditions**

351.    Plaintiffs incorporate by reference all preceding paragraphs.

352.    The 2024 Rule imposes an unconstitutional condition on Plaintiffs' receipt of federal funding.

353.    The 2024 Rule applies to any healthcare provider who accepts federal funding from any source for any program.

354.    The 2024 Rule requires CBA members to adopt policies regarding standards of care for patients that violate Plaintiffs' religious and conscientious beliefs, as well as their medical judgment, and also interfere with CBA members' practice of medicine.

355.    Defendants' actions therefore impose an unconstitutional condition on CBA members' receipt of federal funding and violate Plaintiffs' rights as secured to them by the First and Fourteenth Amendments of the United States Constitution.

356.    Absent injunctive and declaratory relief against the 2024 Rule, the CBA Plaintiffs have been and will continue to be harmed.

**COUNT IX**

**Violation of the First Amendment**
**Freedom of Speech**
**Expressive Association**

357.    Plaintiffs incorporate by reference all preceding paragraphs.

358.    CBA members believe and teach that participating in actions, procedures, and services with the goal of transitioning from one sex to another violate their religious beliefs.

359.    CBA members believe and teach that participating in actions, procedures, and services with the goal of procuring an abortion violate their religious beliefs.

360.    CBA members believe and teach that participating in actions, procedures, and services that separate the unitive and procreative nature of a marital union violate their religious beliefs.

361.    CBA members believe and teach that participating in actions, procedures, and services that result in elective sterilizations violate their religious beliefs.

362.    The Mandate compels CBA members to participate in procedures, services, and activities that contradict their religious beliefs and message.

363.    The Mandate compels CBA members to offer health coverage for procedures, services, and activities that violate their religious beliefs and message.

364.     The Mandate refuses to allow CBA to assert the rights of its members on an associational basis.

365.     Defendants' actions thus violate CBA members' rights of expressive association as secured to them by the First Amendment of the United States Constitution.

366.     Absent injunctive and declaratory relief against the Mandate, the CBA and its members have been and will continue to be harmed.

367.     The Mandate exposes CBA members to civil suits that would hold them liable for practicing and expressing their sincerely held religious beliefs.

368.     The Mandate furthers no compelling governmental interest.

369.     The Mandate is not the least restrictive means of furthering Defendants' stated interests.

370.     Absent injunctive and declaratory relief against the Mandate, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT X

### Violation of the Religious Freedom Restoration Act
### Compelled Medical Services

371.     Plaintiffs incorporate by reference all preceding paragraphs.

372.     CBA members' sincerely held religious beliefs prohibit them from deliberately offering services and performing (or referring for) operations or other procedures required by the the Mandate. CBA members' compliance with these beliefs is a religious exercise.

373.     CBA members sincerely held religious beliefs prohibit them facilitating gender transition procedures. CBA members' compliance with these beliefs is a religious exercise.

374.    CBA members' sincerely held religious beliefs prohibit them facilitating steriliza-

tion procedures. CBA members' compliance with these beliefs is a religious exercise.

375.    CBA members' sincerely held religious beliefs prohibit them facilitating procedures

intended to procure an abortion. CBA members' compliance with these beliefs is a religious exer-

cise.

376.    CBA members' sincerely held religious beliefs prohibit them facilitating procedures

that separate that separate the unitive and procreative nature of a marital union. CBA members'

compliance with these beliefs is a religious exercise.

377.    The Mandate creates government-imposed coercive pressure on CBA members to

change or violate their religious beliefs.

378.    The Mandate chills CBA members' religious exercise.

379.    The Mandate exposes CBA members to the loss of substantial government funding

as a result of their religious exercise.

380.    The Mandate exposes CBA members to substantial penalties under the False

Claims Act, 31 U.S.C. § 3729 et seq.

381.    The Mandate exposes CBA members to criminal penalties under 18 U.S.C. § 1035.

382.    The Mandate exposes CBA members to civil suits that would hold them liable for

practicing their sincerely held religious beliefs.

383.    The Mandate thus imposes a substantial burden on the CBA's and its members'

religious exercise.

384.    The Mandate furthers no compelling governmental interest.

385.     The Mandate is not the least restrictive means of furthering Defendants' stated interests.

386.     The Mandate violates the CBA's and its members' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

387.     Absent injunctive and declaratory relief against the Mandate, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT XI

### Violation of the Religious Freedom Restoration Act
### Compelled Coverage

388.     Plaintiffs incorporate by reference all preceding paragraphs.

389.     For the same reasons discussed above, CBA members' sincerely held religious beliefs prohibit them from deliberately covering or offering health insurance or other benefits that would cover or facilitate services related to gender transition, sterilization, abortion, and certain infertility treatments.

390.     CBA members specifically exclude coverage of any services related to gender transition, abortion, sterilization, and certain infertility treatments in their group health plans.

391.     CBA members' compliance with these beliefs by maintaining these exclusions is a religious exercise.

392.     Under the Mandate, such health-plan exclusions are facially invalid.

393.     The Mandate exposes CBA members to the loss of substantial government funding as a result of their religious exercise.

394.     The Mandate also makes it more expensive for CBA members to do business with a third-party administrator for a health benefits plan. The Mandate subjects third party

administrators to potential liability for administering plans that reflect Catholic teachings, and thus CBA members will be forced to indemnify, or accept liability for, any TPA. This constitutes an additional substantial burden on the CBA's and its members' religious exercise.

395.    The Mandate exposes CBA members to substantial penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.

396.    The Mandate exposes CBA members to criminal penalties under 18 U.S.C. § 1035.

397.    The Mandate exposes CBA members to civil suits that would hold them liable for practicing their sincerely held religious beliefs.

398.    The Mandate thus imposes a substantial burden on the CBA's and its members' religious exercise.

399.    The Mandate furthers no compelling governmental interest.

400.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

401.    The Mandate violates the CBA's and its members' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

402.    Absent injunctive and declaratory relief against the Mandate, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT XII

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

403.    Plaintiffs incorporate by reference all preceding paragraphs.

404.    Plaintiffs and CBA members object to providing, facilitating, covering, or otherwise participating in gender transition procedures, abortions, and certain infertility treatments.

405.    The Mandate imposes substantial burdens on CBA members by forcing them to choose between their exercise of religion and the avoidance of fines, penalties, liability, and other adverse consequences.

406.    The Mandate seeks to suppress the religious practice of individuals and organizations such as CBA members, while allowing exemptions for similar conduct based on secular and non-religious reasons. Thus, the Mandate is neither neutral nor generally applicable.

407.    The 2024 Rule repeatedly states that any request for a religious or conscience exemption must be evaluated on an individualized, case-by-case basis. *E.g.*, 89 Fed Reg. at 37,656. Thus, the mandate imposes a system of individualized assessments in violation of the First Amendment.

408.    None of the statutes pursuant to which the Mandate is promulgated is generally applicable. Section 1557, Title IX, and Title VII are not generally applicable. For example, Title VII is not generally applicable because it exempts or does not cover employers that employ fewer than 15 employees and, as a result, does not apply to millions of employers that together employ hundreds of millions of people.

409.    The Mandate is not justified by a compelling governmental interest.

410.    Even if the Mandate is justified by a compelling government interest, it is not the least restrictive means of achieving that interest.

411.    Defendants' actions thus violate the CBA's and its members' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

412.    Absent injunctive and declaratory relief against the Mandate, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT XIII

**Violation of the Fifth Amendment to the United States Constitution**
**Due Process Clause**
**Substantive Due Process**

413.    Plaintiffs incorporate by reference all preceding paragraphs.

414.    The United States has a deeply rooted tradition of honoring physicians' and healthcare institutions' rights to provide medical treatment in accordance with their moral and religious beliefs.

415.    CBA members possess a fundamental right of liberty of conscience.

416.    CBA members possess a fundamental right not to be coerced to provide medical procedures and services in violation of their conscience.

417.    The Mandate coerces CBA members to provide medical services and coverage in violation of their conscience.

418.    Defendants' conduct cannot be justified by a compelling governmental interest.

419.    The Mandate is not justified by a compelling governmental interest.

420.    Even if Defendants have a compelling government interest, the Mandate is not narrowly tailored to achieve that interest.

421.    Defendants' actions therefore violate CBA members' rights to substantive due process.

422.    Absent injunctive and declaratory relief against the Mandate, the CBA and its members have been and will continue to be harmed.

## COUNT XIV

**Violation of the Fifth Amendment to the United States Constitution
Due Process and Equal Protection**

423.    Plaintiffs incorporate by reference all preceding paragraphs.

424.    The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

425.    The Mandate discriminates on the basis of religious views or religious status by refusing to recognize religious exemptions that exist in the law.

426.    The Mandate discriminates on the basis of religious views or religious status by refusing to recognize valid medical views of religious healthcare professionals on gender transition procedures.

427.    The Defendants' actions thus violate Plaintiffs' rights secured to them by the Fifth Amendment of the United States Constitution.

428.    Absent injunctive and declaratory relief against the Mandate, CBA and its members have been and will continue to be harmed.

## COUNT XV

**Violation of Title VII, 42 U.S.C. §§ 2000e-1(a) and 2000e(j)**

429.    Plaintiffs incorporate by reference all preceding paragraphs.

430.    Title VII does not apply to religious entities or societies "with respect to the employment of individuals of a particular religion."  42 U.S.C. § 2000e-1(a).

431.    The term "religion" includes all aspects of religious observance and practice.  42 U.S.C. § 2000e(j).

432.    The health plan coverage portion of the EEOC Statement is contrary to the Catholic values and to the observance and practice of the CBA Plaintiffs.

433.    Applying the health plan coverage portion of the EEOC Statement to the CBA Plaintiffs violates the religious exemption within Title VII.

434.    Absent injunctive and declaratory relief against the EEOC Statement, the CBA Plaintiffs have been and will continue to be harmed.

## IX.    PRAYER FOR RELIEF

Wherefore Plaintiffs request that the Court:

A.  Declare Section 1557 does not require Plaintiffs to perform, facilitate, refer for, provide insurance coverage for, or a self-funded plan for: gender-transition procedures, including surgery, counseling, provision of pharmaceuticals, or other treatments sought in furtherance of a gender transition; abortion; and artificial reproductive technologies that violate Catholic beliefs, including without limitation IVF, surrogacy, and gamete donation; violates their sincerely held religious beliefs without satisfying strict scrutiny under the RFRA;

B.  Declare that Title VII does not require the CBA and its members to provide insurance coverage for: gender-transition procedures, including surgery, counseling, provision of pharmaceuticals, or other treatments sought in furtherance of a gender transition; abortion; and artificial reproductive technologies that violate Catholic beliefs, including without limitation IVF, surrogacy, and gamete donation; violates Plaintiffs' sincerely held religious beliefs without satisfying strict scrutiny under the RFRA and without complying with Title VII's religious exemption that protects employers' religious practices, 42 U.S.C. § 2000e-1(a) and 42 U.S.C. § 2000e(j);

C. Issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting:

    a. The Department of Health and Human Services, Secretary Becerra, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116(a), or any implementing regulations thereto against the CBA Plaintiffs and the CBA members in a manner that would require them to perform gender-transition procedures, abortion, or infertility treatments contrary to Catholic beliefs; or provide insurance coverage or a self-funded plan for the same, including by denying federal financial assistance because of their failure to perform such procedures or provide insurance coverage for such procedures or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement action; and

    b. The Equal Employment Opportunity Commission, Chair Burrows, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., or any implementing regulations thereto against the CBA Plaintiffs and the CBA members in a manner that would require them to accommodate gender-transition procedures or infertility treatments contrary to Catholic beliefs; or to provide insurance coverage for gender-transition procedures, including by denying federal financial assistance because of their failure to provide insurance coverage for such

procedures or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions;

D.  Extend the relief above to: CBA Plaintiffs and the CBA present and future members, anyone acting in concert or participation with them, and their respective health plans any insurers, pharmacy benefit managers ("PBM"), service provider, or third-party administrators ("TPA") in connection with such health plans.

E.  Declare that to come within the scope of this order, a CBA member must meet the following criteria: (a) The employer is not yet protected from interpretations of Section 1557 and Title VII that require the provision or coverage of gender transitions by any other judicial order; (b) The CBA has determined that the employer meets the CBA's membership criteria; (c) The CBA's membership criteria have not changed since the CBA filed its this complaint on May 30, 2024; and (d) The employer is not subject to an adverse ruling on the merits in another case involving interpretations of Section 1557 and Title VII that require the provision or coverage of gender transitions.

F.  Declare that the Mandate and Defendants' enforcement of the Mandate against the CBA and its members violate the Administrative Procedure Act, and that no taxes, penalties, or other burdens can be charged or assessed against these members for failure to pay for, provide, or directly or indirectly facilitate access to abortion, infertility treatments contrary to Catholic beliefs, or gender transition services;

G.  Declare that the Mandate and Defendants' enforcement of the Mandate against the CBA and its members violate the laws and constitutional provisions described in their causes of action and that no taxes, penalties, or other burdens can be charged or assessed against the

CBA and its members for failure to pay for, provide, or directly or indirectly facilitate access to abortion, infertility treatments contrary to Catholic beliefs, or gender transition services;

H.  Declare that any interpretation of Title VII and Section 1557 to require coverage or provision of gender-transition procedures, including surgery, counseling, provision of pharmaceuticals, or other treatments sought in furtherance of a gender transition; abortion; and artificial reproductive technologies that violate Catholic beliefs, including IVF, surrogacy, and gamete donation may not be applied against the CBA and its members' insurers, PBM's, service providers, and TPAs of the CBA and its members; may not interfere with members' attempts to arrange or contract for morally compliant health coverage or related services for their employees; and that no taxes, penalties, or other burdens can be charged or assessed against such insurers or TPAs in relation to their work for the CBA and its members;

I.  Declare that CBA members have the right to contract with service providers, including insurers and third-party administrators, to secure morally compliant health plans;

J.  Award Plaintiffs the costs of this action and reasonable attorney's fees as provided by law, including 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988(b); and

K.  Award such other and further relief as the Court deems equitable and just.

DATED: May 30, 2024.

Respectfully submitted,

*/s/ L. Martin Nussbaum*
L. Martin Nussbaum
Andrew Nussbaum
First & Fourteenth PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
(719) 428-2386
martin@first-fourteenth.com
andrew@first-fourteenth.com

*Attorneys for Plaintiffs*

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing allegations pertaining to The Catholic Benefits Association and its members are true and correct to the best of my knowledge. I further declare under penalty of perjury that Exhibit A attached hereto is a true and ac- curate copy of the Amended and Restated Certificate of Incorporation of The Catholic Benefits Association, that Exhibit B is a true and accurate copy of the Third Amended and Restated Bylaws of The Catholic Benefits Association, that Exhibit C is a true and accurate copy of the CBA Nonprofit Employer Application for Membership, that Exhibit D is a true and accurate copy of the CBA For Profit Employer Application for Membership; Exhibit I are documents related to an EEOC enforcement action brought against a CBA member; and Exhibits K and L are true and accurate copies of insurance riders sent to CBA members.


Executed on May 29, 2024


Douglas Wilson, Jr.
CEO, the Catholic Benefits Association

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing allegations pertaining to the teachings of the Catholic Church, Catholic values, and the beliefs and values of The Catholic Benefits Association are true and correct to the best of my knowledge.

Executed on May 29, 2024

William E. Lori

Most Rev. William E. Lori
Archbishop of Baltimore
Chairman of the Board, The Catholic Benefits Association

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing allegations: pertaining to the Sisters of St. Francis of the Immaculate Heart of Mary (described herein as the Sisters of St. Francis), St. Anne's Guest Home, and St. Gerard's Community of Care, including their membership in the CBA and adherence to Catholic teaching regarding human dignity, gender dysphoria, abortion, and infertility are true and correct to the best of my knowledge.


Executed on May 29, 2024


*Sister Donna Marie Welder, OSF*

Sister Donna Marie Welder, OSF
Provincial, President, and Chair of the Sisters of St. Francis of the Immaculate Heart of Mary
President and Chair of St. Anne's Guest Home
President and Chair of St. Gerard's Community of Care