IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STATE OF FLORIDA; FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION; FLORIDA DEPARTMENT OF MANAGEMENT SERVICES; CATHOLIC MEDICAL ASSOCIATION, on behalf of its current and future members,

    *Plaintiffs*,

No. 8:24-cv-1080-WFJ-TGW

DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the Department of Health and Human Services; MELANIE FONTES RAINER, in her official capacity as the Director of the Office for Civil Rights; CENTERS FOR MEDICARE AND MEDICAID SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services,

    *Defendants*.

**REPLY IN SUPPORT OF MOTION FOR STAY OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

I.      The Rules Mean What They Say ................................................................. 1

II.     This Suit is Justiciable .................................................................................. 4

        A.     Standing .......................................................................................... 4

        B.     Implied Preclusion ......................................................................... 5

        C.     Ripeness .......................................................................................... 8

III.    The Rules Are Invalid .................................................................................. 9

        A.     *Adams* Controls ............................................................................. 9

        B.     The "Gender-Transition" Rules Are Unlawful ............................. 10

        C.     The Social Security Act Claim Is Timely .................................... 11

IV.   The Rules Will Inflict Irreparable Harm ................................................... 11

CONCLUSION ............................................................................................................. 15

## INTRODUCTION

As of July 5, HHS's 2024 Rules ("Rules") will govern all entities involved in health-related activities that receive federal financial assistance, including Plaintiffs. 89 Fed. Reg. at 37,688. By their plain terms, the Rules forbid "the unremarkable—and nearly universal—practice of separating [private spaces] based on biological sex," whenever that practice conflicts with a person's gender identity. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 796 (11th Cir. 2022) (en banc); Compl. ¶ 135. And by their plain terms, the Rules say that denying "gender-transition" interventions or failing to subsidize them is discriminating based on sex, Compl. ¶¶ 136–53, and purport to preempt conflicting state law. 89 Fed. Reg. at 37,535, 37,598. The Rules are built atop a foundation that defies precedent. HHS *defined* discriminating on the basis of sex to include "[g]ender identity," 45 C.F.R. § 92.101(a)(2), even though *Adams* makes it clear—"pellucid"—that Title IX, and hence Section 1557, doesn't reach that category. Dkt. 12, at 8–12.

HHS has no answer to *Adams*. It just falls back on the classic agency playbook to avoid judicial rebuke: delay judicial relief, while it coerces compliance. That is not the law: this Court has jurisdiction, the suit is ripe, the Rules flout text and precedent and will inflict irreparable harms. Dkt. 12, at 20–23. A stay is warranted.

## ARGUMENT

### I. The Rules Mean What They Say

At the outset, HHS tries to obfuscate how the Rules work, and what they're about. HHS repeatedly claims that "[a]t its core, the Rule" forbids denying transgender

1

patients care or coverage for "a sore throat, a broken bone, or cancer—because of traits or actions that they would not have questioned in members of a different sex." Dkt. 33, at 3; *see also id.* at 10, 13, 33 ("broken bone"). But the Rules are not about addressing that extremely rare occurrence. The words "broken bone" don't appear in the Rules. The words "gender transition" and "gender affirming care," by contrast, appear over 100 times. And HHS's "equal access" rule—the "core" of the regulation—sets out a framework for prohibiting policies separating healthcare facilities based on sex and for promoting "gender transition" interventions, not for mending "broken bones."

Plaintiffs' quotations from the Rules aren't "misapprehensions," and HHS's disclaimers don't withstand scrutiny. On separate facilities, HHS claims the "equal access" rule, and specifically 45 C.F.R. § 92.206(b)(3), "does not purport to resolve § 1557's application to specific claims involving bathrooms, locker rooms, or anything else of the kind." Dkt. 33, at 1, 17 (quotation marks omitted). HHS then acknowledges, in a footnote, that the Rules say otherwise. Dkt. 33, at 17 n.9. HHS thus lacks candor in saying "the Rule does not forbid what [20 U.S.C. ]§ 1686 permits." Dkt. 33, at 20.

HHS also claims that the "gender-transition" Rules don't promote a "standard of care." Dkt. 33, at 8. But "gender transition" *is* the putative "standard of care," Compl. ¶¶ 72–84, 105, and the regulatory text on its face compels access to it. HHS also says that "[n]othing in the Rule overrides a clinician's medical judgment as to whether a service is medically necessary or appropriate for any patient." Dkt. 33, at 8. That's reminiscent of the quip that the Soviet Union didn't restrict freedom of speech, only freedom *after* speech. Endocrinologists like Dr. Van Meter can have a general

2

policy against providing hormones for a gender transition—until HHS comes knocking. *See* Compl. ¶¶ 136–137, 195, 210–13. And HHS repeatedly says it will rely on "medical guidelines" to evaluate *individualized* medical necessity determinations, which is unnecessary unless HHS will override general judgments that, in its view, lack "medical substantiation" under relevant "guidelines." 89 Fed. Reg. at 37,613. These "guidelines" will not be Florida's rules of ethics. After all, HHS claims its Rules preempt state rules that pose an "obstacle" to gender transition—including rules reflecting the judgment of state medical boards, who are clinicians. *Id.* at 37,535, 37,598. The same is true for policies limiting coverage for "gender transition," except that here, the conflict is starker still. The United States has already said Florida's coverage limits conflict with the Rules. Dkt. 12, at 21.

HHS argues that Plaintiffs' concerns are hypothetical because covered entities may sometimes be able to prove, as an affirmative defense, that they had a legitimate, nondiscriminatory reason for denying these interventions. But guilty until proven innocent is the problem with HHS's "framework for determining whether any particular denial of [gender-transition] care or coverage violates § 1557." Dkt. 33, at 18. The "framework" relieves HHS of the need to show discrimination based on sex to establish prima facie liability and preempt conflicting state law whenever "gender transition" is involved. HHS may think Section 1557 authorizes this regime, but Plaintiffs disagree, and this dispute is not hypothetical. Plaintiffs think that "gender transition" is "experimental" and dangerous, and HHS has made clear it thinks that view is not legitimate. Compl. ¶ 10.

3

## II. This Suit is Justiciable

Plaintiffs have standing, this Court has jurisdiction, and the suit is ripe. HHS's argument that this Court should wait out "over two years of investigation," while HHS coerces Plaintiffs, Dkt. 33, at 29–30, has no basis in justiciability principles. That's why the Sixth Circuit just rejected many of the same arguments HHS raises here. *See Tennessee v. Dep't of Educ.*, No. 22-5807, 2024 WL 2984295 (6th Cir. June 14, 2024).

### A. Standing

"Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *Food & Drug Admin. v. All. for Hippocratic Med.*, Nos. 23-235 & 23-256, 2024 WL 2964140, at *7 (U.S. June 13, 2024) ("*FDA v. AHM*"). This is one of those cases. Plaintiffs include covered entities, and the Rules "arguably proscribe[] their conduct" and impose compliance costs. *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1137–38 (11th Cir. 2023). The Rules further injure Florida's sovereignty by reimagining the terms of its bargain, *id.* at 1136, and by injuring its "interest in enforcing [its] duly enacted laws without contradiction from the federal government." *Tennessee*, 2024 WL 2984295, at *10. Plaintiffs' "fear is not unfounded. It comes directly from the text of the" Rules. *Id.* at *5; *see supra* Part I. And harm is likely. *Id.* at *6. Come July 5, Plaintiffs (including CMA's doctors) must sign an assurance of compliance to continue receiving funding, modify their policies and practices, and begin trainings to conform to the "gender identity" regime. 89 Fed. Reg. at 37,684–85, 37,689; *see also* Dkt. 33, at 27 ("Florida must comply with the Rule"); 89

4

Fed. Reg. at 37,685 ("[A]lmost all practicing physicians [a]re likely covered by the rule."). And only one party needs to show standing is likely. *Tennessee*, 2024 WL 2984295, at *9 n.15. Thus Plaintiffs establish a "substantial likelihood of Article III standing." *Id.* at *13.[1]

### B. Implied Preclusion

***1557 Preclusion.*** In a footnote, HHS claims that Section 1557 implicitly strips district courts of jurisdiction over this pre-enforcement challenge. Dkt. 33, at 21 n.10. But "Section 1557 contains no explicit or implicit bar to judicial review." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 684 (N.D. Tex. 2016), so Plaintiffs may challenge rules through "actions for declaratory judgments … in a court of competent jurisdiction." 5 U.S.C. § 703. It is no wonder HHS relegated this argument to a footnote, since it has been repeatedly rejected, including most recently by the Sixth Circuit. *Tennessee*, 2024 WL 2984295, at *17.[2] Section 1557 is nothing like the Mine Act, the FTC Act, the Exchange Act, or for that matter, CHIP.

Section 1557 incorporates "[t]he enforcement mechanisms provided for and available under" laws such as Title VI and Title IX. 42 U.S.C. § 18116. But these laws

---

[1] The Religious Freedom Restoration Act ("RFRA") is irrelevant to CMA's standing. HHS acknowledges CMA members (indeed, all physicians) are regulated entities, and that HHS's exemption process involves costs, 89 Fed. Reg. at 37,684. Either is enough for standing.
[2] *See also Franciscan All.*, 227 F. Supp. 3d at 684 (Section 1557); *Louisiana v. EPA*, No. 2:23-CV-00692, 2024 WL 250798, at *19 (W.D. La. Jan. 23, 2024) (Title VI scheme "is not a special statutory scheme and does not vest review in courts of appeal, nor does it provide any comprehensive review process."); *Romeo Cmty. Schs. v. U.S. Dep't of Health, Educ., & Welfare*, 438 F. Supp. 1021, 1028–29 & n.8 (E.D. Mich. 1977) (Title IX does not preclude APA challenge to regulation).

don't contain "a special statutory scheme and do[] not vest review in courts of appeal, nor do[] [they] provide any comprehensive review process." *Louisiana v. EPA*, No. 2:23-CV-00692, 2024 WL 250798, at *19 (W.D. La. Jan. 23, 2024) (Title VI); *Tennessee*, 2024 WL 2984295, at *18 (Title IX). Instead, they provide that "agency action ... shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds." 20 U.S.C. § 1683. The referenced "agency action" includes rules. *See* 20 U.S.C. § 1682; *see also* 5 U.S.C. § 551(13) ("agency action" includes a "rule"). So, the "enforcement mechanisms" say courts "shall" review rules as "provided by" the APA, the opposite of a preclusive "special statutory review scheme." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023).

These mechanisms also don't confer "exclusive jurisdiction" on any "court of appeals." *Id*. at 185; *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). The statutes provide that a sanctioned person "may obtain judicial review of such action in accordance with chapter 7 of title 5," the APA. 42 U.S.C. § 2000d-2; 20 U.S.C. § 1683. The APA itself doesn't confer jurisdiction, *Califano v. Sanders*, 430 U.S. 99, 107 (1977), so jurisdiction would still be under 1331 in district court—*i.e.*, exactly what we've filed here. *See, e.g.*, *Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 518 (1982) ("Trumbull then filed suit in … District Court … contending that HEW's Title IX employment regulations were invalid and seeking declaratory and injunctive relief."). A statute that requires would-be plaintiffs to rely on federal-question jurisdiction and the APA to

6

challenge an agency sanction is not a special statutory review scheme channeling jurisdiction.

*Social Security Act Preclusion*. HHS argues the Social Security Act ("SSA") implicitly strips this Court of jurisdiction to review the new contract requirements for Medicaid contracts with managed-care organizations. Dkt. 33, at 24 (42 C.F.R. § 438.3(d)(4)). HHS specifically invokes 42 U.S.C. § 1316(e) (item disallowance) and 1316(a)(3) (plan determination). These provisions have nothing to do with reviewing managed-care-plan contracts. Contracts are reviewed by CMS under 42 C.F.R. § 438.3(a), a provision HHS doesn't mention, and CMS's decision to disapprove them is not subject to any special statutory review scheme. And in any event, channeling review through the tangential schemes HHS mentions "could foreclose all meaningful judicial review." *Axon*, 598 U.S. at 190; *see also Texas v. Brooks-LaSure*, 680 F. Supp. 3d 791, 807 (E.D. Tex. 2023) (rejecting argument that APA challenge to CMS rule was precluded by § 1316(e)). It's hard to see how Florida could tee up a challenge under them. A private managed-care entity would have to agree to a non-compliant contract with Florida to provoke HHS retaliation. That distinguishes this case from *Florida v. CMS*, No. 8:24-cv-317, 2024 WL 2803298, at *5 (M.D. Fla. May 31, 2024). A dispute about the scope of the federal government's authority under the SSA and the Spending Clause to impose disparate-impact duties through managed-care contracts is also "wholly collateral" to the agency process and has "nothing to do with the [fact-specific, reimbursement] matters" CMS adjudicates. *Axon*, 598 U.S. at 193. And this case

7

presents questions of law distinct from "technical considerations of agency policy." *Tennessee*, 2024 WL 2984295, at *21; *Texas*, 680 F. Supp. 3d at 807.

### C. Ripeness

HHS's remaining objections sound in ripeness. Dkt. 33, at 20–21, 24. According to HHS, the suit comes too early because "[t]he Rule does not include a determination that any Plaintiffs' particular laws or policies violate § 1557." *Id.* at 3. On this view, Plaintiffs could bring APA pre-enforcement challenges only against rules that operate as a bill of attainder. This "would immunize nearly all agency rulemaking activities from the coverage of the Administrative Procedure Act." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 147 (1967). It would make the APA not "generous," *id.* at 141, but stingy. That is not the law. And HHS fails to identify any additional facts needed to rule.

Plaintiffs' challenge is ripe. The issues are "fit for judicial resolution." *Id.* at 153. HHS says its Rules are "*compelled by* the Supreme Court's reasoning in *Bostock*," Dkt. 33, at 10 (emphasis added). The Eleventh Circuit, *see Adams*, disagrees. HHS's assertion that the "justification for these Rules might vary with different circumstances," thus "overlooks the fact that both sides have approached this case as one purely of congressional intent." *Abbott Lab'ys*, 387 U.S. at 149. Plaintiffs would also suffer "hardship." *Id.* The 2024 Rules threaten Plaintiffs with the loss of billions of dollars in funds. *Tennessee*, 2024 WL 2984295, at *17. Plaintiffs "need not assume such risks while waiting for [HHS] to drop the hammer in order to have their day in court." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016); *Tennessee*, 2024 WL 2984295, at *17 (same).

### III. The Rules Are Invalid

#### A. *Adams* Controls

On the merits, HHS concedes that if "discrimination on the basis of sex excludes discrimination on the basis of gender identity" under Title IX, then the Rules are "irreconcilable with" *Adams*. Dkt. 33, at 14. *Adams* makes it "pellucid" that Title IX, and hence Section 1557, doesn't include "gender identity." *See* Dkt. 12, at 9–10. So, the Rules conflict with *Adams*. HHS argues the Court should follow *Bostock*'s but-for-causation test. That is "the dissent's theory" in *Adams*, which the majority expressly rejects. *Adams*, 57 F.4th at 814 n.7. For good reason. HHS's "dissent theory" would mean Section 1557 "would provide more protection against discrimination on the basis of transgender status under the statute . . . than it would against discrimination on the basis of sex." *Adams*, 57 F.4th at 814. At the least, none of this was "clear" on the face of the statute. *Id.* at 816. Plaintiffs are likely to succeed.

Although the Court need not reach the question because Section 1557 doesn't cover gender identity, *Adams* also means the "equal access" rule for separate facilities, 45 C.F.R. § 92.206(b)(3), is invalid. HHS's defense is that the rule may have valid applications, so the invalid applications must get a pass. This *Salerno* deference test is hard to square with HHS's argument that the APA doesn't authorize non-party relief, Dkt. 33, at 14 n.21, or the Court's duty to set aside rules in "excess of . . . authority," 5 U.S.C. § 706(2)(C), not just "entirely in excess of authority." Dkt. 33, at 14. But the Court may sidestep this question by fashioning relief as applied to Plaintiffs. And even if this test applies to party-specific claims for APA relief, and it doesn't, lawful

9

applications covered by other rules are "irrelevant" under *Salerno*. *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 419 (2015); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407 (D.C. Cir. 1998) (the focus under *Salerno* would be on "incremental regulation"). The only putatively "valid" application HHS can come up with, "sex stereotypes," Dkt. 33, at 16, is already prohibited by a separate rule, 45 C.F.R. § 92.101(a)(2)(v).

## B. The "Gender-Transition" Rules Are Unlawful

Setting aside *Adams*, the gender-transition rules are independently unlawful because they prohibit conduct that is not discriminatory. HHS argues its "framework" is "consistent with" *McDonnell Douglas*. Dkt. 33, at 18. Not so. Under *McDonnell Douglas*, a prima facie claim "falls apart because of a failure to locate a similarly situated individual." *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007). The problem with HHS's "framework" is that it doesn't require a "similarly situated individual." Dkt. 12, at 16–17. HHS doesn't defend its proxy-based reasoning either. Indeed, according to HHS, "many transgender individuals do not seek gender-affirming surgeries or other types of care." 89 Fed. Reg. at 37,682. Opposing these interventions is not discrimination, presumptively or otherwise. Dkt. 12, at 15–18.[3] So, the gender-transition rules are unlawful.

---

[3] HHS cites to *Lange*, a Title VII case, but *Lange* doesn't govern. Dkt. 12, at 15 n.2.

### C. The Social Security Act Claim Is Timely

On the Social Security Act, HHS argued the claim is time-barred. Dkt. at 23–24. But the six-year statute of limitations "begins to run when the agency issues the final action that gives rise to the claim," *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1292 (11th Cir. 2015) (citing 28 U.S.C. §2401(a)), and Plaintiffs challenged the Rules the day they published. To the extent earlier rules are implicated, HHS reopened them by expanding them to "gender identity." *See Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1227 (D.C. Cir. 1996). The suit is timely, and HHS's conclusory defense needs no reply. Plaintiffs are likely to show the Rules are invalid.

## IV. The Rules Will Inflict Irreparable Harm

Harm is imminent. Effective July 5, covered entities must file an assurance of compliance with the 2024 Rules to continue receiving funds. 89 Fed. Reg. at 37,696, *to be codified at* 45 C.F.R. § 92.5; *see also Grove City Coll. v. Bell*, 465 U.S. 555, 574–75 (1984) (upholding defunding for failure to file an assurance). Plaintiffs have three options. Option 1: If Plaintiffs say they will comply, but don't mean it, they risk liability under the False Claims Act, including a penalty of $11,000 for each false claim, "plus 3 times the amount of damages which the Government sustains because of" the false claim. 31 U.S.C. § 3729(a)(1); *see, e.g.*, *United States ex. rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (university subject to False Claims Act for violating federal regulations in funding program). Option 2: If Plaintiffs refuse to file an assurance of compliance, they risk immediate termination of federal financial assistance. Just ask Grove City College. *See Grove City Coll.*, 465 U.S. 555. Option 3: If

Plaintiffs comply, they violate state standards or their religious conscience (or both), suffering injury.

Apparently, HHS thinks that, because it could subject Plaintiffs to a purgatory of informal "negotiation" and Star Chamber proceedings before dropping the hammer, Plaintiffs suffer no immediate harm from Rules purporting to preempt state law, and mandating Plaintiffs immediately assure compliance, develop policies consistent with the Rules, and train employees. Dkt. 33, at 28–30. But there's nothing to negotiate. HHS wants Plaintiffs to promote gender transitions. Plaintiffs refuse. And HHS's ability to delay judicial review to use "informal coercion" only highlights the problem with delaying equitable relief. *Tennessee*, 2024 WL 2984295, at *20. Without immediate relief, Florida "will continue to face pressure to change [its] laws to avoid legal consequences," an irreparable injury. *Id.* at *25. And covered entities will risk immediate loss of all funds.

Nor does conscience language in the rule dampen CMA's need for relief. CMA's doctors are "practicing physicians" and therefore regulated by the rule. 89 Fed. Reg. at 37. HHS has imposed a sweeping mandate on them, but only made room for conscience in narrow circumstances *if* previous statutes apply. 45 C.F.R. § 92.302. But previous conscience statutes mostly cover abortion, which is not at issue here. *See, e.g.*, 42 U.S.C. §§ 238n, 300a-7. Other provisions in them do not protect entities (like Dr. Van Meter's business), or when patients pay privately. *Id.* § 300a-7(d).

As for RFRA, the rule suggests doctors can ask HHS for an "assurance" that it will not punish them, § 92.302(b), but that does not relieve their harm. First, the rule

12

forces the hospitals where CMA's doctors practice to stamp out all newly-defined discrimination. But HHS is not promising to shield these doctors from the coercion it is imposing on them through hospitals. An injunction protecting CMA's doctors would stop HHS from using the rule to injure them by any means. In addition, while CMA's doctors are religious, the rule requires their physician practices to comply. But like most companies, those practices are often not set up as religious entities. For example, nothing reflects that Dr. Van Meter's company is religious. Comp., Ex. 4 ¶ 23. Therefore, RFRA would not protect those companies from the rule—and therefore would force Dr. Van Meter to make sure their companies comply—unless HHS is also forcing CMA's members to incur added costs by restructuring their businesses to be religious. This adds to the nearly $1,000 HHS admits it is imposing on CMA's members to seek an exemption. An injunction for CMA will relieve these burdens.

HHS points to other suits, but those do not dampen the need for relief. Dkt. __. *Dekker* doesn't affect Florida's interest in enforcing the spending laws at issue there. It is not a class action, and declaratory relief against the policies is limited "to the extent they categorically ban Medicaid payment for puberty blockers and cross-sex hormones for the treatment of gender dysphoria." *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1299 (N.D. Fla. 2023). Florida is still enforcing the Medicaid rule against non-parties because it is not categorical—a waiver process is available. Fla. Admin. Code r. 59G-1.050(7), Compl ¶ 121; Dkt. __. *Ladapo*, recently decided, is a class action, but the judgment doesn't forbid Florida from enforcing its public health laws to restrict

13

procedures other than puberty blockers and hormones, so Florida may enforce the laws to prevent other interventions, such as mastectomies for minors. Dkt. __. And in any event, *Ladapo* and *Dekker* are of no relevance to Florida's Department of Management of Services ("DMS"), which has a longstanding policy limiting payment for these interventions, Compl. ¶¶ 169-72; or to the Agency for Persons with Disabilities ("APD"), which has a policy of separating dual-occupancy rooms based on sex, regardless of gender identity. Compl. ¶ 173. They, and CMA's members, need relief now.

As for *Neese v. Becerra*, 640 F. Supp. 3d 668 (N.D. Tex. 2022); *see also* Compl. ¶ 59, the classwide declaratory relief for physicians there doesn't negate a need for immediate relief for two reasons. First, Florida, AHCA, DMS, and APD are not class members, because they are not medical providers covered by the physician class. HHS ambiguously claims that APD might be a class member, Dkt. 33, at 32, but that would be wrong, as APD is an agency, not a physician. To the extent it now claims it won't enforce the Rules against APD for "the kind of gender identity discrimination addressed in that case," HHS is just engaging in "voluntary cessation," which must be disregarded. *Tennessee*, 2024 WL 2984295, at *5 n.8.

Second, as to CMA, *Neese* didn't provide injunctive relief against Defendants. 640 F. Supp. 3d at 684–85. So the judgment doesn't stop HHS from enforcing these Rules against Plaintiffs, including CMA's doctors. HHS has also appealed *Neese*, arguing that the class representatives lack standing. No. 23-10078 (5th Cir.). Argument was in January. And HHS makes no promise not to enforce the Rules as soon as it

14

wins that appeal; rather, it suggests the opposite. An ambiguous promise to not enforce the Rules against "the kind of gender identity discrimination addressed in that case," whatever that might entail, is thus no promise at all. And even if HHS refrains from "enforcement," the Rules still force CMA doctors to certify compliance starting July 5 or lose their funding—or their conscience. A stay is warranted.

## CONCLUSION

Plaintiffs are entitled to a stay or preliminary injunction. The Court should stay the challenged Rules as to Plaintiffs, including CMA and its Members, and enjoin Defendants from enforcing the assurance-of-compliance requirement until final judgment.

Respectfully submitted,

| | |
|---|---|
| ASHLEY MOODY<br>ATTORNEY GENERAL<br><br>JOHN GUARD<br>CHIEF DEPUTY ATTORNEY GENERAL<br>Florida Bar No. 374600<br><br>JAMES H. PERCIVAL<br>CHIEF OF STAFF<br>Florida Bar No. 1016188<br><br>HENRY C. WHITAKER<br>SOLICITOR GENERAL<br>Florida Bar No. 1031175<br><br>/S/ NATALIE P. CHRISTMAS<br>NATALIE P. CHRISTMAS*<br>SENIOR COUNSELOR<br>Florida Bar No. 1019180<br><br>Office of the Attorney General<br>The Capitol, Pl-01<br>Tallahassee, Florida 32399-1050<br>(850) 414-3300<br>(850) 410-2672 (fax)<br>Natalie.Christmas@myfloridalegal.com<br><br>*Lead Counsel<br>Counsel for the State of Florida | /S/ JAMES R. CONDE<br>R. TRENT MCCOTTER (*pro hac vice*)<br>JAMES R. CONDE (*pro hac vice*)*<br>Boyden Gray PLLC<br>801 17th St NW, Suite 350<br>Washington, DC 20006<br>(202) 706-5488<br>jconde@boydengray.com<br><br>*Lead Counsel<br>Counsel for Agency for Health Care Administration & Florida Department of Management Services<br><br>ANDREW T. SHEERAN<br>GENERAL COUNSEL<br>Florida Bar No. 0030599<br>Agency for Health Care Administration<br>2727 Mahan Drive, Mail Stop #3<br>Tallahassee, Florida 32308<br>(850) 412-3670<br>Andrew.Sheeran@ahca.myflorida.com<br><br>Counsel for Agency for Health Care Administration<br><br>KRISTEN LARSON<br>GENERAL COUNSEL<br>Florida Bar No. 124770<br>Florida Department of Management Services<br>4050 Esplanade Way<br>Tallahassee, Florida 32399<br>(850) 922-2137<br>Kristen.Larson@dms.fl.gov<br><br>Counsel for Florida Department of Management Services |

MATTHEW S. BOWMAN (*pro hac vice*)
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 (fax)
mbowman@ADFlegal.org

/S/ JULIE MARIE BLAKE
JULIE MARIE BLAKE (*pro hac vice*)*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
(571) 707-4790 (fax)
jblake@ADFlegal.org

DAVID A. CORTMAN
Florida Bar No. 18433
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 (fax)
dcortman@ADFlegal.org

ALLISON H. POPE (*pro hac vice*)
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
(571) 707-4790 (fax)
apope@ADFlegal.org


*Lead Counsel*
*Counsel for Plaintiff Catholic Medical Association*

17

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2024, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties who have registered with CM/ECF and filed an appearance in this action. I also sent a copy by email to the following U.S. Department of Justice attorney assigned to this matter:

Liam Holland
U.S. Department of Justice
Liam.C.Holland@usdoj.gov

                                          */s/ James R. Conde*
                                          James R. Conde