IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

**STATE OF FLORIDA,** *et al.*

                Plaintiffs,

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**, *et al.*

                Defendants.

Case No. 8:24-cv-01080-WFJ-TGW

**RESPONSE TO THE COURT'S EXHIBIT**

On June 21, 2024, the Court held a hearing on Plaintiffs' motion for a Stay or a Preliminary Injunction. ECF No. 37. At the hearing, the Court distributed an article titled "A systematic review of hormone treatment for children with gender dysphoria and recommendations for research" by Jonas F. Ludvigsson, *et al.*, published in the ACTA Pediatricia medical journal. ECF No. 38. The study concludes that a review of its selected 24 studies "suggests that long-term effects of hormone therapy on psychosocial and somatic health care are unknown, except that GnRHa treatment seems to delay bone maturation and gain in bone mineral density." *Id*. at 12. At the hearing, the Court indicated that it intended to refer to the article when balancing the equities and ordered "the parties to critique the Court's exhibit." ECF No. 37.

The Court should not rely on the exhibit as a basis for entry of a preliminary injunction for three reasons: (1) the study is not relevant to Plaintiffs' facial challenge to the Rule, (2) it is improper for the Court to compile its own record, (3) reliance on

1

one study among many in the field of gender-affirming care provision for minors to draw any conclusions without the benefit of expert testimony and normal adversary testing would be improper; and (4) the study, even if admitted, does not support the claim that an injunction against enforcement of any provision of the Rule is in the public interest.

I. **The Rule Does Not Require Any Medical Provider to Provide Hormone Treatment to Children with Gender Dysphoria if Doing So is Inconsistent with Medical Judgment.**

The exhibit is not relevant to Plaintiffs' facial challenge to the Rule because no provision of the Rule requires medical providers to take actions inconsistent with their medical judgment. Medical providers are expected to consider relevant studies in their field of practice when making treatment decisions, including when determining whether to provide hormone therapy to a child with gender dysphoria. And a court reviewing a hypothetical application of the Rule could consider any studies upon which the provider relied in assessing whether the provider had a legitimate nondiscriminatory justification for denying treatment. But no application of the Rule is at issue in this case.

Section 1557 provides that "an individual shall not . . . be denied the benefits of, or be subjected to discrimination under, any health program or activity" based on sex. 42 U.S.C. § 18116(a). Consistent with the statutory language, the Rule precludes denials of treatment or coverage that are based on unlawful animus or bias, or constitute a pretext for discrimination, while permitting denials that are based on legitimate nondiscriminatory reasons, such as medical judgment. 45 C.F.R.

§§ 92.206(c), 92.207(c). Insofar as the Court understands the Rule to require a clinician to provide a health service to an individual that is contrary to the clinician's medical judgment, the Court is mistaken. "There is no part of section 1557 that compels clinicians to provide a service that they do not believe is medically appropriate for a patient." 89 Fed. Reg. at 37,596. Moreover, HHS's Office for Civil Rights has a "general practice of deferring to a clinician's judgment about whether a particular service is medically appropriate for an individual," such as whether hormone treatment is medically appropriate for a child, and, in forming that judgment, a clinician may (and is expected to) rely on scientific literature. *See* 89 Fed. Reg. at 37,597.

Plaintiffs are challenging provisions of the Rule on their face in all of their applications; they are not challenging any application of any provision of the Rule to any of Florida's policies or to the policies of any Catholic Medical Association member. In the speculative hypothetical that HHS were to investigate a provider for alleged sex discrimination for failing to provide hormone therapy to a child with gender dysphoria, this study could be referenced by the provider in support of its assertion of a legitimate nondiscriminatory justification. Similarly, in the context of any related enforcement action, a court could consider this study and other evidence relating to the issue to determine whether the medical provider's decision was based on a legitimate nondiscrimination reason, as opposed to unlawful animus or a pretext for discrimination based on sex. *Cf. Dekker v. Weida*, 679 F. Supp. 3d 1271, 1294-95 (N.D. Fla. 2023) (considering "legitimate concerns about the effect on bone density"

3

in the context of a private lawsuit challenging an actual policy under Section 1557, not a challenge to the framework in §§ 92.206(c), 92.207(c)). But no such situation is before the Court.

At the facial challenge stage, when the Court "conclude[s] that a challenged regulatory provision does not exceed [the statute's] limits . . . [it] will uphold the provision and preserve the right of complainants to bring as-applied challenges against any alleged unlawful applications.'" *Nat'l Ass'n of Regulatory Utility Commissioners v. FERC*, 964 F.3d 1177, 1185 (D.C. Cir. 2020). It may be that "litigation will follow . . . but such is the nature of facial challenges." *Id*. at 1189.

## II. The Court's Compiling of Its Own Record is Inconsistent with Principles of Adversarial Presentment and the Court's Duty to Evaluate Whether Plaintiffs Have Satisfied their High Burden to Obtain Extraordinary Relief.

The adversarial nature of our justice system is premised on the parties' responsibility for raising their own claims and adducing their own evidence. The Court's *sua sponte* addition of this study to the record is inconsistent with those principles. Any decision to bypass those principles would be especially unwarranted here, given the extraordinary remedy that Plaintiffs seek.

"A preliminary injunction is a powerful exercise of judicial authority." *Ne. Fla. Chapter. Of Ass'n of General Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). It "is an extraordinary and drastic remedy not to be granted until *the movant* 'clearly carries the burden of persuasion as to the four prerequisites.'" *Id*. at 1285 (emphasis added) (quoting *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519

4

(11th Cir. 1983)). "A party seeking a preliminary injunction bears the burden of establishing its entitlement to relief." *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). Where the moving party "fails to make the requisite showing" on each factor, the motion must be denied. *Zardui-Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir. 1985).

Any decision by the Court to *sua sponte* supplement the record in response to any failure on Plaintiffs' part to make the requisite showing on the public interest factor would be inconsistent with those principles.

### III. Even if This Case Presented a Challenge to Application of the Rule to a Particular Policy or Practice—Which it Does Not—Reliance on the Study to Order Injunctive Relief Without the Benefit of Expert Testimony and Normal Adversary Testing Would be Improper.

This case presents a facial challenge to the Rule. It is not an opportunity for the Court to pre-judge whether any Florida or Catholic Medical Association member policy or practice related to gender-affirming care violates Section 1557 or is instead based on a legitimate nondiscriminatory reason, like medical evidence. But even if this case involved an application of the Rule, it would be inappropriate for the Court to rely on this study's conclusions without the benefit of expert adversarial testimony.

In another case in this circuit, the district court held a two-day evidentiary hearing on a motion by transgender minors and others seeking to enjoin a state policy banning certain medical procedures and therapies for minors experiencing gender dysphoria. Multiple experts testified including Dr. Meredithe McNamara, who testified at length regarding the flaws with *this* exact study. That expert—whose

5

testimony was assigned "significant weight" and deemed "to be highly credible" by the court, *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1351 n.27, 1353 n.31 (N.D. Ga. 2023)—testified that the study had the following flaws:

- The authors lacked subject matter expertise;
- The review attempted to cover too many topics within one systematic review;
- The search terms were bare, which could have excluded important studies; and
- The authors searched only a short time period ending years before the study was published, so it did not reflect the best available evidence.

*See* Exhibit 1 (Transcript of Preliminary Injunction Hearing at 82-84), *Koe v. Noggle*, No. 1:23-cv-02904-seg (N.D. Ga. Aug. 10, 2023).[1] She also testified that the type of clinical trial that the authors of the study recommended—randomized controlled trials—would be "highly unethical and impractical to conduct" to study the use of gender affirming care for minors. *Id.* at 80.

The point here is not to suggest that a medical provider could not rely on the study cited by the Court when determining whether to provide hormone therapy to a child with gender dysphoria; or to suggest that a court could not consider the study if and when the Rule is applied to determine whether a medical provider's decision to deny care was based on a legitimate nondiscrimination reason, as opposed to unlawful animus or a pretext for discrimination based on sex. But in this facial challenge to the

---

[1] Defendants understand based on the *Koe* court record that the "systematic review published in the Littman Study" that Dr. McNamara was asked about refers to the systematic review published by Ludvigsson, *et al.* that the Court has cited.

6

Rule, the Court should not rely on this study alone to determine where the public interest lies without a full review of the literature and the sort of adversarial process with expert testimony through which such evidence is normally admitted. The particular study at issue, at minimum, should not be considered without also considering the "weight of medical authority" that supports the provision of hormone therapy to treat transgender minors when deemed medically necessary by their healthcare provider, including authority from the "American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Psychiatric Association, and at least a dozen more." *Dekker*, 679 F. Supp. 3d at 1285.

## IV. The Study Provides No Basis for a Broad Preliminary Injunction.

If the Court nonetheless relies on this study in considering whether a preliminary injunction is in the public interest, Defendants respectfully submit that the study does not support broad injunctive relief, even if Plaintiffs could satisfy their burden on the other preliminary injunction factors (which they cannot).[2]

"'[A]n injunction must be narrowly tailored to remedy the specific harm shown.'" *Nebraska Dep't of Health & Human Servs. v. HHS*, 435 F.3d 326, 329-30 (D.C. Cir. 2006) (citation omitted). At the hearing on Plaintiffs' motion, the Court asserted

---

[2] "Failure to show any of the four factors is fatal[.]" *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade County Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (citation omitted).  Thus, a showing on the public interest prong does not eliminate the necessary showing on any of the other three factors.

7

that refusals to treat transgender individuals for ailments such as a sore throat or cancer because they present as a sex that differs from their sex assigned at birth are not at issue in this case. Thus, there is no basis for preliminarily enjoining enforcement of, for example, 45 C.F.R. § 92.101(a)(2)(iv), against Plaintiffs or CMA's members in all of its applications so as to preclude HHS from enforcing the Rule where a transgender person has been discriminated against in that manner. In the same way, the study cited by the Court provides no basis for the Court to enjoin HHS from investigating a complaint of sex discrimination where a covered entity denied a transgender adult's request for insurance coverage for hormone therapy or other gender-affirming care. 45 C.F.R. § 92.207(b)(5). Even if the study supported a limitation on provision of certain types of gender-affirming care to minors (which has not been established), it would not support such a limitation for adults. Thus, the study in no circumstance supports the kind of broad preliminary injunction that would typically correlate to Plaintiffs' facial Administrative Procedure Act challenge to several provisions of the Rule.

Dated: June 26, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE R. BENNETT
Assistant Director, Federal Programs Branch

*/s/ Liam C. Holland*
LIAM C. HOLLAND
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

8

                Washington, DC 20005
                Tel: (202) 514-4964
                Fax: (202) 616-8460
                Email: liam.c.holland@usdoj.gov

*Counsel for Defendants*