**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| STATE OF FLORIDA, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. |
| | ) |
| DEPARTMENT OF HEALTH and HUMAN | ) 8:24-cv-01080-WFJ-TGW |
| SERVICES, et al., | ) |
| | ) |
| Defendants. | ) |

_____

**MOTION HEARING**
**BEFORE THE HONORABLE WILLIAM F. JUNG**

**June 21, 2024**
**2:33 p.m.**

(Proceedings recorded by mechanical stenography, transcript produced by computer-assisted transcription.)

**REPORTED BY:**
SUSIE K. CAYLER, FCRR, RPR
Federal Official Court Reporter
(515)778-5008 | reportercayler@gmail.com
801 North Florida Avenue, Tampa, Florida 33602

**APPEARANCES**


**FOR PLAINTIFF**
**FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION:**

    JAMES R. CONDE
    R. TRENT MCCOTTER
    Boyden Gray PLLC
    800 17th Street NW, Suite 350
    Washington, DC 20006
    646.266.4011
    Jconde@boydengray.com
    Tmccotter@boydengray.com

**FOR PLAINTIFF STATE OF FLORIDA**

    NATALIE CHRISTMAS
    Florida Attorney General's Office
    PL-01 The Capitol
    Tallahassee, FL 32399
    850.414.3300
    Natalie.christmas@myfloridalegal.com

**FOR PLAINTIFF CATHOLIC MEDICAL ASSOCIATION:**

    ALLISON POPE
    Alliance Defending Freedom
    44180 Riverside Parkway
    Lansdowne, Virginia 20176
    571.707.4655
    Apope@adflegal.org


**FOR THE DEFENDANTS:**

    Liam Holland
    Department of Justice
    Federal Programs Branch
    1100 L Street NW
    Washington, DC 20530
    202.514.4964
    Liam.c.holland@usdoj.gov

~~~~~

(Open court.)

(Proceedings began at 2:33 p.m.)

THE COURT:  Good afternoon.  Let's call the case.

COURTROOM DEPUTY:  The Court calls
8:24-CV-1080-WFJ-TGW, State of Florida, et al., versus
Department of Health and Human Services, et al.

Counsel, if you can please state your appearance for
the record, starting with the plaintiffs.

MR. CONDE:  James Conde for the Agency for Health
Care Administration and the Department of Management Services.

MS. POPE:  Allison Pope for Catholic Medical
Association.

THE COURT:  Give me that last name again.

MS. POPE:  Pope, P-o-p-e.

THE COURT:  P-o-p-e, for the Catholic, that's good.
Okay.  I won't forget that one.

MS. CHRISTMAS:  Natalie Christmas for the State of
Florida.

THE COURT:  Thank you.

MR. MCCOTTER:  Trent McCotter also for the Florida
Agency, Your Honor.

THE COURT:  All right.  Thank you.

And for the defense.

MR. HOLLAND:  Liam Holland with the U.S. Department

of Justice for the defendants.

          THE COURT:  Thank you.

          So thank you, everybody.

          So I've read everything.  I've probably read 15
cases.  Of course, I've read the Fed reg, the Rule, and all
the -- whatever you want to call it, the preamble, the
comments, all that.

          I have not read, or not closely anyway, the --
whatever you want to call it, the predecessor, NPRM, the notice
of -- whatever you want to call, potential rule making, 87 Fed
reg.  I haven't read that.

          So we're here on the motion for preliminary
injunction.  I'm just going to put all this right here on the
shelf.  I'll pull some stuff out.

          So why don't -- the movants, let me hear from you,
and then we'll give you a little button-up rebuttal since you
have the burden.

          And then I think you noticed I put on the docket some
time ago to supply me with a draft order that you wanted.  I
put that deadline at close of business today, but that's fine
if you all want more time to do that.

          The one attached to your motion is a little thin,
Eleventh Circuit is going to want a little more than that.  So
it was a two pager.

          Okay.  Let's hear from the movants.

Couple thoughts for the plaintiff. In your comments -- and very informal courtroom. You can stand, you can do whatever you want, stay seated, anything you want. You just got to be around a mic, okay, because acoustics are bad and my ears aren't brand new, either.

So just in the plaintiffs' comments, at some point, just make a note to touch on a couple other questions I had, which I'm going to give you. I'm sure I'll have others.

So I didn't see a big difference -- whatever the word is -- mechanically, doctrinally, between just a flat-out preliminary injunction and a preliminary injunction with a stay. I know you kind of were pushing the stay piece. If there's a difference there, doctrinally, it seems like they're pretty much the same thing, you preliminarily enjoin something, it's certainly going to be stayed. Anyway, that's one sort of make a note.

And then what, if anything, do I consider or think about, or do I just completely ignore the NPRM, which is the 87 Fed Reg 47824?

Another one. Somebody please touch on this, Pope, maybe somebody else, your worthy opponent is arguing about your standing, and I guess there was that district court in Tennessee, I know it's maybe pending. But in any event, touch on the Catholic Medical Association's standing piece. I'm sure you were going to anyway.

And then I did not really get -- meaning understand or focus my attention on this -- if there's anything to it, I know the plaintiff mentioned it, this Social Security Act disparate, however you pronounce that -- disparate treatment concept item.

So touch on that. Just tell me -- you know, school me on that a little bit, and then we'll ask -- if it's anything significant we'll ask Mr. Holland.

All right. Movants, plaintiffs, you have the floor. So tell me what you want me to know.

MR. CONDE: We'll start with the question about a stay.

So I think the way that stay operates, in our view, at least, is that it operates as a form of interim vacatur. So it means that the Rule is not even in place.

So as a doctrinal matter, if, you know, the stay later gets lifted, people would not have violated the Rule in the past, so to speak, is the way we view that.

THE COURT: All right. But don't I have to make the same findings to do a --

MR. CONDE: The standard is absolutely the same. There's no difference.

THE COURT: So if I did a preliminary injunction, poof, you're enjoined. Okay. No one's going to be found guilty of violating that Rule while my injunction is extant,

right?

            MR. CONDE:  Right.  It's just if the injunction later
gets overturned.

            THE COURT:  All right.  So if it gets overturned,
then the Rule applies?

            MR. CONDE:  Right.

            THE COURT:  The stay gets overturned and the Rule
applies.

            MR. CONDE:  The reason is that we have to assure
compliance with Part 92.  And our view is, if we get the Rule
stayed when we're assuring compliance with Part 92, we're not
assuring compliance with the State portions of the Rule.
That's why we think a stay is the proper remedy here.

            THE COURT:  Okay.  All right.  Anyway, go ahead.

            MR. CONDE:  So I didn't catch the second question.  I
think you were asking about the NPRM?

            THE COURT:  Yeah.  Is there -- I mean, I think you've
cited it and, of course, it seemed like that was sort of the
thing.  I don't know legally what the word is that the agency
uses to get the ball rolling, to get the comments generated, to
kind of iron out the issues.

            Does it have any other significance, at this point,
now that we have a rule?

            MR. CONDE:  So I will say that the NPRM included
slightly different regulatory text in the relevant regulation,

and so what is now 92.206(c) included the following

sentence that said --

THE COURT:  Yeah, they tamped it down.

MR. CONDE:  Yeah.  So I believe that gender

transition is never appropriate or compliance with a state law

reflecting a similar judgment is not legitimate.

So they took that out in the Final Rule.  But HHS has

not disavowed that position at all.  It actually doubles down

on that position.  It emphasizes throughout the Final Rule that

only individualized denials of treatment or coverage --

(Reporter clarification.)

MR. CONDE:  -- individualized denials of coverage,

insurance coverage or treatment, will be viewed as legitimate.

They emphasize that repeatedly.

In fact, the only examples they give of when you're

not going to be liable is when you are not in the field of

practice at all that's relevant.  So you wouldn't even be

covered by the Rule to begin with.

THE COURT:  All right.  So on the point, then, you're

saying that the NPRM is a tell in the poker world, that what

they were thinking -- and although they may have changed that

money provision, or whatever the word is, to keep the bad

metaphor going, the discussions there, it shows their state of

mind?

MR. CONDE:  I think it does.  And they explain why

they delete it. And I'm going to give you the citation.
That's page 37,598 of the Final Rule.

And they explain that they deleted it because they
wanted to protect entities that believe in good faith they are
obligated to deny treatment by state or local law. And they
say, you can show that you had good faith if you demonstrate a
willingness to refer or provide accurate information about
gender affirming care.

And then they say, but don't worry, nevertheless,
generally -- the Rule will still generally preempt conflicting
state law reflecting the same judgment that they were trying to
cover in the proposed Rule.

So they haven't actually changed their position.

THE COURT: Give me the page site again. I have read
that probably twice, but give me the page.

MR. CONDE: Yeah. So the pincite it's 37,598.

THE COURT: 89 FR 37 -- what? 37 --

MR. CONDE: 37,598.

THE COURT: Okay. Go ahead.

MR. CONDE: So I think the other question was about
the merits of the social security.

THE COURT: Yeah. I didn't really -- I mean, there's
a lot to digest here. I didn't -- what do you understand that
the -- your opponent is saying there and what did you want me
to do? And just give me the road map of your -- when you

mentioned that.

MR. CONDE:  Right.

THE COURT:  What do you want me to do?  What's that about?  SSAP is about disparate impact.

MR. CONDE:  Right.

So that applies to State contracts with managed care entities.  And so it says in our contracts, if we want them to get approved by CMS and -- so they can get a federal payment participation, so they can get reimbursed, we have to include this breathtaking clause that includes a promise that they are not -- the managed care plans are not going to adopt any policy or practice that will have a disparate impact on gender identity.

THE COURT:  This comes from the SSA, according to the defendants.

MR. CONDE:  So they cite in propria statutes.  They cite 1557, which is not a disparate impact statute.  So that is it a nonstarter.  Then they cite several provisions of the Social Security Act dealing with methods of administration to make the plan more efficient.  But in context, I think it's very difficult to read that provision to justify a civil rights sort of obligation on contractors.

It's all about personnel and payments, all those sort of administrative tasks that you would expect would be in the Social Security Act.  Nothing like sort of landmark civil

rights guarantees.

THE COURT: All right. So that is the managed care piece where, let's see, in Florida that might be WellCare, if WellCare is still around, or --

MR. CONDE: Right.

THE COURT: -- those type of places.

All right. So you've touched on the points I had for you.

So tell me what's on your mind.

And the purpose of this is to take whatever time you-all need to make sure I don't miss any of your high points. And I assure you I've read everything.

So go ahead.

MR. CONDE: So I'll just say why we need emergency relief and why we think we're irreparably injured by this Rule.

So I've been on the phone with the general counsel for the Department of Management and Services this week. They don't know what to do come January 5th.

THE COURT: July 5th.

MR. CONDE: Sorry. July 5th.

They cannot sign an assurance of compliance because the State Employee Plan is at least arguably not compliant with the Rule. It essentially has a categorical restriction on any sex change drugs and procedures.

And if you actually look at the NPRM, there's a

footnote, footnote 460, where they list a bunch of plans that will be noncompliant with the Rule. And if you look at those plans, actually our restriction is no different from the restriction in those plans. So it seems pretty definite that they are going to take the view that our restriction is not lawful.

THE COURT: This would be for your employees for the --

MR. CONDE: Right.

THE COURT: -- whatever -- prison guards, or whoever?

MR. CONDE: Correct. Right. This is for -- yeah. All the Florida employees --

THE COURT: -- employee -- custodians at the state capitol, et cetera?

MR. CONDE: Yeah, and their dependents.

So also, the Department of Management Service cannot change the plan without prior approval from the Florida legislature, which has already made clear that it's not going to use funds for this.

So it really -- without a stay, they are not going to be able to assure compliance, and they stand to risk all their federal funding.

And then we have the Agency For Healthcare Administration. They're in a similar situation. They have a policy that says they cannot use any Medicaid or CHIP funds to

pay for these drugs and procedures.

          And the Department of Justice, in a brief signed by
the Assistant Attorney General has already said this Rule
violates -- this State Rule violates their Final Rule.

          So we're in a similar situation.  We cannot --

          THE COURT:  Where did he say that?

          MR. CONDE:  So this is in a footnote of the amicus
brief they filed in the *Dekker* case.

          THE COURT:  Oh, okay.

          MR. CONDE:  Yeah.  They say the -- they reference the
State Rule and they say, this will violate our proposed and
soon-to-be Final Rule.  So it's cited in our briefs.

          And then we have another agency that we've included
an affidavit for, the Agency For Persons With Disabilities has
a policy of separating dual-occupancy rooms by sex, regardless
of gender identity.  This policy is actually required by State
law, so they cannot assure compliance.  And this policy clearly
violates the rule, HHS says so expressly.

          So that's -- I'm going to give you another cite.  The
Final Rule.  37,593, it says:  A current entity will be in
violation of this rule if they refuse to admit a transgender
person for care or refuse to place them in facilities
consistent with their gender identity because doing so will
result in more than --

          THE COURT:  And that's in the preamble --

MR. CONDE:  That's in the preamble, correct.

THE COURT:  -- that Mr. Holland --

MR. CONDE:  Yeah.

THE COURT:  -- sort of sought to discount in a footnote?

MR. CONDE:  Right.

But -- so the concept of de minimis harm is -- you know, there's case law for that, and the concept is clearly right.  It includes dignitary and emotional harm.  So it's not an incorrect statement.  It's a correct statement of what the Rule does.

So the other theory of irreparable harm that we're pressing, the sovereign injuries from preemption and coercion, I know that there's been a lot of case citations about that.  And I'm happy to address any of those cases -- the *Doe* case or the *Dekker* case -- if Your Honor has questions.

But I think on this --

THE COURT:  By *Doe*, you mean *Lapado* (sic)?

MR. CONDE:  That case, exactly.

THE COURT:  I've read that.  Okay.

MR. CONDE:  So the *Dekker* case, I think we explain -- I'm happy to address that if you want right now.  The *Dekker* case addresses the healthcare spending rules that Florida has.

It essentially grants declaratory relief and injunction to three plaintiffs.  But Florida's position is that

it can still enforce the Medicaid rule because it is not a categorical ban within the meaning of the declaratory judgment.

So ACA is still enforcing that rule, so we still have a sovereign interest in defending the viability of that rule.

And as far as the *Doe* case -- I'm going to call it -- that case only applies to hormones, puberty blockers.  It doesn't apply to all the surgeries that are prohibited under Florida law.  So we still have a sovereign interest in defending that.

I think the recent *Tennessee* case in the Sixth Circuit is pretty persuasive on the injury, irreparable harm from the risk of preemption and coercion.

THE COURT:  Now which one is that?  Is that the district court case or the -- give me a cite on that, because I --

MR. CONDE:  So this is the --

THE COURT:  -- don't have it here.

MR. CONDE:  It was just published a few days ago.  We cited it in our reply brief.

THE COURT:  Right.  Doesn't that deal with Title IX in the education setting?

MR. CONDE:  Correct.

THE COURT:  Okay.  Yeah, I've read that.

MR. CONDE:  Yeah, yeah.  That's the opinion by Judge Nalbandian.

THE COURT:  Yeah, which came from the one that has a very stark opening by the district judge about sex.

MR. CONDE:  Yeah.  I don't think I remember the district court opinion.

THE COURT:  Yeah, okay.

MR. CONDE:  So -- yeah.  I mean, I think our case is actually stronger than the *Tennessee* case, because here we have an actual final rule that DOJ says on page 27 of its brief Florida has to comply with.  In that case they were dealing with guidance.

THE COURT:  Brief in *Dekker?*

MR. CONDE:  No.  In this case, it says Florida has to comply with the Rule.

THE COURT:  Sure.  I mean, that's why we're here.

MR. CONDE:  Right.

THE COURT:  Right.

MR. CONDE:  And if you read the page I cited, page 37,598, DOJ is claiming that this Rule as obstacle preempts any rule -- any conflicting state rule that sort of poses an obstacle to the procedures and drugs it wants to advance in this Rule.

So it is asserting the most sweeping form of preemption other than field preemption in the Rule itself -- in the preamble itself, of course, but it's asserting that.

So we think we also have that injury from preemption.

And the last theory of irreparable harm is compliance costs.

So we have affidavits here that are undisputed that show that we're going to incur heavy compliance costs. The Rule itself says that we're going to incur heavy compliance costs. The federal government has sovereign immunity. And the Eleventh Circuit case law actually recognizes that compliance costs can be a source of irreparable harm.

So the cite I would give for that is the opinion of Judge Grant in *Georgia versus Biden*, 46 F.4th 1283, page 1302. She's actually citing Eleventh Circuit case law recognizing that.

So there's a lot in the Department of Justice's brief that talks about how it's not clear that, you know, we haven't sort of said that our rules are unlawful and sort of surrendered ourselves to the government, so it's not clear that our rules violate the Department's Rule, and so our challenge is not ripe.

I think the case that controls here is *West Virginia versus Department of Treasury*. And the standard it sets there for pre-enforcement challenges is that the plaintiffs only need to show that the rule arguably prescribes conduct and that there's a credible threat of enforcement. I think we satisfy that standard here.

So there's a lot of preclusion arguments that have

been raised.  I'm happy to address those if the Court has any questions.

If there's any other questions that Your Honor has in mind, I'm happy to deal with that.

THE COURT:  No.  I mean, before you-all tender the floor to Mr. Holland, obviously someone needs to talk about the Catholic Med. Association standing.

But I don't have any particular questions for you that I didn't already posit.

MR. CONDE:  Okay.  Well, I'm happy to cede the floor.

THE COURT:  All right.  What says Ms. Pope about standing?

Didn't *Tennessee* -- didn't they say you didn't have standing?

MS. POPE:  So that was a district court in Tennessee, but that was to separate rules.  So those were prior rules. This wasn't about the 2024 rule.  Both parties conceded at the Sixth Circuit that that case has been mooted.  So that really isn't -- doesn't control us here.

THE COURT:  And they also said that you were splitting your cause of action.

So does the CMA have a current pending lawsuit against this Rule anywhere other than here?

MS. POPE:  No, Your Honor.

THE COURT:  Okay.  What else?

MS. POPE:  We know it's black letter law that government regulations that require or forbid some action by a plaintiff almost invariably satisfy the injury and fact and causation requirements.

This 2024 Rule directly regulates CMA members, causes them to do certain things, say certain things, or not do certain things.  So standing is pretty easy to establish.

THE COURT:  That's succinctly put.

What else does the plaintiffs' side have for me?  I'm not suggesting you do or don't, but I'm all ears.

MR. CONDE:  Well, I'm happy to talk about the merits.

THE COURT:  As you wish.  I've read everything.  I want you to make sure you highlight anything you want to make sure I don't miss.

MR. CONDE:  Sure.  So I would just highlight in *Adams* opinion footnote 7, which I think directly rejects the government's theory.

The entire equation of on the basis of sex, on the basis of gender identity, is based on the but for cause reasoning --

(Reporter interruption.)

MR. CONDE:  The but for cause reasoning of the Supreme Court's opinion in *Clayton* -- *Bostock versus Clayton County*.

THE COURT:  Spell *Bostock*.

MR. CONDE:  B-o-s-t-o-c-k.

THE COURT:  All right.

MR. CONDE:  And so the footnote says:  Nevertheless, the dissent using *Bostock* argues that sex was a but for cause of the discrimination Adams experienced, which the dissent argues violates Title IX.  And then it says:  This argument is of no avail.

And then they go on to explain why this theory -- applying this sort of *Bostock* logic to Title IX would not make sense in the context of Title IX.

So I think that the very premise of the rule we're challenging here was directly in violation of *Adams*.  And I think on the merits that should sort of settle our likelihood of success.

I'm happy to cede the floor to the government now.

THE COURT:  All right.  Mr. Holland, couple questions --

Thank you, both of you.

Mr. Holland, I appreciate very much the very high level of lawyering on both sides, including the plaintiff and the defense.  So thank you.

You know, just a thought or two, Mr. Holland -- and I thought your pleadings were superb.  I will say that you had a straw man or two in there.

We aren't -- we are not here, and it's not going to

happen -- let's pick St. Joe's Hospital. I'm assuming it's run by the Roman Catholics. I think it's also run by the Baptists.

Okay. It's just not going to happen that a -- let's say, a trans man -- which we'll get all our nomenclature straight -- which is a natal female that is expressing a male identity, a trans man, goes in there with a broken leg. That's just not going to happen, they're not going to treat that person.

I understand the Rule would prohibit that, but that's -- or as you say, a sore throat. That's just not going to happen. Okay? They're going to treat that broken leg every single time, if that person -- whether they're a gender transsexual or questioning or anything else.

And the other one, where the government suggests that they would -- they will treat the broken -- it prohibits treating the broken bone of a cisgender man, but they wouldn't treat it of a transgender man. That's just not what we're talking about.

Same thing, if we have a trans female, meaning a natal male, who is expressing a female gender, and goes to Tampa General or St. Joe's Hospital, and has testicular cancer, they're not going to say get out of here with your cancer, because you're -- that's not what we're talking about.

So let me ask you a couple questions apropos to what I asked the plaintiff, Mr. Holland.

So do I just ignore the NPRM?  It's like, you know, just starter -- I mean, you know, to some extent is it just food for thought to get the process running, or does it have some relevance to why we're here today?

MR. HOLLAND:  You want me to respond right now?  I thought you were going to list them.

THE COURT:  No.  I'll list them.

MR. HOLLAND:  Okay.

THE COURT:  I'll list them.

MR. HOLLAND:  Okay.  Sorry.

THE COURT:  So same thing.  Is there any difference practically between a PI and a PI/stay?

And then what about the NPRM?  Is there any real significance to that or --

And then, of course, at some point you might touch on CMA standing.

And the same thing -- the other query I had about the SSA and the disparate treatment.  I just didn't -- I think I understand it now, relates to those managed care contracts.

So anyway, those are the preliminary questions for you.

MR. HOLLAND:  Yeah.  Well, can I respond first to your initial comment, if I may?

THE COURT:  Sure.  Any way you want to talk.

MR. HOLLAND:  So I understand that the plaintiffs are

not here because -- you know, they're stating that they're not
going to treat someone's broken bone or they're not going to
treat someone's sore throat.  They want to come here, and
they're worried about specific hypothetical applications of
these very high-level rules.

But the problem with that, Your Honor, I mean, if you
look at the Rule, right, where, for example, gender identity
discrimination is listed, it's among one of the other types of
discrimination that's prohibited by Section 1557, like race
discrimination, for example.

THE COURT:  We're not in 1557.  Why do you say that?
Where's that -- why do you say that?  Because you're going to
put it in with *Bostock*; right?

MR. HOLLAND:  So Section --

THE COURT:  Where in 1557 does it say that?  We both
know it doesn't.  It says "sex."  You want me to read it to
you?

MR. HOLLAND:  Correct, Your Honor.  It does say
"sex."

But just like it says -- but the point is here,
Your Honor, that it also says "race."  It says "national
origin."

THE COURT:  Right.

MR. HOLLAND:  And they're not here suggesting that
they're going to treat --

THE COURT: We're talking about sex. We're talking about sex.

MR. HOLLAND: But that's the manner in which -- at this level of generality, Your Honor, if Your Honor were to issue an injunction that says -- that says, you may not -- that HHS may not enforce this statute in all circumstances -- like if it may not enforce Section 92.101(a)(2)(iv), which is that provision, it means that even if -- sorry. Go ahead.

THE COURT: Go ahead. No. Go ahead.

MR. HOLLAND: Even if the reason that the covered entity discriminated, if it was on the basis of a sex stereotyping theory or if it was on the basis of sex, you know, even if the theory was exactly the same, we would not be able to enforce that. Just because that person is transgender ultimately, and because you could characterize that as gender identity discrimination, that would be the import of the type of broad injunction against a facial challenge to that provision.

And so I think the Court needs to focus on, like, the specific aspects of the rule. If what they're worried about are particular applications, they need to get an agency action that's tailored to those particular applications.

THE COURT: You mentioned 1557. So we both agree it doesn't say anything in there about gender identity; right?

MR. HOLLAND: It prohibits discrimination on the

basis of sex.

THE COURT:  Right.  It doesn't say anything about sex -- we got to keep our nomenclature straight -- gender identity.  Gender expression is not in 1557; correct?

MR. HOLLAND:  It prohibits discrimination on the basis of sex, which includes discrimination on the basis of sex-related traits, which is the same thing as gender identity discrimination.

THE COURT:  So that last part -- of course, what you just said is not in the text.  Where do you get that in there?  Where does that come from?  Where does sex -- the issue is gender identity, whether we're going to require the State of Florida and all the people to, for the first time -- because the rule was different two years ago -- to create these rights based on gender identity.

So how does it get into 1557?  By what mechanism?

MR. HOLLAND:  1558 discriminates -- prohibits discrimination on the basis of sex.

THE COURT:  Right.

MR. HOLLAND:  As the Supreme Court explains in *Bostock* --

THE COURT:  *Bostock*.  Okay.  Just say that.  I mean, you said it on the second page of your -- on the second page of your pleading.

So -- okay.  So *Bostock* is what gets it in there.

And this all changed after Bostock; right?

   MR. HOLLAND:  No, Your Honor.

   THE COURT:  It didn't?  Yes, it did.

   MR. HOLLAND:  No, it didn't.

   THE COURT:  The Rule came out, what, after *Bostock,* didn't it?

   MR. HOLLAND:  No, Your Honor.  This rule came out after *Bostock*, but let me -- let's go -- if Your Honor wants to go through the history, I'm happy to do that.

   The first Rule came out -- under this section in 2016.  That rule prohibited discrimination --

  (Reporter clarification.)

   MR. HOLLAND:  I'm sorry.

   That rule did prohibit discrimination on the basis of gender identity, because it's effectively a sex stereotyping theory.  You're treating someone differently because of their sex traits.  It's no different than if you treat someone differently because of their sex traits.  They're not presenting the way that you would expect them to, based on their biological sex as Florida presents it.  That's a sex stereotyping theory.

   In 2020, DOJ took the position in *Bostock* that Title VII did not cover sexual orientation or gender identity discrimination.

   At that time, in the Trump administration, there was

another rule making.  In that rule making, the government --
DHS took the position that Title VII is the same exact
statutory language -- or essentially the same statutory
language as is present in 1557.  And there's case law that
we've cited in our brief, and there's more I could provide you
about how courts consistently construe the language in
Title VII and related civil rights statutes the same.

          THE COURT:  Except in *Adams*.

          MR. HOLLAND:  I can get to *Adams*.  But let me -- I'll
just -- if I can finish the history.

          So the Department of Justice suggesting that however
*Bostock* turns out would govern here, took the word "sexual
orientation" and "gender identity discrimination" out of the
Rule in 2020.  But the position all along had been, however the
Supreme Court comes out in *Bostock* would govern, because the
language is essentially the same.  And the position of the
government at the time was, removing those words from the
regulation has no impact because sex discrimination inherently
includes gender identity discrimination because it's eventually
a sex stereotyping sex-related traits theory.

          THE COURT:  And that's in the 2020 Rule?

          MR. HOLLAND:  It's in the 2020 Rule.  And the
briefing in courts -- I actually think a really interesting
opinion to read, Your Honor, is Judge Robart's opinion.  I
think it's the only correct opinion from all the 2020 Rule

changes.  I shouldn't say that.

But it's *Washington v. HHS*, and it's an opinion from the Western District of Washington from August 2020.  And the states made a big hula about removing those words from the regulation.  And he said, look, if *Bostock* is correctly decided, then this will also cover gender identity and sexual orientation discrimination, whether or not those words are in the regulation or not.

THE COURT:  Plainly they aren't, they weren't.

MR. HOLLAND:  I'm sorry, Your Honor?

THE COURT:  All right.  Go ahead.

MR. HOLLAND:  It's true that Congress did not explicitly put those words in there.  And I know -- you know, I can only tell you what the Supreme Court said in *Bostock*, which is, again, that we have to cover the language that Congress used.  And even if there's unintended consequences because of that language, it's really the text that governs.

THE COURT:  You don't think Title VII is different from Title IX?  Because where we are here is Title IX.  This is -- the authority in 1557 is Title IX, not Title VII; correct?

MR. HOLLAND:  That's correct.  Although, I --

THE COURT:  So is it --

MR. HOLLAND:  I'm just -- sorry.

THE COURT:  Is it any different that it's Title IX,

where we are now, rather than *Bostock*, which was Title VII?

      MR. HOLLAND:  Yes.  Although, you know, I'm not confident that there's any provision of this Rule that gets into this problem.

      But I will say, what Section 1557 does, it only incorporates the grounds prohibited under Title IX and the enforcement mechanisms provided under Title IX.  It doesn't reference any other part of Title IX other than those two things.

      So my understanding of that is that really just refers to sex discrimination, and then the separate sentence of the statute, an entire sentence refers to the enforcement mechanisms, which we understand to be, you know, what we described at length in our briefing about how this would hypothetically be enforced administratively as well as the judicial review proceedings.  It does not refer to other sections of Title IX.

      Plaintiffs, I think, refer to a Northern District of Texas case, which refer to the et cetera part of the statute in order to incorporate the rest --

      THE COURT:  The sex, yeah.

      MR. HOLLAND:  Sorry if I said that wrong.

      THE COURT:  That's all right.

      MR. HOLLAND:  The problem with that approach is it would render the entire second sentence of the paragraph

surplusage.  And the Court's required --

        THE COURT:  I'm sorry.  Of the paragraph in 1557?

        MR. HOLLAND:  Exactly.  The statute itself has --
this is a very short statute.  So to read an entire sentence to
mean nothing I think would be very weird and inappropriate.  I
think that's the wrong word.  But it certainly doesn't seem
like the best way to read a statute.

        But there would have been no reason for Congress to
have specifically said in an entire sentence, the enforcement
mechanisms provided for and available under such Title VI,
Title IX, Section 794, et cetera.  There would have been no
reason for Congress to do that if it already had just done that
by saying "et cetera."

        So I think the best reading of that is that grounds
prohibited under each one is, race, national origin, sex, age,
disability.  And separately the enforcement mechanisms refer to
the administrative proceedings, the prior right of action, as
well as the judicial review proceedings for the enforcement
mechanisms.

        But that all being said, Your Honor, I really don't
think any of these issues are at issue in the Rule.

        I guess to move on to your point about the NPRM.  And
relatedly, all of this preamble -- everything I heard my friend
talk about are just responses to comments in the preamble, and
yet aren't bringing an arbitrary and capricious challenge in

their motion, which is where the Court may look at those things to determine --

THE COURT: But I do have to -- I agree. But I do have to decide whether any injunction would be in the public interest. So that kind of ties it in a little bit. Don't I?

That's one of the four things -- for regs, I think.

MR. HOLLAND: May I ask you to elaborate on what you mean by that? I don't know if I follow.

THE COURT: I thought that one of the four requirements in the Eleventh Circuit for a preliminary injunction is that the injunction is in the public interest.

MR. HOLLAND: That's true.

THE COURT: It seems to tie into, you know, quite a bit of this medical stuff.

MR. HOLLAND: Okay. That's fair enough, Your Honor.

But in terms of -- yeah. I think the Court can consider the record, I think, in balancing the equities that's before the Court.

But in terms of the plaintiffs' substantial claim and likelihood of success on the merits, at least at this stage, they haven't raised an arbitrary and capricious claim.

So the NPRM is what the agency had proposed. Of course, you would hope that the agency listens to commenters, evaluates their concerns, listens to their concerns, and then writes a new rule in response to all of those concerns.

That's what the agency did here. They relied extensively on the NPRM, maybe because they just followed the day that the Rule was published, I don't know. But the Rule doesn't say what the NPRM says.

And also, on the contrary to law claim, the Court's only role here, I think here, Your Honor, is to compare the text of the regulation with the statute and ask whether each one of those provisions is invalid on its face in all of its applications.

THE COURT: All right. Am I guided by *Adams?* Let's talk *Adams* for a minute.

MR. HOLLAND: Okay.

THE COURT: Let me ask you this, Mr. Holland: If I find -- and I've read *Adams* twice, or parts of it more than that. If I find that *Adams* holds that gender identity is not a concept protected by Title IX, then -- if I find that, I know you would disagree with that vociferously -- then they've satisfied, likely, to -- likelihood of success on the merits, haven't they?

MR. HOLLAND: I think so. Although, I'm struggling to understand what you mean by that.

THE COURT: All right. I've read *Adams*. *Adams* is -- okay.

You can't align -- you agree with me that when the Eleventh Circuit -- we have to follow their law?

MR. HOLLAND: Yes.

THE COURT: If we don't, we get in big trouble.

MR. HOLLAND: Yeah.

THE COURT: *Adams* pretty much says, don't tell us anything about gender identity when we're talking Title IX. Pretty much. I mean, they go on and on and cite six or eight dictionaries what the word "sex" meant at the time Title IX was written. It meant boy and girl, male and female, it did not mean gender identity. They say that.

And so you have to basically say, well, that just deals with school bathrooms, Judge, and they didn't mean that for everything related to Title IX.

MR. HOLLAND: Well, Your Honor, I just want to pause and say for a second that the Rule does not -- is not based on the conclusion that sex is gender identity. That's not what the Rule is based on.

The reason why gender identity discrimination is prohibited is because, let's say, for example -- and I know you think this isn't a reality, but this is what the Rule --

THE COURT: Don't give me a straw man. Let's pick another one.

You understand -- maybe you don't, but I do -- that burn victims, especially catastrophically, are often prescribed testosterone as they're just -- you know, they're just bad burn victims. They give androgenic steroids to -- they give

testosterone to treat burn victims.

And they also -- let's say our hypothetical hospital gives old guys who have low T, you know, because that's what happens when you get old, supplements for -- I don't know what the word is, hypergonadism, or hypo, I don't know.  I'm sure there's hospitals that do that.

So this burn victim gets the testosterone as his treatment from the burn.  His sister just moved to town -- or lives here and says, I would like to be considered to trans -- to change my gender identity with your department of endocrinology hospital with testosterone treatment, because that's what is often done when I'm transitioning, when natal females are transitioning to males.  And the hospital says we don't prescribe testosterone for sex change or for gender transition, sorry.  Okay.

They're clearly in violation of the Rule, are they not?

MR. HOLLAND:  No.

THE COURT:  Why?

MR. HOLLAND:  Because it depends on their reason.

THE COURT:  No.  Their reason is that it's off label and we -- all right.  I'll give you the reason.

We don't do gender transitions here.  We don't believe that they're appropriate.  And we're not going to address you or open a chart.  We're not interested.  We don't

do off-label drugs in our hospital and, therefore, we're sorry
we don't -- we're not going to consider you as a patient.

I mean, they're in violation; right?  It was a
policy.  It wasn't because of her particular workup or
anything, we just don't do it.

MR. HOLLAND:  And I think an article -- under the
Rule, an Article III judge would eventually determine whether
or not that statement --

THE COURT:  Well, I just stated the facts.  Under
these facts, it's plainly in violation of the Rule; right?

MR. HOLLAND:  No, Your Honor.  It depends on whether
that's a legitimate nondiscriminatory reason.

THE COURT:  No.  The reason is, we don't -- we don't
do -- our hospital does not do off-label drugs and we don't do
gender transitions.  Okay?  We don't think they're appropriate.
Go elsewhere.  That violates the rule; right?

MR. HOLLAND:  Okay.  So --

THE COURT:  I mean, does it or doesn't it?

MR. HOLLAND:  The Rule's provisions on this are at
Section 92.207.

THE COURT:  Right.

MR. HOLLAND:  Okay.  There's a number of ways that
are consistent with the plain language of the statute in which
somebody can raise an inference of potential discrimination,
but that does not decide that anyone has discriminated.

The real substance of that provision is in Subsection C, which is nothing in this section requires --

Oh, I'm sorry.  I'm sorry.

Nothing in this section requires coverage of any health service where the covered entity has a legitimate nondiscriminatory reason for denying or limiting coverage of the health service, or determining that such health service fails to meet applicable coverage requirements, including reasonable medical management techniques, such as medical necessity requirements.  But those are just including, it's not limited to that.

And here's the real thrust of it:  Such coverage denial or limitation must not be based on unlawful animus or bias or constitute a pretext for discrimination.

I think the good case on this, Your Honor, is *Ecknes-Tucker*, which the plaintiffs rely on; right?  *Ecknes-Tucker* provides the correct rule statement, which is exactly what the Rule says.  So the actual language from *Ecknes-Tucker* is:  By the same token, the regulation or course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for individual discrimination against individuals.

That's the language --

THE COURT:  Back to my --

MR. HOLLAND: That's the language --

THE COURT: Back to my hypo.

They're in violation of the Rule. They're not treating transgender patients because we don't believe in it, it requires off-label prescriptions. You'll have to leave now, ma'am. They're in violation of the Rule, aren't they?

Aren't you going to force them to at least consider working this lady up to see if she -- I'm sorry -- the natal female transitioning to see if she is an appropriate candidate for testosterone treatment? You're going to force them to do that, aren't you?

MR. HOLLAND: No -- I -- my understanding is, Your Honor, is that person -- or any person can call OCR and claim that they've been discriminated against.

THE COURT: Right.

MR. HOLLAND: And then OCR would evaluate whether it thinks the --

THE COURT: Right.

MR. HOLLAND: -- official legitimate --

THE COURT: So you can't tell me this hypothetical -- whether those facts violate the Rule? It's not enough?

MR. HOLLAND: Because I need -- there's no agency action at issue. The rule is set because of these issues, Your Honor. Because this is very controversial, the Rule is set at a level of generality that provides --

THE COURT:  Right.

MR. HOLLAND:  -- for balancing that's decided ultimately by an Article III judge.

THE COURT:  Well, maybe.

MR. HOLLAND:  And they may find differently in different circuits.

(Reporter clarification.)

THE COURT:  All right.  Here's another question.  Same hypo, similar.

Male has testicular cancer and the hospital -- you know, whatever the word -- I never -- I'm afraid to mispronounce this -- does a orchiectomy.  All right.

His cousin shows up and says, I'm transitioning and I want you to -- your general surgeon, the same one that did my cousin, I want you to examine me to see whether the orchiectomy is appropriate for my transitioning to the female gender.  And the hospital says, we don't remove healthy tissue.  No.  Okay?

We are not removing -- we don't think it's appropriate for anyone to do that.  You'll have to leave now.  We're not going to work up a chart for you.  We don't remove people's testicles when they're -- when the testicle is not diseased.

I mean, aren't they in violation of your Rule?

MR. HOLLAND:  To be clear, the provider questions are actually covered by 92.206(c), but effectually it has the same

language.

       But again, the question in those circumstances would be for an Article III judge to determine --

       THE COURT:  So you can't answer on those facts?

       MR. HOLLAND:  A judicial review --

       THE COURT:  It sounds like they're discriminating against gender identity.  We're not doing orchiectomies for gender identity.

       Let's see, I want to make sure I get this speech right.  Ma'am, transitioning natal male into female, we are not -- Nope.  We don't do them.  We don't remove healthy tissue.  We do not do orchiectomies for gender transition, very sorry.

       They're plainly in violation of your Rule, aren't they?  Because they already did for the guy with cancer.

       MR. HOLLAND:  The rule applies the same standard that I just described from *Ecknes-Tucker.*  That's what the rule provides.

       THE COURT:  So you can't tell me -- so they are or they aren't or you don't know?

       MR. HOLLAND:  The Rule just provides a standard and a framework that's consistent with *McDonnell Douglas,* and that's what we're here to defend.  There's no particular agency action at issue in this case.  There's no particularized application of that standard --

THE COURT:  Other than you're going to make them agree to this by starting to affirm and making affirmative statements and have training and have a coordinator to do all this -- a three -- starting the fifth -- hold on.  Let's just read the Rule then.  Just let me get to it.  Sorry.  I'm not the most organized, people have said.

So this hypothetical -- this hypothetical hospital that said, we don't do orchiectomies for gender transition, okay, by definition, putting aside the holistic scope of the gender dysphoria, the organ is healthy.

Okay.  So they are actually denying or limiting, are they not, based upon gender identity, meaning desired gender identity?  And their denial has the effect of excluding individuals from participating in or denying them benefits, otherwise subjecting them to discrimination on the basis of sex.

In other words, the thing is provided for someone with cancer, but not with someone with gender dysphoria.  They're in plain violation, aren't they?

MR. HOLLAND:  But you can read that consistently with (c).  You cannot ignore (c).

THE COURT:  (c) says -- help me out, where is (c)?

Okay.  Nothing in this section requires any health service where it has a legitimate nondiscriminatory reason.

So I guess the question is whether their refusal,

their blanket refusal, you're saying, to handle surgery for gender transition is legitimate, and then someone's got to find that.

MR. HOLLAND:  And specifically, like the next sentence, such coverage denial or limitation must not be based on unlawful animus or bias --

THE COURT:  Right.

MR. HOLLAND:  -- or constitute a pretext for discrimination, which is the same language as --

THE COURT:  So then we have a trial on every one of these; right?  Because the hospital is going to say, we just don't do it.  We don't believe it's correct.  Put aside -- well, this will be a city hospital.

Put aside the religious piece, we just don't do it. We -- as a matter of principle, we're not going to do it.  We don't believe in it.  It's a healthy organ.  We don't remove healthy organs.  We don't prescribe things off label.

So then every one of these is going to be a lawsuit?

MR. HOLLAND:  Well, if it's a principle that's a conscience-based principle, then it's probably protected under other provisions of --

THE COURT:  I'm not talking about religion.  They just don't do it.  We don't -- we don't remove healthy organs, period.  And we're sorry.

MR. HOLLAND:  They do it with no reason?  If they do

it with no reason --

THE COURT:  In their medical judgment, that the Hippocratic Oath -- I think the first line says, first do no harm.  And they view the removal of healthy organs from an otherwise physically health body as doing harm.

MR. HOLLAND:  Medical judgments, Your Honor, are a quintessential legitimate nondiscriminatory reasons.

THE COURT:  All right.  Let me give you another hypo.

So -- okay.  Now, I've never been to an AA meeting, but I have a friend, a college buddy of mine, that I sat through a football game with and he's telling me all about his AA for the whole game.  I think it's part of the therapy, or whatever you want to call it.  It wasn't what I was expecting, but, okay.  The game wasn't that good, so he goes on.

So, you know, they have AA meetings, female only. Okay.  There's a lot of good reasons for that.  Okay.  Female alcoholism is different than male.  Just probably some female alcoholism is due to stuff that, you know, men have done to these women.  Who knows.  You know, there's a lot of reasons why they would have a female-only AA meeting.  A lot of vulnerability is shown in these things.

But your Rule would -- so a gender dysphoric, or a trans male can only be excluded from a female AA meeting, assuming a provider does it -- and Tampa General I'm sure has AA meetings, I know a lot of clinics do.  If the exclusion

would not cause de minimis harm to that person, right -- so they can't just say, you know what, no guys are going to the female AA meeting.  And if it caused more than de minimis harm they'd have to let that transitioning person in, notwithstanding how far they've gone on their gender identity journey; right?

        MR. HOLLAND:  I think it would depend -- the Rule creates the de minimis harm standard --

        THE COURT:  Right.

        MR. HOLLAND:  -- which derives from cases like *Burlington Northern, Oncale* --

        THE COURT:  Right.

        MR. HOLLAND:  -- and *Muldrow*.  It really sets forth the standard.

        THE COURT:  So we have to let him in if it causes him de minimis -- I'm sorry.

        MR. HOLLAND:  It could cause -- so the Rule doesn't resolve when there's conflicting harm interests.  Right.  The Rule doesn't actually resolve --

        THE COURT:  It only talks about the transition -- the gender identity person.

        MR. HOLLAND:  No.

        THE COURT:  It talks about -- what does it say --

        MR. HOLLAND:  No, Your Honor.

        THE COURT:  All right.  What does it say about the

females --

        MR. HOLLAND:  The thing about de minimis harm is not specific to gender identity individuals.  It applies also to any kind of -- so let's say an AA club only -- and this is an odd example because it's not health care, but we'll go with it.

        I mean, if the AA club only had a female meeting but had no services for men, and that provided men more than de minimis harm, that's also the standard.  It's the standard from the case law, *Burlington Northern, Oncale.*  That's where it comes from.

        THE COURT:  All right.  So we have to let this transitioning male into the female AA meeting if failure to do so causes him more than de minimis harm?

        MR. HOLLAND:  If it causes him more than de minimis harm and there's no other countervailing interests, I believe that that could potentially be true, yes.

        THE COURT:  All right.  And are the countervailing interests listed in the Rule?

        MR. HOLLAND:  So because the Rule just says more than de minimis harm, it doesn't resolve what happens when there's more than de minimis harm to other people.

        THE COURT:  It only talks about de minimis harm to --

        MR. HOLLAND:  No.

        THE COURT:  All right.  Well, let's look at it and

see what it says.  You may be right.  Okay.

MR. HOLLAND:  So like *Adams*, for example, I think it's important in the background of *Adams*.  The Court went on at length to note how it accommodated an LGBT student.

The school was not forcing the LGBT student to use a bathroom it was uncomfortable with.  The Court noted how there was a separate single-operation bathroom available.

The point of the background section of *Adams*, I think, is to note -- and the Court really found that important, that the school was not ignoring the interests of that student.

THE COURT:  All right.  So the Rule says that you cannot apply any policy or practice of treating individuals differently or separating them on a basis of sex -- meaning the female-only AA meeting -- in a manner that subjects any individual to more than de minimis harm.

So you can't separate them in a manner that separates anyone to -- it doesn't say put them together.

So if this transitioning male -- and, of course, you know this and I know this, gender dysphoria is often accompanied to a much greater extent that nongender dysphoric populations with self-harm and suicidal ideation.  That's in the DMS-5 (sic); right?  Have you read that?

MR. HOLLAND:  No, I have not.

THE COURT:  All right.  Well, it's in there.  I'll read it -- I have it marked if you want me to read it for the

record.

So this person, this transitioning male, trans --
natal male, transitioning's halfway through and demands to go
in a female AA meeting, or on the female floor in the communal
living, and he is disturbed greatly if that's denied.  Okay.
To the point of well beyond dignity -- sufficiently that it's
more than de minimis harm.  You have to let him in, don't you,
or get sued?  It's more than de minimis harm, we're keeping him
out.

MR. HOLLAND:  Nothing in this lawsuit is going to
stop anybody from getting sued, unfortunately.

THE COURT:  Although the more requirements that you
place on people, the more purchases there are to bring suits.

So answer the question.  The transitioning male, the
natal male who is transitioning but he's not there yet, or he's
there and it's obvious that he's a natal male, okay, and if
he's experiencing more than de minimis harm because you
won't -- they won't let him into the female AA meeting or on
the female floor of a communal living center, then you have to
let him in under the rule.

MR. HOLLAND:  If that's more than de minimis harm.

THE COURT:  Right.  Really?  You don't think that's
bold?  Hey, hey, ladies, move over, here comes the
transitioning male because he's going to slice his wrists if we
don't let him in.  Really?  That's what the Rule says, though,

doesn't it?

        MR. HOLLAND:  I mean, you're making a lot of -- the
Rule just says de minimis harm.

        THE COURT:  All right.

        MR. HOLLAND:  The problem is -- the problem is the
agency set this at a high level of generality and --

        THE COURT:  Maybe that is a problem because here we
are in Tampa talking about what's going to happen at the
communal living center where these sexes must be separated,
according to that affidavit.  These people are not like me and
you and the plaintiffs' lawyers, okay.  They need to be
separated for a lot of reasons.

        But if this natal male transitioning would incur more
than de minimis harm, then he's got to be included in the
ladies wing; right?  If he says, I'm going to slice my wrist --
and I'll read you this suicide data if you want me to read it
to you -- I'm going to harm myself physically unless you let me
into this -- let me be where I'm supposed to be, which is in
the female unit.

        That's what the Rule would require would be for him
to be included, would it not?

        MR. HOLLAND:  Insofar as the covered entity is
intentionally disregarding that person's interests because
they're presenting as in one way -- as one section normally
would when you expect them to present as a different sex, then

that would be a problem, yes.

THE COURT:  All right.  So it would be a problem.
And, in fact, it's a flat violation of the Rule to exclude
someone because of gender identity from a -- what's the right
word -- health program or activity if it caused them more than
de minimis harm.

You don't think that's a really bold thing to tell
these hospitals?  They've got a lot of problems running these
communal healthcare dorms.  These are dorms where people with
behavioral problems live.

Okay.  So the transitional male is included in the
female wing if failure to include causes him more than de
minimis harm; right?

MR. HOLLAND:  The standard is more than de minimis
harm, yeah.

May I move on to something else, Your Honor?

THE COURT:  Of course.

MR. HOLLAND:  If that's okay?

THE COURT:  Go ahead.

MR. HOLLAND:  Because I think we're talking about a
lot of things that I'm not really sure is important, because
all of -- because there is already a class action judgment in a
case called *Neese*.

THE COURT:  I'm very familiar with *Neese.*  It was
just argued, and the argument, if I -- Fifth Circuit; right?

MR. HOLLAND: That's right.

THE COURT: Yeah. So the argument appeared to be, gosh -- Edith Jones appeared to be the presiding judge. And I have my notes. There were two other judges. It appears to be going off on standing or on ripeness; right?

MR. HOLLAND: I have no idea how the Fifth Circuit is going to come out in that case.

THE COURT: It's what they argued about for 42 minutes, because I listened to it yesterday.

MR. HOLLAND: It's the government's position that we hope that the case is -- you know, that the decision is reversed, for a variety of reasons. And we respectfully agree with the *Neese* decision.

But, you know, as of right now, that is a class action declaratory judgment. And my friends on the other side, they've mischaracterized the class definition. We've included a copy of the class certification order on the record. It's attached at ECF 32. I think it's the first attachment.

The definition of the class is all healthcare providers subject to Section 1557. And that judgment already concludes that gender identity and sexual orientation discrimination is not covered under Section 1557.

THE COURT: All right. And here's the problem with anything about *Neese*. I think it -- in fact, I'm sure it did not adjudicate in any way, shape, or form the final rule.

Okay.  It was a predecessor piece.  Okay.

Secondly, I'm telling you I listened to the argument yesterday, and it appears to me it's going off on standing.

All right.  Let's get back to some of these things. Let's talk another hypo.  Precocious puberty.

Okay.  So that is, you know, a nine-year-old male is -- males, you know, go through puberty later than females. So they would give it hormone agonist, or whatever the word is, to try and tamp that down.  The hospital, the clinic does that. Okay.  But they don't do it for gender dysphoria, or for whatever you want to call it, gender-affirming care.  And they just as a matter of policy, we're not -- we don't do hormones, it's off-label drugs, that means that the FDA has not found it to be safe and effective.

The FDA, in fact, in July of 2022 warned about puberty blockers, the use of off-label drugs for puberty blockers.  We don't do it.  We will do it for precocious puberty.

Okay.  Same thing, aren't they in violation if they just have that policy?

MR. HOLLAND:  That sounds exactly like *Ecknes-Tucker*, which is the standard in the Rule.  Again, the standard in the Rule is whether or not the regulation is a pretext for invidious discrimination, which is the same standard for *Ecknes-Tucker*.

THE COURT: All right. It seems to me like it would be in violation of this rule, if they did that. If they said, precocious puberty, yes, gender transition, or whatever you want to call it, preparing for transition -- no, we're not doing that. Seems like that would violate the current rule that brings us here, wouldn't it?

MR. HOLLAND: For no reason, Your Honor, or --

THE COURT: Yes. We determine that we don't prescribe off-label drugs. The FDA has said that off-label, by definition, since they're off label, have not been found to be safe and effective under the FDA's labeling. And on July 1st of 2022, they warned -- FDA warned against using puberty blockers for -- off-label puberty blockers. They're all off label, none of it is approved for gender transition. And we don't do that, period, we're sorry.

MR. HOLLAND: That sounds like a very arguable legitimate nondiscriminatory reason that has absolutely nothing to do with animus for transgender people.

THE COURT: All right. This -- you know, we have all these -- I guess, I'm just old -- all these new language, you know. I never heard of anybody referred to as cisgender until the last three or four years. Now it's in DMS-V (sic), and it's in the case law, gender-affirming care.

To determine whether an injunction's in the -- and the Rule and the HHS endorse gender-affirming care, don't they?

Isn't that fair to say that they suggest it should be a -- it
was -- whatever it might be, it needs to be part of medical
practice, and failure to provide that to people based on their
sexual -- I'm sorry -- their gender identity is likely to be in
violation of the Rule.

MR. HOLLAND:  So I think the proposed rule had a
provision that said something along those lines, which was
removed, Your Honor.  Specifically, the proposed rule had had a
provision that said:  However, a provider's belief that gender
transition or other gender-affirming care --

(Reporter clarification.)

MR. HOLLAND:  Oh, I'm sorry.  I'm sorry.  When I
read -- I'm sorry about that.

However, a provider's belief that gender transition
or other gender-affirming care can never be beneficial for such
individuals is not a sufficient basis for a judgment that a
health service is not clinically appropriate.

That's the statement, Your Honor, that was removed
and replaced with the statement from *Ecknes-Tucker*.  It covered
an entity's determination must not be based on unlawful animus
or bias or constitute a pretext for discrimination.

THE COURT:  All right.  I thought that some of the
comment also referred also to gender-affirming care.

Here's why, Counsel:  You know, all of this -- and
there's case law in *Lapado* -- *Doe versus Lapado* talks all about

it.  All of this talk about -- it seems like gender transition
to -- and the reason I even thought about this is I have to
make a finding whether any injunction's in the public interest.
Okay.

It seems like the talk about gender-affirming care
involves, often as a start -- not always, but for
transitioning, the use of hormone agonists or -- which I think
slows down puberty, or puberty blockers.  And it just seems
among some -- whatever the word is, entities, like a lot of
case law, some case law, and certainly HHS, that that's just
kind of a given and that's part of sound medical practice.
And, you know, the Endocrine Society has these standards, and
WPAF has these standards.

So in the inquiry as to whether an injunction would
be in the public interest, shouldn't I look at that?  What if
all that was just not true and, quote/unquote, gender-affirming
care, which often involves puberty blockers and hormone
agonists is, in fact, not based on good science?  Don't I have
to at least think about that?

MR. HOLLAND:  Well, considering the fact that the
Rule doesn't require anyone to do anything that's not based on
good science, I'm not sure why it would be particularly
relevant to what's in the Rule.  The Rule does not include any
of those standards of care.  And I think it's especially
important when you're talking things like adolescent context

that you're talking about which is -- there's a lot of evidence on both sides. The Rule does not require anyone to make determinations inconsistent with their legitimate nondiscriminatory medical judgments.

THE COURT: On an individual basis. Unless it's like the State of Florida, they're just blocked. And then the State of Florida plainly would be in violation of the Rule, they just blocked them, right, said they can't do it?

MR. HOLLAND: Well, it's true it's on an individual basis, but that's only because the statutory language, Your Honor, says as applied to individuals. But there's nothing in the Rule necessarily that decides either way whether a covered entity could deny to an individual based on a policy that is more broad.

Can we speak about the assurance issues for a second? Because that's what plaintiffs --

THE COURT: Hold on.

MR. HOLLAND: I'm sorry.

THE COURT: We'll get to it.

MR. HOLLAND: I just want to make sure we will have time.

THE COURT: Yes, I want you to have your full say.

MR. HOLLAND: Okay.

THE COURT: And I appreciate very much, you know, you fielding all these errant and wild balls I'm throwing up in the

air.

All right.  You know, the only reason I say this is I'm just -- maybe I don't have to say a thing about it, but let's just tell the truth here, Counsel.  HHS is pushing -- trying to encourage, at least not discourage, gender transition medical care, okay.  I mean, they've changed the Rule.  It's now sort of presumptively part of Title IX.

I guess you put it in there somehow since -- or by way of *Bostock.*  And I'm just not all sure that all -- it's kind of like -- maybe I'm, either, A, a fool, which I'm sure you may believe, or, B, kind of the kid that says the emperor's naked.

I'm -- you know, I'm not at all sure there's many studies that show that puberty blockers and stuff are all a good idea.  For example, the National Health Service in England doesn't give them anymore.  They did -- the National Health Service in England just did what your rule, certainly, and Judge Hinkle in *Lapado* -- both your Rule, to a great extent, and Judge Hinkle's ruling just did the opposite.

And I guess you have no comment on whether gender-affirming care is encouraged or protected by -- in that regard by this Rule.

MR. HOLLAND:  You mean as opposed to, like, individuals for, like, puberty blockers in particular?  No, it does not require the provision of any particular medication or

any kind of treatment.  And it certainly does not do so for,
like, adolescents in particular.  Those are medical judgments
to be made by medical professionals based on the scientific
evidence that Your Honor was discussing.

THE COURT:  Well, for example, in your response at --
oh, gosh, what page is it?  I had to print -- at 37,671, HHS
says, when medically necessary treatments are categorically
excluded when sought by transgender enrollees for the purpose
of gender-affirming care.  That would be my hypo on the puberty
-- or the hormones.  But same treatments are covered for
cisgender enrollees.  Such exclusions may deny transgender
individuals based on their sex.

MR. HOLLAND:  It may, Your Honor.

THE COURT:  Then the next paragraph, to an extent, a
covered entity provides coverage for a particular health
service.  Let's talk about mastectomies.

The covered entity must provide coverage for the
health service to all individuals in a neutral,
nondiscriminatory manner consistent with this rule.

In other words, you can't just say, we're not
removing healthy tissue, we're not doing mastectomies for
gender identity purposes.  As a rule, our hospital does not do
that.  The State of Florida does not pay for that.

It seems like you're requiring --

MR. HOLLAND:  Your Honor, like -- as a concrete

example, like the plaintiffs' brief here, Florida doesn't say they do that for no reason.  Florida says they do that to protect the safety of their citizens.

So is that a nondiscriminatory reason?

THE COURT:  Well --

MR. HOLLAND:  The Rule doesn't answer that question.

THE COURT:  All right.  You had a couple points.  I want to make sure you made all your points.  And let me know everything that's on your mind here.  Have at it.

MR. HOLLAND:  Okay.  You know, so I don't want -- we don't think the plaintiffs have standing for the same reasons as described by the D.C. Circuit in *National Family Planning and Reproductive Health Association v. Gonzales.*  But, frankly, Your Honor, I don't think we really need to get into that in this case, at least at this stage, because what is really at issue is whether the plaintiffs are going to face an irreparable injury during the course of this case.

You know -- and it's not normal and it's not traditionally the case in this country that folks get emergency injunctions just because a rule has been issued.  That's -- my friend on the other side talked about the ripeness analysis, which is just about whether they had the right to a pre-enforcement review, period.

You know, we can disagree on that, but that's a separate issue from whether they're entitled to an emergency

injunction because they've shown irreparable injury that will occur during this case.  And we don't think that they've shown that.  So --

            HE COURT:  So they have to do assurances?

            MR. HOLLAND:  Your Honor --

            THE COURT:  Go ahead.  Go ahead.  Go ahead.  I'm looking at it.

            MR. HOLLAND:  So they don't have to -- first of all, they don't have to do assurances on July 5th.  The plain language of the Rule, Section 92.5 says that an entity applying for federal financial assistance, to which this part applies, as a condition for any application for federal assistance must submit assurance on that form specified by the director.  That they operate consistent with.

            So it's not that they have to have an assurance on July 5th.  The assurance is something that's attached to a funding application.  There's nothing in the record whatsoever that says that anybody in this case is applying for a federal funding grant or anything at any time soon.

            I've been trying to figure this out.  And I just got the reply brief a few days ago.  And I had several other PI oppositions due, and so please respect -- I'm not trying to misrepresent anything, but I honestly don't know the answer.

            Like, for example, Medicaid -- for example, it may well be the case that the assurance they supplied with fraud as

applied to Medicaid from, like, 1965 is still the operable assurance. And this rule wouldn't require them to provide a new assurance, because it's not -- because we don't -- that's not how spending programs work.

THE COURT: All right. And how about the next one, the designated --

And by the way, Mr. Holland, I was thinking about you. I wasn't going to mention this. I hope you get to keep your frequent flyer points because I know you've been busy. So thank you.

MR. HOLLAND: Someone's got to do this, I guess.

THE COURT: And you're defending in the highest -- the highest aspirations of the Bar. So thank you.

Okay. So the next one says they have to designate a 1557 coordinator to coordinate the compliance under the thing -- under 1557. And that coordinator's got to do all this, receives, reviews, processes grievances. So they're going to have to set that up; right?

MR. HOLLAND: Yes, Your Honor. But that's -- there's really not much that's actually at issue in that that has anything to do with gender identity discrimination. The Rule has a whole bunch of requirements that's related to national origin discrimination, particularly for limited English proficient people, how to address, you know, people who don't speak --

THE COURT:  All right.  Well, we're in Florida, we're used to that.

MR. HOLLAND:  Right.

THE COURT:  We speak about four languages here.

The one that's going to take the work is for what Florida law's contrary to, which is the provision of nondiscriminatory healthcare based upon sexual identity. That's the one that's going to take their work.

MR. HOLLAND:  And Florida believes that its policies are nondiscriminatory and based on legitimate nondiscriminatory bases.  And nothing in that section requires them to train on anything else other than that.

THE COURT:  But we both know they're contrary to your rule right now, because they don't even allow payment for hormones, let alone surgery or any of that stuff.

By a fiat, by a uniform, universal rule in Florida, nobody's prescribed -- I know there have been cases that are going up and down, and I don't know what's enforced and what's not anymore.  But their law says, we're not paying and you're not prescribing hormones for gender transition among minors.

So plainly they're in violation of this Rule, aren't they?

MR. HOLLAND:  It depends on whether the law is based on a legitimate nondiscriminatory reason or it's a pretext for discrimination.

Your Honor --

THE COURT:  Just hold on.

So we got the coordinator, which you said is
dominions because it's no big deal.  But then we got to do our
written policies, right, on 92.8, and procedures.  And then we
got a state -- we've got to have a written policy that states
we won't discriminate on the basis of race, color, et cetera,
but also on the basis of sexual identity and healthcare
provisions, we've got to state that; right?

MR. HOLLAND:  I'm not sure how the compliance costs
running more from stating gender identity than it is from
stating race --

THE COURT:  Well, I'm not sure either, but we have an
affidavit in this record that says that guy is going -- that
man is going to have to rework his entire communal residence
facility because no longer can they strictly separate men from
female --

MR. HOLLAND:  Your Honor, that declarant,
Mr. Bailey -- may I have one second to look at this?

THE COURT:  Of course, of course.

MR. HOLLAND:  I'm trying to find what I'm looking
for, Your Honor, but I believe there's some statement from
Mr. Bailey that folks who are residents at that particular
facility -- I understand them to be severely developmentally
disabled residents.  The notion that any of them might be

asking, based on their gender identity, to, you know, be in the
same room with anyone, I don't know if that's very plausible
from the statements that he said.

There's certainly no allegation that anybody in that
facility -- and I think there's only about 300 of them --
identify in a way that's different from their sex.

So I really think it's very, very speculative that
they're going to even have any kind of request from anybody at
that facility that they're going to have to do anything
differently.

And by the way, again, I cannot stress this enough,
the rules do not require the facilities to, like, have
integrated facilities by sex.  And they made up this number
that's an incredible amount of money, and that number is based
on, like, undoing their entire facility.  Even if they
hypothetically had to have somebody, they could just put them
in one room.  That's really the number we're talking about.

THE COURT:  We've already determined that if a
transitioning natal male transitioning to female would endure
more than de minimis harm, he has got to be included in the
female group.

MR. HOLLAND:  Of these developmentally disabled
folks --

THE COURT:  Or any health facility that's regulated.

MR. HOLLAND:  Well, but I don't know if we have a

declaration --

THE COURT:  You and I just agreed on that.  If we have, whatever you want to call it, the female AA group, if this program is female only, but the transitioning male wants to participate, and failure to include him creates more than de minimis harm to him, he must be included.

That's clear from the Rule; right?

MR. HOLLAND:  If it costs more than de minimis harm to him than anybody else.

THE COURT:  Well, I don't think it's in there.  But okay.

MR. HOLLAND:  Well, the Rules says it can't cause any individual more than de minimis harm.

THE COURT:  So we would weigh his harm -- his harm against the ladies'.

MR. HOLLAND:  I think that's a complex situation that is not resolved by any agency action that's before the Court in this case.

THE COURT:  It's certainly a complex situation that's presented by this Rule.  I think it needs --

MR. HOLLAND:  I think --

THE COURT:  -- or -- right?

MR. HOLLAND:  Florida has been being sued over their policies under Section 1557 regardless of anything the Rule has done.  There's lawsuits all over the country directly under

Section 1557.  There's a private right of action.  The Rule has
no ability to create a private right of action.

You know, I don't know if this arises from the Rule,
Your Honor, it's the nature of the ambiguous language "sex
discrimination" which originally was put in the Civil Rights
Act of 1964 and, again, Congress in 2010 reiterated that you
would not --

THE COURT:  Not in Title IX.

MR. HOLLAND:  This is 2010.

THE COURT:  It only says "sex" in Title IX; right?

MR. HOLLAND:  That's the grounds that were -- that's
the grounds, Your Honor, that -- yes, Section --

THE COURT:  Back on the requirements.

So then they have to designate a Section 1557
coordinator who takes care of all this stuff, recordkeeping,
grievances, training on this rule.  And then they have to --
what else?  You know, et cetera.  Do training -- they're going
to have to do training modules, hire some consultant or
somebody in their headquarters to do this training.

Every relevant employee must be trained no later than
30 days after their implementation of the policies or certainly
by next spring.  Then they got to do a notice of
nondiscrimination to everyone.  And I don't know if they have
to post it, including that we don't discriminate in the
provision of health services based upon gender identity.

So, I mean, it's -- you know, it's a little bit more than de minimus, isn't it?  I mean, you know --

MR. HOLLAND:  The compliance clause?

THE COURT:  Yeah.

MR. HOLLAND:  So most of those clause -- I mean, if the Court enjoined, like, the gender identity requirements -- which again, we're not -- the agency is not enforcing those after July 5th, because they are bound by a declaratory judgment in *Neese*.

THE COURT:  If you list that argument, that could be gone pretty quick.

MR. HOLLAND:  I don't disagree with that, Your Honor, but the reality is -- I understand class action judgments to preclude members of the class, but, you know, I don't know -- I don't disagree with you.  But I just don't think that we can speculate about what the Fifth Circuit is going to do, and I don't think we can speculate about --

THE COURT:  We certainly can't.  I agree.  Especially the Fifth Circuit, which is -- the Fourth Circuit used to be that way, and for years I was a -- I hate this term, I'll say it anyway -- white-collar criminal defense lawyer.  And oh, I hated the Fourth Circuit.  I didn't hate them, but I reviled -- is that the right word?  I disliked them intensely.

I didn't mean to dominate your point.  So please make every salient point that you want to bring up that we haven't

gone over.

MR. HOLLAND: I think Florida has conceded that -- I think that they can't protect the interests of their citizens in a suit against the federal government. The case law is pretty clear about that. It's cited in our brief.

Just now in argument they cited this West Virginia case for -- I think that's for standing, not necessarily for an emergency preliminary injunction. They cited their group health insurance plan.

I want to make clear that this Rule does not govern any employee -- any relationship, even if the entity is a healthcare facility or the State, it doesn't cover any relationship between an employer and employee because that's covered by Title VII. And that's right there. And that includes the State's employee's benefits plan, that's right there in the beginning of the Rule application, 92.9(b), provisions of this Rule shall not apply to any employer or any plan sponsor of a group health plan, including but not limited to -- yada, yada, yada -- it's provision of employee health benefits. So those are not at issue in this case.

THE COURT: Managed care plans are like WellCare or whatever; right?

MR. HOLLAND: That's correct. That's correct. But not their State employee benefits plan, which they --

THE COURT: So this rule requires that -- as a

practical matter, it requires those managed healthcare plans to provide nondiscriminatory, defined by the Rule, healthcare services, and to not preclude same based on gender identity.

MR. HOLLAND: So with respect to specifically how it governs those, they're all governed by 92.207. And, yes, the question is whether any particular denial is based on a legitimate nondiscriminatory reason, or in the alternative, it's a pretext for discrimination which is the standard in *Ecknes-Tucker*.

THE COURT: Wouldn't you agree that that's going to be incredibly expensive? Let's just say -- and I think the answer is true.

I don't know the names of these managed care plans anymore, but back in the day WellCare was one, and they had Staywell, and they had Healthy, and they were managed care plans and they were, I think, paid for by the State, you know, and they sort of managed that.

And I'm quite certain the State of Florida has not been paying for gender transition. Okay. This would require that a blanket prohibition on that would not apply and the State would have to at least make those services available through managed care plans make those services available. Whether they're appropriate for any one patient or not remains to be seen; right?

I mean, you're requiring managed care plans in their

panoply of things we will address, it now includes gender transition after this rule, does it not?

MR. HOLLAND: Are we talking about that Section 44 --

THE COURT: I thought you told managed care plans that this rule applies to you now.

MR. HOLLAND: Yeah. I mean, they are covered under Section 1557. So I think that issue is separate.

THE COURT: It's not in this rule?

MR. HOLLAND: No. It is in -- they are covered under both Section 1557 and this other provision.

THE COURT: So you get the thing from StayWell and Healthy, that says, the services we provide, you know, allergy --

MR. HOLLAND: Sure.

THE COURT: You know, yada, yada, yada. It will now say for the first time, health services related to gender identity, won't it?

I'm not saying any one person will get it, but now the managed care plans must provide that as a service. They can't block it as a holistically -- we just don't do it.

MR. HOLLAND: I think it would depend on the reasons why they blocked it holistically. We took the provision out of there. Remember, we took the provision out of the proposed rule that said that -- that said exactly what you're saying.

It's true that a categorical coverage exclusion that

you're talking about from everything creates -- you know, satisfies (b). But then that -- or (b)(4), but then that's subject to (c) as well.

And so it would have to be a pretext for discrimination. It's a standard from *Ecknes-Tucker*.

THE COURT: All right. Don't you think that that -- however you want to say it, that that rule is going to be incredibly expensive? I mean, this is a very expense -- to go all the way, you know, create a neovagina, or orchectomy -- I don't even know all the words. But we know, to go a full surgical transition because of gender dysphoria, that's expensive. I mean, that is some serious health care.

So isn't that going to raise a significant cost to the State if they're paying in whole or in part these managed healthcare plans?

MR. HOLLAND: If the expense is a legitimate nondiscriminatory reason and it's not a pretext for discrimination, then it sales the Rule. And if not it's not --

THE COURT: So they can tell their managed plans, don't do it because it's expensive?

MR. HOLLAND: From the --

THE COURT: We both know --

MR. HOLLAND: -- purpose of the assurance, if they, in good faith, believe both of those things for purposes of the assurance, then they can -- as long as they believe they're not

acting in a discriminatory manner.

THE COURT: So it's a little bit circular what you just said.

So they have to offer these services. And what you're telling me now is -- I mean, I'm sure you agree with me that the full -- that's very expensive. I mean, it's a lot of -- you know, mastectomies the whole bit, Adam's apple, whatever that word is, you know, shaving, that's an expensive piece of medicine. And you're saying that the State-managed care plans must now offer this, aren't you? That must be an incredible -- I mean, these things are going to go way up in price, aren't they?

MR. HOLLAND: The standard is the same as *Ecknes-Tucker*. It's also essentially like -- so I'll say if you look at what Judge Hinkle did in those cases --

THE COURT: I read *Lapado*, yeah.

MR. HOLLAND: I actually haven't had the chance to read *Lapado* in detail because I've been super busy, but I've read *Dekker*.

THE COURT: It's 140 pages.

MR. HOLLAND: Yeah, it's very long. I read the order in the end.

But *Dekker* at least I can say, I don't believe does not necessarily endorse -- the Rule itself does not necessarily endorse how the interests were balanced in that case, but what

the judge did in general, I would say -- so you can disagree with how he balanced those interests, but --

THE COURT:  Is this *Lapado* or *Ecknes-Tucker?*

MR. HOLLAND:  *Dekker*, which I think is consistent with *Ecknes-Tucker*.

But the way the analysis went that -- the first question, is there a legitimate interest.  Second, is there a pretextual discrimination.  That's what the Rule requires.

But the Rule extent decide -- the Rule itself does not decide if Judge Hinkle correctly found on both of those bases.  You know, we think that on the -- separately, like DOJ, the government agrees the Eleventh Circuit should affirm that decision, because we agreed that the record in that case provided that, but that's not what the Rule does.  The Rule just tries its best -- considering a big country full of a lot of different judges and different courts with a lot of things going on -- to try to provide a standard that can make this work and balance a lot of interests.

THE COURT:  For the first time, the standard for managed care healthcare discrimination includes gender identity with this Rule.  For the first time.

MR. HOLLAND:  No.  I mean -- so in our position --

THE COURT:  Did it before?

MR. HOLLAND:  It's always -- it's always prohibited sex discrimination.

THE COURT:  Right.

MR. HOLLAND:  So if any covered entity treats somebody different because of their sex-related traits, that's covered.  And that's why all those lawsuits have gone forward. And courts have agreed with them in many cases, Your Honor.

The Rule -- in terms of written in the text of a rule, it was also in the Rule from 2016 -- I mean, and a court did vacate it, but it has been in the Rule in the past.  But I didn't think there was a preliminary injunction in this case.

THE COURT:  I read *Ecknes-Tucker*, and I'm don't -- not really sure why you cite it because -- two things.  It was an equal protection case, which isn't here, but it also said that -- as I recall, that the preclusion of gender-affirming care withstood rational basis test scrutiny, which is like nothing, you know.  So -- I mean, didn't they say that?

It's like --

MR. HOLLAND:  Yeah.

THE COURT:  -- it withstood the most minimal scrutiny available in the law, in constitutional law.

MR. HOLLAND:  So the language from *Ecknes-Tucker* says that, yeah, it's normally fine, it wouldn't trigger heightened scrutiny unless the regulation -- it would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination against such individuals.

And 92.207 says, a coverage denial or limitation must

not be based on unlawful animus or bias, or constitute a
pretext for discrimination.  That's the analysis.

THE COURT:  It's illegal if it's illegal, is what
you're citing me.  Which they said, here it wasn't and it
withstands -- your proffered reasons withstand the lowest
constitutional scrutiny.

MR. HOLLAND:  *Ecknes-Tucker* actually said the record
didn't -- it was just a functional challenge.  The record
didn't provide a basis like the way that the *Dekker* court went
through.

THE COURT:  All right.  Go ahead.  I didn't mean to
interrupt you.  And I have repeatedly.

MR. HOLLAND:  I appreciate you interrupting me.

THE COURT:  Thank you.

MR. HOLLAND:  You can call it circular, but, like,
that's, like, the state of the -- I think we believe this is
consistent with the state of law, and that's why it's not
contrary to Section 1557.

Where were we?

So on the assurances piece -- so they haven't even
established that they have any kind of assurance due for
anything anytime soon.

I think that the interesting case here to look at is
*Gardner v. Alabama*, 385 Fed F.2d 804, Fifth Circuit 1967.  That
case is interesting for two reasons.

It was a similar dispute from the 1960s over Alabama's concern over filing of an assurance. And the corpus, we said that there really was -- the parties were making a big hoo-ha out of nothing, I would say, because there was a way for the parties to just work together and to write down the assurance, what folks are comfortable with.

And here, Florida is stating repeatedly -- and there is a general good-faith basis for its plan. It says on page 5 of their brief that it's based on health. So if that's the problem, I don't see why something similar can't happen here. I mean, we're really just -- they're just assuming that there's going to be a problem with saying they don't like -- they don't discriminate on the basis of gender identity.

And I know Your Honor, like, doesn't believe this, but that's really consistent -- that statement in the Rule, is with all the other disprobative grounds of discrimination, like race, national origin. And really, that's what it's intended to be about. That section, which is only required to say "assurance of," all of their training programs are really just to restate that principle that treats all people with dignity and respect, treat people for their broken bones. That's what that provision of that rule is.

And an injunction that says --

THE COURT: You and I both know they're treating broken bones all day every day. That's really a straw man.

The question is really whether they're going to treat someone that wants an orchiectomy and he has healthy testicles because he is transitioning to female. That's the question.

And your -- and the essence of your Rule is requiring that as a policy that can't be resolved in the negative.

MR. HOLLAND: Let me skip to the -- if that's the case, Your Honor, the injunction should be not on 92.101(a)(2)(iv), but instead on the provisions of 92.207, which address that question more specifically and be tailored to that issue.

If you enjoin us from enforcing the ones you believe to say that, then let's recover the other type -- don't enjoin gender-identity discrimination wholesale, because that would cover the stuff that you say isn't going to happen, but I think that there are times that it happens.

In each instance --

THE COURT: Not in -- this says 1983, Counsel.

And with all due respect, you know, if a trans woman has testicles and appears at any hospital in Florida with testicular cancer, she is getting treated all day every day in the same treatment as Mr. Football Star at University of Florida.

We're not going to pretend otherwise. You have great arguments. But the broken arm argument is not a good argument.

Anyway. I'm sorry. Go ahead. I'm done

interrupting.

Anything else?

MR. HOLLAND: No, please. I'm sorry, Your Honor.

So I don't know if it's worth going through the options 1, 2, and 3 in plaintiffs' reply brief with respect to the assurances. And again, they don't actually have to submit one on July 5th. They haven't established when they have to submit one. They haven't established that the parties can agree on a language in any assurance.

The option 1 is that the plaintiffs don't say -- the plaintiffs say that they don't mean what they say on the insurance form. Like, I don't -- I don't understand what that means, because I think the parties can come to an agreement about language.

Nothing in here -- like take CNA, for example. If CNA lenders have a religious objection, they can rely on all kinds of religious statutes and freedom laws and they write an assurance, we're not doing this for religious reasons.

The plaintiffs can -- nothing in the Rule says that we can't write on the form. There's a form from the director, and the -- but the form is modifiable, under *Gardner v. Alabama*, that's basically what the court said.

So, you know, we can come to a practical solution. It doesn't require an injunction. Like, but given the realities of this here -- right? -- like, all of their policies

are kind of before the section -- the Eleventh Circuit.  Right?
If we're talking about Florida, this is all before the Eleventh
Circuit on what the statute means.

So as an absolute practical matter, for this Court to
be issuing, like, injunctions that kind of, like, conflict with
that and they override them, it's before the Eleventh Circuit.
And we've kind of suggested in our briefing in footnote 18,
like, the likelihood that this even gets any kind of
enforcement action while that's all pending before the Eleventh
Circuit seems pretty speculative.

You know, I don't know if that's -- if that makes a
lot of sense, Your Honor.  But anyway.

You know, similarly, they say they're going to have a
false act claim, but that only requires a -- that would require
a knowing violation of the Rule.

They are asserting in their briefing and before
*Dekker* and before the Eleventh Circuit, as well as I understand
it, they have nondiscriminatory reasons for their policies,
which is what the Rule requires.  So I don't know why they
would have to make a knowing violation of anything and be
subject to False Claims Act liability.  It seems incredibly
speculative.

They, of course, can defend any False Claims Act
claim, they have an adequate alternative remedy at that suit to
defend that.

But they also invoke the -- the option 2 is to not file an assurance. And they don't have to file an assurance. What happens if they don't file an assurance? It's like *Grove City*. This wasn't an emergency injunction to the rules that were issued in the 1970s, that's not what it was at all. They let the process -- the courts let the process move forward, applying traditional equitable principles waiting for real irreparable harm.

There was a multiyear process in which there was a negotiation, there were hearings, and ultimately there was a decision to terminate funding. And the statute provides a way to stop that if it's imminent, for an Article III judge to stop that. That's what happened in *Grove City v. Bell*. That's what we're urging the Court to do, is the normal -- is permit the normal process to go forward if they want to do that.

Of course, we think we can potentially come to an agreement on language. We haven't even tried.

What was I going to say?

So *Grove City,* I don't see how that helps them at all. I mean, they talk about chamber -- star chamber proceedings or something like that. I wouldn't characterize those like that at all. But ultimately it's kind of irrelevant, because this -- the notion that having to pay for administrative proceedings as an irreparable injury has been squarely rejected again and again by the Supreme Court. And

that's essentially what they're trying to argue in *FTC v. Standard Oil*. The Supreme Court said -- you know, the plaintiff had argued that the expanse and disruption of defending itself in protracted adjudicatory proceedings constitute irreparable harm.

As indicated above, we do not doubt the burden of defending this proceeding will be substantial, but the expense and annoying means of litigation is part of the social burden of living under government. As we recently reiterated, mere litigation expense, even substantial --

(Reporter clarification.)

MR. HOLLAND: I'm sorry. I'm sorry.

Even substantial and recoupable cost does not constitute irreparable injury.

So what they're saying, there is no consequence for not complying. Right? There's no like -- this is not a statutory scheme like in the ones they cite where they're subject to retroactive liability.

The consequence for noncompliance is eventually potential termination of funding. But Congress contemplated this when it set up the enforcement scheme, and set it up with equitable principles in mind, and set it up in a manner where -- I don't think Congress wanted these emergency injunctions. They wanted to permit this to be fleshed out a little bit more, to flesh out whether or not there's really a

problem.

The *Dekker v. Doe* cases, I think they have implications here, too, for the balance of the equities and for standing. You know, as my counsel on the other side kind of admitted, I mean, they're enjoined from enforcing a bunch of their laws against a whole class of people.

Then they've got their group health policy, which is not covered by the Rule. Then a bunch of their other policies they've told the *Dekker* court that they're not enforcing categorically, and they're on a case-by-case basis. It's hard for me to even figure out, based on the record, what is even left.

THE COURT: The correct word is "mess."

MR. HOLLAND: It's a huge mess.

But, like -- there's nothing like -- and frankly, let's be perfectly honest with each other -- right? -- if whatever's left -- if they were actually denying anybody based on whatever's left, I'm sure that person would run to court and try to get an injunction and lawsuit too. So I doubt that there's really any actual concrete standing interest that's left when you consider all of the stuff that's going on.

It's all just kind of -- you know, I understand these are very salient, political, moral issues, or whatnot, that folks are very interested in. But in real life, like, what are we talking about? I don't know.

This has been covered in so many different ways by the *Neese* court that's binding on us. And so we're not going to conflict with the declaratory -- we're not going to do something that violates the declaratory judgment. Judge Scalia in the DC Circuit, footnote 8, in *Sanchez-Espinoza v. Reagan,* reiterated that a declaratory judgment, when it's against a federal official, it must be treated like an injunction. It must be treated as seriously as an injunction, because it's expected that the federal government will follow the law.

And here, we are not -- my client is not going to enforce any aspect of the Rule so as to violate class members in *Neese*.

And every person in this case -- that covers everything in this case, except for -- except for Florida in its capacity as a coverage provider of those Medicaid stuff, which I'm not even sure, again, is at issue, given what they've said to the *Dekker* court.

So -- and the easy thing, too, Your Honor, I mean, there are these issues of preclusion that allows at the moment of class certification.

You know, that -- if you read -- you might be familiar with *Mann Manufacturing v. Hortex*, F -- 439 F.2d 403, Fifth Circuit 1971. That's like the first of a progeny of cases that deal with duplicative lawsuits.

The question for the second filed court is whether

there's a likelihood of substantial overlap between the two
suits.

And related to that, I know you asked my counsel --
my friends on the other side about the ACP lawsuit.  You know,
similarly -- they characterize that as a challenge to the
notice and this as a challenge to the reg.  But the problem
with that is that's not what the --

THE COURT:  The Tennessee piece?

MR. HOLLAND:  I'm sorry?

THE COURT:  The Tennessee --

MR. HOLLAND:  The district court's decision that is
now on appeal before the Sixth Circuit --

THE COURT:  Yeah.  I'm sorry.  I didn't mean to
interrupt, but I think both sides have said it's moot.  I
looked at the docket --

MR. HOLLAND:  That's true, Your Honor.  But the Court
hasn't vacated the district court's judgment.  And the reasons
that the parties say they're moot are different.  And that's
relevant, because our mootness argument is essentially a
standing argument.  The mootness can depend on what happens
during the -- the reason the government thinks it's moot is
because the -- for the same reason the Supreme Court just said
in *Alliance* last week.  There's -- the Rule provides so many
avenues to protect religious liberty that they couldn't
plausibly have an injury.

That's -- they say it's moot because now there's a new rule.  But the problem with their argument -- they might have good arguments on that if both of these cases were just like APA cases and the relief requested was, like, targeted to specific agency actions.  In neither case is that true.

I mean, we would dispute whether the notice is a reviewable agency action.  But I think partially because of that -- partially because of that.  In both cases they seek the exact same relief.  And that relief -- their declaratory judgments that the -- exactly like the *Neese* declaratory judgment that just says gender identity discrimination is not covered by Section 1557.  That type of order is untethered which -- to any agency action, which is also consistent with the --

THE COURT:  It came before the Rule.  So I'm not sure -- I understand your point, but I'm telling you, *Neese* did not adjudicate this rule.  They adjudicated, I guess, the concept.

We'll see what happens, because you don't know what happens when you listen to oral arguments, but it sounded like it was going to go off on standing.

MR. HOLLAND:  The Rule is -- governs how HHS will enforce the statute.  So the fact that the -- that *Neese* covers the statute, and the fact that --

THE COURT:  What statute?

MR. HOLLAND:  Section 1557.

THE COURT:  Oh, it does interpret that, you're right.

MR. HOLLAND:  And that's why we're not going to --
that's why, despite the fact that the rule came out, as we
emphasize in footnote 118, we are not going to enforce this
rule.

THE COURT:  Right.  I understand that.  I appreciate
it.

Hold on.  The court reporter needs a break.

So why don't we do that, and let's all get super
concise here and see if both sides can button up on this stuff.

Can we sort of do ten minutes?

All right.  Thank you.

(Recess 4:21 p.m. to 4:28 p.m.)

THE COURT:  And by the way, I know this is work for
both sides.  And this will sound weird.  What we're doing now
is the most enjoyable part of my job.  So it's work for you-all
and it's stressful.  I've been there, you know, up last night,
you didn't sleep well, you got some caffeine going.  But I --
because it's such a high level, you guys are such good lawyers.

So thank you.

All right.  So, Mr. Holland, we were back with you.
You have any other comments, we want to hear them.

MR. HOLLAND:  I just want to make sure I addressed
all the Court's questions, and I think I lost, unfortunately,

my notes on that.

THE COURT: Okay. The PI versus PI stay, it seems to me that it's kind of a difference with no difference.

MR. HOLLAND: I think plaintiffs think that it means something that I don't think is real. So in our opinion they are the difference with no difference.

If you read, like, *Abbott Labs v. Gardner,* for example, at the end it calls a 705 stay a stay of enforcement. You know, they think it's some kind of, like, magic wand that deletes things from the federal register.

In reality, you know, we are the defendants in this suit. We're just not going to enforce the provisions of the Rule. We're just going to comply with your order. It's not about deleting things. That's really not how it works, as far as I know.

It's -- *Abbott Labs* -- I'm sorry. *Abbott Labs* refers to a stay of enforcement. I also think the Court can just consider -- the plain language of the statute kind of doesn't really provide any support for this notion that it's, like, interim vacatur. It really just mirrors the exact language from a preliminary injunction. It says, to the extent to prevent irreparable injury, the Court considers delayed effective date or to preserve status or rights pending conclusion of the review proceedings.

So it's really, in our view, exactly the same thing

based on this plain language of the statute.

You know, the Supreme Court in *Sampson v. Murray* in a footnote said that this was not intended to be some magic tool to provide district courts with new tools to interrupt things. It's really exactly the same as a preliminary injunction. So we agree, it's a distinction without a difference.

And related to that point, we think that -- at a minimum, if there's any relief granted here, it should be limited to the parties, specifically the parties that have shown irreparable. It should really be as a matter of balancing equities, which is separate from likelihood of success, unlike challenging a particular agency action. But, like, in that aspect of this, the Court can really narrow the relief.

THE COURT: Are judges still doing, like, nationwide injunctions? I saw there was a Title IX injunction multistate, but it had multistate parties. The thought of doing -- just -- just a level of boldness that just is -- that ain't happening. I'll never do that.

MR. HOLLAND: We would suggest that, you know, the association presents really complicated questions, too, as Justice Thomas pointed out in his concurrence recently in *Alliance*.

You know, we don't know who these 2,500 people are. I'm sure they're all good people. But they haven't shown

irreparable harm.  And for the plaintiffs to be able to bypass Rule 23 and get an injunction this way just doesn't seem consistent with the requirement that they show irreparable harm, and that the injunction is tailored to that irreparable harm.  I will just note that.

The other thing I think I did want to touch upon is what the plaintiffs call 1557 preclusion.  I think the Court -- I mentioned *Gardner v. Alabama,* which is a case that's really interesting for assurances.  It's also really, really, interesting on this issue as well.  And I think it's binding on this Court.

THE COURT:  Sure it is.  It's a circuit before 1981.

MR. HOLLAND:  Sure.  But a lot has happened since then, so I just don't want to premise it --

But, you know, it actually addresses the Title VI, which is, again, one of the enforcement mechanisms incorporated by reference in Section 1557.

And in that case -- you know, again, it was later in this process than, like, immediately after our new rules came out, because that's not how historically this has ever happened.

But the plaintiffs did challenge the regulation itself.  Alabama challenged the regulation itself, both in district court and in the Court of Appeals.  And the Court of Appeals said that they were required to go through Section 604

of the Civil Rights Act, which is kind of the mirror image of
Title IX's judicial review provision.  And they're exactly the
same.  So I don't know if 1557 incorporates one or the other,
but it kind of doesn't matter, and I think that is potentially
the intention.

But that case said that they were required to go
through that, even for the Rule challenge.

The Court considered *Abbott Labs* and *Toilet Goods*,
the ripeness cases -- I'm sorry -- which had just come out
apparently earlier that year, and said they didn't apply.  The
Rule challenge must be brought consistently with, you know, a
request to stay a termination of funding, because it's all
inexplicably intertwined with one another, effectively, I
think.

And also what's really interesting about that opinion
is it really construes the language of the statute, which I'm
just trying to pull up.  Which my friend on the other side in
their reply brief of kind of just says the language -- the
first sentence says, any department or agency action taken
pursuant to Section 1682 of this Title, which is like the
anticipated enforcement that they're -- they think is going to
happen -- shall be subject to just such judicial review as may
otherwise be provided by law for a similar action taken by such
department or agency on other grounds.

Now they construe that to mean that they can just

challenge the Rule under the APA.  The way that the Fifth

Circuit -- the former Fifth Circuit in 1967 interpreted that

is, it's really actually going to depend on what is the federal

program that is -- the problem's associated with.  So that if

the assurance was submitted with the Medicaid application,

which I think it was in the Alabama case, then you actually

have to look to the, like, Medicaid statutory review provisions

to see whether or not there is a, like, special statutory

provision.  It's not just, like, a way to bypass the APA.

Which, again, the APA also has its own provision that says

nothing here, you know, bypasses a specific provision that

Congress has put forward for judicial review.

So I think that's an interesting opinion to take a

look at.  I hope I'm interpreting it correctly.  I think I am.

And kind of related to this point -- and this is kind

of related to everything.

The agency did the best it could, I think, to balance

a lot of these interests and put forth standards that hopefully

people could apply, and they might apply differently in

different areas.  And the agency is going to, as they're

required to, enforce the law of the circuit.  It might be the

case that the Seventh Circuit and the Fourth Circuit have

different -- like, a different application of some of these

principles than others.  And the agency's -- under existing

law, they need to apply the law of the circuit on these things.

If *Adams* counts as that, *Adams* counts as that.

And I want to say, the Rule does not reflect agency actions with determinations on any of these issues we've talked about today.

So, insofar as what the plaintiffs are really seeking is all these determinations on how sex discrimination applies in these kind -- in these -- in these ways, I just encourage the Court not to issue -- not to think that at the end of this case it would be appropriate to kind of construe this in a manner where -- that we've written out of the statute the judicial review process. The process that Congress intended in, for example, 20 USC 1683, for folks to seek judicial review of agency decisions on particular issues. Otherwise, everyone would just run to court immediately and get an injunction based on their belief about how the agency is going to enforce something.

And that's really -- I think that would not be consistent with what Congress intended here, which was -- it would render this entire section surplusage. No one would ever go through this proceeding. You'd never utilize this proceeding if folks could just come to court and get an injunction.

THE COURT: What's the name of the case, Roper -- *Loper*, that the Supreme Court -- I don't know if they'll say a thing, but isn't that sort of in this APA bailiwick, *Chevron*

*Percenter* coming out like tomorrow maybe --

      MR. HOLLAND:  -- yeah.  They could get rid of *Chevron* tomorrow for all I know.  I don't know if that has anything to do with anything we're talking about.

      THE COURT:  But it's worth reading.

      MR. HOLLAND:  For that reason -- yes.

      But for that reason we're not claiming like *Chevron* deference.  And that's why the Rule -- it doesn't -- it just tries to put forth standards that we think are consistent with the type of civil rights jurisprudence, *McDonnell Douglas,* that is reflected in the language of the Act.

      So I think that's basically everything I had.  I'm sorry if I took too long.

      THE COURT:  I sure appreciate that.  And I appreciate your patience with a judge asking questions from all forms of the field.

      Before we get -- Ms. Pope, I did have one question for you.  So I guess I hadn't focused on this -- and then I'll give you all the button up, whatever you want.

      And I know there was an affidavit from, I guess, your member, and he was in Tennessee or someplace.

      So you have members outside the Eleventh Circuit; right?

      MS. POPE:  Yes.

      THE COURT:  All right.  So that -- that might be an

issue, because, you know, either *Adams* does apply or doesn't
apply or it's not relevant.  And, of course, that only goes to
three states in the Eleventh Circuit.

So I would be adjudicating the conduct or the
umbrella or whatever it is of some member in Hamilton, Ohio,
and it might not apply to the person across the hall at the
hospital; right?

MS. POPE:  If you -- yeah.  If you had an injunction
against CMA members and the other person across the hallway --

THE COURT:  Yeah, he's a Baptist.  So he's not
covered?

MS. POPE:  Correct.

THE COURT:  It's a little spotty sort of, kind of.
But I'm going to give you all some homework.

So think about that.  Okay?  It would be a little
weird, like this guy or lady, I'm protected.  Good luck,
Mr. Baptist, or whatever.  You know what I mean?

MS. POPE:  They could bring a suit as well.  So it's
not like they, you know, have no relief, but --

THE COURT:  Right.  It's just -- so there would be
differing behavioral requirements that -- so if you must know,
the hospital in Hamilton is called Fort Hamilton Hospital.
Okay?  So the doctors -- that's the public hospital.  The other
one is Mercy Hospital, Catholic.

So the doctors at Fort Hamilton Hospital or Mercy,

some would be covered. At Mercy would be more covered since it's run by the archdiocese, and at Fort Hamilton fewer would be covered. Just seems not real settling, you know?

MS. POPE: Yeah, I understand that. I think -- I mean, we do take the position that the APA allows you to just stay the effective date of the Rule and that would give relief to all of them. But if you were -- it sounds like you are more comfortable with a more narrow remedy of just --

THE COURT: No. I don't know yet.

MS. POPE: Okay. Well, that's one option. So you wouldn't have that outcome where a doctor across the hall wouldn't be covered because they're not a CMA member.

THE COURT: I don't understand your point about stay either. Stay the whole thing? Like from -- like stay it in Anchorage, Alaska, too?

MS. POPE: Well, the APA says stay the effective date of the Rule. So --

THE COURT: Nationwide?

MS. POPE: From the plain text, that's what it says. I understand your --

THE COURT: FYI, I am very, very unlikely to stay a rule in Poughkeepsie, wherever that is, New York, when I don't have anybody in Poughkeepsie in front of me, just FYI.

Anyway --

MS. POPE: Understood. Yes.

THE COURT: So plaintiffs, button up. And just remember, all good lawyers are concise.

So what do you have to say?

MR. CONDE: I'll try to be brief, Your Honor.

So I think we heard a lot about sex stereotypes. This is not what this challenge is about. There's a separate definition that says on the basis of sex includes sex stereotypes.

The problem is that biology is not a stereotype and that's why they need gender identity in this roll.

Then we heard a little bit about what I call the chameleon theory of Title IX, which is that Title IX means something different when it's incorporated into 1557. That actually was not defended at all in their briefs. They sort of allude to it and say, well, it's not clear that it means the same thing. But that just means we win under the clear statement canon.

So on what the Rule does and what it doesn't, there was a lot of back and forth. I think it reminds me of the statement by the chief justice where he said, judges are not supposed to exhibit a naivety from which ordinary citizens are free. I think that's what the government is asking you to do here.

The entire point of the Rule is to set forth presumptions, so they -- you're presumably guilty of

discrimination.  This is not what *Ecknes-Tucker* is about.  In fact, *Ecknes-Tucker* says you are not presumably guilty.  You can't make a prima facie case this way.

It is the government's burden -- or the plaintiffs' burden to put forth evidence that you are ambiguously discriminating, that your reasons are pretext.  It's not the defendant's burden to show he's innocent.  That's what the government is trying to require here.

We know what they mean by "pretext."  They say if you say it's experimental, that's pretext.  If you say, you know, I'm not willing to refer, that's pretext.  So we know they have a vast concept of what that means.

And this is not decided by judges, this is decided by HHS employees.  And then the facts are reviewed deferentially by judges under the substantial evidence standard, which the Supreme Court has said, given a scintilla of evidence is good enough.

So they say you're presumably guilty, and then they say, all we need is a scintilla of evidence that you were -- you had a pretextual reason for this, and then we can defund you.

So this is what the Rule is actually about.

And then on *McDonnell Douglas*.  This is nothing like *McDonnell Douglas*.  You don't need a similarly situated individual here at all.  That's the entire point of our second

argument.

Let's see, the government talked about an old Fifth Circuit case about preclusion. I don't remember any discussion of that case in their brief. In their preclusion section there's actually just a footnote. We discussed preclusion extensively, and I think the Sixth Circuit's opinion is actually quite persuasive on this point. So I would ask the Court to look at that.

We talked about Rule (b)(3), this is the de minimis harm rule. So there is no countervailing risk there, there's just a strict liability rule. I don't know -- I don't see any countervailing policy considerations coming in.

Then we talked about *Neese.* I agree, Your Honor, it's going to be dismissed on standing grounds.

THE COURT: Maybe, maybe -- you never can tell.

MR. CONDE: I'm fairly confident.

THE COURT: I mean, I listened to it yesterday. It sure sounds like it's going that way.

MR. CONDE: It doesn't seem the doctors are going to be asked -- or have a likelihood of success on showing that they're providing gender transition services. At least that's what the Court seems to think.

But even if that wasn't right, the class doesn't protect Florida. It doesn't protect ACA. It doesn't protect DMS.

And I was just talking to the general counsel for the agency for Persons with Disabilities, who's looked at the record in that case. He doesn't think he's covered by the class. He doesn't think he's covered by the class because the motion says that it is healthcare professionals moving to certify a class. APD is not similarly situated to the physicians in that case. So we don't think that that class certification actually covers this.

Then let me talk about DMS. I heard something about DMS somehow not being covered. It is a covered entity. We established that in the affidavit. It is an insurance issuer and it receives funding from the HHS. So it's clearly covered by this Rule.

We heard a little bit about science. I think on the science I would agree that the -- we'll say the emperor is naked.

I have here a list. This is Appendix C, Table 2, Version 8 of the WPATH past standards of care. They hide this in the very bottom of the standards. And it includes all the risks that you face if you go -- if you take these testosterone regimens to transition.

Polycythemia, that means --

THE COURT: Yeah, you cited that. I read it.

MR. CONDE: Yeah. So all those -- there's definitely a lot of risks. We think the evidence of a benefit is

completely speculative.

So on the balance of interests, I don't think the Court needs to take into account the science. What I would say is that here I think there's an interest in federalism. There are 21 states who don't agree with this and are not permitting these experiments. There are others that are permitting it. And the government here is essentially trying to use the power of the purse to coerce all the states it disagrees with to agree with the other states.

So I think the public interest here is in allowing the states that want to try this to try it, and those that don't, no. And then we'll find out whether this actually works or not. That's the point of federalism.

So just a couple more points. I think -- we talked about the Eleventh Circuit cases that are pending. I think that actually supports preserving the status quo, because, as I mentioned, the acting assistant -- sorry, the assistant attorney general for the Civil Rights Division is relying on this rule in that case to say, well, you know, the plaintiffs here should really win, because look at this rule.

THE COURT: *Dekker*.

MR. CONDE: In *Dekker*, that's right.

So I think that case just supports a stay to, you know, keep the status quo so the Eleventh Circuit can adjudicate the case.

I think that's all I have.

THE COURT: Ms. Pope, so there's nothing in the record that shows that you have members in Florida, or is there?

MS. POPE: There is, Your Honor.

And Dr. Akey, she's an exhibit -- she's a declarant with an exhibit.

THE COURT: Yeah, I read that.

MS. POPE: Yes. Yeah, we do have members in Florida.

THE COURT: It's just, I'm -- I -- you know, it's like any other bad virus. So some judge -- and let's face it, you know, judges have whatever you want to call it, philosophies. Some judge that has a left wing, what I'll call a left wing philosophy, enjoy something nationwide. And then some judge what I'll call has a right wing philosophy, it's just like, wow, that's bull.

So I'm not that confident to do -- to enjoin somebody in Kansas City when they're not in front of me.

Okay. Anything else from the plaintiffs' side?

MS. POPE: Just to address what you were just discussing.

THE COURT: Yes.

MS. POPE: We aren't seeking a nationwide injunction. We are only seeking it for CMA members. So that would be around 2,500 members. A lot of other doctors and covered

entities -- everyone else would not be covered, other than, obviously, Florida here.

I'd also like to address, opposing counsel mentioned the conscience exceptions. There's no general exception for noncompliance for religious reasons. The statute -- the Rule simply refers to already existing federal conscience protections, and those are not -- those do not apply in all the circumstances that the mandate would.

For example, most of them are limited to abortion, and they're specifically sterilization procedures. The church amendments are limited only to individuals. So Dr. Van Meter would still have to -- he's a small business --

THE COURT: You pointed that out. For his clinic.

MS. POPE: Yes.

So it only applies to individuals. And it also would only apply to when we are treating patients who are being federally insured rather than privately insured.

RFRA also doesn't -- isn't as broad as opposing counsel might suggest. It would only restrain HHS, not private facilities. So the doctors who are employed by hospitals would still be affected by this rule.

And HHS isn't promising to not enforce the Rule against -- not promising to force the hospital to not force their doctors to comply.

And also, most of our doctors' businesses, those that

own their own practices, they're not specifically religious. So RFRA wouldn't cover them either.

On top of it, you would -- you know, it's a balancing test with the compelling government interests. There's no certainty about whether that exemption would be allowed or not.

Addressing the other two cases, *Neese* and the *Tennessee* Sixth Circuit case. You're right, both of those are about different rules, not 2024 rules. So they don't really matter here.

Also, *Neese* is just a declaration and it might be reversed on appeal, at which point HHS would likely enforce it.

And as for the *Tennessee* Sixth Circuit case, the parties agree it's moot.

Associational standing doctrine is still good law. I know Justice Thomas thinks differently, but he acknowledges that it's good law even if he doesn't agree with it.

*Neese*, on facts that our doctors as a whole and certain individual doctors like Dr. Van Meter, Dr. Akey, are harmed by this rule, and we're entitled to represent their interests under current law.

Dr. Van Meter is a member of CMA, he's before this Court as a member of CMA, and he is seeking relief from this rule even though he doesn't reside in Florida. And this Rule is making him choose by July 5th whether he is going to violate his conscience or violate the Rule by performing gender

transition procedures that he doesn't agree with, that is not good science, and that violate his own conscience.

CMA also has members in Florida, so if you are not willing to, you know, give relief to members outside of Florida, you certainly should give relief to CMA's members within Florida's borders in the Eleventh Circuit.

And again, this wouldn't be a nationwide injunction that we're requesting, it would just be for CMA's members.

In addition, I believe you're correct that all the examples that you gave Mr. Holland would be in violation of the Rule as it's written. He's certainly not disavowing that they would enforce it in those circumstances.

And these doctors are not presenting hypotheticals. These are real, in fact, situations that they're dealing with right now. They will have to make assurances, take down current policies, add new policies for those new businesses come July 5th. And come July 5th, individual doctors will have to perform procedures for gender transition purposes if they provide them for other purposes. And they cannot do that under their consciences. So we're requesting an injunction for those reasons.

THE COURT: Thank you, both sides.

Now, there's no rest for the weary. So here's your homework. Okay? And I said previously, you know, 5:00 today or whatever. Okay.

By Wednesday get me the order you want me to sign. Okay? Something that you think -- and let's just tell the truth here, that you think the Eleventh Circuit will just smile when they see it. Okay. Wednesday. Close of business.

Okay. One other piece. I'm not sure about the bit about an injunction has to be in the public interest or whatever. And this is a little unusual. So I had many years ago, before you all were even in school, one class in biology in freshman year at college. So I am not -- I have no knowledge. And a little learning is a dangerous thing, as Alexander Pope once said.

So, you know, all this talk about all this, I know nothing about it, of course, and I don't want to go outside this record or anything like that because it's not fair.

So yesterday I typed into Google "hormone treatment for children with genital dysphoria." What comes up? So this is -- I'm telling you what I did. And the first thing up was this article. And, you know, I'm not a scientist, okay, in any way. I assure you. It's -- it seems pretty convincing.

It just surveys all the studies, and you know you want something new. So it's January of -- I'm sorry -- it's 2023 -- okay? -- when it's published. And it basically says -- you know, they looked at all these studies, they surveyed all these studies -- and, of course, it's conducted by -- it looks like it came through Sweden. And just basically said, this

stuff don't work, okay.  The emperor's naked.

So you have homework to do.  Okay?  I'm going to put one of these in the record -- I'm not saying -- you might say -- with your homework you might say, oh, all these are mouth to bank, they don't know what they're talking about.  Or this has been disproven.  This was a fraudulent study.  I have no idea.

But you're -- in addition to your homework, I'm going to give Mr. Gooding-Butts three copies.  Well, I have more than that, I have five.  He's going to put one in the record and give you-all one.  I want you to critique this by close of business on Wednesday.  And you can just say, well, it's all a bunch of nonsense or, of course, it's true, or we don't know, it's irrelevant.

But, you know, it's a new study, and it basically says, hormone treatment as gender-affirming care is, frankly, like -- I'm not going to say phony, but it's very critical of that practice, which seems to me to be -- notwithstanding Mr. Holland's protestations it's irrelevant, it didn't happen. It seems to me an important part of what HHS is trying to do here is to invoke an ordinance of, among other things, gender-affirming care as part of the federal healthcare system.

So I may be wrong on that.  I know that Mr. Holland makes a good argument that it's just, you know, nondiscrimination, and that's not what we're trying to do.

So that's your two assignments, the draft order by close of business Wednesday.

I will have an order out for you all by July 3rd. And then critique this. I don't need 30 pages. You could do it with three pages. Okay. Read it and critique it.

You know, it's like, wow. But maybe I'm just -- maybe it's a junk order -- a junk article, or maybe I'm just reading it wrong.

Now, finally, I know that none of you drank, but if you're partaking in soft drinks this evening, you should toast yourselves for a fantastic presentation with forensic skills that are as high as any I've seen. So thank you both sides.

Good day.

MR. HOLLAND: Judge, can I ask a question? Sorry. The critique also Wednesday close of business?

THE COURT: Yes.

MR. HOLLAND: Thank you.

THE COURT: Because I've got to get something out here if you want something by July 3rd.

(Proceedings adjourned at 4:57 p.m.)

1                    **CERTIFICATE OF REPORTER**

2    STATE OF FLORIDA

3    COUNTY OF HILLSBOROUGH

4        I, SUSIE K. CAYLER, FCRR, RPR, do hereby certify that I

5    was authorized to and did stenographically report the

6    foregoing proceedings; and that the foregoing pages constitute

7    a true and complete computer-aided transcription of my original

8    stenographic notes to the best of my knowledge, skill, and

9    ability.

10       I further certify that I am not a relative, employee,

11   attorney, or counsel of any of the parties, nor am I a relative

12   or employee of any of the parties' attorneys or counsel

13   connected with the action, nor am I financially interested in

14   the action.

15       IN WITNESS WHEREOF, I have hereunto set my hand at Tampa,

16   Hillsborough County, Florida, this 24th day of July, 2024.

17                              _/s/ Susie K. Cayler_
                                Susie K. Cayler, FCRR, RPR
18                              Federal Official Court Reporter
                                United States District Court
19                              Middle District of Florida

20

21

22

23

24

25